1                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF VIRGINIA
2                        ABINGDON DIVISION

3   UNITED STATES OF AMERICA,

4                     Plaintiff,
                                     No. 1:17-mj-143
5       vs.                         Abingdon, Virginia
                                    September 5, 2017
6   JOEL A. SMITHERS,

7                     Defendant.

8         TRANSCRIPT OF PRELIMINARY EXAMINATION PROCEEDINGS
               BEFORE THE HONORABLE PAMELA MEADE SARGENT
9                   UNITED STATES MAGISTRATE JUDGE.

10  APPEARANCES:

11  For the Government:

12  STEVEN RANDALL RAMSEYER
    United States Attorneys Office
13  180 West Main Street, Suite B19
    Abingdon, VA 24210
14  276-628-4161


15


16  For the Defendant:

17  CHARLES YANCEY SIPE
    O'Hagan Meyer, PLLC
18  411 East Franklin Street, Suite 500
    Richmond VA 232219
19  804-403-7127


20


21  Transcribed by:   Carol Jacobs White
                      Registered Diplomate Reporter
22                    P.O. Box 182
                      Goode VA 24556

23


24      Proceedings recorded by FTR; computer-assisted transcription.

25

1          (Call to Order of the Court at 3:06 p.m.)

2               THE COURT:  The Court has before it this afternoon the

3     case of *United States of America versus Joel A. Smithers*.  It is

4     Case No. 1:17-mj-143.

5               Mr. Smithers appeared before the Court based on his

6     arrest back on -- give me just one moment -- on August the 15th.  I

7     appointed counsel for him for the proceedings that occurred that

8     day:  the initial appearance and the bond hearing.

9               It was set over for today for a preliminary

10    examination/probable cause hearing.  And prior to this hearing,

11    counsel has now entered an appearance on his behalf.

12              Mr. Sipe, am I --

13              MR. SIPE:  Sipe.  Yes, ma'am.

14              THE COURT:  -- am I saying it correctly --

15              MR. SIPE:  You are.

16              THE COURT:  -- Mr. Sipe.

17              And, Mr. Sipe, you are entering a general appearance in

18    the case; correct?

19              MR. SIPE:  Yes, ma'am.

20              THE COURT:  All right.  So I will make sure that an order

21    is done releasing Ms. Dickenson from any further service in the

22    case.

23              And you are present today and we're prepared to go

24    forward today with the probable cause hearing; correct?

25              MR. SIPE:  Yes, ma'am.

```
 1          (Off-the-record discussion between Court and clerk.)

 2              THE COURT:  All right.  Is the government prepared to

 3      proceed, Mr. Ramseyer?

 4              MR. RAMSEYER:  Yes, Your Honor.  The government relies on

 5      the affidavit submitted with the criminal complaint.

 6              THE COURT:  All right.  I have the criminal complaint

 7      before me and the affidavit.  And, of course, it was sworn to

 8      before me.  So I have that.

 9              All right.  Is the agent here who swore the complaint?

10              MR. RAMSEYER:  Yes, Your Honor.

11              THE COURT:  All right.  Mr. Sipe, would you like to call

12      the agent with regard to the complaint?

13              MR. SIPE:  Yes, ma'am.

14              THE COURT:  All right.  Ma'am, if you'll step forward,

15      please.  If you'll step right up here, please.  And raise your

16      right hand so you can be sworn.

17                    ANITA SOWERS, DEFENSE WITNESS, SWORN

18              MR. SIPE:  Judge, would you rather me be at the lectern

19      or here --

20              THE COURT:  I think it is just a little easier if you're

21      at the lectern.

22              And I started to apologize to you, but I don't feel so

23      bad, because you swore to it telephonically, so I never actually

24      saw you; is that correct?

25              THE WITNESS:  That is correct.  Yes, ma'am.
```

1    THE COURT:  Okay.  So now I don't feel so bad.  Okay.

2    You may, Mr. Sipe.

3                    DIRECT EXAMINATION

4    BY MR. SIPE:

5    Q.    Ma'am, do you -- I'm sorry.  Are you ready?

6    A.    Yes, sir.

7    Q.    You are Anita Sowers?

8    A.    Yes, sir.

9    Q.    And back in March of 2017 how were you employed?

10   A.    I am a TFO, which is a task force officer, through the DEA

11   through my police department in Martinsville, Virginia.

12   Q.    Okay.  And in that capacity you drafted and then filed the

13   affidavit for the arrest warrant in this case?

14   A.    Yes, sir, I did.

15   Q.    I want to just ask you a couple questions.  So you executed

16   that affidavit on March 7, 2017?

17   A.    The search warrant on March 7th, yes, sir.

18   Q.    Yes.

19        And then, in executing that search warrant, you and other task

20   force officers searched Mr. Smithers' or Dr. Smithers' automobile?

21   A.    Actually, I was on another search warrant.  We did

22   approximately three search warrants that day.  But I was later on

23   at the search warrant for Dr. Smithers' office.

24   Q.    The search warrants were all --

25                    MR. RAMSEYER:  Your Honor, if I may, I just want to

1  object for a minute.  I think -- it is more of a clarification.

2          You were asking -- was the question about the arrest

3  warrant or the search warrant?  Because Ms. Sowers was the affiant

4  for the arrest warrant.

5          THE COURT:  But not the search warrant.

6          MR. RAMSEYER:  But not the search warrant.

7          MR. SIPE:  I'm not asking about the search warrant.

8          MR. RAMSEYER:  Okay.  I thought you said something about

9  that, because of the March date.  Okay.  I apologize for that.

10  BY MR. SIPE:

11  Q.   You-all executed the arrest warrant in August; correct?

12  A.   Yes, sir, in August.

13  Q.   And in doing that, were you -- was that based on a search of

14  Dr. Smithers' automobile?

15  A.   Yes, sir.

16  Q.   And his home?

17  A.   Yes, sir.

18  Q.   And his office?

19  A.   Yes, sir.

20  Q.   And the information concerning the pills and the currency that

21  was confiscated, that was all found in the automobile?

22  A.   Yes, sir.

23  Q.   There's no mention in the August affidavit concerning anything

24  found at either of the other two locations; correct?

25  A.   No, sir.

1   Q.   Now, at the time of the arrest warrant, was -- in August of

2   2017, you-all conducted an interview with Dr. Smithers?

3   A.   I did not.  Other agents had conducted an interview.

4   Q.   Was he advised of his *Miranda*?

5   A.   I don't know.  I was not present during that interview.

6   Q.   Do you know if that occurred?

7   A.   I do not know.

8   Q.   Okay.  Do you know if he gave a written statement?

9   A.   I do not know if it was a written statement or not.

10   Q.   Now, the -- in looking at your affidavit, in looking at the

11   pills that were found, there was a number of them in four ziplock

12   baggies?

13   A.   Yes, sir.

14   Q.   And Dr. Smithers was able to -- or explained to you that those

15   had been given back to him by a patient in order to be disposed of?

16   A.   That was explained to another agent; yes, sir.

17   Q.   Okay.  And, in fact, the task force or you or the other agent

18   actually spoke to that patient and that was corroborated?

19   A.   Other agents did, or task force officers; correct.

20   Q.   And so that -- the destruction of those pills -- or the reason

21   behind those pills being in Dr. Smithers' possession was

22   corroborated by that former patient; correct?

23   A.   Yes, sir.

24   Q.   Now, in the four months -- or at any time between March of

25   2017 and August of 2017 did you or the task force or any other

```
1   agents speak to any other patients about that similar scenario?
2   A.   I do not know that answer.
3   Q.   There's a reference in there to speaking to a Wendell Wilson,
4   who is the compliance officer for Dr. Smithers' practice group?
5   A.   Yes, sir.
6   Q.   Did you speak to him?
7   A.   I did not.  Other agents did.
8   Q.   And was he able to confirm that patients would return
9   narcotics in order to be disposed?
10  A.   Yes, sir.
11  Q.   Now, the money that was seized -- and there's nothing in your
12  affidavit indicating any actual distribution; correct?
13  A.   Yes, there is.
14  Q.   Okay.  Can you point that out to me?
15  A.   The distribution due to the packaging of the -- of presumably
16  oxy (inaudible).
17  Q.   But nobody who you've spoken with who said they actually
18  received narcotics from him?
19  A.   Not that I know of.
20  Q.   Okay.  You are just -- when you say "distribution," you are
21  referencing the packaging?
22  A.   Correct.
23  Q.   Which includes the ziplock baggies; am I right?
24  A.   Correct.
25  Q.   With the currency that was seized, did you or the task force
```

1  or any of the agents do anything to determine if the money that you

2  seized were actual receipts from the practice group?

3  A.   I do not know the answer to that.

4        MR. SIPE:  Those are all the questions I have, Your

5  Honor.

6        THE COURT:  Mr. Ramseyer, further questions?

7                    CROSS-EXAMINATION

8  BY MR. RAMSEYER:

9  Q.   Just to be clear, you did not swear out the March search

10  warrant; is that correct?

11  A.   No, sir; I did not.

12  Q.   You are the affiant for the arrest warrants?

13  A.   Right, the arrest warrant only in August.

14  Q.   Thank you.

15        MR. RAMSEYER:  I have nothing further.

16        THE COURT:  Anything further of the witness?

17        MR. SIPE:  No, ma'am.

18        THE COURT:  All right.  You may step down.  Thank you.

19        All right.  Mr. Ramseyer, based on the testimony of the

20  witness, does the government wish to present any other evidence?

21        MR. RAMSEYER:  No, Your Honor.

22        THE COURT:  All right.  Any argument on the probable

23  cause issue, gentlemen?

24        MR. SIPE:  Just a little, Your Honor.  I know we're at

25  -- what stage we're in in the proceeding, but we would suggest that

there's insufficient testimony or evidence of a possession with

intent to distribute narcotics.  What we have is some narcotics

that were found in Mr. -- Dr. Smithers' vehicle and -- and in the

way that they were packaged.  However, an explanation for why they

were packaged that way and how they came into Dr. Smithers'

possession was given to the agents and then actually corroborated

by the patient.  And that's contained in the affidavit.

There's no suggestion of -- that any of the other pills

were not obtained in a similar fashion.  And that is pills -- I'll

call them narcotics -- pills that were in Dr. Smithers' possession

that were obtained from patients and were to be disposed of

appropriately.

And then the currency, while it is not insignificant,

there was no effort to determine whether that currency matched

receipts from the business for actual patient care that had taken

place.

So when we talk about possession with intent to

distribute, I think that there's an insufficiency on that basis

alone.

THE COURT:  Mr. Ramseyer, do you want to address that?

MR. RAMSEYER:  Yes, Your Honor.

It is important that -- in this case, that the pills were

not in pharmaceutical bottles.  They were not -- if the patient

brought them back, presumably in the bottle, they are not in them

anymore.  And they are not in the clinic.  They are in

1  Mr. Smithers' car, in his backpack, and some of them stored

2  -- obviously were -- seemed to be packaged for resale, with the

3  baggies.  So we believe there is probable cause that it was

4  possession with intent to distribute.

5          THE COURT:  Well, let me ask you this:  Just the mere

6  fact that there might be evidence that conflicts with evidence that

7  would show probable cause, that doesn't defeat the probable cause,

8  does it?

9          MR. RAMSEYER:  No, Your Honor.

10         THE COURT:  I mean, I understand that the defendant may

11 come forward with evidence that if the case went forward might

12 refute the charge, but that does not, I think, under the case law,

13 take away from a finding of probable cause, does it?

14         MR. RAMSEYER:  No, it does not, Your Honor.

15         THE COURT:  And if I'm correct -- I mean, there were -- I

16 understand the evidence of the distribution is the packaging along

17 with the cash, but, wow, I mean, these pills were found in a number

18 of different types of packaging, one of which would suggest use of

19 the drugs.

20         I mean, it is correct that they were found mixed together

21 in multiple different packages, multiple different bottles;

22 correct?

23         MR. RAMSEYER:  Yes, Your Honor.

24         THE COURT:  Even in this -- this bullet charm, there was

25 even controlled substances found in it?

1        MR. RAMSEYER:  The what, Your Honor?

2        THE COURT:  The bullet charm.  I mean, there's like a

3    container shaped like a bullet?

4        MR. RAMSEYER:  Yes.  I think it was a pill holder.  It is

5    shaped like a bullet.

6        THE COURT:  I have never seen a pill holder -- it was

7    something shaped like a bullet.  I mean -- well, maybe they really

8    do sell pill holders shaped like bullets.

9        All right.  Any further argument, Mr. Ramseyer?

10       MR. RAMSEYER:  No, Your Honor.

11       THE COURT:  Mr. Sipe, any further argument, sir?

12       MR. SIPE:  No, ma'am.

13       THE COURT:  All right.

14       Insofar as we're dealing with the issue of probable

15    cause, I find that the affidavit -- the evidence contained in the

16    affidavit along with the testimony today of the agent does show

17    probable cause for the charge of possession with intent to

18    distribute the Schedule II controlled substances.

19       Now, I do appreciate your argument, Mr. Sipe.  And that

20    is that that goes to refute that evidence.  But I don't think that

21    that takes away from the probable cause finding.

22       Now, one thing I wanted to mention too while we are here

23    today, when Mr. Smithers originally appeared, I had gone ahead and

24    released him on bond.  He was released pretty much on my standard

25    conditions of bond.  I just wanted to make sure, now that he has

1  retained counsel, that there's no issue with regard to his

2  conditions of release.

3          MR. SIPE:  No, ma'am.

4          THE COURT:  Okay.

5          MR. SIPE:  Well, one thing we did want to address, if

6  Your Honor would be willing, is one of the conditions of the

7  original bond was that Dr. Smithers not prescribe scheduled

8  narcotics.

9          THE COURT:  Yes, sir.

10          MR. SIPE:  And I believe -- I wasn't here; if I'm

11  incorrect, I apologize -- that there was some discussion at that

12  time about Dr. Smithers' participation in the Virginia Health

13  Practitioners Monitoring Program.  I don't know how familiar Your

14  Honor is with that.  But, essentially, it is a program through the

15  Virginia Board of Medicine where an individual -- with the Board of

16  Medicine, it is physicians -- their license to practice, to

17  prescribe, is suspended for in this case it was some substance

18  abuse and some other issues.  And then they are asked to enter into

19  a contract with the Virginia Health Practitioners Monitoring

20  Program, which is usually a five-year contract.  In this case

21  Dr. Smithers has entered into that contract.  He first entered into

22  it in February of 2016.

23          And, in essence, what that provides is, as long as the

24  practitioner is enrolled in the program, that he or she is able to

25  continue to practice medicine.  They are able to prescribe.  What

they are required to do is to submit to random urine screens.  And
I believe, since the inception of Dr. Smithers' enrollment in the
program, he has had close to a hundred urine screens; all have been
negative.

You also have a case manager, almost like a probation
officer, through that program, that you are to communicate with on
a scheduled time frame, and also have a peer monitor.  In this case
it is an anesthesiologist from -- Lawrenceville?

THE DEFENDANT:  Lawrenceville, and he works in
(inaudible).

MR. SIPE:  -- from Lawrenceville, who also works in
Roanoke.

And then also to participate in AA, NA, as well as what
is called Caduceus, which is AA and NA for doctors, lawyers,
architects, professionals.

So we would ask that Dr. Smithers' condition of not being
able to prescribe be modified in his bond condition.  There is
clear oversight through the HPMP program, through the peer monitor.
I have a copy of --

THE COURT:  Do I understand you correct that this is
something he entered into more than a year ago?

MR. SIPE:  Yes, ma'am.  And there -- they are familiar
-- the HPMP -- the Board of Medicine, through the HPMP program, is
aware of these charges, the allegations that are being made against
him.  And he remains in that program.  They reviewed all of the

1  materials and made a decision to continue him in the program.

2         THE COURT:  And this was as a result of him losing his

3  license?

4         MR. SIPE:  Well, no.  It is usually based on -- here is a

5  typical example:  a doctor in the hospital or a nurse at the

6  hospital, either there's some complaint or investigation opened

7  with the Board of Health Professionals about that person's ability

8  to practice.  And so the Board of Medicine, in this case, initiates

9  an investigation.  And then the practitioner is basically told,

10  "Look, you need to address whatever this underlying issue is.

11  Until you do that, you are not to practice."

12         And then, once that initial stage is completed, then

13  sometimes they are offered one of these contracts, which basically

14  says, "We're going to let you continue to practice, not right away,

15  but when your case manager says that you can."  So there is a time

16  frame where they are just to follow the terms of the contract, get

17  their urine screens, do their programs.  And then a case manager

18  makes a determination whether they are safe to practice in their

19  view.  And so in this case that determination was made in 2016.

20         And then, once -- or in the present day, the program is

21  aware of all that is going on in this case and has made a

22  determination to allow Dr. Smithers to practice.  Not allowing

23  Dr. Smithers to practice is akin to not letting him work --

24         THE COURT:  Well, and that was my reasoning behind not

25  taking his -- or not ordering his condition of bond he could not

practice medicine.  It was -- the condition of bond was designed to

allow him to try to practice medicine, but not to be able to

prescribe the medications that, in essence, at best there's

evidence of him improperly having them, you know, looking at the

evidence in the light most favorable to Mr. Smithers.  It certainly

is not proper for him to have those.  It arguably is very illegal

for him to have those and to take possession of them from other

people, even if things were done according to his statement, that

he was taking them back from his patients.  So that was very

troubling to the Court.

         And as I understand it, you are saying that he is under

the auspices of this agreement.  I mean, how do they double-check

that his subscription -- or his subscribing of controlled

substances is appropriate?

         MR. SIPE:  Well, I think that's the peer -- that's the

peer monitoring.  And so one of the things -- we thought we would

kind of raise this issue today, since we're all here.  One of the

things that we were going to attempt to propose, understanding the

Court's reluctance to just say, "Here, have back at it," is to try

to craft some sort of -- maybe for a different day and a different

courtroom, but some sort of plan that would incorporate this peer

review, who is actually an actual practicing physician, to in some

way oversee prescriptions that are being written.

         It would be impractical for that physician to actually

sign prescriptions.  In fact, that might be illegal.  But in some

way of having some kind of an accounting or something, some kind of oversight as to prescriptions that are being written, for whom and for what, and have there be this outside physician practitioner having some oversight --

THE COURT: And I understand that. And I'm not saying that -- I'm not going to preclude that. Okay? I'm not saying that there's no evidence that you could present me that I wouldn't -- I would not entertain. Okay? But I'm kind of surprised --

Could you email Debbie Foster and ask her to send me Mr. Smithers' pretrial report? I don't have it before me.

But I'm kind of surprised by you telling me that he has entered into one of these agreements previously, because that would indicate that there had been some problem previously. And by you telling me that the agreement calls for him to take urine screens and/or complete certain NA or AA meetings suggests to me that it is a substance abuse problem. And I am going to ask to see the pretrial report. But I want to say Mr. Smithers completely denied any prior substance issues when he spoke to pretrial services.

MR. SIPE: Well, if you -- and I'm happy to hand up the contract. The actual reason behind the contract was not a substance abuse issue. It was an anxiety disorder type of depression issue.

THE COURT: Then why would he have to take drug screens?

MR. SIPE: Because it is part of the contract.

THE COURT: Well, let me see the contract.

1          And did you send that to Debbie?

2          MR. SIPE:  And urine screens are a standard part of the

3    contract.

4          THE COURT:  Okay.  And that may be.  I don't -- I'm not

5    familiar enough with it on the medical side.

6      (Pause.)

7          THE COURT:  I'll just get my email up so I can see if she

8    has sent it.

9      (Pause.)

10         THE COURT:  Mr. Ramseyer, have you seen this?  Would you

11   like to see it?

12         MR. RAMSEYER:  I have seen it, Your Honor.

13         THE COURT:  Okay.  All right.

14         MR. RAMSEYER:  I don't have a copy, but I have seen it.

15         THE COURT:  All right.

16         MR. RAMSEYER:  Mr. Sipe had showed it to me prior to the

17   hearing.

18         THE COURT:  I guess, Mr. Sipe, if your request today is

19   for me to alter that condition, my response would be that I don't

20   believe I have the evidence before me that would justify doing so.

21   I'm not going to say that there isn't some arrangement that can be

22   made that would -- for instance -- and I understand what you are

23   saying is that there may not be arrangements that can be made where

24   another health care provider comes into the practice.  But there

25   may be arrangements that can be made with another physician who

would agree to review the records weekly or monthly with regard to prescribing -- it is hard for me to imagine right now what -- what would satisfy my concerns. But I don't want to tell you that there's not evidence that wouldn't. Okay? I can imagine there might be some evidence that would satisfy my concerns, if, indeed, Mr. Smithers has not lost his DEA privileges thus far. And, of course, that's a separate issue, an administrative issue, not an issue for this Court to be involved in. But that may be an issue that he will face before the criminal matters are determined. But I don't want to say that there is not some scenario under which I might allow it. I guess I would have to see what you would propose.

MR. SIPE: Yes, ma'am. I think the key is going to be (inaudible) the anesthesiologist or another prescribing medical doctor.

THE COURT: Now, let me say this, because I am surprised by this. I am looking at his -- I'm looking at his pretrial report. And I'm going to read you the entire mental health section.

It says, "The defendant reported a history of mental health issues, but is not presently experiencing any active symptoms." And that would have been -- this is based on his interview at the time of his arrest. "In 2014 he was referred by the North Carolina Physicians Health Program to attend counseling for approximately six months. He advised that for approximately a

month around this time period he was prescribed Lexapro." He did

not report any continuing mental health issues. He did not report

any ongoing supervision by any type of Board of Health

Professionals agency. And he did not report that he was taking any

other prescription medication.

I will assume that I placed upon him a condition of open

communications, because I typically do.

Let me just get to this file a moment, if I may.

(Pause.)

THE COURT: I will note that he apparently did not reveal

to the officer that he had any problems with anxiety, because the

only medication he listed was an antidepressant medication, not an

anti-anxiety medication.

What I'm hearing today brings up the necessity, I think,

for some additional conditions of release to be placed upon

Mr. Smithers. And I intend to do so.

I will just point out that he has an ongoing obligation

under the conditions I previously imposed upon him to keep his

supervising officer abreast of any medications that he takes. At

the time that he came here, he told us that he took none. So if

that's incorrect information, he needs to make the officer aware of

that.

MR. SIPE: That's correct.

THE COURT: Okay. I'm just advising that he has a

continuing obligation to keep them aware of that.

1          I mean, I won't -- I won't preclude the scheduling of a

2     hearing for me to hear whatever your plan is.  I don't know what

3     that would be.  But I'm also -- you know, I can't give you an

4     advisory opinion one way or the other.

5          MR. SIPE:  I understand.

6          THE COURT:  But I can imagine that there might be some

7     scenario under which, with supervision, it might be allowed.

8          I would suspect that if this matter goes forward

9     Mr. Smithers may have the bigger issue of the fact that the DEA may

10     act on his -- as I have seen it happen before, prior to conviction

11     -- may suspend his privileges.  So -- but I would be open to it,

12     Mr. Sipe.

13          MR. SIPE:  And we fully expect it.  I just wanted to

14     throw that out there.

15          THE COURT:  Now, what I will do today, based on what I

16     have heard here, is I'm going to put a number of other conditions

17     on.  And that is that --

18          May I see that contract again so that I can get the

19     wording correct here?

20          I am going to order that he must continue in his

21     -- Mr. Smithers must continue in his mental health treatment at his

22     expense and as required by the Virginia Health Practitioners

23     Monitoring Program, HPMP; that he has to stay in compliance with

24     his HPMP contract; and that he must allow open communications not

25     only between any treatment agencies, mental health care providers,

physical health care providers, and his supervising officer, but
also he's going to have to allow open communications between his
supervising officer and the Board of Healthcare Professionals
and/or the monitoring program of the Department of Health
Professionals.

MR. SIPE:  I believe, Your Honor, there has already been
a release (inaudible).

THE COURT:  I don't know that -- I don't think he signed
a release that would cover that, because, I'll be honest with you,
I don't think any of us knew this when it came before us before.
If I did, I have forgotten it.

I don't recall it being an issue in the bond hearing.  Do
you, Mr. Ramseyer?

MR. RAMSEYER:  Your Honor, I wasn't here at the bond
hearing --

THE COURT:  You didn't cover the bond hearing.

MR. RAMSEYER:  -- so I don't want to say.

THE COURT:  I don't recall it at all.  Not to say that I
would, necessarily, but --

MR. SIPE:  It is coming from HPMP.  They had asked --
when they were advised of what is going on here, asked for
permission.

THE COURT:  Okay.  That's good.  That's good.  But, you
know, knowing that Mr. Smithers is in this program, just so far as
supervising him, greatly concerns me about his possession of these

```
 1   medications.
 2           I mean, obvious, you know, no matter if I should allow
 3   him to go back to prescribing controlled substances, there would be
 4   a condition stating that he cannot take any further medications
 5   from his patients.  Okay?
 6           But, I mean, if you want to schedule a hearing, I'll be
 7   glad to hear the evidence on it.
 8           MR. SIPE:  Yes, ma'am.
 9           THE COURT:  Okay.  Now, Mr. Smithers, if you'll stand
10   with your counsel so I might address you.
11           The next stage in the proceedings, sir, is your case has
12   to go before a grand jury.  That should occur in the next 30 days.
13   The grand jury has to consider your case.  It may or may not return
14   an indictment against you.  If the grand jury doesn't charge you,
15   doesn't return an indictment against you, the case against you will
16   be dismissed.
17           If the grand jury does return an indictment against you,
18   finds there's probable cause to charge you with a crime, then we'll
19   contact Mr. Sipe.  We'll schedule you back in for what is called an
20   arraignment.  And at that time you'll be notified of what the
21   charges are.  The Court will take your formal pleas to the charges
22   and would set your trial date at that time.  Okay?
23           I can't tell you when the next date is that you'll have
24   to appear, because, first of all, I don't know if the grand jury
25   will indict.  If they do indict, however, we'll simply contact your
```

1  counsel.  And your counsel will contact you.  And we'll schedule a

2  date for you to appear.  You must follow his directions, though,

3  and appear as the Court requires you to appear to be in compliance

4  with your conditions of bond.  Do you understand that?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  All right.  Is there anything further we need

7  to take up today?

8            MR. RAMSEYER:  No, Your Honor.

9            THE COURT:  All right.  If not, then the Court will stand

10 in adjournment.  Thank you.

11     (Thereupon, these proceedings were adjourned at 3:42 p.m.)

12

13                        EXAMINATION INDEX

14

ANITA SOWERS, DEFENSE WITNESS

15     DIRECT BY MR. SIPE . . . . . . . . . . . . . . . . . . 4
       CROSS BY MR. RAMSEYER . . . . . . . . . . . . . . . . . 8

16

17

18

19     I, court-approved transcriber, certify that the foregoing is a

20 correct transcript from the official electronic sound recording of

21 the proceedings in the above-entitled matter.

22

23

          _____/s/ Carol Jacobs White_____  ___April 24, 2019___
24        Signature of Approved Transcriber            Date

25