Louisiana State Board of Medical Examiners                                    Page 1 of 2

## Louisiana State Board of Medical Examiners

## Verification: Details

[back]                                                    Information as of 4/28/2019 8:50:05 PM

## ARNOLD E. FELDMAN , MD

505 E. Airport Dr.
Baton Rouge, LA 70806

## Credential Information

| Credential Number | Credential Category | Credential Type | Issue Date | Reinstatement Date | Current Through | Current Status | Specialty |
|---|---|---|---|---|---|---|---|
| MD.10296R | Physician | License | 03/03/1994 | | 10/20/2016 | SUSPENDED | Anesthesiol |
| DISP.200974 | Dispensation Registration | License | 04/14/2013 | | 12/31/2015 | INACTIVE | |
| SP.SP0633 | Supervising Physician to a Physician Assistant | License | 09/24/2002 | | | INACTIVE | |

## Discipline History

If Discipline Status is Conditional, Limited, Probation, Reprimanded, Revoked, Suspended, Past Disciplinary Action or Voluntary Surrender of License, a Board issued order can be found on our Disciplinary Actions page .

| Credential Number | Discipline Status | Public Documents |
|---|---|---|
| MD.10296R | SUSPENDED | |
| DISP.200974 | NONE | |
| SP.SP0633 | NONE | |

## Supervision

| Name | License Number | Approved Date | Type |
|---|---|---|---|
| ARNOLD E. FELDMAN, MD | MD.10296R | | Dispensing Physician |

**PRIMARY SOURCE VERIFICATION STATEMENT:** Verification service provides data extracted by the LSBME from its own database. The data in this web site is provided by and controlled entirely by the LSBME and therefore constitutes a primary source verification as authentic as a direct inquiry to the LSBME. The information provided through the verification service is all of the information pertinent and available in that field of information in the LSBME database.

Louisiana State Board of Medical Examiners                                    Page 2 of 2

**DISCLAIMER:** The physician's specialty certification information in the LSBME database is updated periodically with data provided by the physician. As it is not a requirement for licensure, it is not primary source verified. Due to the possibility of reporting and processing errors, the accuracy and completeness of records cannot be guaranteed. The LSBME cannot be held responsible for incomplete or inaccurate information in each physician's record. Visitors assume sole responsibility for any decisions made based upon this information. If you require authentication of the specialty certification information, contact the respective specialty board directly.

Updated: 4/28/2019 8:50:05 PM



## LOUISIANA STATE BOARD OF MEDICAL EXAMINERS

630 Camp Street, New Orleans, LA 70130
www.lsbme.la.gov

Telephone: (504) 568-6820
FAX: (504) 568-8893
Writer's Direct Dial:

(504) _____

## BEFORE THE LOUISIANA STATE BOARD OF MEDICAL EXAMINERS

### NUMBER: 14-A-004
### IN THE MATTER OF:

### ARNOLD ERWIN FELDMAN, M.D.
### (Certificate No. 10296R)

### ADMINISTRATIVE HEARING
### HELD APRIL 11-13, 2016

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DECISION AND ORDER

This matter came before the Board pursuant to an Administrative Complaint, which charges Respondent, Arnold Erwin Feldman, M.D., with seven (7) violations of the Louisiana Medical Practice Act. The case was heard before a panel of the Board consisting of Dr. Kweli J. Amusa, Dr. Joseph Dewey Busby, Jr., Dr. Roderick Vince Clark, and Dr. Kenneth Barton Farris, the Presiding Vice-President. The Respondent was present and represented by Counsel. The Board will address each of the seven (7) violations.

In the Administrative Complaint, Dr. Feldman is charged with the following violations.

1. La. Rev. Stat. § 37:1285A(13) ("Unprofessional conduct") and Rev. Stat. § 37:1285A(4) ("Providing false testimony before the Board or providing false sworn information to the Board").

2. La. Rev. Stat. § 37:1285A(13) ("Unprofessional conduct") and La. Rev. Stat. §§37:1285(A)(14) ("Continuing or recurring medical practice which fails to satisfy the prevailing and usually accepted standards of medical practice in this state").

3. La. Rev. Stat. §§37:1285(A)(14) ("Continuing or recurring medical practice which fails to satisfy the prevailing and usually accepted standards of medical practice in this state").

4. La. Rev. Stat. § 37:1285A(13) ("Unprofessional conduct").

5. La. Rev. Stat. § 37:1285A(18) ("Knowingly performing any act, which, in any way, assists an unlicensed person to practice medicine or having a professional connection with or lending one's name to an illegal practitioner").

6. La. Rev. Stat § 37:1285A(6) ("Prescribing, dispensing, or administering legally controlled substances or any dependency-inducing medication without legitimate medical justification thereof or in other than a legal or legitimate manner") and La. Rev. Stat. § 37:1285A(18) ("Knowingly performing any act, which, in any way, assists an unlicensed person to practice medicine or having a professional connection with or lending one's name to an illegal practitioner").

7. La. Rev. Stat § 37:1285A(11) ("Making or submitting false, deceptive, or unfounded claims, reports, or opinions to any patient, insurance company or indemnity association, company, individual, or governmental authority for the purpose of obtaining anything of economic value").

## FINDINGS OF FACT

The Board considered the following:

The **first charge** asserts that Dr. Feldman violated La. R.S. 37:1285(A)(13) ("Unprofessional conduct") and La. R.S. 37:1285(A)(4) ("Providing false testimony before the Board or providing false sworn information to the Board") relative to his submission to the Board of medical records that had been falsified to reflect nursing care performed by a registered nurse on a patient who died under his care.

The Complainant supported this charge primarily through the testimony and evidence provided by Nurse Melinda Ballard. The Board found Ms. Ballard's testimony to be very credible and weighed it accordingly. Her testimony demonstrated that the extent of the falsifications in RR's record quite staggering. The following examples are illustrative of these falsifications:

- The Preoperative Checklist was signed by Ms. Ballard as the "Pre-Op Nurse," although Ms. Ballard testified she was not present for the preoperative exam.

- The Preoperative Checklist was signed by Ms. Ballard as the "OR Nurse," although Ms. Ballard testified she was not there during the operation.

- The Preoperative Checklist was signed by Ms. Ballard indicating the different medicines administered (500mg Cipro, 10mg Valium, and 100mg Demerol). Ms. Ballard, however, testified she did not administer those medications.

- Ms. Ballard made five marks on the Procedure Record even though she was not present for the procedure. The record was also signed by Dr. Feldman – it listed Ms. Ballard as circulator, which was false.

- Ms. Ballard signed the IVP Med Sheet even though she was not in the room when Versed was administered. Moreover, she was not present for the taking of vital signs even though she signed the document.

- The Nurses Notes were signed by Ms. Ballard even though she was not the nurse during the procedure.

- Ms. Ballard signed the Physician Orders, even though she did not perform the preoperative procedure on RR, and was not there to receive any physician orders before the patient went to surgery.

- The Admission Form shows Ms. Ballard as a "witness" to RR's signature, even though she did not admit RR or witness his signature.

- The Procedure Consent Form shows Ms. Ballard as a "witness" to RR's signature, even though she did not witness RR sign the document. As with

all the records, Dr. Feldman signed the Procedure Consent Form, despite its false representations, *after* Ms. Ballard did.

- The Material Risks form shows Ms. Ballard as a "witness" to RR's signature even though she never witnessed RR signing it.

- Ms. Ballard signed the Acknowledgement Authorization and Consent form as a "witness" to RR's signature even though she did not witness him signing the document.

- The Surgical Safety Checklist shows Ms. Ballard with the designations "In OR" and "per AEF," even though she was not in the ASC operating room for the patient confirmation, and never received any orders from Dr. Feldman.

- And finally, Ms. Ballard signed a Nursing Care Plan as the "Nurse" even though she was not the nurse during the procedure.

In sum, Ms. Ballard was asked and encouraged to sign the RR records ***eleven*** times in a false manner.

Addressing Nurse Ballard's testimony, the Respondent argued that Dr. Feldman never told Ms. Ballard to falsify anything and there is nothing to indicate he knew of her falsehoods. However, the evidence suggests that Dr. Feldman knew that RR's records were falsified for multiple reasons. In addition to the patently false entries of Ms. Ballard, Dr. Feldman signed RR's medical records no less than ***seven*** times. Dr. Feldman certainly knew that Ms. Ballard was not present during RR's procedure, because, among other reasons, Ms. Hart, a scrub tech testified that she told him she was running late. Even apart from Ms. Hart's testimony, Dr. Feldman ***admitted*** that Ms. Ballard was not present for RR's procedure until the stretchers were called. Despite this knowledge, Dr. Feldman signed RR's medical records where the records indicate Ms. Ballard as the "Pre-Op Nurse," "OR Nurse," and "Circulator." Each of these representations were false, but

Dr. Feldman executed the documents anyway. In fact, at least **_three_** times, he signed documents that were previously signed by Ms. Ballard. For each of these documents – the Physician Orders, the Procedure Consent Form, and the Acknowledgement/Consent – Ms. Ballard conceded that she signed all the documents before Dr. Feldman did.

Dr. Feldman can make no credible argument that he merely signed the documents but did not review them.

Further, Dr. Feldman himself made entries that were false. Of most importance, he signed the Anesthesia Preoperative Evaluation form, even though he did not perform the evaluation. On that same form, he signed acknowledging that he had explained to RR the anesthesia risks. Dr. Feldman did not see RR and advise him of anesthesia risks. Dr. Mellick, Dr. Feldman's own expert, said it would be "concerning" if Dr. Feldman did not see RR preoperatively to do a history and physical, or did not perform a cardiac respiratory exam before the procedure.

For the foregoing reasons, the Board finds Dr. Feldman guilty of violating La. R.S. 37:1285(A)(13) ("Unprofessional conduct") and La. R.S. 37:1285(A)(4) ("Providing false testimony before the Board or providing false sworn information to the Board").

**Charge two** maintains that Dr. Feldman violated La. R.S. 37:1285(A)(13) ("Unprofessional conduct") and La. R.S. 37:1285(A)(14) ("Continuing or recurring medical practice which fails to satisfy the prevailing and usually accepted standards of medical practice in this state") relative to his failure to assure that licensed and registered nurses are available to assist and monitor patients undergoing surgical procedures in his facility. The allegations continued that Dr. Feldman also delegated nursing care, patient

assessment and monitoring, and the administration of intravenous medication to unlicensed personnel.

Similarly, **charge three** contends that Dr. Feldman violated La. R.S. 37:1285(A)(14) ("Continuing or recurring medical practice which fails to satisfy the prevailing and usually accepted standards of medical practice in this state") relative to his performing a surgical procedure on a patient in his ASC who was a poor candidate for the procedure, and without a registered nurse or another appropriately trained, qualified, and licensed individual in the facility to monitor the patient while under conscious sedation. The allegations continued that Dr. Feldman failed to adequately monitor the patient, exercised poor management or care of the patient after complications arose, and all of his resuscitation attempts were contributing factors to the patient's death.

Since Charges 2 and 3 are closely related, these charges are reviewed together.

The evidence submitted to support these charges fell into three categories: (1) a history of citations lodged against Dr. Feldman by the DHH; (2) falsification of records; and (3) Dr. Feldman's treatment of RR fell below the standard of care for the LESI procedure.

<u>History of Citations by DHH</u>

The evidence showed that in 2010, the DHH visited Dr. Feldman's facility and placed it in "immediate jeopardy." The Public Health section of the Code of Federal Regulations defines "immediate jeopardy" as a "situation in which the provider's or supplier's non-compliance with one or more Medicare requirements, conditions of practitioners, conditions for coverage, or certificate **has caused, or is likely to cause,**

serious injury, harm, impairment, or death to a resident or patient." The reasons given for the "immediate jeopardy" citation in 2010 were as follows:

- failure to ensure a registered nurse was on-site;

- scrub tech sat at the head of the bed monitoring the patient;

- no nurse in the recovery room when there were patients in the ASC;

- the administration of medication was delegated to unlicensed personnel;

- no documentation of the staff member who administered the medications;

- a scrub nurse had been assigned to administer medicine in the preoperative area;

- Dr. Feldman acknowledged that he was not continuously at the bedside of patients when they were in the pre-anesthesia care unit when medications were administered.

Further, DHH returned to Dr. Feldman's facility in May 2011 and discovered that many of the same problems persisted.

Still further, DHH investigated Dr. Feldman's facility after RR's death (in February 2013). Once again, he was cited by DHH because:

- there was no documented evidence that he assessed the patient for anesthesia risk prior to RR's procedure;

- there was no documentation demonstrating that RR was cleared to have his procedure and cleared to receive anesthesia in an ambulatory setting;

- he failed to properly credential another surgeon, Dr. Ronald Sylvest.

Falsification of Records

The Board believes it thoroughly discussed this issue in its analysis of charge one, and will not repeat itself.

### Dr. Feldman's treatment of RR fell below the standard of care for the LESI procedure

The Complainant alleged that RR was not a good candidate for a procedure under conscious sedation at an ambulatory surgery center. Complainant stated that the procedure was risky because of the patient's numerous co-morbidities, including morbid obesity, obstructive sleep apnea, chronic obstructive pulmonary disease, hypertension, hypercholesteremia, and heart disease characterized as a "weak heart".

Of course, Respondent claims that RR was an acceptable candidate for the LESI procedure and provided expert testimony to support this position. The Board finds that whether RR was a good candidate to undergo the LESI procedure at an ambulatory surgical center is a reasonably debatable issue. What is beyond debate, however, is that RR received substandard care when he was brought into the preoperative room. First, he was not given a Preoperative Anesthesia Evaluation by a physician. Instead, that evaluation form was filled out by an unlicensed, unsupervised medical assistant, Haley Barker. Additionally, RR was not attended by a preoperative nurse, but instead, was examined by Ms. Barker.

No nurse was on the premises, let alone in the room, for RR's preoperative care. Ms. Barker testified that she brought RR back to the preoperative room from the waiting room because the nurse, Melinda Ballard, was running late. Further evidence of Dr. Feldman' treatment falling below the standard of care is RR's medication injections.

RR's preoperative medicines, including an injection of Demerol, a Schedule II narcotic, were administered by Ms. Barker, an unlicensed, unsupervised medical assistant. Also, an unlicensed scrub tech, Dana Bramlett, placed a 22-gauge peripheral

intravenous line in RR's left hand.  That IV was problematic.  During RR's code, IV access was lost and was never reestablished.

After RR was taken in to the operating room, there was no nurse physically present on the premises, let alone supervising the surgical suite, during RR's procedure. Moreover, RR was specifically designated for MAC (i.e., monitored anesthesia care) for the procedure, but the evidence revealed he was not monitored by any licensed personnel, such as a registered nurse or a nurse anesthetist.  Still further, the sedative RR received (allegedly 4mg of Versed) was administered to RR by the unlicensed scrub tech before Dr. Feldman entered the operating room.  Finally, the monitoring of RR during the procedure by the unlicensed scrub tech failed to detect any early signs of distress, and unfortunately, RR had a cardiac arrest.

Taking all of the aforementioned into account, this Board finds that Dr. Feldman is guilty of charges 2 and 3.

The **fourth charge** lodged against Dr. Feldman avers that he violated La. R.S. 37:1285(A)(13) ("Unprofessional conduct") relative to the allegation that he allowed an orthopedic surgeon, whose license was on probation pursuant to a Consent Order that required pre-approval of his practice, to perform surgical procedures at his ASC.  Of the seven charges brought against Dr. Feldman, the Board finds this one to be almost self-proving.  It was undisputed that Dr. Sylvest was placed on indefinite probation in 2011 for substance abuse.  He was under a Consent Order.  As part of the Order, the Board limited his practice as follows:  "**Restriction to Board Approval Practice**. Dr. Sylvest shall only engage in the practice of medicine in a medical setting preapproved in writing

by the Board." The Board also demanded that it "be apprised of his plans for performing any surgical procedures and any privileges be obtained in outpatient surgery centers." In spite of the clear restrictions of this Consent Order, Dr. Feldman allowed Dr. Sylvest to perform twenty-seven (27) surgeries at his facilities before Dr. Sylvest was credentialed at all by the ASC. Dr. Feldman did credential Dr. Sylvest in March 2013, however, he knew that Dr. Sylvest could not obtain staff privileges at any hospital. When Dr. Feldman credentialed Dr. Sylvest, he also knew that Dr. Sylvest was under a Consent Order with the Board. In 2013, the Board discovered Dr. Sylvest's actions, and again, suspended him.

Thus, Dr. Feldman allowed Dr. Sylvest to perform twenty-seven (27) surgeries at the clinic without being credentialed, and while Dr. Sylvest had not received clearance from the Board pursuant to the 2013 Sylvest Consent Order.

Respondent vehemently argued that Dr. Sylvest, and not Dr. Feldman, was the one who needed to apprise the Board and seek approval to engage in the practice of medicine at Dr. Feldman's facilities. This argument is without merit because it misses the point.

The charge against Dr. Feldman is not that he was the one obligated to request and seek from the Board any approval for Dr. Sylvest to perform surgeries at his facilities. It is immaterial who apprised and requested approval from the Board. Rather, the charge focused on the fact that Dr. Feldman, as the medical director and the chief credentialing doctor at his facilities, was obligated to assure that those doctors who operated at his facilities – with his approval – were, in fact, licensed and authorized to practice medicine at his facilities.

Therefore, the Board finds that Dr. Feldman violated La. R.S. 37:1285(A)(13) ("Unprofessional conduct") and is guilty of charge four.

Turning our attention to **charge five**, we note that the Complainant declared that Dr. Feldman violated La. R.S. 37:1285(A)(18) ("Knowingly performing an act, which, in any way, assists an unlicensed person to practice medicine or having a professional connection with or lending one's name to an illegal practitioner") relative to the allegation that he knew or should have known that a staff member under his authority was engaging in the unauthorized practice of medicine.

The evidence adduced at the hearing supports the position that Dr. Feldman facilitated the unauthorized practice of medicine with his unlicensed staff. The following facts were demonstrated at the hearing:

- Dana Bramlett, an unlicensed scrub tech, refilled pain pumps.

- Pain pumps were filled by Ms. Bramlett even when Dr. Feldman was *not* on the premises.

- Ms. Bramlett was seen changing the dosages of pain pumps without consulting Dr. Feldman.

- Unlicensed personnel administered controlled medications at Dr. Feldman's facilities.

   o Ms. Bramlett administered the medications in the operating room for RR's procedure.

   o Haley Barker, a medical assistant, administered Demerol, a Schedule II controlled substance, to patients.

   o Ms. Bramlett administered Versed outside the presence of Dr. Feldman.

     ○  Ms. Barker, a medical assistant, could not administer medications or help in the operating room. Despite these limitations, she did both. She injected Demerol and she helped in the operating room.

The Board finds that the evidence relating to the fifth charge is overwhelming, and therefore, finds Dr. Feldman guilty of this charge.

The **sixth charge** against Dr. Feldman states that he violated La. R.S. 37:1285(A)(6) ("Prescribing, dispensing, or administering legally controlled substances or any dependency-inducing medication without legitimate medical justification thereof or in other than a legal or legitimate manner"), and La. R.S. 37:1285(A)(18) ("Knowingly performing an act, which, in any way, assists an unlicensed person to practice medicine or having a professional connection with or lending one's name to an illegal practitioner") relative to the allegation that he provided pre-signed prescriptions to his staff and/or allowed staff to utilize a "Ghost Writer" to affix his signature to prescriptions.

In addition to pre-printed, pre-signed prescriptions provided to patients without seeing him, Dr. Feldman also facilitated the unauthorized practice of medicine by allowing unauthorized personnel to "sign" prescriptions. Prescriptions were signed by unlicensed personnel using a ghostwriter, a device which would simulate his signature. Haley Barker testified that she signed prescriptions with the ghostwriter for a variety of medications like Percocet or OxyContin. Furthermore, based on the testimony of witnesses, we find that prescriptions were also signed by unlicensed personnel by hand.

In addition to allowing unlicensed personnel to dispense pre-signed prescriptions and to sign prescriptions by a ghostwriter or by hand, Dr. Feldman also allowed

{DLG00033491.1 }Feldman - August 2016

unlicensed personnel access to controlled substances through a Pyxis machine.   Dr. Feldman conceded he gave Dana Bramlett, a scrub tech, and Ms. Barker, a medical assistant, access to his Pyxis machine and its controlled substances.   And, Ms. Barker confirmed that she had access to the machine.

The final charge the Board had to deliberate upon was **charge seven**, which states that Dr. Feldman violated  La. R.S.  37:1285(A)(11) ("Making or submitting false, deceptive, or unfounded claims, reports, or opinions to any patient, insurance company or indemnity association, company, individual, or governmental authority for the purpose of obtaining anything of economic value") relative to the allegation that he submitted bills to insurance companies and/or governmental agencies for services that he did not personally perform.

Dr. Feldman avoided testimony about improper billing practices by invoking his Fifth Amendment privilege against self-incrimination.   Because he invoked the constitutional right provided to him by the Fifth Amendment of the United States Constitution, the Board believed that he was constrained to fully defend himself against charge 7.   Although the Complainant provided evidence to support this charge, it was challenging to rule on this issue after receiving only one side of what allegedly transpired with regard to Dr. Feldman's billing practices.   Consequently, the Board decided to dismiss this specific charge without prejudice.

## CONCLUSIONS OF LAW

In conclusion, in light of the foregoing discussion, and based on the law, evidence and findings of this Board, the Board holds that Dr. Feldman is guilty of Charges 1 through 6, and the Board dismisses, without prejudice, Charge 7.

## SANCTIONS

Based upon the Findings of Fact and Conclusions of Law:

**IT IS ORDERED** that the license of Arnold Feldman, MD is hereby **SUSPENDED** from the practice of medicine for a **period of two (2) years**; the suspension period begins thirty (30) days after the date of this ruling, allowing time for patient referral to other providers.

**IT IS FURTHER ORDERED** that in the event First Choice Surgery Center of Baton Rouge continues to operate, the Board is to be notified of the physician serving as the Director and the Board is to be notified of any physician practicing medicine within the facility. This notification shall occur at least ten (10) business days prior to said physicians operating and/or practicing within the facility.

**IT IS FURTHER ORDERED** that Dr. Feldman shall pay a **fine of $5000 and all costs associated with these proceedings** beginning on the date of the filing of the Administrative Complaint.

**IT IS FURTHER ORDERED** that Dr. Feldman shall take one or more courses, which have been pre-approved by the Board, in the area of medical ethics, professionalism and medical recordkeeping.

**IT IS FURTHER ORDERED** that within 60 days prior to a request for reinstatement, Dr. Feldman shall undergo a mental/physical evaluation at a facility that has been pre-approved by the Board, and be deemed to be competent to practice medicine.

**IT IS FURTHER ORDERED** upon conclusion of the period of suspension, Dr. Feldman shall make a Personal Appearance before the Board during regularly scheduled meeting to demonstrate his compliance with the Board Order and to request reinstatement of his license.

**IT IS FURTHER ORDERED** that upon satisfaction of the proceeding terms, Dr. Feldman's license to practice medicine in the state of Louisiana shall be **Reinstated on Probation** for a **period of three years (3)** subject to his strict compliance with the following terms and conditions.

(1) **Board Approval of Medical Practice**. Following the effective date of the Reinstatement Order and for the duration of the probationary period, Dr. Feldman shall provide the Board with information including a complete and accurate description, and such further information as the Board may request, concerning any practice setting in which Dr. Feldman intends to practice medicine. Dr. Feldman shall not engage in the practice of medicine in any practice setting in advance of the Board's specific written approval of such practice setting.

(2) **Practice Monitoring and Quarterly Reports**. Within sixty (60) days of the effective date of the Reinstatement Order, Dr. Feldman shall enter into a contract with a Board-approved practice monitor program to monitor and review Dr. Feldman's medical practice during the probationary period. The program will work in conjunction with the

Board to develop parameters for monitoring Dr. Feldman's practice, including a review of Dr. Feldman's patient records and charts. The practice monitor shall review no less than thirty (30) records a quarter. The practice monitoring program will provide quarterly reports to the Board that will include an opinion as to whether Dr. Feldman is practicing medicine and documenting his patient's evaluation and treatment in accordance with the prevailing standards of medical practice. Dr. Feldman shall bear all costs associated with the practice monitor program.

(3) **Prescription, Dispensation, Administration of Controlled Substances Prohibited.** During the probationary period, except as authorized herein, Dr. Feldman shall not prescribe, dispense or administer any substance which may be classified, defined, enumerated or included in 21 C.F.R. §§1308.11-.15 or La. Rev. Stat §40:964, as a Schedule II, III or IV controlled substances. Dr. Feldman will be able to continue to prescribe Schedule V controlled substances in the course of his practice. This prohibition shall not prevent him from ordering the administration of controlled substances and other prescription medications to in-patients of and at a hospital or similar institution where he may be employed or exercise staff and clinical privileges in accordance with such hospital or institution's prescribed policies and procedures governing the administration of controlled substances.

(4) **Prohibitions on the Prescribing of Controlled Substances for the Treatment of Chronic Pain or Obesity.** At no time following the effective date of the Reinstatement Order shall Dr. Feldman prescribe controlled substances for the treatment of non-cancer related chronic pain or obesity. Furthermore, he shall not receive any remuneration from, have any ownership interest in or association with any clinic or practice setting or arrangement that advertises or holds itself out to the public as a clinic or practice for the care and/or treatment of patients for the management of chronic pain or obesity. Until and unless otherwise modified by the Board, in its

sole discretion, the restrictions contained in this provision shall survive the probationary period and remain in effect so long as Dr. Feldman shall hold any form of license or permit to practice medicine in the state of Louisiana.

(5)   **Collaboration with Nurse Practitioners, Supervision of Physician Assistants/Effect On.**  During the probationary period, Dr. Feldman is not eligible to enter into or continue in a collaborative or supervisory practice agreement with a mid-level provider, *e.g.*, nurse practitioner or physician assistant.  This restriction shall not preclude Dr. Feldman from employing nurses or other medical personnel to assist in his practice, as long as he is present and directing their activities appropriate to their level of expertise and ability.

(6)   **Continuing Medical Education.**  Dr. Feldman shall obtain not less than fifty (50) credit hours per year for each of the three (3) years of his probationary period through attendance at and participation in continuing medical education ("CME") programs accredited by the American Medical Association.  On or before the anniversary date of the effective date of this Order, for each of the three (3) years, Dr. Feldman shall cause to be submitted to the Board written certification of the CME programs and credits completed by him during the preceding twelve (12) months.

(7)   **Absence from the State/Practice/Effect on Probation.**  Should Dr. Feldman at any time during the period of probation ordered herein be absent from the state of Louisiana, relocate to and/or take up residency in another state or country, or discontinue practicing as a physician, for a period of thirty (30) days or more, he will so advise the Board in writing.  In such instance, the probationary period ordered herein shall be deemed interrupted and extended for no less than the period of time during which he was not engaged in practice or was absent from the state of Louisiana; however, all terms and conditions may continue to be in effect as ordered or may be modified or altered as needed at the Board's discretion.

(8) **Notification.** Dr. Feldman shall provide a complete copy of this Order to each hospital, clinic, facility or other employer or prospective employer at which or for whom he provides services as a physician in this state.

(9) **Cooperation with Board's Probation and Compliance Officer.** Dr. Feldman shall immediately notify the Board's Probation and Compliance Officer of any change in his current home and professional addresses and telephone numbers and he shall direct all matters required pursuant to this Order to the attention of the Probation and Compliance Officer, with whom he shall cooperate on all matters and inquiries pertaining to his compliance with the terms and conditions of this Order.

(10) **Probation Monitoring Fee.** For each year of the probationary period Dr. Feldman shall pay the Board a probation monitoring fee of Three Hundred ($300.00) Dollars. Payment of the initial fee shall be due not later than sixty (60) days from the effective date of the Reinstatement Order. All subsequent annual payments shall be due on or before the anniversary date of the initial fee payment.

(11) **Certification of Compliance with Probationary Terms/Personal Appearance.** At least sixty (60) days prior to the conclusion of the probationary period imposed herein, Dr. Feldman shall provide the Board with an affidavit certifying that he has complied with each of the terms of probation imposed by this Order and he shall contact the Board and arrange for a personal appearance before the Board at its meeting preceding the expiration of his probationary period. The probationary period and all of its terms and conditions shall be, and shall be deemed to be, extended and continued in full force and effect pending Dr. Feldman's compliance with the requirements of this provision.

**IT IS FURTHER ORDERED** that any violation or failure of strict compliance with any of the terms and conditions set forth by this Order by Dr.

Feldman   shall be deemed adequate and sufficient cause, upon proof of such violation or failure, for the revocation and cancellation of Dr. Feldman 's license to practice medicine in the State of Louisiana or for such other action as the Board may deem appropriate, as if such violations were enumerated among the causes provided in La. Rev. Stat. § 37:1285.

**IT IS FURTHER ORDERED** that this Order shall be, and shall be deemed to be, a public record.

New Orleans, Louisiana, this 15th day of August, 2016.

**LOUISIANA STATE BOARD OF MEDICAL EXAMINERS**

BY: _Kenneth Barton Farris, MD_

Kenneth Barton Farris, M.D.
Vice-President

**BEFORE THE MISSISSIPPI STATE BOARD OF MEDICAL LICENSURE**

**IN THE MATTER OF PHYSICIAN'S LICENSE**

**OF**

**ARNOLD E. FELDMAN, M.D.**

**DETERMINATION AND ORDER**

**THIS MATTER** came on regularly for hearing on March 16, 2017, before the Mississippi State Board of Medical Licensure (hereinafter "Board"), pursuant to Title 73, Chapter 25 of Mississippi Code (1972) Annotated.  The Board initiated these proceedings on January 3, 2017, by issuance of a Summons and Affidavit against Arnold E. Feldman, M.D., (hereinafter Licensee) setting forth  two (2) counts of violation of the Mississippi Medical Practice Act, specifically Count I, Miss. Code Ann. Section 73-25-29(9), and Count II, Miss. Code Ann. Sections 73-25-29(8)(d) and 73-25-83(a), all based upon disciplinary action being taken against Licensee by the Louisiana State Board of Medical Examiners on August 15, 2016, and amended on October 14, 2016.

Also on January 3, 2017, the Board issued its Order of Temporary Action Pending Hearing, restricting Licensee's license by prohibiting him from prescribing controlled substances in any schedules for the treatment of chronic (non-cancer) pain and obesity, pending the outcome of the hearing then scheduled for January 12, 2017, later continued until March 16, 2017.

Licensee was present at the March 16, 2017 hearing, represented by Honorable Philip Hearn, Complaint counsel for the Board was Honorable Stan T. Ingram.  Sitting as legal advisor to the Board was Honorable Ellen O'Neal, Special Assistant Attorney General. Board members present for all proceedings were Charles D. Miles, M.D.; Virginia Crawford,

M.D.; Claude D. Brunson, M.D.; S. Randall Easterling, M.D.; Charles K. Lippincott, M.D.;

William D. McClendon, Jr., M.D.; Michelle Y. Owens, M.D.; and Ann Rea, M.D.

Based upon the evidence and testimony presented, the Board renders the following

Findings of Fact, Conclusions of Law, and Order:

## **FINDINGS OF FACT**

1.      Licensee is a physician licensed to practice medicine in the State of

Mississippi, currently holding License No. 10981, issued April 22, 1986.

2.      On August 15, 2016, the Louisiana Board of Medical Examiners issued a

Decision and Order finding Licensee guilty of six (6) counts of violating the statutes of

Louisiana regarding the practice of medicine, and as a result, censured and reprimanded

Licensee, fined him five thousand ($5,000) dollars, and suspended his license for a period

of two (2) years, subject to specific terms and conditions.  The Louisiana Board further

ordered that upon conclusion of the two-year period of suspension and satisfaction of all

terms, Licensee's license shall be reinstated, subject to certain probationary terms and

conditions for an additional period of three (3) years, including but not limited to, that

board's approval of his medical practice, practice monitoring, prohibition against

prescribing controlled substances in Schedules II, III, and IV and continuing medical

education (CME), but that Licensee would be permanently prohibited from prescribing

controlled substances in the treatment of chronic (non-cancer) pain and obesity.

3.      Licensee has since appealed the Louisiana order and said appeal is pending;

4. On January 3, 2017, based upon the actions of the Louisiana Board, this Board issued a Summons and accompanying Affidavit of Todd Pohnert, agent of the Mississippi State Board of Medical Licensure, charging Licensee with the following counts:

### COUNT I

Licensee is guilty of having his license to practice medicine in another state or jurisdiction revoked, suspended, or other restriction imposed thereon, all in violation of Miss. Code Ann., §73-25-29(9).

### COUNT II

Licensee is guilty of unprofessional conduct, which includes, but is not limited to being guilty of any dishonorable or unethical conduct likely to harm the public, all in violation of Miss. Code Ann., §73-25-29(8)(d) and §73-25-83(a), as amended.

5. Evidence was presented at the hearing demonstrating, and the Board hereby finds by clear and convincing evidence, that Licensee did have his license to practice medicine in another state or jurisdiction suspended and restrictions imposed thereon, and that, as a result, Licensee is guilty of unprofessional conduct, including but not limited to dishonorable or unethical conduct likely to harm the public. It should be noted that the Board's right to take action based on Miss. Code Ann. Section 73-25-29(9) is prima facie established upon entry of a certified copy of the disciplinary order or action taken by the other stated or jurisdiction, notwithstanding the pendency of any appeal. (See Board Exhibit 3).

5. Licensee's testimony and evidence presented in his own behalf did not sufficiently refute the foregoing findings.

## CONCLUSIONS OF LAW

Based upon the foregoing, the Board concludes that Licensee is guilty of Counts I and II of the January 3, 2017 Affidavit of Todd Pohnert, and that the Board is therefore authorized by Miss. Code Ann. Section 73-25-29 to suspend, revoke or restrict Licensee's license to practice medicine in Mississippi.

## ORDER

**IT IS THEREFORE, ORDERED** that based upon the Findings of Fact and Conclusions of Law enumerated above, Licensee's license to practice medicine in Mississippi is hereby suspended, said suspension to run concurrently with that of Louisiana, that is, until October 14, 2018, at which time Licensee shall petition the Board for removal of the suspension;

**IT IS FURTHER ORDERED** that if, prior to October 14, 2018, the Louisiana order is modified or reversed on appeal, Licensee may petition the Board for reconsideration of the sanctions imposed herein;

**IT IS FURTHER ORDERED** that, to give Licensee sufficient time to notify his patients, the suspension of his license will take effect on April 17, 2017.

**IT IS FURTHER ORDERED** that Licensee shall reimburse the Board for all costs incurred in relation to this matter pursuant to Miss. Code Ann. Section 73-25-30, with said amount not to exceed $10,000.  Licensee shall be advised of the total assessment by separate notification, and shall tender to the Board a certified check or money order on or before forty (40) days from the date the assessment is mailed to Licensee via U.S. mail at the address shown on file at the Board.

**IT IS FURTHER ORDERED** that pursuant to <u>Miss. Code Ann</u>. Section 73-25-27, a copy of this Determination and Order shall be sent by registered mail or personally served upon Licensee or his counsel.

**SO ORDERED**, this the 16th day of March, 2017.

**MISSISSIPPI STATE BOARD OF
MEDICAL LICENSURE**

BY: _____

**CHARLES MILES, M.D.,
PRESIDENT**