IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ABINGDON DIVISION

UNITED STATES OF AMERICA,    )
                          )
           Plaintiff,   )   Criminal Case No.
                          )   1:17-cr-00027-JPJ-PMS-1
vs.                    )
                          )
JOEL A. SMITHERS,       )
                          )
           Defendant.   )

_____

TRANSCRIPT OF JURY TRIAL – DAY 6
HONORABLE JUDGE JAMES P. JONES PRESIDING
MONDAY, MAY 6, 2019

_____

**A P P E A R A N C E S**

On behalf of United States:
        **Steven Randall Ramseyer**
        **Zachary T. Lee**
        **Samuel Cagle Juhan**
        United States Attorneys Office
        180 West Main Street, Suite B19
        Abingdon, VA 24210

On behalf of Defendant:
        **Donald M. Williams, Jr.**
        Williams Law Office, PLC
        P.O. Box 601
        Pennington Gap, VA 24277

Proceedings taken by Certified Court Reporter and transcribed
using Computer-Aided Transcription

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS  Document 236  Filed 06/08/19  Page 1 of 195  Pageid#: 10127

<b><u>INDEX</u></b>

**PLAINTIFF'S WITNESSES:**                                    **PAGE**

**DEENI BASSAM**
     DIRECT EXAMINATION BY MR. RAMSEYER          5
     CROSS-EXAMINATION BY MR. WILLIAMS          88


**DEFENSE WITNESSES:**                                        **PAGE**

**BRENDA M. FISHER**
     DIRECT EXAMINATION BY MR. WILLIAMS        117
     CROSS-EXAMINATION BY MR. LEE              123
     REDIRECT EXAMINATION BY MR. WILLIAMS      143
     RECROSS EXAMINATION BY MR. LEE            146
**LENNIE HARTSHORN, JUNIOR**
     DIRECT EXAMINATION BY MR. WILLIAMS        148
     RECROSS-EXAMINATION BY MR. RAMSEYER       156


**EXHIBITS**                                    **MARKED**  **RECEIVED**

ON BEHALF OF THE PLAINTIFF:
SB-2   -   Steve Blevins patient file                         4
JMay-3  Jerry Maynard patient file                            4
DR-     Text messages between Joel                            4
1000  -   Smithers and Deborah Reynolds
74  -     Photo - notice re restrooms                         4
107  -    Pharmacy Chart-signed                              25

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 230   Filed 06/08/19   Page 2 of 195   Pageid#: 10128

```
 1        (Proceedings commenced at 9:05 a.m.)

 2            THE COURT:  Good morning, ladies and gentlemen.  Are

 3    we ready to proceed?

 4            MR. RAMSEYER:  We are, Your Honor.  I have one thing

 5    I want to bring to the Court's attention.

 6            THE COURT:  Yes, sir.

 7            MR. RAMSEYER:  There's an initial appearance next

 8    door in the Indivior case that I was going to cover, if the

 9    Court would allow me to break for that, and that's at 10:30.

10            THE COURT:  Yes, sir.

11            MR. RAMSEYER:  Thank you.

12            THE COURT:  Yes, sir, Mr. Williams.

13            MR. WILLIAMS:  Your Honor, my client has presented

14    me with something that I just -- it was just handed to me.

15    I'd ask to present it to the Court.

16            THE COURT:  All right.  If you'll hand it to me,

17    please.

18            The statement from Mr. Smithers signed by him says

19    that the Court is biased against him and "has shown bias

20    against my person in my case" and requests that I withdraw

21    from the case.

22            And I will have the clerk file this.  The motion

23    will be denied.

24            Are we ready for the jury?

25            We'll have the jury in.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 3 of 195   Pageid#:
10129

```
1        (Proceedings held in the presence of the jury.)

2            THE COURT:  Good morning, ladies and gentlemen.

3    Hope you had a good weekend.  We're ready to go again.  And

4    the Government may call its next witness.

5            MR. RAMSEYER:  Your Honor, before I do that, I'd

6    like to introduce -- move to introduce two pieces of evidence.

7    I inadvertently forgot to ask the Court, or did not ask the

8    Court to introduce Government's Exhibit SB-2, which is a

9    fragment of the Steve Blevins file.  And JMay, M-a-y, 3, which

10   is a fragment of the Jerry Maynard file.  And I'd also move to

11   introduce Government's Exhibit DR-1000, which are the text

12   messages relating to Deborah Reynolds that Mr. Lee and the

13   agent talked about on Friday -- or Thursday, excuse me.  And

14   also move to introduce Exhibit 74, which is the photograph

15   taken of the search warrant of the piece of paper talking

16   about urinating in the parking lot.

17           THE COURT:  They will be admitted.

18           MR. RAMSEYER:  Thank you, Your Honor.

19      (Government's Exhibit SB-2 received.)

20      (Government's Exhibit JMay-3 received.)

21      (Government's Exhibit DR-1000 received.)

22      (Government's Exhibit 74 received.)

23           MR. RAMSEYER:  The Government calls Dr. Bassam.

24           THE COURT:  Yes, sir.  If you'll come forward and

25   stand before the clerk and be sworn, please.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 848-5100

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 4 of 195   Pageid#:
10130

```
 1              THE CLERK:  If you'll raise your right hand.

 2              Do you solemnly swear that the testimony you're

 3    about to give in this case shall be the truth, the whole

 4    truth, and nothing but the truth, so help you God?

 5              THE WITNESS:  Yes.

 6              THE CLERK:  You may take the stand.

 7                        DEENI BASSAM,

 8    Called as a witness herein by the Government, having been

 9    first duly sworn, was examined and testified as follows:

10                     DIRECT EXAMINATION

11    BY MR. RAMSEYER:

12    Q.   And, Dr. Bassam, there's a cup and water there in that

13    picture, if at any time you need to take a drink.

14    A.   Thank you.

15    Q.   Please introduce yourself to the jury.

16    A.   My name is Dr. Deeni Bassam.

17              THE COURT:  Doctor, I wonder if you would pull the

18    microphone so you speak directly into it, not on the side of

19    it like you have it.

20              There we go.  Thank you.

21              THE WITNESS:  Good morning.  My name is Dr. Deeni

22    Bassam.

23    BY MR. RAMSEYER:

24    Q.   And, Dr. Bassam, where do you live?

25    A.   I live in Manassas, Virginia.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 230   Filed 06/08/19   Page 5 of 195   Pageid#:
10131

1    Q.    All right.  And are you a medical doctor?

2    A.    I am.

3    Q.    All right.  And to become a medical doctor, what did you

4    have to do?

5    A.    Graduate from a four-year college, go to medical school.

6    Q.    You, in particular, what did you do?

7    A.    I went to Virginia Tech for my undergraduate degree.  I

8    went to the University of Virginia for medical school.

9    Graduated in 1997.  Completed an internship in general surgery

10   at North Western University in Chicago.  Residency in

11   anesthesiology at New York Hospital in New York.  And then a

12   fellowship in pain medicine at Texas Tech Medical Center in

13   Lubbock, Texas.

14   Q.    Okay.  And the pain fellowship you did, pain medicine

15   fellowship, did anything come of that?  Was there some special

16   designation you were getting by doing that?

17   A.    Yes, sir.  By completing the fellowship I was completing

18   the requirements to become board certified in pain management

19   and medicine.

20   Q.    And are you, in fact, board certified in pain management

21   and medicine?

22   A.    Yes, sir.

23   Q.    Not only did you have to do the fellowship, what else did

24   you have to do?

25   A.    In order to become board certified in pain medicine, you

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 638-5166

Case 1:17-cr-00027-JPJ-PMS   Document 230   Filed 06/08/19   Page 6 of 195   Pageid#:
10132

1   have to have graduated from an accredited fellowship which is

2   at least a year long.  You have to have a study for and sat

3   and passed written examination boards in pain medicine.  Then

4   you have to maintain those credentials with ongoing continuing

5   education and recertification.

6   Q.   Have you done all those things?

7   A.   Yes, sir.

8   Q.   So are you at this time board certified in pain medicine

9   and pain management?

10  A.   I am.

11  Q.   And how long have you been certified?

12  A.   Since 2002.

13  Q.   All right.

14          THE COURT:  Doctor, I'm not sure that I got your

15  first name.

16          THE WITNESS:  Yes, sir, it's Deeni.  D-e-e-n-i.

17          THE COURT:  Thank you.

18  BY MR. RAMSEYER:

19  Q.   And, Dr. Bassam, have you been practicing in the pain

20  management field?

21  A.   Yes, I am.

22  Q.   Approximately how long have you done that?

23  A.   I've been practicing since I graduated.

24  Q.   Okay.  Now, at some point did you become involved with

25  the Virginia Board of Medicine?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 848-5163

Case 1:17-cr-00027-JPJ-PMS   Document 230   Filed 06/08/19   Page 7 of 195   Pageid#: 10133

```
1    A.    I did.

2    Q.    Okay.  When was that?

3    A.    Approximately 2008.

4    Q.    Okay.  How long is a term on the Board of Medicine?

5    A.    Four years.

6    Q.    And did you serve a full term?

7    A.    I did.

8    Q.    All right.  And what were your duties on the Virginia

9    Board of Medicine?

10   A.    So my duties were mainly around reviewing cases that come

11   before the Board of Medicine typically involving improper

12   prescribing habits of healthcare providers in the state when

13   those cases were referred to the Virginia Board.  The board

14   has a responsibility to review them and adjudicate them and

15   decide if there's any action that needs to be taken against

16   the license of the individual, such as restricting it or

17   revoking it.  And so I was involved in that process as a board

18   member for four years, which means I was reviewing cases, as

19   well as sitting on panels of physicians in administrative

20   hearings.

21   Q.    And approximately how many of those different kinds of

22   hearings did you participate in over four years?  Or if you

23   know, like, per month, if that's an easier way to describe it.

24   A.    I would take generally somewhere between two to four work

25   days per month and travel to Richmond and dedicate the day to
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 8 of 195   Pageid#: 10134

1    the work of the board.

2    Q.    Okay.  And when you did that, were you reviewing

3    basically professional practice of physicians and proper

4    prescribing?

5    A.    Correct.  Most of my cases involved improper prescribing

6    cases and allegations.

7    Q.    Okay.  And were those just for Manassas or where did

8    those people that came before you come from?

9    A.    No, sir.  These cases come from all over the

10   commonwealth.

11   Q.    So for approximately four years you were reviewing what

12   doctors were doing all over the state of Virginia?

13   A.    Correct.

14           MR. RAMSEYER:  All right.  Your Honor, at this time

15   I'd ask that Dr. Bassam be recognized as an expert in the

16   field of pain medicine and prescribing of controlled

17   substances.

18           THE COURT:  Any objection?

19           MR. WILLIAMS:  No, Your Honor.

20           THE COURT:  Very well.  You may proceed.

21   BY MR. RAMSEYER:

22   Q.    Now, Dr. Bassam, in the field of pain management is the

23   only tool available to you controlled substance prescriptions?

24   A.    No, sir.

25   Q.    What tools do you have?  What's -- what's proper practice

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 9 of 195   Pageid#:
10135

1   when a patient comes in?

2   A.   Well, generally, to answer your question, proper practice

3   is -- starts with a thorough in-depth assessment of the

4   patient's condition.  I think there is a responsibility to

5   know what you're treating and what the diagnosis is.  And

6   then -- as a beginning.  And then based on that to be able to

7   formulate a plan to help the person.

8            So in answer to your question about the types of

9   tools, medications are one tool among many.  But in my field

10  there is a broad spectrum of options to help patients from

11  medications, to therapy, to family and psychological support,

12  to counseling, to injections, to surgery.  The answers often

13  depend mainly on the underlying condition and the degree of

14  severity of that condition, which is why it's so important to

15  know what you're treating.

16  Q.   All right.  And, Dr. Bassam, have you been consulted

17  before by the Government to review files?

18  A.   I have.

19  Q.   And in relation to this case, were you provided certain

20  patient files of Dr. Smithers and asked to review them to give

21  your opinion as to whether the prescriptions issued were

22  within the scope of professional practice for legitimate

23  medical purpose?

24  A.   Yes, I was.

25  Q.   All right.  And can you -- after reviewing those files,

1  can you tell the jury kind of your general impression of what

2  was going on based on your review of the patient files?

3  A.   After review of the files initially, I became very

4  concerned because of the, really, lack of any depth to these

5  medical files.  And they were files that I was not used to

6  seeing.  In fact, so much so that I communicated with the U.S.

7  Attorney to make sure I got all the files.  There was really a

8  significant -- a lack of information that I would normally see

9  in medical files that would help capture the thought processes

10 of a physician as they go through the process of working up a

11 problem, coming to a diagnosis, and a treatment plan.  These

12 files really lacked any of the elements that I would normally

13 see in a physician file capturing patient encounters.

14 Q.   And is one of the things that a doctor does keep good

15 files, keep a good record of what happened?

16 A.   The medical record is of extreme importance.  It's the

17 only way to memorialize the encounter and to capture the

18 thought processes and decision-making processes of the

19 physician based on the patient's presentation and information

20 that's collected.  So if -- it's important also for the

21 physician themselves.  If you're in a busy practice, you're

22 treating in some cases thousands of patients a year.  You have

23 no possible way of remembering what you did for whom and what

24 the details were surrounding that decision if you didn't

25 capture it in the medical file.  And then further, those

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5115

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 11 of 195   Pageid#: 10137

```
 1   medical files don't exist in a vacuum.  We live in a society
 2   where those files end up often in other people's hands for
 3   review.  Patients move and transfer doctors.  Other physicians
 4   need to be able to read your files and understand what you did
 5   and why you did it.  Those files end up in insurance offices,
 6   in courtrooms, and so it's important so that the files be
 7   maintained in a way that somebody can come after you who is
 8   qualified and understands what you do about medicine and is
 9   able to review those files and make sense of your decision
10   making.
11   Q.   And what about the Schedule II controlled substances, is
12   it important to keep track of those and the reasons why you're
13   prescribing those?
14   A.   Yes, it's especially important.  I tell my patients,
15   these are not vitamins.  These are strong narcotic
16   medications.  In many cases, controlled substances.  And
17   there's even a heightened importance of keeping accurate
18   records and files when you're prescribing controlled
19   substances to be able to document the decision making, the
20   medical necessity, why you arrived at that decision, what
21   other options did you consider? and, ultimately, how you
22   monitored and followed the progress of the patient when you're
23   prescribing these strong medications.
24   Q.   So, again, if a doctor practicing in this area -- if a
25   patient comes in and says they're in pain, does that mean they
```

1  get Schedule II narcotics?

2  A.   I would say that it depends on a lot more than just

3  simply the patient saying that they're in pain.

4  Q.   All right.  Now, was there anything about -- did you

5  notice that the patient files you were reviewing, the patients

6  were all getting Schedule II controlled substances?

7  A.   Yes.

8  Q.   And did that strike you in any way given the files?

9  A.   Well, it implies that this is the nature of the practice.

10  I ultimately reviewed almost 50 files and every one of them

11  was prescribing narcotic medications.  So I assumed that this

12  is a representative sample of the entire practice and

13  reflective of the whole practice.

14       MR. WILLIAMS:  Your Honor, I would object as to

15  speculation where he's assuming.

16       THE COURT:  I'll overrule the objection.

17  BY MR. RAMSEYER:

18  Q.   All right.  So what we're going to do at this point is go

19  through these files individually so you can explain to the

20  jury some of the bases for your opinion.

21       Let me ask you first, you reviewed all the

22  prescriptions that are charged in the indictment.  And what

23  was your opinion as to all of those, being as to whether --

24  were they within the scope of professional practice?

25  A.   After reviewing all the files in totality and the

 1    prescriptions, I -- it was -- I came to the conclusion, it was

 2    my opinion that the -- what was happening here was not

 3    resembling what I recognize as the practice of medicine.  This

 4    primarily leads to the logical conclusion that the

 5    prescriptions were not written for a legitimate medical

 6    purpose.

 7    Q.    Was it your opinion they were outside the scope of

 8    professional practice?

 9    A.    Yes.

10    Q.    So let's start with Robert Battaglia.  I'm going to show

11    you, I'm going to start with RB-1.  So this is a Priority

12    Urgent Care Patient Intake Form.  Do you see that?

13    A.    Yes.

14             MR. RAMSEYER:  All right.  Then we go to page 2.

15             A consent to -- for treatment.

16             Go to page 3.  It's dated July 24, 2015.

17             If you could go to page 4.

18             This is page 3.

19             Page 4.

20             Go to page 5.

21    BY MR. RAMSEYER:

22    Q.    This is called a Review of Systems.  And correct me if

23    I'm getting any of this wrong.  I'm just trying to move it

24    along quickly.

25    A.    That's correct.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 523-5100

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 14 of 195   Pageid#:
10140

```
 1              MR. RAMSEYER:  Page 6.  Physician Assessment.  Dated
 2    July 24, 2015.
 3              If we go to page 7.
 4              That's all for that one.
 5              If you could go to RB-2.
 6    BY MR. RAMSEYER:
 7    Q.   So in RB-2, page 1, Client Audit REMS Screening, Inc.  Do
 8    you see that?
 9    A.   Yes.
10    Q.   Is that something you're familiar with?
11    A.   No, it's not.  It's not something I've ever seen.
12              MR. RAMSEYER:  All right.  If we can go to page 2.
13              More of the Pre-screening Audit, REMS Screening.
14              Go to page 3.
15              Page 4, please.
16    BY MR. RAMSEYER:
17    Q.   So on page 4, appears to be a criminal records check; is
18    that correct?  Page 4 and 5?
19    A.   Yes, sir.
20    Q.   All right.  And, again, is that something -- page 5 is
21    criminal records.  Is that something you're familiar with
22    seeing in files?
23    A.   Actually, it's not.  It's not something I'm used to
24    seeing in medical files.
25              MR. RAMSEYER:  Okay.  And we go to page 6.  And go
```

1    to -- which is blank.  Page 7, more criminal record.

2              We can go back to page 5, if you don't mind.

3              Okay.  You can scroll through.  So it's various

4    pages of criminal records for Mr. Battaglia.

5    BY MR. RAMSEYER:

6    Q.   And then on page 12, it's PC, Patient Contact, Form.  Can

7    you see that?

8    A.   Yes, sir.

9              MR. RAMSEYER:  And go to the next page.

10   BY MR. RAMSEYER:

11   Q.   So this is a New Patient Intake Form for pain management

12   for Smithers Community Healthcare Clinic PC.  And it says on

13   here, "Approximately when did this begin?"

14             "Ten years ago."  Do you see that?

15   A.   Yes, sir.

16   Q.   And it says, "What caused your current pain episode?"

17             "Driving every day.  Car accidents."

18             Do you see that?

19   A.   Yes, I do.

20             MR. RAMSEYER:  All right.  We can go to the next

21   page.

22   BY MR. RAMSEYER:

23   Q.   And this is what we call a PMP; is that right?

24   A.   Yes, it is.

25   Q.   That's to show prescriptions; if the patient's getting

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236 (Page 3 of 4) Filed 06/08/19   Page 16 of 195   Pageid#: 10142

1    them from other doctors or filling the prescriptions you're

2    prescribing.

3    A.    That's correct.

4              MR. RAMSEYER:  Go to the next page.  Page 15 is more

5    PMP.

6              Page 16, more compliance audits REMS screening page.

7              Then we go to page 17.  So this is a Brief Pain

8    Inventory (Short Form).

9    BY MR. RAMSEYER:

10   Q.    And just ask about, any of these things we've seen so

11   far, do those help you as a doctor to see what to do with the

12   patient?  Are they conclusive?  What are those things, in your

13   opinion?

14   A.    The short answer to your question is no.  This, so far,

15   and most of the records that I reviewed, is a collection of

16   papers that captures self-reported symptoms by patients,

17   whether the patient themselves is filling out the form

18   describing their own situation or the physician is filling out

19   the form based on what the patient is telling them

20   subjectively about their situation.  So, no, it's very much

21   insufficient to be able to come to a diagnosis and assessment

22   and accurately come up with an appropriate treatment plan.

23             MR. RAMSEYER:  All right.  So we'll go to page 18.

24             Go to page 19.

25             If at any point there's something here that you want

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 17 of 195   Pageid#: 10143

1    to point out, feel free, but I'm trying to move through it.

2            So page 20.

3            If we can go back to page 20 for a minute.

4    BY MR. RAMSEYER:

5    Q.   Down here at the bottom, it says, "reviewer."  And I'll

6    represent to you the evidence has been that that "JDO" is from

7    Joel Smithers, the doctor, showing he reviewed it on

8    November 30th, 2015.  Do you see that?

9    A.   Yes, sir, I do.

10           MR. RAMSEYER:  If we can go back to the first page

11   of that.  I'm sorry -- go back to 19.

12           18.

13           17.

14   BY MR. RAMSEYER:

15   Q.   All right.  So this indicates the patient came in on

16   November 30th, at 8:48; correct?  Is that what it says up

17   there at the top?

18   A.   November 30th, 8:48, that's correct.  Yes, sir.

19           MR. RAMSEYER:  Then we can go to page 21 now.

20   BY MR. RAMSEYER:

21   Q.   So do you recognize this?  Is this part of that SOAPP-R?

22   A.   Yes.  It looks like the second page of a patient filled

23   out questionnaire called a SOAPP-R.

24           MR. RAMSEYER:  Okay.  Go to page 22.  This is a

25   consent for treatment.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5144

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 18 of 195   Pageid#:
10144

```
 1                    Page 23.  More of a questionnaire.

 2                    Page 24.  Another questionnaire.

 3                    Go to page 25.  More of a questionnaire.

 4                    26.  More of a questionnaire.

 5                    Page 27, more of a questionnaire.

 6                    28, more of a questionnaire.

 7                    29, more of a questionnaire.

 8   BY MR. RAMSEYER:

 9   Q.    30 is the first page of that SOAPP-R.

10   A.    Yes, sir.

11                    MR. RAMSEYER:  31.  Copy of driver's license.

12   BY MR. RAMSEYER:

13   Q.    Page 32 is a letter discharging Mr. Battaglia dated

14   June 1st of 2016.  Do you see that?

15   A.    Yes, I do.

16                    MR. RAMSEYER:  All right.  And if we move on to

17   page 33.  Substance abuse treatment facility locater.

18                    Go to page 34.

19                    Keep going.  Page 35.

20                    Page 36.

21                    A brief pain inventory.

22                    Go back one page.  Sorry.  So locate -- go back one

23   more.

24                    So this indicates that there's a substance abuse

25   facility at Cumberland Road, Cedar Bluff, Virginia, Community
```

```
1    Substances Abuse Program.
2              Can we go to 36, please.
3              Another brief pain inventory.  This one is October,
4    looks to be maybe 29 of 2015.
5    BY MR. RAMSEYER:
6    Q.   And, again, what does this do for you as a doctor?  When
7    you see this, does this mean a person should be on controlled
8    substances?
9    A.   No.  Again, this is just simply one small element of
10   what's needed to make a complete encounter for the patient.
11   This is simply the patient telling you what their symptoms
12   are.  That's a start, but that's not a complete medical
13   encounter.
14             MR. RAMSEYER:  All right.  Go to the next page.
15             37 is more of a questionnaire.
16             38.
17   BY MR. RAMSEYER:
18   Q.   It says, "Tolerates prescription well."  Do you know what
19   this is?  I don't know if that's medical speak or what that
20   is.
21   A.    Without.  "S" with a line over it is without.
22   "Tolerating prescription well without side effects -- I'm
23   going to assume, I'm not familiar with this, but I think it
24   means side effects.  "OxyContin 60 milligrams, 10 per tab.
25   Patient is currently working but without insurance."
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 20 of 195   Pageid#:
10146

1  Q.   So is it saying the pills are $10 a tablet?  Is that a

2  dollar sign?  Can you tell?

3  A.   I -- it could be.

4       Yep.  That looks like it now that you zoom in on it.

5  Q.   Then "S" is without insurance?

6  A.   Yes.  "S" with a line over it means without.

7       MR. RAMSEYER:  All right.  Next page, 39.  More of a

8  questionnaire.

9       Page 40 a prescription for Zanaflex.

10      THE WITNESS:  Yes, sir.

11      MR. RAMSEYER:  Page 41.  Prescription for OxyContin.

12  60 milligrams, 60 tablets.

13      And 42.  Oxycodone 20 milligrams, 90 tablets.

14      Now, those both indicate --

15      Go back.

16  BY MR. RAMSEYER:

17  Q.   Those are October 29th, and we'll go back later to that.

18  But from the evidence that's already been submitted there were

19  prescriptions written on September 3rd of 2015 for MS Contin

20  15 milligrams, and oxycodone 30 milligrams.

21      But let me just ask you in general, these quantities

22  of narcotics, are these -- what can you say about them?

23      MR. RAMSEYER:  Go back to the previous page please,

24  page 41.

25  ///

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 21 of 195   Pageid#:
10147

```
 1   BY MR. RAMSEYER:
 2   Q.    60 milligram tablet of OxyContin.  Is that for, like, a
 3   headache?  Is that a small pain dose?
 4   A.    These would be considered high doses of opiate
 5   medications, narcotic medications.  They add up to quite a few
 6   milligrams, well over 100 morphine milligram equivalents per
 7   day.  And that's considered high doses of narcotics.
 8   Q.    So you say "morphine milligram equivalents," is that a
 9   way to equate different drugs and their strength?
10   A.    It is.  Different drugs have different strengths and we
11   can compare them to morphine and it gives us a way to follow
12   the total amount of narcotic medication the patients are being
13   prescribed or taking.  So adding that up for these
14   medications, you're well over 100 milli-equivalents of
15   morphine per day that the patient is being prescribed.
16   Q.    For instance, for this Robert Battaglia on October 29th,
17   it's a 60-milligram tablet, and there's 60 tablets for
18   30 days.  So that would be two tablets a day; correct?
19   A.    Yes, sir.
20   Q.    120 milligrams a day; correct?
21   A.    Of OxyContin, yes.
22   Q.    Kind of a pill that's been around a long time, like a
23   Percocet.  The standard Percocet was a Percocet 5.  That's
24   five milligrams of oxycodone; right?
25   A.    That's correct.  The active ingredient is five milligrams
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 22 of 195   Pageid#:
10148

```
 1    versus, in this case, 120 milligrams.
 2    Q.    So this guy is taking -- or what's being prescribed,
 3    doing the math, 24 -- equivalent of 24 Percocets a day of
 4    oxycodone amounts?
 5    A.    Yes, that's correct.  That's the equivalent.
 6              MR. RAMSEYER:  All right.  Can we go to page 42.
 7    BY MR. RAMSEYER:
 8    Q.    And on top of that, he's getting an additional 90
 9    oxycodone 20 pills; is that correct?
10    A.    That's correct.
11    Q.    And that would be three times a day for --
12    A.    Yes, taken regularly that would be three times a day.
13    Q.    So that would be 60 milligrams of that; is that correct?
14    A.    Correct.  60 additional milligrams.
15    Q.    So he's prescribed this guy 180 milligrams of oxycodone
16    per day; is that correct?
17    A.    Per day, that's correct.
18    Q.    So that would be 30 Percocet 5s; correct?
19    A.    Yes, sir.
20    Q.    Is that correct?
21    A.    Mm-hmm.
22              MR. RAMSEYER:  Page 43.  More of this compliance
23    audit.
24              Page 44.  Another part of PMP.
25              Page 45, Brief Pain Inventory.
```

```
 1              Page 46, more of that.

 2              Page 47.  So here, this is October 1 of '15, the

 3     date the doctor is initialing it.  If we can go back to the

 4     first page of the pain inventory.  Shows that the patient

 5     filled this out October 1, the same day.

 6              And go to that last page again, please.  47.

 7     BY MR. RAMSEYER:

 8     Q.   If you could read what this is, please.  We can zoom that

 9     in.

10     A.   Sure.  "Patient reports taking and tolerating

11     prescription well.  He does not feel the current dose of MS

12     Contin is treating his pain.  Denies any nausea, vomiting.

13     D -- I'm not sure what that means, diarrhea or diaphoresis,

14     and C, I'm not 100% sure what the doctor means by that initial

15     either.  But he's essentially describing that the patient

16     denies any side effects of the current dose.

17     Q.   Okay.  So the records show -- maybe this might help.

18              MR. RAMSEYER:  Your Honor, if I might approach the

19     witness.

20              THE COURT:  Yes, sir.

21     BY MR. RAMSEYER:

22     Q.   Dr. Bassam, you previously had gone through this exhibit,

23     actually went through it again.  Went through it last night

24     and made check marks on it and signed it; is that correct?

25     A.   That's correct.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5111

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 24 of 195   Pageid#: 10150

```
 1   Q.   So does that indicate that for all of those prescriptions
 2   you've indicated they're not for legitimate medical purpose
 3   and they're outside the scope of professional practice?
 4   A.   That's correct.
 5   Q.   All right.
 6           MR. RAMSEYER:  Your Honor, I'd move for admission
 7   into evidence of Government's Exhibit -- I believe it's 107.
 8   Yes, Your Honor, 107.
 9           THE COURT:  It will be admitted.
10       (Government's Exhibit 107 received.)
11           MR. RAMSEYER:  I'm going to let you keep that
12   because that shows the date of the prescriptions we've been
13   talking about.
14   BY MR. RAMSEYER:
15   Q.   So if you can see on that, if you look on Exhibit 107, it
16   shows that on September 3rd of 2015, a prescription was
17   written for MS Contin 15 milligrams, 60 pills.  And oxycodone
18   30 milligrams, 120 pills; is that correct?
19   A.   Yes, that's correct.
20   Q.   All right.  And so that's happened before this visit.
21   Then when he comes back on the next visit, he's basically
22   saying the MS Contin is not working.  The morphine is not
23   working; is that right?
24   A.   Yes, that's what you've highlighted in the follow-up
25   visit.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 25 of 195   Pageid#:
10151

1   Q.   So, as you can see in the chart, then on October 1st the

2   doctor changes him from MS Contin 15 to OxyContin

3   60 milligrams, 60 pills, which is the prescription we just

4   looked at previously.

5   A.   Yes.  And oxycodone.

6   Q.   I'm sorry, it's not the one we looked at previously.

7   That will be the next one.  But he did, in fact, take him off

8   the MS Contin and put him on the OxyContin.

9   A.   That's correct.

10  Q.   And that's when the patient asked to; is that right?

11  A.   Yes, at a substantially higher dose.

12  Q.   All right.

13          MR. RAMSEYER:  Next page please.

14          48.  Nothing on it.

15          49.  More of the questionnaires.

16          50.  Doctor's instructions about nortriptyline,

17  Zanaflex, and GABA.  I believe that would be Gabapentin.

18          THE WITNESS:  Yes, I'm assuming so.

19          MR. RAMSEYER:  Also known as Neurontin.  That's

20  page 50.

21  BY MR. RAMSEYER:

22  Q.   Then page 51 is Form 1.1, Initial Pain Assessment Tool,

23  dated September 5 of '15.  Do you see that?

24  A.   Yes, I do.

25  Q.   And it indicates that the nurse is Angel Smithers.  Do

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 26 of 195   Pageid#:
10152

1  you see that?  Right here?

2  A.   Yes, I see that.  Thank you.

3  Q.   And then it appears that whoever wrote Angel Smithers,

4  that handwriting seems to match most of the other handwriting;

5  is that correct?

6  A.   Yes, I agree.

7  Q.   And, again, does that justify controlled substances that

8  Dr. Smithers was writing?

9  A.   No.  This, again, assessment is simply a collection of

10  the patient's symptoms and a description of their condition.

11  It's insufficient to justify prescribing high doses of

12  narcotics to an individual.

13  Q.   Okay.  But it shows here somebody, in different

14  handwriting than the nurse and same ink as Dr. Smithers it

15  looks like, has marked something on the person.  Would that

16  justify controlled substances if a doctor says they say

17  they're in pain in their neck and their back?

18  A.   No.

19  Q.   Okay.  Why not?

20  A.   Because that's, again, just simply capturing the

21  patient's subjective complaints.  It's a fraction of what's

22  necessary in a complete medical encounter to be able to arrive

23  at an accurate and complete diagnosis and appropriate

24  treatment plan.

25            MR. RAMSEYER:  All right.  If we can go to page 52,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5100

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 27 of 195   Pageid#:
10153

```
 1    please.
 2              This is a discharge summary.  If we could pull this
 3    up, please.
 4              This is a discharge summary, September 3 of 2015,
 5    for Robert Battaglia.
 6              If we can zoom back out now, please.
 7    BY MR. RAMSEYER:
 8    Q.   And this is for some non-controlled; is that correct?
 9    A.   Zanaflex, diclofenac, yes.
10    Q.   At least they're not Schedule II.
11    A.   Correct.  They're not Schedule IIs.
12              MR. RAMSEYER:  If we can go to 53.  Appears to be
13    the same thing.
14              Go to page 54.
15              Okay.  So this one is narcotic medication.  If we
16    zoom that up, same date.
17              THE WITNESS:  Yes.  MS Contin, oxycodone, both are
18    narcotics.
19              MR. RAMSEYER:  All right.  And it says down at the
20    bottom here, if we could blow that up.  I'm just going to read
21    this, you tell me if I'm getting it wrong.
22              "I understand the emergency care I received is not
23    intended to be complete and definitive medical care and
24    treatment.  I acknowledge that I've been instructed to contact
25    the above physician as indicated for continued and complete
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-9100

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 28 of 195   Pageid#:
10154

1    medical diagnosis, care, and treatment.  EKGs and X-rays and

2    lab studies will be reviewed by appropriate specialist and I

3    will be notified of significant discrepancies.  I also

4    understand that my signature authorizes this medical center to

5    release all or any part of my medical record, including, if

6    applicable, information pertaining to AIDS and/or HIV testing,

7    mental health records, and drug and/or alcohol treatment for

8    the follow-up physicians listed above."

9    BY MR. RAMSEYER:

10   Q.    Did I get that right?

11   A.    Yes, sir.

12   Q.    So if you look at your chart, Exhibit 107, you can see

13   that that date, that discharge summary, is the first date that

14   we've charged illegal distributions; correct?

15   A.    September 3rd, 2015.

16   Q.    Yes.

17         And so it says "discharge summary," but that's not

18   the last time Dr. Smithers sees -- or writes prescriptions for

19   Robert Battaglia; correct?

20   A.    No.  In fact, that's the first time.  Certainly not the

21   last time.

22         MR. RAMSEYER:  So we'll go to the next page.

23   BY MR. RAMSEYER:

24   Q.    In fact, it goes all the way to May of 2016; is that

25   correct?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 29 of 195   Pageid#:
10155

```
 1   A.    That's correct.

 2            MR. RAMSEYER:  Next page.

 3   BY MR. RAMSEYER:

 4   Q.    Now here's a checklist for long-term opioid therapy.

 5   It's got some rubber stamps on it for September 5th of 2015,

 6   and October 1st of 2015 for certain things.  Is anything

 7   written in the outcome?

 8   A.    Nothing is written in the outcome.

 9            MR. RAMSEYER:  Okay.  Next page, 57, is blank.

10            58.  Another Brief Pain Inventory.  This one appears

11   to be blank.

12            THE WITNESS:  Yes.

13            MR. RAMSEYER:  Okay.  Keep moving through that.  59

14   is blank.

15            60, brief pain inventory, blank.

16            61, more of the same.

17            62 is a transmission verification report.

18            63 is a fax.  On this fax it says, "Dr. Smithers is

19   requesting enclosed patient's full treatment record and

20   specifically needs the patient's --

21            Let's move out.

22            -- dated medication delivery or records showing

23   dates patient received methadone.  Thanks much?"

24   BY MR. RAMSEYER:

25   Q.    That's dated May 24th, 2016; is that right?
```

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 30 of 195   Pageid#: 10156

```
 1    A.   Yes, it is.

 2    Q.   So that's about eight months after he's started writing

 3    controlled substances to him.

 4    A.   Yes, it is.

 5              MR. RAMSEYER:  All right.  Go to the next.

 6              Another Brief Pain Inventory.  This one is dated --

 7              Can you blow that up?

 8              I believe that's 4-11.

 9              THE WITNESS:  April 11, uh-huh.

10              MR. RAMSEYER:  2016.  There's a sticky on it,

11    "Patient reminded to bring bottles."

12              Next page.

13              Okay.  Next page, 66.

14    BY MR. RAMSEYER:

15    Q.   All right.  On here, again, looks like the doctor is

16    writing some things down.

17    A.   Yes, sir.

18    Q.   Isn't that what a doctor is supposed to do?  Isn't he

19    doing everything right there?

20    A.   No, sir.  This is -- this is far from everything a doctor

21    needs to do in this type of a clinical encounter.

22    Q.   Okay.  But the patient says he's got increased leg pain.

23    Doesn't that mean he should get controlled substances?

24    A.   No, not automatically.

25              MR. RAMSEYER:  All right.  So let's go to the next
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 31 of 195   Pageid#:
10157

1   page.  More notes.

2           Next page.  More of a survey.

3           Page 69 is another copy of that June 1st letter

4   discharging him.

5           Page 70 is another copy of the same Cumberland

6   Mountain Community Services Board Substances Abuse Program

7   address.

8           71 and 72, part of that.

9           73 is that fax again.

10          74 is patient contact form.

11          Consent for treatment is 75.

12          New River Treatment.  This is May 25th of '16.  It's

13  a fax cover sheet.

14          THE WITNESS:  Yes.

15          MR. RAMSEYER:  77.

16          It's an authorization to exchange information.

17  Unsigned.

18          78.  Checklist for disclosure, Battaglia.

19          Keep going.

20  BY MR. RAMSEYER:

21  Q.   Page 79, this is a receipt, which appears to be for the

22  mailing of something.  Do you see that?  Dated June 2nd, 2016?

23  A.   Yes.

24          MR. RAMSEYER:  Okay.  And then page 80 are copies of

25  prescriptions.  So Opana ER and oxycodone dated March 9 of

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 32 of 195   Pageid#:
10158

1   2016.

2            Next page.  More prescriptions.

3            Next page.  More prescriptions.

4            Next page.  More prescription.

5            Next page.  More prescriptions.

6            87 is more prescriptions.

7            88 is more prescriptions.

8            89 is more prescriptions.

9            90 is more prescriptions.

10           91 is more prescriptions --

11           Go back to that one, please.  91.  That one is

12   October 29.  So go to the next one.

13   BY MR. RAMSEYER:

14   Q.   It's another receipt for a credit card for $30.65 dated

15   May 12 of 2016 from Priority Urgent Care.

16   A.   Yes.

17           MR. RAMSEYER:  Next.  Same thing.  Another receipt

18   in the amount of $300.

19           Certified mail receipt dated June 2nd, 2016.

20           Page 96 is a sticky note.  Mr. Battaglia's address

21   and phone number, presumably.

22           Page 90- -- is that all?

23           Is there an RB-3?  There's not.

24   BY MR. RAMSEYER:

25   Q.   So that's the patient's file of Robert Battaglia who

1    received prescriptions for MS Contin, oxycodone, OxyContin,

2    fentanyl, oxymorphone from September of 2015 to May of 2016.

3             Those prescriptions were issued to Mr. Battaglia by

4    Dr. Smithers.  In your opinion were those within the scope of

5    professional practice and were they for legitimate medical

6    purpose?

7    A.   No.

8             MR. RAMSEYER:  All right.  Next we'll go to Frank

9    Blair.

10            We'll start off with FB-1, page 1.

11            And this -- we can go up here, see what this is.

12   (Indicating).

13            So it says Frank Blair, date of birth, got a date of

14   March 2, 2017.

15            Scroll up.  Go back up, please.

16   BY MR. RAMSEYER:

17   Q.   Some sort of thing indicating a billing chart or

18   something; is that right?

19   A.   Yes, sir.  These are a list of diagnoses and what are

20   called ICD codes that's often used for billing purposes,

21   preauthorization purposes.

22   Q.   Okay.  And this one, it's been circled as headache and

23   osteoarthritis, unspecified site; is that right?

24   A.   Yes, sir.

25            MR. RAMSEYER:  Go to page 2.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 34 of 195   Pageid#:
10160

1          Another Brief Pain Inventory.

2          Go more.

3          Keep going.

4          Page 4.

5          Page 5.

6          Page 6.

7          What I'm going to do, again, to try to move this

8 along because we have 50 of these. Just going to scroll

9 through the pages. If there's something there you want to

10 point out, we'll stop. But, otherwise, we'll go through.

11          THE WITNESS: Thank you.

12          MR. RAMSEYER: Hold it right there on 53.

13          Let's blow this up.

14 BY MR. RAMSEYER:

15 Q.   This is April 27 of 2016. Can you read that, please.

16 A.   Yes, sir. "Patient takes and tolerates prescription well

17 without issue. Patient reports moderate control of pain this

18 month. He believes four OP-ER -- I guess that means Opana ER,

19 "40 milligrams would better control his pain since he reports

20 his tolerance is 'very high'."

21 Q.   What does that tell you as a doctor?

22 A.   This tells me that the physician is just simply capturing

23 what the patient is telling him. The patient is telling him

24 that, for reasons that are not clearly documented, his

25 self-reported pain was worse this month, and the patient

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 35 of 195   Pageid#:
10161

```
 1    believes that he needs more narcotic medication and that he
 2    has -- and this is because he has a high tolerance.
 3              This is, in my opinion, inconsistent with a patient
 4    who is struggling from a severe pain problem.  And to this
 5    date, looking at this record, I still don't even understand
 6    what the patient's diagnosis is that would justify anything
 7    close to this level of medication.  So it concerns me a great
 8    deal that this is used as justification to increase what's
 9    already high doses of opiates.
10    Q.   And the doctor may or may not increase it.  But what does
11    it tell you about the patient?
12    A.   I'm not sure what it says about the patient.  It concerns
13    me because, in general, this kind of behavior on behalf of a
14    patient is consistent with a patient who is struggling with
15    some type of opiate use disorder or addiction to their
16    medications that's perhaps using it for non-medical purposes.
17    Q.   Okay.  And can you explain to the jury the difference
18    between a pain patient and a pain medicine patient, as you see
19    it?
20    A.   The way I would describe it is this.  When you're working
21    in this space as a physician, it's very, very important for
22    you to be able to differentiate between a person that has a
23    pain problem versus a person that has a pain medicine problem.
24    These are different people with very different problems.  And,
25    frankly, they behave and act in very different ways.  To put
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(336) 293-9194

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 36 of 195   Pageid#: 10162

1    it simply, a person who has a pain medicine problem, who is

2    struggling with addiction, who is perhaps diverting their

3    medications to others, will, frankly, behave over time like a

4    person who is doing exactly that.

5            A person who is struggling with a legitimate and

6    severe pain problem will act in a very different way and it

7    will be consistent with a person who is struggling with a pain

8    problem.  So I think it's very important for a doctor to be

9    able to very quickly and early in this type of relationship

10   differentiate between a person who has a pain problem and a

11   pain medicine problem.  They act different.  They need

12   different treatment plans.  They need different direction and

13   it's critical to be able to make that difference.

14           What I'm looking at on this paper, on this page, and

15   really throughout this record, are people that are struggling

16   with pain medicine problems.  There's very little in any of

17   the documentation of significant pain problems.

18   Q.   All right.  So if it's a pain patient, they're going to a

19   doctor to have their pain treated or to have their problem

20   treated, how would they act that would be different?

21   A.   Well, they would want to know what's wrong.  They'd want

22   to know, first of all, what's wrong?  Why does it hurt so bad

23   that I have to take hundreds of milligrams of morphine per

24   day?  They would want to know what's wrong.  They'd want to

25   know what can be done about the problem so that they don't

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5616
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 37 of 195   Pageid#: 10163

```
 1    have to rely on huge doses of opiates and narcotics on a daily
 2    basis.
 3              That fundamental wish would drive their behavior and
 4    they would be seeking not just ways to mask the pain with
 5    narcotics, but to treat the underlying condition and improve
 6    that and their overall health in the process.
 7    Q.   All right.
 8              MR. RAMSEYER:  All right.  If we can go to page 154.
 9    When we get to 154, I'd ask you to stop.
10              Stop there.  Let's talk about that real quick.  This
11    is 93.
12              Again, this is -- highlight that.  Discharge summary
13    dated September 10, 2015.
14    BY MR. RAMSEYER:
15    Q.   And again, these are not Schedule III narcotics; correct?
16    A.   That's right.
17              MR. RAMSEYER:  Okay.  If we can go to the next page.
18    Page 94.
19              Okay.  Let's stop there.  96.
20    BY MR. RAMSEYER:
21    Q.   This is that same date.  Those are Schedule II narcotics;
22    correct?
23    A.   Yes, they are.
24              MR. RAMSEYER:  All right.  Go ahead.
25    ///
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 38 of 195   Pageid#: 10164

1  BY MR. RAMSEYER:

2  Q.   Now, again, here's the Initial Pain Assessment Tool.

3  Again, it's Angel Smithers.  And then there appears to be

4  handwriting by somebody else, maybe Dr. Smithers.

5        Again, does -- it says down here that, "Patient

6  reports poor pain control."  Doesn't that mean he should just

7  get controlled substances?

8  A.   No.  What are we prescribing controlled substances for in

9  the first place to this person?  What's wrong?  What's the

10  problem?  What's the diagnosis?  The patient is simply

11  reporting it to the doctor and the doctor is just copying on

12  to the chart where the patient says it hurts.  That's far from

13  a diagnosis of what's wrong.  Pain is a symptom.  It's not a

14  diagnosis in and of itself.

15        MR. RAMSEYER:  All right.  Go to the next page.

16        And page 114 is a checklist for long-term opioid

17  therapy.  Stamp marks for September 10th.  Handwritten

18  October 8.

19  BY MR. RAMSEYER:

20  Q.   Any outcomes on those?

21  A.   Nothing in the outcomes.

22        MR. RAMSEYER:  All right.  Okay.  As we come to 154.

23        Could we go back one more please.  153.

24  BY MR. RAMSEYER:

25  Q.   This patient did not bring bottles or meds again.  Dated

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 39 of 195   Pageid#:
10165

1    November 10, '16.  Do you see that?

2    A.    Yes, sir.

3              MR. RAMSEYER:  Then we go to 154.

4    BY MR. RAMSEYER:

5    Q.    So this is second non-RXD.  The drug testing

6    consistencies authorizing illicit substance.  Do you see that?

7    A.    Yes, sir.

8    Q.    So does this indicate knowledge that he tested positive

9    for Buprenorphine at some point; is that correct?

10   A.    That's correct.

11   Q.    And Buprenorphine, that's a Schedule II controlled

12   substance that's used to treat people with drug addiction; is

13   that right?

14   A.    It's one of its main uses is exactly that.

15   Q.    And Dr. Smithers was not prescribing Buprenorphine for

16   him, was he, according to the records?

17   A.    No, according to the records, he was not.

18             MR. RAMSEYER:  So here, if you go down here to 155.

19             Zoom that in.

20   BY MR. RAMSEYER:

21   Q.    This is one of these compliance reports.  It indicates

22   UDT failure for oxazepam.  Is that A. Benitez?

23   A.    Yes, it's Benitez.

24   Q.    This first failure, that's actually before he was even a

25   patient to Dr. Smithers, according to the records; correct?

```
 1    A.   Yes, sir.
 2              MR. RAMSEYER:  Okay.  Next page.
 3    BY MR. RAMSEYER:
 4    Q.   So there's a sticky note here.  "Going to decrease the
 5    OC-IR," OxyContin IR, "to 30 if bottles not brought."
 6              Doesn't that show the doctor is trying to do the
 7    right thing?  Everything is legitimate.  He's going to
 8    decrease the dose if he doesn't bring the bottles in.
 9    A.   No.  It sounds punitive.  But the entire thing is
10    predicated on no sound understanding or assessment of the
11    patient's underlying condition.  So I think it tells me very
12    little about what the doctor's intentions are.
13              MR. RAMSEYER:  All right.  Go through.
14              Next page.
15              Let's stop at page 172.
16    BY MR. RAMSEYER:
17    Q.   So if you look at your chart, 107, for Frank Blair, if
18    you look at Counts 41, 42.
19    A.   Yes, sir.
20    Q.   Does that indicate he was prescribed oxycodone and
21    oxymorphone on July 21st of 2016?
22    A.   Yes, it does.
23    Q.   And if you look down here at -- this is --
24              MR. RAMSEYER:  Let me zoom up in here first.
25    ///
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 41 of 195   Pageid#: 10167

1    BY MR. RAMSEYER:

2    Q.    Lab report sample for August 18th.  Do you see that?

3    A.    Yes.  August 18th, 2016, urine sample.

4    Q.    Okay.  And if we go down here, what does it say about the

5    oxycodone that he was prescribed?

6    A.    So the urine was analyzed for the presence of oxycodone

7    and noroxycodone.  But it was not there.

8    Q.    What does that mean?

9    A.    This means for three to four days there was no evidence

10   that this person took oxycodone.

11              MR. RAMSEYER:  Okay.  Go 174.

12              Let me back up.

13   BY MR. RAMSEYER:

14   Q.    So according to your chart, 107, when that lab test on

15   August 18th showed negative for oxycodone, does he get a

16   prescription for oxycodone the next month?  Well, the next

17   month, meaning the next time we have him, which would be

18   October.

19   A.    Yes, that's correct, he does.

20   Q.    Okay.  It's a smaller dose, but it's still oxycodone; is

21   that correct?

22   A.    It's --

23   Q.    If you look at the October --

24   A.    It's the same dose per pill, it's a smaller quantity.

25   Q.    Right.  And the oxycodone continues for Frank Blair until

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236 (*) Filed 06/08/19   Page 42 of 195   Pageid#:
10168

1  March of 2017; is that correct?

2  A.   Yes, that's correct.  March 2, 2017, is the last

3  prescription you see for Frank Blair.

4  Q.   So when your patients are being prescribed heavy duty

5  controlled substances and they're negative for it, what does

6  it tell you is happening?  What are the two different options?

7  A.   Well, the two options are that -- what it indicates, as I

8  said, is that the patient has not taken the medication at

9  least three to four days.  It raises concerns whether indeed

10  the patient is taking it at all.  These medications have a

11  high value for people who want to abuse them.  It's easily

12  diverted to others.  So it raises some serious questions

13  whether the patient has diverted these medications.  Or the

14  other scenario is that driven by profound addiction, they

15  consumed all of the medication's month's supply in much

16  shorter time and ran out of the medication.

17  Q.   So under either of those circumstances is the right thing

18  to do to keep giving them Schedule II controlled substances?

19  A.   Not at all.

20        MR. RAMSEYER:  All right.  Sorry, back up to

21  page 175, please.

22  BY MR. RAMSEYER:

23  Q.   So this is one where we got a positive for Buprenorphine

24  on page 175.  Again, not prescribed by Dr. Smithers, according

25  to the records; correct?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 43 of 195   Pageid#:
10169

1    A.    That's correct.

2    Q.    Okay.  And if we can go to the date.  Collected on

3    July 21st, and reported on July 26; correct?

4    A.    That's correct.

5    Q.    All right.  So down here it shows on August 18th,

6    Dr. Smithers's notes indicate -- that second part.  Patient

7    reports taking Suboxone from friend while staying --

8    something.

9    A.    It's with mom.  A "C" with a line over it, it means

10   "with".

11   Q.    "With mom and had left his prescription at home."

12   A.    Yes.  That's how I interpret it.

13   Q.    So, again, what does that tell you is going on here?

14   A.    So, strictly speaking, it means -- it would appear that

15   this person took some kind of trip to stay with his mom and

16   had left his medications behind.  And instead, he had borrowed

17   a friend's similar, not the same medication, Suboxone, and

18   that's why it showed up in his urine drug screen.

19          To me, this is a sort of prime example of the kind

20   of behavior that you would see in a person that has a drug

21   addiction or opioid use disorder and not the kind of behavior,

22   quite the opposite, from someone you would see that struggles

23   with a legitimate and severe pain problem.  People with a bad

24   pain problem understand the severity of their condition and

25   the severity of the fact that they have to rely on narcotic

1   medications on a daily basis and manage that condition.

2   They're very careful about those medications.  They want to

3   make sure that those medications are kept secure, with them on

4   their person so that they don't run out.  And they are very

5   afraid of sharing those medications or taking medications from

6   other people.

7           Meanwhile, people who -- whose underlying problem is

8   an opiate use disorder, an addiction problem, would behave --

9   their behavior is much more consistent with what we're reading

10  here.

11  Q.   All right.  That's even assuming he's telling the truth;

12  right?

13  A.   That's true.  If what you're reading here is often true.

14          MR. RAMSEYER:  Go to page 169, please.

15          It's earlier on the chart but it's later in time.

16  So we've already talked about the positive Buprenorphine on

17  July 21st.  So this is November 10th.  If we go up here, it

18  shows November 10th.

19          And if we go to the next page, 70.

20          Next page.

21          I'm sorry, if you can go back one page, please.

22          So here.  Pull that up, please.

23  BY MR. RAMSEYER:

24  Q.   So back on August 8th, he tested positive for -- excuse

25  me, he tested negative for oxycodone back in August.  Kept

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 45 of 195   Pageid#:
10171

1   getting oxycodone.  This is a test from November, and, again,

2   he's negative for oxycodone, the drug that's being prescribed

3   to him; is that correct?

4   A.   That's correct.

5            MR. RAMSEYER:  All right.  If we go to page 163.

6            And if we can blow that up please.

7   BY MR. RAMSEYER:

8   Q.   We can see it was reported on February 6, 2017.  Again,

9   he's negative for oxycodone; correct?

10  A.   That's correct.

11  Q.   And it's still being prescribed to him; correct?

12  A.   That's correct.

13           It appears that the doctor's note next to the

14  negative finding in this case implies a PRN, meaning that the

15  doctor was accepting the negative results and the excuse for

16  the negative result being that the medication is prescribed as

17  needed.  And so it would appear that the doctor's documenting

18  the decision-making process as being that he was assuming the

19  patient just simply hadn't taken the medication for a number

20  of days and, therefore, he's not seeing the -- not seeing the

21  importance of this negative finding.  Especially repeatedly,

22  if the patient wasn't taking --

23  Q.   I was going to show you on your chart, 107.

24  A.   Yes, sir.

25  Q.   If you go to Count 52, which would be the prescription

1   that was issued prior to this -- or, no, I'm sorry.  It would

2   be 50, Count 50.

3   A.   Yes, sir.

4   Q.   So it shows he was prescribed 20 oxycodone 20-milligram

5   pills the month before; is that correct?

6   A.   Yes, that's correct.

7   Q.   So that would be -- he wouldn't take one every day;

8   correct? if it was 20 for 30 days?

9   A.   If it was 20 for 30 days it wouldn't be every day.

10  Q.   Should it be in his system, given the continued

11  prescribing of those?

12  A.   Yes, at some point it should.  He's taking the medication

13  chronically.  If it's not in the system repeatedly, the

14  question is where are the pills?  Are they being all used up

15  in the beginning?  Are they just sitting and accumulating in

16  bottles not being used?  There's no documentation of

17  ultimately where these pills are.  It's just a notation by the

18  doctor that since it's prescribed as needed, then he's not

19  anticipating that it needs to be in the urine screen.

20         MR. RAMSEYER:  All right.  We can go back to 172,

21  which I think is where we were, and finish this chart.

22         173.

23         174.

24         Keep going, please.

25         If I can go back.  Go back one slide, I'm sorry.

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 47 of 195   Pageid#: 10173

1          Go back one more page, please.

2   BY MR. RAMSEYER:

3   Q.   So up at the top here where it says "medications

4   prescribed".

5   A.   Yes.

6   Q.   So that would be the prescriptions issued by

7   Dr. Smithers; is that right?

8   A.   That's correct.

9   Q.   And one of them is Fioricet which is another controlled

10  substance that includes butalbital.

11  A.   That's correct.

12  Q.   It indicates negative for that.

13  A.   That's correct.

14          MR. RAMSEYER:  All right.  So we go to FB-2.

15  BY MR. RAMSEYER:

16  Q.   So it shows the doctor actually at some point discharged

17  Frank Blair; March 29 of 2017?

18  A.   Yes, sir.

19  Q.   And gave him a titration dose, he says.

20          MR. RAMSEYER:  So if we can go to the next page.

21  BY MR. RAMSEYER:

22  Q.   So in your opinion does that make all those prescriptions

23  he issued legitimate and within the scope of professional

24  practice because at some point he discharged the patient?

25  A.   No.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 48 of 195   Pageid#:
10174

1    Q.    Okay.  Why not?

2    A.    Because the decision to start or continue these

3    medications was based on a significant insufficient evaluation

4    of the patient's condition.  The whole premise of this

5    relationship is based on no foundation.

6                MR. RAMSEYER:  Okay.  We go on through this file.

7    Just keep going.

8                Wait a minute.  Back up on that page.  I'm sorry.

9                So one page, page 9.

10   BY MR. RAMSEYER:

11   Q.    So this shows this guy is from Lenore, West Virginia.

12   Did you notice that these patients seem to be traveling great

13   distances to see Dr. Smithers?

14   A.    Yes, I did.

15   Q.    Anything about that seem unusual to you?

16   A.    Yes.  I mean, the question is why would folks have to

17   travel hours and hours across state lines to see Dr. Smithers?

18   It's hard to imagine a medical reason for that.

19   Q.    Okay.

20                MR. RAMSEYER:  All right.  Is there an FB-3?

21                So that's it for Frank Blair.

22   BY MR. RAMSEYER:

23   Q.    Again, based on that chart, your review of it, those

24   prescriptions issued to Frank Blair, were they for a

25   legitimate medical purpose or within the scope of professional

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 49 of 195   Pageid#:
10175

1   practice?

2   A.   No, they were not.

3   Q.   All right.

4          THE COURT:  Mr. Ramseyer, why don't we take a break

5   now.

6          Ladies and gentlemen, if you'll follow the bailiff

7   out, please.  We'll take a break.

8       (Proceedings held in the absence of the jury.)

9          THE COURT:  Mr. Ramseyer, let me just discuss with

10  you a little bit about how we're going about this.  We've got

11  2 of 50.

12         MR. RAMSEYER:  Your Honor, I don't intend to go at

13  the same pace with the other ones.  I thought it was important

14  to show what's in these files.  Then I intended to ask him:

15  During your review of the other files, would you find similar

16  things or those characteristic of that?  Then I intended to

17  point out certain things in those other files.

18         THE COURT:  All right.  Then that will be very good.

19         MR. RAMSEYER:  Thank you.

20         THE COURT:  All right.  If there's nothing further,

21  then we'll be in recess.

22      (Proceedings suspended at 10:23 a.m. and resumed at 10:57

23  a.m.)

24         THE COURT:  Are we ready for the jury?

25         MR. RAMSEYER:  Yes, Your Honor.

```
 1              THE COURT:  All right.  We'll have the jury in,
 2   please.
 3        (Proceedings held in the presence of the jury.)
 4              THE COURT:  All right.  We're ready to go again.
 5              MR. RAMSEYER:  Thank you, Your Honor.  I promise I
 6   will move faster.
 7              So as to Steve Blevins, if we could go to SB-2.
 8   BY MR. RAMSEYER:
 9   Q.   So, Dr. Bassam, you reviewed all these charts previously;
10   correct?
11   A.   That's correct.
12   Q.   So I'm not going to go through into every single page.
13   I'm just going to point out a couple things.  So on SB-2, the
14   chief complaint.  It's right here.
15   A.   Yes, sir.  Pain all over.
16   Q.   Does that mean he gets controlled substances?
17   A.   No.
18   Q.   And you reviewed that chart.  Were those prescriptions to
19   Steve Blevins for legitimate medical purpose and within the
20   scope of professional practice?
21   A.   In my opinion they were not.
22              MR. RAMSEYER:  All right.  Next is Geneva Bowman.
23              And as to that, if we could go to page GB-64.
24              Next page, please.
25              Next page.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 51 of 195   Pageid#:
10177

```
 1              Keep going, please.

 2              Go down here.  If we could highlight that.

 3              This is on GB-68.

 4    BY MR. RAMSEYER:

 5    Q.    So it indicates for Ms. Bowman, back in 2013 she tested

 6    positive for hydrocodone.  She has an old prescription

 7    warning:  Next time would be a failure; is that correct?

 8    A.    Yes.

 9    Q.    Again, that would be before she even saw Dr. Smithers;

10    correct?

11    A.    Yes, sir, that's correct.

12    Q.    Then in October '14, she had a failed drug screen for

13    being negative for morphine and oxycodone; do you see that?

14    A.    Yes, I do.

15    Q.    Down here is this interesting note.  July 20, 2015.  Can

16    you read that?

17    A.    "Patient seen for first time today since Charleston

18    Clinic closure.  Unable to find old file, so."

19    Q.    That's dated 7-20 of '15; is that correct?

20    A.    Yes, it is 7-20-15.

21    Q.    And if you look at the prescriptions for Geneva Bowman,

22    the counts charged begin in October of 2015; is that correct?

23    A.    That's correct.

24    Q.    And they continue all the way to July of 2016; is that

25    correct?
```

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 52 of 195   Pageid#:
10178

```
 1    A.    That's correct.

 2              MR. RAMSEYER:  And if we can go to GB-70.

 3              70.  That's 60.  I'm sorry.

 4              Sorry, that's not the page I was looking for.

 5              So might be 69.

 6    BY MR. RAMSEYER:

 7    Q.    In any event, as to Geneva Bowman -- and let me ask you

 8    this.  On some of these charts, I'm going to point out failed

 9    urine drug screens, things like that.  Just assume they didn't

10    fail any drug screens, like all their urine drug screens were

11    good, all their PMPs were good, would these prescriptions be

12    for legitimate medical purpose and within the scope of

13    professional practice?

14    A.    No, they would not.

15    Q.    And why is that?

16    A.    Because they weren't for a legitimate medical purpose in

17    the first place.  There's no documentation of any significant

18    pathology that a physician would reasonably assume is causing

19    severe pain.  Furthermore, there is no other attempt made to

20    make an accurate diagnosis or offer -- examine a patient and

21    offer an accurate diagnosis and treatment plan.

22    Q.    Are these patients being helped in the way a physician

23    would help a patient?

24    A.    Not in my opinion, no.  They're not being helped, not in

25    the way a physician takes care of a patient.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 53 of 195   Pageid#:
10179

1    Q.   So, again, the prescriptions -- to save time, I'm not

2    going to ask you as to each patient.  We'll wait until we get

3    to the end and you've actually testified about all of them

4    before.

5              MR. RAMSEYER:  So let's move on to Jason Bowman.

6              So for Jason Bowman, page 37.

7              Again, highlight that, please.

8    BY MR. RAMSEYER:

9    Q.   Patient says -- so does it indicate the Opana was

10   prescribed twice a day, but he took it -- is that three times

11   a day?

12   A.   Three times a day.

13   Q.   For 14 days.

14   A.   For 14 days.

15   Q.   Due to pain.  Is that right?

16   A.   That's correct.  "This past month due to increased pain,

17   patient reports it's possibly due to increased activity and

18   change in the weather, pain in the neck and midback is

19   continued and concerning to her because it has worsened."

20   Q.   It's probably him; right?  Concerning to him?

21   A.   Him, sorry.  He feels it has worsened.

22   Q.   That was on November 12, 2015.  Again, is that a reason

23   to change the dose or even continue the patient on these

24   drugs?

25   A.   No.  Quite the opposite, in fact.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 54 of 195   Pageid#:
10180

1  Q.   Okay.  So what happens, he comes in on November 12 with

2  that situation.  And prior to that on September 11th, he had

3  received morphine sulfate 15 milligrams, 90 pills, and

4  oxycodone 30 milligrams, 90 pills.  And the doctor puts him on

5  oxymorphone 30 milligrams; is that right?

6  A.   So he increases the medications.

7  Q.   Right.  Is that on the chart?

8  A.   Yes, it is on the chart.

9  Q.   And on October -- excuse me, on December 14th, he

10  increases the oxymorphone from 30 milligrams to 40 milligrams

11  per day -- I mean, per pill; is that correct?  That would be

12  Count 84.

13  A.   Count 84 is for oxymorphone 40 milligrams, 90 pills for

14  30 days.  That represents an increase from the prior

15  prescription of oxymorphone, which was for 30 milligrams per

16  pill.

17  Q.   All right.

18          MR. RAMSEYER:  If we could go to JB-119, please.

19  BY MR. RAMSEYER:

20  Q.   And this shows medications prescribed.

21  A.   Yes.  Oxycodone, oxymorphone, as well as Neurontin and

22  Zanaflex.

23  Q.   All right.  And the patient is positive for

24  Buprenorphine.

25  A.   That's correct.  That's a controlled substance that was

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 55 of 195   Pageid#:
10181

1    not prescribed by the doctor.

2    Q.   And that was June 14th of 2016.  Does he continue to get

3    drugs into July and August?

4    A.   Yes, he does.

5    Q.   Continues to get oxycodone and oxymorphone; is that

6    correct?

7    A.   That's correct.  And the oxycodone on this urine drug

8    screen, June 14, 2016, is also noted to be negative.

9    Q.   So he's not positive for the drug he's taking.  He's

10   positive for some drug he's not being prescribed; is that

11   right?

12   A.   Yes, that's correct.

13            MR. RAMSEYER:  All right.  Let's go to Deborah

14   Brown.

15            On page 1, it's an MRI.

16   BY MR. RAMSEYER:

17   Q.   So let me ask you this.  Just as a general matter, if a

18   person gets an MRI, does that mean they should be getting

19   Schedule II controlled substances?

20   A.   No, not necessarily.  Not automatically, certainly not.

21   Q.   Because sometimes an MRI shows that nothing is wrong.

22   A.   An MRI shows a very detailed picture of the anatomy in

23   question that you're looking at.

24   Q.   Right.  But, I mean, it could show nothing wrong or it

25   could show something, there's something there, but it doesn't

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 56 of 195   Pageid#:
10182

1    justify controlled substances; right?

2    A.    Yes, that's accurate.  That's correct.

3    Q.    So if you look at the report here, this was dated

4    February 11 of 2014.  And Deborah Brown comes to Dr. Smithers,

5    according to the chart, on August 31st of 2015.  So that's

6    about a year and a half after that; is that right?  Go from

7    February '14 to August of '15?

8    A.    Yes.  My first prescription for Deborah Brown on my page

9    is --

10   Q.    September 1.

11   A.    September 1, 2015, that's correct.

12   Q.    Correct.  Okay.  And if you look at the MRI report, if

13   you go down to the impression down here, it says, "Mild

14   multi-level spondylosis."

15   A.    Yes, that's correct.

16             MR. RAMSEYER:  Okay.  And if we go to the next page.

17             And go to the next page, please.

18   BY MR. RAMSEYER:

19   Q.    So this is another one, radiology report.  Go to the

20   impression of the radiology report, what does it show?

21   A.    No acute abnormality.

22   Q.    So what do these MRIs and X-rays tell you?

23   A.    Very little.  I would point out that this is a

24   48-year-old female at the time of the MRI that was previously

25   looked at.  On the screen right now is an X-ray of the hip

1    that shows no acute abnormality.  But you have to appreciate

2    that these MRIs are very, very detailed pictures.  And in this

3    case of a person's spine of a 48-year-old, nobody, practically

4    nobody above the age of about 30 has a perfect looking spine.

5    So it would be unusual, in fact, to see an MRI of someone who

6    is 48 of their spine and have zero evidence of any

7    degeneration or aging.

8            So what's reported on that MRI, and we don't have

9    the benefit of the pictures, but what the radiologist has

10   interpreted and reported is entirely consistent with a normal

11   degenerative aging of a 48-year-old's spine and would

12   certainly not be an appropriate basis or justification for the

13   prescription of high-level chronic narcotics.

14           MR. RAMSEYER:  All right.  Let's go to Clayton

15   Colegrove.

16           CC-1, page 18, please.

17   BY MR. RAMSEYER:

18   Q.   And up here where it talks about the pain.  It says, "I

19   hurt all the time."  So, again, is that justification for

20   controlled substances being issued to him repeatedly?

21   A.   No.  Not an isolation like this.  That by itself is not

22   justification for narcotics.

23           MR. RAMSEYER:  If we can go to CC-1, page 9.

24   BY MR. RAMSEYER:

25   Q.   And, again, he's positive for Buprenorphine; is that

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 58 of 195   Pageid#:
10184

1    correct?

2    A.    That's correct.

3    Q.    Again, according to Dr. Smithers's records, he's not

4    being prescribed Buprenorphine, is he?

5    A.    That's correct.

6    Q.    And it's a Schedule III controlled drug; correct?

7    A.    It is.

8    Q.    After that he gets prescriptions in July, August,

9    November of 2016; is that correct?

10   A.    That's correct.

11   Q.    For oxycodone and oxymorphone; is that right?

12   A.    Yes, sir.

13           MR. RAMSEYER:  If we go to Janet Craycraft.  On

14   page 2.  Here it says --

15           Go down, I'm sorry.  Wrong part.

16           It's this one.

17   BY MR. RAMSEYER:

18   Q.   So the patient says they're taking drugs not prescribed

19   for you.

20   A.   Yes.

21   Q.    Is that a red flag of potential abuse?

22   A.    It is a red flag.

23           MR. RAMSEYER:  All right.  So let's go to Timmy

24   Damron.  To TD-19.

25           It's another urine drug screen.

```
 1              Scroll back out.  I'm sorry.
 2              The date, May 19th, 2015.  I should go to here.  So
 3    it shows it's actually a lab report from Hope Clinic in
 4    Wytheville, dated collected on May 19 of 2015.
 5              And if you could go to the next page.
 6              Go to 19, I'm sorry.
 7    BY MR. RAMSEYER:
 8    Q.   So drugs prescribed are oxycodone and gabapentin; do you
 9    see that?
10    A.   Yes, sir.
11    Q.   And down here it shows positive for hydrocodone.  So that
12    would be a drug not prescribed; correct?
13    A.   That's correct.  That was not prescribed.
14    Q.   Again, that's a red flag of someone that's abusing drugs?
15    A.   It is.
16              MR. RAMSEYER:  Hassel Daniels.  If we can go to
17    page 120.
18              I'm sorry, it's just HD-120, not HD-1.  Just HD.
19              So it says, "Darryl Williams gave this fax number to
20    send my information from Hassel Daniels's birth date," blah
21    blah.
22    BY MR. RAMSEYER:
23    Q.   Now, doctor, when you made your opinion that these
24    prescriptions were not within the scope of professional
25    practice and they weren't for a legitimate medical purpose,
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 60 of 195   Pageid#:
10186

1   did you base that just on your review of the files?

2   A.   Yes, sir, that's all I had.

3   Q.   I want to tell you some facts that came out in evidence

4   and ask if that changes your opinion in any away.  There's

5   been evidence introduced that Darryl Williams would send money

6   to Dr. Smithers to pay for the office visits of other

7   patients.  Would that change your view of whether these were

8   for legitimate medical purpose or not?

9   A.   No, it wouldn't.

10          MR. WILLIAMS:  Your Honor, I would object as to

11   speculation.

12          THE COURT:  Well, I'll overrule the objection.

13          I guess, Mr. Ramseyer, if you would -- I think it

14   would be more proper to ask the witness if he assumed.  I

15   mean, whether or not the facts introduced into evidence will

16   be accepted is not known.

17          MR. RAMSEYER:  Thank you, Your Honor.

18   BY MR. RAMSEYER:

19   Q.   So, Dr. Bassam, if there were -- just for the sake of

20   argument, if you assume that Darryl Williams was sending money

21   to Dr. Smithers to pay for other patients' office visits, some

22   of these patients we've been talking about, would that change

23   your opinion in anyway?

24   A.   I'm assuming these are unrelated people, so it would only

25   enforce my opinion.

1   Q.   All right.  And let me ask you.  You've reviewed files

2   before for other doctors?

3   A.   Yes, sir.

4   Q.   In reviewing these files of Dr. Smithers, is it a close

5   call as to whether it's within the scope of professional

6   practice?

7   A.   No, in my opinion it's not a close call.

8   Q.   All right.

9        MR. RAMSEYER:  So for Hassel Daniels, let's go to

10  September 5th of 2016.  And that would be page HD-20.

11  BY MR. RAMSEYER:

12  Q.   All right.  So if you look at chart 107 that you have

13  there, the exhibit, Hassel Daniels has been receiving

14  oxycodone every month from April 28, June 2nd, June 30th,

15  August 4th, September 5th.  And on September 5th he's tested

16  for oxycodone and he's negative; correct?

17  A.   That's correct.

18  Q.   He's also been prescribed oxymorphone.  He's positive for

19  that; correct?

20  A.   That's correct.

21  Q.   So the next visit, or the next prescription appears to be

22  November 14th, and he gets oxymorphone 60.  So, again, a

23  negative oxycodone screen.  What does that tell you when

24  you're getting a prescription for oxycodone?

25  A.   It's concerning.  It should be there.  He's prescribed 45

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(36 ) 823-9441
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 62 of 195   Pageid#:
10188

```
 1    tablets of oxycodone to be taken for 30 days.  And assuming

 2    that this person has pain on an every-day basis as they're

 3    purporting, then one would anticipate that medication to be

 4    there.  Instead, it's not there, meaning he hadn't taken it

 5    for at least three to four days.

 6              MR. RAMSEYER:  All right.  Let's go to Robert

 7    Daniels.

 8              So let's go to RD-41.

 9              RD-41, please.

10    BY MR. RAMSEYER:

11    Q.   Again, looking at your chart 107.  He's been receiving

12    oxycodone and oxymorphone since September 2015.  This lab

13    report is dated December of 2015.  Do you see that?

14    A.   Yes.

15              MR. RAMSEYER:  All right.  I'm going to go then to

16    the bottom of that page.

17              Can we go to page 41, please.

18              Can we scroll down.

19              I'll need to get the original.

20              Just going to the next page, if you don't mind.

21              Go to the next page.

22              All right.

23              We'll get the original for the jury.

24    BY MR. RAMSEYER:

25    Q.   But assuming that on December 21st he was negative for
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 63 of 195   Pageid#: 10189

1    oxycodone.  Again, she continued to get these drugs?

2    A.    Yes.  Despite being negative on the urine screen, the

3    prescribing of medication continues.

4    Q.    And should that happen?

5    A.    No.  There should be a much more thoughtful process as to

6    figuring out why the abnormal drug screen.

7              MR. RAMSEYER:  All right.  Let's go to Donna Dotson.

8              Let's go to DD-2, 18.

9              DD-2, page 18, please.

10             Actually, skip that.  Let's go to DD-2, page 30.

11             And this is one of these Brief Pain Inventories.

12   You've already testified this isn't really that useful.  But

13   let me go to the end of that.

14             So if we go to page 31.

15             Page 32.

16             Page 33.

17   BY MR. RAMSEYER:

18   Q.    And down here for "reviewer," does it indicate anybody

19   has even reviewed it?

20   A.    No, it would appear not.

21             MR. RAMSEYER:  All right.  And if we could go to

22   DD-2, page 24.

23             This is May 9th of 2017.  So it's the next month.

24   Let me go to the last page of that.

25   ///

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 64 of 195   Pageid#: 10190

BY MR. RAMSEYER:

Q.   Again, does it appear anybody's even reviewed it?

A.   No, it does not appear to be reviewed.

        MR. RAMSEYER:  All right.  Stephen Fearin.  Let's go
to SF-7.

        So let's highlight this.  Bring that up.

BY MR. RAMSEYER:

Q.   So the driver's license said he's from Wallingford,
Kentucky.  And according to this, his date of birth is 1988.
Makes him, in 2015, 27 years old, approximately; is that
right?

A.   Yes, sir.

Q.   Is that -- does that mean anything to you as a doctor
when you're talking about controlled substances?

A.   Yes, he was a young man.  What could he possibly have
that's so severe that requires high doses of narcotics?

        MR. RAMSEYER:  And if we could go to SF-7.

BY MR. RAMSEYER:

Q.   So this is a checklist for long-term opioid therapy.
Again, anything there that helps you know what's going on or
what the basis for the treatment is?

A.   Nothing here that would assist him that way.

Q.   All right.  Again, I don't want to go through the whole
file, but, in general, these files --

        I won't ask that.  I asked it before.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 65 of 195   Pageid#: 10191

```
 1              MR. RAMSEYER:  Let's go to Brenda Fisher.

 2              So if we go to BF-1, page 7.

 3   BY MR. RAMSEYER:

 4   Q.    So the medication prescribed is OC-IR?

 5   A.    Yes, sir.

 6   Q.    So she's positive for oxycodone.  That's the first

 7   prescription we have issued is on that date, November 17 of

 8   2016.  And, again, with Brenda Fisher.  It's November, she

 9   gets oxycodone and oxymorphone.  December, oxycodone,

10   oxymorphone.  January, oxymorphone.  February, oxycodone and

11   OxyContin.  And if you look at BF-1, page 25.  The Brief Pain

12   Inventory dated December 15th of 2016.

13              MR. RAMSEYER:  Can you scroll.

14   BY MR. RAMSEYER:

15   Q.    Again, does it appear that anybody has even reviewed it?

16   A.    It would appear no one has reviewed this.

17   Q.    What does it tell you when there's stuff in the chart and

18   doesn't look like it's being used to guide any kind of

19   practice?

20   A.    It's concerning.  I mean, it's just papers on the chart

21   that have no meaning and certainly no useful purpose,

22   medically speaking.

23              MR. RAMSEYER:  All right.  Let's go to Candy George.

24   So CG-38.

25   ///
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5100

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 66 of 195   Pageid#:
10192

1   BY MR. RAMSEYER:

2   Q.   So she's been -- this is back, again, it's from Hope

3   Clinic, May 19th of '15.  So it's before she's seen by

4   Dr. Smithers, but it's in his charts.

5   A.   Yes, sir.

6   Q.   Patient's medications prescribed, oxycodone and Zanaflex,

7   and positive for hydrocodone.

8   A.   Yes.  Medication which was not listed as being

9   prescribed.

10  Q.   Okay.  And there's a note there, "Patient advised this

11  was an ER visit," which is in her Wytheville chart.  Do you

12  see that?

13  A.   Yes, I see that.

14  Q.   And in August she gets MS Contin, oxycodone.  September

15  she gets oxycodone, morphine sulfate.

16          MR. RAMSEYER:  Let's look at her New Patient Intake

17  Form, which is CG-12.

18  BY MR. RAMSEYER:

19  Q.   And do you see at the bottom, again, any indication

20  anybody's looked at it?

21  A.   No.  No, sir.  No indication anybody has looked at it to

22  review it.

23          MR. RAMSEYER:  Let's go to Bryan Harlow.  And if you

24  go to page 6.  And down here, if we highlight this.

25  ///

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 67 of 195   Pageid#: 10193

1  BY MR. RAMSEYER:

2  Q.   "Have you ever received treatment in a methadone or

3  Suboxone treatment center?"

4  A.   "Yes."  The patient responded in the affirmative.

5  Q.   Okay.  When you get treatment at a methadone or Suboxone

6  treatment center, what's that treatment for?

7  A.   That's for addiction to opiates, or abuse.

8  Q.   All right.  So, according to this, Dr. Smithers is aware

9  of this on October 1st of 2015.  And so what does he prescribe

10  to him on October 1st of 2015?

11  A.   He prescribes the medications that he's addicted to.

12  Q.   Prescribes oxycodone 30 milligrams, 60 pills, and

13  oxymorphone 30 milligrams, 60 pills; is that right?

14  A.   Yes.

15  Q.   And that continues, October, November, January, another

16  prescription in late January, February.

17        MR. RAMSEYER:  So if we can go to BH-31.

18        And highlight this.

19  BY MR. RAMSEYER:

20  Q.   This is dated June 12 -- or, excuse me.  March 24th,

21  2016.  Can you read that?

22  A.   Yes.  It looks to be some kind of descriptions of patient

23  reports of pain.  Number 1 is pointing to the back of the

24  right shoulder.  And notation is made that, "Last MRI was in

25  2013.  Since then had rotator cuff repaired.  However, pain

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 68 of 195   Pageid#:
10194

1    has worsened."

2          Another note, "Seeing new PCP this month for X-rays

3    and/or ortho referral."

4          Number 2 is a description -- is pointing to the low

5    back on the diagram.  And the notation, "Left greater than

6    right and the symptoms the patient is describing are worse on

7    the left."  And the doctor's note, "Seeing a neurologist for

8    worsening pain and numbness in the low back and legs.  Left

9    greater than right."

10   Q.    All right.  And what does this mean to you?

11   A.    This is just capturing what the patient's reporting in

12   terms of their symptoms.  It is also capturing what the

13   patient is telling the physician he's planning on doing for

14   these things.  So patient's reporting that they're going to be

15   getting the new primary care physician sometime this month and

16   will be asking them for X-rays to look into shoulder and

17   perhaps a referral to an orthopedic doctor.  And similar

18   things are being said to the doctor about the low back and

19   seeing a different doctor for these worsening symptoms in the

20   low back and legs.

21   Q.    Okay.  But what does it tell you about Dr. Smithers?

22   What's his role as a doctor, according to these charts?

23   A.    I'm not sure.  This is confusing to me.  There's nothing

24   that prevents Dr. Smithers from making an X-ray request, or an

25   orthopedic referral, or for referring for -- get a

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(36 6) 623-504 4*

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 69 of 195   Pageid#:
10195

1    consultation or testing for the worsening low back pain

2    complaints from the patient.  There's nothing that prevents

3    the doctor in this encounter from following up on these and

4    directing them.

5    Q.   So, I mean, from the charts and things like this, what

6    does it appear Dr. Smithers is providing?

7    A.   Just simply documentation of the patient's report of pain

8    and prescriptions for narcotics.

9    Q.   All right.  And if you look to BH-24.  So the doctor has

10   prescribed non-controlled substances.  What does this

11   indicate?

12   A.   It indicates that the non-controlled substances were not

13   filled, only the controlled substances, the narcotics were

14   filled of the prescriptions that were written.

15   Q.   All right.  And what is that a sign of?

16   A.   That's, I think, another example of the kind of behavior

17   you would see in someone whose intent is to misuse, abuse, or

18   divert narcotic controlled substances.

19            MR. RAMSEYER:  All right.  That's May 23rd of 2016.

20   Let's go to July 18th of 2016, BH-16.

21            MR. WILLIAMS:  Your Honor.

22            THE COURT:  Yes, sir.

23            MR. WILLIAMS:  I'm going to object on that last

24   question as to speculation.

25            THE COURT:  Well, I'm going to overrule the

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 70 of 195   Pageid#: 10196

```
 1    objection.  The witness has shown his qualifications as a pain

 2    management expert.  But he is expressing an opinion consistent

 3    with that expertise.

 4           MR. RAMSEYER:  All right.  Let's go ahead -- let's

 5    go to --

 6           THE COURT:  Ladies and gentlemen, let me add to

 7    that.  Again, you are the judge of all of the testimony in

 8    this case.  I'm simply admitting that testimony for your

 9    consideration.

10           Go ahead, Mr. Ramseyer.

11           MR. RAMSEYER:  Let's go to John Greg Harlow.  Page

12    JHa-9.

13           Page 9, please.

14           Let's go Pamela Harlow.

15           Let's go to PH-1000.  Can we do that?

16           Let's go to PH-6.

17    BY MR. RAMSEYER:

18    Q.   And it shows the medications prescribed.  Is that

19    diclofenac, gabapentin, oxycodone and Zanaflex?  Do you see

20    that?

21    A.   Yes, sir.

22    Q.   May 18th, 2016.  And she is --

23           MR. RAMSEYER:  Go down here.

24    BY MR. RAMSEYER:

25    Q.   She's negative for gabapentin, negative for oxycodone,
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 71 of 195   Pageid#:
10197

```
 1   and positive for oxymorphone.  Do you see that?
 2   A.   That's correct.
 3           MR. RAMSEYER:  If we can go to the next page.
 4           Next page.
 5           Next page.
 6           All right.  So she goes into a high-risk contract.
 7   Down here is this sticky note on the same page.  It's dated
 8   6-14 of '16.  If we can go to that, please.
 9   BY MR. RAMSEYER:
10   Q.   It says, "Darryl Williams, OP-ER prescription from Pam
11   Harlow on 4-22-16.  He or she will provide the original RX."
12   What does that tell you?
13   A.   It's hard for me to opine on this.  Darryl Williams is
14   not the patient that we're talking about, so I don't
15   understand why this person has anything to do with Pam
16   Harlow's prescriptions.
17           MR. RAMSEYER:  All right.  If we can go to PH-12.
18   BY MR. RAMSEYER:
19   Q.   And it is for June 14th of '16.  It says, "First DT
20   inconsistency for negative meds."  Again, what does it mean if
21   your urine screen is showing negative if you're get -- in this
22   case she was getting oxycodone, oxymorphone?
23   A.   The patient's being prescribed narcotics, oxycodone and
24   oxymorphone, for severe pain.  And when a drug test, urine
25   test is administered and analyzed for the presence of
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 72 of 195   Pageid#: 10198

1  medication and there's none there, that means the patient at

2  the very least has not taken the medication for three to four

3  days.

4  Q.   All right.

5  A.   I'm sorry.  Further I would state that it should raise

6  serious questions in the provider's mind about the ultimate

7  disposition of these medications and how they're being used.

8            MR. RAMSEYER:  Okay.  If you go to HH-2, for Heather

9  Hartshorn.

10 BY MR. RAMSEYER:

11 Q.   Okay.  It's got the medication record.  Do you see that?

12 A.   Yes, sir.

13           MR. RAMSEYER:  And on the little sticky note, if we

14 could blow that up.

15 BY MR. RAMSEYER:

16 Q.   "Patient will bring all RXs next month, 2-20-17."

17 A.   Yes, sir.

18           MR. RAMSEYER:  All right.  And if we could go to

19 HH-70.

20           It's another one of those Brief Pain Inventories.

21 This one doesn't even have a date.

22           Go to the next page, please.

23           Next page.

24           Next page.

25 ///

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 73 of 195   Pageid#: 10199

1    BY MR. RAMSEYER:

2    Q.    Again, does it indicate any medical person's reviewed it?

3    A.    No, sir.

4    Q.    Not anyone.

5          MR. RAMSEYER:  All right.  Let's go to Bobby

6    Hopkins.  Let's go to BH-01, page 14.

7    BY MR. RAMSEYER:

8    Q.    So this is an Agreement For Opioid Maintenance Therapy.

9    Do you see that?

10   A.    Yes.

11         MR. RAMSEYER:  And you can go to page 15.

12   BY MR. RAMSEYER:

13   Q.    So it appears to be dated on October 29 of 2015.  It

14   says, "The above agreement has been explained to me by

15   Dr. Smithers."  Do you see that?

16   A.    Yes, sir.

17         MR. RAMSEYER:  If you go back to the previous page,

18   page 14.  If you highlight Number 2 there.

19   BY MR. RAMSEYER:

20   Q.    So does it say, "You must use only one pharmacy to obtain

21   all opiate prescriptions and adjunctive analgesics prescribed

22   by your physician."  And there's a place to put in where that

23   pharmacy is going to be; correct?

24   A.    Yes, sir.

25   Q.    Is it filled in?

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 74 of 195   Pageid#: 10200

1   A.   It's blank.

2   Q.   So, again, what does that tell you?

3   A.   This form is not serving its purpose.  It's not being

4   filled out correctly.  It is standard practice to ask that one

5   pharmacy be used for filling controlled substances for

6   recordkeeping purposes.  And that if that's not possible, for

7   there to be some communication documented as to why that's not

8   possible.  In this case, it's simply left blank.

9        MR. RAMSEYER:  All right.  Let's go to Sam Hubbard.

10  SH-13.  It's dated December 23rd of 2015.

11        And let's go down to the bottom here.

12        If you could highlight, "The patient does not recall

13  taking an OC-IR prior to this UDT.  But as we review it almost

14  six months later, he's unsure how it was in his system."

15        THE WITNESS:  Yes, this is inconsistent.  This is a

16  drug screen.  The medication being prescribed is not found.

17  The second one appears that this was actually ordered and

18  received -- collected, ordered, and received in December of

19  2015, but was not reviewed by the physician until months later

20  in May of 2016.

21  BY MR. RAMSEYER:

22   Q.   It indicates WW reviewed it May 18th of '16.

23   A.   Yes.  I'm sorry, I'm not familiar with WW.  But that's --

24   Q.   Right.  Then we go to the next page.  There it

25  indicates --

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 75 of 195   Pageid#:
10201

1   A.   Yes.  This is Dr. Smithers's signature dated May of 18.

2   On the urine drug screen from approximately six months prior,

3   "Patient reports may have been given Tramadol in the ED just

4   prior to this urine drug screen."  And then a note at the

5   bottom, "Delayed review due to system down."

6   Q.   Right.  So, as a doctor, if you order lab tests done, do

7   you wait five months to look at it? or six months to look at

8   it?

9   A.   No.  We'd be looking at it as it comes in and certainly

10  considering it, at the latest, at the time of the next visit

11  of the patient when they're back in front of you.

12          MR. RAMSEYER:  All right.  Let's go to Sam Hubbard

13  again, for SH-8.

14          And if you highlight the description down there at

15  the bottom.

16  BY MR. RAMSEYER:

17  Q.   So at the top it says, "First failure, UDT."  That means

18  urine drug test; is that right?

19  A.   Yes, sir.

20  Q.   So 5-18-16 it was positive for Valium metabolites.

21  Valium was not prescribed.  "Patient states it was given to

22  him in the hospital before his May 2016 visit.  He advised he

23  would bring in the paperwork from the hospital on the June

24  2016 visit.  First failure assigned.  Patient moved to

25  moderate risk.  6-21-16.  WW."

1          Then Dr. Smithers, if you can read what's above his

2     handwriting there.

3     A.    Yes, sir.  It appears Dr. Smithers wrote and signed this

4     on August 31st, 2016.  "Patient failed to show for most recent

5     appointment due to financial issues.  Raise to high-risk

6     contract due to poor judgment in letting a discharged patient

7     from this practice fill his last prescription."

8     Q.    Okay.  And, again, is that something you see?  Is that a

9     typical kind of thing, a doctor's note?

10    A.    I'm confused by this notation.  The second sentence, I

11    don't know what relationship it has to the first sentence.

12    The first sentence I can understand a little bit easier.  It's

13    rather straightforward.  Really the second sentence, "raised

14    to high-risk contract due to poor judgment in letting fill his

15    last prescription -- last prescription or lost prescription.

16    I'm not sure.  If it says "lost prescription," and that's --

17    if that's what had indeed happened, then that's, in my

18    opinion, the kind of behavior that's evidenced with someone

19    whose intent is to abuse medications rather than use them for

20    a medical purpose.

21          If it says, "filled his last prescription," then I'm

22    just frankly confused by this sentence.

23    Q.    Okay.  So if you look at Sammy Hubbard's prescriptions,

24    November 2015 all the way through September of 2016, Dilaudid.

25    A.    Yes, sir.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 77 of 195   Pageid#:
10203

1   Q.   Which is Hydromorphone; is that right?

2   A.   Yes, sir.

3   Q.   Oxymorphone, oxycodone, month after month; correct?

4   A.   Yes, sir, that's correct.

5   Q.   And so after this note, August 31st, he gets a

6   prescription on September 29.  It's one of these titrating

7   doses, appears to be, if you look at -- is that correct?  If

8   you look at Counts 326 through 329, if you can just explain to

9   the jury what your opinion of that is.

10  A.   I'm not sure -- sorry, can you ask that last question

11  again.  What am I looking at?

12  Q.   Counts 326 through 329.

13  A.   Yes, sir.

14  Q.   And you can see that there appear to be four

15  prescriptions issued for oxycodone on the same day?

16  A.   Yes, that's correct.

17  Q.   One's for 28, one's for 21, one's for 14, and one's for

18  seven.  And based on your review of the charts and just your

19  general knowledge, what does that appear to be?

20  A.   I'm going to assume it was a titrated schedule for the

21  medications to be discontinued over the course of four weeks.

22          MR. RAMSEYER:  So if you go to SH-1.

23  BY MR. RAMSEYER:

24  Q.   So there's a discharge titration note that's dated

25  September 29.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 78 of 195   Pageid#: 10204

1   A.   Yes, sir.

2   Q.   So, again, doesn't this show Dr. Smithers tried to do

3   everything right?  He finds out somebody is doing something

4   and he gets rid of them.

5   A.   No, I would not agree with that statement.

6   Q.   Should this person have ever got controlled substances

7   from Dr. Smithers?

8   A.   Not from what I can determine in the first place.

9          MR. RAMSEYER:  Go to DJ-1, page 3, please.  Deanna

10   Jessie.  Page 3.

11          It's got a Post-it note here, if you can highlight

12   that.

13   BY MR. RAMSEYER:

14   Q.   "Will bring kidney stone records.  Patient reminded to

15   bring bottles."  Again, what is that telling you?  Or what is

16   that?  Is there any significance to that?

17   A.   It appears that the doctor's basing the prescriptions for

18   pain on the patient having a diagnosis of a kidney stone,

19   except a kidney stone passing is a time-limited event and

20   would not be reasonably considered to be a cause of ongoing

21   severe chronic pain requiring chronic narcotics.

22   Q.   All right.

23          MR. RAMSEYER:  Your Honor, I'm trying to move

24   through as quickly as possible.

25          Go to page 15, NJ-15.  Neil Jewell, 15, please.

Case 1:17-cr-00027-JPJ-PMS   Document 236  Filed 06/08/19   Page 79 of 195   Pageid#: 10205

```
 1              Highlight this.
 2   BY MR. RAMSEYER:
 3   Q.    This is for patient Neil Jewell.  Indicates they did a
 4   criminal records check and he was convicted of possession with
 5   intent to deliver narcotics in 2012.  Do you see that?
 6   A.    Yes, sir.
 7   Q.    Did Dr. Smithers prescribe narcotics for him after
 8   becoming aware of that?  This was 9-28.
 9   A.    Yes, sir, he did.
10   Q.    Prescribed oxycodone and oxymorphone?
11   A.    Yes, on October of 2015, November of 2015.
12            MR. RAMSEYER:  Let's go to Lora Kicklighter.  So
13   LK-5.
14            And go right here.  This is December 2nd of 2015.
15   BY MR. RAMSEYER:
16   Q.    Okay.  It says "track marks."
17            "Yes, right wrist, left hand."  Can you explain to
18   the jury what track marks are?
19   A.    In this context we're talking about markings on a
20   patient's arm that are consistent with IV, intravenous,
21   injection of drugs and narcotics.
22   Q.    So these drugs that Dr. Smithers was prescribing for
23   these different people that you've looked through these
24   charts, were they drugs that should be taken intravenously by
25   injection?
```

```
 1    A.    No, sir, not at all.
 2    Q.    If you see that they're being taken intravenously, what
 3    does that tell you about the patient?
 4    A.    I think if you see evidence of active drug addiction
 5    problem going on, you need to be very aware and act
 6    appropriately in a patient before prescribing them narcotic
 7    medications.  This is evidence of an ongoing and active drug
 8    addiction problem.
 9    Q.    All right.  And that's November 5th of 2015.
10          MR. RAMSEYER:  Can you go to LK 37.
11    BY MR. RAMSEYER:
12    Q.    On that same date, November 5th, 2015, this indicates
13    that she had a charge of tracking in illegal drugs, 4 to
14    14 grams.  Do you see that?
15    A.    Yes, sir, I do.
16    Q.    It indicates Dr. Smithers saw that on November 5th, 2015.
17    Do you see that?
18    A.    Yes, sir, I see that.
19    Q.    And did he issue a prescription to her on November 5th of
20    2015?
21    A.    Yes, and then subsequent to those dates.
22    Q.    Okay.  And what did he prescribe to her?  Knowing this
23    person had charges of trafficking and had track marks on her
24    hand, what did he prescribe for her?
25    A.    It might be strong evidence that this person is
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236 (36 of 823 of 914)06/08/19   Page 81 of 195   Pageid#: 10207

1    struggling with an addiction problem.  If you care about this

2    person, you identify that and refer that appropriately for

3    evaluation and treatment of their addiction.

4    Q.    But instead, what did Dr. Smithers prescribe for her?

5    A.    He prescribed the medications that she's showed an

6    addiction to.

7    Q.    Well, was it oxymorphone 40 milligrams three times a day?

8    A.    Yes, sir.

9    Q.    So that's 120 milligrams of oxycodone per day prescribed

10   to this person.

11   A.    Yes, sir.

12              MR. RAMSEYER:  If you go to December 2nd.  Excuse

13   me.

14   BY MR. RAMSEYER:

15   Q.    And she continued to get -- after December, she got

16   oxymorphone, Opana from Dr. Smithers in January, January 4th,

17   January 29th, February 26th, March 31st, April 4th, May 2nd --

18   excuse me, let me back up.  That April 4th was oxycodone.

19   A.    Yes, sir.

20   Q.    May 2nd, Opana, oxymorphone.  June 6th, oxymorphone; is

21   that correct?

22   A.    Yes, sir.

23   Q.    And then she got a discharge in July of 2016; is that

24   right?  If we go to page 6.  According to the chart, anyway,

25   she's discharged July 5th.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 82 of 195   Pageid#:
10208

 1   A.   Yes, sir.

 2   Q.   When she's discharged, she's given some more oxycodone to

 3   take home with her; is that right?

 4   A.   That's correct.

 5   Q.   Doctor, again, for the sake of trying to move things

 6   along, I'm not going to go through all these reports.  There

 7   are MRIs, there are X-rays, there's things like that; is that

 8   right?

 9   A.   There are.

10   Q.   Do any of those things justify the controlled substances

11   that Dr. Smithers wrote for these people?

12   A.   I did not see any objective evidence of the patient's

13   condition, including the MRIs and X-rays, that would justify

14   the prescriptions of high-dose chronic opiates.

15   Q.   All right.

16        MR. RAMSEYER:  Your Honor, I have one more set of

17   questions, if I can just ask a quick question of my colleague.

18   BY MR. RAMSEYER:

19   Q.   So I'm going to skip to Darryl Williams.

20        Darryl Williams, according to your chart in front of

21   you, Exhibit 107, starting at Count 784.

22   A.   Yes, sir, 784.

23   Q.   On August 31st, he got 120 oxycodone 30s, and 60

24   oxymorphone 40s; --

25   A.   Yes, sir.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 83 of 195   Pageid#: 10209

```
 1    Q.    -- correct?
 2            And he got those from August of 2015, all the way
 3    through -- or he got controlled substances -- Schedule II
 4    controlled substances until May of 2016; is that right?
 5    A.    Yes, sir.
 6            MR. RAMSEYER:  And if you will look at DWi-41,
 7    please.
 8            Okay.  Go to the next page, please.
 9            All right.  Highlight this.
10    BY MR. RAMSEYER:
11    Q.    So this report indicates he's positive for cocaine use;
12    right?
13    A.    Yes, sir, it does.
14    Q.    So on December 21st, 2015, he comes in for a test.
15    Positive for cocaine.
16            MR. RAMSEYER:  Let's go to DWi-71.
17    BY MR. RAMSEYER:
18    Q.    And possession with intent to deliver controlled
19    substance charge in May of 2012; is that correct?
20    A.    Yes, that's correct.
21            MR. RAMSEYER:  Okay.  Go to the next page.
22            Next page.
23            Actually, go back to 71, again.  I'd like to ask one
24    question.
25    ///
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 84 of 195   Pageid#: 10210

 1   BY MR. RAMSEYER:

 2   Q.   Again, someone has written on here, indicating someone's

 3   viewed it; is that right?

 4   A.   Yes.

 5   Q.   So he tests positive for cocaine, has a previous charge

 6   of possession with intent to deliver.  That's on

 7   December 21st.  Does he after that get a prescription for

 8   oxycodone, oxymorphone, oxycodone, oxymorphone, oxycodone,

 9   Opana ER, oxycodone, oxycodone, oxycodone, and oxycodone?

10   A.   Yes, sir.  The prescribing of the narcotics continues

11   after December 15 for months.

12   Q.   Now, doctor, again, you made your decision just based on

13   reviewing patient charts.  So I want to show you some other

14   things to have you consider.

15        MR. RAMSEYER:  So if we could go to -- on the Darryl

16   Williams's text, if we go to 1,000, page 13.

17        If we could highlight right here, please.

18   BY MR. RAMSEYER:

19   Q.   So, assume for your -- based on your opinion, that this

20   is a text message from Dr. Smithers to Darryl Williams, one of

21   the patients.

22   A.   Yes, sir.

23   Q.   And that it says, "By my -- don't assume, it does say,

24   "By my count -- it lists 18 people as initials.  Do you see

25   that?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 85 of 195   Pageid#:
10211

```
 1    A.   Yes, sir.
 2              MR. RAMSEYER:  If we go on down.
 3    BY MR. RAMSEYER:
 4    Q.   And then Dr. Smithers is saying, "18 x 3 = 54."
 5              And assume, again, for your opinion, that that means
 6    18 people getting prescriptions, $300 per person, $5,400.
 7              And Darryl Williams says, "Sounds right."
 8              THE COURT:  Yes, sir.
 9              MR. WILLIAMS:  Your Honor, I'm again going to object
10    as speculation.  I think we're going into hypotheses here.
11              THE COURT:  Certainly.  I'll overrule the objection.
12              Go ahead.
13              MR. RAMSEYER:  Go on down.  Go to the next page
14    please.
15    BY MR. RAMSEYER:
16    Q.   Then assume the evidence would be that Darryl Williams
17    wires $5,400 to Dr. Smithers and Dr. Smithers's wife as
18    payment for those prescriptions.  And assume that those
19    prescriptions are then mailed to Darryl Williams and those
20    prescriptions are filled.  Would that affect your opinion as
21    to whether these prescriptions were issued for a legitimate
22    medical purpose within the scope of professional practice?
23    A.   I can't imagine any clinical medical scenario where that
24    would be appropriate action to take as a physician, no.  What
25    your describing is not in any way, shape, or form familiar to
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 86 of 195   Pageid#: 10212

```
 1   the practice of medicine.
 2   Q.   And you said earlier that it wasn't a close call just
 3   looking at the records.  What does this do to your opinion as
 4   to whether it was a close call?
 5   A.   It confirms it.
 6            MR. RAMSEYER:  That's all my questions.
 7   BY MR. RAMSEYER:
 8   Q.   Just in recap, Government's Exhibit 107, you reviewed
 9   every one of those prescriptions and in your opinion every one
10   of those was issued outside the scope of professional practice
11   and not for legitimate medical purpose; is that correct?
12   A.   Yes, that is correct.
13            MR. RAMSEYER:  Thank you.
14            THE COURT:  All right.  Ladies and gentlemen, we're
15   going to take our luncheon break at this time.  If you'll be
16   back in one hour.  If you'll follow the bailiff out.  Please
17   remember my instructions to you.
18       (Proceedings held in the absence of the jury.)
19            THE COURT:  All right.  Counsel, is there anything
20   we need to take up before we take our luncheon recess?
21            If not, we'll be in recess for one hour.
22       (Proceedings suspended at 12:07 p.m. and resumed at 1:08
23   p.m.)
24            THE COURT:  Are we ready for the jury?
25            MR. WILLIAMS:  We are, Your Honor.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 322-9160

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 87 of 195   Pageid#: 10213

```
 1              THE COURT:  Go ahead and bring the jury in.
 2         (Proceedings held in the presence of the jury.)
 3              THE COURT:  All right.  You may cross-examine,
 4    Mr. Williams.
 5              MR. WILLIAMS:  Thank you, Your Honor.
 6                        CROSS-EXAMINATION
 7    BY MR. WILLIAMS:
 8    Q.   Dr. Bassam, how are you today?
 9    A.   Well, thank you.
10    Q.   Okay.  Dr. Bassam, you reviewed these files that the
11    government gave you; correct?
12    A.   Yes, sir.
13    Q.   And it's about 50-some files; is that right?
14    A.   Broken up over the course of a year.  He sent different
15    sets.
16    Q.   Now, you didn't review all of the files of Dr. Smithers,
17    did you?
18    A.   No.  I reviewed the files the Government gave me.
19    Q.   Okay.  And did you get any of the referring doctor files
20    to review?  Did you ever view anything -- files that may have
21    been referred to him, did you talk with those doctors or
22    anything?
23    A.   No, sir, I have not spoken to anyone.
24    Q.   Now, are you familiar with the World Health Organization?
25    A.   Yes, sir.
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(36) 823-5144

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 88 of 195   Pageid#:
10214

 1   Q.   Okay.  And what is the World Health Organization?

 2   A.   It's an international health organization.

 3   Q.   Okay.  And are you aware that it defines pain as being

 4   subjective?  Would you agree with that statement?

 5   A.   Yes, I would agree that pain is a subjective experience.

 6   Q.   Okay.  In other words, if you and I were to have the

 7   exact same injury, the pain level may be different for you

 8   versus me, is that kind of what that means?

 9   A.   I'd say there's some variability in there to a degree.

10   Q.   Okay.  Now, as far as the referring doctor files, is it

11   possible Dr. Smithers had access to those that you didn't?

12   A.   I'm unsure about that.

13   Q.   Okay.  You talked about some various forms of diagnostic

14   testing; MRIs, and X-rays, and stuff like that; is that

15   correct?

16   A.   Yes, sir.

17   Q.   Okay.  And you indicated those could be done to sort of

18   help supplement to help determine injuries; correct?

19   A.   Could be, yes, sir.

20   Q.   But now those cost money, don't they?

21   A.   They can.  Yes, they do.

22   Q.   And are you aware of the financial situations of any of

23   these patients?

24   A.   I'm not.

25   Q.   Okay.  Are you aware whether they had insurance or not?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 89 of 195   Pageid#: 10215

```
 1    A.    Only what's on the chart.  Sometimes insurance
 2    information was in the chart and sometimes it was not.
 3    Q.    Okay.  And is it not fair to say that some insurances and
 4    stuff will not cover certain things if testing has already
 5    been done?
 6    A.    No, I wouldn't make that blanket statement.
 7    Q.    Okay.  It's possible that it could be done, but it's --
 8    there are times it might be denied because --
 9    A.    There are times insurance denies care, that's correct.
10    Q.    Okay.  Now, Dr. Smithers had Opioid Treatment Agreements,
11    didn't he?
12    A.    On some of the charts, yes, sir.
13    Q.    And on those opioid agreements, the patients agreed to
14    take the medication as prescribed, didn't they?
15    A.    Yes.  That's standard language in an opiate agreement,
16    medication agreement.
17    Q.    And they also agreed to be honest and truthful with him,
18    didn't he?
19    A.    I'm afraid I don't know if that's what it says in his
20    agreement.  But I wouldn't be surprised if it says such a
21    thing.
22    Q.    That's an essential element between a patient and a
23    physician, isn't it?
24    A.    It's an important element, yes, honesty when you're
25    discussing your medical condition with your physician.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 90 of 195   Pageid#:
10216

1  Q.  Okay.  Were you aware that in Dr. Smithers's agreement it

2  also said you were not allowed to sell or distribute your

3  pills?

4  A.  I would not be surprised.  Again, that is standard

5  language for a medication agreement.

6  Q.  Okay.  Now, all the prescriptions that Dr. Smithers gave

7  were all prescribed by the FDA; correct -- or all approved by

8  the FDA.

9  A.  They are.

10 Q.  And the FDA doesn't limit the amount or anything that can

11 be given by a physician, does it?

12 A.  That's correct.

13 Q.  Now, I'm going to ask you to look here just a minute, if

14 we can, on the screen.  I'm going to show you -- what is this

15 a form of?  Does it say?

16        And this is the RB-2, 51.

17 A.  So this is a one-page form that's titled, "Initial Pain

18 Assessment Tool."

19 Q.  Okay.  And with respect to this, what's the name there,

20 if you can?

21 A.  The patient's name is Robert Battaglia.

22 Q.  Okay.  Now, you talked in depth about Robert Battaglia's

23 chart, did you not, earlier?

24 A.  We did.

25 Q.  Okay.  The numbers that are listed right under Robert

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 823-9100

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 91 of 195   Pageid#:
10217

1  Battaglia --

2  A.   Yes, sir.

3  Q.   -- what does that line say right there?

4  A.   Diagnosis.

5  Q.   Okay.  And what do those numbers appear to be to you?

6  A.   Those appear to be ICD-9 codes, corresponding to a

7  variety of diagnoses.

8  Q.   Okay.  So these would be diagnoses that Dr. Smithers has

9  made with respect to this; correct?

10  A.   Yes, that's correct.

11  Q.   Okay.

12        MR. WILLIAMS:  You can take that off.  Thank you.

13  BY MR. WILLIAMS:

14  Q.   Now, many patients face a choice a lot of times, don't

15  they, with respect to pain?

16  A.   I'm sorry, I don't understand your question.

17  Q.   Okay.  They're -- in other words, certain patients may be

18  offered surgery to help alleviate pain; correct?

19  A.   If they have a condition that surgery can help, often

20  that may be the case, yes.

21  Q.   All right.  But these surgeries, they cost money;

22  correct?

23  A.   Yes.

24  Q.   They'd have to be approved by insurance.

25  A.   Often.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(336) 623-5100

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 92 of 195   Pageid#:
10218

1   Q.   Okay.  A lot of these patients have back injuries;

2   correct?

3   A.   I don't know that.

4   Q.   Okay.  Would it be safe to say that surgeries pose risks?

5   A.   Surgery poses risks, inherently.

6   Q.   And so, with this, is it not fair to say that some people

7   may choose not to have surgery on something?

8   A.   That may be the case in some people, sure.  That would be

9   a conversation and thought process that would typically be

10  memorialized and captured in the chart.

11  Q.   Now, with respect to this, it's certainly a person's

12  decision on their own to decide whether or not they want to

13  have surgery; correct?

14  A.   Certainly.

15  Q.   And they may choose to have a long-term treatment with

16  medication in lieu of surgery, could they not?

17  A.   I suppose people could choose to take pain medications

18  forever or for long periods of time instead of surgery.  I

19  suppose that could be a choice.

20  Q.   Okay.  And so they may choose the risk of possible

21  dependency over the long-term effects of having surgery;

22  correct?

23  A.   Risk of dependency and other risks, including death.

24  Q.   Now, did you know Dr. Smithers -- do you know what

25  Dr. Smithers's training or anything is in pain medication?

 1   A.   I do not.

 2   Q.   And, now, let me go into another instance there that we

 3   talked about earlier.

 4              MR. WILLIAMS:  If we can put this up on the screen.

 5              This is DWi-71.

 6   BY MR. WILLIAMS:

 7   Q.   Talked a little bit earlier there about Darryl Williams.

 8   A.   Yes, sir.

 9   Q.   And one of the things you talked about here was a

10   conviction that he had back in 2012; is that correct?

11   A.   It looks like it's a charge and dismissal.

12   Q.   Okay.  That was -- you got my next question.  In other

13   words, that charge that was showing was dismissed; correct?

14   A.   Yes, sir.

15   Q.   You had said earlier it caused you concern.  But the

16   charge was actually dismissed, was it not?

17   A.   Yes.

18   Q.   Okay.  Now, many of these patients had been to other

19   doctors, had they not?

20   A.   It would appear so, yes.

21   Q.   Okay.  And so sometimes these have been referred to

22   Dr. Smithers; correct?

23   A.   I'm not certain about that.  I didn't see any direct

24   referrals of that nature.

25   Q.   But now isn't it true that certainly other doctors may

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 94 of 195   Pageid#:
10220

1   not have been able to make diagnoses either; correct?

2   A.   I suppose that's true, although I saw no records like

3   that.

4   Q.   Okay.  When a patient has had chronic severe pain, and

5   they've already had an MRI, isn't it true that a lot of times

6   that's not necessary to repeat?

7   A.   Well, that's true.  It's not necessary to repeat in all

8   cases just because of time having gone by.

9   Q.   Okay.  In other words, if a specialist or radiologist or

10  something has already looked at it and made a determination,

11  it could be possible that that wouldn't need to be repeated;

12  correct?

13  A.   It's possible that it doesn't need to be repeated.

14  Q.   Now, on Dr. Smithers's pain form, do you recall --

15  A.   I'm sorry, the pain what?

16  Q.   The pain form.

17  A.   The pain form.  Which one?

18  Q.   The short form.

19  A.   The Brief Pain Inventory.  Thank you.

20  Q.   Actually, let's go back.  Let's do the initial.

21  A.   Okay.  Initial Pain Assessment Tool.

22  Q.   Initial pain.  One of the things Dr. Smithers asked on

23  that is alternative testing that's already been done for the

24  patient, did he not?

25  A.   That's one of the things listed on the form.

1    Q.    In other words, he asked if he'd already had physical

2    therapy; correct?

3    A.    Yes, that's one of the options listed on the form for the

4    patient to fill out.

5    Q.    Okay.  Asked if hot and cold packs worked?

6    A.    If that's what's listed on the form, that's a choice for

7    the patient to fill out.  I don't know that that means that

8    anything was physically asked by the doctor of the patient.

9    Q.    Okay.  But these things have been asked to determine

10   prior treatments; correct?

11   A.    These things are listed on a form for a patient to fill

12   out.

13   Q.    Okay.

14   A.    That's all I can see.

15   Q.    But that would be something that would be beneficial to a

16   doctor to know prior, treatments that had either worked or not

17   worked; correct?

18   A.    Certainly.

19   Q.    Now, isn't the key to try to get someone to where they

20   could get a greater degree of functionality to be able to live

21   every-day life?

22   A.    That's one of the goals of chronic pain treatment is try

23   to improve functional capacity.

24   Q.    And to be able to lift things and get a better quality of

25   life?

1    A.    Yes, a better quality of life and improve functionality,

2    as measured by a functional improvement.

3    Q.    Okay.  Doctor, how many patients do you see in a day?

4    A.    Between myself and my extended staff, my physician's

5    assistant, we see somewhere between I'd say 40 to 60 patients

6    a day.

7    Q.    Okay.  Now, how much time do you spend on average with

8    each patient?

9    A.    I'm not sure if I have a figure that's based on any fact.

10   I spend the appropriate time I need to with each of my

11   patients.

12   Q.    Would it be fair to say after you've seen a patient for a

13   period of time you might spend less time with them?

14   A.    In some cases, that would be the case, yes.

15   Q.    So you kind of know the patient, you kind of know what

16   their history is; correct?

17   A.    Yes.  It can be some visits are routine in nature.

18   Q.    And you're able to observe them, the way they're moving,

19   the way they're functioning, whether things are working;

20   correct?

21   A.    Yes, I pay attention to that.

22   Q.    Okay.  So, with respect to this, doctor, isn't it true

23   that a key thing is to be able to see and actually see what

24   the patient looks like when they come into the room?

25   A.    Yes.  It's important to have a face-to-face encounter

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 97 of 195   Pageid#: 10223

1   with your patient when you're treating them.

2   Q.   And it's much more beneficial than to observe something

3   simply through a chart; correct?

4   A.   I'm sorry, I don't understand that question.

5   Q.   It's more beneficial to be able to see a patient in

6   person than to judge by a piece of paper, would you agree with

7   that?

8   A.   Yes.  You have additional benefit when you're sitting in

9   front of a patient rather than just reviewing a medical

10  record, certainly.

11  Q.   Okay.  And did you ever speak with any of Dr. Smithers's

12  patients?

13  A.   No, sir, I have not.

14  Q.   Now, Dr. Smithers took methods to try to correct certain

15  things that were wrong that may have been not going as well in

16  his practice --

17          MR. RAMSEYER:  Objection.

18          MR. WILLIAMS:  I'll rephrase.

19  BY MR. WILLIAMS:

20  Q.   Dr. Smithers instituted pill counts, did he not?

21  A.   He had some pill counts on some of the charts that he

22  asked for.

23  Q.   And he did drug screening.

24  A.   He did have urine drug testing on many of the charts.

25  Q.   Okay.  And both of those are able to be manipulated by

1  patients, aren't they?

2  A.   Yes.   Neither is 100 percent foolproof.

3  Q.   So a lot of times as a doctor you have to be able to

4  judge something to be able to give it the benefit of the doubt

5  or not; correct?

6  A.   I think as a doctor you have the responsibility to judge

7  the entire situation and not just a single item of information

8  that's in front of you.   It needs to be interpreted in the

9  context of the entire medical relationship with the patient.

10  Q.   Okay.   Now, doctor, just because something is not charted

11  doesn't mean it didn't actually happen; correct?

12  A.   No.   But in all practical matters, if it wasn't charted,

13  then I often teach medical students and a physician that is

14  younger than me that if it's not written down, then it

15  practically didn't happen.

16  Q.   Okay.   Now, doctor, every person in their charts

17  indicated that medication had helped them; correct?

18  A.   To different degrees, yes.   Some were complaining that it

19  wasn't helping enough.   But, yes, that's a generally accurate

20  statement.

21  Q.   Okay.   Now, isn't it true that there are different

22  schools of thought over discharging patients?

23  A.   I'm afraid you have to be more specific.

24  Q.   As far as drug testing and stuff.   Failing a drug screen.

25  A.   You'll have to -- I'm sorry, I don't follow your

```
 1   question.
 2   Q.   I'll rephrase it.  That's probably a very poor question
 3   on my part.
 4   A.   That's okay.
 5   Q.   Isn't it true that there are certain doctors and certain
 6   schools of thought that believe you should never discharge a
 7   patient, even if they failed a drug screen?
 8   A.   So I would say that many physicians would say that a
 9   single point of information, certainly if it's contrary to
10   everything else that you know about the patient and then
11   collected, shouldn't serve as the only reason to discontinue a
12   relationship with a patient.  There's many doctors who feel
13   that way.  I would say that the assessment and judgment really
14   needs to be on a case-by-case basis and after a consideration
15   of all of the information rather than just a single data
16   point.
17   Q.   Okay.  But Dr. Smithers actually dismissed patients, did
18   he not?
19   A.   Yes, he did.
20   Q.   Now, Dr. Smithers also -- there were records in there
21   indicating he had checked the PMP, which is the prescription
22   being filled by other places; is that correct?
23   A.   Yes, that's correct.
24   Q.   He also checked criminal history, did he not?
25   A.   I'm sorry?  Criminal histories --
```

1    Q.    Criminal histories.

2    A.    Yes.  Yes.

3    Q.    All right.  I want to pull up here DJ-150.

4          I want to ask you if you'll take a look at this

5    document here.

6    A.    Yes, sir.

7    Q.    Okay.  What is this document showing?

8    A.    This is titled Smithers Community Healthcare New Patient

9    Intake Form for Pain Management.

10   Q.    Okay.  Now, what is the patient's name there, if you can?

11   A.    Name is Deanna Jessie.

12   Q.    Okay.  And the date on that form?

13   A.    The date the form was filled out, September 24th, 2015.

14   Q.    Okay.  Now, one of the things you indicated earlier was

15   you pointed out -- Mr. Ramseyer pointed out a Post-it note, do

16   you recall, on Ms. Jessie's form?

17   A.    I don't recall that one.  We looked at quite a few

18   Post-it notes on these charts, yeah.

19   Q.    Post-it note that may have said kidney stone information.

20   A.    Yes, I recall that.

21   Q.    Okay.  Now, it says "chief complaint".  What are the

22   chief complaints?

23   A.    Lower back, kidney stones.

24   Q.    Okay.  Now with respect to this, I'm going to scroll down

25   just a little bit.  When did this pain begin?  What does that

1    state?

2    A.    It was three years ago.

3    Q.    Okay.  And what caused her recurrent pain episode?

4    A.    Upon falling in Walmart, car accident.

5    Q.    So when you testimony -- the testimony was earlier about

6    the kidney stones.  There's obviously more going on with

7    Ms. Jessie's situation than just kidney stones; correct?  By

8    this form?

9    A.    I don't know what's going on with this patient.  All I

10   see is that they say they fell in Walmart three years ago and

11   had a car accident.

12   Q.    Okay.

13   A.    That tells me very little to nothing about what's going

14   on today.

15   Q.    Doctor, when a person walks in with subjective intent to

16   deceive a doctor, would it have a negative impact on the

17   doctor's ability to treat that patient?

18   A.    Yes.

19   Q.    And some patients come in certainly with that idea in

20   mind; correct?

21   A.    Yes.

22   Q.    Okay.  And it's almost impossible at times to be able to

23   tell certain times whether these are -- whether they're faking

24   or not, is it not?

25   A.    No.

Q.   Now, Dr. Bassam, how much are you being paid to be here
today?

A.   My hourly rate for giving testimony is $750 an hour.

Q.   Okay.  And was that the same rate that you were asked to
review the files?

A.   Yes, that's correct.

Q.   Okay.  And how many times have you testified in criminal
cases?

A.   This is my first time testifying in a criminal case.

Q.   Okay.  So you've never testified in a criminal case
prior?

A.   No, sir.  I don't do this professionally.

Q.   Okay.

        MR. WILLIAMS:  Your Honor, may have a moment with my
client?

        No further questions, Your Honor.

        THE COURT:  All right.  Any further redirect?

        MR. RAMSEYER:  No, Your Honor.

        THE COURT:  All right.  May this witness be excused?

        MR. RAMSEYER:  Yes, Your Honor.

        THE COURT:  Thank you, doctor.  You may be excused.

        THE WITNESS:  Thank you, sir.

        MR. RAMSEYER:  Your Honor, I'd just like to confirm
with the Court that all of our exhibits that have been marked
have been introduced into evidence.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 103 of 195   Pageid#:
10229

```
1              THE COURT:  Madam Clerk; is that correct?

2              THE CLERK:  Yes.

3              MR. RAMSEYER:  That being the case, Your Honor, the

4    Government rests at this time.

5              THE COURT:  All right.  The Government rests.

6              And, Mr. Williams, are you ready to proceed?

7              MR. WILLIAMS:  Your Honor, we would ask for sidebar,

8    if we could, please.

9              THE COURT:  Well, I'll remove the jury if you need

10   to talk with me.

11             MR. WILLIAMS:  I would request that, Your Honor.

12             THE COURT:  All right.  Ladies and gentlemen, if you

13   would follow the bailiff to the jury room, please.

14        (Proceedings held in the absence of the jury.)

15             THE COURT:  Yes, sir, Mr. Williams.

16             MR. WILLIAMS:  Your Honor, at this time the defense

17   would move --

18             THE COURT:  Come to the lectern, please.

19             MR. WILLIAMS:  Oh, sorry.

20             Your Honor, at this time the defense would make a

21   motion for judgment of acquittal.  Certainly with respect to

22   Count 1, which involves the possess with intent to distribute.

23   I think the Government's only evidence is that with respect to

24   distribution would be certainly just a few pills in a baggie.

25   We certainly don't think that the Government has met its
```

```
 1    burden with respect to that.
 2              In addition, certainly the Government did not
 3    produce several witnesses on the stand.  And also we believe
 4    that -- did not produce several witnesses on the stand with
 5    respect to counts -- to Counts 3 through 862, I think, and
 6    certainly for those grounds, we'd move for a motion of
 7    judgment of acquittal on those grounds as well.
 8              THE COURT:  All right.  Mr. Ramseyer.
 9              First, let me ask you about Count 1.  What is the
10    basis for the Government's proof?
11              MR. RAMSEYER:  Your Honor, it's the way that they
12    were packaged.  They were in individual packets of ten in the
13    baggies, that's part of it.  And also the quantity was
14    hundreds of pills of controlled substances.
15              THE COURT:  Well, the defendant is a -- or was at
16    the time a physician.  So why -- why would not the Government
17    have to prove that his possession with intent to distribute
18    was beyond the bounds of medical practice and not for a
19    legitimate purpose?
20              MR. RAMSEYER:  He's not allowed to possess
21    controlled substances, Your Honor.  He can't take controlled
22    substances back from a patient, and he can't -- I don't
23    believe he had a license to dispense Schedule II controlled
24    substances.
25              THE COURT:  Well, I mean, where is this --
```

```
 1              MR. RAMSEYER:  That's in the federal regulations,

 2    the DEA regulations, Your Honor.

 3              We can move to introduce those into evidence.  We

 4    were --

 5              THE COURT:  I'm sorry?

 6              MR. RAMSEYER:  We can move to introduce those into

 7    evidence.  We were asked -- we were considering asking the

 8    Court to include that as a jury instruction.  It's the law.

 9    It's not a --

10              THE COURT:  The law is that a physician cannot,

11    what?  Possess a controlled substance?

12              MR. RAMSEYER:  Cannot -- they have to have a special

13    license to dispense Schedule II controlled substances.  And

14    after that a special license to take pills back from a

15    patient.

16              THE COURT:  Well, how do we know that these pills

17    were taken back from a patient?

18              MR. RAMSEYER:  We don't.  But, I mean, those are the

19    two options, either --

20              THE COURT:  Well, I mean, you know, I don't know

21    what the regulations say.  But physicians, I understand, at

22    least in my experience, have in their office on occasion

23    medication that they give to patients.  Correct?

24              MR. RAMSEYER:  They do.  Not Schedule II controlled

25    substances, Your Honor.
```

```
 1            THE COURT:  And where is that in the United States

 2    Code?  Where is that in -- you know, it's -- the indictment

 3    charges -- if this was in violation of 21, 841(a) and (b).

 4            MR. RAMSEYER:  Your Honor, the agent's corrected me.

 5    He can dispense controlled substances.  He can't -- he has to

 6    be licensed to take drugs back.

 7            And to answer your question specifically, these

 8    weren't packaged, like, in a bottle of oxycodone pills, or a

 9    bottle of oxymorphone pills.  These were all passed together

10    into a nutrition supplement bottle.

11            THE COURT:  Well, I understand that.  But how would

12    the jury -- are you saying that the jury -- because they

13    weren't packaged in a bottle with the name of the controlled

14    substance on it that he couldn't dispense it?

15            I mean, where is the evidence that it was a

16    violation of federal law for the defendant to have in his

17    possession, as a physician, a controlled substance?  Just,

18    those are the facts.  He had in his possession, at least I

19    believe the jury could find, he had in his possession

20    controlled substances.  He is a physician.  Why doesn't the

21    same standard apply to his possession of that controlled

22    substance with intent to distribute, as it does writing a

23    prescription?

24            MR. RAMSEYER:  Well, if it does, Your Honor, again,

25    the way it was packaged, we think would be evidence that it
```

```
1    wasn't for a legitimate medical purpose within the scope of
2    practice.  Just, that's not the way, I mean, I think -- I
3    don't know that you have to have an expert testimony about a
4    bottle full of all different kinds of pills is a doctor being
5    a legitimate doctor.
6              THE COURT:  Well, but what's the -- I mean, what's
7    the Government's inference here? that he was selling these
8    drugs on the street?
9              MR. RAMSEYER:  Well, the inference was that they
10   were with the intent to distribute.  He's got a bottle full of
11   pills.
12             THE COURT:  Right.
13             MR. RAMSEYER:  Schedule II drugs and other drugs.
14             THE COURT:  And non-controlled substances.
15             MR. RAMSEYER:  And non-controlled substances.
16             THE COURT:  Right.
17             MR. RAMSEYER:  Again, under DEA regulations, he has
18   to have a license to be able to take drugs back from a
19   patient.
20             THE COURT:  No evidence that those pills came back
21   from any patient.
22             MR. RAMSEYER:  Right.  So if you go with that
23   evidence, that means he got them from a manufacturer, took
24   them out --
25             THE COURT:  He got them from a pharmacy.  He wrote a
```

```
 1    prescription.
 2              MR. RAMSEYER:  He can't do that either.  He can't
 3    write a prescription to just have the pills come back to him.
 4              But, in any event --
 5              THE COURT:  No, no, no.  He in some way lawfully
 6    obtained, just like physicians do, obtained medicine,
 7    prescription medicine that he had in his office or possession.
 8              MR. RAMSEYER:  Again, to do that, he can't just
 9    write a prescription to the pharmacy, like, in his name to
10    have pills come back to him.  So he can't do that.  He's got
11    to order them from a manufacturer.  I think there's some
12    mechanism to get it from a pharmacy, but it would have to be
13    done in the right manner.
14              THE COURT:  So where's the evidence that he didn't
15    do that?
16              MR. RAMSEYER:  Well, again, the Government's not
17    really -- the point of the Government's case is not how he got
18    the drugs.
19              THE COURT:  Right.
20              MR. RAMSEYER:  It's how the drugs are being
21    packaged.  They're in a backpack in his car in a nutritional
22    supplement bottle.  It's not -- I mean, you can't even -- you
23    know, they're, like -- there's an oxycodone pill, there's an
24    OxyContin pill, there's an MS Contin --
25              THE COURT:  Well, I agree that it's very, very
```

```
 1    strange.  But, so would you agree with me that the Government
 2    has to prove that his intent to distribute under Count 1 was
 3    beyond the bounds of medical practice and not for legitimate
 4    purpose?
 5            MR. RAMSEYER:  May I have a moment, Your Honor?  I
 6    believe so, but I want to just check.
 7            THE COURT:  Well, I've been concerned about this.  I
 8    did not provide counsel with a proposed instruction as to
 9    Count 1, because I, frankly, didn't understand what the
10    Government's theory was.  I didn't know if some evidence was
11    going to be presented.  Now it is possible -- I mean, there
12    are cases that say that you don't have to have an expert.  The
13    Government does not have to have an expert in a case such as
14    this when the facts are extreme enough that a reasonable jury
15    could find that it was beyond the bounds of medical practice
16    and not for legitimate purpose.  I don't know that they're
17    there in this case, but that's a possibility.
18            MR. RAMSEYER:  I think we would agree with the Court
19    that it would have to be possession with the intent to
20    distribute outside the scope of professional practice or
21    without a legitimate medical purpose.  We tried a case here
22    without an expert for a medical practitioner.
23            THE COURT:  Right.
24            MR. RAMSEYER:  So we don't think there needs to be
25    expert testimony on that.
```

```
 1              THE COURT:  I agree.

 2              MR. RAMSEYER:  And we think the facts in this case,

 3    with all the other facts in the case about the way

 4    Dr. Smithers was operating, and the way these things were

 5    bottled, you know, they're in the backpack, there's like

 6    $20,000 of cash in the glove compartment, we think there is

 7    evidence of possession with intent to distribute.  What other

 8    reason is there for him to possess pills in that form?

 9              THE COURT:  Well, I mean, they may have been just

10    for the same reason he was writing the prescriptions for his

11    patients.  Maybe he carried them around in case he ran into a

12    patient who needed them and he dispensed them on the spot.

13              MR. RAMSEYER:  Again, Your Honor, that would be, we

14    believe, outside the scope of professional practice given the

15    testimony that's been given about what's within the scope of

16    professional practice.

17              THE COURT:  All right.  All right.

18              MR. RAMSEYER:  Thank you, Your Honor.

19              THE COURT:  Mr. Williams, anything further you want

20    to say on that?

21              MR. WILLIAMS:  Your Honor, I think that one of the

22    key points, and I think the Government and I may even be

23    agreeing on some of the facts on this, but I think we view it

24    differently.  I think the key part of this thing is that

25    typically when we see something where there's intent to
```

1  distribute we have packaging.  We've got them set aside.

2  We've got a certain kind of thing here and there.  These are

3  all placed in bottles mixed up along with vitamins, herbal

4  supplements, along with all kinds of other things.  And I

5  think certainly that goes to the fact that this clearly isn't

6  a distribution ring.  If you're going to be distributing

7  pills -- at least if I would be -- I would want them in an

8  order or something, this is what I'm handing out or whatever.

9  I don't want to have to go digging through a bottle amongst a

10  bunch of vitamins and everything else to distribute anything.

11  So we certainly think the Government has failed to prove that

12  element.

13         THE COURT:  All right.  Thank you.

14         Well, I have some question about the sufficiency of

15  the proof as to Count 1, but I'm going to take the motion for

16  judgment of acquittal as to Count 1 under advisement.  And

17  under the rules, I will make that determination in the event

18  that the defendant is convicted by the jury of that count

19  based on the evidence presented in the Government's case in

20  chief.

21         Otherwise, I will deny the motion for judgment of

22  acquittal.  I find that there has been sufficient evidence

23  presented as to the other counts of the indictment.

24         Let me ask Mr. Ramseyer that.  Did the -- as to the

25  other counts, except the one that the Government has

            dismissed, do you represent that the Government has presented

            evidence in its filings as to each of those?

                    MR. RAMSEYER:  Yes, Your Honor.  We presented the

            patient files.  We've presented the prescriptions.  And we've

            presented the chart of the expert and his testimony that all

            of those were outside the scope of professional practice.  We

            think all of the evidence in the case goes toward the

            maintaining a place count, which is Count 2.

                    THE COURT:  Yes, sir.  Well, I will deny the

            judgment for -- motion for judgment of acquittal as to the

            other counts.

                    All right.  Mr. Williams.

                    MR. WILLIAMS:  Your Honor, one other matter, just

            sort of a, I guess, a housekeeping matter.  Defense has two

            witnesses here today.  Dr. Smithers had actually talked to

            another lady about testifying -- I think, actually supposed to

            have her here tomorrow, a lady by the name of Deborah Moore.

            We have not been able to get ahold of her as far as her

            attendance.  I know he has tried, and I've tried throughout

            the weekend, and even tried as far as as close as during

            lunch.  So we're not sure of the status of her.  I've left

            messages, even sent a text message.  But that is a witness

            that we are not sure of, at least at this point, whether or

            not she will be here today or be able to testify.

                    THE COURT:  Well, let's see if we can get ahold of

```
1   her today, and we'll see where we are about that after you've
2   presented your other witnesses.
3                MR. RAMSEYER:  Your Honor, Dr. Smithers is not
4   supposed to be in contact with any witnesses in the case as
5   part of his condition of release.
6                THE COURT:  Well, I don't know what this witness is,
7   but I'll take that up if the witness doesn't show up.
8                MR. WILLIAMS:  Judge, I would just simply say it's
9   not a Government witness.  It's not a witness that's been, to
10  my knowledge, interviewed by the Government in any way.
11               THE COURT:  Yes, sir.  I'm not going to take that
12  issue up right now.  It may be --
13               Now, has the defendant decided whether or not he's
14  going to testify or not, Mr. Williams?
15               MR. WILLIAMS:  Your Honor, I'm not sure.  He and I
16  have been in discussions, and I think he's gone back and forth
17  as to whether he's going to or not.
18               THE COURT:  All right.  In any event, you're going
19  to call these other witnesses now?
20               MR. WILLIAMS:  Yeah.  It would be preferable to call
21  them first.
22               THE COURT:  Yes, sir.  Absolutely.
23               So then you're ready to proceed on that?
24               MR. WILLIAMS:  We are.
25               MR. RAMSEYER:  Your Honor --
```

1            THE COURT:  Yes, sir.

2            MR. RAMSEYER:  -- one matter.  One of the witnesses

3    Mr. Williams indicated they intended to call, Lennie

4    Hartshorn, who is the father of Heather Hartshorn, we believe

5    that the testimony that they are seeking to illicit from him

6    would be hearsay.  We don't believe there's any admissible

7    evidence that he could present.

8            THE COURT:  Yes, sir, Mr. Williams.

9            MR. WILLIAMS:  I think certainly -- I mean, I would

10   certainly caution Mr. Hartshorn about hearsay evidence.  But

11   certainly we would ask that he be allowed to testify to what

12   he has personal knowledge of.

13           THE COURT:  Well, again, obviously hearsay --

14           MR. WILLIAMS:  I understand.

15           THE COURT:  -- unless there's some exception, for it

16   will not be admissible.

17           MR. WILLIAMS:  I understand.

18           THE COURT:  All right.  We'll have the jury back in,

19   please.

20       (Proceedings held in the presence of the jury.)

21           THE COURT:  All right.  Ladies and gentlemen, you've

22   heard the Government's evidence in chief.  And the defendant

23   will now be given an opportunity to present evidence.

24           Mr. Williams, you may proceed.

25           MR. WILLIAMS:  Your Honor, the defense calls Brenda

 1    Fisher.

 2            THE COURT:  All right.  Is that witness outside?

 3            MR. WILLIAMS:  She is.

 4            THE COURT:  If you would get her.

 5            MR. WILLIAMS:  Your Honor, Ms. Fisher is I think in

 6    a wheelchair.  Not sure if she'll be able to get up there or

 7    not.

 8            THE COURT:  All right.  Perhaps we could put her

 9    down right in front next to the lectern.  Her testimony ought

10    to be picked up by the microphone at the lectern.

11            Well, there is a microphone right behind the lectern

12    there.

13            If the witness will come around.  There you go.

14            Raise your right hand to be sworn, please.

15            THE CLERK:  Do you solemnly swear that the testimony

16    you're about to give in this case shall be the truth, the

17    whole truth, and nothing but the truth, so help you God?

18            THE WITNESS:  I do.

19            THE COURT:  Ma'am, if you'll speak up so that we can

20    all hear you.

21            THE WITNESS:  Okay.

22                            **BRENDA M. FISHER,**

23    Called as a witness herein by the Defense, having been first

24    duly sworn, was examined and testified as follows:

25    ///

1       **DIRECT EXAMINATION**

2  BY MR. WILLIAMS:

3  Q.    Would you please state your name for the jury.

4  A.    Brenda M. Fisher.

5  Q.    Spell your last name so they get it right.

6  A.    F-i-s-h-e-r.

7  Q.    Ms. Fisher, where do you live?

8  A.    In Leon, West Virginia.

9  Q.    And do you know Dr. Smithers?

10  A.    Yes.

11  Q.    Okay.  And how do you know him?

12  A.    I went to him as a patient.

13  Q.    Okay.  Do you remember when you first saw him?

14  A.    No, I don't.

15  Q.    Was it around November 17th of 2016; does that sound

16  about correct?

17  A.    Of 2,000 what?

18  Q.    '16?

19  A.    Yeah.

20  Q.    Okay.  And describe, if you will, that first visit with

21  Dr. Smithers.

22  A.    I went to him just like any doctor, and he tested my

23  back.  He examined my back and everything.

24  Q.    Okay.  When you say "examined," describe what all he did

25  during that initial --

```
 1   A.   I don't remember exactly what he did, but I know he

 2   checked my back and he had me walk for him in the room like

 3   most back doctors do.

 4   Q.   Okay.  Do you recall if he took any vital signs or

 5   anything like that?

 6   A.   Yes.

 7   Q.   Okay.

 8   A.   I do believe so.

 9   Q.   All right.  And how long was your first visit, do you

10   recall?

11   A.   Quite a long time, because he takes you in there and

12   talks to you for -- it seemed like it was over two hours, the

13   best of I can remember.

14   Q.   Okay.  And what all were you-all talking about in that?

15   A.   He actually went clear back into my childhood.

16             MR. LEE:  Objection, Your Honor, as to hearsay.  I

17   don't think the witness can testify about a conversation with

18   Dr. Smithers and be admissible.

19             THE COURT:  I'm going to overrule the objection.  It

20   seems to me that under the circumstances its the -- not for

21   the truth of the matter, but to show a pattern or routine.

22   BY MR. WILLIAMS:

23   Q.   Okay.  Go ahead.

24   A.   Can I answer?  I get confused.

25   Q.   Yeah.
```

```
1    A.    Yeah, he sat there and he talked to me.  He went clear
2    back into my childhood.  Like I said, you know, the first time
3    I injured my back, I was 18 working for 7-Eleven.  I mean, he
4    went clear back --
5    Q.    Okay.
6    A.    -- to find out exactly how all the damage had been done
7    to my back.
8    Q.    Okay.  And describe to the jury what was wrong with your
9    back.
10   A.    I've got degenerative bone disease and bulging disk.  And
11   I've got a right knee that needs replaced.  At that time I was
12   on cancer medicine, so they didn't want to replace my knee
13   joint until I got off the cancer medicine.
14   Q.    Okay.  Now was there something happened when you were
15   about 17 that contributed to this?
16   A.    I was in a car accident.
17   Q.    Okay.  And describe the car accident, if you will.
18   A.    Somebody backed out in front of my mother.  She was
19   driving, and we went around the telephone pole.  And I lost
20   the use of my legs.  I couldn't even feel them.  When they got
21   me out of the car to stand up, I had to look down to see if I
22   had legs.
23   Q.    Okay.
24   A.    I've had trouble with my back ever since.
25   Q.    Okay.  Now did Dr. Smithers prescribe anything?
```

```
 1   A.    Yes.

 2   Q.    What all did he prescribe?

 3   A.    Well, I had to take in my pharmacy list to show what I

 4   had been taking.  And I had been taking the Roxicodone 30s.

 5   Q.    Okay.

 6   A.    And he said he would start me -- I think he started me

 7   off, I'm not sure, but he said that he would give me those for

 8   a couple months, then he was going to start weaning me off

 9   them because he didn't like prescribing those to anybody.

10   Q.    Okay.  And what did -- did he tell you what he was

11   planning on?  Or did he prescribe anything else other than the

12   oxycodones?

13   A.    Yes.  He would prescribe me other medication to take the

14   breakthrough pain and to get me off the Roxicodone

15   30 milligrams.  He said they were too strong and he didn't

16   like having those for any of the patients.

17   Q.    Okay.  Now what did he prescribe other than that?

18   A.    Opanas.

19   Q.    Okay.

20   A.    And where they're time released, I've had a gastric

21   bypass and they gave me heartburn real bad.  He asked me to

22   try them for a while, which I did, and I couldn't take 'em, so

23   I brought them back into the office.

24   Q.    Okay.

25   A.    And I think I had taken -- or oxymorphone, is that the --
```

```
 1    I don't know if that's the same thing as the Opanas.  He tried
 2    a couple two, three medicines with me.
 3    Q.    Okay.  And you said you weren't able to take it; is that
 4    right?
 5    A.    I get heartburn real bad because it lays in your stomach
 6    too long.
 7    Q.    What did you do with those?
 8    A.    I brang 'em back to him.
 9    Q.    When you brought 'em back to him, was there anything in
10    particular you did with them?
11    A.    Well, the -- I don't know what Wendell was called, the
12    counselor or whatever.  He would go into the restroom.  He
13    would count them and write them on a paper that he had.  Me
14    and him would go into the restroom where they did the drug
15    testing.  We'd go into the restroom and he'd flush them and
16    then we'd both sign off on a paper that they had been flushed.
17    Q.    Okay.  Now, was there a time that Wendell was there that
18    was busy or had to hurry or something?
19    A.    He had gotten a phone call right as I went into the
20    office, and he found out that his father was about to pass
21    away.  He came in, said, I'm going to talk to you real quick
22    and do my job, but I'll just go ahead and give those to
23    Dr. Smithers and, you know, he can destroy them later.
24    Q.    Okay.  Now what are those?
25    A.    I don't remember if it was the oxymorphone or the Opanas.
```

1    But one of them I had returned to him, the last time I

2    returned to him anything, they were in the little packets 10

3    at a time.

4    Q.   Okay.  Describe what you mean by "little packets"?

5    A.   They're little Ziploc baggies.  I would put my medication

6    in those and that way it would help me keep track of how many

7    I had to make sure I was, you know, not getting ahead of

8    myself on my medicine and I'd have enough to last me 'til my

9    next doctor's visit.

10   Q.   Okay.  Why would you put them in things of ten?

11   A.   That's just the way I can count easier.  I mean, at the

12   deposition they had asked me about that.  They said why not 7

13   or 7 days' worth?

14            I said, I don't know.  Just everybody counts

15   differently, and I count in the 10s.

16   Q.   Okay.  Now how many of them did you return?

17   A.   Several.  I don't remember the exact number.

18   Q.   Okay.  More than 20?

19   A.   I think so.  I think it was several.

20   Q.   More than 30?

21   A.   Yeah, I think so.  It was a bunch of 'em because I

22   couldn't take them very well.

23   Q.   Okay.

24   A.   He told me to try to take them for so many days, and I

25   did, but they just hurt me real bad.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 122 of 195   Pageid#: 10248

```
 1              MR. WILLIAMS:  May I have a moment, Your Honor?

 2              No further questions at this time, Your Honor.

 3              THE COURT:  All right.  Cross-examination.
```

 4                          **CROSS-EXAMINATION**

 5    BY MR. LEE:

 6    Q.    Good afternoon.

 7    A.    Hello.

 8    Q.    Ms. Fisher, you thought Dr. Smithers was a good doctor,

 9    didn't you?

10    A.    Yes, I did.

11    Q.    You thought, and I think you said, he checked you and

12    treated you like the other back doctors do; is that correct?

13    A.    Yes.

14    Q.    And you really liked Dr. Smithers, didn't you?

15    A.    Well, he was always talking about taking me off of the

16    medication, you know, stepping me down and getting everybody

17    off the medication, the stronger stuff.

18    Q.    He was?

19    A.    Yes.

20    Q.    Okay.  Did he ever do that?

21    A.    Yes, he was trying.  Like I said, I had trouble with some

22    of the medication because of my gastric bypass.  Where they're

23    extended release, they lay in your stomach and it comes off so

24    much at a time.

25    Q.    Okay.  You said he also testified he wanted you off the

```
1    oxycodone; right?

2    A.    Right.

3    Q.    He never took you off the oxycodone, did he?

4    A.    I think he had taken me down to 20 milligrams, instead of

5    the 30 milligrams that I originally was on.

6    Q.    Okay.  But he was also prescribing you OxyContin at that

7    time, wasn't he?

8    A.    He prescribed something for the breakthrough pain to get

9    me off the other stuff.  Because I had trouble tolerating it,

10   and I live so far away, so he was trying to get me on

11   something else that I could tolerate.

12   Q.    Let's talk about that.  How far away did you live from

13   Dr. Smithers?

14   A.    Quite a ways.  I lived in -- I live in Leon.

15   Q.    How many hours did it take you to drive to Martinsville,

16   Virginia?

17   A.    About four, I think.

18         MR. LEE:  Ms. Vogt, could you bring up Government's

19   Exhibit 50, please.

20         Let me see if -- can I swing -- I'll try to show you

21   this.

22         Actually -- I tell you what, don't worry about it.

23   BY MR. LEE:

24   Q.    I don't know if you can see that, ma'am.

25   A.    Yeah, a little bit.
```

```
 1    Q.   Where is Leon, do you know?

 2    A.   Near Buffalo.

 3    Q.   Okay.

 4    A.   Near Toyota.

 5    Q.   So I've circled Buffalo up there, is that --

 6    A.   Yeah, that's about right.

 7    Q.   Okay.  So you live there.  Of course, Martinsville, if

 8    you're familiar with the map, it's all the way down there;

 9    right?

10    A.   Right.

11    Q.   Where did you fill your prescriptions?

12    A.   At Ravenswood.  Well, at the time I was staying with a

13    gentleman at his house most of the time helping him to the

14    doctor appointments and stuff, Larry Workman, and he lived in

15    Millwood, which is right there in that circle --

16    Q.   Okay.

17    A.   -- and we got our medications filled at Ravenswood --

18    Q.   Is that in that area, too?

19    A.   Yes.  Ravenswood Drug I think is the name of it.

20    Q.   So you drove at least four hours?

21    A.   Yes.

22    Q.   Is that each way to Dr. Smithers's clinic?

23    A.   Yes.

24    Q.   Okay.  And I think you also testified at a prior time

25    that you used to stay overnight before your visits; is that
```

1    correct?

2    A.    Yeah.  It would be easier on Larry, yeah.

3    Q.    And you've been to a lot of doctors, haven't you?

4    A.    Oh, yeah.  Different problems.

5    Q.    Okay.  And you've been to pain clinics in the past;

6    correct?

7    A.    No.  I don't know.  I went to one in Cleveland, and I'm

8    not sure if it was before Dr. Smithers or after Dr. Smithers.

9    Q.    Let's talk about doctors that have written you controlled

10   substances such as oxycodone, ketamine, and similar controlled

11   substances.

12   A.    What's ketamine?

13   Q.    Ketamine, it's a pain prescription.

14   A.    I don't believe I've ever been on that.

15   Q.    Okay.  Do you know a Dr. Derakhshan?

16   A.    Yes.

17   Q.    Okay.  He was your doctor for a long time, wasn't he?

18   A.    Yeah.  I started going to him in 1997 for migraines.

19   Q.    Is he still practicing as a doctor?

20   A.    No, not to my knowledge.

21   Q.    He got shut down, didn't he?

22   A.    Yeah.

23   Q.    He got prosecuted by the United States Attorneys Office

24   in West Virginia, didn't he?

25   A.    I don't know.

```
1   Q.   He got prosecuted for illegally prescribing and failing
2   to record the dispensing of controlled substances, didn't he?
3   A.   I don't know.
4   Q.   Okay.  You just know he can't write you controlled
5   substances.
6   A.   I just know he closed.
7   Q.   Do you know a Dr. Holly?
8   A.   Yes.
9   Q.   Okay.  Is he still writing you prescriptions?
10  A.   Not to my knowledge.
11  Q.   Did he get shut down too?
12  A.   No.  I believe he's still open.  He's a heart doctor and
13  different things.
14  Q.   Okay.  But he can't write controlled substances, can he?
15  A.   I don't believe so.
16  Q.   That's why you stopped going to see him, wasn't it?
17  A.   Well, I went there with my daughter and she stopped going
18  down there.  I went down to Dr. Kessinger in Eleanor, in
19  Putnam County.
20  Q.   Do you remember testifying in front of the grand jury?
21  A.   I don't remember if it was a deposition or what it was,
22  but yeah.
23  Q.   In this courthouse?
24  A.   Yeah.
25  Q.   Back in September of 2017?
```

```
 1   A.    Yeah.
 2   Q.    Okay.  Do you remember testifying you saw Dr. Holly in
 3   Point Pleasant, and he would give me Percocets until he
 4   couldn't write?
 5   A.    Yeah.  If that's what I said, I don't remember.
 6   Q.    So you went to him after your other doctor got shut down;
 7   right?
 8   A.    Yes.
 9   Q.    You went to Dr. Holly until he got shut down as far as
10   writing controlled substances.
11   A.    Right.  Everybody in the state of West Virginia, you
12   know, they couldn't write medications.
13   Q.    And then you went to Dr. Smithers?
14   A.    Yes.
15   Q.    And you drove four hours each way to see him?
16   A.    Well, with the guy that I was staying with, me and my
17   husband would take him to his doctor's appointments and
18   everything until he died.  And he started going there, and
19   then I started going after I started taking him down there
20   several times.
21   Q.    You're talking about Larry Workman; correct?
22   A.    Yes.
23   Q.    Okay.  He was a drug dealer, wasn't he?
24   A.    I'm not sure what he did.
25   Q.    Well, he got charged with dealing drugs, distributing
```

1    drugs, didn't he?

2    A.    He was already dead when they did that.

3    Q.    Okay.  But he got charged with it; correct?

4    A.    That's what they said.  They had a warrant for him.  I

5    don't know what they charged him with.

6    Q.    You got charged in addition to that with him, didn't you?

7    A.    Yeah, because I was in the same place when he was doing

8    it.

9    Q.    So he was a drug dealer; correct?

10   A.    I mean, I know he would do things with the -- you know,

11   the kids would come in and he would loan them money and stuff.

12   But I didn't really realize he was selling drugs because I

13   stayed in my room most of the time.

14   Q.    Okay.  And that's the person that took you and referred

15   you to Dr. Smithers; correct?

16   A.    Yes.

17   Q.    Okay.  And Mr. Workman had been a patient of a place

18   called Hope Clinic before that, hadn't he?

19   A.    Yes.

20   Q.    And they got shut down?

21   A.    In Beckley, and then he went to Wytheville.

22   Q.    Okay.  And then that place got shut down; correct?

23   A.    Yeah.

24   Q.    And then the two of you went to Dr. Smithers?

25   A.    He went to Dr. Smithers two or three times and then I

```
 1    went to him.  He went several -- I don't know exactly how many
 2    times he went before I started with him.
 3    Q.   Now, when you were seeing Dr. Smithers, you were not in a
 4    wheelchair as you are today; correct?
 5    A.   Right.  I had surgery -- I've had three surgeries in the
 6    last couple years -- two years on my -- on a hernia.  I still
 7    have a hole in my belly with a patch on it.
 8    Q.   Okay.  So you --
 9    A.   And I got tendonitis in that hip from that.
10    Q.   Okay.  So you're in a much different condition than you
11    are now -- or than you were when you saw Dr. Smithers?
12    A.   Right.  I was walking with a cane.
13    Q.   Okay.  Now you paid $450 for your first visit at
14    Dr. Smithers's office; correct?
15    A.   Yes.
16    Q.   That was in cash; right?
17    A.   Yes.
18    Q.   He didn't take your insurance?
19    A.   No.
20    Q.   Why not?
21    A.   He couldn't bill the insurance.  I don't know why.  The
22    insurance is -- my insurance is military.
23    Q.   Okay.  And then you also stated that every time -- well,
24    I don't want to -- did every time you went to see him, did you
25    stay overnight in a hotel?
```

```
 1   A.   Yes.  Because sometimes when you'd go in there, he'd be
 2   so busy, you'd have to wait several hours to be seen.
 3   Q.   Okay.  So in addition to what you were paying cash for
 4   your office visit, you were having to pay for a hotel room?
 5   A.   Well, Larry paid for half, and I paid half the expenses.
 6   Q.   So you're paying some amount of money; right?
 7   A.   Right.
 8   Q.   And you're on a fixed income; correct?
 9   A.   Yes.
10   Q.   What was your monthly income, if you know?
11   A.   I don't have any income.  My husband has a military
12   retirement.  I've got an auction house, but I haven't been
13   selling much.  I mean, I did.  But the last couple years with
14   my stomach, I haven't been able to sell anything.
15   Q.   Okay.  So what's your husband's monthly income?
16   A.   About 1400 on retirement and about 13 on social security,
17   I think.  Something like that.
18   Q.   Is that what it was back when you were seeing
19   Dr. Smithers?
20   A.   Yes.
21   Q.   Okay.  So you paid $450 for your first visit, for that
22   first visit.  Then after that it was $300 cash a month;
23   correct?
24   A.   Something like that.  I'm not sure.
25   Q.   Every time you went to see Dr. Smithers.
```

```
 1   A.    When I had this surgery -- I had one in September and
 2   then one in December of 2018.  And in September my -- no, end
 3   of December.  My heart started messing up and they gave me a
 4   lot of heart medication, so I don't have a really good memory
 5   on everything.  Used to be I could quote numbers and
 6   everything, but I just can't do that anymore.
 7   Q.    You didn't have any trouble remembering when asked
 8   questions by Mr. Williams, did you?
 9   A.    Certain things I said best I could remember.
10   Q.    Okay.  But you can't tell this jury how much you had to
11   pay for an office visit?
12   A.    It was around 300, I think, like you said.  It sounds
13   familiar.
14   Q.    Then you had to pay about $300 to get your prescriptions;
15   correct?
16   A.    No, my insurance paid for those.
17   Q.    Every time?
18   A.    Well, I think the first time we had went to a drugstore
19   in -- I'm not sure where that was.
20   Q.    Was it in Wytheville?
21   A.    I think so.  Mike's.
22   Q.    Best Practices?
23   A.    Yeah.
24   Q.    You actually went there and filled your prescriptions on
25   two, at least two occasions, didn't you?
```

1    A.    I'm pretty sure it was just one because I had to pay cash

2    there, unless he started taking my insurance.  And then I got

3    the pharmacy at the house to take it -- my insurance.  So it

4    didn't cost me anything, or just very little, I don't

5    remember.

6    Q.    Okay.  But when you went to Mike's it was about $300,

7    wasn't it?

8    A.    Yeah.  Like I said, I think I just found pills there

9    once.

10    Q.    Okay.  So you're looking somewhere 600 to $700 just to go

11    to the doctor that you're paying out cash?

12    A.    The one time.

13    Q.    Do you remember testifying in the grand jury that you

14    went to Mike's at least twice to fill your prescriptions

15    there?

16    A.    No, I don't remember.  I thought it was just one time.

17    Q.    Well, that's the only place you could get Opana filled;

18    right?

19    A.    I did there in Ravenswood, Ravenswood Drugs, eventually.

20    But I talked to the owner of it and got him to -- because he

21    knew how bad I was hurting and everything, my condition, so he

22    filled them for me.

23    Q.    Now you talked about this -- well, let me ask you this.

24    Did you actually see Dr. Smithers every time you went for a

25    visit?

```
 1   A.   There was once for -- I think it was just one time.  I
 2   don't remember exactly.  But he would talk to me on a
 3   face-to-face, whatever you call that, on the phone.
 4   Q.   FaceTime?
 5   A.   Yeah.  Something like that.
 6   Q.   Are you sure it didn't happen at least twice?
 7   A.   It may have, I don't recall.
 8   Q.   Okay.  So you go in, you'd see Wendell --
 9   A.   Yeah.
10   Q.   -- wait numerous hours, then you'd walk in and the doctor
11   wouldn't even be there?
12   A.   No.  When you went in and talked to Wendell, then he
13   would tell you whether Dr. Smithers was there or not.
14   Q.   Okay.  And how often did that happen?
15   A.   Like I said, I remember one time.  But I don't recall --
16   I don't remember.
17   Q.   But, again, you remember testifying in the grand jury
18   that it could have been more than once?
19   A.   I don't remember what I even said.  I know I was here.
20   But, like I said, those three heart medications they put me
21   on, I'm sorry, but I don't recall everything.
22   Q.   Did you have to pay when you just talked to the doctor on
23   the phone?
24   A.   Yes.
25   Q.   What were you paying for?
```

```
 1    A.    What do you mean?

 2    Q.    Well, you didn't have a medical exam, did you?

 3    A.    Yeah.  Wendell would take care of everything like

 4    Dr. Smithers did.

 5    Q.    What do you mean?

 6    A.    Like your -- your heart rate and that stuff.

 7    Q.    So Wendell would take your heart rate?

 8    A.    Yeah.

 9    Q.    Take your blood pressure?

10    A.    Then you have your drug test and all that, you know.

11    Whether Dr. Smithers was there or not, you know.

12    Q.    Okay.  And did Wendell do a back exam for you?

13    A.    No.  I don't recall.

14    Q.    Okay.  Did he do anything other than just check your

15    heart rate and do a urine screen?

16    A.    I don't remember what all he did, actually.  I know I'd

17    go in and talk to Wendell.

18    Q.    Okay.  So on these occasions when a doctor wasn't even

19    there, Wendell would do some kind of medical stuff, you can't

20    remember what, and then a urine screen, and then you'd get on

21    the phone with the doctor?

22    A.    Right.  Well, Wendell didn't actually do the urine

23    screens.  After a while they had another person qualified to

24    do it, that way it got you in and out faster.

25    Q.    All right.  So then you talked to the doctor.  Did -- who
```

1  gave you a prescription?

2  A.   I don't know if the guy up front gave it to -- I think

3  the guy up front would give it to you after they got written

4  and they got copies.

5  Q.   Who wrote the prescription?

6  A.   I don't know.  I didn't never see that.

7  Q.   Okay.  Clearly it wasn't Dr. Smithers; right?

8  A.   Unless he came in.  Sometimes he would come in and then

9  leave.

10  Q.   But you'd still have to talk to him on the phone?  I'm

11  just talking about the times that you never saw Dr. Smithers

12  in person.

13  A.   Right.  I don't know what happened with the

14  prescriptions.

15  Q.   Just some guy at the front would give them to you after

16  you paid your $300?

17  A.   After I'd seen Wendell and talked to Dr. Smithers.

18  Q.   Okay.  Now you mentioned these drugs that you

19  supposedly -- or that you testified that you brought back to

20  Dr. Smithers; is that right?

21         In fact, Dr. Smithers told you about this idea that

22  you brought these drugs back to give to him, didn't he?

23  A.   Yeah, he told me to bring them back if I couldn't take

24  them.

25  Q.   No.  No.  He told you that at some point you'd be

1  questioned by the DEA about bringing drugs back to him, didn't

2  he?

3  A.   No.

4  Q.   He didn't have a conversation with you --

5  A.   Oh, well, he did about the -- once it was in the bag.  I

6  went to see him, I think it was -- may have been the last

7  visit, and he said, "You're the baggie woman."

8            And I said, "What?"

9            He said, "You're the one that returned the medicine

10 in the bag the day that Wendell's dad was dying."

11 Q.   So he told you about this incident that had occurred,

12 didn't he?

13 A.   Yeah.  I think he talked to a DEA agent while I was

14 there.

15 Q.   And this was right after a search warrant had been

16 executed at Dr. Smithers's practice, wasn't it?

17 A.   I'm not sure about that because I wasn't there.

18 Q.   Okay.  And it's your testimony that you had been getting

19 this oxymorphone, that you didn't like it, and that you

20 brought it back and give it to Dr. Smithers.

21 A.   Yeah, I don't know if it was the Opana or the

22 oxymorphone.  I forgot about even getting that.

23 Q.   Well, you got three different prescriptions for that

24 drug, didn't you?

25 A.   I don't know.  Now I know one of the medications he gave

1   me and he said that I didn't try it long enough.  And he asked

2   me to try it a little longer.

3   Q.   Okay.  You got a prescription for oxymorphone or Opana on

4   November 17th, December 15th, both in 2016, and January 12,

5   2017; does that sound about right?

6   A.   I have no idea.  I don't remember this.

7   Q.   And then you talk about on one occasion you brought back

8   pills that you couldn't take.  But the doctor told you he

9   wanted --

10  A.   It happened more than once.  It happened more than once.

11       I remember two times.  And it may have been a third

12  time.  I don't remember.

13  Q.   Okay.  But on at least one occasion, you actually brought

14  pills back to Dr. Smithers and then he wrote you another

15  prescription, didn't he?

16  A.   Of something else, yes.

17  Q.   Well, he wrote you a prescription for the same thing

18  because you hadn't tried it long enough.

19  A.   That's what I just said, yes.

20  Q.   Okay.  So explain to me why if you already have pills in

21  your possession that you haven't taken from a prior

22  prescription, why did the doctor need to write you another

23  prescription for that same set of pills?

24  A.   Well, like I said, you'd go in and see Wendell first.

25  And Wendell flushed them down the toilet and took care of

```
 1    them.  You know, and then I would see Dr. Smithers and then he
 2    would tell me I needed to try it longer.  Because he was
 3    really trying to get me off all the harder medications.
 4    Q.   Okay.
 5    A.   And he was right.  I mean, at the time I didn't think he
 6    was right, you know, because I thought Dr. Derakhshan kept
 7    giving me more and more of the oxy -- Roxicodone, the little
 8    blue ones.  He was giving me more over time, over the years,
 9    and I just thought --
10              THE COURT:  Ma'am, just answer the question.  All
11    right?
12              THE WITNESS:  Oh, okay.
13    BY MR. LEE:
14    Q.   Ma'am, you're still getting oxycodone today, aren't you?
15    A.   Since I had surgery, yes.  Oxycodone 5 milligrams.
16    Q.   When did you ever stop getting oxycodone?
17    A.   After Dr. Smithers.  I believe he was the last person
18    that prescribed it to me until I had this bowel block and had
19    to have surgery.
20    Q.   So your records show you've been getting oxycodone, in
21    essence, ever since you left Dr. Smithers's practice?
22    A.   No.
23    Q.   That's not true?
24    A.   No.
25    Q.   Okay.
```

1  A.    I didn't get it until I had the bowel block.  And then

2  there was a time -- the first surgery was in September -- or

3  November 22nd of 2017.  And then he had -- I had -- it broke

4  loose and I had an incisional hernia and he had to operate in

5  September.

6  Q.    Ms. Fisher, you stopped going to -- you didn't go to

7  Dr. Smithers in July of 2017, did you?

8  A.    Whenever he closed.  I don't remember the date.

9  Q.    Okay.  Well, you had something happen in your life that

10  prevented you from going to Dr. Smithers's office, didn't you?

11  A.    I don't remember.

12  Q.    Okay.  Do you remember getting arrested in July of 2017?

13  A.    I was thinking it was August.

14  Q.    Okay.  Do you remember getting arrested in August of

15  2017?

16  A.    Yes.

17  Q.    What were you arrested for?

18  A.    They arrested me for felonies that were -- I was staying

19  with Larry Workman, and he was doing drug buys, or sales, or

20  whatever.  And I was in his trailer.  And there was one time

21  one girl had -- I loaned her money because she was dating my

22  nephew.  She paid me back the money she owed me in Walmart.

23  And her mother was dying, and I know I shouldn't have, but I

24  loaned her some medication that -- for her mother.

25  Q.    You were charged with drug distribution, weren't you?

```
 1   A.   I don't think so.

 2   Q.   Four counts of drug distribution?

 3   A.   No.

 4   Q.   What were you charged with?

 5   A.   I said three of the felonies was with Larry.

 6   Q.   What was your charge?  Your criminal charge?

 7   A.   I don't know.

 8   Q.   Okay.  And then --

 9   A.   Everything was dropped.  I mean, nothing -- you know.

10   Q.   But you gave -- you were at the Walmart --

11   A.   Yeah, that's where I -- I thought I was loaning her

12   medication, and I thought she was paying me back, because I

13   still had her food stamp card.  She gave it to me to hold

14   until she paid me.  I thought the money she was giving me at

15   Walmart that day was for the food stamps.  I knew she was

16   talking funny, but I didn't realize she was wired.

17   Q.   It was Amanda Brewington (phonetic), wasn't it?

18   A.   Yes.

19   Q.   She was wearing a wire and cooperating with law

20   enforcement, wasn't she?

21   A.   Right.  That was before she kidnapped a baby.

22   Q.   You gave her six oxycodone pills, didn't you?

23   A.   I don't remember how many.  Her mother was dying of

24   cancer and she asked for some.

25   Q.   Okay.  Do you remember testifying in front of the grand
```

```
1    jury?
2    A.    I remember I was there.
3    Q.    And do you remember telling the grand jury that you gave
4    Amanda Brewington six of your oxycodone pills?
5    A.    Like I said, I don't remember how many it was because
6    it's been a while.
7    Q.    I'm going to show you page 46 of your grand jury
8    testimony.
9          I'm going to ask you to read this to yourself,
10   beginning at lines 18.
11   A.    You want me to read it out loud?
12   Q.    No, I want you to read it to yourself.
13   A.    Okay.   Yeah.
14   Q.    Does that refresh your recollection?
15   A.    That's what I just said, that she owed me money.   She
16   said, "Here's the money I owe you."
17   Q.    After you gave her six OxyContin 20 pills?
18   A.    There was a conversation on the phone before that.   And
19   she said that her mother was running out of her pain
20   medication.   And her mother was, like I said, dying of cancer.
21   I thought I was just loaning it to her.   She said her mother
22   would go to the doctor, like, two or three days later and she
23   would pay me back.
24   Q.    So you're at Walmart with your autistic nephew.
25   A.    Yes.
```

```
 1    Q.    Who is 14 years old; correct?

 2    A.    Yes.

 3    Q.    And your grandson.

 4    A.    Yes.

 5    Q.    How old was he?

 6    A.    One or two at the time.

 7    Q.    And you gave Amanda Brewington six oxycodone 20s;

 8    correct?

 9    A.    If that's what I wrote down there, I don't remember.  It

10    said four or six, I wasn't sure.

11    Q.    She said, "Here's the money I owe you."  And you gave her

12    the pills?

13    A.    I thought it was the money she owed me, like I said

14    before.

15          MR. LEE:  No further questions, Your Honor.

16          THE COURT:  All right.  Any redirect?

17          MR. WILLIAMS:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19    BY MR. WILLIAMS:

20    Q.    Ms. Fisher, when you went in to see Dr. Smithers, did he

21    talk to you about alternatives to medication?

22    A.    Right.  Yes.

23    Q.    What all did he talk about?

24    A.    He had talked about the probiotics and to -- I'm not sure

25    what else.
```

```
 1   Q.   Acupuncture?

 2   A.   Yeah.

 3   Q.   Okay.  What about yoga?

 4   A.   Yeah.  Because he said there was different things I could

 5   do to make it feel better.  And then to try to get moving

 6   around more.

 7   Q.   Okay.  Did you ever try that?

 8   A.   I did.  But I've got that degenerative bone disease and

 9   it hurt too bad.

10   Q.   Okay.  Now, did he talk to you about any other things,

11   other than just your pain?

12   A.   Like what?

13   Q.   I mean, did he help you with any other aspects of your

14   life?  Aid or anything like that?

15   A.   Yeah, we were always talking about stuff, but I don't

16   really remember everything that he said.  He was always trying

17   to talk to me and to Larry to get us healthier and get off the

18   pain medication that we were on.

19   Q.   Okay.  Now, did you have to do drug screens when you were

20   there?

21   A.   Yes.

22   Q.   Okay.  What about bring your pills in and pill counts and

23   stuff?

24   A.   Yes.

25   Q.   Okay.
```

1   A.   You had to bring your medication in and Wendell would

2   count them.

3   Q.   Okay.  Now we talked a little bit about getting your

4   prescriptions filled and stuff like that.  Was Dr. Smithers

5   ever trying to help you with that?

6   A.   No.

7   Q.   Okay.  He didn't try to help you where you could get it

8   locally filled or anything?

9   A.   No.  The guy up front had told me about that -- he had

10  told Larry about that pharmacy, Mike's Pharmacy.  We went

11  there a couple times.  But he wouldn't take -- he couldn't

12  take no insurance.  He couldn't take no insurance cards, so.

13  Q.   Did he ever try to help you with someplace with

14  insurance?

15  A.   Who?

16  Q.   Dr. Smithers.

17  A.   No.

18  Q.   Okay.

19  A.   Not that I remember.

20  Q.   Did he ever help you with TRICARE, try to get your

21  medications approved or anything?

22  A.   Not that I recall.  I don't remember.

23          MR. WILLIAMS:  No further questions.

24          THE COURT:  Anything further?

25          MR. LEE:  Just briefly, Your Honor.

```
 1                    RECROSS EXAMINATION

 2   BY MR. LEE:

 3   Q.   Ms. Fisher, the six oxycodone pills that you sold to

 4   Miss Brewington --

 5   A.   I loaned them to her.

 6   Q.   Okay.  Those came from a prescription written by

 7   Dr. Smithers, didn't it?

 8   A.   I'm not sure.  Larry had some laying around that he had

 9   when he passed away, and I had those.  So I'm not sure.

10          MR. LEE:  If I could have one moment, Your Honor.

11   BY MR. LEE:

12   Q.   Ma'am, do you remember testifying in front of the grand

13   jury?

14   A.   Like I said, I remember I was here, but I don't remember

15   what I said.  That was before I took all that heart

16   medication.

17   Q.   I'm going to show you what's going to be marked, excuse

18   me, pages 49 and 50 of your grand jury testimony.

19          Ms. Fisher, if you'd read to yourself, starting at

20   line 19 on page 49.

21   A.   Right.  That's what I just said.  That I loaned her my

22   medication.  That's what I said in the grand jury, apparently.

23   Q.   The question in the grand jury was:  "And to be clear,

24   the OxyContin pills that you gave to this lady in Walmart came

25   from Dr. Smithers; is that right?"
```

```
 1              And your answer was:  "Yes," wasn't it?
 2   A.   Whether it was mine or Larry's, yeah, I don't recall.
 3   Q.   Okay.  So regardless of whether it was your prescription
 4   or Larry's, it would have come from a prescription written by
 5   Dr. Smithers; correct?
 6   A.   Yes.
 7              MR. LEE:  No further questions, Your Honor.
 8              THE COURT:  Yes, sir.
 9              MR. WILLIAMS:  Your Honor, no further questions.
10              May she be excused?
11              THE COURT:  Yes.  The witness may be excused.
12              All right.  You may take the witness out.
13              THE WITNESS:  Thank you.  Sorry about that for being
14   in a wheelchair.
15              THE COURT:  Yes, ma'am.
16              You may call your next witness.
17              MR. WILLIAMS:  Your Honor, the defense calls Lennie
18   Hartshorn.
19              Your Honor, if I may have just a second, I may have
20   to go find Mr. Hartshorn.  I'm not sure where he went.
21              THE COURT:  All right.
22              THE WITNESS:  Where to?
23              THE CLERK:  If you'll come forward, please.
24              If you'll raise your right hand.
25              Do you solemnly swear that the testimony you're
```

1    about to give in this case shall be the truth, the whole

2    truth, and nothing but the truth, so help you God?

3              THE WITNESS:  Yes, ma'am.

4              THE CLERK:  You may take the stand.

5              THE COURT:  Yes, sir, you may proceed.

6              MR. WILLIAMS:  Thank you, Your Honor.

7                    **LENNIE HARTSHORN, JUNIOR,**

8    Called as a witness herein by the Defense, having been first

9    duly sworn, was examined and testified as follows:

10                      **DIRECT EXAMINATION**

11   BY MR. WILLIAMS:

12   Q.   Would you state your name for the record.

13   A.   Lennie Hartshorn, Junior.

14   Q.   Okay.  And you spell your last name so that they can --

15   A.   H-a-r-t-s-h-o-r-n.

16   Q.   Okay.  Now, Mr. Hartshorn, where do you live?

17   A.   In Bolt, West Virginia.

18   Q.   Okay.  And how long have you lived there?

19   A.   Since 1958; 61 years total.

20   Q.   Okay.  And do you know Dr. Smithers?

21   A.   Yes, sir.

22   Q.   How long have you known Dr. Smithers?

23   A.   I'd have to guess.  Approximately two years.

24   Q.   Okay.  Did you become a patient of his?

25   A.   Yes, sir.

1  Q.   Okay.  And when did you become a patient of his, do you

2  recall?

3  A.   Approximately two years ago I guess.  I'm not sure for

4  sure.

5  Q.   Would around September, October of 2016 sound about

6  correct?

7  A.   Yes, that sounds about right.

8  Q.   Okay.  And why did you go to Dr. Smithers?

9  A.   The pain clinics had been shut down.  And one of the

10 people that had -- was working at that pain clinic I was going

11 to went to work for him and got me to be able to come see him

12 for pain management.

13 Q.   Okay.  Would that be the one in Wytheville?

14 A.   Yes.

15 Q.   Okay.  And tell the members of the jury about what was

16 wrong with you.

17 A.   What was wrong with me?

18 Q.   Yeah.

19 A.   I've had a lot of disks messed up in my neck and my back.

20 In the past year and a half I had four disks fused, lower back

21 cage, right hip replaced, and right knee replaced.  Got to let

22 my body heal up before I can have my left knee replaced.  And

23 hopefully then I'm going to go fishing in Alaska or something.

24 I had a whole a lot of things wrong.

25 Q.   What was the start of all your injuries?

```
1    A.    Excuse me?

2    Q.    What kind of started all your injuries?  Were you

3    involved in a mining accident?

4    A.    Twenty-four  years in a coal mine.  I was working for

5    Hartford 11.  Yeah, I was injured in mining several different

6    ways and times.  I was able to keep working.

7    Q.    Okay.  Describe how you were injured.

8    A.    I had rocks fall.  I've had -- running a shuttle car, hit

9    holes in the -- in the roadway and it would throw you against

10   the steel canopy top and mess your neck up.  On the rails, the

11   top was so low, they'd put pipes or rails across on top of 'em

12   on your mine trips and you could hit your head on it.  We've

13   done that several times -- or I have.  There are just a whole

14   lot of ways of getting injured in a coal mine.  It's a very,

15   very dangerous place to be.

16   Q.    Now, when you went to see Dr. Smithers, did you take

17   X-rays?  MRIs?  Anything like that when you went?

18   A.    I took all my medical records.

19   Q.    Okay.

20   A.    Yeah, I had MRIs, X-rays, and I'd already had a neck

21   fusion one time.  It was not successful.  And I've been taking

22   pills, pain pills from my doctor in Beckley, which was like

23   Lortabs or something like that.  And he had told me that --

24              THE COURT:  Don't say what your doctor told you,

25   okay?  Don't testify as to what your doctor told you.
```

```
 1            THE WITNESS:  Okay.
 2            THE COURT:  The question -- wait a minute.  The
 3  question was did you take your medical records?  And you said
 4  yes.
 5            THE WITNESS:  Yes, sir.  Sorry.
 6  BY MR. WILLIAMS:
 7  Q.   Okay.  Now, when you went there, describe your first
 8  visit with Dr. Smithers.
 9  A.   He was knowledgeable about what was going on.  Explained
10  a lot of things to me that a lot of other ones hadn't.  He was
11  very particular about what, you know, your medicine that you
12  were taking.  You had to have a record of all that.  I had a
13  list of all of them.  He would talk to me about the
14  counteractions of one medicine versus the other.  And I was
15  good on that.  I didn't have any that conflicted with the pain
16  medicine itself.
17  Q.   Okay.  How long did he take with you that first visit; do
18  you recall?
19  A.   I was there quite a -- quite a few hours.  With him, his
20  self, probably at least a half hour, if not a lot longer.
21  Q.   Okay.
22  A.   He explained --
23            THE COURT:  All right.  You've answered the
24  question.
25            Just listen to the question and answer it.
```

```
 1              THE WITNESS:  Not add anything to it.  All right.
 2   Thank you.
 3   BY MR. WILLIAMS:
 4   Q.   Did he talk to you?  Did he do any kind of physical exams
 5   or anything on you?
 6   A.   Yeah.  He listened to my lungs and stuff, you know, blood
 7   pressure.
 8   Q.   Okay.  Did he check your back or anything?
 9   A.   Yeah.  And my knee, yes.
10   Q.   Okay.  Now, when you went in, did you have to go through
11   drug testing or anything like that?
12   A.   Yes.
13   Q.   Okay.  And did you ever have any problems with your drug
14   tests?
15   A.   No.
16   Q.   Did you have to do pill counts?
17   A.   Yes.
18   Q.   Okay.  Did you ever have any problem with those?
19   A.   No.
20   Q.   Okay.  Now as far as what kind of medication did
21   Dr. Smithers prescribe to you?
22   A.   Oxycodone.  I can't recall if there was anything else or
23   not.  I don't think so.
24   Q.   Okay.  And how did it affect your pain, what he had given
25   you?
```

```
1    A.    It made it tolerable where I could do things.
2    Q.    Okay.  When you say, "tolerable so you could do things,"
3    do things like what?
4    A.    Just normal living.  Be able to do a few things on the
5    farm, be able to enjoy life some.  I have a convenience store,
6    it allowed me to help tinker around in that.
7    Q.    Okay.  So you weren't able to do that prior to this?
8    Prior to seeing Dr. Smithers?
9    A.    Yes, because I had been seeing another doctor before.
10   Q.    Okay.  Without the medication, what was your life like?
11   A.    Recliner.  Laying in it, unable to really get out and
12   enjoy life.
13   Q.    Okay.  Now you're Heather Hartshorn's father; correct?
14   A.    Yes.
15   Q.    Okay.  And I'm very sorry, okay.
16         Do you recall the day that Heather passed away?
17   A.    Yes.
18   Q.    Okay.
19   A.    To some degree.
20   Q.    Okay.  Now I don't want to you tell me what you've heard
21   or what you've -- anything.  But I want you to tell me what
22   you know personally, okay?
23   A.    Yes.
24   Q.    Okay.  Did you see Heather that day?
25   A.    Yes.
```

```
1    Q.    Okay.  What time did you see her?

2    A.    Approximately 5:00 or 6:00 p.m.

3    Q.    Okay.  And where was that at?

4    A.    At my convenience store.

5    Q.    Okay.  And was there anybody with her?

6    A.    I think she had -- I'm sorry, thinking.  She had one of

7    her sons with her and the father of the son.

8    Q.    Okay.  Was that someone she was involved with?  Or dating

9    or anything?

10   A.    Yes.  That was a person that lived with her.

11   Q.    Okay.  So they lived together?

12   A.    Yes.

13   Q.    And where did they live together at?

14   A.    At my home in Bolt.

15   Q.    Okay.  Did you see her at any point in time subsequent to

16   that?  That night?

17            THE COURT:  You mean after that?

18   BY MR. WILLIAMS:

19   Q.    After that; correct.

20   A.    No, not until I went back to the home about 6:00 a.m.

21   Q.    Okay.  Did you know -- do you have -- do you know

22   personally whether or not Heather was taking any kind of

23   prescription?

24            MR. RAMSEYER:  Objection, Your Honor.  Unless he has

25   personal knowledge.
```

```
 1              THE COURT:  Not on what somebody told you.  Did you
 2    see her take a controlled substance or any kind of
 3    prescription?
 4              THE WITNESS:  That day or?
 5              MR. WILLIAMS:  Yes, that day.
 6              THE COURT:  Well, I don't know.
 7              That day.
 8              THE WITNESS:  Again, I'd have to say -- did I
 9    actually see her?  No.
10    BY MR. WILLIAMS:
11    Q.   Okay.  Now, Heather had some problems; correct?
12    A.   Yes.
13    Q.   Okay.  Had she ever threatened suicide to you?
14    A.   She had -- I guess hearsay or something.  She had
15    mentioned she would rather be dead than be in pain all the
16    time.
17              MR. RAMSEYER:  Objection, Your Honor.
18              THE WITNESS:  I don't know.
19              THE COURT:  You can't -- yes.  Ladies and gentlemen,
20    disregard that statement.
21              You can't testify as to what somebody told you, sir.
22              And, Mr. Williams, don't ask questions --
23              THE WITNESS:  Then I can't answer that question.
24              MR. WILLIAMS:  I'm sorry.
25              THE COURT:  All right.  Do you have any further
```

1    questions of the witness?

2              MR. WILLIAMS:  May I ask?

3              THE COURT:  All right.

4    BY MR. WILLIAMS:

5    Q.    Did Dr. Smithers talk to you about alternative therapies

6    and stuff?

7    A.    Yeah.  We discussed that, yes.

8    Q.    Okay.  And what all did you discuss?

9    A.    About physical therapy, surgeries.  But where I hadn't

10   had such good luck out of the surgeries, that was a last

11   resort.  And it finally got down to last resort and I have had

12   to have several surgeries.

13   Q.    Okay.  Mr. Hartshorn, do you blame Dr. Smithers for

14   anything?

15   A.    No.

16             MR. WILLIAMS:  No further questions.

17                        **RECROSS-EXAMINATION**

18   BY MR. RAMSEYER:

19   Q.    Mr. Hartshorn, your daughter died two days after getting

20   a prescription from Dr. Smithers; is that correct?

21   A.    Yes.

22   Q.    And were you the one that got her hooked up with

23   Dr. Smithers?

24   A.    Was what?

25   Q.    Are you the person that got her hooked up with

```
 1    Dr. Smithers?

 2    A.   No.

 3    Q.   She was already going there before you?

 4    A.   I'm not sure.  I think so --

 5    Q.   Where did she --

 6    A.   No.  I don't know, because -- I really don't know.

 7    Q.   Where did you live at the time that you were going to

 8    Dr. Smithers?

 9    A.   Fairdale, at my convenience store.

10    Q.   Where?

11    A.   Where did I live?

12    Q.   Yes.

13    A.   Fairdale.

14    Q.   Fairdale, West Virginia?

15    A.   Yes.

16    Q.   Where did she live?

17    A.   Bolt.  At my home in Bolt.

18    Q.   Bolt, West Virginia.  How far apart are those places?

19    A.   Five miles.

20    Q.   Okay.  Did you see her on a regular basis?

21    A.   Yes.

22    Q.   Okay.  And so you don't know if she was going to

23    Dr. Smithers first or you were going to Dr. Smithers first?

24    A.   No, I don't know for sure.  She may have went before I

25    did.  But I'm not sure because where they had shut down in
```

1  Wytheville, and he had just opened up his practice there, I

2  don't remember for sure if I got -- from the employee that let

3  me know that he was doing business there.  I don't know if she

4  had a visit the week before me or a week after, that type of

5  thing, where he had just opened up.  I really don't know.

6  Q.  Did you see Dr. Smithers every time you went to the

7  office?

8  A.  I think there was one time he was not there.

9  Q.  There was more than one time, wasn't it?

10  A.  I don't know.  I can recall one time.

11  Q.  Okay.  The one time you went, he wasn't there, did you

12  know he wasn't going to be there?

13  A.  No.

14  Q.  How far had you driven to get there?

15  A.  It's two and a half hours.  I can't remember.  Something

16  like that, two and a half, three hours.

17  Q.  At least three hours, isn't it?

18  A.  Again, I can't recall for sure.  But probably two and a

19  half, three hours.

20  Q.  Did you drive it?

21  A.  No, I rode.

22  Q.  Who drove?

23  A.  Usually a man by the name of Wayne Tolliver would drive.

24  Q.  Okay.  Was he getting pills too?

25  A.  Excuse me?

```
 1    Q.    Was he getting pills from Dr. Smithers too?

 2    A.    He getting a prescription, yeah, I guess.

 3    Q.    Yeah.  Was he from your local area too?

 4    A.    Yes.

 5    Q.    Okay.  Did you have to give him any of your pills for him

 6    driving you?

 7    A.    No, sir.

 8    Q.    Okay.  Did you ever give him any of 'em?

 9    A.    What?

10    Q.    Did you ever give Wayne any of your prescriptions?

11    A.    No.

12    Q.    Okay.  How much did you have to pay for the office visit?

13    A.    I think it was 300.

14    Q.    Okay.  Was it --

15    A.    Maybe 250 or 300, I don't recall.

16    Q.    How did you pay it?

17    A.    Cash.

18    Q.    And where did you get the money from?

19    A.    Out of my bank account.

20    Q.    Okay.  Did you have a job at the time?

21    A.    No.  I'm retired, disabled, and run a convenience store.

22    Q.    Okay.  So how did you pay for your prescriptions?

23    A.    Out of my bank account.

24    Q.    Did you pay cash for your prescriptions?

25    A.    Oh yeah, cash.
```

```
1    Q.   You had insurance though; right?

2    A.   Yeah.

3    Q.   Okay.  So you could have used insurance to pay for your

4    prescriptions, couldn't you?

5    A.   Not through them.  They wasn't taking insurance yet.

6    They was getting set up for that, I was told.

7    Q.   That's Mike's Pharmacy you're talking about?  Which

8    pharmacy are you talking about that wouldn't take insurance?

9    A.   My pharmacy always took my insurance.

10   Q.   Your pharmacy did take your insurance?

11   A.   Yeah.  I thought you said the doctor.

12   Q.   So you're talking about the doctor.  Okay.  So the doctor

13   took cash.  The pharmacy took insurance.

14   A.   Yeah.

15   Q.   So now are there doctors in your area -- between your

16   place and Dr. Smithers, were there other doctors?

17   A.   All kinds of doctors, but none that would --

18   Q.   None that would write a prescription; right?

19   A.   Right.

20   Q.   That's why you went to Dr. Smithers was for the

21   prescription; correct?

22   A.   Yeah.  Where they shut 'em down, they just kept moving.

23   And they kept moving away instead of closer.

24   Q.   Right.  And Dr. Smithers prescribed over 1400 oxycodone

25   or oxymorphone pills to you; is that right?
```

```
1    A.   I don't know.

2    Q.   Well, he wrote to you every month from September of 2015

3    to July of 2017; isn't that right?

4    A.   It could be.  I don't have no dates.

5    Q.   Dr. Smithers, he's a smart guy, isn't he?

6    A.   Extremely, I think.

7    Q.   Very smart.  Correct?

8    A.   I think so, in my opinion.  Does that matter?

9    Q.   That's what I asked for.

10   A.   Okay.

11   Q.   Now, who are the other people you knew that were going to

12   Dr. Smithers to get pills?

13   A.   That I knew?  Patty Dickens.

14   Q.   Is that your girlfriend?

15   A.   Yes.  It is now, yeah.

16   Q.   She didn't start out getting pills until you'd been

17   getting them for a while and then she decided to get some too;

18   right?

19   A.   No.

20   Q.   Well, were you a patient first or was she?

21   A.   With Dr. Smithers?

22   Q.   Yes.

23   A.   I think we went down together, got a visit at the same

24   time.

25   Q.   So you went together?
```

```
1    A.    Yes.

2    Q.    In September 2015?

3    A.    It could be, yeah, I don't know.

4    Q.    And you both got oxycodone and oxymorphone?

5    A.    I'm really not sure if she got morphone or morphine or

6    codone.  I don't know.

7    Q.    Would she get a Schedule II drug?  She got some Schedule

8    II drug.

9    A.    Yes.

10   Q.    And you went and filled them both; right?  You filled her

11   prescriptions and your prescriptions.

12   A.    We -- I filled mine and she filled hers.

13   Q.    Did you fill them at the same place?

14   A.    I usually -- I think I got all mine filled at Carry's

15   Drive Pharmacy.

16   Q.    Where did she fill hers?

17   A.    Mike's maybe, or...

18   Q.    Mike's, that's the place in Wytheville?

19   A.    Yes.

20   Q.    Okay.  All right.  And you had to pay cash there, didn't

21   you?

22   A.    I couldn't tell you.  I think they had insurance that

23   took it there, I'm not sure.

24   Q.    Okay.  What other people did you know?  You may have

25   mentioned Wayne Tolliver, obviously your daughter Heather,
```

```
 1   Patty Dickens.  Who else was going to the doctor to get pills?
 2   A.   I don't know who other patients he had.
 3   Q.   You knew some of the other people that went, didn't you?
 4   A.   No, sir.
 5   Q.   When you went down, you didn't recognize anybody from
 6   your area?
 7   A.   No, sir.
 8   Q.   Those are the only four?
 9   A.   That I can recall, yes.
10   Q.   Or three.  Three plus you.
11   A.   Yeah.
12           MR. RAMSEYER:  May I just have a moment, Your Honor?
13           THE COURT:  Yes, sir.
14           MR. RAMSEYER:  That's all my questions.  Thank you.
15           THE COURT:  Any further questions?
16           MR. WILLIAMS:  No further questions, Your Honor.
17           THE COURT:  May this witness be excused?
18           MR. RAMSEYER:  Yes, Your Honor.
19           MR. WILLIAMS:  Yes, Your Honor.
20           THE COURT:  Okay.  Thank you, sir.  You may step
21   down.  And you're excused.
22           All right.  Mr. Williams.
23           MR. WILLIAMS:  Your Honor, we had discussed earlier
24   about a witness, and I have not had a chance to make a phone
25   call to check on that.
```

```
 1                THE COURT:  All right.  Ladies and gentlemen, we're
 2      going to take a break at this time.  If you'll follow the
 3      bailiff out.
 4           (Proceedings held in the absence of the jury.)
 5                THE COURT:  All right.  So can you call that person?
 6                MR. WILLIAMS:  I will try to get a phone call,
 7      Judge.  We've been trying -- I've been trying for a while and
 8      I haven't been able to get in touch with her.
 9                THE COURT:  All right.  We'll be in recess.
10                MR. WILLIAMS:  Thank you, Your Honor.
11           (Proceedings suspended at 2:51 p.m. and resumed at 3:13
12      p.m.)
13                THE COURT:  All right.  Mr. Williams, do you have
14      any further witnesses?
15                MR. WILLIAMS:  Your Honor, I have spoken with
16      Ms. Moore.  I actually did get in touch with her.  She lives
17      in Florida.  She actually has followed -- indicated that she's
18      supposed to have a flight tonight.  She's hoping to be able to
19      make that flight.  However, she says that she does not know
20      whether she can be here today or tomorrow.  And that's all
21      that I can advise the Court with what she said.  We did not
22      have her subpoenaed.  She had indicated she was going to
23      appear.  We anticipated the trial going much longer and had
24      kind of indicated it would probably be the end of the week
25      before we anticipated needing her.
```

```
 1              THE COURT:  She said she had fallen?

 2              MR. WILLIAMS:  She said she fell last night and that

 3    she was having some trouble getting around and that she hoped

 4    to be able to make her flight tonight, but she was in a lot of

 5    pain.

 6              THE COURT:  So we don't know when she's going to be

 7    here?

 8              MR. WILLIAMS:  As of right now, no, sir.

 9              THE COURT:  Is she a former patient of the doctor's?

10              MR. WILLIAMS:  She is.

11              THE COURT:  Uh-huh.

12              Well, what's the Government's position?

13              MR. RAMSEYER:  Your Honor, one thing, she is not one

14    of the patients where we've charged the prescription regarding

15    to her.  So we're not sure what the relevance is going to be.

16    Although we did charge maintain a place, I guess it could

17    potentially go to that.  Although the Court's instruction is

18    going to be that not every person had illegal prescriptions

19    necessarily.  But, in any event, we'd like to get the trial

20    finished.  It's kind of unclear as to whether she's going to

21    be here or not.  I don't know how long we're going to put this

22    off.  So that's the Government's position, Your Honor.

23              THE COURT:  Yes, sir.

24              MR. WILLIAMS:  Your Honor, Dr. Smithers has also

25    provided me the names of two pharmacists that he would like
```

```
 1      for me to get in touch with.  I have talked with him once
 2      previously, but they have not committed to anything, so.
 3                  THE COURT:  When did he provide you with these
 4      names?
 5                  MR. WILLIAMS:  He provided me with these names
 6      approximately a week ago, two weeks ago, week and a half ago,
 7      something like that.  I actually spoke with them on the phone.
 8      Neither wanted to really get involved with it.  And so I spoke
 9      with him about what that was --
10                  THE COURT:  Well, what would be the purpose of their
11      testimony?
12                  MR. WILLIAMS:  I think it would just be simply to
13      show that they had filled prescriptions for him and did not
14      have a problem filling his prescriptions.
15                  THE COURT:  Well, I mean, they haven't been
16      summonsed, I guess.
17                  MR. WILLIAMS:  They had not, Your Honor.  And I
18      didn't really anticipate calling them until he mentioned that
19      to me, I think it was last night, about the possibility.  And
20      so I spoke with them both on the phone real briefly.  And my
21      decision kind of not to call them, but I didn't really feel
22      like -- but he is asking me to call them, so.
23                  THE COURT:  And, again, what's the name of the lady
24      who is in Florida --
25                  MR. WILLIAMS:  Deborah Moore.
```

```
 1              THE COURT:  -- and trying to get here?

 2              MR. WILLIAMS:  Deborah Moore.

 3              THE COURT:  Uh-huh.

 4              Well, to give every opportunity here, particularly

 5     since we thought this case was going to go much longer, I

 6     mean, the information was there was going to be 70 or 80

 7     witnesses, and it would have obviously gone -- and it was set

 8     for a month, if not five weeks.  I'll allow you to see what

 9     you can do tomorrow for witnesses.  But I don't think we can

10     go much farther than that.  I mean, we do need to get this

11     resolved.  The problem is if we just stretch it out trying to

12     find other witnesses, I just don't think that's the

13     appropriate way to proceed.  It's not -- it's not fair to the

14     parties or the jury to do that.

15              Now, I do want to this afternoon go over the jury

16     charge.  And I take it you don't -- you don't know whether

17     Dr. Smithers is going to testify or not?

18              MR. WILLIAMS:  I think he is waiting with respect to

19     these witnesses to make that decision, Your Honor.  That's

20     what he's indicated to me.

21              THE COURT:  Well, I don't know what -- well, all

22     right.

23              Well, I'm going to excuse the jury and require them

24     to come back tomorrow.  But if you have any further witnesses,

25     you need to present them tomorrow.  All right?
```

          1              MR. WILLIAMS:  Thank you, Your Honor.

          2              THE COURT:  We'll have the jury in.

          3         (Proceedings held in the presence of the jury.)

          4              THE COURT:  All right.  Ladies and gentlemen, it

          5    appears that we don't have any further witnesses at this time.

          6    It's possible that we may have additional witnesses for the

          7    defendant tomorrow.  But for various reasons they are not

          8    available at this time.

          9              And so I'm going to let you go.  Again, we're

         10    getting very close to the end.  And if you could be back at

         11    9:00 in the morning.  Please remember my instructions to you

         12    about not discussing this case or permitting anyone to discuss

         13    it with you.  Don't do any research on any of the evidence

         14    that you've heard.  And don't listen or watch or read any news

         15    accounts in the case.

         16              And drive carefully.  If you'll follow the bailiff

         17    out, we'll see you tomorrow at 9:00.

         18         (Proceedings held in the absence of the jury.)

         19              THE COURT:  All right.  Let's take a moment and go

         20    over the instructions.  My law clerk is going to hand you some

         21    new instructions.

         22              All right.  Counsel, I earlier provided you, and I

         23    hope you received it, a copy of the proposed charge.  I've

         24    made the following changes.  In Instruction No. 9, I believe

         25    there was only one witness who testified that she had hope of

securing leniency in her case.  So Instruction No. 9 I've

changed "witnesses" to just "witness".

15-A is a new instruction as to the burden of proof

and elements of Count 1.

Instruction No. 19, I've removed a sentence that

referred to the question of good faith because I realize that

I had gone into that at some length in a later instruction.

Actually, the next instruction, Instruction 20.

And then in Instruction No. 21, I changed that to --

in accord with the proposed verdict form by the Government --

to indicate that the question is whether the use of the

prescribed controlled substances in both Counts 298 and 299

resulted in the death of the patient involved.

In addition, of course, the Government has prepared

a verdict form, which I have adopted.  I did make a minor

change I think to that.  I think I added a question mark at

the end of the question about the death of the patient.  In

any event, my law clerk has a copy of the verdict form to

supply.

Let me inquire at this time whether there are any

objections, comments, or other proposed jury instructions.

MR. RAMSEYER:  Your Honor, we would ask the Court to

add an instruction that indicates when a medical provider

prescribes a controlled substance to a patient with the intent

that the prescription be filled, then under the law the

```
 1    medical provider has caused the controlled substance to be
 2    dispensed or distributed.
 3           I believe the Court's given a similar instruction in
 4    the past on that.
 5           THE COURT:  Yes, I will do that.  Do you have a copy
 6    of what I --
 7           MR. RAMSEYER:  Your Honor, I did earlier today, and
 8    I must have taken it back with me at lunch time.  I'll
 9    provide -- I'll be happy to provide the Court and Mr. Williams
10    a copy of that by e-mail when we finish.
11           THE COURT:  All right.  Mr. Williams, that simply
12    says that I have done that in other similar cases.  The
13    writing of a prescription to be filled is the distribution or
14    cause to be distribution of a substance.
15           MR. WILLIAMS:  Okay.  All right.  Your Honor, if I
16    just may have a chance to look at it.
17           THE COURT:  Yes, sir.  Of course.
18           MR. WILLIAMS:  I'll let you know if we have
19    objection.
20           MR. RAMSEYER:  Your Honor, also, Instruction No. 19
21    uses "and" and Instruction No. 20 uses "or", about acting
22    without a legitimate medical purpose or beyond the bounds of
23    medical practice.  And we believe they should both be "or".  I
24    believe that's the law.
25           THE COURT:  I think you're correct.
```

     1            But, Mr. Williams, is that -- do you have any

     2     comment there?

     3            MR. WILLIAMS:  Your Honor, I was going to raise the

     4     same issue, but I think we believe it should be "and".

     5            THE COURT:  Well, I say "and" in the instructions, I

     6     think.  That's 15-A and 19; is that correct, Mr. Ramseyer?

     7            MR. RAMSEYER:  Excuse me.  The two instructions?

     8            THE COURT:  Yes.

     9            MR. RAMSEYER:  I believe it was 19 and 20.  In 19

    10     it's "and" and in 20 it's "or".

    11            Oh, actually, Mr. Juhan is showing me that in 15-A

    12     it's also -- for the possession with intent to distribute, the

    13     Court has "and" also.  So I think it's 15-A, 19, and 20 should

    14     all -- in the Government's view should all be "or".

    15            THE COURT:  Yes.  In 20 I say "or".

    16            MR. RAMSEYER:  Correct.  Yes, Your Honor.

    17            THE COURT:  Yes, sir.

    18            All right.  Anything else, Mr. Ramseyer?

    19            MR. RAMSEYER:  No, Your Honor.  That's all for the

    20     Government at this time.

    21            THE COURT:  All right.  Mr. Williams?

    22            MR. WILLIAMS:  Your Honor, we would just like an

    23     opportunity to be able to read the statute certainly with that

    24     and/or language.

    25            THE COURT:  Right.  Well, I'm not going to make any

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 171 of 195   Pageid#:
10297

```
 1    final rulings at this time.  You have no additional
 2    instructions that you intend to offer, Mr. Williams?
 3              MR. WILLIAMS:  No, none at this time, Your Honor.
 4              THE COURT:  And the verdict form, Mr. Williams, you
 5    have no --
 6              MR. WILLIAMS:  No objections.
 7              THE COURT:  -- no objection there?
 8              And there's copies of the -- oh, I believe in
 9    Count 1 I also added the "without a legitimate purpose."  And
10    I guess the question there is also "or".
11              MR. RAMSEYER:  Yes, Your Honor.  I believe that's
12    15-A.
13              THE COURT:  Well, I mean, on the verdict form it
14    says "and".
15              All right.  Well, we're going to -- I understand the
16    parties' issues, I think, about the instructions.  And we're
17    going to adjourn now and I will consider the requests that
18    have been made.
19              And Mr. Ramseyer is going to e-mail the Court and
20    the opposing counsel the proposed instruction about
21    prescriptions, and I'll look at that also.
22              Is there anything else that we need to take up?
23              If not, we will adjourn court.
24         (Proceedings concluded at 3:33 p.m.)
25
```

1       **REPORTER'S CERTIFICATE**

2

3           I, DONNA J. PRATHER, do hereby certify that the

4       above and foregoing, consisting of the preceding 173 pages,

5       constitutes a true and accurate transcript of my stenographic

6       notes and is a full, true and complete transcript of the

7       proceedings to the best of my ability.

8           Dated this 8th day of June, 2019.

9

10

11          S/Donna Prather
            _____
12          DONNA J. PRATHER, RPR, CRR, CBC, CCP
            Federal Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 173 of 195   Pageid#:
10299

**$**

**$10** [1] - 21:1
**$20,000** [1] - 111:6
**$30.65** [1] - 33:14
**$300** [6] - 33:18, 86:6, 131:22, 132:14, 133:6, 136:16
**$450** [2] - 130:13, 131:21
**$5,400** [2] - 86:6, 86:17
**$700** [1] - 133:10
**$750** [1] - 103:3

**'**

**'14** [2] - 52:12, 57:7
**'15** [5] - 24:2, 26:23, 52:19, 57:7, 67:3
**'16** [6] - 32:12, 40:1, 72:8, 72:19, 75:22, 117:18
**'em** [7] - 120:22, 121:8, 121:9, 122:21, 150:11, 159:8, 160:22
**'very** [1] - 35:20

**1**

**1** [16] - 15:7, 24:2, 24:5, 34:10, 56:15, 57:10, 57:11, 68:23, 104:22, 105:9, 110:2, 110:9, 112:15, 112:16, 169:4, 172:9
**1,000** [1] - 85:16
**1.1** [1] - 26:22
**10** [4] - 20:24, 38:13, 40:1, 122:2
**100** [3] - 22:6, 22:14, 99:2
**100%** [1] - 24:14
**1000** [1] - 2:15
**107** [13] - 2:16, 25:7, 25:8, 25:10, 25:15, 29:12, 41:17, 42:14, 46:23, 62:12, 63:11, 83:21, 87:8
**10:23** [1] - 50:22
**10:30** [1] - 3:9
**10:57** [1] - 50:22
**10s** [1] - 122:15
**10th** [3] - 39:17, 45:17, 45:18
**11** [3] - 31:9, 57:4, 150:5
**114** [1] - 39:16
**117** [1] - 2:7
**11th** [1] - 55:2
**12** [6] - 16:6, 33:15,

54:22, 55:1, 68:20, 138:4
**120** [6] - 22:20, 23:1, 25:18, 60:17, 82:9, 83:23
**123** [1] - 2:7
**12:07** [1] - 87:22
**13** [2] - 85:16, 131:16
**14** [8] - 54:13, 54:14, 56:8, 74:6, 74:18, 78:17, 81:14, 143:1
**1400** [2] - 131:16, 160:24
**143** [1] - 2:8
**146** [1] - 2:8
**148** [1] - 2:9
**14th** [4] - 55:9, 56:2, 62:22, 72:19
**15** [9] - 17:4, 21:20, 25:17, 26:2, 55:3, 74:11, 79:25, 85:11
**15-A** [5] - 169:3, 171:6, 171:11, 171:13, 172:12
**153** [1] - 39:23
**154** [4] - 38:8, 38:9, 39:22, 40:3
**155** [1] - 40:18
**156** [1] - 2:10
**15th** [2] - 66:12, 138:4
**16** [1] - 17:6
**163** [1] - 46:5
**169** [1] - 45:14
**17** [4] - 17:7, 18:13, 66:7, 119:15
**172** [2] - 41:15, 47:20
**173** [1] - 47:22
**174** [2] - 42:11, 47:23
**175** [2] - 43:21, 43:24
**17th** [2] - 117:15, 138:4
**18** [11] - 17:23, 18:12, 58:16, 64:8, 64:9, 76:1, 85:24, 86:4, 86:6, 119:3, 142:10
**180** [2] - 1:20, 23:15
**18th** [7] - 42:2, 42:3, 42:15, 44:5, 70:20, 71:22, 75:22
**19** [11] - 17:24, 18:11, 60:4, 60:6, 146:20, 169:5, 170:20, 171:6, 171:9, 171:13
**1958** [1] - 148:19
**1988** [1] - 65:9
**1997** [2] - 6:9, 126:18
**19th** [2] - 60:2, 67:3

**1:08** [1] - 87:22
**1:17-cr-00027-JPJ-PMS-1** [1] - 1:6
**1st** [6] - 19:14, 26:1, 30:6, 32:3, 68:9, 68:10

**2**

**2** [10] - 14:14, 15:12, 34:14, 34:25, 43:2, 50:11, 59:14, 69:4, 74:18, 113:8
**2,000** [1] - 117:17
**2-20-17** [1] - 73:16
**20** [17] - 18:2, 18:3, 21:13, 23:9, 47:4, 47:8, 47:9, 52:15, 122:18, 124:4, 142:17, 169:8, 170:21, 171:9, 171:10, 171:13, 171:15
**20-milligram** [1] - 47:4
**2002** [1] - 7:12
**2008** [1] - 8:3
**2012** [3] - 80:5, 84:19, 94:10
**2013** [2] - 52:5, 68:25
**2014** [1] - 57:4
**2015** [40] - 14:16, 15:2, 18:8, 20:4, 21:19, 25:16, 28:4, 29:15, 30:5, 30:6, 34:2, 38:13, 52:15, 52:22, 54:22, 57:5, 57:11, 60:2, 60:4, 63:12, 63:13, 65:10, 68:9, 68:10, 74:13, 75:10, 75:19, 77:24, 80:11, 80:14, 81:9, 81:12, 81:16, 81:20, 84:2, 84:14, 101:13, 161:2, 162:2
**2016** [33] - 19:14, 29:24, 30:25, 31:10, 32:22, 33:1, 33:15, 33:19, 34:2, 35:15, 41:21, 42:3, 52:24, 56:2, 56:8, 59:9, 62:10, 66:8, 66:12, 68:21, 70:19, 70:20, 71:22, 75:20, 76:22, 76:24, 77:4, 77:24, 82:23, 84:4, 117:15, 138:4, 149:5
**2017** [3] - 34:14, 43:1, 43:2, 46:8, 48:17, 64:23, 127:25, 138:5, 140:3, 140:7,

140:12, 140:15, 161:3
**2018** [1] - 132:2
**2019** [1] - 1:12
**20s** [1] - 143:7
**21** [4] - 18:19, 78:17, 107:3, 169:9
**21st** [6] - 41:21, 44:3, 45:17, 63:25, 84:14, 85:7
**22** [1] - 18:24
**22nd** [1] - 140:3
**23** [1] - 19:1
**23rd** [2] - 70:19, 75:10
**24** [6] - 14:16, 15:2, 19:2, 23:3, 64:22
**24210** [1] - 1:21
**24277** [1] - 1:24
**24th** [3] - 30:25, 68:20, 101:13
**25** [3] - 2:16, 19:3, 66:11
**250** [1] - 159:15
**25th** [1] - 32:12
**26** [2] - 19:4, 44:3
**26th** [1] - 82:17
**27** [3] - 19:5, 35:15, 65:10
**28** [3] - 19:6, 62:14, 78:17
**29** [7] - 19:7, 20:4, 33:12, 48:17, 74:13, 78:6, 78:25
**298** [1] - 169:12
**299** [1] - 169:12
**29th** [3] - 21:17, 22:16, 82:17
**2:51** [1] - 164:11
**2nd** [7] - 32:22, 33:19, 62:14, 80:14, 82:12, 82:17, 82:20

**3**

**3** [9] - 4:9, 14:16, 14:18, 15:14, 28:4, 79:9, 79:10, 86:4, 105:5
**30** [21] - 19:9, 21:20, 22:18, 23:18, 25:18, 41:5, 47:8, 47:9, 55:4, 55:5, 55:10, 55:14, 55:15, 58:4, 63:1, 64:10, 68:12, 68:13, 120:15, 122:20, 124:5
**300** [3] - 132:12, 159:13, 159:15
**30s** [2] - 83:23, 120:4
**30th** [4] - 18:8, 18:16, 18:18, 62:14

**31** [2] - 19:11, 64:14
**31st** [5] - 57:5, 77:4, 78:5, 82:17, 83:23
**32** [2] - 19:13, 64:15
**326** [2] - 78:8, 78:12
**329** [2] - 78:8, 78:12
**33** [2] - 19:17, 64:16
**34** [1] - 19:18
**35** [1] - 19:19
**36** [1] - 19:20, 20:2
**37** [3] - 20:15, 54:6, 81:10
**38** [1] - 20:16
**39** [1] - 21:7
**3:13** [1] - 164:11
**3:33** [1] - 172:24
**3rd** [3] - 21:19, 25:16, 29:15

**4**

**4** [11] - 2:13, 2:14, 2:14, 2:15, 14:17, 14:19, 15:15, 15:17, 15:18, 35:4, 81:13
**4-11** [1] - 31:8
**4-22-16** [1] - 72:11
**40** [6] - 21:9, 35:19, 55:10, 55:13, 82:7, 97:5
**40s** [1] - 83:24
**41** [4] - 21:11, 21:24, 41:18, 63:17
**42** [3] - 21:13, 23:6, 41:18
**43** [1] - 23:22
**44** [1] - 23:24
**45** [2] - 23:25, 62:25
**46** [2] - 24:1, 142:7
**47** [2] - 24:2, 24:6
**48** [2] - 26:14, 58:6
**48-year-old** [2] - 57:24, 58:3
**48-year-old's** [1] - 58:11
**49** [3] - 26:15, 146:18, 146:20
**4th** [4] - 62:15, 82:16, 82:17, 82:18

**5**

**5** [6] - 2:3, 14:20, 15:18, 15:20, 16:2, 22:23, 26:23, 35:5, 139:15
**5-18-16** [1] - 76:20
**50** [9] - 13:10, 26:16, 26:20, 35:8, 47:2, 50:11, 124:19, 146:18
**50-some** [1] - 88:13

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5566

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 174 of 195   Pageid#: 10300

**51** [2] - 26:22, 91:16
**52** [2] - 27:25, 46:25
**53** [2] - 28:12, 35:12
**54** [2] - 28:14, 86:4
**57** [1] - 30:9
**58** [1] - 30:10
**59** [1] - 30:13
**5:00** [1] - 154:2
**5s** [1] - 23:18
**5th** [9] - 30:5, 62:10, 62:15, 81:9, 81:12, 81:16, 81:19, 82:25

# 6

**6** [8] - 1:11, 1:12, 15:1, 15:25, 35:6, 46:8, 67:24, 82:24
**6-14** [1] - 72:8
**6-21-16** [1] - 76:25
**60** [17] - 20:24, 21:12, 22:2, 22:17, 23:13, 23:14, 25:17, 26:3, 30:15, 53:3, 62:22, 68:12, 68:13, 83:23, 97:5
**60-milligram** [1] - 22:17
**600** [1] - 133:10
**601** [1] - 1:23
**61** [2] - 30:16, 148:19
**62** [1] - 30:17
**63** [1] - 30:18
**66** [1] - 31:13
**69** [2] - 32:3, 53:5
**6:00** [2] - 154:2, 154:20
**6th** [1] - 82:20

# 7

**7** [5] - 15:3, 16:1, 66:2, 122:12, 122:13
**7-20** [1] - 52:19
**7-20-15** [1] - 52:20
**7-Eleven** [1] - 119:3
**70** [4] - 32:5, 45:19, 53:3, 167:6
**71** [2] - 32:8, 84:23
**72** [1] - 32:8
**73** [1] - 32:9
**74** [4] - 2:15, 4:14, 4:22, 32:10
**75** [1] - 32:11
**77** [1] - 32:15
**78** [1] - 32:18
**784** [2] - 83:21, 83:22
**79** [1] - 32:21

# 8

**8** [1] - 39:18
**80** [2] - 32:24, 167:6
**84** [2] - 55:12, 55:13
**841(a** [1] - 107:3
**862** [1] - 105:5
**87** [1] - 33:6
**88** [2] - 2:4, 33:7
**89** [1] - 33:8
**8:48** [2] - 18:16, 18:18
**8th** [1] - 45:24

# 9

**9** [6] - 32:25, 49:9, 58:23, 71:13, 168:24, 169:1
**9-28** [1] - 80:8
**90** [7] - 21:13, 23:8, 33:9, 33:22, 55:3, 55:4, 55:13
**91** [2] - 33:10, 33:11
**93** [1] - 38:11
**94** [1] - 38:18
**96** [2] - 33:20, 38:19
**9:00** [2] - 168:11, 168:17
**9:05** [1] - 3:1
**9th** [1] - 64:23

# A

**a.m** [4] - 3:1, 50:22, 50:23, 154:20
**ability** [1] - 102:17
**ABINGDON** [1] - 1:4
**Abingdon** [1] - 1:21
**able** [34] - 10:6, 12:4, 12:9, 12:19, 17:21, 27:22, 36:22, 37:9, 37:13, 95:1, 96:20, 96:24, 97:18, 97:23, 98:5, 98:25, 99:3, 99:4, 102:22, 108:18, 113:18, 113:24, 116:6, 121:3, 131:14, 149:11, 150:6, 153:4, 153:5, 153:7, 164:8, 164:18, 165:4, 171:23
**abnormal** [1] - 64:6
**abnormality** [2] - 57:21, 58:1
**absence** [5] - 50:8, 87:18, 104:14, 164:4, 168:18
**absolutely** [1] - 114:22
**abuse** [7] - 19:17, 19:24, 43:11, 59:21,
68:7, 70:17, 77:19
**Abuse** [2] - 20:1, 32:6
**abusing** [1] - 60:14
**accepted** [1] - 61:16
**accepting** [1] - 46:15
**access** [1] - 89:11
**accident** [5] - 102:4, 102:11, 119:16, 119:17, 150:3
**accidents** [1] - 16:17
**accord** [1] - 169:10
**according** [12] - 40:16, 40:17, 40:25, 42:14, 43:24, 57:5, 59:3, 65:9, 68:8, 69:22, 82:24, 83:20
**account** [2] - 159:19, 159:23
**accounts** [1] - 168:15
**accredited** [1] - 7:1
**accumulating** [1] - 47:15
**accurate** [6] - 12:17, 27:23, 53:20, 53:21, 57:2, 99:19
**accurately** [1] - 17:22
**acknowledge** [1] - 28:24
**acquittal** [5] - 104:21, 105:7, 112:16, 112:22, 113:10
**act** [5] - 36:25, 37:6, 37:11, 37:20, 81:5
**acting** [1] - 170:21
**action** [2] - 8:15, 86:24
**active** [3] - 22:25, 81:4, 81:7
**activity** [1] - 54:17
**acupuncture** [1] - 144:1
**acute** [2] - 57:21, 58:1
**add** [4] - 22:5, 71:6, 152:1, 169:23
**added** [2] - 169:16, 172:9
**addicted** [1] - 68:11
**addiction** [12] - 36:15, 37:2, 40:12, 43:14, 44:21, 45:8, 68:7, 81:4, 81:8, 82:1, 82:3, 82:6
**adding** [1] - 22:13
**addition** [4] - 105:2, 129:6, 131:3, 169:14

**additional** [5] - 23:8, 23:14, 98:8, 168:6, 172:1
**address** [2] - 32:7, 33:20
**adjourn** [2] - 172:17, 172:23
**adjudicate** [1] - 8:14
**adjunctive** [1] - 74:21
**administered** [1] - 72:25
**administrative** [1] - 8:19
**admissible** [3] - 115:6, 115:16, 118:18
**admission** [1] - 25:6
**admitted** [2] - 4:17, 25:9
**admitting** [1] - 71:8
**adopted** [1] - 169:15
**advise** [1] - 164:21
**advised** [2] - 67:10, 76:22
**advisement** [1] - 112:16
**affect** [2] - 86:20, 152:24
**afraid** [3] - 45:5, 90:19, 99:23
**afternoon** [2] - 123:6, 167:15
**age** [1] - 58:4
**agent** [2] - 4:13, 137:13
**agent's** [1] - 107:4
**aging** [2] - 58:7, 58:11
**ago** [7] - 16:14, 102:2, 102:10, 149:3, 166:6
**agree** [9] - 27:6, 79:5, 89:4, 89:5, 98:6, 109:25, 110:1, 110:18, 111:1
**agreed** [2] - 90:13, 90:17
**agreeing** [1] - 111:23
**agreement** [6] - 74:14, 90:15, 90:16, 90:20, 91:1, 91:5
**Agreement** [1] - 74:8
**Agreements** [1] - 90:10
**agreements** [1] - 90:13
**ahead** [8] - 38:24, 71:4, 71:10, 86:12, 88:1, 118:23, 121:22, 122:7

**ahold** [2] - 113:18, 113:25
**aid** [1] - 144:14
**Aided** [1] - 1:25
**AIDS** [1] - 29:6
**Alaska** [1] - 149:23
**alcohol** [1] - 29:7
**allegations** [1] - 9:6
**alleviate** [1] - 92:18
**allow** [2] - 3:9, 167:8
**allowed** [4] - 91:2, 105:20, 115:11, 153:6
**almost** [3] - 13:10, 75:13, 102:22
**alternative** [2] - 95:23, 156:5
**alternatives** [1] - 143:21
**Amanda** [3] - 141:17, 142:4, 143:7
**AMERICA** [1] - 1:5
**amount** [4] - 22:12, 33:18, 91:10, 131:6
**amounts** [1] - 23:4
**analgesics** [1] - 74:21
**analyzed** [2] - 42:6, 72:25
**anatomy** [1] - 56:22
**and"** [2] - 171:4, 172:14
**anesthesiology** [1] - 6:11
**Angel** [3] - 26:25, 27:3, 39:3
**answer** [9] - 10:2, 10:8, 17:14, 107:7, 118:24, 139:10, 147:1, 151:25, 155:23
**answered** [1] - 151:23
**answers** [1] - 10:12
**anticipate** [2] - 63:3, 166:18
**anticipated** [2] - 164:23, 164:25
**anticipating** [1] - 47:19
**anyway** [2] - 61:23, 82:24
**apart** [1] - 157:18
**appear** [14] - 44:14, 46:17, 64:20, 65:2, 65:3, 66:15, 66:16, 70:6, 78:14, 78:19, 92:5, 92:6, 94:20, 164:23
**appearance** [1] - 3:7
**applicable** [1] - 29:6
**apply** [1] - 107:21

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 175 of 195   Pageid#: 10301

**appointment** [1] - 77:5
**appointments** [1] - 125:14, 128:17
**appreciate** [1] - 58:1
**approach** [1] - 24:18
**appropriate** [7] - 17:22, 27:23, 29:2, 58:12, 86:24, 97:10, 167:13
**appropriately** [2] - 81:6, 82:2
**approved** [1] - 91:7, 92:24, 145:21
**April** [5] - 31:9, 35:15, 62:14, 82:17, 82:18
**area** [5] - 12:24, 125:18, 159:3, 160:15, 163:6
**argument** [1] - 61:20
**arm** [1] - 80:20
**arrested** [4] - 140:12, 140:14, 140:17, 140:18
**arrive** [1] - 27:22
**arrived** [1] - 12:20
**aside** [1] - 112:1
**aspects** [1] - 144:13
**Assessment** [5] - 15:1, 26:22, 39:2, 91:18, 95:21
**assessment** [5] - 10:3, 17:21, 27:9, 41:10, 100:13
**assigned** [1] - 76:24
**assist** [1] - 65:22
**assistant** [1] - 97:5
**assume** [10] - 20:23, 53:9, 53:18, 61:20, 78:20, 85:19, 85:23, 86:5, 86:16, 86:18
**assumed** [2] - 13:11, 61:14
**assuming** [7] - 13:15, 26:18, 45:11, 46:18, 61:24, 63:1, 63:25
**attempt** [1] - 53:19
**attendance** [1] - 113:19
**attention** [2] - 3:5, 97:21
**Attorney** [1] - 11:7
**Attorneys** [2] - 1:20, 126:23
**auction** [1] - 131:12
**audit** [1] - 23:23
**Audit** [2] - 15:7, 15:13

**audits** [1] - 17:6
**August** [18] - 42:2, 42:3, 42:15, 44:5, 45:24, 45:25, 56:3, 57:5, 57:7, 59:8, 61:15, 67:14, 77:4, 78:5, 83:23, 84:2, 140:13, 140:14
**authorization** [1] - 32:16
**authorizes** [1] - 29:4
**authorizing** [1] - 40:6
**autistic** [1] - 142:24
**automatically** [2] - 31:24, 56:20
**available** [2] - 9:23, 168:8
**average** [1] - 97:7
**aware** [7] - 68:8, 80:8, 81:5, 89:3, 89:22, 89:25, 91:1

## B

**b)** [1] - 107:3
**B19** [1] - 1:20
**baby** [1] - 141:21
**backed** [1] - 119:18
**backpack** [2] - 109:21, 111:5
**bad** [7] - 37:22, 44:23, 120:21, 121:5, 122:25, 133:21, 144:9
**bag** [2] - 137:5, 137:10
**baggie** [2] - 104:24, 137:7
**baggies** [2] - 105:13, 122:5
**bailiff** [5] - 50:6, 87:16, 104:13, 164:3, 168:16
**bank** [2] - 159:19, 159:23
**base** [1] - 61:1
**based** [12] - 10:6, 11:2, 11:19, 17:19, 49:3, 49:5, 49:23, 78:18, 85:12, 85:19, 97:9, 112:19
**bases** [1] - 13:20
**basing** [1] - 79:17
**basis** [8] - 38:2, 45:1, 58:12, 63:2, 65:21, 100:14, 105:10, 157:20
**BASSAM** [2] - 2:3, 5:7
**Bassam** [15] - 4:23,

5:12, 5:16, 5:22, 5:24, 7:19, 9:15, 9:22, 10:16, 24:22, 51:9, 61:19, 88:8, 88:10, 103:1
**Battaglia** [11] - 14:10, 16:4, 19:13, 22:16, 28:5, 29:19, 32:18, 33:25, 34:3, 91:21, 92:1
**Battaglia's** [2] - 33:20, 91:22
**became** [1] - 11:3
**Beckley** [2] - 129:21, 150:22
**become** [6] - 6:3, 6:18, 6:25, 7:24, 148:24, 149:1
**becoming** [1] - 80:8
**begin** [3] - 16:13, 52:22, 101:25
**beginning** [3] - 10:6, 47:15, 142:10
**behalf** [3] - 1:18, 1:22, 36:13
**BEHALF** [1] - 2:13
**behave** [3] - 36:25, 37:3, 45:8
**behavior** [7] - 36:13, 38:3, 44:20, 44:21, 45:9, 70:16, 77:18
**behind** [2] - 44:16, 116:11
**believes** [2] - 35:18, 36:1
**belly** [1] - 130:7
**beneficial** [3] - 96:15, 98:2, 98:5
**benefit** [3] - 58:9, 98:8, 99:4
**Benitez** [2] - 40:22, 40:23
**best** [3] - 118:13, 132:9, 132:22
**better** [4] - 35:19, 96:24, 97:1, 144:5
**between** [9] - 2:14, 8:24, 36:18, 36:22, 37:10, 90:22, 97:4, 97:5, 160:15
**beyond** [4] - 105:18, 110:3, 110:15, 170:22
**BF-1** [2] - 66:2, 66:11
**BH-01** [1] - 74:6
**BH-16** [1] - 70:20
**BH-24** [1] - 70:9
**BH-31** [1] - 68:17
**bias** [1] - 3:19
**biased** [1] - 3:19
**bill** [1] - 130:21

**billing** [2] - 34:17, 34:20
**birth** [3] - 34:13, 60:20, 65:9
**bit** [6] - 50:10, 77:12, 94:7, 101:25, 124:25, 145:3
**blah** [2] - 60:20, 60:21
**Blair** [8] - 34:9, 34:13, 41:17, 42:25, 43:3, 48:17, 49:21, 49:24
**blame** [1] - 156:13
**blank** [7] - 16:1, 30:9, 30:11, 30:14, 30:15, 75:1, 75:8
**blanket** [1] - 90:6
**Blevins** [4] - 2:13, 4:9, 51:7, 51:19
**block** [2] - 139:18, 140:1
**blood** [2] - 135:9, 152:6
**blow** [5] - 28:20, 31:7, 35:13, 46:6, 73:14
**blue** [1] - 139:8
**Bluff** [1] - 19:25
**board** [7] - 6:18, 6:20, 6:25, 7:8, 8:13, 8:17, 9:1
**Board** [6] - 7:25, 8:4, 8:9, 8:11, 8:13, 32:6
**boards** [1] - 7:3
**Bobby** [1] - 74:5
**body** [1] - 149:22
**Bolt** [5] - 148:17, 154:14, 157:17, 157:18
**bone** [2] - 119:10, 144:8
**borrowed** [1] - 44:16
**bottle** [8] - 107:8, 107:9, 107:10, 107:13, 108:4, 108:10, 109:22, 112:9
**bottled** [1] - 111:5
**bottles** [7] - 31:11, 39:25, 41:5, 41:8, 47:16, 79:15, 112:3
**bottom** [8] - 18:5, 28:20, 63:16, 67:19, 75:11, 76:5, 76:15
**bounds** [4] - 105:18, 110:3, 110:15, 170:22
**bowel** [2] - 139:18, 140:1
**Bowman** [6] - 51:22, 52:5, 52:21, 53:7,

54:5, 54:6
**Box** [1] - 1:23
**brang** [1] - 121:8
**break** [5] - 3:9, 50:4, 50:7, 87:15, 164:2
**breakthrough** [2] - 120:14, 124:8
**BRENDA** [2] - 2:6, 116:22
**Brenda** [4] - 66:1, 66:8, 115:25, 117:4
**Brewington** [4] - 141:17, 142:4, 143:7, 146:4
**brief** [3] - 19:21, 20:3, 30:15
**Brief** [9] - 17:7, 23:25, 30:10, 31:6, 35:1, 64:11, 66:11, 73:20, 95:19
**briefly** [2] - 145:25, 166:20
**bring** [14] - 3:5, 31:11, 39:25, 41:8, 65:6, 73:16, 76:23, 79:14, 79:15, 88:1, 124:18, 136:23, 144:22, 145:1
**bringing** [1] - 137:1
**broad** [1] - 10:10
**broke** [1] - 140:3
**broken** [1] - 88:14
**brought** [8] - 41:5, 120:23, 121:9, 136:19, 136:22, 137:20, 138:7, 138:13
**Brown** [3] - 56:14, 57:4, 57:8
**Bryan** [1] - 67:23
**Buffalo** [2] - 125:2, 125:5
**bulging** [1] - 119:10
**bunch** [2] - 112:10, 122:21
**Buprenorphine** [8] - 40:9, 40:11, 40:15, 43:23, 45:16, 55:24, 58:25, 59:4
**burden** [2] - 105:1, 169:3
**business** [1] - 158:3
**busy** [3] - 11:21, 121:18, 131:2
**butalbital** [1] - 48:10
**buys** [1] - 140:19
**BY** [135] - 2:3, 2:4, 2:7, 2:7, 2:8, 2:8, 2:9, 2:10, 5:11, 5:23, 7:18, 9:21, 13:17, 14:21, 15:6, 15:16, 16:5,

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 236-8*

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 176 of 195   Pageid#: 10302

16:10, 16:22, 17:9, 18:4, 18:14, 18:20, 19:8, 19:12, 20:5, 20:17, 21:16, 22:1, 23:7, 24:7, 24:21, 25:14, 26:21, 28:7, 29:9, 29:23, 30:3, 30:24, 31:14, 32:20, 33:13, 33:24, 34:16, 35:14, 38:14, 38:20, 39:1, 39:19, 39:24, 40:4, 40:20, 41:3, 41:16, 42:1, 42:13, 43:22, 45:23, 46:7, 48:2, 48:15, 48:21, 49:10, 49:22, 51:8, 52:4, 53:6, 54:8, 55:19, 56:16, 57:18, 58:17, 58:24, 59:17, 60:7, 60:22, 61:18, 62:11, 63:10, 63:24, 64:17, 65:1, 65:7, 65:18, 66:3, 66:14, 67:1, 67:18, 68:1, 68:19, 71:17, 71:24, 72:9, 72:18, 73:10, 73:15, 74:1, 74:7, 74:12, 74:19, 75:21, 76:16, 78:23, 79:13, 80:2, 80:15, 81:11, 82:14, 83:18, 84:10, 84:17, 85:1, 85:18, 86:3, 86:15, 87:7, 88:7, 92:13, 94:6, 98:19, 117:2, 118:22, 123:5, 124:23, 139:13, 143:19, 146:2, 146:11, 148:11, 151:6, 152:3, 154:18, 155:10, 156:4, 156:18
  **bypass** [2] - 120:21, 123:22

# C

**cage** [1] - 149:21
**Cagle** [1] - 1:19
**cancer** [4] - 119:12, 119:13, 141:24, 142:20
**Candy** [1] - 66:23
**cane** [1] - 130:12
**cannot** [2] - 106:10, 106:12
**canopy** [1] - 150:10
**capacity** [1] - 96:23
**capture** [3] - 11:9, 11:17, 11:25
**captured** [1] - 93:10
**captures** [1] - 17:16

**capturing** [5] - 11:13, 27:20, 35:22, 69:11, 69:12
**car** [8] - 16:17, 102:4, 102:11, 109:21, 119:16, 119:17, 119:21, 150:8
**card** [2] - 33:14, 141:13
**cards** [1] - 145:12
**Care** [2] - 14:12, 33:15
**care** [9] - 28:22, 28:23, 29:1, 53:25, 69:15, 82:1, 90:9, 135:3, 138:25
**careful** [1] - 45:2
**carefully** [1] - 168:16
**carried** [1] - 111:11
**Carry's** [1] - 162:14
**case** [35] - 3:8, 3:20, 3:21, 5:3, 10:19, 23:1, 46:14, 58:3, 71:8, 72:22, 75:8, 92:20, 93:8, 97:14, 100:14, 103:9, 103:10, 104:3, 109:17, 110:13, 110:17, 110:21, 111:2, 111:3, 111:11, 112:19, 113:7, 114:4, 116:16, 148:1, 167:5, 168:12, 168:15, 169:1
**Case** [1] - 1:6
**case-by-case** [1] - 100:14
**cases** [13] - 8:10, 8:13, 8:18, 9:5, 9:6, 9:9, 11:22, 12:16, 95:8, 97:14, 103:8, 110:12, 170:12
**cash** [11] - 111:6, 130:16, 131:3, 131:22, 133:1, 133:11, 159:17, 159:24, 159:25, 160:13, 162:20
**caused** [4] - 16:16, 94:15, 102:3, 170:1
**causing** [1] - 53:18
**caution** [1] - 115:10
**CC-1** [2] - 58:16, 58:23
**Cedar** [1] - 19:25
**Center** [1] - 6:12
**center** [3] - 29:4, 68:3, 68:6
**certain** [12] - 10:19, 30:6, 50:17, 90:4, 92:17, 94:23, 98:14, 100:5, 102:23, 112:2,

132:9
  **certainly** [24] - 29:20, 56:20, 58:12, 66:21, 76:9, 86:11, 93:11, 93:14, 94:25, 96:18, 98:10, 100:9, 102:19, 104:21, 104:24, 104:25, 105:2, 105:6, 112:5, 112:11, 115:9, 115:10, 115:11, 171:23
**certified** [6] - 6:18, 6:20, 6:25, 7:8, 7:11, 33:19
**Certified** [1] - 1:25
**CG-12** [1] - 67:17
**CG-38** [1] - 66:24
**chance** [2] - 163:24, 170:16
**change** [5] - 54:18, 54:23, 61:7, 61:22, 169:16
**changed** [2] - 169:2, 169:9
**changes** [3] - 26:2, 61:4, 168:24
**characteristic** [1] - 50:16
**charge** [11] - 81:13, 84:19, 85:5, 94:11, 94:13, 94:16, 141:6, 165:16, 167:16, 168:23
**charged** [10] - 13:22, 29:14, 52:22, 128:25, 129:3, 129:5, 129:6, 140:25, 141:4, 165:14
**charges** [2] - 81:23, 107:3
**Charleston** [1] - 52:17
**Chart** [1] - 2:16
**chart** [27] - 26:1, 29:12, 34:17, 39:12, 41:17, 42:14, 45:15, 46:23, 47:21, 49:23, 51:18, 55:7, 55:8, 57:5, 62:12, 63:11, 66:17, 66:20, 67:11, 82:24, 83:20, 90:1, 90:2, 91:23, 93:10, 98:3, 113:5
**Chart-signed** [1] - 2:16
**charted** [2] - 99:10, 99:12
**charts** [13] - 51:9, 53:8, 67:4, 69:22, 70:5, 78:18, 80:24, 85:13, 90:12, 98:21,

98:24, 99:16, 101:18
**check** [7] - 15:17, 24:24, 80:4, 110:6, 135:14, 152:8, 163:25
**checked** [4] - 100:21, 100:24, 118:2, 123:11
**checklist** [4] - 30:4, 32:18, 39:16, 65:19
**Chicago** [1] - 6:10
**chief** [5] - 51:14, 101:21, 101:22, 112:20, 115:22
**childhood** [2] - 118:15, 119:2
**choice** [2] - 92:14, 93:19, 96:6
**choose** [4] - 93:7, 93:15, 93:17, 93:20
**chronic** [6] - 58:13, 79:21, 83:14, 95:4, 96:22
**chronically** [1] - 47:13
**circle** [1] - 125:15
**circled** [2] - 34:22, 125:5
**circumstances** [2] - 43:17, 118:20
**Clayton** [1] - 58:14
**clear** [4] - 118:15, 119:1, 119:4, 146:23
**clearly** [3] - 35:24, 112:5, 136:7
**Clerk** [1] - 104:1
**CLERK** [6] - 5:1, 5:6, 104:2, 116:15, 147:23, 148:4
**clerk** [4] - 3:22, 4:25, 168:20, 169:18
**Cleveland** [1] - 126:7
**Client** [1] - 15:7
**client** [2] - 3:13, 103:15
**Clinic** [5] - 16:12, 52:18, 60:3, 67:3, 129:18
**clinic** [2] - 125:22, 149:10
**clinical** [2] - 31:21, 86:23
**clinics** [2] - 126:5, 149:9
**close** [7] - 36:7, 62:4, 62:7, 87:2, 87:4, 113:20, 168:10
**closed** [2] - 127:6, 140:8
**closer** [1] - 160:23
**closure** [1] - 52:18

**coal** [2] - 150:4, 150:14
**cocaine** [3] - 84:11, 84:15, 85:5
**Code** [1] - 107:2
**codes** [2] - 34:20, 92:6
**codone** [1] - 162:6
**cold** [1] - 96:5
**Colegrove** [1] - 58:15
**colleague** [1] - 83:17
**collected** [5] - 11:20, 44:2, 60:4, 75:18, 100:11
**collection** [2] - 17:15, 27:9
**college** [1] - 6:5
**coming** [1] - 11:11
**commenced** [1] - 3:1
**comment** [1] - 171:2
**comments** [1] - 169:21
**committed** [1] - 166:2
**commonwealth** [1] - 9:10
**communicated** [1] - 11:6
**communication** [1] - 75:7
**Community** [4] - 16:12, 19:25, 32:6, 101:8
**compare** [1] - 22:11
**compartment** [1] - 111:6
**complaining** [1] - 99:18
**complaint** [1] - 51:14
**complaint"** [1] - 101:21
**complaints** [3] - 27:21, 70:2, 101:22
**complete** [6] - 20:10, 20:12, 27:22, 27:23, 28:23, 28:25
**completed** [1] - 6:9
**completing** [2] - 6:17
**compliance** [3] - 17:6, 23:22, 40:21
**Computer** [1] - 1:25
**Computer-Aided** [1] - 1:25
**concern** [1] - 94:15
**concerned** [2] - 11:4, 110:7
**concerning** [4] - 54:19, 54:20, 62:25, 66:20

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 328-Prather
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 177 of 195   Pageid#: 10303

concerns [3] - 36:7, 36:12, 43:9

concluded [1] - 172:24

conclusion [2] - 14:1, 14:4

conclusive [1] - 17:12

condition [15] - 10:4, 10:13, 10:14, 27:10, 38:5, 41:11, 44:24, 45:1, 49:4, 83:13, 90:25, 92:19, 114:5, 130:10, 133:21

confirm [1] - 103:23

confirms [1] - 87:5

conflicted [1] - 151:15

confused [3] - 77:10, 77:22, 118:24

confusing [1] - 69:23

consent [3] - 14:15, 18:25, 32:11

consider [3] - 12:21, 85:14, 172:17

consideration [2] - 71:9, 100:14

considered [3] - 22:4, 22:7, 79:20

considering [2] - 76:10, 106:7

consistencies [1] - 40:6

consistent [6] - 36:14, 37:7, 45:9, 58:10, 71:2, 80:20

consultation [1] - 70:1

consulted [1] - 10:16

consumed [1] - 43:15

Contact [1] - 16:6

contact [3] - 28:24, 32:10, 114:4

context [2] - 80:19, 99:9

Contin [10] - 21:19, 24:12, 25:17, 25:22, 26:2, 26:8, 28:17, 34:1, 67:14, 109:24

continue [4] - 49:2, 52:24, 54:23, 56:2

continued [5] - 28:25, 47:10, 54:19, 64:1, 82:15

continues [5] - 42:25, 56:5, 64:3, 68:15, 85:10

continuing [1] - 7:4

contract [3] - 72:6,

77:6, 77:14

contrary [1] - 100:9

contributed [1] - 119:15

control [3] - 35:17, 35:19, 39:6

controlled [59] - 9:16, 9:23, 12:11, 12:16, 12:18, 13:6, 20:7, 27:7, 27:16, 28:8, 31:3, 31:23, 39:7, 39:8, 40:11, 43:5, 43:18, 48:9, 51:16, 55:25, 56:19, 57:1, 58:20, 59:6, 65:14, 70:10, 70:12, 70:13, 70:18, 75:5, 79:6, 83:10, 84:3, 84:4, 84:18, 105:14, 105:21, 105:23, 106:11, 106:13, 106:24, 107:5, 107:16, 107:17, 107:20, 107:21, 108:14, 108:15, 126:9, 126:10, 127:2, 127:4, 127:14, 128:10, 155:2, 169:12, 169:24, 170:1

convenience [4] - 153:5, 154:4, 157:9, 159:21

conversation [4] - 93:9, 118:17, 137:4, 142:18

convicted [2] - 80:4, 112:18

conviction [1] - 94:10

cooperating [1] - 141:19

copies [3] - 32:24, 136:4, 172:8

copy [7] - 19:11, 32:3, 32:5, 168:23, 169:18, 170:5, 170:10

copying [1] - 39:11

correct [163] - 14:22, 14:25, 15:18, 17:3, 18:16, 18:18, 22:18, 22:20, 22:25, 23:5, 23:9, 23:10, 23:13, 23:14, 23:16, 23:17, 23:18, 23:20, 24:24, 24:25, 25:4, 25:18, 25:19, 26:9, 27:5, 28:8, 28:11, 29:14, 29:19, 29:25, 30:1, 38:15, 38:22, 40:9, 40:10, 40:25, 42:19,

42:21, 43:1, 43:2, 43:25, 44:1, 44:3, 44:4, 46:3, 46:4, 46:9, 46:10, 46:11, 46:12, 47:5, 47:6, 47:8, 48:8, 48:11, 48:13, 51:10, 51:11, 52:7, 52:10, 52:11, 52:19, 52:22, 52:23, 52:25, 53:1, 54:16, 55:11, 55:25, 56:6, 56:7, 56:12, 57:2, 57:11, 57:12, 57:15, 59:1, 59:2, 59:5, 59:6, 59:9, 59:10, 60:12, 60:13, 62:16, 62:17, 62:19, 62:20, 72:2, 74:23, 78:3, 78:4, 78:7, 78:16, 82:21, 83:4, 84:1, 84:19, 84:20, 87:11, 87:12, 88:11, 89:15, 89:18, 90:9, 91:7, 91:12, 92:9, 92:10, 92:18, 92:22, 93:2, 93:13, 93:22, 94:10, 94:13, 94:22, 95:1, 95:12, 96:2, 96:10, 96:17, 97:16, 97:20, 98:3, 98:14, 99:5, 99:11, 99:17, 100:22, 100:23, 102:7, 102:20, 103:6, 104:1, 106:23, 117:16, 123:12, 126:1, 126:6, 128:21, 129:3, 129:9, 129:15, 129:22, 130:4, 130:14, 131:8, 131:23, 132:15, 143:1, 143:8, 147:5, 149:6, 153:13, 154:19, 155:11, 156:20, 160:21, 161:7, 170:25, 171:6, 171:16

Correct [2] - 9:5, 9:13

corrected [1] - 107:4

correctly [1] - 75:4

corresponding [1] - 92:6

cost [3] - 89:20, 92:21, 133:4

counsel [1] - 87:19, 110:8, 168:22, 172:20

counseling [1] - 10:12

counselor [1] - 121:12

count [7] - 85:24,

112:18, 113:8, 121:13, 122:11, 122:15, 145:2

Count [14] - 46:25, 47:2, 55:12, 55:13, 83:21, 104:22, 105:9, 110:2, 110:9, 112:15, 112:16, 113:8, 169:4, 172:9

counteractions [1] - 151:14

Counts [5] - 41:18, 78:8, 78:12, 105:5, 169:12

counts [11] - 52:22, 98:20, 98:21, 105:5, 112:23, 112:25, 113:11, 122:14, 141:2, 144:22, 152:16

County [1] - 127:19

couple [6] - 51:13, 120:8, 121:2, 130:6, 131:13, 145:11

course [5] - 78:21, 88:14, 125:7, 169:14, 170:17

COURT [141] - 1:2, 3:2, 3:6, 3:10, 3:12, 3:16, 4:2, 4:17, 4:24, 5:17, 7:14, 7:17, 9:18, 9:20, 13:16, 24:20, 25:9, 50:4, 50:9, 50:18, 50:20, 50:24, 51:1, 51:4, 61:12, 70:22, 70:25, 71:6, 86:8, 86:11, 87:14, 87:19, 87:24, 88:1, 88:3, 103:17, 103:19, 103:21, 104:1, 104:5, 104:9, 104:12, 104:15, 104:18, 105:8, 105:15, 105:25, 106:5, 106:10, 106:16, 106:20, 107:1, 107:11, 108:6, 108:12, 108:14, 108:16, 108:20, 108:25, 109:5, 109:14, 109:19, 109:25, 110:7, 110:23, 111:1, 111:9, 111:17, 111:19, 112:13, 113:9, 113:25, 114:6, 114:11, 114:18, 114:22, 115:1, 115:8, 115:13, 115:15, 115:18, 115:21, 116:2, 116:4, 116:8,

116:19, 118:19, 123:3, 139:10, 143:16, 145:24, 147:8, 147:11, 147:15, 147:21, 148:5, 150:24, 151:2, 151:23, 154:17, 155:1, 155:6, 155:19, 155:25, 156:3, 163:13, 163:15, 163:17, 163:20, 164:1, 164:5, 164:9, 164:13, 165:1, 165:6, 165:9, 165:11, 165:23, 166:3, 166:10, 166:15, 166:23, 167:1, 167:3, 167:21, 168:2, 168:4, 168:19, 170:5, 170:11, 170:17, 170:25, 171:5, 171:8, 171:15, 171:17, 171:21, 171:25, 172:4, 172:7, 172:13

Court [14] - 1:25, 3:9, 3:15, 3:19, 4:7, 4:8, 103:24, 106:8, 110:18, 164:21, 169:22, 170:9, 171:13, 172:19

court [1] - 172:23

Court's [3] - 3:5, 165:17, 170:3

courthouse [1] - 127:23

courtrooms [1] - 12:6

cover [3] - 3:8, 32:13, 90:4

Craycraft [1] - 59:13

credentials [1] - 7:4

credit [1] - 33:14

Criminal [1] - 1:6

criminal [12] - 15:17, 15:21, 16:1, 16:4, 80:4, 100:24, 100:25, 101:1, 103:7, 103:9, 103:10, 141:6

critical - 37:13

CROSS [4] - 2:4, 2:7, 88:6, 123:4

cross [2] - 88:3, 123:3

cross-examination [1] - 123:3

CROSS-EXAMINATION [4] - 2:4, 2:7, 88:6, 123:4

cross-examine [1] - 88:3

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 236-****

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 178 of 195   Pageid#: 10304

**cuff** [1] - 68:25
**Cumberland** [2] - 19:25, 32:5
**cup** [1] - 5:12
**current** [3] - 16:16, 24:11, 24:16

## D

**D-e-e-n-i** [1] - 7:16
**dad** [1] - 137:10
**daily** [2] - 38:1, 45:1
**damage** [1] - 119:6
**Damron** [1] - 59:24
**dangerous** [1] - 150:15
**Daniels** [4] - 60:16, 62:9, 62:13, 63:7
**Daniels's** [1] - 60:20
**Darryl** [13] - 60:19, 61:5, 61:20, 72:10, 72:13, 83:19, 83:20, 85:15, 85:20, 86:7, 86:16, 86:19, 94:7
**data** [1] - 100:15
**date** [19] - 24:3, 25:12, 28:16, 29:13, 34:13, 36:5, 38:21, 44:2, 60:2, 60:20, 65:9, 66:7, 73:21, 81:12, 101:12, 101:13, 140:8
**dated** [24] - 14:16, 15:1, 19:13, 26:23, 30:22, 30:25, 31:6, 32:22, 32:25, 33:14, 33:19, 38:13, 39:25, 52:19, 57:3, 60:4, 63:13, 66:12, 68:20, 72:7, 74:13, 75:10, 76:1, 78:24
**dates** [3] - 30:23, 81:21, 161:4
**dating** [2] - 140:21, 154:8
**daughter** [3] - 127:17, 156:19, 162:25
**DAY** [1] - 1:11
**days** [16] - 8:25, 22:18, 42:9, 43:9, 46:20, 47:8, 47:9, 54:13, 54:14, 55:14, 63:1, 63:5, 73:3, 122:24, 142:22, 156:19
**days'** [1] - 122:13
**DD-2** [4] - 64:8, 64:9, 64:10, 64:22
**DEA** [4] - 106:2,

108:17, 137:1, 137:13
**dead** [2] - 129:2, 155:15
**deal** [1] - 36:8
**dealer** [2] - 128:23, 129:9
**dealing** [1] - 128:25
**Deanna** [2] - 79:9, 101:11
**death** [3] - 93:23, 169:13, 169:17
**Deborah** [8] - 2:15, 4:12, 56:13, 57:4, 57:8, 113:17, 166:25, 167:2
**deceive** [1] - 102:16
**December** [16] - 55:9, 63:13, 63:25, 66:9, 66:12, 75:10, 75:18, 80:14, 82:12, 82:15, 84:14, 85:7, 85:11, 132:2, 132:3, 138:4
**decide** [2] - 8:15, 93:12
**decided** [2] - 114:13, 161:17
**decision** [11] - 11:18, 11:24, 12:9, 12:19, 12:20, 46:18, 49:2, 85:12, 93:12, 166:21, 167:19
**decision-making** [2] - 11:18, 46:18
**decrease** [2] - 41:4, 41:8
**dedicate** [1] - 8:25
**DEENI** [2] - 2:3, 5:7
**Deeni** [3] - 5:16, 5:21, 7:16
**Defendant** [2] - 1:9, 1:22
**defendant** [6] - 105:15, 107:16, 112:18, 114:13, 115:22, 168:7
**Defense** [2] - 116:23, 148:8
**DEFENSE** [1] - 2:5
**defense** [5] - 104:16, 104:20, 113:14, 115:25, 147:17
**defines** [1] - 89:3
**definitive** [1] - 28:23
**degeneration** [1] - 58:7
**degenerative** [3] - 58:11, 119:10, 144:8
**degree** [5] - 6:7, 10:13, 89:9, 96:20,

153:19
**degrees** [1] - 99:18
**Delayed** [1] - 76:5
**deliver** [3] - 80:5, 84:18, 85:6
**delivery** [1] - 30:22
**denied** [2] - 3:23, 90:8
**denies** [3] - 24:12, 24:16, 90:9
**deny** [2] - 112:21, 113:9
**dependency** [2] - 93:21, 93:23
**deposition** [2] - 122:12, 127:21
**depth** [3] - 10:3, 11:4, 91:22
**Derakhshan** [2] - 126:15, 139:6
**describe** [9] - 8:23, 36:20, 117:20, 117:24, 119:8, 119:17, 122:4, 150:7, 151:7
**describing** [4] - 17:18, 24:15, 69:6, 86:25
**description** [3] - 27:10, 69:4, 76:14
**descriptions** [1] - 68:22
**designation** [1] - 6:16
**despite** [1] - 64:2
**destroy** [1] - 121:23
**detailed** [2] - 56:22, 58:2
**details** [1] - 11:24
**determination** [2] - 95:10, 112:17
**determine** [3] - 79:8, 89:18, 96:9
**diagnoses** [4] - 34:19, 92:7, 92:8, 95:1
**diagnosis** [13] - 10:5, 11:11, 17:21, 27:23, 29:1, 36:6, 39:10, 39:13, 39:14, 53:20, 53:21, 79:18, 92:4
**diagnostic** [1] - 89:13
**diagram** [1] - 69:5
**diaphoresis** [1] - 24:13
**diarrhea** [1] - 24:13
**Dickens** [2] - 161:13, 163:1

**diclofenac** [2] - 28:9, 71:19
**died** [2] - 128:18, 156:19
**difference** [2] - 36:17, 37:13
**different** [27] - 8:21, 22:9, 22:10, 27:13, 36:24, 36:25, 37:6, 37:11, 37:12, 37:20, 43:6, 69:19, 80:23, 88:14, 89:7, 99:18, 99:21, 108:4, 126:4, 127:13, 130:10, 137:23, 144:4, 150:5
**differentiate** [2] - 36:22, 37:10
**differently** [2] - 111:24, 122:15
**digging** [1] - 112:9
**Dilaudid** [1] - 77:24
**DIRECT** [6] - 2:3, 2:7, 2:9, 5:10, 117:1, 148:10
**direct** [1] - 94:23
**directing** [1] - 70:4
**direction** [1] - 37:12
**directly** [1] - 5:18
**disabled** [1] - 159:21
**discharge** [8] - 28:2, 28:4, 29:13, 29:17, 38:12, 78:24, 82:23, 100:6
**discharged** [5] - 48:16, 48:24, 77:6, 82:25, 83:2
**discharging** [3] - 19:13, 32:4, 99:22
**disclosure** [1] - 32:18
**discontinue** [1] - 100:11
**discontinued** [1] - 78:21
**discrepancies** [1] - 29:3
**discuss** [3] - 50:9, 156:8, 168:12
**discussed** [2] - 156:7, 163:23
**discussing** [2] - 90:25, 168:12
**discussions** [1] - 114:16
**disease** [2] - 119:10, 144:8
**disk** [1] - 119:10
**disks** [2] - 149:19, 149:20
**dismissal** [1] - 94:11

**dismissed** [4] - 94:13, 94:16, 100:17, 113:1
**disorder** [3] - 36:15, 44:21, 45:8
**dispense** [4] - 105:23, 106:13, 107:5, 107:14
**dispensed** [2] - 111:12, 170:2
**dispensing** [1] - 127:2
**disposition** [1] - 73:7
**disregard** [1] - 155:20
**distances** [1] - 49:13
**distribute** [11] - 91:2, 104:22, 105:17, 107:22, 108:10, 110:2, 110:20, 111:7, 112:1, 112:10, 171:12
**distributed** [1] - 170:2
**distributing** [2] - 112:6, 128:25
**distribution** [6] - 104:24, 112:6, 140:25, 141:2, 170:13, 170:14
**distributions** [1] - 29:14
**DISTRICT** [2] - 1:2, 1:3
**divert** [1] - 70:18
**diverted** [2] - 43:12, 43:13
**diverting** [1] - 37:2
**DIVISION** [1] - 1:4
**DJ-1** [1] - 79:9
**DJ-150** [1] - 101:3
**doctor** [78] - 5:17, 6:1, 6:3, 7:14, 11:14, 12:24, 17:11, 18:7, 20:6, 24:3, 24:14, 26:2, 27:16, 31:15, 31:18, 31:20, 35:21, 36:10, 37:8, 37:19, 39:11, 41:6, 46:15, 47:18, 48:16, 55:4, 56:1, 60:23, 65:13, 69:17, 69:18, 69:19, 69:22, 70:3, 70:9, 76:6, 83:5, 85:12, 88:19, 89:10, 96:8, 96:16, 97:3, 97:22, 99:3, 99:6, 99:10, 99:16, 102:15, 102:16, 103:21, 108:4, 108:5, 117:22, 123:8, 125:14,

126:17, 126:19,
127:12, 128:6,
133:11, 134:10,
134:22, 135:18,
135:21, 135:25,
138:8, 138:22,
142:22, 150:22,
150:24, 150:25,
153:9, 160:11,
160:12, 163:1
  **doctor's** [11] - 26:16,
41:12, 46:13, 46:17,
69:7, 77:9, 79:17,
102:17, 122:9,
128:17, 165:9
  **doctors** [16] - 9:12,
12:3, 17:1, 62:2,
88:21, 94:19, 94:25,
100:5, 100:12, 118:3,
123:12, 126:3, 126:9,
160:15, 160:16,
160:17
  **document** [3] -
12:19, 101:5, 101:7
  **documentation** [4] -
37:17, 47:16, 53:17,
70:7
  **documented** [2] -
35:24, 75:7
  **documenting** [1] -
46:17
  **dollar** [1] - 21:2
  **Donald** [1] - 1:22
  **done** [12] - 7:6, 7:22,
37:25, 76:6, 89:17,
90:5, 90:7, 95:23,
109:13, 119:6,
150:13, 170:12
  **Donna** [1] - 64:7
  **door** [1] - 3:8
  **dose** [10] - 22:3,
24:11, 24:16, 26:11,
41:8, 42:20, 42:24,
48:19, 54:23, 83:14
  **doses** [7] - 22:4,
22:7, 27:11, 36:9,
38:1, 65:16, 78:7
  **Dotson** [1] - 64:7
  **doubt** [1] - 99:4
  **down** [49] - 18:5,
28:19, 31:16, 39:5,
40:18, 41:23, 42:4,
44:5, 52:2, 52:15,
57:13, 59:15, 60:11,
63:18, 64:18, 67:24,
71:23, 72:7, 75:11,
76:5, 76:14, 86:2,
86:13, 99:14, 101:24,
116:9, 119:21,
123:16, 124:4, 125:8,

126:21, 127:11,
127:18, 128:6, 128:9,
128:19, 129:20,
129:22, 138:25,
143:9, 149:9, 156:11,
157:25, 160:22,
161:23, 163:5, 163:21
  **Dr** [149] - 4:23, 5:12,
5:16, 5:21, 5:24, 7:19,
9:15, 9:22, 10:16,
10:20, 24:22, 27:8,
27:14, 29:18, 30:18,
34:4, 39:4, 40:15,
40:25, 43:24, 44:6,
48:7, 49:13, 49:17,
51:9, 52:9, 57:4, 59:3,
61:6, 61:19, 61:21,
62:4, 67:4, 68:8,
69:21, 69:24, 70:6,
74:15, 76:1, 77:1,
77:3, 79:2, 79:7, 80:7,
80:22, 81:16, 82:4,
82:16, 83:11, 85:20,
86:4, 86:17, 88:8,
88:10, 88:16, 89:11,
90:10, 91:1, 91:6,
92:8, 93:24, 93:25,
94:22, 95:14, 95:22,
98:11, 98:14, 98:20,
100:17, 100:20,
103:1, 111:4, 113:15,
114:3, 117:9, 117:21,
118:8, 119:25,
121:23, 123:8,
123:14, 124:13,
125:22, 126:8,
126:15, 127:7,
127:18, 128:2, 128:9,
128:13, 129:15,
129:24, 129:25,
130:3, 130:11,
130:14, 131:19,
131:25, 133:24,
134:13, 135:4,
135:11, 136:7,
136:11, 136:17,
136:20, 136:21,
137:16, 137:20,
138:14, 139:1, 139:6,
139:17, 139:21,
140:7, 140:10,
143:20, 145:4,
145:16, 146:7,
146:25, 147:5,
148:20, 148:22,
149:8, 150:16, 151:8,
152:21, 153:8, 156:5,
156:13, 156:20,
156:23, 157:1, 157:8,
157:23, 158:6, 159:1,
160:16, 160:20,

160:24, 161:5,
161:12, 161:21,
165:24, 167:17
  **DR** [1] - 2:14
  **DR-1000** [2] - 4:11,
4:21
  **drink** [1] - 5:13
  **Drive** [1] - 162:15
  **drive** [5] - 38:3,
124:15, 158:20,
158:23, 168:16
  **driven** [2] - 43:14,
158:14
  **driver's** [2] - 19:11,
65:8
  **driving** [3] - 16:17,
119:19, 159:6
  **dropped** [1] - 141:9
  **drove** [3] - 125:20,
128:15, 158:22
  **drug** [42] - 29:7,
40:5, 40:12, 44:18,
44:20, 46:2, 52:12,
53:9, 53:10, 56:7,
56:9, 56:10, 59:6,
59:25, 60:12, 64:6,
72:24, 75:16, 76:2,
76:4, 76:18, 81:4,
81:7, 98:23, 98:24,
99:24, 100:7, 121:14,
128:23, 129:9,
135:10, 137:24,
140:19, 140:25,
141:2, 144:19,
152:11, 152:13,
162:7, 162:8
  **Drug** [1] - 125:19
  **drugs** [25] - 22:9,
22:10, 54:24, 56:3,
59:18, 60:8, 60:14,
64:1, 80:21, 80:22,
80:24, 81:13, 107:6,
108:8, 108:13,
108:18, 109:18,
109:20, 128:25,
129:1, 129:12,
136:18, 136:22, 137:1
  **Drugs** [1] - 133:19
  **drugstore** [1] -
132:18
  **DT** [1] - 72:19
  **due** [7] - 54:15,
54:16, 54:17, 76:5,
77:5, 77:6, 77:14
  **duly** [3] - 5:9,
116:24, 148:9
  **during** [3] - 50:15,
113:20, 117:25
  **duties** [2] - 8:8, 8:10
  **duty** [1] - 43:4

**DWi-41** [1] - 84:6
**DWi-71** [2] - 84:16,
94:5
  **dying** [4] - 137:10,
140:23, 141:23,
142:20

---

# E

  **e-mail** [2] - 170:10,
172:19
  **early** [1] - 37:9
  **easier** [4] - 8:23,
77:12, 122:11, 126:2
  **easily** [1] - 43:11
  **ED** [1] - 76:3
  **education** [1] - 7:5
  **effects** [4] - 20:22,
20:24, 24:16, 93:21
  **eight** [1] - 31:2
  **either** [6] - 24:15,
43:17, 95:1, 96:16,
96:19, 109:2
  **EKGs** [1] - 29:1
  **Eleanor** [1] - 127:18
  **element** [4] - 20:9,
90:22, 90:24, 112:12
  **elements** [2] - 11:12,
169:4
  **emergency** [1] -
28:22
  **employee** [1] - 158:2
  **enclosed** [1] - 30:19
  **encounter** [7] -
11:17, 20:10, 20:13,
27:22, 31:21, 70:3,
97:25
  **encounters** [1] -
11:13
  **end** [8] - 12:2, 12:5,
54:3, 64:13, 132:2,
164:24, 168:10,
169:17
  **enforce** [1] - 61:25
  **enforcement** [1] -
141:20
  **enjoy** [2] - 153:5,
153:12
  **entire** [4] - 13:12,
41:9, 99:7, 99:9
  **entirely** [1] - 58:10
  **episode** [2] - 16:16,
102:3
  **equate** [1] - 22:9
  **equivalent** [2] - 23:3,
23:5
  **equivalents** [3] -
22:6, 22:8, 22:14
  **ER** [6] - 32:25, 35:18,
67:11, 72:10, 85:9

**especially** [2] -
12:14, 46:21
  **essence** [1] - 139:21
  **essential** [1] - 90:22
  **essentially** [1] -
24:15
  **evaluation** [2] - 49:3,
82:3
  **event** [7] - 53:7,
79:19, 109:4, 112:17,
114:18, 165:19,
169:18
  **eventually** [1] -
133:19
  **every-day** [2] - 63:2,
96:21
  **evidence** [34] - 4:6,
18:6, 21:18, 25:7,
42:9, 58:6, 61:3, 61:5,
61:15, 81:4, 81:7,
81:25, 83:12, 86:16,
103:25, 104:23,
106:3, 106:7, 107:15,
107:25, 108:20,
108:23, 109:14,
110:10, 111:7,
112:19, 112:22,
113:2, 113:7, 115:7,
115:10, 115:22,
115:23, 168:13
  **evidenced** [1] -
77:18
  **exact** [2] - 89:7,
122:17
  **exactly** [6] - 37:4,
40:14, 118:1, 119:6,
130:1, 134:2
  **exam** [1] - 135:2,
135:12
  **examination** [2] -
7:3, 123:3
  **EXAMINATION** [16] -
2:3, 2:4, 2:7, 2:7, 2:8,
2:8, 2:9, 2:10, 5:10,
88:6, 117:1, 123:4,
143:18, 146:1,
148:10, 156:17
  **examine** [2] - 53:20,
88:3
  **examined** [5] - 5:9,
116:24, 117:23,
117:24, 148:9
  **example** [2] - 44:19,
70:16
  **exams** [1] - 152:4
  **except** [2] - 79:19,
112:25
  **exception** [1] -
115:15
  **exchange** [1] - 32:16

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 356-4218*

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 180 of 195   Pageid#: 10306

**excuse** [12] - 4:13, 45:24, 46:15, 55:9, 68:20, 82:12, 82:18, 146:17, 150:1, 158:25, 167:23, 171:7
**excused** [6] - 103:19, 103:21, 147:10, 147:11, 163:17, 163:21
**executed** [1] - 137:16
**exhibit** [2] - 24:22, 62:13
**Exhibit** [14] - 4:8, 4:11, 4:14, 4:19, 4:20, 4:21, 4:22, 25:7, 25:10, 25:15, 29:12, 83:21, 87:8, 124:19
**EXHIBITS** [1] - 2:12
**exhibits** [1] - 103:24
**exist** [1] - 12:1
**expenses** [1] - 131:5
**experience** [2] - 89:5, 106:22
**expert** [8] - 9:15, 71:2, 108:3, 110:12, 110:13, 110:22, 110:25, 113:5
**expertise** [1] - 71:3
**explain** [5] - 13:19, 36:17, 78:8, 80:17, 138:20
**explained** [3] - 74:14, 151:9, 151:22
**expressing** [1] - 71:2
**extended** [2] - 97:4, 123:23
**extreme** [2] - 11:16, 110:14
**extremely** [1] - 161:6

## F

**f-i-s-h-e-r** [1] - 117:6
**face** [5] - 92:14, 97:25, 134:3
**face-to-face** [2] - 97:25, 134:3
**FaceTime** [1] - 134:4
**facility** [2] - 19:17, 19:25
**fact** [11] - 6:20, 11:6, 26:7, 29:20, 29:24, 44:25, 54:25, 58:5, 97:9, 112:5, 136:21
**facts** [7] - 61:3, 61:15, 107:18, 110:14, 111:2, 111:3, 111:23
**fail** [1] - 53:10

**failed** [5] - 52:12, 53:8, 77:4, 100:7, 112:11
**failing** [2] - 99:24, 127:1
**failure** [5] - 40:22, 40:24, 52:7, 76:17, 76:24
**fair** [4] - 90:3, 93:6, 97:12, 167:13
**Fairdale** [3] - 157:9, 157:13, 157:14
**faith** [1] - 169:6
**faking** [1] - 102:23
**fall** [1] - 150:8
**fallen** [1] - 165:1
**falling** [1] - 102:4
**familiar** [8] - 15:10, 15:21, 20:23, 75:23, 86:25, 88:24, 125:8, 132:13
**family** [1] - 10:11
**far** [14] - 17:11, 17:14, 31:20, 39:12, 89:10, 99:24, 113:18, 113:20, 124:10, 124:12, 128:9, 152:20, 157:18, 158:14
**farm** [1] - 153:5
**faster** [2] - 51:6, 135:24
**father** [4] - 115:4, 121:20, 153:13, 154:7
**fax** [5] - 30:18, 32:9, 32:13, 60:19
**FB-1** [1] - 34:10
**FB-2** [1] - 48:14
**FB-3** [1] - 49:20
**FDA** [3] - 91:7, 91:8, 91:10
**Fearin** [1] - 65:4
**February** [6] - 46:8, 57:4, 57:7, 66:10, 68:16, 82:17
**federal** [2] - 106:1, 107:16
**fell** [2] - 102:10, 165:2
**fellowship** [6] - 6:12, 6:14, 6:15, 6:17, 6:23, 7:1
**felonies** [2] - 140:18, 141:5
**female** [1] - 57:24
**fentanyl** [1] - 34:2
**few** [5] - 22:5, 101:17, 104:24, 151:19, 153:4
**field** [4] - 7:20, 9:16,

9:22, 10:9
**figure** [1] - 97:9
**figuring** [1] - 64:6
**file** [11] - 2:13, 2:14, 3:22, 4:9, 4:10, 11:13, 11:25, 33:25, 49:6, 52:18, 65:24
**files** [41] - 10:17, 10:20, 10:25, 11:2, 11:3, 11:5, 11:7, 11:9, 11:12, 11:15, 12:1, 12:2, 12:4, 12:5, 12:6, 12:9, 12:18, 13:5, 13:8, 13:10, 13:19, 13:25, 15:22, 15:24, 50:14, 50:15, 50:17, 61:1, 62:1, 62:4, 65:24, 88:10, 88:13, 88:16, 88:18, 88:19, 88:20, 89:10, 103:5, 113:4
**filings** [1] - 113:2
**fill** [9] - 77:7, 77:14, 96:4, 96:7, 96:11, 125:11, 133:14, 162:13, 162:16
**filled** [24] - 18:22, 24:5, 70:13, 70:14, 74:25, 75:4, 77:21, 86:20, 100:22, 101:13, 125:17, 132:24, 133:17, 133:22, 145:4, 145:8, 162:10, 162:12, 162:14, 166:13, 169:25, 170:13
**filling** [5] - 17:1, 17:17, 17:18, 75:5, 166:14
**final** [1] - 172:1
**finally** [1] - 156:11
**financial** [2] - 77:5, 89:22
**finish** [2] - 47:21, 170:10
**finished** [1] - 165:20
**Fioricet** [1] - 48:9
**first** [40] - 5:9, 7:15, 13:21, 18:10, 19:9, 24:4, 29:13, 29:20, 37:22, 39:9, 40:24, 41:24, 52:17, 53:17, 57:8, 66:6, 76:24, 77:11, 77:12, 79:8, 103:9, 105:9, 114:21, 116:23, 117:13, 117:20, 118:9, 119:2, 131:3, 131:21, 131:22, 132:18, 138:24, 140:2, 148:8,

151:7, 151:17, 157:23, 161:20
**First** [2] - 72:19, 76:17
**Fisher** [11] - 66:1, 66:8, 116:1, 116:5, 117:4, 117:7, 123:8, 140:6, 143:20, 146:3, 146:19
**FISHER** [2] - 2:6, 116:22
**fishing** [1] - 149:23
**five** [5] - 22:24, 22:25, 76:7, 157:19, 167:8
**fixed** [1] - 131:8
**flag** [3] - 59:21, 59:22, 60:14
**flight** [3] - 164:18, 164:19, 165:4
**Florida** [2] - 164:17, 166:24
**flush** [1] - 121:15
**flushed** [2] - 121:16, 138:25
**folks** [1] - 49:16
**follow** [9] - 22:11, 25:24, 29:8, 50:6, 87:16, 99:25, 104:13, 164:2, 168:16
**follow-up** [2] - 25:24, 29:8
**followed** [2] - 12:22, 164:17
**following** [2] - 70:3, 168:24
**follows** [3] - 5:9, 116:24, 148:9
**food** [2] - 141:13, 141:15
**foolproof** [1] - 99:2
**FOR** [1] - 1:3
**forever** [1] - 93:18
**forgot** [2] - 4:7, 37:22
**form** [25] - 17:17, 17:19, 32:10, 75:3, 86:25, 91:15, 91:17, 95:14, 95:16, 95:17, 95:18, 95:25, 96:3, 96:6, 96:11, 101:12, 101:13, 101:16, 102:8, 111:8, 169:10, 169:15, 169:18, 172:4, 172:13
**Form** [6] - 14:12, 16:6, 16:11, 26:22, 67:17, 101:9
**Form)** [1] - 17:8
**former** [1] - 165:9

**forms** [1] - 89:13
**formulate** [1] - 10:7
**forth** [1] - 114:16
**forward** [2] - 4:24, 147:23
**foundation** [1] - 49:5
**four** [21] - 6:5, 8:5, 8:18, 8:22, 8:24, 9:11, 35:18, 42:9, 43:9, 63:5, 73:2, 78:14, 78:21, 124:17, 125:20, 128:15, 141:2, 143:10, 149:20, 150:4, 163:8
**four-year** [1] - 6:5
**fraction** [1] - 27:21
**fragment** [2] - 4:9, 4:10
**Frank** [8] - 34:8, 34:13, 41:17, 42:25, 43:3, 48:17, 49:21, 49:24
**frankly** [4] - 36:25, 37:3, 77:22, 110:9
**free** [1] - 18:1
**Friday** [1] - 4:13
**friend** [1] - 44:7
**friend's** [1] - 44:17
**front** [13] - 76:11, 83:20, 98:9, 99:8, 116:9, 119:18, 127:20, 136:2, 136:3, 136:15, 141:25, 145:9, 146:12
**full** [4] - 8:6, 30:19, 108:4, 108:10
**functional** [2] - 96:23, 97:2
**functionality** [2] - 96:20, 97:1
**functioning** [1] - 97:19
**fundamental** [1] - 38:3
**funny** [1] - 141:16
**furthermore** [1] - 53:19
**fused** [1] - 149:20
**fusion** [1] - 150:21

## G

**GABA** [1] - 26:17
**gabapentin** [3] - 60:8, 71:19, 71:25
**Gabapentin** [1] - 26:17
**Gap** [1] - 1:24
**gastric** [2] - 120:20, 123:22

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 926-3838

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 181 of 195   Pageid#: 10307

**GB-64** [1] - 51:23
**GB-68** [1] - 52:3
**GB-70** [1] - 53:2
**general** [7] - 6:9, 11:1, 21:21, 36:13, 56:17, 65:24, 78:19
**generally** [3] - 8:24, 10:2, 99:19
**Geneva** [3] - 51:22, 52:21, 53:7
**gentleman** [1] - 125:13
**gentlemen** [10] - 3:2, 4:2, 50:6, 71:6, 87:14, 104:12, 115:21, 155:19, 164:1, 168:4
**George** [1] - 66:23
**girl** [1] - 140:21
**girlfriend** [1] - 161:14
**given** [11] - 13:8, 47:10, 76:3, 76:21, 83:2, 91:11, 111:14, 111:15, 115:23, 152:24, 170:3
**glove** [1] - 111:6
**goals** [1] - 96:22
**God** [3] - 5:4, 116:17, 148:2
**government** [1] - 88:11
**Government** [21] - 4:4, 4:23, 5:8, 10:17, 88:18, 104:4, 104:5, 104:25, 105:2, 105:16, 110:1, 110:13, 111:22, 112:11, 112:25, 113:1, 114:9, 114:10, 169:10, 169:14, 171:20
**Government's** [21] - 4:8, 4:11, 4:19, 4:20, 4:21, 4:22, 25:7, 25:10, 87:8, 104:23, 105:10, 108:7, 109:16, 109:17, 110:10, 112:19, 115:22, 124:18, 165:12, 165:22, 171:14
**graduate** [1] - 6:5
**graduated** [3] - 6:9, 7:1, 7:23
**grams** [1] - 81:14
**grand** [10] - 127:20, 133:13, 134:17, 141:25, 142:3, 142:7, 146:12, 146:18, 146:22, 146:23

**grandson** [1] - 143:3
**great** [2] - 36:7, 49:12
**greater** [3] - 69:5, 69:9, 96:20
**Greg** [1] - 71:11
**grounds** [2] - 105:6, 105:7
**guess** [10] - 35:18, 61:13, 113:14, 148:23, 149:3, 155:14, 159:2, 165:16, 166:16, 172:10
**guide** [1] - 66:18
**guy** [9] - 23:2, 23:15, 49:11, 128:16, 136:2, 136:3, 136:15, 145:9, 161:5

# H

**H-a-r-t-s-h-o-r-n** [1] - 148:15
**habits** [1] - 8:12
**half** [9] - 57:6, 131:5, 149:20, 151:20, 158:15, 158:16, 158:19, 166:6
**hand** [7] - 3:16, 5:1, 80:17, 81:24, 116:14, 147:24, 168:20
**handed** [1] - 3:14
**handing** [1] - 112:8
**hands** [1] - 12:2
**handwriting** [5] - 27:4, 27:14, 39:4, 77:2
**handwritten** [1] - 39:17
**happy** [1] - 170:9
**hard** [2] - 49:18, 72:13
**harder** [1] - 139:3
**Harlow** [4] - 67:23, 71:11, 71:14, 72:11
**Harlow's** [1] - 72:16
**Hartford** [1] - 150:5
**Hartshorn** [10] - 73:9, 115:4, 115:10, 147:18, 147:20, 148:13, 148:16, 156:13, 156:19
**HARTSHORN** [2] - 2:9, 148:7
**Hartshorn's** [1] - 153:13
**Hassel** [4] - 60:16, 60:20, 62:9, 62:13
**HD** [1] - 60:18

**HD-1** [1] - 60:18
**HD-120** [1] - 60:18
**HD-20** [1] - 62:10
**head** [1] - 150:12
**headache** [2] - 22:3, 34:22
**heal** [1] - 149:22
**health** [1] - 29:7, 38:6, 89:2
**Health** [2] - 88:24, 89:1
**Healthcare** [2] - 16:12, 101:8
**healthcare** [1] - 8:12
**healthier** [1] - 144:17
**hear** [1] - 116:20
**heard** [3] - 115:22, 153:20, 168:14
**hearings** [2] - 8:20, 8:22
**hearsay** [5] - 115:6, 115:10, 115:13, 118:16, 155:14
**heart** [4] - 127:12, 132:3, 132:4, 134:20, 135:6, 135:7, 135:15, 146:15
**heartburn** [2] - 120:21, 121:5
**Heather** [8] - 73:8, 115:4, 153:13, 153:16, 153:24, 154:22, 155:11, 162:25
**heavy** [1] - 43:4
**heightened** [1] - 12:17
**held** [10] - 4:1, 50:8, 51:3, 87:18, 88:2, 104:14, 115:20, 164:4, 168:3, 168:18
**hello** [1] - 123:7
**help** [20] - 5:4, 10:7, 10:10, 11:9, 17:11, 24:17, 53:23, 89:18, 92:18, 92:19, 116:17, 122:6, 144:13, 145:5, 145:7, 145:13, 145:20, 148:2, 153:6
**helped** [3] - 53:22, 53:24, 99:17
**helping** [2] - 99:19, 125:13
**helps** [1] - 65:20
**herbal** [1] - 112:3
**herein** [3] - 5:8, 116:23, 148:8
**hernia** [2] - 130:6, 140:4
**HH-2** [1] - 73:8

**HH-70** [1] - 73:19
**high** [12] - 22:4, 22:7, 27:11, 36:2, 36:9, 43:11, 58:13, 65:16, 72:6, 77:5, 77:14, 83:14
**high'** [1] - 35:20
**high-dose** [1] - 83:14
**high-level** [1] - 58:13
**high-risk** [3] - 72:6, 77:5, 77:14
**higher** [1] - 26:11
**highlight** [13] - 38:12, 52:2, 54:7, 65:6, 67:24, 68:18, 74:18, 75:12, 76:14, 79:11, 80:1, 84:9, 85:17
**highlighted** [1] - 25:24
**hip** [3] - 57:25, 130:9, 149:21
**histories** [2] - 100:25, 101:1
**history** [2] - 97:16, 100:24
**hit** [2] - 150:8, 150:12
**HIV** [1] - 29:6
**hmm** [1] - 23:21
**hold** [2] - 35:12, 141:13
**hole** [1] - 130:7
**holes** [1] - 150:9
**Holly** [3] - 127:7, 128:2, 128:9
**home** [5] - 44:11, 83:3, 154:14, 154:20, 157:17
**honest** [1] - 90:17
**honesty** [1] - 90:24
**Honor** [85] - 3:4, 3:13, 4:5, 4:18, 9:14, 9:19, 13:14, 24:18, 25:6, 25:8, 50:12, 50:25, 51:5, 61:10, 61:17, 70:21, 79:23, 83:16, 86:9, 87:25, 88:5, 103:14, 103:16, 103:18, 103:20, 103:23, 104:3, 104:7, 104:11, 104:16, 104:20, 105:11, 105:21, 106:2, 106:25, 107:4, 107:24, 110:5, 111:13, 111:18, 111:21, 113:3, 113:13, 114:3, 114:15, 114:25,

115:25, 116:5, 118:16, 123:1, 123:2, 143:15, 143:17, 145:25, 146:10, 147:7, 147:9, 147:17, 147:19, 148:6, 154:24, 155:17, 163:12, 163:16, 163:18, 163:19, 163:23, 164:10, 164:15, 165:13, 165:22, 165:24, 166:17, 167:19, 168:1, 169:22, 170:7, 170:15, 170:20, 171:3, 171:16, 171:19, 171:22, 172:3, 172:11
**HONORABLE** [1] - 1:11
**hooked** [2] - 156:22, 156:25
**hope** [3] - 4:3, 168:23, 168:25
**Hope** [3] - 60:3, 67:2, 129:18
**hoped** [1] - 165:3
**hopefully** [1] - 149:23
**hoping** [1] - 164:18
**Hopkins** [1] - 74:6
**Hospital** [1] - 6:11
**hospital** [2] - 76:22, 76:23
**hot** [1] - 96:5
**hotel** [2] - 130:25, 131:4
**hour** [4] - 87:16, 87:21, 103:3, 151:20
**hourly** [1] - 103:3
**hours** [13] - 49:17, 118:12, 124:15, 125:20, 128:15, 131:2, 134:10, 151:19, 158:15, 158:16, 158:17, 158:19
**house** [3] - 125:13, 131:12, 133:3
**housekeeping** [1] - 113:14
**Hubbard** [2] - 75:9, 76:12
**Hubbard's** [1] - 77:23
**huge** [1] - 38:1
**hundreds** [2] - 37:23, 105:14
**hurry** [1] - 121:18
**hurt** [4] - 37:22,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 283-

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 182 of 195   Pageid#: 10308

58:19, 122:25, 144:9
**hurting** [1] - 133:21
**hurts** [1] - 39:12
**husband** [2] -
128:17, 131:11
**husband's** [1] -
131:15
**hydrocodone** [3] -
52:6, 60:11, 67:7
**Hydromorphone** [1]
- 78:1
**hypotheses** [1] -
86:10

**I**

**ICD** [1] - 34:20
**ICD-9** [1] - 92:6
**idea** [3] - 102:19,
136:21, 138:6
**identify** [1] - 82:2
**II** [15] - 12:11, 13:1,
13:6, 28:10, 38:21,
40:11, 43:18, 56:19,
84:3, 105:23, 106:13,
106:24, 108:13,
162:7, 162:8
**III** [2] - 38:15, 59:6
**IIs** [1] - 28:11
**illegal** [3] - 29:14,
81:13, 165:18
**illegally** [1] - 127:1
**illicit** [2] - 40:6, 115:5
**imagine** [2] - 49:18,
86:23
**impact** [1] - 102:16
**implies** [2] - 13:9,
46:14
**importance** [3] -
11:16, 12:17, 46:21
**important** [10] -
10:14, 11:20, 12:6,
12:12, 12:14, 36:21,
37:8, 50:13, 90:24,
97:25
**impossible** [1] -
102:22
**impression** [3] -
11:1, 57:13, 57:20
**improper** [2] - 8:11,
9:5
**improve** [3] - 38:5,
96:23, 97:1
**improvement** [1] -
97:2
**IN** [1] - 1:2
**in-depth** [1] - 10:3
**inadvertently** [1] -
4:7
**Inc** [1] - 15:7

**incident** [1] - 137:11
**incisional** [1] - 140:4
**include** [1] - 106:8
**includes** [1] - 48:10
**including** [3] - 29:5,
83:13, 93:23
**income** [4] - 131:8,
131:10, 131:11,
131:15
**inconsistency** [1] -
72:20
**inconsistent** [2] -
36:3, 75:15
**increase** [3] - 36:8,
36:10, 55:14
**increased** [3] -
31:22, 54:16, 54:17
**increases** [2] - 55:6,
55:10
**indeed** [2] - 43:9,
77:17
**INDEX** [1] - 2:1
**indicate** [10] - 21:14,
25:1, 40:8, 41:20,
44:6, 54:9, 64:18,
70:11, 74:2, 169:11
**indicated** [10] - 25:2,
28:25, 89:17, 99:17,
101:14, 115:3,
164:17, 164:22,
164:24, 167:20
**indicates** [15] -
18:15, 19:24, 26:25,
40:21, 43:7, 48:12,
52:5, 70:12, 75:22,
75:25, 80:3, 81:12,
81:16, 84:11, 169:23
**indicating** [3] -
34:17, 85:2, 100:21
**indicating)** [1] -
34:12
**indication** [2] -
67:19, 67:21
**indictment** [3] -
13:22, 107:2, 112:23
**individual** [3] - 8:16,
27:12, 105:12
**individually** [1] -
13:19
**Indivior** [1] - 3:8
**inference** [2] - 108:7,
108:9
**information** [11] -
11:8, 11:19, 29:6,
32:16, 60:20, 90:2,
99:7, 100:9, 100:15,
101:19, 167:6
**ingredient** [1] -
22:25
**inherently** [1] - 93:5

**initial** [5] - 3:7,
24:14, 95:20, 95:22,
117:25
**Initial** [4] - 26:22,
39:2, 91:17, 95:21
**initialling** [1] - 24:3
**initials** [1] - 85:24
**injection** [2] - 80:21,
80:25
**injections** [1] - 10:12
**injured** [4] - 119:3,
150:5, 150:7, 150:14
**injuries** [4] - 89:18,
93:1, 149:25, 150:2
**injury** [1] - 89:7
**ink** [1] - 27:14
**inquire** [1] - 169:20
**instance** [2] - 22:16,
94:2
**instead** [6] - 44:16,
63:4, 82:4, 93:18,
124:4, 160:23
**instituted** [1] - 98:20
**instructed** [1] -
28:24
**Instruction** [6] -
168:24, 169:1, 169:8,
169:9, 170:20, 170:21
**instruction** [10] -
106:8, 110:8, 165:17,
169:3, 169:5, 169:7,
169:8, 169:23, 170:3,
172:20
**instructions** [10] -
26:16, 87:17, 168:11,
168:20, 168:21,
169:21, 171:5, 171:7,
172:2, 172:16
**insufficient** [3] -
17:21, 27:11, 49:3
**insurance** [25] -
12:5, 20:25, 21:5,
89:25, 90:1, 90:9,
92:24, 130:18,
130:21, 130:22,
132:16, 133:2, 133:3,
145:12, 145:14,
160:1, 160:3, 160:5,
160:8, 160:9, 160:10,
160:13, 162:22
**insurances** [1] - 90:3
**Intake** [4] - 14:12,
16:11, 67:16, 101:9
**intend** [2] - 50:12,
172:2
**intended** [4] - 28:23,
50:14, 50:16, 115:3
**intent** [16] - 70:17,
77:19, 80:5, 84:18,
85:6, 102:15, 104:22,

105:17, 107:22,
108:10, 110:2,
110:19, 111:7,
111:25, 169:24,
171:12
**intentions** [1] - 41:12
**interesting** [1] -
52:15
**international** [1] -
89:2
**internship** [1] - 6:9
**interpret** [1] - 44:12
**interpreted** [2] -
58:10, 99:8
**interviewed** [1] -
114:10
**intravenous** [1] -
80:20
**intravenously** [2] -
80:24, 81:2
**introduce** [8] - 4:6,
4:8, 4:11, 4:14, 5:15,
106:3, 106:6
**introduced** [3] -
61:5, 61:15, 103:25
**Inventories** [2] -
64:11, 73:20
**Inventory** [7] - 17:8,
23:25, 30:10, 31:6,
35:1, 66:12, 95:19
**inventory** [4] - 19:21,
20:3, 24:4, 30:15
**involved** [7] - 7:24,
8:17, 9:5, 150:3,
154:8, 166:8, 169:13
**involves** [1] - 104:22
**involving** [1] - 8:11
**IR** [4] - 41:5, 66:4,
75:13
**isolation** [1] - 58:21
**issue** [4] - 35:17,
81:19, 114:12, 171:4
**issued** [10] - 10:21,
34:3, 47:1, 48:6,
48:23, 49:24, 58:20,
66:7, 78:15, 86:21,
87:10
**issues** [2] - 77:5,
172:16
**item** [1] - 99:7
**itself** [3] - 39:14,
58:21, 151:16
**IV** [1] - 80:20

**J**

**JAMES** [1] - 1:11
**Janet** [1] - 59:13
**January** [7] - 66:10,
68:15, 68:16, 82:16,

82:17, 138:4
**Jason** [2] - 54:5,
54:6
**JB-119** [1] - 55:18
**JDO** [1] - 18:6
**Jerry** [2] - 2:14, 4:10
**Jessie** [2] - 79:10,
101:11
**Jessie's** [2] - 101:16,
102:7
**Jewell** [2] - 79:25,
80:3
**JHa-9** [1] - 71:12
**JMay** [1] - 4:9
**JMay-3** [2] - 2:14,
4:20
**job** [2] - 121:22,
159:20
**Joel** [2] - 2:14, 18:7
**JOEL** [1] - 1:8
**John** [1] - 71:11
**joint** [1] - 119:13
**JONES** [1] - 1:11
**Jr** [1] - 1:22
**Judge** [2] - 114:8,
164:7
**judge** [4] - 71:7,
98:6, 99:4, 99:6
**JUDGE** [1] - 1:11
**judgment** [9] - 77:6,
77:14, 100:13,
104:21, 105:7,
112:16, 112:21,
113:10
**Juhan** [2] - 1:19,
171:11
**July** [16] - 14:16,
15:2, 41:21, 44:3,
45:17, 52:15, 52:24,
56:3, 59:8, 70:20,
82:23, 82:25, 140:7,
140:12, 161:3
**June** [12] - 19:14,
32:3, 32:22, 33:19,
56:2, 56:8, 62:14,
68:20, 72:19, 76:23,
82:20
**JUNIOR** [2] - 2:9,
148:7
**Junior** [1] - 148:13
**JURY** [1] - 1:11
**jury** [51] - 3:24, 3:25,
4:1, 5:15, 11:1, 13:20,
36:17, 50:8, 50:24,
51:1, 51:3, 63:23,
78:9, 80:18, 87:18,
87:24, 88:1, 88:2,
104:9, 104:13,
104:14, 106:8,
107:12, 107:19,

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 638-7421

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 183 of 195   Pageid#:
10309

110:14, 112:18, 115:18, 115:20, 117:3, 119:8, 127:20, 132:10, 133:13, 134:17, 142:1, 142:3, 142:7, 146:13, 146:18, 146:22, 146:23, 149:15, 164:4, 167:14, 167:15, 167:23, 168:2, 168:3, 168:18, 169:21

**justification** [4] - 36:8, 58:12, 58:19, 58:22

**justify** [7] - 27:7, 27:11, 27:16, 36:6, 57:1, 83:10, 83:13

## K

**keep** [14] - 11:14, 11:15, 12:12, 19:19, 25:11, 30:13, 32:19, 35:3, 43:18, 47:24, 49:7, 52:1, 122:6, 150:6

**keeping** [1] - 12:17
**Kentucky** [1] - 65:9
**kept** [5] - 45:3, 45:25, 139:6, 160:22, 160:23

**Kessinger** [1] - 127:18

**ketamine** [3] - 126:10, 126:12, 126:13

**key** [4] - 96:19, 97:23, 111:22, 111:24

**Kicklighter** [1] - 80:12

**kidnapped** [1] - 141:21

**kidney** [7] - 79:14, 79:18, 79:19, 101:19, 101:23, 102:6, 102:7

**kids** [1] - 129:11

**kind** [24] - 11:1, 22:22, 36:13, 44:15, 44:19, 44:21, 66:18, 68:22, 70:16, 77:9, 77:18, 89:8, 97:15, 112:2, 135:19, 150:2, 152:4, 152:20, 154:22, 155:2, 164:24, 165:20, 166:21

**kinds** [4] - 8:21, 108:4, 112:4, 160:17

**knee** [5] - 119:11, 119:12, 149:21,

149:22, 152:9

**knowing** [1] - 81:22
**knowledge** [7] - 40:8, 78:19, 114:10, 115:12, 126:20, 127:10, 154:25

**knowledgeable** [1] - 151:9

**known** [3] - 26:19, 61:16, 148:22

## L

**lab** [6] - 29:2, 42:2, 42:14, 60:3, 63:12, 76:6

**lack** [2] - 11:4, 11:8
**lacked** [1] - 111:12
**ladies** [10] - 3:2, 4:2, 50:6, 71:6, 87:14, 104:12, 115:21, 155:19, 164:1, 168:4

**lady** [4] - 113:16, 113:17, 146:24, 166:23

**language** [3] - 90:15, 91:5, 171:24

**Larry** [9] - 125:14, 126:2, 128:21, 131:5, 140:19, 141:5, 144:17, 145:10, 146:8

**Larry's** [2] - 147:2, 147:4

**last** [24] - 24:6, 24:23, 29:18, 29:21, 43:2, 64:24, 70:23, 77:7, 77:15, 77:21, 78:10, 117:5, 122:1, 122:8, 130:6, 131:13, 137:6, 139:17, 148:14, 156:10, 156:11, 165:2, 166:19

**Last** [1] - 68:24
**late** [1] - 68:16
**latest** [1] - 76:10
**Law** [1] - 1:23
**law** [8] - 106:8, 106:10, 107:16, 141:19, 168:20, 169:18, 169:25, 170:24

**lawfully** [1] - 109:5
**lay** [1] - 123:23
**laying** [2] - 146:8, 153:11

**lays** [1] - 121:5
**leads** [1] - 14:4
**least** [16] - 7:2, 28:10, 43:9, 63:5, 73:2, 106:22, 107:18,

112:7, 113:23, 125:20, 132:25, 133:14, 134:6, 138:13, 151:20, 158:17

**leave** [1] - 136:9
**lectern** [4] - 104:18, 116:9, 116:10, 116:11

**LEE** [13] - 2:7, 2:8, 118:16, 123:5, 124:18, 124:23, 139:13, 143:15, 145:25, 146:2, 146:10, 146:11, 147:7

**Lee** [2] - 1:19, 4:12
**Left** [1] - 69:5
**left** [9] - 44:11, 44:16, 69:7, 69:8, 75:8, 80:17, 113:21, 139:21, 149:22

**leg** [1] - 31:22
**legitimate** [24] - 10:22, 14:5, 25:2, 34:5, 37:5, 41:7, 44:23, 48:23, 49:25, 51:19, 53:12, 53:16, 60:25, 61:8, 86:21, 87:11, 105:19, 108:1, 108:5, 110:3, 110:16, 110:21, 170:22, 172:9

**legs** [4] - 69:8, 69:20, 119:20, 119:22

**length** [1] - 169:7
**leniency** [1] - 169:1
**LENNIE** [2] - 2:9, 148:7

**Lennie** [3] - 115:3, 147:17, 148:13

**Lenore** [1] - 49:11
**Leon** [2] - 117:8, 124:14, 125:1

**less** [1] - 97:13
**letter** [2] - 19:13, 32:3

**letting** [2] - 77:6, 77:14

**level** [4] - 36:7, 57:14, 58:13, 89:7

**license** [7] - 8:16, 19:11, 65:8, 105:23, 106:13, 106:14, 108:18

**licensed** [1] - 107:6
**lieu** [1] - 93:16
**life** [8] - 46:21, 96:25, 97:1, 140:9, 144:14, 153:5, 153:10, 153:12

**lift** [1] - 96:24
**limit** [1] - 91:10
**limited** [1] - 79:19

**line** [5] - 20:21, 21:6, 44:9, 92:3, 146:20

**lines** [2] - 49:17, 142:10

**list** [3] - 34:19, 120:3, 151:13

**listed** [7] - 29:8, 67:8, 91:25, 95:25, 96:3, 96:6, 96:11

**listen** [2] - 151:25, 168:14

**listened** [1] - 152:6
**lists** [1] - 85:24
**live** [14] - 5:24, 5:25, 12:1, 96:20, 117:7, 124:10, 124:12, 124:14, 125:7, 148:16, 154:13, 157:7, 157:11, 157:16

**lived** [5] - 124:14, 125:14, 148:18, 154:10, 154:11

**lives** [1] - 164:16
**living** [1] - 153:4
**LK** [1] - 81:10
**LK-5** [1] - 80:13
**loan** [1] - 129:11
**loaned** [4] - 140:21, 140:24, 146:5, 146:21

**loaning** [2] - 141:11, 142:21

**local** [1] - 159:3
**locally** [1] - 145:8
**locate** [1] - 19:22
**locater** [1] - 19:17
**logical** [1] - 14:4
**long-term** [5] - 30:4, 39:16, 65:19, 93:15, 93:21

**look** [26] - 25:15, 29:12, 41:17, 41:18, 41:23, 42:23, 52:21, 57:3, 57:12, 62:12, 66:11, 66:18, 67:16, 69:16, 70:9, 76:7, 77:23, 78:7, 78:8, 84:6, 91:13, 101:4, 119:21, 170:16, 172:21

**looked** [8] - 26:4, 26:6, 57:25, 67:20, 67:21, 80:23, 95:10, 101:17

**looking** [10] - 36:5, 37:14, 53:4, 56:23, 58:4, 63:11, 76:9, 78:11, 87:3, 133:10

**looks** [8] - 18:22, 20:4, 21:4, 27:15, 31:15, 68:22, 94:11,

97:24

**loose** [1] - 140:4
**Lora** [1] - 80:12
**Lortabs** [1] - 150:23
**lost** [3] - 77:15, 77:16, 159:19

**loud** [1] - 142:11
**low** [6] - 69:4, 69:8, 69:18, 69:20, 70:1, 150:11

**lower** [2] - 101:23, 149:20

**Lubbock** [1] - 6:13
**luck** [1] - 156:10
**lunch** [2] - 113:21, 170:8

**luncheon** [2] - 87:15, 87:20

**lungs** [1] - 152:6

## M

**ma'am** [7] - 116:19, 124:24, 139:10, 139:14, 146:12, 147:15, 148:3

**Madam** [1] - 104:1
**mail** [3] - 33:19, 170:10, 172:19

**mailed** [1] - 86:19
**mailing** [1] - 32:22
**main** [1] - 40:14
**Main** [1] - 1:20
**maintain** [2] - 7:4, 165:16

**maintained** [1] - 12:7
**maintaining** [1] - 113:8

**Maintenance** [1] - 74:8

**man** [2] - 65:15, 158:23

**manage** [1] - 45:1
**Management** [1] - 101:9

**management** [8] - 6:18, 6:20, 7:9, 7:20, 9:22, 16:11, 71:2, 149:12

**Manassas** [2] - 5:25, 9:7

**manipulated** [1] - 98:25

**manner** [1] - 109:13
**manufacturer** [2] - 108:23, 109:11

**map** [1] - 125:8
**March** [7] - 32:25, 34:14, 43:1, 43:2, 48:17, 68:20, 82:17

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 236-

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 184 of 195   Pageid#: 10310

**mark** [1] - 169:16
**marked** [3] - 27:15,
103:24, 146:17
**MARKED** [1] - 2:12
**markings** [1] - 80:19
**marks** [5] - 24:24,
39:17, 80:16, 80:18,
81:23
**Martinsville** [2] -
124:15, 125:7
**mask** [1] - 38:4
**match** [1] - 27:4
**math** [1] - 23:3
**matter** [6] - 56:17,
113:13, 113:14,
115:2, 118:21, 161:8
**matters** [1] - 99:12
**MAY** [2] - 1:12, 4:9
**Maynard** [2] - 2:14,
4:10
**mean** [42] - 12:25,
20:7, 31:23, 39:6,
42:8, 49:16, 51:16,
55:11, 56:18, 56:24,
61:15, 65:13, 66:20,
69:10, 70:5, 72:20,
99:11, 105:25,
106:18, 106:20,
107:15, 108:2, 108:6,
109:22, 110:11,
111:9, 115:9, 119:3,
122:4, 122:11,
129:10, 131:13,
135:1, 135:5, 139:5,
141:9, 144:13,
154:17, 166:15,
167:6, 167:10, 172:13
**meaning** [4] - 42:17,
46:14, 63:4, 66:21
**means** [15] - 8:18,
20:24, 21:6, 24:13,
24:14, 35:18, 42:9,
44:9, 44:14, 73:1,
76:17, 86:5, 89:8,
96:7, 108:23
**meanwhile** [1] - 45:7
**measured** [1] - 97:2
**mechanism** [1] -
109:12
**medical** [53] - 6:1,
6:3, 6:5, 6:8, 10:23,
11:5, 11:9, 11:16,
11:25, 12:1, 12:20,
14:5, 15:24, 20:12,
20:19, 25:2, 27:22,
28:23, 29:1, 29:4,
29:5, 34:5, 36:16,
49:18, 49:25, 51:19,
53:12, 53:16, 60:25,
61:8, 74:2, 77:20,

86:22, 86:23, 87:11,
90:25, 98:9, 99:9,
99:13, 105:18, 108:1,
110:3, 110:15,
110:21, 110:22,
135:2, 135:19,
150:18, 151:3,
169:23, 170:1,
170:22, 170:23
**Medical** [1] - 6:12
**medically** [1] - 66:22
**medication** [42] -
22:12, 28:15, 30:22,
36:1, 36:7, 43:8,
43:16, 44:17, 46:16,
46:19, 47:12, 63:3,
64:3, 66:4, 67:8, 73:1,
73:2, 73:11, 75:16,
90:14, 90:16, 91:5,
93:16, 93:25, 99:17,
106:23, 120:13,
122:5, 123:16,
123:22, 123:22,
132:4, 140:24,
141:12, 142:20,
143:21, 144:18,
145:1, 146:16,
146:22, 152:20,
153:10
**medication's** [1] -
43:15
**medications** [37] -
10:9, 10:11, 12:16,
12:23, 13:11, 22:5,
22:14, 36:16, 37:3,
43:10, 43:13, 44:16,
45:1, 45:2, 45:3, 45:5,
48:3, 49:3, 55:6,
55:20, 67:6, 68:11,
71:18, 73:7, 77:19,
78:21, 81:7, 82:5,
93:17, 125:17,
128:12, 134:20,
137:25, 139:3, 145:21
**Medicine** [4] - 7:25,
8:4, 8:9, 8:11
**medicine** [25] - 6:12,
6:14, 6:19, 6:21, 6:25,
7:3, 7:8, 9:16, 12:8,
14:3, 36:18, 36:23,
37:1, 37:11, 37:16,
87:1, 109:6, 109:7,
119:12, 119:13,
122:8, 137:9, 151:11,
151:14, 151:16
**medicines** [1] -
121:2
**meds** [2] - 39:25,
72:20
**member** [1] - 8:18

**members** [1] -
149:15
**memorialize** [1] -
11:17
**memorialized** [1] -
93:10
**memory** [1] - 132:4
**mental** [1] - 29:7
**mentioned** [4] -
136:18, 155:15,
162:25, 166:18
**mess** [1] - 150:10
**message** [2] - 85:20,
113:22
**messages** [3] - 2:14,
4:12, 113:22
**messed** [1] - 149:19
**messing** [1] - 132:3
**met** [1] - 104:25
**metabolites** [1] -
76:20
**methadone** [3] -
30:23, 68:2, 68:5
**methods** [1] - 98:14
**microphone** [3] -
5:18, 116:10, 116:11
**midback** [1] - 54:18
**might** [6] - 24:17,
24:18, 53:5, 81:25,
90:8, 97:13
**migraines** [1] -
126:18
**Mike's** [7] - 132:21,
133:6, 133:14,
145:10, 160:7,
162:17, 162:18
**Mild** [1] - 57:13
**miles** [1] - 157:19
**military** [2] - 130:22,
131:11
**milli** [1] - 22:14
**milli-equivalents** [1]
- 22:14
**milligram** [3] - 22:2,
22:6, 22:8
**milligrams** [33] -
20:24, 21:12, 21:13,
21:20, 22:6, 22:20,
22:24, 22:25, 23:1,
23:13, 23:14, 23:15,
25:17, 25:18, 26:3,
35:19, 37:23, 55:3,
55:4, 55:5, 55:10,
55:13, 55:15, 68:12,
68:13, 82:7, 82:9,
120:15, 124:4, 124:5,
139:15
**Millwood** [1] -
125:15
**mind** [4] - 16:2,

63:20, 73:6, 102:20
**mine** [6] - 147:2,
150:4, 150:12,
150:14, 162:12,
162:14
**mining** [2] - 150:3,
150:5
**minor** [1] - 169:15
**minute** [4] - 18:3,
49:8, 91:13, 151:2
**Miss** [1] - 146:4
**misuse** [1] - 70:17
**mixed** [1] - 112:3
**moderate** [2] - 35:17,
76:25
**mom** [3] - 44:9,
44:11, 44:15
**moment** [6] - 103:14,
110:5, 123:1, 146:10,
163:12, 168:19
**MONDAY** [1] - 1:12
**money** [14] - 61:5,
61:20, 89:20, 92:21,
129:11, 131:6,
140:21, 140:22,
141:14, 142:15,
142:16, 143:11,
143:13, 159:18
**monitored** [1] -
12:22
**month** [18] - 8:23,
8:25, 35:18, 35:25,
42:16, 42:17, 47:5,
54:16, 62:14, 64:23,
69:2, 69:15, 73:16,
78:3, 131:22, 161:2,
167:8
**month's** [1] - 43:15
**monthly** [2] - 131:10,
131:15
**months** [8] - 31:2,
75:14, 75:19, 76:2,
76:7, 85:11, 120:8
**Moore** [4] - 113:17,
164:16, 166:25, 167:2
**morning** [4] - 3:2,
4:2, 5:21, 168:11
**morphine** [10] - 22:6,
22:8, 22:11, 22:15,
25:22, 37:23, 52:13,
55:3, 67:15, 162:5
**morphone** [1] -
162:5
**most** [7] - 9:5, 17:15,
27:4, 77:4, 118:3,
125:13, 129:13
**mother** [7] - 119:18,
140:23, 140:24,
141:23, 142:19,
142:20, 142:21

**motion** [6] - 3:22,
104:21, 105:6,
112:15, 112:21,
113:10
**Mountain** [1] - 32:6
**move** [18] - 4:6, 4:10,
4:14, 12:3, 14:23,
18:1, 19:16, 25:6,
30:21, 35:7, 51:6,
54:5, 79:23, 83:5,
104:17, 105:6, 106:3,
106:6
**moved** [1] - 76:24
**moving** [5] - 30:13,
97:18, 144:5, 160:22,
160:23
**MR** [374] - 2:3, 2:4,
2:7, 2:7, 2:8, 2:8, 2:9,
2:10, 3:4, 3:7, 3:11,
3:13, 4:5, 4:18, 4:23,
5:11, 5:23, 7:18, 9:14,
9:19, 9:21, 13:14,
13:17, 14:14, 14:21,
15:1, 15:6, 15:12,
15:16, 15:25, 16:5,
16:9, 16:10, 16:20,
16:22, 17:4, 17:9,
17:23, 18:4, 18:10,
18:14, 18:19, 18:20,
18:24, 19:8, 19:11,
19:12, 19:16, 20:5,
20:14, 20:17, 21:7,
21:11, 21:16, 21:23,
22:1, 23:6, 23:7,
23:22, 24:7, 24:18,
24:21, 25:6, 25:11,
25:14, 26:13, 26:19,
26:21, 27:25, 28:7,
28:12, 28:19, 29:9,
29:22, 29:23, 30:2,
30:3, 30:9, 30:13,
30:24, 31:5, 31:10,
31:14, 31:25, 32:15,
32:20, 32:24, 33:13,
33:17, 33:24, 34:8,
34:16, 34:25, 35:12,
35:14, 38:8, 38:14,
38:17, 38:20, 38:24,
39:1, 39:15, 39:19,
39:22, 39:24, 40:3,
40:4, 40:18, 40:20,
41:2, 41:3, 41:13,
41:16, 41:24, 42:1,
42:11, 42:13, 43:20,
43:22, 45:14, 45:23,
46:5, 46:7, 47:20,
48:2, 48:14, 48:15,
48:20, 48:21, 49:6,
49:10, 49:20, 49:22,
50:12, 50:19, 50:25,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 368-6145
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 185 of 195   Pageid#:
10311

51:5, 51:8, 51:22, 52:4, 53:2, 53:6, 54:5, 54:8, 55:18, 55:19, 56:13, 56:16, 57:16, 57:18, 58:14, 58:17, 58:23, 58:24, 59:13, 59:17, 59:23, 60:7, 60:16, 60:22, 61:10, 61:17, 61:18, 62:9, 62:11, 63:6, 63:10, 63:15, 63:24, 64:7, 64:17, 64:21, 65:1, 65:4, 65:7, 65:17, 65:18, 66:1, 66:3, 66:13, 66:14, 66:23, 67:1, 67:16, 67:18, 67:23, 68:1, 68:17, 68:19, 70:19, 70:21, 70:23, 71:4, 71:11, 71:17, 71:23, 71:24, 72:3, 72:9, 72:17, 72:18, 73:8, 73:10, 73:13, 73:15, 73:18, 74:1, 74:5, 74:7, 74:11, 74:12, 74:17, 74:19, 75:9, 75:21, 76:12, 76:16, 78:22, 78:23, 79:9, 79:13, 79:23, 80:2, 80:12, 80:15, 81:10, 81:11, 82:12, 82:14, 83:16, 83:18, 84:6, 84:10, 84:16, 84:17, 84:21, 85:1, 85:15, 85:18, 86:2, 86:3, 86:9, 86:13, 86:15, 87:6, 87:7, 87:13, 87:25, 88:5, 88:7, 92:12, 92:13, 94:4, 94:6, 98:17, 98:18, 98:19, 103:14, 103:18, 103:20, 103:23, 104:3, 104:7, 104:11, 104:16, 104:19, 105:11, 105:20, 106:1, 106:6, 106:12, 106:18, 106:24, 107:4, 107:24, 108:9, 108:13, 108:15, 108:17, 108:22, 109:2, 109:8, 109:16, 109:20, 110:5, 110:18, 110:24, 111:2, 111:13, 111:18, 111:21, 113:3, 113:13, 114:3, 114:8, 114:15, 114:20, 114:24, 114:25, 115:2, 115:9, 115:14, 115:17, 115:25, 116:3, 116:5,

117:2, 118:16, 118:22, 123:1, 123:5, 124:18, 124:23, 139:13, 143:15, 143:17, 143:19, 145:23, 145:25, 146:2, 146:10, 146:11, 147:7, 147:9, 147:17, 148:6, 148:11, 151:6, 152:3, 154:18, 154:24, 155:5, 155:10, 155:17, 155:24, 156:2, 156:4, 156:16, 156:18, 163:12, 163:14, 163:16, 163:18, 163:19, 163:23, 164:6, 164:10, 164:15, 165:2, 165:8, 165:10, 165:13, 165:24, 166:5, 166:12, 166:17, 166:25, 167:2, 167:18, 168:1, 169:22, 170:7, 170:15, 170:18, 170:20, 171:3, 171:7, 171:9, 171:16, 171:19, 171:22, 172:3, 172:6, 172:11
   **MRI** [10] - 56:15, 56:18, 56:21, 56:22, 57:12, 57:24, 58:5, 58:8, 68:24, 95:5
   **MRIs** [7] - 57:22, 58:2, 83:7, 83:13, 89:14, 150:17, 150:20
   **MS** [10] - 21:19, 24:11, 25:17, 25:22, 26:2, 26:8, 28:17, 34:1, 67:14, 109:24
   **multi** [1] - 57:14
   **multi-level** [1] - 57:14
   **must** [2] - 74:20, 170:8

**N**

   **name** [17] - 5:16, 5:21, 7:15, 91:19, 91:21, 101:10, 101:11, 107:13, 109:9, 113:17, 117:3, 117:5, 125:19, 148:12, 148:14, 158:23, 166:23
   **names** [3] - 165:25, 166:4, 166:5
   **narcotic** [9] - 12:15, 13:11, 22:5, 22:12,

28:15, 36:1, 44:25, 70:18, 81:6
   **narcotics** [20] - 13:1, 21:22, 22:7, 27:12, 28:18, 38:1, 38:5, 38:15, 38:21, 58:13, 58:22, 65:16, 70:8, 70:13, 72:23, 79:21, 80:5, 80:7, 80:21, 85:10
   **nature** [3] - 13:9, 94:24, 97:17
   **nausea** [1] - 24:12
   **near** [2] - 125:2, 125:4
   **necessarily** [2] - 56:20, 165:19
   **necessary** [3] - 27:22, 95:6, 95:7
   **necessity** [1] - 12:20
   **neck** [5] - 27:17, 54:18, 149:19, 150:10, 150:20
   **need** [15] - 5:13, 12:4, 37:11, 37:12, 63:19, 81:5, 87:20, 95:11, 95:13, 97:10, 104:9, 138:22, 167:10, 167:25, 172:22
   **needed** [5] - 20:10, 46:17, 47:18, 111:12, 139:2
   **needing** [1] - 164:25
   **needs** [9] - 8:15, 30:20, 31:21, 36:1, 47:19, 99:8, 100:14, 110:24, 119:11
   **negative** [21] - 42:15, 43:5, 45:25, 46:2, 46:9, 46:14, 46:15, 46:16, 46:21, 48:12, 52:13, 56:8, 62:16, 62:23, 63:25, 64:2, 71:25, 72:20, 72:21, 102:16
   **Neil** [2] - 79:25, 80:3
   **nephew** [2] - 140:22, 142:24
   **neurologist** [1] - 69:7
   **Neurontin** [2] - 26:19, 55:21
   **never** [5] - 100:6, 103:10, 124:3, 136:6, 136:11
   **New** [6] - 6:11, 16:11, 32:12, 67:16, 101:8
   **new** [4] - 69:2, 69:15,

168:21, 169:3
   **news** [1] - 168:14
   **next** [65] - 3:7, 4:4, 16:9, 16:20, 17:4, 20:14, 21:7, 25:21, 26:7, 29:22, 30:2, 30:9, 31:5, 31:12, 31:13, 31:25, 32:2, 33:2, 33:3, 33:4, 33:5, 33:12, 33:17, 34:8, 38:17, 39:15, 41:2, 41:14, 42:16, 42:17, 45:19, 45:20, 46:13, 48:20, 51:22, 51:24, 51:25, 52:7, 57:16, 57:17, 60:5, 62:21, 63:20, 63:21, 64:23, 72:3, 72:4, 72:5, 73:16, 73:22, 73:23, 73:24, 75:24, 76:10, 84:8, 84:21, 84:22, 86:13, 94:12, 116:9, 122:9, 147:16, 169:8
   **Next** [1] - 26:13
   **night** [4] - 24:23, 154:16, 165:2, 166:19
   **NJ-15** [1] - 79:25
   **nobody** [2] - 58:3, 58:4
   **non** [7] - 28:8, 36:16, 40:5, 70:10, 70:12, 108:14, 108:15
   **non-controlled** [5] - 28:8, 70:10, 70:12, 108:14, 108:15
   **non-medical** [1] - 36:16
   **non-RXD** [1] - 40:5
   **none** [4] - 73:1, 160:17, 160:18, 172:3
   **normal** [2] - 58:10, 153:4
   **normally** [2] - 11:8, 11:12
   **noroxycodone** [1] - 42:7
   **North** [1] - 6:10
   **nortriptyline** [1] - 26:16
   **notation** [4] - 47:17, 68:24, 69:5, 77:10
   **note** [16] - 33:20, 41:4, 46:13, 52:15, 67:10, 69:2, 69:7, 72:7, 73:13, 76:4, 77:9, 78:5, 78:24, 79:11, 101:15, 101:19
   **noted** [1] - 56:8
   **notes** [3] - 32:1, 44:6, 101:18

**nothing** [14] - 5:4, 26:14, 30:8, 39:21, 50:20, 56:21, 56:24, 65:22, 69:23, 70:2, 102:13, 116:17, 141:9, 148:2
   **notice** [3] - 2:15, 13:5, 49:12
   **notified** [1] - 29:3
   **November** [23] - 18:8, 18:16, 18:18, 40:1, 45:17, 45:18, 46:1, 54:22, 55:1, 59:9, 62:22, 66:7, 66:8, 68:15, 77:24, 80:11, 81:9, 81:12, 81:16, 81:19, 117:15, 138:4, 140:3
   **number** [4] - 33:21, 46:19, 60:19, 122:17
   **Number** [3] - 68:23, 69:4, 74:18
   **numbers** [3] - 91:25, 92:5, 132:5
   **numbness** [1] - 69:8
   **numerous** [1] - 134:10
   **nurse** [2] - 26:25, 27:14
   **nutrition** [1] - 107:10
   **nutritional** [1] - 109:21

**O**

   **object** [4] - 13:14, 61:10, 70:23, 86:9
   **objection** [12] - 9:18, 13:16, 61:12, 71:1, 86:11, 98:17, 118:16, 118:19, 154:24, 155:17, 170:19, 172:7
   **objections** [2] - 169:21, 172:6
   **objective** [1] - 83:12
   **observe** [2] - 97:18, 98:2
   **obtain** [1] - 74:20
   **obtained** [2] - 109:6
   **obviously** [4] - 102:6, 115:13, 162:25, 167:7
   **OC** [3] - 41:5, 66:4, 75:13
   **OC-IR** [3] - 41:5, 66:4, 75:13
   **occasion** [3] - 106:22, 138:7, 138:13
   **occasions** [2] - 132:25, 135:18

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 398-

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 186 of 195   Pageid#: 10312

13

occurred [1] - 137:11

**October** [20] - 20:3, 21:17, 22:16, 24:2, 24:5, 26:1, 30:6, 33:12, 39:18, 42:18, 42:23, 52:12, 52:22, 55:9, 68:9, 68:10, 68:15, 74:13, 80:11, 149:5

**OF** [4] - 1:3, 1:5, 1:11, 2:13

offer [3] - 53:20, 53:21, 172:2

offered [1] - 92:18

office [12] - 61:6, 61:21, 106:22, 109:7, 120:23, 121:20, 130:14, 131:4, 132:11, 140:10, 158:7, 159:12

**Office** [3] - 1:20, 1:23, 126:23

offices [1] - 12:5

often [8] - 10:12, 12:2, 34:20, 45:13, 92:19, 92:25, 99:13, 134:14

old [5] - 52:6, 52:18, 65:10, 143:1, 143:5

**ON** [1] - 2:13

once [7] - 133:9, 134:1, 134:18, 137:5, 138:10, 166:1

one [90] - 3:4, 10:9, 11:14, 13:10, 15:4, 19:22, 20:3, 20:9, 26:6, 26:7, 28:15, 30:10, 31:6, 33:11, 33:12, 34:22, 39:23, 40:14, 40:21, 43:23, 45:21, 47:7, 47:25, 48:1, 48:9, 49:9, 57:19, 59:16, 63:3, 64:11, 66:16, 73:20, 73:21, 74:20, 75:4, 75:17, 78:6, 83:16, 84:23, 85:20, 87:9, 87:16, 87:21, 91:17, 94:9, 95:17, 95:22, 95:25, 96:3, 96:22, 101:14, 101:17, 111:21, 112:25, 113:13, 115:2, 122:1, 126:7, 132:1, 132:2, 133:1, 133:12, 133:16, 134:1, 134:15, 137:9, 137:25, 138:7, 138:13, 140:20,

140:21, 143:6, 146:10, 149:9, 149:13, 150:21, 151:14, 154:6, 156:22, 158:8, 158:9, 158:10, 158:11, 165:13, 168:25

one's [4] - 78:17

one-page [1] - 91:17

ones [3] - 50:13, 139:8, 151:10

ongoing [3] - 7:4, 79:20, 81:7

**OP** [2] - 35:18, 72:10

**OP-ER** [2] - 35:18, 72:10

**Opana** [9] - 32:25, 35:18, 54:9, 82:16, 82:20, 85:9, 133:17, 137:21, 138:3

**Opanas** [3] - 120:18, 121:1, 121:25

open [1] - 127:12

opened [2] - 158:1, 158:5

operate [1] - 140:4

operating [1] - 111:4

opiate [5] - 22:4, 36:15, 45:8, 74:21, 90:15

opiates [4] - 36:9, 38:1, 68:7, 83:14

opine [1] - 72:13

opinion [25] - 10:21, 13:20, 13:23, 14:2, 14:7, 17:13, 34:4, 36:3, 48:22, 51:21, 53:24, 60:23, 61:4, 61:23, 61:25, 62:7, 71:2, 77:18, 78:9, 85:19, 86:5, 86:20, 87:3, 87:9, 161:8

opioid [5] - 30:4, 39:16, 44:21, 65:19, 90:13

**Opioid** [2] - 74:8, 90:10

opportunity [3] - 115:23, 167:4, 171:23

opposing [1] - 172:20

opposite [2] - 44:22, 54:25

options [6] - 10:10, 12:21, 43:6, 43:7, 96:3, 106:19

or" [5] - 170:23, 171:10, 171:14, 171:15, 172:10

or.. [1] - 162:17

order [4] - 6:25, 76:6, 109:11, 112:8

ordered [2] - 75:17, 75:18

**Organization** [2] - 88:24, 89:1

organization [1] - 89:2

original [3] - 63:19, 63:23, 72:11

originally [1] - 124:5

ortho [1] - 69:3

orthopedic [2] - 69:17, 69:25

osteoarthritis [1] - 34:23

otherwise [2] - 35:10, 112:21

ought [1] - 116:9

outcome [2] - 30:7, 30:8

outcomes [2] - 39:20, 39:21

outside [7] - 14:7, 25:3, 87:10, 110:20, 111:14, 113:6, 116:2

overall [1] - 38:6

overnight [2] - 125:25, 130:25

overrule [5] - 13:16, 61:12, 70:25, 86:11, 118:19

owe [2] - 142:16, 143:11

owed [3] - 140:22, 142:15, 143:13

own [2] - 17:18, 93:12

owner [1] - 133:20

oxazepam [1] - 40:22

oxy [1] - 139:7

oxycodone [80] - 21:13, 21:20, 22:24, 23:4, 23:9, 23:15, 25:17, 26:5, 28:17, 32:25, 34:1, 41:20, 42:5, 42:6, 42:10, 42:15, 42:16, 42:20, 42:25, 45:25, 46:1, 46:2, 46:9, 47:4, 52:13, 55:4, 55:21, 55:25, 56:7, 59:11, 60:8, 62:14, 62:16, 62:23, 62:24, 63:1, 63:12, 64:1, 66:6, 66:9, 66:10, 67:6, 67:14, 67:15, 68:12, 71:19, 71:25, 72:22, 72:23, 78:3, 78:15,

80:10, 82:9, 82:18, 83:2, 83:23, 85:8, 85:9, 107:8, 109:23, 124:1, 124:3, 126:10, 139:14, 139:15, 139:16, 139:20, 141:22, 142:4, 143:7, 146:3, 152:22, 160:24, 162:4

oxycodones [1] - 120:12

**OxyContin** [13] - 20:24, 21:11, 22:22, 22:21, 26:2, 26:8, 34:1, 41:5, 66:11, 109:24, 124:6, 142:17, 146:24

oxymorphone [36] - 34:2, 41:21, 55:5, 55:10, 55:13, 55:15, 55:21, 56:5, 59:11, 62:18, 62:22, 63:12, 66:9, 66:10, 68:13, 72:1, 72:22, 72:24, 78:3, 80:10, 82:7, 82:16, 82:20, 83:24, 85:8, 107:9, 120:25, 121:25, 137:19, 137:22, 138:3, 160:25, 162:4

---

# P

p.m [6] - 87:22, 87:23, 154:2, 164:11, 164:12, 172:24

**P.O** [1] - 1:23

pace [1] - 50:13

packaged [5] - 105:12, 107:8, 107:13, 107:25, 109:21

packaging [1] - 112:1

packets [3] - 105:12, 122:2, 122:4

packs [1] - 96:5

**PAGE** [2] - 2:2, 2:5

page [163] - 14:14, 14:16, 14:17, 14:18, 14:19, 14:20, 15:1, 15:3, 15:7, 15:12, 15:14, 15:15, 15:17, 15:18, 15:20, 15:25, 16:1, 16:2, 16:6, 16:9, 16:21, 17:4, 17:6, 17:7, 17:23, 17:24, 18:2, 18:3, 18:10, 18:19, 18:22, 18:24, 19:1, 19:2, 19:3, 19:5, 19:9, 19:13, 19:17,

19:18, 19:19, 19:20, 19:22, 20:14, 21:7, 21:9, 21:11, 21:23, 21:24, 23:6, 23:22, 23:24, 23:25, 24:1, 24:2, 24:4, 24:6, 26:13, 26:20, 26:22, 27:25, 28:14, 29:22, 30:2, 30:9, 31:12, 31:13, 32:1, 32:2, 32:3, 32:5, 32:21, 32:24, 33:2, 33:3, 33:4, 33:5, 33:20, 33:22, 34:10, 34:25, 35:4, 35:5, 35:6, 37:14, 38:8, 38:17, 38:18, 39:15, 39:16, 41:2, 41:14, 41:15, 43:21, 43:24, 45:14, 45:19, 45:20, 45:21, 46:5, 48:1, 48:20, 49:8, 49:9, 51:12, 51:23, 51:24, 51:25, 53:4, 54:6, 56:15, 57:8, 57:16, 57:17, 58:16, 58:23, 59:14, 60:5, 60:17, 62:10, 63:16, 63:17, 63:20, 63:21, 64:9, 64:10, 64:14, 64:15, 64:16, 64:22, 64:24, 66:2, 66:11, 67:24, 71:11, 71:13, 72:3, 72:4, 72:5, 72:7, 73:22, 73:23, 73:24, 74:6, 74:11, 74:17, 74:18, 75:24, 79:9, 79:10, 79:25, 82:24, 84:8, 84:21, 84:22, 85:16, 86:13, 91:17, 142:7, 146:20

pages [3] - 16:4, 35:9, 146:18

paid [9] - 103:1, 130:13, 131:5, 131:21, 132:16, 136:16, 140:22, 141:14

pain [93] - 6:12, 6:14, 6:18, 6:20, 6:25, 7:3, 7:8, 7:9, 7:19, 9:16, 9:22, 12:25, 13:3, 16:11, 16:16, 19:21, 20:3, 22:3, 24:4, 24:12, 27:17, 30:15, 31:22, 35:17, 35:19, 35:25, 36:4, 36:18, 36:23, 37:1, 37:6, 37:7, 37:10, 37:11, 37:16, 37:17, 37:18, 37:19, 38:4, 39:6,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 356-xxxx

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 187 of 195   Pageid#: 10313

39:13, 44:23, 44:24, 51:15, 53:19, 54:15, 54:16, 54:18, 58:18, 63:2, 68:23, 68:25, 69:8, 70:1, 70:7, 71:1, 72:24, 79:18, 79:21, 89:3, 89:5, 89:7, 92:15, 92:18, 93:17, 93:25, 95:4, 95:14, 95:15, 95:16, 95:17, 95:22, 96:22, 101:25, 102:3, 120:14, 124:8, 126:5, 126:13, 142:19, 144:11, 144:18, 149:9, 149:10, 149:12, 150:22, 151:15, 152:24, 155:15, 165:5
**Pain** [14] - 17:7, 23:25, 26:22, 30:10, 31:6, 35:1, 39:2, 64:11, 66:11, 73:20, 91:17, 95:19, 95:21, 101:9
**Pam** [2] - 72:10, 72:15
**Pamela** [1] - 71:14
**panels** [1] - 8:19
**paper** [5] - 4:15, 37:14, 98:6, 121:13, 121:16
**papers** [2] - 17:16, 66:20
**paperwork** [1] - 76:23
**parking** [1] - 4:16
**part** [10] - 18:21, 23:24, 29:5, 32:8, 44:6, 59:15, 100:3, 105:13, 111:24, 114:5
**participate** [1] - 8:22
**particular** [3] - 6:6, 121:10, 151:11
**particularly** [1] - 167:4
**parties** [1] - 167:14
**parties'** [1] - 172:16
**pass** [1] - 121:20
**passed** [4] - 7:3, 107:9, 146:9, 153:16
**passing** [1] - 79:19
**past** [4] - 54:16, 126:5, 149:20, 170:4
**patch** [1] - 130:7
**pathology** [1] - 53:18
**patient** [116] - 2:13, 2:14, 10:1, 10:20, 11:2, 11:13, 12:22, 12:25, 13:3, 13:5, 17:12, 17:17, 17:19,

18:15, 18:22, 20:10, 20:11, 20:25, 22:15, 24:4, 24:10, 24:15, 26:10, 30:23, 31:22, 32:10, 35:16, 35:17, 35:23, 35:25, 36:3, 36:11, 36:12, 36:14, 36:18, 37:18, 39:10, 39:12, 39:25, 40:25, 43:8, 43:10, 43:13, 44:6, 46:19, 46:22, 48:24, 52:17, 53:20, 53:23, 53:25, 54:2, 54:9, 54:17, 54:23, 55:23, 59:18, 68:4, 68:22, 69:6, 69:13, 70:2, 72:14, 73:1, 73:16, 75:12, 76:11, 76:21, 76:24, 77:4, 77:6, 79:14, 79:18, 80:3, 81:3, 81:6, 85:13, 90:22, 95:4, 95:24, 96:4, 96:7, 96:8, 96:11, 97:8, 97:12, 97:15, 97:24, 98:1, 98:5, 98:9, 99:9, 100:7, 100:10, 100:12, 102:9, 102:17, 105:22, 106:15, 106:17, 108:19, 108:21, 111:12, 113:4, 117:12, 129:17, 148:24, 149:1, 161:20, 165:9, 169:13, 169:17, 169:24
**Patient** [9] - 14:12, 16:6, 16:11, 31:11, 39:5, 67:10, 67:16, 76:3, 101:8
**patient's** [20] - 10:4, 11:19, 16:25, 27:10, 27:21, 30:19, 30:20, 33:25, 36:6, 41:11, 49:4, 67:6, 69:11, 69:14, 70:7, 72:23, 80:20, 83:12, 91:21, 101:10
**patients** [32] - 10:10, 11:22, 12:3, 12:14, 13:5, 17:16, 22:12, 43:4, 49:12, 53:22, 61:7, 61:22, 85:21, 89:23, 90:13, 92:14, 92:17, 93:1, 94:18, 97:3, 97:5, 97:11, 98:12, 99:1, 99:22, 100:17, 102:19, 106:23, 111:11, 120:16, 163:2, 165:14

**patients'** [1] - 61:21
**pattern** [1] - 118:21
**Patty** [2] - 161:13, 163:1
**pay** [15] - 61:6, 61:21, 97:21, 131:4, 132:11, 132:14, 133:1, 134:22, 142:23, 159:12, 159:16, 159:22, 159:24, 160:3, 162:20
**paying** [5] - 131:3, 131:6, 133:11, 134:25, 141:12
**payment** [1] - 86:18
**PC** [2] - 16:6, 16:12
**PCP** [1] - 69:2
**Pennington** [1] - 1:24
**people** [20] - 9:8, 36:24, 37:15, 40:12, 43:11, 44:23, 45:6, 45:7, 61:24, 80:23, 83:11, 85:24, 86:6, 93:6, 93:8, 93:17, 149:10, 161:11, 162:24, 163:3
**people's** [1] - 12:2
**per** [14] - 8:23, 8:25, 20:24, 22:6, 22:15, 23:16, 23:17, 37:23, 42:24, 55:11, 55:15, 82:9, 86:6
**percent** [1] - 99:2
**Percocet** [4] - 22:23, 23:18
**Percocets** [2] - 23:3, 128:3
**perfect** [1] - 58:4
**perhaps** [4] - 36:16, 37:2, 69:17, 116:8
**period** [1] - 97:13
**periods** [1] - 93:18
**permitting** [1] - 168:12
**person** [36] - 3:20, 10:7, 20:7, 27:15, 36:22, 36:23, 37:1, 37:4, 37:5, 37:7, 37:10, 39:9, 42:10, 44:15, 44:20, 45:4, 56:18, 63:2, 72:15, 79:6, 81:23, 81:25, 82:2, 82:10, 86:6, 98:6, 99:16, 102:15, 129:14, 135:23, 136:12, 139:17, 154:10, 156:25, 164:5, 165:18
**person's** [3] - 58:3,

74:2, 93:11
**personal** [2] - 115:12, 154:25
**personally** [2] - 153:22, 154:22
**pertaining** [1] - 29:6
**PH-1000** [1] - 71:15
**PH-12** [1] - 72:17
**PH-6** [1] - 71:16
**pharmacists** [1] - 165:25
**pharmacy** [13] - 74:20, 74:23, 75:5, 108:25, 109:9, 109:12, 120:3, 133:3, 145:10, 160:8, 160:9, 160:10, 160:13
**Pharmacy** [4] - 2:16, 145:10, 160:7, 162:15
**phone** [11] - 33:21, 121:19, 134:3, 134:23, 135:21, 136:10, 142:18, 163:24, 164:6, 166:7, 166:20
**phonetic** [1] - 141:17
**Photo** [1] - 2:15
**photograph** [1] - 4:14
**physical** [3] - 96:1, 152:4, 156:9
**physically** [1] - 96:8
**physician** [25] - 11:10, 11:13, 11:19, 11:21, 15:1, 17:18, 28:25, 35:22, 36:21, 53:18, 53:22, 53:25, 69:13, 69:15, 74:22, 75:19, 86:24, 90:23, 90:25, 91:11, 99:13, 105:16, 106:10, 107:17, 107:20
**physician's** [1] - 97:4
**physicians** [7] - 8:19, 9:3, 12:3, 29:8, 100:8, 106:21, 109:6
**picked** [1] - 116:10
**picture** [2] - 5:13, 56:22
**pictures** [2] - 58:2, 58:9
**piece** [2] - 4:15, 98:6
**pieces** [1] - 4:6
**pill** [10] - 22:22, 42:24, 55:11, 55:16, 98:20, 98:21, 109:23, 109:24, 144:22, 152:16
**pills** [48] - 21:1, 23:9,

25:17, 25:18, 26:3, 47:5, 47:14, 47:17, 55:3, 55:4, 55:13, 68:12, 68:13, 91:3, 104:24, 105:14, 106:14, 106:16, 107:8, 107:9, 108:4, 108:11, 108:20, 109:3, 109:10, 111:8, 112:7, 133:8, 138:8, 138:14, 138:20, 138:23, 141:22, 142:4, 142:17, 143:12, 144:22, 146:3, 146:24, 150:22, 158:24, 159:1, 159:5, 160:25, 161:12, 161:16, 163:1
**pipes** [1] - 150:11
**place** [14] - 39:9, 53:17, 74:22, 79:8, 113:8, 129:7, 129:17, 129:22, 133:17, 150:15, 160:16, 162:13, 162:18, 165:16
**placed** [1] - 112:3
**places** [2] - 100:22, 157:18
**PLAINTIFF** [1] - 2:13
**Plaintiff** [1] - 1:6
**PLAINTIFF'S** [1] - 2:2
**plan** [5] - 10:7, 17:11, 17:22, 27:24, 53:21
**planning** [2] - 69:13, 120:11
**plans** [1] - 37:12
**PLC** [1] - 1:23
**Pleasant** [1] - 128:3
**plus** [1] - 163:10
**PMP** [4] - 16:23, 17:5, 23:24, 100:21
**PMPs** [1] - 53:11
**point** [19] - 7:24, 13:18, 17:25, 18:1, 35:10, 40:9, 47:12, 48:16, 48:24, 50:17, 51:13, 53:8, 57:23, 100:9, 100:16, 109:17, 113:23, 136:25, 154:15
**Point** [1] - 128:3
**pointed** [1] - 101:15
**pointing** [2] - 68:23, 69:4
**points** [1] - 111:22
**pole** [1] - 119:19
**poor** [4] - 39:6, 77:6,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 926-3788
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 188 of 195   Pageid#: 10314

77:14, 100:2
**pose** [1] - 93:4
**poses** [1] - 93:5
**position** [2] - 165:12, 165:22
**positive** [18] - 40:8, 43:23, 45:16, 45:24, 52:6, 55:23, 56:9, 56:10, 58:25, 60:11, 62:18, 66:6, 67:7, 72:1, 76:20, 84:11, 84:15, 85:5
**possess** [4] - 104:22, 105:20, 106:11, 111:8
**possession** [13] - 80:4, 84:18, 85:6, 105:17, 107:17, 107:18, 107:19, 107:21, 109:7, 110:19, 111:7, 138:21, 171:12
**possibility** [2] - 110:17, 166:19
**possible** [11] - 11:23, 75:6, 75:8, 79:24, 89:11, 90:7, 93:20, 95:11, 95:13, 110:11, 168:6
**possibly** [2] - 54:17, 65:15
**Post** [4] - 79:11, 101:15, 101:18, 101:19
**Post-it** [4] - 79:11, 101:15, 101:18, 101:19
**potential** [1] - 59:21
**potentially** [1] - 165:17
**practical** [1] - 99:12
**practically** [2] - 58:3, 99:15
**practice** [38] - 9:3, 9:25, 10:2, 10:22, 11:21, 13:9, 13:12, 13:13, 13:24, 14:3, 14:8, 25:3, 34:5, 48:24, 50:1, 51:20, 53:13, 60:25, 62:6, 66:19, 75:4, 77:7, 86:22, 87:1, 87:10, 98:16, 105:18, 108:2, 110:3, 110:15, 110:20, 111:14, 111:16, 113:6, 137:16, 139:21, 158:1, 170:23
**Practices** [1] - 132:22

**practicing** [4] - 7:19, 7:23, 12:24, 126:19
**practitioner** [1] - 110:22
**Pre** [1] - 15:13
**Pre-screening** [1] - 15:13
**preauthorization** [1] - 34:21
**predicated** [1] - 41:10
**preferable** [1] - 114:20
**premise** [1] - 49:4
**prepared** [1] - 169:14
**prescribe** [11] - 68:9, 80:7, 81:22, 81:24, 82:4, 119:25, 120:2, 120:11, 120:13, 120:17, 152:21
**prescribed** [42] - 22:13, 22:15, 23:2, 23:15, 41:20, 42:5, 43:4, 43:24, 46:2, 46:11, 46:16, 47:4, 47:18, 54:10, 55:20, 56:1, 56:10, 59:4, 59:18, 60:8, 60:12, 60:13, 62:18, 62:25, 66:4, 67:6, 67:9, 70:10, 71:18, 72:23, 74:21, 75:16, 76:21, 80:10, 82:5, 82:9, 90:14, 91:7, 124:8, 139:18, 160:24, 169:12
**prescribed"** [1] - 48:4
**prescribes** [3] - 68:11, 68:12, 169:24
**prescribing** [20] - 8:12, 9:4, 9:5, 9:16, 12:13, 12:18, 12:23, 13:11, 17:2, 27:11, 39:8, 40:15, 47:11, 64:3, 80:22, 81:6, 85:10, 120:9, 124:6, 127:1
**prescription** [57] - 20:18, 20:22, 21:9, 21:11, 24:11, 25:16, 26:3, 33:4, 35:16, 42:16, 43:3, 44:11, 46:25, 52:6, 55:15, 57:8, 58:13, 62:21, 62:24, 66:7, 68:16, 72:10, 77:7, 77:15, 77:16, 77:21, 78:6, 81:19, 85:7, 100:21,

107:23, 109:1, 109:3, 109:7, 109:9, 126:13, 136:1, 136:5, 138:3, 138:15, 138:17, 138:22, 138:23, 146:6, 147:3, 147:4, 154:23, 155:3, 156:20, 159:2, 160:18, 160:21, 165:14, 169:25, 170:13
**prescriptions** [66] - 9:23, 10:21, 13:22, 14:1, 14:5, 16:25, 17:1, 21:19, 25:1, 25:12, 29:18, 32:25, 33:2, 33:3, 33:5, 33:6, 33:7, 33:8, 33:9, 33:10, 34:1, 34:3, 48:6, 48:22, 49:24, 51:18, 52:21, 53:11, 54:1, 59:8, 60:24, 70:8, 70:14, 72:16, 74:21, 77:23, 78:15, 79:17, 83:14, 86:6, 86:18, 86:19, 86:20, 86:21, 87:9, 91:6, 111:10, 113:4, 125:11, 127:9, 132:14, 132:24, 133:14, 136:14, 137:23, 145:4, 159:10, 159:22, 159:24, 160:4, 162:11, 165:18, 166:13, 166:14, 172:21
**presence** [7] - 4:1, 42:6, 51:3, 72:25, 88:2, 115:20, 168:3
**present** [4] - 3:15, 115:7, 115:23, 167:25
**presentation** [1] - 11:19
**presented** [9] - 3:13, 110:11, 112:19, 112:23, 113:1, 113:3, 113:4, 113:5, 114:2
**PRESIDING** [1] - 1:11
**pressure** [2] - 135:9, 152:7
**presumably** [1] - 33:21
**pretty** [1] - 133:1
**prevented** [1] - 140:10
**prevents** [2] - 69:24, 70:2
**previous** [3] - 21:23,

74:17, 85:5
**previously** [6] - 24:22, 26:4, 26:6, 51:9, 57:24, 166:2
**primarily** [1] - 14:4
**primary** [1] - 69:15
**prime** [1] - 44:19
**Priority** [2] - 14:11, 33:15
**PRN** [1] - 46:14
**probiotics** [1] - 143:24
**problem** [22] - 11:11, 36:4, 36:23, 37:1, 37:6, 37:8, 37:10, 37:11, 37:19, 37:25, 39:10, 44:23, 44:24, 45:7, 45:8, 81:5, 81:8, 82:1, 152:18, 166:14, 167:11
**problems** [6] - 36:24, 37:16, 37:17, 126:4, 152:13, 155:11
**proceed** [7] - 3:3, 9:20, 104:6, 114:23, 115:24, 148:5, 167:13
**Proceedings** [16] - 1:25, 3:1, 4:1, 50:8, 50:22, 51:3, 87:18, 87:22, 88:2, 104:14, 115:20, 164:4, 164:11, 168:3, 168:18, 172:24
**process** [6] - 8:17, 11:10, 38:6, 46:18, 64:5, 93:9
**processes** [3] - 11:9, 11:18
**produce** [2] - 105:3, 105:4
**professional** [18] - 9:3, 10:22, 13:24, 14:8, 25:3, 34:5, 48:23, 49:25, 51:20, 53:13, 60:24, 62:5, 86:22, 87:10, 110:20, 111:14, 111:16, 113:6
**professionally** [1] - 103:12
**profound** [1] - 43:14
**Program** [2] - 20:1, 32:6
**progress** [1] - 12:22
**promise** [1] - 51:5
**proof** [5] - 105:10, 112:15, 169:3
**proper** [4] - 9:3, 9:25, 10:2, 61:14
**proposed** [5] - 110:8, 168:23,

169:10, 169:21, 172:20
**prosecuted** [2] - 126:23, 127:1
**prove** [3] - 105:17, 110:2, 112:11
**provide** [5] - 72:11, 110:8, 166:3, 170:9
**provided** [4] - 10:19, 165:25, 166:5, 168:22
**provider** [2] - 169:23, 170:1
**provider's** [1] - 73:6
**providers** [1] - 8:12
**providing** [1] - 70:6
**psychological** [1] - 10:11
**pull** [4] - 5:17, 28:2, 45:22, 101:3
**punitive** [1] - 41:9
**purporting** [1] - 63:3
**purpose** [23] - 10:23, 14:6, 25:2, 34:6, 49:25, 51:19, 53:12, 53:16, 60:25, 61:8, 66:21, 75:3, 77:20, 86:22, 87:11, 105:19, 108:1, 110:4, 110:16, 110:21, 166:10, 170:22, 172:9
**purposes** [4] - 34:20, 34:21, 36:16, 75:6
**put** [10] - 26:8, 36:25, 74:22, 94:4, 116:8, 122:5, 122:10, 134:20, 150:11, 165:21
**Putnam** [1] - 127:19
**puts** [1] - 55:4

## Q

**qualifications** [1] - 71:1
**qualified** [2] - 12:8, 135:23
**quality** [2] - 96:24, 97:1
**quantities** [1] - 21:21
**quantity** [2] - 42:24, 105:13
**questioned** [1] - 137:1
**questionnaire** [10] - 18:23, 19:1, 19:2, 19:3, 19:4, 19:5, 19:6, 19:7, 20:15, 21:8
**questionnaires** [1] - 26:15
**questions** [17] -

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 926-3808

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 189 of 195   Pageid#: 10315

43:12, 73:6, 83:17, 87:6, 103:16, 123:2, 132:8, 143:15, 145:23, 147:7, 147:9, 155:22, 156:1, 156:16, 163:14, 163:15, 163:16

**quick** [3] - 38:10, 83:17, 121:21

**quickly** [3] - 14:24, 37:9, 79:24

**quite** [8] - 22:5, 44:22, 54:25, 101:17, 118:11, 124:14, 151:19

**quote** [1] - 132:5

# R

**radiologist** [2] - 58:9, 95:9

**radiology** [2] - 57:19, 57:20

**rails** [2] - 150:10, 150:11

**raise** [6] - 5:1, 73:5, 77:5, 116:14, 147:24, 171:3

**raised** [1] - 77:13

**raises** [2] - 43:9, 43:12

**RAMSEYER** [282] - 2:3, 2:10, 3:4, 3:7, 3:11, 4:5, 4:18, 4:23, 5:11, 5:23, 7:18, 9:14, 9:21, 13:17, 14:14, 14:21, 15:1, 15:6, 15:12, 15:16, 15:25, 16:5, 16:9, 16:10, 16:20, 16:22, 17:4, 17:9, 17:23, 18:4, 18:10, 18:14, 18:19, 18:20, 18:24, 19:8, 19:11, 19:12, 19:16, 20:5, 20:14, 20:17, 21:7, 21:11, 21:16, 21:23, 22:1, 23:6, 23:7, 23:22, 24:7, 24:18, 24:21, 25:6, 25:11, 25:14, 26:13, 26:19, 26:21, 27:25, 28:7, 28:12, 28:19, 29:9, 29:22, 29:23, 30:2, 30:3, 30:9, 30:13, 30:24, 31:5, 31:10, 31:14, 31:25, 32:15, 32:20, 32:24, 33:13, 33:17, 33:24, 34:8, 34:16, 34:25, 35:12, 35:14, 38:8, 38:14, 38:17, 38:20,

38:24, 39:1, 39:15, 39:19, 39:22, 39:24, 40:3, 40:4, 40:18, 40:20, 41:2, 41:3, 41:13, 41:16, 41:24, 42:1, 42:11, 42:13, 43:20, 43:22, 45:14, 45:23, 46:5, 46:7, 47:20, 48:2, 48:14, 48:15, 48:20, 48:21, 49:6, 49:10, 49:20, 49:22, 50:12, 50:19, 50:25, 51:5, 51:8, 51:22, 52:4, 53:2, 53:6, 54:5, 54:8, 55:18, 55:19, 56:13, 56:16, 57:16, 57:18, 58:14, 58:17, 58:23, 58:24, 59:13, 59:17, 59:23, 60:7, 60:16, 60:22, 61:17, 61:18, 62:9, 62:11, 63:6, 63:10, 63:15, 63:24, 64:7, 64:17, 64:21, 65:1, 65:4, 65:7, 65:17, 65:18, 66:1, 66:3, 66:13, 66:14, 66:23, 67:1, 67:16, 67:18, 67:23, 68:1, 68:17, 68:19, 70:19, 71:4, 71:11, 71:17, 71:23, 71:24, 72:3, 72:9, 72:17, 72:18, 73:8, 73:10, 73:13, 73:15, 73:18, 74:1, 74:5, 74:7, 74:11, 74:12, 74:17, 74:19, 75:9, 75:21, 76:12, 76:16, 78:22, 78:23, 79:9, 79:13, 79:23, 80:2, 80:12, 80:15, 81:10, 81:11, 82:12, 82:14, 83:16, 83:18, 84:6, 84:10, 84:16, 84:17, 84:21, 85:1, 85:15, 85:18, 86:2, 86:3, 86:13, 86:15, 87:6, 87:7, 87:13, 98:17, 103:18, 103:20, 103:23, 104:3, 105:11, 105:20, 106:1, 106:6, 106:12, 106:18, 106:24, 107:4, 107:24, 108:9, 108:13, 108:15, 108:17, 108:22, 109:2, 109:8, 109:16, 109:20, 110:5, 110:18, 110:24, 111:2, 111:13,

111:18, 113:3, 114:3, 114:25, 115:2, 154:24, 155:17, 156:18, 163:12, 163:14, 163:18, 165:13, 169:22, 170:7, 170:20, 171:7, 171:9, 171:16, 171:19, 172:11

**Ramseyer** [11] - 1:18, 50:4, 50:9, 61:13, 71:10, 101:15, 105:8, 112:24, 171:6, 171:18, 172:19

**ran** [2] - 43:16, 111:11

**Randall** [1] - 1:18

**rate** [5] - 103:3, 103:4, 135:6, 135:7, 135:15

**rather** [5] - 77:13, 77:19, 98:9, 100:15, 155:15

**Ravenswood** [5] - 125:12, 125:17, 125:19, 133:19

**ray** [2] - 57:25, 69:24

**rays** [9] - 29:1, 57:22, 69:2, 69:16, 83:7, 83:13, 89:14, 150:17, 150:20

**RB-1** [1] - 14:11

**RB-2** [3] - 15:5, 15:7, 91:16

**RB-3** [1] - 33:23

**RD-41** [2] - 63:8, 63:9

**re** [1] - 2:15

**read** [13] - 12:4, 24:8, 28:20, 35:15, 52:16, 68:21, 77:1, 142:9, 142:11, 142:12, 146:19, 168:14, 171:23

**reading** [2] - 45:9, 45:13

**ready** [8] - 3:3, 3:24, 4:3, 50:24, 51:4, 87:24, 104:6, 114:23

**real** [6] - 38:10, 120:21, 121:5, 121:21, 122:25, 166:20

**realize** [3] - 129:12, 141:16, 169:6

**really** [20] - 11:4, 11:7, 11:12, 37:15, 64:12, 77:13, 100:13, 109:17, 123:14, 129:12, 132:4, 139:3,

144:16, 153:11, 157:6, 158:5, 162:5, 166:8, 166:18, 166:21

**reason** [5] - 49:18, 54:22, 100:11, 111:8, 111:10

**reasonable** [1] - 110:14

**reasonably** [2] - 53:18, 79:20

**reasons** [3] - 12:12, 35:24, 168:7

**recap** [1] - 87:8

**receipt** [4] - 32:21, 33:14, 33:17, 33:19

**RECEIVED** [1] - 2:12

**received** [13] - 4:19, 4:20, 4:21, 4:22, 25:10, 28:22, 30:23, 34:1, 55:3, 68:2, 75:18, 168:23

**receiving** [2] - 62:13, 63:11

**recent** [1] - 77:4

**recertification** [1] - 7:5

**recess** [4] - 50:21, 87:20, 87:21, 164:9

**recliner** [1] - 153:11

**recognize** [3] - 14:3, 18:21, 163:5

**recognized** [1] - 9:15

**recollection** [1] - 142:14

**record** [12] - 11:15, 11:16, 16:1, 29:5, 30:19, 36:5, 37:15, 73:11, 98:10, 127:2, 148:12, 151:12

**recordkeeping** [1] - 75:6

**records** [21] - 12:18, 15:17, 15:21, 16:4, 17:15, 24:17, 29:7, 30:22, 40:16, 40:17, 40:25, 43:25, 59:3, 79:14, 80:4, 87:3, 95:2, 100:20, 139:20, 150:18, 151:3

**RECROSS** [4] - 2:8, 2:10, 146:1, 156:17

**RECROSS-EXAMINATION** [2] - 2:10, 156:17

**recurrent** [1] - 102:3

**red** [3] - 59:21, 59:22, 60:14

**REDIRECT** [2] - 2:8, 143:18

**redirect** [1] - 103:17,

143:16

**refer** [1] - 82:2

**referral** [3] - 69:3, 69:17, 69:25

**referrals** [1] - 94:24

**referred** [5] - 8:13, 88:21, 94:21, 129:14, 169:6

**referring** [3] - 69:25, 88:19, 89:10

**reflective** [1] - 13:13

**refresh** [1] - 142:14

**regarding** [1] - 165:14

**regardless** [1] - 147:3

**regular** [1] - 157:20

**regularly** [1] - 23:12

**regulations** [4] - 106:1, 106:2, 106:21, 108:17

**relating** [1] - 4:12

**relation** [1] - 10:19

**relationship** [5] - 37:9, 49:5, 77:11, 99:9, 100:12

**release** [3] - 29:5, 114:5, 123:23

**released** [1] - 120:20

**relevance** [1] - 165:15

**rely** [2] - 38:1, 44:25

**remember** [43] - 87:17, 117:13, 118:1, 118:13, 121:25, 122:17, 127:20, 127:21, 127:22, 128:2, 128:5, 132:9, 133:5, 133:13, 133:16, 134:2, 134:15, 134:16, 134:17, 134:19, 135:16, 135:20, 138:6, 138:11, 138:12, 140:8, 140:11, 140:12, 140:14, 141:23, 141:25, 142:2, 142:3, 142:5, 143:9, 144:16, 145:19, 145:22, 146:12, 146:14, 158:2, 158:15, 168:11

**remembering** [2] - 11:23, 132:7

**reminded** [2] - 31:11, 79:14

**remove** [1] - 104:9

**removed** [1] - 169:5

**REMS** [3] - 15:7, 15:13, 17:6

**repaired** [1] - 68:25

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 190 of 195   Pageid#: 10316

**repeat** [2] - 95:6, 95:7
**repeated** [2] - 95:11, 95:13
**repeatedly** [3] - 46:21, 47:13, 58:20
**rephrase** [2] - 98:18, 100:2
**replace** [1] - 119:12
**replaced** [4] - 119:11, 149:21, 149:22
**report** [10] - 30:17, 42:2, 57:3, 57:12, 57:19, 57:20, 60:3, 63:13, 70:7, 84:11
**reported** [6] - 17:16, 35:25, 44:3, 46:8, 58:8, 58:10
**Reporter** [1] - 1:25
**reporting** [3] - 39:11, 69:11, 69:14
**reports** [10] - 24:10, 35:17, 35:19, 39:6, 40:21, 44:7, 54:17, 68:23, 76:3, 83:6
**represent** [2] - 18:6, 113:1
**representative** [1] - 13:12
**represents** [1] - 55:14
**request** [2] - 69:24, 104:11
**requesting** [1] - 30:19
**requests** [2] - 3:20, 172:17
**require** [1] - 167:23
**requirements** [1] - 6:18
**requires** [1] - 65:16
**requiring** [1] - 79:21
**research** [1] - 168:13
**resembling** [1] - 14:3
**residency** [1] - 6:10
**resolved** [1] - 167:11
**resort** [2] - 156:11
**respect** [11] - 91:19, 92:9, 92:15, 93:11, 97:22, 101:24, 104:21, 104:23, 105:1, 105:5, 167:18
**responded** [1] - 68:4
**responsibility** [3] - 8:14, 10:4, 99:6
**restricting** [1] - 8:16
**restroom** [3] - 121:12, 121:14, 121:15

**restrooms** [1] - 2:15
**rests** [2] - 104:4, 104:5
**result** [1] - 46:16
**resulted** [1] - 169:13
**results** [1] - 46:15
**resumed** [3] - 50:22, 87:22, 164:11
**retired** [1] - 159:21
**retirement** [2] - 131:12, 131:16
**return** [1] - 122:16
**returned** [3] - 122:1, 122:2, 137:9
**review** [17] - 8:14, 10:17, 10:20, 11:2, 11:3, 12:3, 12:9, 49:23, 50:15, 61:1, 67:22, 75:13, 76:5, 78:18, 88:16, 88:20, 103:5
**Review** [1] - 14:22
**reviewed** [19] - 13:10, 13:21, 17:15, 18:7, 29:2, 51:9, 51:18, 62:1, 64:19, 65:2, 65:3, 66:15, 66:16, 74:2, 75:19, 75:22, 87:8, 88:10, 88:18
**reviewer** [2] - 18:5, 64:18
**reviewing** [10] - 8:10, 8:18, 9:2, 9:11, 10:25, 13:5, 13:25, 62:4, 85:13, 98:9
**revoking** [1] - 8:17
**Reynolds** [2] - 2:15, 4:12
**Richmond** [1] - 8:25
**rid** [1] - 79:4
**ring** [1] - 112:6
**risk** [6] - 72:6, 76:25, 77:5, 77:14, 93:20, 93:23
**risks** [3] - 93:4, 93:5, 93:23
**River** [1] - 32:12
**Road** [1] - 19:25
**roadway** [1] - 150:9
**Robert** [9] - 14:10, 22:16, 28:5, 29:19, 33:25, 63:6, 91:21, 91:22, 91:25
**rocks** [1] - 150:8
**rode** [1] - 158:21
**role** [1] - 69:22
**room** [5] - 97:24, 104:13, 118:2, 129:13, 131:4

**rotator** [1] - 68:25
**routine** [2] - 97:17, 118:21
**Roxicodone** [3] - 120:4, 120:14, 139:7
**rubber** [1] - 30:5
**rules** [1] - 112:17
**rulings** [1] - 172:1
**run** [2] - 45:4, 159:21
**running** [2] - 142:19, 150:8
**RX** [1] - 72:11
**RXD** [1] - 40:5
**RXs** [1] - 73:16

## S

**safe** [1] - 93:4
**sake** [2] - 61:19, 83:5
**sales** [1] - 140:19
**Sam** [2] - 75:9, 76:12
**Sammy** [1] - 77:23
**sample** [3] - 13:12, 42:2, 42:3
**Samuel** [1] - 1:19
**sat** [2] - 7:2, 119:1
**save** [1] - 54:1
**saw** [7] - 52:9, 81:16, 95:2, 117:13, 128:2, 130:11, 136:11
**SB-2** [5] - 2:13, 4:8, 4:19, 51:7, 51:13
**scenario** [2] - 43:14, 86:23
**Schedule** [18] - 12:11, 13:1, 13:6, 28:10, 28:11, 38:15, 38:21, 40:11, 43:18, 56:19, 59:6, 84:3, 105:23, 106:13, 106:24, 108:13, 162:7
**schedule** [1] - 78:20
**school** [2] - 6:5, 6:8
**schools** [2] - 99:22, 100:6
**scope** [18] - 10:22, 13:24, 14:7, 25:3, 34:4, 48:23, 49:25, 51:20, 53:12, 60:24, 62:5, 86:22, 87:10, 108:1, 110:20, 111:14, 111:15, 113:6
**screen** [19] - 44:18, 47:19, 52:12, 56:8, 57:25, 59:25, 62:23, 64:2, 64:6, 72:21, 75:16, 76:2, 76:4, 91:14, 94:4, 99:24, 100:7, 135:15, 135:20
**Screening** [1] - 15:7,

15:13
**screening** [3] - 15:13, 17:6, 98:23
**screens** [5] - 53:9, 53:10, 135:23, 144:19
**scroll** [7] - 16:3, 34:15, 35:8, 60:1, 63:18, 66:13, 101:24
**search** [2] - 4:15, 137:15
**second** [7] - 18:22, 40:5, 44:6, 75:17, 77:10, 77:13, 147:19
**secure** [1] - 45:3
**securing** [1] - 169:1
**security** [1] - 131:16
**see** [88] - 11:8, 11:13, 14:12, 15:8, 16:7, 16:14, 16:18, 17:11, 18:8, 19:14, 20:7, 25:15, 26:1, 26:23, 27:1, 27:2, 29:12, 32:22, 34:11, 36:18, 40:1, 40:6, 42:2, 43:3, 44:20, 44:22, 46:8, 49:13, 49:17, 52:13, 58:5, 60:9, 63:13, 67:12, 67:13, 67:19, 70:17, 71:19, 72:1, 73:11, 74:9, 74:15, 77:8, 78:14, 80:5, 81:2, 81:4, 81:14, 81:17, 81:18, 83:12, 85:24, 94:23, 96:14, 97:3, 97:5, 97:23, 98:5, 102:10, 111:25, 113:25, 114:1, 119:21, 124:20, 124:24, 127:16, 128:15, 130:24, 131:25, 133:24, 134:8, 136:6, 137:6, 138:24, 139:1, 143:20, 149:11, 150:16, 153:24, 154:1, 154:15, 155:2, 155:9, 157:20, 158:6, 167:8, 168:17
**Seeing** [2] - 69:2, 69:7
**seeing** [10] - 11:6, 15:22, 15:24, 46:20, 69:19, 130:3, 131:18, 153:8, 153:9
**seeking** [2] - 38:4, 115:5
**seem** [2] - 49:12, 49:15
**sees** [1] - 29:18

15:13
**self** [3] - 17:16, 35:25, 151:20
**self-reported** [2] - 17:16, 35:25
**sell** [2] - 91:2, 131:14
**selling** [2] - 108:7, 129:12, 131:13
**send** [2] - 60:20, 61:5
**sending** [1] - 61:20
**sense** [1] - 12:9
**sent** [2] - 88:14, 113:22
**sentence** [6] - 77:10, 77:11, 77:12, 77:13, 77:22, 169:5
**September** [29] - 21:19, 25:16, 26:23, 28:4, 29:15, 30:5, 34:2, 38:13, 39:17, 55:2, 57:10, 57:11, 62:10, 62:15, 63:12, 67:14, 77:24, 78:6, 78:25, 101:13, 127:25, 132:1, 132:2, 140:2, 140:5, 149:5, 161:2, 162:2
**serious** [2] - 43:12, 73:6
**serve** [2] - 8:6, 100:11
**Services** [1] - 32:6
**serving** [1] - 75:3
**set** [5] - 83:16, 112:1, 138:23, 160:6, 167:7
**sets** [1] - 88:15
**seven** [1] - 78:18
**several** [10] - 105:3, 105:4, 122:17, 122:19, 128:20, 130:1, 131:2, 150:5, 150:13, 156:12
**severe** [1] - 36:4, 37:6, 44:23, 53:19, 65:16, 72:24, 79:21, 95:4
**severity** [3] - 10:14, 44:24, 44:25
**SF-7** [2] - 65:5, 65:17
**SH-1** [1] - 78:22
**SH-13** [1] - 75:10
**SH-8** [1] - 76:13
**shall** [3] - 5:3, 116:16, 148:1
**shape** [1] - 86:25
**sharing** [1] - 45:5
**sheet** [1] - 32:13
**Short** [1] - 17:8
**short** [2] - 17:14, 95:18

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 356-8

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 191 of 195   Pageid#: 10317

**shorter** [1] - 43:16
**shoulder** [2] - 68:24, 69:16
**show** [21] - 14:10, 16:25, 24:17, 41:6, 46:23, 50:14, 56:24, 56:25, 57:20, 77:4, 79:2, 85:13, 91:14, 114:7, 118:21, 120:3, 124:20, 139:20, 142:7, 146:17, 166:13
**showed** [3] - 42:15, 44:18, 82:5
**showing** [6] - 18:7, 30:22, 72:21, 94:13, 101:7, 171:11
**shown** [2] - 3:19, 71:1
**shows** [16] - 24:4, 25:12, 25:16, 27:13, 44:5, 45:18, 47:4, 48:16, 49:11, 55:20, 56:21, 56:22, 58:1, 60:3, 60:11, 71:18
**shut** [9] - 126:21, 127:11, 128:6, 128:9, 129:20, 129:22, 149:9, 157:25, 160:22
**shuttle** [1] - 150:8
**side** [4] - 5:18, 20:22, 20:24, 24:16
**sidebar** [1] - 104:7
**sign** [3] - 21:2, 70:15, 121:16
**signature** [2] - 29:4, 76:1
**signed** [4] - 2:16, 3:18, 24:24, 77:3
**significance** [1] - 79:16
**significant** [5] - 11:8, 29:3, 37:17, 49:3, 53:17
**signs** [1] - 118:4
**similar** [6] - 44:17, 50:15, 69:17, 126:10, 170:3, 170:12
**simply** [16] - 13:3, 20:9, 20:11, 27:9, 27:20, 35:22, 37:1, 39:10, 46:19, 70:7, 71:8, 75:8, 98:3, 114:8, 166:12, 170:11
**single** [4] - 51:12, 99:7, 100:9, 100:15
**site** [1] - 34:23
**sitting** [3] - 8:19, 47:15, 98:8
**situation** [5] - 17:18, 17:20, 55:2, 99:7,

102:7
**situations** [1] - 89:22
**six** [9] - 75:14, 76:2, 76:7, 141:22, 142:4, 142:17, 143:7, 143:10, 146:3
**skip** [2] - 64:10, 83:19
**slide** [1] - 47:25
**small** [2] - 20:9, 22:3
**smaller** [2] - 42:20, 42:24
**smart** [2] - 161:5, 161:7
**Smithers** [123] - 2:15, 3:18, 10:20, 16:12, 18:7, 26:25, 27:3, 27:8, 27:14, 29:18, 30:18, 34:4, 39:3, 39:4, 40:15, 40:25, 43:24, 48:7, 49:13, 49:17, 52:9, 57:4, 61:6, 61:21, 62:4, 67:4, 68:8, 69:21, 69:24, 70:6, 74:15, 77:1, 77:3, 79:2, 79:7, 80:7, 80:22, 81:16, 82:4, 82:16, 83:11, 85:20, 86:4, 86:17, 88:16, 89:11, 90:10, 91:6, 92:8, 93:24, 94:22, 95:22, 98:14, 98:20, 100:17, 100:20, 101:8, 111:4, 113:15, 114:3, 117:9, 117:21, 118:18, 119:25, 121:23, 123:8, 123:14, 124:13, 126:8, 128:13, 129:15, 129:24, 129:25, 130:3, 130:11, 131:19, 131:25, 133:24, 134:13, 135:4, 135:11, 136:7, 136:11, 136:17, 136:20, 136:21, 137:20, 138:14, 139:1, 139:17, 140:7, 143:20, 145:4, 145:16, 146:7, 146:25, 147:5, 148:20, 148:22, 149:8, 150:16, 151:8, 152:21, 153:8, 156:5, 156:13, 156:20, 156:23, 157:1, 157:8, 157:23, 158:6, 159:1, 160:16, 160:20,

160:24, 161:5, 161:12, 161:21, 165:24, 167:17
**SMITHERS** [1] - 1:8
**Smithers's** [13] - 44:6, 59:3, 76:1, 86:17, 91:1, 93:25, 95:14, 98:11, 125:22, 130:14, 137:16, 139:21, 140:10
**SOAPP** [3] - 18:21, 18:23, 19:9
**SOAPP-R** [3] - 18:21, 18:23, 19:9
**social** [1] - 131:16
**society** [1] - 12:1
**sold** [1] - 146:3
**solemnly** [3] - 5:2, 116:15, 147:25
**someone** [8] - 44:22, 58:5, 60:14, 70:17, 77:18, 85:2, 96:19, 154:8
**someplace** [1] - 145:13
**sometime** [1] - 69:15
**sometimes** [6] - 56:21, 90:1, 90:2, 94:21, 131:1, 136:8
**somewhere** [3] - 8:24, 97:5, 133:10
**son** [1] - 154:7
**sons** [1] - 154:7
**sorry** [31] - 18:11, 19:22, 26:6, 43:20, 45:21, 47:1, 47:25, 49:8, 53:3, 53:4, 54:21, 59:15, 60:1, 60:6, 60:18, 73:5, 75:23, 78:10, 92:16, 95:15, 98:4, 99:25, 100:25, 104:19, 106:5, 134:21, 147:13, 151:5, 153:15, 154:6, 155:24
**sort** [4] - 34:17, 44:19, 89:17, 113:14
**sound** [4] - 41:10, 117:15, 138:5, 149:5
**Sounds** [1] - 86:7
**sounds** [3] - 41:9, 132:12, 149:7
**space** [1] - 36:21
**speaking** [2] - 44:14, 66:22
**special** [3] - 6:15, 106:12, 106:14
**specialist** [2] - 29:2, 95:9
**specific** [1] - 99:23

**specifically** [2] - 30:20, 107:7
**spectrum** [1] - 10:10
**speculation** [4] - 13:15, 61:11, 70:24, 86:10
**spell** [2] - 117:5, 148:14
**spend** [3] - 97:7, 97:10, 97:13
**spine** [4] - 58:3, 58:4, 58:6, 58:11
**spoken** [2] - 88:23, 164:15
**spondylosis** [1] - 57:14
**spot** [1] - 111:12
**staff** [1] - 97:4
**stamp** [2] - 39:17, 141:13
**stamps** [2] - 30:5, 141:15
**stand** [6] - 4:25, 5:6, 105:3, 105:4, 119:21, 148:4
**standard** [5] - 22:23, 75:4, 90:15, 91:4, 107:21
**start** [9] - 14:10, 14:11, 20:12, 34:10, 49:2, 120:6, 120:8, 149:25, 161:16
**started** [3] - 31:2, 120:6, 126:18, 128:18, 128:19, 130:2, 132:3, 133:2, 150:2
**starting** [2] - 83:21, 146:19
**starts** [1] - 10:3
**state** [8] - 8:12, 9:12, 49:17, 73:5, 102:1, 117:3, 128:11, 148:12
**statement** [6] - 3:18, 79:5, 89:4, 90:6, 99:20, 155:20
**states** [1] - 76:21
**STATES** [2] - 1:2, 1:5
**States** [4] - 1:18, 1:20, 107:1, 126:23
**status** [1] - 113:21
**statute** [1] - 171:23
**stay** [3] - 44:15, 125:25, 130:25
**stayed** [1] - 129:13
**staying** [4] - 44:7, 125:12, 128:16, 140:18
**steel** [1] - 150:10
**step** [1] - 163:20

**Stephen** [1] - 65:4
**stepping** [1] - 123:16
**Steve** [4] - 2:13, 4:9, 51:7, 51:19
**Steven** [1] - 1:18
**sticky** [5] - 31:10, 33:20, 41:4, 72:7, 73:13
**still** [10] - 36:5, 42:20, 46:11, 126:19, 127:9, 127:12, 130:6, 136:10, 139:14, 141:13
**stomach** [3] - 121:5, 123:23, 131:14
**stone** [4] - 79:14, 79:18, 79:19, 101:19
**stones** [2] - 101:23, 102:6, 102:7
**stop** [6] - 35:10, 38:9, 38:10, 38:19, 41:15, 139:16
**stopped** [3] - 127:16, 127:17, 140:6
**store** [4] - 153:5, 154:4, 157:9, 159:21
**straightforward** [1] - 77:13
**strange** [1] - 110:1
**street** [1] - 108:8
**Street** [1] - 1:20
**strength** [1] - 22:9
**strengths** [1] - 22:10
**stretch** [1] - 167:11
**strictly** [1] - 44:14
**strike** [1] - 13:8
**strong** [4] - 12:15, 12:23, 81:25, 120:15
**stronger** [1] - 123:17
**struggles** [1] - 44:22
**struggling** [7] - 36:4, 36:14, 37:2, 37:5, 37:7, 37:15, 82:1
**students** [1] - 99:13
**studies** [1] - 29:2
**study** [1] - 7:2
**stuff** [15] - 66:17, 89:14, 90:4, 99:24, 123:17, 124:9, 125:14, 129:11, 135:6, 135:19, 144:15, 144:23, 145:4, 152:6, 156:6
**subjective** [4] - 27:21, 89:4, 89:5, 102:15
**subjectively** [1] - 17:20
**submitted** [1] - 21:18
**Suboxone** [4] - 44:7,

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 356-6280*

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 192 of 195   Pageid#: 10318

44:17, 68:3, 68:5
**subpoenaed** [1] - 164:22
**subsequent** [2] - 81:21, 154:15
**substance** [16] - 9:23, 19:17, 19:24, 40:6, 40:12, 48:10, 55:25, 84:19, 106:11, 107:14, 107:17, 107:22, 155:2, 169:24, 170:1, 170:14
**substances** [45] - 9:17, 12:11, 12:16, 12:19, 13:6, 20:8, 27:7, 27:16, 31:3, 31:23, 39:7, 39:8, 43:5, 43:18, 51:16, 56:19, 57:1, 58:20, 65:14, 70:10, 70:12, 70:13, 70:18, 75:5, 79:6, 83:10, 84:3, 84:4, 105:14, 105:21, 105:22, 105:24, 106:13, 106:25, 107:5, 107:20, 108:14, 108:15, 126:10, 126:11, 127:2, 127:5, 127:14, 128:10, 169:12
**Substances** [2] - 20:1, 32:6
**substantially** [1] - 26:11
**successful** [1] - 150:21
**sufficiency** [1] - 112:14
**sufficient** [1] - 112:22
**suicide** [1] - 155:13
**Suite** [1] - 1:20
**sulfate** [2] - 55:3, 67:15
**summary** [5] - 28:2, 28:4, 29:13, 29:17, 38:12
**summonsed** [1] - 166:16
**supplement** [3] - 89:18, 107:10, 109:22
**supplements** [1] - 112:4
**supply** [2] - 43:15, 169:19
**support** [1] - 10:11
**suppose** [3] - 93:17, 93:19, 95:2
**supposed** [4] - 31:18, 113:16, 114:4,

164:18
**supposedly** [1] - 136:19
**surgeries** [6] - 92:21, 93:4, 130:5, 156:9, 156:10, 156:12
**surgery** [15] - 6:9, 10:12, 92:18, 92:19, 93:5, 93:7, 93:13, 93:16, 93:18, 93:21, 130:5, 132:1, 139:15, 139:19, 140:2
**surprised** [2] - 90:20, 91:4
**surrounding** [1] - 11:24
**survey** [1] - 32:2
**suspended** [3] - 50:22, 87:22, 164:11
**swear** [3] - 5:2, 116:15, 147:25
**swing** [1] - 124:20
**sworn** [5] - 4:25, 5:9, 116:14, 116:24, 148:9
**symptom** [1] - 39:13
**symptoms** [6] - 17:16, 20:11, 27:10, 69:6, 69:12, 69:19
**system** [4] - 47:10, 47:13, 75:14, 76:5
**Systems** [1] - 14:22

**T**

**tab** [1] - 20:24
**tablet** [3] - 21:1, 22:2, 22:17
**tablets** [5] - 21:12, 21:13, 22:17, 22:18, 63:1
**talks** [2] - 58:18, 118:12
**TD-19** [1] - 59:24
**teach** [1] - 99:13
**Tech** [2] - 6:7, 6:12
**telephone** [1] - 119:19
**ten** [3] - 16:14, 105:12, 122:10
**tendonitis** [1] - 130:9
**term** [7] - 8:4, 8:6, 30:4, 39:16, 65:19, 93:15, 93:21
**terms** [1] - 69:12
**test** [7] - 42:14, 46:1, 72:24, 72:25, 76:18, 84:14, 135:10
**tested** [6] - 40:8, 45:24, 45:25, 52:5, 62:15, 117:22

**testified** [11] - 5:9, 54:3, 64:12, 103:7, 103:10, 116:24, 123:25, 125:24, 136:19, 148:9, 168:25
**testify** [7] - 113:24, 114:14, 115:11, 118:17, 150:25, 155:21, 167:17
**testifying** [8] - 103:9, 113:16, 127:20, 128:2, 133:13, 134:17, 141:25, 146:12
**testimony** [18] - 5:2, 71:7, 71:8, 102:5, 103:3, 108:3, 110:25, 111:15, 113:5, 115:5, 116:9, 116:15, 137:18, 142:8, 146:18, 147:25, 166:11
**testing** [10] - 29:6, 40:5, 70:1, 89:14, 90:4, 95:23, 98:24, 99:24, 121:15, 152:11
**tests** [3] - 76:6, 85:5, 152:14
**Texas** [2] - 6:12, 6:13
**text** [4] - 4:11, 85:16, 85:20, 113:22
**Text** [1] - 2:14
**THE** [174] - 1:2, 1:3, 2:13, 3:2, 3:6, 3:10, 3:12, 3:16, 4:2, 4:17, 4:24, 5:1, 5:5, 5:6, 5:17, 5:21, 7:14, 7:16, 7:17, 9:18, 9:20, 13:16, 21:10, 24:20, 25:9, 26:18, 28:17, 30:12, 31:9, 32:14, 35:11, 50:4, 50:9, 50:18, 50:20, 50:24, 51:1, 51:4, 61:12, 70:22, 70:25, 71:6, 75:15, 86:8, 86:11, 87:14, 87:19, 87:24, 88:1, 88:3, 103:17, 103:19, 103:21, 103:22, 104:1, 104:2, 104:5, 104:9, 104:12, 104:15, 104:18, 105:8, 105:15, 105:25, 106:5, 106:10, 106:16, 106:20, 107:1, 107:11, 108:6, 108:12, 108:14, 108:16, 108:20, 108:25, 109:5,

109:14, 109:19, 109:25, 110:7, 110:23, 111:1, 111:9, 111:17, 111:19, 112:13, 113:9, 113:25, 114:6, 114:11, 114:18, 114:22, 115:1, 115:8, 115:13, 115:15, 115:18, 115:21, 116:2, 116:4, 116:8, 116:15, 116:18, 116:19, 116:21, 118:19, 123:3, 139:10, 139:12, 143:16, 145:24, 147:8, 147:11, 147:13, 147:15, 147:21, 147:22, 147:23, 148:3, 148:4, 148:5, 150:24, 151:1, 151:2, 151:5, 151:23, 152:1, 154:17, 155:1, 155:4, 155:6, 155:8, 155:18, 155:19, 155:23, 155:25, 156:3, 163:13, 163:15, 163:17, 163:20, 164:1, 164:5, 164:9, 164:13, 165:1, 165:6, 165:9, 165:11, 165:23, 166:3, 166:10, 166:15, 166:23, 167:1, 167:3, 167:21, 168:2, 168:4, 168:19, 170:5, 170:11, 170:17, 170:25, 171:5, 171:8, 171:15, 171:17, 171:21, 171:25, 172:4, 172:7, 172:13
**themselves** [2] - 11:21, 17:17
**theory** [1] - 110:10
**therapies** [1] - 156:5
**Therapy** [1] - 74:8
**therapy** [6] - 10:11, 30:4, 39:17, 65:19, 96:2, 156:9
**therefore** [1] - 46:20
**they've** [1] - 95:5
**thinking** [2] - 140:13, 154:6
**third** [1] - 138:11
**thorough** [1] - 10:3
**thoughtful** [1] - 64:5
**thousands** [1] - 11:22
**threatened** [1] - 155:13

**three** [23] - 23:11, 23:12, 42:9, 43:9, 54:10, 54:12, 63:5, 73:2, 82:7, 102:2, 102:10, 121:2, 129:25, 130:5, 134:20, 137:23, 141:5, 142:22, 158:16, 158:17, 158:19, 163:10
**throughout** [2] - 37:15, 113:19
**throw** [1] - 150:9
**Thursday** [1] - 4:13
**time-limited** [1] - 79:19
**Timmy** [1] - 59:23
**tinker** [1] - 153:6
**titled** [2] - 91:17, 101:8
**titrated** [1] - 78:20
**titrating** [1] - 78:6
**titration** [2] - 48:19, 78:24
**today** [11] - 52:17, 88:8, 102:14, 103:2, 113:15, 113:24, 114:1, 130:4, 139:14, 164:20, 170:7
**together** [5] - 107:9, 154:11, 154:13, 161:23, 161:25
**toilet** [1] - 138:25
**tolerable** [2] - 153:1, 153:2
**tolerance** [2] - 35:20, 36:2
**tolerate** [1] - 124:11
**Tolerates** [1] - 20:18
**tolerates** [1] - 35:16
**tolerating** [3] - 20:22, 24:10, 124:9
**Tolliver** [2] - 158:23, 162:25
**tomorrow** [7] - 113:17, 164:20, 167:9, 167:24, 167:25, 168:7, 168:17
**tonight** [2] - 164:18, 165:4
**took** [15] - 42:10, 44:15, 54:10, 98:14, 108:23, 118:4, 124:3, 129:14, 138:25, 146:15, 150:18, 160:9, 160:13, 162:23
**Tool** [4] - 26:22, 39:2, 91:18, 95:21
**tool** [2] - 9:23, 10:9
**tools** [2] - 9:25, 10:9

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 236-5171

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 193 of 195   Pageid#: 10319

**top** [7] - 18:17, 23:8, 48:3, 76:17, 150:10, 150:11
**total** [2] - 22:12, 148:19
**totality** [1] - 13:25
**touch** [3] - 164:8, 164:16, 166:1
**toward** [1] - 113:7
**Toyota** [1] - 125:4
**track** [5] - 12:12, 80:16, 80:18, 81:23, 122:6
**tracking** [1] - 81:13
**trafficking** [1] - 81:23
**trailer** [1] - 140:20
**training** [1] - 93:25
**Tramadol** [1] - 76:3
**transcribed** [1] - 1:25
**TRANSCRIPT** [1] - 1:11
**Transcription** [1] - 1:25
**transfer** [1] - 12:3
**transmission** [1] - 30:17
**travel** [2] - 8:25, 49:17
**traveling** [1] - 49:12
**treat** [3] - 38:5, 40:12, 102:17
**treated** [3] - 37:19, 37:20, 123:12
**treating** [5] - 10:5, 10:15, 11:22, 24:12, 98:1
**treatment** [22] - 11:11, 14:15, 17:22, 18:25, 19:17, 27:24, 28:24, 29:1, 29:7, 30:19, 32:11, 37:12, 53:21, 65:21, 68:2, 68:3, 68:5, 68:6, 82:3, 93:15, 96:22
**Treatment** [2] - 32:12, 90:10
**treatments** [2] - 96:10, 96:16
**trial** [2] - 164:23, 165:19
**TRIAL** [1] - 1:11
**TRICARE** [1] - 145:20
**tried** [7] - 79:2, 110:21, 113:19, 113:20, 121:1, 138:18
**trip** [1] - 44:15
**trips** [1] - 150:12

**trouble** [5] - 119:24, 123:21, 124:9, 132:7, 165:3
**true** [10] - 45:13, 94:25, 95:2, 95:5, 95:7, 97:22, 99:21, 100:5, 139:23
**truth** [11] - 5:3, 5:4, 45:11, 116:16, 116:17, 118:21, 148:1, 148:2
**truthful** [1] - 90:17
**try** [16] - 35:7, 96:19, 96:22, 98:14, 120:22, 122:24, 124:20, 138:1, 138:2, 139:2, 144:5, 144:7, 145:7, 145:13, 145:20, 164:6
**trying** [14] - 14:23, 18:1, 41:6, 79:23, 83:5, 123:21, 124:10, 139:3, 144:16, 145:5, 164:7, 167:1, 167:11
**twenty** [1] - 150:4
**twenty-four** [1] - 150:4
**twice** [3] - 54:10, 133:14, 134:6
**two** [26] - 4:6, 8:24, 22:18, 43:6, 43:7, 106:19, 113:14, 118:12, 121:2, 129:24, 129:25, 130:6, 132:25, 138:11, 142:22, 143:6, 148:23, 149:3, 156:19, 158:15, 158:16, 158:18, 165:25, 166:6, 171:7
**type** [4] - 31:21, 36:15, 37:9, 158:4
**types** [1] - 10:8
**typical** [1] - 77:9
**typically** [3] - 8:11, 93:9, 111:25

# U

**U.S** [1] - 11:6
**UDT** [3] - 40:22, 75:13, 76:17
**ultimate** [1] - 73:6
**ultimately** [3] - 12:21, 13:10, 47:17
**unable** [2] - 52:18, 153:11
**unclear** [1] - 165:20
**under** [8] - 43:17, 91:25, 108:17, 110:2, 112:16, 112:17, 118:20, 169:25

**undergraduate** [1] - 6:7
**underlying** [4] - 10:13, 38:5, 41:11, 45:7
**UNITED** [2] - 1:2, 1:5
**United** [4] - 1:18, 1:20, 107:1, 126:23
**University** [2] - 6:8, 6:10
**unless** [4] - 115:15, 133:2, 136:8, 154:24
**unrelated** [1] - 61:24
**unsigned** [1] - 32:17
**unspecified** [1] - 34:23
**unsure** [2] - 75:14, 89:12
**unusual** [2] - 49:15, 58:5
**up** [59] - 11:10, 12:2, 12:5, 17:22, 18:16, 22:5, 22:13, 25:24, 28:3, 28:16, 28:20, 29:8, 31:7, 34:11, 34:15, 35:13, 41:24, 42:12, 43:20, 44:18, 45:17, 45:22, 46:6, 47:14, 48:3, 49:8, 58:18, 65:6, 70:3, 73:14, 82:18, 87:20, 88:14, 94:4, 101:3, 112:3, 114:7, 114:12, 116:6, 116:10, 116:19, 119:21, 124:18, 125:5, 132:3, 136:2, 136:3, 145:9, 149:19, 149:22, 150:10, 156:22, 156:25, 158:1, 158:5, 160:6, 172:22
**Urgent** [2] - 14:12, 33:15
**urinating** [1] - 4:16
**urine** [18] - 42:3, 42:6, 44:18, 47:19, 53:9, 53:10, 56:7, 59:25, 64:2, 72:21, 72:24, 76:2, 76:4, 76:18, 98:24, 135:15, 135:20, 135:22
**useful** [2] - 64:12, 66:21
**uses** [3] - 40:14, 170:21

# V

**VA** [1] - 1:21, 1:24
**vacuum** [1] - 12:1
**Valium** [2] - 76:20, 76:21
**value** [1] - 43:11
**variability** [1] - 89:9
**variety** [1] - 92:7
**various** [3] - 16:3, 89:13, 168:7
**verdict** [5] - 169:10, 169:15, 169:18, 172:4, 172:13
**verification** [1] - 30:17
**versus** [4] - 23:1, 36:23, 89:8, 151:14
**view** [4] - 61:7, 88:20, 111:23, 171:14
**viewed** [1] - 85:3
**violation** [2] - 107:3, 107:16
**VIRGINIA** [1] - 1:3
**Virginia** [16] - 5:25, 6:7, 6:8, 7:25, 8:8, 8:13, 9:12, 19:25, 49:11, 117:8, 124:16, 126:24, 128:11, 148:17, 157:14, 157:18
**visit** [23] - 25:20, 25:21, 25:25, 62:21, 67:11, 76:10, 76:22, 76:24, 117:20, 118:9, 122:9, 130:13, 131:4, 131:21, 131:22, 132:11, 133:25, 137:7, 151:8, 151:17, 158:4, 159:12, 161:23
**visits** [4] - 61:6, 61:21, 97:17, 125:25
**vital** [1] - 118:4
**vitamins** [3] - 12:15, 112:3, 112:10
**Vogt** [1] - 124:18
**vomiting** [1] - 24:12
**vs** [1] - 1:7

# W

**wait** [6] - 49:8, 54:2, 76:7, 131:2, 134:10, 151:2
**waiting** [1] - 167:18
**walk** [2] - 118:2, 134:10
**walking** [1] - 130:12
**walks** [1] - 102:15
**Wallingford** [1] - 65:8
**Walmart** [7] - 102:4, 102:10, 140:22, 141:10, 141:15, 142:24, 146:24

**warning** [1] - 52:7
**warrant** [3] - 4:15, 129:4, 137:15
**watch** [1] - 168:14
**water** [1] - 5:12
**Wayne** [3] - 158:23, 159:10, 162:25
**ways** [5] - 36:25, 38:4, 124:14, 150:6, 150:14
**weaning** [1] - 120:8
**wearing** [1] - 141:19
**weather** [1] - 54:18
**week** [5] - 158:4, 164:24, 166:6
**weekend** [2] - 4:3, 113:20
**weeks** [3] - 78:21, 166:6, 167:8
**Wendell** [14] - 121:11, 121:17, 134:8, 134:12, 135:3, 135:7, 135:12, 135:17, 135:19, 135:22, 136:17, 138:24, 138:25, 145:1
**Wendell's** [1] - 137:10
**West** [8] - 1:20, 49:11, 117:8, 126:24, 128:11, 148:17, 157:14, 157:18
**Western** [1] - 6:10
**WESTERN** [1] - 1:3
**wheelchair** [3] - 116:6, 130:4, 147:14
**whole** [8] - 5:3, 13:13, 49:4, 65:23, 116:17, 148:1, 149:24, 150:13
**wife** [1] - 86:17
**Williams** [34] - 1:22, 1:23, 3:12, 60:19, 61:5, 61:20, 72:10, 72:13, 83:19, 83:20, 85:20, 86:7, 86:16, 86:19, 88:4, 94:7, 104:6, 104:15, 111:19, 113:12, 114:14, 115:3, 115:8, 115:24, 132:8, 155:22, 163:22, 164:13, 170:9, 170:11, 171:1, 171:21, 172:2, 172:4
**WILLIAMS** [79] - 2:4, 2:7, 2:8, 2:9, 3:13, 9:19, 13:14, 61:10, 70:21, 70:23, 86:9, 87:25, 88:5, 88:7,

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 883-8870
Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 194 of 195   Pageid#: 10320

92:12, 92:13, 94:4, 94:6, 98:18, 98:19, 103:14, 104:7, 104:11, 104:16, 104:19, 111:21, 113:13, 114:8, 114:15, 114:20, 114:24, 115:9, 115:14, 115:17, 115:25, 116:3, 116:5, 117:2, 118:22, 123:1, 143:17, 143:19, 145:23, 147:9, 147:17, 148:6, 148:11, 151:6, 152:3, 154:18, 155:5, 155:10, 155:24, 156:2, 156:4, 156:16, 163:16, 163:19, 163:23, 164:6, 164:10, 164:15, 165:2, 165:8, 165:10, 165:24, 166:5, 166:12, 166:17, 166:25, 167:2, 167:18, 168:1, 170:15, 170:18, 171:3, 171:22, 172:3, 172:6

**Williams's** [1] - 85:16

**wire** [1] - 141:19
**wired** [1] - 141:16
**wires** [1] - 86:17
**wish** [1] - 38:3
**with"** [1] - 44:10
**withdraw** [1] - 3:20
**WITNESS** [25] - 5:5, 5:21, 7:16, 21:10, 26:18, 28:17, 30:12, 31:9, 32:14, 35:11, 75:15, 103:22, 116:18, 116:21, 139:12, 147:13, 147:22, 148:3, 151:1, 151:5, 152:1, 155:4, 155:8, 155:18, 155:23
**witness** [23] - 4:4, 5:8, 24:19, 61:14, 71:1, 103:19, 113:22, 114:6, 114:7, 114:9, 116:2, 116:13, 116:23, 118:17, 147:11, 147:12, 147:16, 148:8, 156:1, 163:17, 163:24, 168:25
**witness"** [1] - 169:2
**WITNESSES** [2] - 2:2, 2:5

**witnesses** [16] - 105:3, 105:4, 113:15, 114:2, 114:4, 114:19, 115:2, 164:14, 167:7, 167:9, 167:12, 167:19, 167:24, 168:5, 168:6, 169:2
**woman** [1] - 137:7
**wonder** [1] - 5:17
**words** [5] - 89:6, 92:17, 94:13, 95:9, 96:1
**Workman** [4] - 125:14, 128:21, 129:17, 140:19
**World** [2] - 88:24, 89:1
**worry** [1] - 124:22
**worse** [2] - 35:25, 69:6
**worsened** [3] - 54:19, 54:21, 69:1
**worsening** [3] - 69:8, 69:19, 70:1
**worth** [1] - 122:13
**wrist** [1] - 80:17
**write** [9] - 109:3, 109:9, 121:13, 127:4, 127:14, 128:4, 128:12, 138:22, 160:18
**writes** [1] - 29:18
**writing** [8] - 27:8, 31:2, 31:16, 107:22, 111:10, 127:9, 128:10, 170:13
**written** [13] - 7:3, 14:5, 21:19, 25:17, 30:7, 30:8, 70:14, 85:2, 99:14, 126:9, 136:3, 146:6, 147:4
**wrote** [9] - 27:3, 77:3, 83:11, 108:25, 136:5, 138:14, 138:17, 143:9, 161:2
**WW** [3] - 75:22, 75:23, 76:25
**Wytheville** [7] - 60:4, 67:11, 129:21, 132:20, 149:13, 158:1, 162:18

### X

**X-ray** [2] - 57:25, 69:24
**X-rays** [9] - 29:1, 57:22, 69:2, 69:16, 83:7, 83:13, 89:14, 150:17, 150:20

### Y

**year** [6] - 6:5, 7:2, 11:22, 57:6, 88:14, 149:20
**years** [17] - 8:5, 8:18, 8:22, 9:11, 16:14, 65:10, 102:2, 102:10, 130:6, 131:13, 139:8, 143:1, 148:19, 148:23, 149:3, 150:4
**yoga** [1] - 144:3
**York** [2] - 6:11
**you-all** [1] - 118:14
**young** [1] - 65:15
**younger** [1] - 99:14
**yourself** [4] - 5:15, 142:9, 142:12, 146:19

### Z

**Zachary** [1] - 1:19
**Zanaflex** [6] - 21:9, 26:17, 28:9, 55:22, 67:6, 71:19
**zero** [1] - 58:6
**Ziploc** [1] - 122:5
**zoom** [6] - 21:4, 24:8, 28:6, 28:16, 40:19, 41:24

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 608-4148

Case 1:17-cr-00027-JPJ-PMS   Document 236   Filed 06/08/19   Page 195 of 195   Pageid#: 10321