# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No. 1:17-CR-27 |
| | : | |
| **v.** | : | **GOVERNMENT'S OPPOSITION** |
| | : | **TO MOTION FOR ACQUITTAL** |
| **JOEL A. SMITHERS** | : | **OR A NEW TRIAL** |

Joel Smithers invoked his right to a jury trial.  The jury received testimony (including Smithers') and evidence for six days.  It found him guilty of all 861 counts before it.  Smithers now asks the Court to undo every one of those convictions.  (Dkt. 218).  The defendant's motion, however, disregards the evidence before the jury and the standard by which the Court must now view it.  The 861 convictions should stand.  His motion ought to be denied.

Smithers operated a pill mill, and he knew it.  He feared detection and tried to avoid suspicion by moving offices and terminating patients he thought worked with law enforcement. He wrote and mailed controlled substance prescriptions for "patients" he had not seen.[1]  He pre-signed prescriptions, mailed them, and passed out others in a Starbucks parking lot.  His medical exams and documentation were non-existent or cursory.

His clientele drove hours, over hundreds of miles, to obtain and fill his prescriptions.  His patients included drug addicts, drug dealers, and drug convicts.  He steered patients to the few, favored, far-off pharmacies that would fill his prescriptions.  At times, he took special requests for more or stronger drugs, and coached patients how to fill out forms.  His staff had no medical training.  His business refused insurance and dealt only in cash.  His sparse office lacked basic medical equipment and supplies.  In his car, he had thousands of dollars in cash, stored Schedule II substances in over-the-counter containers, and kept pills in small, dispense-ready baggies.

---

[1]     For brevity, this brief refers to those for whom Smithers wrote prescriptions as "patients."

Smithers own text-messages confirmed many of these facts.  Dr. Denni Bassam—formerly of the Virginia Board of Medicine and qualified as an expert—reviewed each patient file and prescription charged in the indictment.  He affirmed what was already apparent:  Smithers' actions were not part of the medical profession.  For Dr. Bassam, it "wasn't even a close call"—an opinion he reached without knowing the other voluminous evidence known to the jury.

The jury weighed the evidence, including that which Smithers' claims justifies dismissal of some counts.  (Dkt. 218 ¶¶ 1, 3–6).  It found for the Government and against Smithers' narrative.  Substantial evidence supports the verdict, and Smithers' legal arguments are without merit.

## LEGAL STANDARD

A judgment of acquittal based on insufficient evidence can only be granted if the Court finds as a matter of law that the government's evidence is insufficient to establish factual guilt on the charges in the indictment.  *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003).  The jury verdict must be upheld if there is substantial evidence, viewed in the light most favorable to the government, to support it.  *United States v. Perkins*, 470 F.3d 150, 160 (4th Cir. 2006).  "Substantial evidence is evidence that a reasonable fact finder could accept as adequate and sufficient to support a conclusion of guilt beyond a reasonable doubt."  *Id.*[2]  "In applying this standard of review, [courts] must remain cognizant of the fact that the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe."  *Id.*

A new trial may be granted only "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Motions for new trial "are disfavored."  *United States v. Chavez*, 894 F.3d 593, 607 (4th

---

[2]     Internal quotations and citations are omitted throughout this brief.

Cir. 2018).  A "district court should exercise its discretion to grant a new trial sparingly[,] and [it] should grant a new trial based on the weight of the evidence only when the evidence weighs heavily against the verdict." *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997); *see United States v. Saint Louis*, 889 F.3d 145, 157 (4th Cir. 2018)

**ANALYSIS**

Smithers' motion presents mainly a sufficiency-of-the-evidence argument.  The Court heard the evidence.  The Government highlights below several aspects of it.  The jury was entitled to take into consideration the full panoply of evidence against Smithers to evaluate, *e.g.*, whether he intended to distribute controlled substances outside of his role as a physician (Count 1) and whether he operated outside of that role regarding individual distributions.  Here, it was reasonable for a jury to conclude—as this jury did—that the entirety of Smithers' conduct was outside the bounds of the medical profession and was not for a legitimate medical purpose in the usual course of medical practice.

I.     **Smithers Did Not Operate as a Legitimate Doctor.**

The evidence exposed an interstate drug distribution ring, with Smithers at its center.

A.     **Smithers was conscious of his own guilt**.

Smithers knew his actions were illegal.  He worried about keeping "the DEA and State Board of [M]edicine off of [his] back."  (Ex. DWi-1000 at 257).  He fretted that he "damn sure" needed a "good fucking plan" to do so  (*Id*. at 258).  He wrote that he "really need[ed]" to talk to a lawyer "and come up with a battle plan to fight these fuckers."  (*Id*. at 259).  He and one of his primary sub-distributors, D.Wi., discussed the prospect of hiring a "criminal lawyer friend that does major drug cases."  (*Id*.).  D.Wi. advised Smithers in September 2015 that Smithers "can

make a million a year" writing prescriptions, but if he did it wrong without using a lawyer he could go to jail. (*Id.* at 195). Smithers worried about whom he could trust. (*Id.* at 256).

Smithers complained to D.Wi. it was "shady as fuck" when patients recruited by D.Wi. visited the office and stated someone else paid for their visit. (Dkt. 237 (5/2/19) at 135; Ex. DWi-1000 at 271). Smithers acknowledged his own employee was "ultra suspicious" about the practice of third-parties paying for patient visits. (Dkt. 237 at 137). Smithers and D.Wi. discussed how D.Wi. would "burn the paperwork" from wire transfer payments to Smithers. (*Id.* at 113). After Smithers said he was ready to receive more wire transfers from D.Wi., Smithers was warned that he had "to watch how much" he did. (Ex. DWi-1000 at 33).

A note written by Smithers in his office contained a script to thwart potential undercover investigators: "for suspected wires: 'w/o verification of your issues I cannot help you.'" (Ex. 49; dkt. 237 at 82–84). A sticky-note in his office expressed fear of law enforcement surveillance, reading "is Darryl Williams wearing a wire?" (Ex. 87; dkt. 237 at 84). Another note asked "DEA?" with an apparent license tag number written down beside "late model Ford." (Ex. 88; dkt. 237 at 84–85).

Smithers also revealed his consciousness of guilt by discharging patients he suspected of cooperating with law enforcement. (*E.g.*, dkt. 233 at 27–28 (D.Wi. discharged by Smithers); Ex. 87 (indicating suspicion of D.Wi. wearing wire)). Patient R.B. was a cooperator and provided information on Smithers in May 2016 to the DEA. (Dkt. 237 at 69–70). The cooperation was not publicly known, but R.B. had an associate who knew Smithers. (*Id.* at 73–75). Within two days of R.B.'s cooperation, the associate texted Smithers concerning the "DEA" and "informants," which Smithers found "interesting." Smithers thanked the associate. The associate responded "I like y'all an i can't stand a dam snitch" and suggested Smithers send R.B. a discharge letter and

not talk to him again.  Smithers did so.  (Ex. 104 at 4 (5/20/16 text messages), 9 (6/15/16 text messages); dkt. 237 at 69–70, 76–80).

Evading authorities was part of Smithers' *modus operandi* before coming to Virginia. West Virginia authorities approached him on June 23, 2015 about a complaint with his practice. (Dkt. 238 (4/30/19) at 11).  They returned with a subpoena the next day, but his office was "locked" and "cleaned out."  (*Id.* at 12).  A dumpster outside the office contained shredded paper, bags, and untested urine samples marked with patient-identifying information.  (*Id.* at 13).  The resulting investigation revealed Smithers, despite stating he "did not want to be a chronic pain center," had over half of his patients receiving narcotics, in violation of West Virginia regulations.  (*Id.* at 11–13).  Smithers then opened his clinic in Martinsville, Virginia in August 2015.  (*Id.* at 20).

### B.    Smithers' patients were not legitimate.

Smithers' patients were not seeking legitimate medical treatment.  They wanted drugs.

*

Most of Smithers' patients were out of state.  (Dkt. 233 at 154).  They traveled extreme distances, frequently making 8-, 10, 12-, and 16-hour round trips from other states, to obtain pills from Smithers.  (Dkt. 238 at 74–75, 110–11, 140; dkt. 233 (5/1/19) at 112–13; dkt. 237 at 67–68, 88–89; Ex. 50; Ex. RiJ-1000 at 12 (8/23/15 text messages)[3]).  Doctors closer to their homes would not prescribe the controlled substances that they sought.  (Dkt. 238 at 75; dkt. 233 at 63–64, 115). A mother and daughter (patient S.K.) came from Kentucky and Ohio, respectively, to receive opiates in order to make money selling them on the street.  (Dkt. 238 at 102–04; *see, e.g.*, dkt. 238 at 20–21, 100, 102 (evidence of patients from Ohio); dkt. 233 at 154 (same); dkt. 237 at 40 (same);

---

[3]    Pinpoint citations to Exhibit RiJ are to sequential PDF pages of the exhibit, not the right-footer pagination.

*see also* dkt. 233 at 154 (patients from Tennessee)).  Smithers' drug-tester thought patients coming

from so far away was "very weird."  (Dkt. 237 at 40).

Patients would often share rides to Smithers' clinic, exchanging pills as a method of

payment.  (Dkt. 238 at 140–43; dkt. 233 at 13–14, 113–14).  One man, patient J.L., hitched a 12-

hour round-trip ride with a driver, Ri.J., he had never met.  (Dkt. 233 at 112–13).  The driver paid

all expenses of the trip, and in return took a cut of the man's pills prescribed by Smithers.  (*Id*. at

113–14).  J.L. knew the arrangement to split the pills was wrong.  (*Id*. at 115).  The driver and his

wife, Re.J., frequently arranged with Smithers to transport patients from Kentucky, scheduled their

appointments, or received their prescriptions via mail.  (*E.g.*, Ex. RiJ-1000 at 8 (patient D.J.), 12–

14 (patients B.L., J.L., D.B., D.Wo., A.W.), 17–18 (patients B.Ho., D.Ho.), 22 (patient J.C.), 23–

24, (patient T.D.), 25 (patients C.G., S.F.), 28 (patient S.F.), 32 (patients D.J., D.Ho., B.Ho.), 51,

(patient B.L.), 84–85 (patient Ri.J.)).

It "was a big red flag" for a local pharmacist that Smithers' patients were mostly "not from

the area," and he refused to fill Smithers' prescriptions.  (Dkt. 238 at 27).  He did so because he

had concerns about whether the prescriptions were for a legitimate medical need.  (*Id*. at 28).

\*        \*

The evidence also showed that Smithers' patients were drug dealers, users, and abusers.

Patient J.P. snorted pills.  (Dkt. 233 at 80–81).  She presumed that her husband, also Smithers'

patient, was an addict.  (*Id*. at 62).  She told Smithers she had been an addict and had been on

Suboxone; he wrote her prescriptions anyway.  (*Id*. at 82).  She admitted she had no reason to be

on high-powered medication. (*Id.* at 62–63).

Patient L.K. saw Smithers because she was an addict and knew she could get opiates

"without any kind of physical exam or bringing medical records."  (Dkt. 233 at 11–13; *e.g.*, dkt.

233 at 18).  She was previously involved with pills mill in Florida, and "every pain doctor or pill mill" she had been to was been shut down.  (Dkt. 233 at 11, 14, 19, 57).  L.K. explained that her boyfriend (D.Wi., one of Smithers' primary co-conspirators) facilitated "probably more than 20 people going" to visit Smithers.  (Dkt. 233 at 13; *e.g.*, *id*. at 36–39).  D.Wi. "would pay for everything" and "when the prescriptions were filled," he would receive half of them to sell, with the so-called patients keeping the remainder.  (*Id*. at 13).  Smithers was generally aware of the arrangement.  (*Id*. at 46–47; *see generally* Ex. DWi-1000).

L.K.'s file showed she had prior charges for illegal drug trafficking and withholding information to obtain prescriptions.  (Ex. LK at 37; dkt. 233 at 30–31).  It also reported she had been doctor- and pharmacy-shopping all over the mid-Atlantic—from Washington, D.C., to Richmond, Virginia, to Chattanooga, Tennessee, even to Indiana.  (Dkt. 233 at 32–33).  Smithers wrote her Schedule II substances anyway.

S.K. from Ohio—who wanted pills for resale—admitted she had no legitimate reason to see Smithers.  (Dkt. 238 at 112).

One couple connected with D.Wi. visited Smithers because the boyfriend (B.Ha.) was addicted to pain medicine and obtaining it from Smithers was cheaper than buying it on the street.  (Dkt. 238 at 32–34, 36, 73).  Smithers was aware that the B.Ha. had an arrangement with D.Wi., and Smithers coached the patient not to report high levels of pain all the time in order "to make it look like the medicine was working."  (*Id*. at 87, 93).  The girlfriend (M.S.) became addicted to the pills and began snorting them.  (*Id.* at 37–38).  She admitted she had no medical need for the drugs but had been coached not to say so.  (*Id*. at 38–39).  She would not have visited Smithers if she had a real medical problem; she went for the pills.  (*Id.* at 41, 62).  She got them.

Several of Smithers' patients came to him only after their prior doctor(s) had been shut down or kicked them out as patients. (Dkt. 238 at 74; dkt. 233 at 57, 108–09). Patients would also routinely failed drug screenings—testing positive for drugs they were not prescribed (indicating street purchasing) or negative for drugs they should have been taking (indicating street selling or overconsumption). (*E.g.*, dkt. 238 at 42; dkt. 236 at 42–47, 52, 55–56, 59–60, 62–63, 67, 71–73, 75–76). Smithers wrote the patients Schedule II substances anyway. (*E.g.*, dkt. 238 at 45). Patient S.M., who had a drug distribution conviction, never even received a drug test. (Dkt. 238 at 144). Patient B.H. received treatment at methadone clinic for opiate addiction. (Dkt. 236 (5/6/29) at 68; Ex. BH at 6). Smithers nonetheless wrote him prescriptions. Smithers kept prescribing drugs even when patients had incorrect pill counts. (*E.g.*, dkt. 233 at 82).

Female patients were not observed during drug screens. (Dkt. 233 at 75, 207–08; dkt. 237 at 31). Indeed, there were no females that worked for Smithers. (Dkt. 237 at 23, 30–31).

Patients talked in the office about selling their prescriptions. (Dkt. 233 at 166–67). Smithers' patients also seemed suspicious to outside observers. An employee of an office next to Smithers' noticed that his patients "were very nervous and weren't well kept [people] who were demanding to use the bathroom and use the phone." (Dkt. 238 at 20). Some of them had license plates from Ohio, Kentucky, and West Virginia, "slept in the parking lot," and used the bathroom outside before the office opened. (*Id.* at 20–21). The employee "didn't feel comfortable letting them in" or walking to her car alone after work. (*Id.* at 20–21).

## C.   Smithers' prescribing practices were abnormal.

Every patient of Smithers received Schedule II controlled substances. (Dkt. 233 at 153; dkt. 235 (5/5/19) at 231). He pre-signed prescriptions for employees to finalize when he was not in the office. (Dkt. 238 at 107–08; dkt. 233 at 156–57, 186; Ex. 86). Patients would still pay the

office visit fee even if Smithers was not there, meaning they simply were buying the prescription. (Dkt. 233 at 157–58).   He performed few if any in-person examinations.   (Dkt. 238 at 86; dkt. 233 at 170–71).   MRIs or X-rays were neither ordered nor performed.   (Dkt. 238 at 105).

Smithers wrote prescriptions in the name of patients he did not see and then sent them to third-parties.  (Dkt. 238 at 39, 82–83; dkt. 233 at 23; *e.g.*, Ex. RiJ-1000 at 42–44, 47).  This most often occurred with established patients.  (Dkt. 233 at 23).   Mailing out prescriptions was done at Smithers' direction.  (Dkt. 233 at 158).

Smithers never saw patient D.R.  (Dkt. 238 at 125, 132).   He wrote prescriptions in her name that she never sought or received.  (Dkt. 238 at 127–30).   She never visited Smithers' clinic, and had never been to the city in which it was located.  (Dkt. 238 at 13).[4]

Patient S.M. drove from Kentucky to Martinsville, but Smithers was out of the office and directed her to meet him in Greensboro, North Carolina at a Starbucks parking lot.  (Dkt. 238 at 145–47, 154).   When Smithers arrived, he called the patient over, she handed him $300, and he handed her a prescription.  (Dkt. 238 at 146–47).   Smithers did not perform an exam.  (Dkt. 238 at 147).   S.H. stopped going to Smithers because she felt the encounter was "very wrong."  (Dkt. 238 at 147–48).

Smithers' patients had difficulty filling his prescriptions locally.  (Dkt. 233 at 20–21, 68–69).   So he'd steer them to far-off pharmacies—such as Buffalo Drug and Poca in West Virginia—that took cash and would sometimes not fill the whole prescription despite charging full price. (Dkt. 238 at 115–16; dkt. 233 at 21–22; dkt. 235 at 228–29; Ex. 89).   Smithers also took special requests from third-parties to write higher doses for his patients.  (Ex. DWi-1000 at 51, 64, 165;

---

[4]      Smithers admitted that his conduct regarding D.R. was "very bad," "very poor judgment," "inappropriate," "not an appropriate decision," and a "significant error in judgment."   (Dkt. 235 at 162–63, 177, 191).

*see* dkt. 238 at 112).  He wrote increasingly stronger doses of narcotics over time.  (Dkt. 238 at 112–14).  Patients received Schedule II controlled substances even after failing drug tests, being convicted of drug offenses, having physical signs of drug use, or admitting to receiving treatment for drug addiction.  (*E.g.*, dkt. 236 at 40–48, 55–56, 58–60, 62–64, 67–68, 71–72, 75–77, 80–81, 84–85).

### D.   Smithers' business practices bore hallmarks of illegitimacy.

Smithers' office was not like a real doctor's office.  (Dkt. 233 at 161).  It had no nurses.  (Dkt. 238 at 84; dkt. 233 at 84).   It was spartan, lacked basic medical equipment supplies, and used bare-bones furniture such as folding chairs.  (Exs. 17–18, 26–27, 68, 72).  One exam room stored children's toys and boxes.  (Ex. 30).  Peter Bodai, Smithers' own receptionist, would not have gone to Smithers' with a legitimate medical problem.  (Dkt. 233 at 161).  Bodai lived out of a back room in the office during the workweek.  (Dkt. 233 at 166; Ex. 32).  He got the job simply by showing up in Martinsville after being told to go there by his former employer.  (Dkt. 233 at 143–45).

Employees were paid in cash, personally handed out by Smithers.  (Dkt. 233 at 150–53; Dkt. 237 at 26–27; dkt. 235 at 198).  The arrangement was "odd."  (Dkt. 233 at 152).  Smithers' drug screener was Juan Angel, whose prior job was waiting tables at his uncle's Mexican restaurant.  (Dkt. 233 at 153; dkt. 237 at 22–23).  Angel had no medical training or experience.  (Dkt. 237 at 25).  He filled out no paperwork before starting. (*Id.* at 25).  Employees tried to keep up the façade that Smithers' patients were legitimate.  (Dkt. 233 at 154–55, 169)

Exam rooms lacked exam tables, and patients supposedly in great pain sat in folding chairs for hours waiting to see Smithers.  (Dkt. 233 at 103–05).  Patients would sometimes wait 8-12 hours (or longer) for Smithers, and the chairs "weren't comfortable at all." (*Id.* at 165). The office

was not sanitized.  (*Id.* at 206).  The practice accepted only cash and did not take insurance.  (Dkt. 238 at 145; dkt. 233 at 22; dkt. 233 at 148; *see* dkt. 233 at 64–65).  Smithers frequently was not in the office.  (Dkt. 235 at 230).  He sometimes saw patients at bizarre hours, such as midnight.  (Dkt. 238 at 54, 89; dkt. 233 at 161–62).  Other people paid for office visits or prescriptions of Smithers' patients.  (*E.g.*, dkt. 238 at 40, 77; dkt. 233 at 13, 23, 24–25; Ex. 48).  Patient records contained notations that patients said they had not told Smithers, indicating that Smithers doctored the files.  (Dkt. 238 at 152–53; *compare id*. at 52–53 *with* Ex. MS at 37).

### E.      Profit motive, rather than medicine, drove Smithers.

Smithers' prescribing practices were motivated by greed, not medical judgment.

D.Wi. encouraged Smithers that he could make a million or more dollars a year writing prescriptions, potentially as much as $10,000 a day—*i.e.*, $3,650,000 annually.  (Ex. DWi-1000 at 195, 256).  Smithers agreed that his operation was a cash cow that provided steady injunctions of cash and should be grown and protected.  (*Id*. at 256, 258).  Smithers kept close tabs on his payments and celebrated when he received them.  (*E.g.*, *id*. at 35, 282, 285).  Over a 20-month period, Smithers deposited approximately $680,000 into a single bank account.  (Dkt. 237 at 59–62; Ex. 51).  Over $57,000 was seized from his home and office.  (Dkt. 237 at 48).  He saw patients together but charged them separately for office visits.  (Dkt. 233 at 105–07).  He bought a Cadillac Escalade for his wife.  (Dkt. 235 at 195).

At one point Smithers discharged patient L.K., allegedly for testing positive for cocaine.  (Dkt. 233 at 27-28).  She then cooperated with the DEA to place a recorded call to Smithers.  (Dkt. 233 at 23–25).  He took a $1,200 payment from her and D.Wi. to pay for other patients in his office.  (Dkt. 233 at 28).  "Business went on as usual" (even though D.Wi. and L.K. were not patients), and Smithers accepted patients that D.Wi. funneled to him.  (Dkt. 233 at 55).

11

**F.      Dr. Bassam confirmed that every prescription was not legitimate.**

Dr. Denni Bassam graduated from the University of Virginia Medical School.  (Dkt. 236 at 6).  He completed a general surgery internship in Chicago, an anesthesiology residence at New York Hospital, and a fellowship in pain medicine at Texas Tech Medical Center.  (*Id.* at 6).  He is board certified in pain management and pain medicine. (*Id.* at 6).  He served on the Virginia Board of Medicine from 2008 to 2012, reviewing cases from all over the Commonwealth regarding improper prescribing habits.  (*Id.* at 7–9).  He is an expert in pain management and prescribing controlled substances.  (*Id.* at 9).

Dr. Bassam reviewed Smithers' patient files and corresponding prescriptions.  (Dkt. 236 at 11, 13–14).  Smithers' operation did "not resemble[e] what [Dr. Bassam] recognize[d] as the practice of medicine."  (*Id.* at 14).  The prescriptions were not written for a legitimate medical purpose and were outside the scope of professional practice.  (*Id.* at 14).  The issue was not even a close call.  (*Id.* at 62).  Regarding the distance patients travelled to see Smithers, it was "hard to image a medical reason for that."  (*Id.* at 49).

In Exhibit 107, Dr. Bassam affirmed his conclusion for every patient prescription at issue during trial.  (Dkt. 236 at 24–25; Ex. 107).  Smithers had "no documentation of any significant pathology that a physician would reasonably assume is causing severe pain," and "there [was] no other attempt to make an accurate diagnosis."  (Dkt. 236 at 53).

Smithers' files "really lacked any of the elements that [Dr. Bassam] would normally see in a physical file," which is "of extreme importance," especially for Schedule II prescriptions.  (Dkt. 236 at 11–12).  Dr. Bassam noted that all of Smithers' patients whose files he reviewed received Schedule II controlled substances.  (*Id.* at 13).  Smithers' files contained materials Dr. Bassam had never seen in medical files before. (*Id.* at 15).  Most of the records contained merely "self-reported

symptoms" that are "very much insufficient to be able to come to a diagnosis and assessment" or an "appropriate treatment plan." (*Id.* at 17; *see id.* at 27). The files reflected patient behavior indicative of "pain medication problems" (addiction) rather than a legitimate "pain problem" (someone seeking to treat an underlying painful condition). (*Id.* at 36–38; *e.g.*, *id.* 236 at 43–45, 48–49).

Dr. Bassam reached his opinion even without being aware of the mountain of other incriminating evidence before the jury. When informed that D.Wi. paid for several other patients' office visits, that fact "only enforce[d]" Dr. Bassam's opinion. (Dkt. 236 at 61). When asked to assume other facts already in evidence—*e.g.*, text messages, wire payments paying for other patients, and mailing prescriptions to third-parties—Dr. Bassam couldn't "imagine any clinical medical scenario where that would be appropriate action to take as a physician," and such actions are "not in any way, shape, or form familiar to the practice of medicine." (*Id*. at 86–87).

### G.    Smithers lacked candor.[5]

The jury had before it ample evidence to conclude that Smithers was not forthright and that he'd obscure, bend, or misstate the truth to serve his interests.

Smithers "lied to a police officer" during his internship, falsely stating when pulled over for speeding (and after having consumed alcohol) that he was going to the hospital to see a patient. (Dkt. 235 at 53, 204). The story was a "total lie." (*Id.* at 205). Essentially, Smithers used his position as a doctor to try to skirt legal trouble. (*Id.* at 204). Smithers was told he could resign or be fired from the hospital; he chose to resign. (*Id.* at 53).

---

[5]    Regarding the Court's reserved Rule 29 ruling on Count 1, the Court may consider only the evidence at the time of the motion. The evidence in this section comes from Smithers' testimony in his defensive case.

Earlier in his career, Smithers joined the Air Force.  (Dkt. 235 at 51).  But he was administratively discharged for lying to police.  Smithers nonetheless held himself out to the public as being "retired" from the Air Force.  (*Id.* at 225–27).

Smithers claimed he valued patient privacy.  (Dkt. 235 at 219).  Yet he had conversations with third-parties about patients' medications, appointments dates of birth, and other sensitive information.  (*E.g.*, Ex. DWi-1000 at 305; *see generally* Ex. DWi-1000; Ex. RiJ-1000).  His office left urine tests with exposed patient information in a dumpster.  (Dkt. 235 at 220).  He kept patient files in the trunk of his car.  (*Id.* at 222).

Smithers asserted he left one employer because it wanted him to see more patients per day.  (Dkt. 235 at 57).  But on cross-examination, Smithers admitted that there were problems with him showing up late for work (although he denied that was why he left).  (*Id.* at 208–09).

Smithers also had scripted notes and stock answers prepared for his testimony, including "Counselor, I'm confused."  (Dkt. 235 at 237–38).  The jury observed Smithers' testimony and demeanor during trial.  It would have been justified in finding his answers evasive, misleading, and nonresponsive.

## II.     The Court Properly Instructed the Jury.

Smithers seeks a new trial on all counts because the Court, he says, erroneously instructed the jury.  As he admits, Fourth Circuit precedent forecloses his argument.  (Dkt. 218 ¶ 2).

The Court disjunctively instructed that Smithers could be convicted if his actions were either without a legitimate medical purpose, *or* beyond the bounds of the medical profession.  That is the law—a conjunctive instruction is not required.  *United States v. Singh*, 54 F.3d 1182, 1186–87 (4th Cir. 1995); *e.g.*, *United States v. Hurwitz*, 459 F.3d 463, 475 (4th Cir. 2006) (summarizing

circuit precedent); *United States v. Hitzig*, 63 F. App'x 83, 86–87 (4th Cir. 2003) (rejecting argument seeking conjunctive jury instruction).

Even if it had been error to instruct in the disjunctive, that error was harmless.  Given the weight of the evidence—including Smithers' own words (*e.g.*, text messages, handwritten notes, admissions on the witness stand) and the unrebutted expert testimony of Dr. Bassam—it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999).  At bottom, the evidence against Smithers was overwhelming, and the case was simply not a close one. *See*, *e.g.*, *United States v. McFadden*, 823 F.3d 217, 224–25, 228 (4th Cir. 2016).

Smithers briefly contends that, without his desired conjunctive instruction, "the statute [is] fatally vague under the Due Process Clause." (Dkt. 218 ¶ 2).  No authority is cited.  The argument was squarely presented in *Hitzig* and did not even draw a response from the Fourth Circuit.  63 F. App'x at 85.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "A statute is unconstitutionally vague if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *United States v. Saunders*, 828 F.3d 198, 206 (4th Cir. 2016).  Smithers presents only the first theory.[6]

---

[6]    A void-for-vagueness challenge must be facial rather than as-applied where, as here, a First Amendment claim is not raised. *See Salerno*, 481 U.S. at 745; *United States v. Williams*, 553 U.S. 285, 304 (2008).  Even if Smithers could raise an as-applied challenge, the evidence showed that he was aware of the illegality of his own actions.

In assessing a vagueness challenge, "perfect clarity and precise guidance have never been required," and the inquiry is whether a "statute's prohibitions are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012).  The test "is necessarily a practical rather than hypertechnical one." *Id*.

Smithers does not identify any particular statutory word or phrase as unconstitutionally vague.  He simply lodges a broadside attack against the Controlled Substances Act's application to doctors.  That is not sufficient.  *See*, *e.g.*, *Saunders*, 828 F.3d at 206–07 & n.6 (observing "oddity" of vagueness challenge not focused on any word or phrase, and finding that complexity does not equate vagueness); *Shrader*, 675 F.3d at 310 (declining defendant's invitation to "throwing up our hands and declaring a statute vague simply because it does not include the most elaborate or the most specific definitions possible").

Moreover, Smithers' offenses contain a scienter requirement, which "alone tends to defeat vagueness challenges to criminal statutes." *Saunders*, 828 F.3d at 207.

In sum, Smithers fails to meet the high bar required to succeed on a vagueness defense.

## III.   Every Conviction is Supported by Substantial Evidence.[7]

### A.   Smithers possessed Schedule II controlled substances with the intent to illegitimately distribute them.

Count 1 charged Smithers with possessing Schedule II controlled substance with the intent to distribute.  Federal agents conducted a search of Smithers' practice and vehicle on March 7, 2017.  (Dkt. 237 at 48).  Smithers had a large sum of cash in the glove box of his car.  (Exs. 42–43, 100; dkt. 237 at 47).  In the car, he also kept a backpack containing several over-the-counter

---

[7]   Besides seeking a new trial on every count based on an erroneous jury instruction (dkt. 218 ¶ 2), Smithers does not make an argument regarding Count 2 for maintain a place for the purpose of distributing controlled substances.

medicine or supplement bottles.  (Exs. 41, 44–47, 56, 58).  The bottles held 92 hydromorphone pills, 19 oxycodone pills, 353 oxymorphone pills, a methadone pill, and 102 morphine pills.  (Exs. 56, 58–59, 76–80; dkt. 237 at 49–57).  Smithers' cache of unlabeled Schedule II controlled substances included oxymorphone pills separated into 10-count groupings within small, plastic baggies.  (Ex. 62; dkt. 237 at 57–58).  The oxymorphone pills were "indicative of distribution amounts" of drugs, and packaged in such a way as to be "[e]asily trafficked or easily distributed." (Dkt. 237 at 57–58).  "Baggies and baggie corners are well-known tools of the narcotics distribution trade."  *United States v. Fisher*, 912 F.2d 728, 731 (4th Cir. 1990).

This evidence—large amounts of cash, large numbers of controlled substances, the absence of standard bottling, dispense-ready packaging—permitted a finding that Smithers intended to distribute the pills outside of a true physician's role.  *See Fisher*, 912 F.2d at 731 (concluding that possession of drugs and "large amounts of cash" in defendant's possession was circumstantial evidence of intent); *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010); *United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005) (explaining that "intent to distribute can be inferred from a number of factors, including but not limited to: (1) the quantity of the drugs; (2) the packaging; (3) where the drugs are hidden; and (4) the amount of cash seized with the drugs.").[8]

In reaching that conclusion, the jury also could consider the full scope of Smithers' conduct.  His clients were drug dealers and drug addicts.  He displayed a fear of law enforcement and consciousness of guilt.  He pre-signed some prescriptions and mailed others to or for patients he had not seen. His text messages revealed a pervasive scheme to distribute drugs. (*See generally* Ex. DWi-1000; Ex. RiJ-1000).  His office was barebones, and his staff had no medical training. He passed out prescriptions from his car in a parking lot for $300—actions consistent with the

---

[8]     As the Court explained during trial, an expert is not needed to prove the "beyond the bounds" element.  (Dkt. 236 at 110–11).

evidence found in his car.  (Dkt. 238 at 145–47, 154).  In short, Smithers operated in a way that revealed a pervasive intent to distribute controlled substances, and to do so without a legitimate medical purpose and beyond the bounds of the medical profession.  The jury's verdict on count 1 is thus supported by substantial evidence.[9]

### B.      Substantial evidence supports the 859 distribution convictions.

Smithers' 859 distribution convictions are supported by substantial evidence. The jury possessed the evidence needed to make a substantive determination for each patient prescription, as the law requires.  *See United States v. Singh*, 54 F.3d 1182, 1188 (4th Cir. 1995).

First, the jury had the patient files of every patient whose prescriptions were charged as a count in the indictment.  (Dkt. 238 at 45–46, 66–71; dkt. 236 at 4).[10]

Second, the jury had the prescriptions forming the basis of each distribution charge.  (Dkt. 238 at 66–71).

---

[9]      Smithers' brief references testimony from his affirmative case, arguing that the money in his possession was destined for a bank account, and that patient B.F. returned pills to him in small, plastic baggies.  (Dkt. 218 ¶ 1). The Court reserved its mid-trial decision on Count 1, so it must consider the evidence only from the Government's case-in-chief.  Fed. R. Crim. P. 29(b).

To the extent the Court considers Smithers' argument, the evidence taken in the Government's favor is substantial for the general reasons explained above.

Additionally, the jury also was entitled to disbelief Smithers' self-serving, implausible narrative that:  the unlabeled pills had been in his car for 19 months since moving to Virginia; the search of his car just so happened to be the very week he meant to dispose of the pills via local law enforcement; and the large amounts of cash in his car were meant for a credit union account.  (Dkt. 235 at 67–69, 195–96).  Smithers admitted he knew the drugs had value for sale on the street. (Dkt. 235 at 198–99).

Lastly, the jury was also entitled to disbelieve B.F.  She drove eight hours to see Smithers; previously went to doctors who were shut down or barred from prescribing controlled substances; associated with a drug dealer; and distributed oxycodone from Smithers to another person at Walmart in the presence of her 14-year-old autistic nephew and two-year-old grandson. (Dkt. 236 at 124–30, 140–43, 146).

[10]      The jury specifically requested to look at the files during deliberations.  (Dkt. 198).

Third, the jury had Dr. Bassam's unrebutted expert testimony that each prescription was not written for a legitimate medical purpose and was outside the scope of professional practice. (Dkt. 236 at 10–11, 13–14; *supra* Section I.F.).  Dr. Bassam rendered this conclusion after review of each patient file and the corresponding prescriptions.  (Dkt. 236 at 10–11, 13–14, 87).

Fourth, the jury had Exhibit 107, a summary chart that reflected Dr. Bassam's individualized consideration of and conclusion about each prescription.  (Ex. 107; dkt. 236 at 24–25, 87; *e.g.*, *id*. at 29, 41, 42, 62, 83).

Fifth, the jury had a common core of evidence that could be considered for each patient. Smithers' general fear of law enforcement and consciousness of guilt, his lack of medical staff, the sketchy way he ran his practice, his profit motive, the distance his patients traveled, and the fact that local pharmacies would not fill his prescriptions, paint a mosaic of contextual facts the jury was entitled to take into account when evaluating whether Smithers' individual prescriptions were legitimate.

In summary fashion, Smithers challenges hundreds of his convictions stemming from approximately 40 patients.  (Dkt. 218 ¶ 3).  He objects that the patients themselves didn't testify and that some patient files in evidence were not discussed at length during trial.[11]  Smithers does not identify any authority requiring that a patient to testify or that his/her files be discussed in open court, and the Government is unaware of any:  What matters is that there was substantive evidence on each count sufficient to sustain a conviction.  *See United States v. Singh*, 54 F.3d 1182, 1188 (4th Cir. 1995) ("In *Tran Trong Cuong*, we reversed the convictions, not because the victims did not testify, but rather because their lack of testimony was not replaced by any substantive

---

[11]     Three patients—H.H., B.P., and L.W.—were unavailable at trial because they were dead. (Dkt. 237 at 11–13; dkt. 233 at 61, 83; dkt. 236 at 128–29).

evidence."); *United States v. Bailey*, No. 1:17CR00029, 2019 WL 313204, at *3–4 (W.D. Va. Jan. 24, 2019) (distinguishing *Tran Trong Cuong*).

There was sufficient evidence to support each conviction.   The patient files and prescriptions were in evidence.   The files indicated failed drug test, prior drug convictions, and signs of illicit drug use or addiction, among other things.   (*E.g.*, dkt. 236 at 40–48, 55–56, 58–60, 62–64, 67–68, 71–72, 75–77, 80–81, 84–85).   Dr. Bassam opined—after individualized consideration and without refutation—that the prescriptions were illegitimate.   And a nucleus of facts common to every patient (*e.g.*, Smithers' motive, intent and state of mind; his business practices, *etc.*) supported Dr. Bassam's conclusions.   Moreover, Smithers' text messages with his most prominent co-conspirators—D.Wi., Ri.J., and Re.J.—further a pervasive scheme to distribute controlled substances to Smithers' patients in a bizarre manner.   Smithers and his main sub-distributors discussed other patients' prescriptions, exchanged patient sensitive information, scheduled their appointments, and arranged the mailing of the prescriptions.[12]

Smithers further argues that the convictions connected to three testifying patients lack sufficient evidence.   His argument cherry-picks testimony favorable to him, mainly, that the patients said they needed the drugs.   But the evidence was to the contrary, and substantially so.

---

[12]   *E.g.*, dkt. 237 at 85–87, 102–19, 122–48 (reading excerpts of DWi-1000); Ex. DWi-1000 at 13 (patients D.R., J.B., F.Wi., G.B., L.K., R.D., S.H., and P.H., among others), 20 (wiring funds), 39–40 (providing to D.Wi. "list of everyone else that needs scripts," including patients G.B., J.B., S.H., C.M., R.D., D.R.), 40 (steering prescription to particular pharmacies), 76 (patients S.H. and M.S., among others), 87 (patients G.B., S.H.), 200–02 ("F Up Fee" for F.Wi. to resume receiving prescriptions so he does not "scar[e] off everyone down here"), 305 (patient dates of birth); Ex. RiJ-1000 at 8 (patient D.J.), 12–14 (patients B.L., J.L., D.B., D.Wo., A.W.), 17–18 (patients B.Ho., D.Ho.), 22 (patient J.C.), 23–24, (patient T.D.), 25 (patients C.G., S.F.), 28 (patient S.F.), 32 (patients D.J., D.Ho., B.Ho.), 51, (patient B.L.), 84–85 (patient Ri.J.); *see also* Ex. CC-1000 at 1–4 (Smithers and patient C.C. arranging mailed prescriptions and money handoffs).

### 1.    Patient J.L.

J.L.'s initial appointment with Smithers was set up by another individual, Ri.J., who frequently ferried patients to Smithers.  (Dkt. 233 at 112; Ex. RiJ-1000).  Ri.J. drove J.L. 12 hours round-trip to the appointment—despite the fact the two men had never met before.  (Dkt. 233 at 113).  J.L made the trip because doctors closer to home wouldn't give him the pills Smithers would.  (*Id*. at 115).  Ri.J. paid for the trip, the office visit, and the pills.  (*Id*. at 113–14).  The two men then split the pills.  (*Id*. at 114).  J.L. stopped going to Smithers because he knew the arrangement was wrong.  (*Id*. at 115).  Given the testimony and the five aspects of evidence highlighted above, substantial evidence supports the verdict on counts 505 through 508.

### 2.    Patient B.F.

B.F. drove hours to see Smithers, a drug dealer she associated with referred her to Smithers, and she distributed oxycodone from Smithers to others in the presence of children.  (*Supra* footnote 9 (citing dkt. 236 at 124–30, 140–43, 146)).  B.F's patient file showed multiple inconsistent drug tests, which Smithers acknowledged he'd seen.  (Ex. BF1 at 7; Ex. BF2 at 15).  B.F.'s testimony and the five categories of evidence mentioned earlier—including Dr. Bassam's expert opinion and Smithers *modus operandi*—are substantial evidence supporting counts 196 through 215.

### 3.    Patient J.P.

J.P. began going to Smithers after her husband.  (Dkt. 233 at 61).  The couple visited Smithers because they could not get the drugs locally.  (*Id*. at 63, 65–66).  The husband eventually died of an overdose.  (*Id.* at 61).

J.P. admitted she did not need the medication Smithers gave her.  (Dkt. 233 at 61–63).  She was previously charged with possession with intent to distribute controlled substances, and pled guilty to forgery.  (*Id.* at 72).  She failed drug tests at Smithers' office.  (*Id.* at 74, 76, 79).  She

snorted hydrocodone pills.  (*Id.* at 80–81, 85–86).  She told Smithers she had been on Suboxone for drug addiction.  (*Id.* at 82).  Her pill counts were off.  (*Id.* at 82).  And her file indicated she was a drug diversion risk, generated inconsistent drug screenings, and had drug charges.  (*E.g.*, Ex. JP at 104, 106, 108, 110–11, 113, 115–18, 120, 128).  It didn't matter:  Smithers kept giving her pills.  (Dkt. 233 at 82).

This testimony and the common core of evidence against Smithers is substantial and supports counts 700 through 716.

*     *     *

The evidence at trial was overwhelming.  The Court correctly instructed on the law.  The jury's 861 convictions should not be disturbed.  For the reasons explained herein, the Government asks that the Court deny the defendant's motion for judgment of acquittal or for a new trial.

Respectfully submitted,

THOMAS T. CULLEN
United States Attorney

s/ S. Cagle Juhan
District of Columbia Bar No: 1022935
Assistant United States Attorney
U.S. Attorney's Office
180 West Main Street, Suite B19
Abingdon, Virginia 24210
276-628-4161
276-628-7399 (fax)
E-Mail:USAVAW.ECFAbingdon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

s/ S. Cagle Juhan
Assistant United States Attorney