```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3             FOR THE WESTERN DISTRICT OF VIRGINIA
 4                       ABINGDON DIVISION
 5   UNITED STATES OF AMERICA,     )
                                   )
 6               Plaintiff,        )   Criminal Case No.
                                   )   1:17-cr-00027-JPJ-PMS-1
 7   vs.                           )
                                   )
 8   JOEL A. SMITHERS,             )
                                   )
 9               Defendant.        )
    _____
10
11           REDACTED TRANSCRIPT OF JURY TRIAL - DAY 7
                HONORABLE JUDGE JAMES P. JONES PRESIDING
12                      TUESDAY, MAY 7, 2019
13  _____
14
15
16
17                    A P P E A R A N C E S
18  On behalf of United States:
             Steven Randall Ramseyer
19           Zachary T. Lee
             Samuel Cagle Juhan
20           United States Attorneys Office
             180 West Main Street, Suite B19
21           Abingdon, VA 24210
22  On behalf of Defendant:
             Donald M. Williams, Jr.
23           Williams Law Office, PLC
             P.O. Box 601
24           Pennington Gap, VA 24277
25  Proceedings taken by Certified Court Reporter and transcribed
    using Computer-Aided Transcription
```

<u>**INDEX**</u>

<u>**DEFENSE WITNESSES:**</u>                                          <u>**PAGE**</u>

**TOM HAYES**
          DIRECT EXAMINATION BY MR. WILLIAMS          22
          CROSS-EXAMINATION BY MR. LEE                29
          RECROSS-EXAMINATION BY MR. WILLIAMS         44
**JOEL ADAM SMITHERS**
          DIRECT EXAMINATION BY MR. WILLIAMS          47
          CROSS-EXAMINATION BY MR. RAMSEYER          175
          REDIRECT EXAMINATION BY MR. WILLIAMS       254


<u>**EXHIBITS**</u>                                    <u>**MARKED**</u>  <u>**RECEIVED**</u>

ON BEHALF OF THE PLAINTIFF:
89 -    List of Recommended Pharmacies              228
108 -   Text messages between Joel                   246
        Smithers and a patient


ON BEHALF OF THE DEFENSE:
3 -     Certification by the American                64
        Board of International Pain
        Physicians

-o0o-

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 2 of 296   Pageid#: 11136

1    (Proceedings commenced at 9:00 a.m.)

2    THE COURT:  Good morning, ladies and gentlemen.

3    Mr. Williams, are we ready to proceed?

4    MR. WILLIAMS:  Your Honor, I think if we might, if

5    we could take up a couple of matters first, I think it could

6    have an impact on my client's decision to testify.

7    THE COURT:  All right.  If you would come to the

8    lectern, please.

9    MR. WILLIAMS:  Your Honor, the -- I think the first

10    matter that I would say that I would ask to address would be,

11    we had filed a motion regarding a Motion to Suppress, asking

12    that the Government not be allowed to go into certain

13    information regarding Dr. Smithers's enrollment in a Health

14    Professional Monitoring Program.  I think at the initial

15    outset the Government kind of indicated that they may not --

16    unless the defendant intended to testify, that they probably

17    wouldn't pursue something like that.  I think that certainly

18    my client now would request a ruling on that.

19    It's our position that back when he was trying to

20    get his license in Virginia, one of the -- the allegations are

21    that he had to sign up on this health care -- Health Care

22    Professions Monitoring Program, HPMP.  What it was was that I

23    think the Government intended to introduce an e-mail that was

24    from a Dr. Harp stating that he wanted Dr. Smithers to sign up

25    on this program.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5194
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 3 of 296   Pageid#: 11137

1          The allegation is that Dr. Smithers did sign up on

2    the program.  There's a document that he signed stating under

3    that that he was -- that he agreed not to see, I think it was,

4    any patients or anything during the time until he was cleared

5    through HPMP.

6          He began -- it was about -- I think his testimony

7    would be he didn't understand that part of it.  He began to

8    see patients.  He had already had his license established.

9    The license was never revoked.  Our position is HPMP doesn't

10   have the authority to be able to suspend the license.  He had

11   a valid license.  The license was never revoked.  He was never

12   disciplined or anything underneath that.  We believe under

13   Rule 403 it would be highly prejudicial to introduce this

14   evidence and far more prejudicial than probative.  We believe

15   that certainly that evidence should be suppressed and that the

16   Government should not be allowed to impeach or cross-examine

17   or anything with respect to that.  So that would be the nature

18   of our motion.

19         THE COURT:  All right.  Was there some other

20   aspect -- some other question about that that you wanted the

21   Court to rule on?

22         MR. WILLIAMS:  I think that was the main one,

23   Your Honor.  I believe that -- certainly, I think there was

24   also -- we also had introduced to the Government -- I

25   apologize, Your Honor.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5194

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 4 of 296   Pageid#: 11138

1          We had provided to the Government -- the Court had

2    admitted Defendant's Exhibit 1, which was an article through

3    the expert.  We also have just the -- underneath the article,

4    there were certain little tabs that you could click on that

5    explained more information regarding the article.

6          At this time we would just ask for that to be

7    introduced as part of Exhibit 1, whether it be Exhibit 1-A or

8    Exhibit 1 that we would be asking for admission.  It is simply

9    a tab under Exhibit 1 that we think more fully explains what

10   Exhibit 1 is.

11          THE COURT:  All right.  Well, have you shown that to

12   the Government?

13          MR. WILLIAMS:  We have.  We provided them a copy,

14   Your Honor.

15          THE COURT:  All right.  So that's --

16          MR. WILLIAMS:  Those are the two main things I think

17   that we had.

18          THE COURT:  All right.  Well, let me hear from the

19   Government.

20          MR. RAMSEYER:  Your Honor, as to Defendant's

21   Exhibit 1-A, which is what he's called it, it is the tabs --

22   it's represented to be tabs from an internet site.  There's no

23   evidence that Dr. Smithers ever saw this or that it guided his

24   practice in any way.  So we're not really sure of the

25   relevance of it.  It's -- and it's not really -- it really has

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(540) 742-3974

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 5 of 296   Pageid#: 11139

```
1    no relevance to the case anyway.  It says, "Warns about
2    serious risks or death when combining opioid pain or cough
3    medicine and benzodiazepines."
4            And I'm not sure what that's for.  But the Court
5    hasn't seen it, so I'd give it to the clerk to look at it.
6            THE COURT:  Maybe I could see Exhibit 1, Defendant's
7    Exhibit 1, too, Madam Clerk.
8            All right.  And the other questions?
9            MR. RAMSEYER:  Your Honor, as to the HPMP material,
10   so background, Dr. Smithers, when he was in North Carolina
11   doing his residency, I guess, or internship, became subject to
12   North Carolina's Monitoring Program for physicians who may
13   have impairment issues.  And so when he applied -- and then he
14   went and practiced in West Virginia.  When he applied for a
15   license in Virginia, Virginia said we will only do that --
16   we'll only give you a license if you participate in Virginia's
17   HPMP program.
18           So he signed up with the HPMP program and signed a
19   contract with the HPMP program on August 11th of 2015.  And in
20   that contract he agreed that he would refrain from practicing
21   or working in Virginia in any position in a healthcare setting
22   until approved by HPMP staff.  And he signed that on
23   August 11, and he's practicing immediately without any
24   approval from the HPMP people.  He did not receive approval.
25   That goes on for several months.  And then at some point, I
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(xxx) xxx-xxxx

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 6 of 296   Pageid#: 11140

1    believe in November, he's terminated from the program because

2    he didn't comply.  So we think it's --

3              THE COURT:  Let me ask you the -- what does HPMP

4    stand for?

5              MR. RAMSEYER:  It is Health Practitioners'

6    Monitoring Program.

7              THE COURT:  And what was -- you said he had a -- I

8    mean, what was the monitoring program about?  What was the

9    disability that --

10             MR. RAMSEYER:  It says under -- under the

11   participation contract, it says, "I, Joel Smithers,

12   recognizing that I may suffer from the disease of alcoholism,

13   and/or chemical dependency, and/or mental illness, and/or

14   physical illness that impairs my ability to practice my health

15   profession safely, as evidenced by my history of monitoring

16   with the North Carolina Physician Health Monitoring Program."

17             THE COURT:  Well, do we know what, in fact, was the

18   nature of his disability -- I mean, that chemical dependency?

19   I mean, it was abusing drugs, or...

20             MR. RAMSEYER:  Your Honor, it's unclear from the

21   records as to what it is.

22             THE COURT:  So what is the relevancy of all of this?

23             MR. RAMSEYER:  Well, we believe it goes to his

24   truthfulness, if he testifies.  I mean, we don't intend to

25   introduce this if he's not a witness.  But as to his

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 7 of 296   Pageid#: 11141

credibility, we believe it's relevant that he tells the person

from the Board of Medicine, you know, I'll sign up for the

HPMP program.  I'll do that.  And, in exchange, Virginia gives

him a license and immediately he's in violation of the

contract with the HPMP that says he will not participate -- he

won't see patients.  I mean, it's right away.  It's not like

it's two months later.  I mean, it certainly appears to the

Government he perpetrated a fraud upon the Virginia Board of

Medicine to get a license, that he had no intent to comply

with the program.

        THE COURT:  Well, so it shows his untruthfulness?

        MR. RAMSEYER:  Yes, Your Honor.

        THE COURT:  All right.  I guess the problem, as

Mr. Williams relies on, is Rule 403.  I mean, aren't we going

to have to get into what was going on here?  If it's -- if we

don't, then the jury is going to believe that he was

disciplined for what he allegedly did in this case over

prescription of narcotics, which is not true.  And then so we

have to get into, you know, that he has alcohol or drug

problems.  And that's -- you know, that's not really relevant

to any of the evidence that we've heard.  I mean, he's not

been -- well, I mean, it's -- I don't see any connection in

the evidence and his possible addiction to alcohol or drugs.

And, again, that seems to me that may be unfairly prejudicial

to him.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(540) 418-5107

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 8 of 296   Pageid#:
11142

```
 1              MR. RAMSEYER:  Well, Your Honor, the Government
 2   would proffer that what would happen is Dr. Smithers would
 3   testify.  The Government would ask him:  Isn't it true that as
 4   a condition of you getting a license in the state of Virginia
 5   you had to sign a contract that had certain conditions in it?
 6              Presumably, yes.
 7              And one of the conditions was that you not practice
 8   medicine until you'd received approval from a program of
 9   Virginia?
10              Yes.
11              And didn't you, in fact, immediately start
12   practicing medicine?
13              Yes.
14              Didn't you, in fact, lie to the Board of Medicine
15   when you said you were going to participate in this program?
16              And we don't think that would unfairly prejudice the
17   defendant.  It shows that he lies.  It doesn't really open the
18   door to anything else.
19              Obviously, if he testifies on direct to certain
20   things about that he's a clean guy, he's never had any
21   problems, then we think those things would be relevant.  But
22   assuming he doesn't do that, we think these questions would be
23   appropriate.
24              THE COURT:  All right.  Anything else?
25              MR. RAMSEYER:  No, Your Honor.
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 9 of 296   Pageid#: 11143

```
 1              THE COURT:  Okay.  Mr. Williams, what about that?
 2    What about if we don't get into any of the -- simply that he
 3    signed an agreement, apparently, that says he couldn't
 4    practice until he got permission in Virginia?  But that he
 5    did, in fact, do that.  He can say, well, I didn't understand
 6    that, or I didn't read that part or something like that.
 7              MR. WILLIAMS:  May I have one second?
 8              THE COURT:  Yes, sir.
 9              MR. WILLIAMS:  Your Honor, I think, certainly, my
10    client wanted to say the reason he was in the program was he
11    had a diagnosis of depression and anxiety.  I think he wanted
12    to make sure that was clear with what the -- North Carolina
13    had said what he was being treated for.  With respect to this,
14    I think certainly our position is that to go into this, HPMP
15    had no authority to suspend his license.  It is simply a -- I
16    think -- I don't think it's a for-profit entity that just
17    reports to the Department of Health Professions.  And,
18    actually, it's the Department of Health Professions that
19    actually has to suspend the license.
20              We simply believe that, again, the prejudicial
21    nature of this certainly outweighs whatever probative value
22    there would be.  I think it causes confusion within the jury,
23    makes them begin to believe that he potentially has
24    abusive-type things, whether it's drugs or whatever.  I know
25    that there's the allegation of -- or the charge of possess
```

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 10 of 296   Pageid#: 11144

```
 1    with intent to distribute where he has the backpack and
 2    everything.  And certainly, it causes us concern with respect
 3    to that that a jury is hearing that, you know, there are abuse
 4    -type situations with that, so...
 5            THE COURT:  Let me ask you about this attachment.  I
 6    really don't understand what the purpose of this attachment
 7    is.  I mean, frankly, I'm not sure that I should have admitted
 8    this Defendant's Exhibit 1 as an exhibit.  It really was used
 9    in the cross-examination of you by a witness.  You know, under
10    the rules, you can do that, but the -- the pamphlet or book or
11    other written information doesn't go into evidence.
12            But I've already admitted it.  I don't think it's
13    any -- I'm not going to reverse my decision.  But this other
14    thing, I don't understand what that has to do with anything --
15            MR. WILLIAMS:  Your Honor, my client --
16            THE COURT:  -- that it would help the jury in any
17    way.  I mean, it's just a more elaborate statement of
18    Exhibit 1, which warns about risk when combining opioid pain
19    or cough medicines with benzodiazepines, which I'm not sure
20    what that has to do with anything.  Maybe there's some
21    argument that I don't understand there, but I --
22            MR. WILLIAMS:  And I think, Judge, what our argument
23    would be simply with respect to that is is that on the death
24    of Heather Hartshorn, which is the -- I don't remember exactly
25    the count number, but on the death count involving her, one of
```

```
 1    the things that I think Dr. Hail testified to was that based
 2    upon information she had looked at, being the autopsy report
 3    and other things, was that Ms. Hartshorn was also -- had
 4    Benzodiazepines in her system, along with the opiate
 5    medication that was involved with what Dr. Smithers had
 6    prescribed.  I think what our allegation or what our argument
 7    is is that certainly --
 8              THE COURT:  Well, what does this -- I mean, that's
 9    certainly what exhibit -- Defendant's Exhibit 1 says.  And
10    what does this additional exhibit say in that regard?
11              MR. WILLIAMS:  Your Honor, my client basically
12    handed me that this morning.  I think these were just simply
13    the tabs.  Our position would be that it certainly helps
14    explain and answer.  It goes into more detail about the basis
15    of the conclusions.  I think --
16              THE COURT:  I've looked at it.  I don't believe --
17    again, we've got enough exhibits here.  I believe that the
18    point is made in the original Exhibit 1, which I don't think
19    that the expert contested, as I recall.
20              So I'm going to refuse the -- why don't we mark this
21    as Defendant's Exhibit 2.
22              MR. WILLIAMS:  Okay.
23              THE COURT:  And refused.
24              And, Madam Clerk, if you'll do that and, of course,
25    separate that.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5171

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 12 of 296   Pageid#:
11146

 1          And here's back Defendant's Exhibit 1, which is
 2    admitted -- which has been admitted.
 3          All right.  Anything else you want to say?
 4          MR. WILLIAMS:  No.  That would be all.
 5          THE COURT:  All right.  I'm going to grant the
 6    defendant's motion under Rule of Evidence 403.  While I
 7    recognize that the Government does not intend to get into the
 8    details of this, I think either way it is unduly prejudicial
 9    to the defendant to get into the HPMP contract and his alleged
10    violation of that contract.
11          You know, while it may have a connection to his
12    truthfulness if he testifies, I just don't see how it could
13    not help but bring up prejudicial -- unduly prejudicial issues
14    about his mental health or speculation about other similar
15    conduct that's not been introduced in regard to illegal
16    distribution of narcotics.  So I'm going to grant the
17    defendant's motion.
18          MR. RAMSEYER:  Your Honor, if I may.  There's one
19    matter related to that that I want to bring to the Court's
20    attention.  As part of that, at some point Dr. Smithers sent a
21    description of his practice to the HPMP that describes it as a
22    holistic practice, really didn't mention anything about
23    controlled substances in it.  We would just ask that the Court
24    would consider if he testifies, depending how he testifies,
25    the Court would potentially allow us to cross-examine him on

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 13 of 296   Pageid#:
11147

1    that letter.  We could just say that he sent a letter to

2    someone describing his practice.

3             THE COURT:  Right.

4             All right.  Mr. Williams, any objection?

5             MR. WILLIAMS:  I'm not sure I completely understand.

6    That was involved with the HPMP?

7             THE COURT:  Well, why don't you look at me while

8    you're talking at least.

9             MR. WILLIAMS:  If it's involved with the HPMP,

10   Judge, it certainly causes -- it's still going to be

11   wondering, I think put in the jury's mind what is HPMP.

12            THE COURT:  I don't know what it says, but

13   Mr. Ramseyer represented it just to be sort of a resume of his

14   practice.  And I don't think -- doesn't sound to me like that

15   that would be unduly prejudicial.  And it may be relevant in

16   that he does not describe himself as a pain medication

17   practice -- I mean, a pain -- excuse me -- pain management

18   practice which is what I understand his defense really in this

19   case is; that he was engaged in pain management, and that's

20   why he prescribed all of these narcotic drugs.

21            MR. WILLIAMS:  And that's correct, Judge.  I think

22   certainly if this involves anything with the HPMP we would be

23   objecting on the grounds that I think it's going to call into

24   question of the jury, what is HPMP?  If it does not, then I

25   don't necessarily know that I have the same argument with

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 14 of 296   Pageid#: 11148

 1    respect to it, but --

 2            THE COURT:  Well, let me see.  Does the Government

 3    have a copy of it?

 4            MR. RAMSEYER:  Yes, Your Honor.

 5            Your Honor, what we would be asking about would be

 6    that first paragraph.

 7            THE COURT:  All right.

 8            MR. WILLIAMS:  Your Honor, the only thing I would

 9    say, there's no date or time.  We don't have any time stamp or

10    anything.

11            THE COURT:  Well, I mean, it would have to be

12    authenticated by the -- I mean, if the defendant denies

13    this -- if he testifies and denies that this is -- he had

14    anything to do with this, it's just made up, I've never seen

15    this before, something like that, that's one question.  But,

16    otherwise, I don't see anything unduly prejudicial about this.

17    And it is relevant, seems to me, to the issues in the case.

18            MR. WILLIAMS:  All right.  Thank you.

19            THE COURT:  So, Madam Clerk, if you'll give that

20    back to Mr. Ramseyer.

21            All right.  Is there anything further then?  And you

22    have witnesses that you're going to call?

23            MR. WILLIAMS:  I have one witness and then

24    potentially Dr. Smithers.  He had indicated earlier he had

25    something he wanted to address to the Court.  I don't know if

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 15 of 296   Pageid#:
11149

1    he still does or not.

2            THE COURT:  All right.  Well, Mr. Smithers, if you

3    wouldn't mind standing, let me advise you in regard to whether

4    or not you intend to testify on your own behalf.

5            You have a right to remain silent under the

6    constitution, and that means that you do not have to testify.

7    And if you don't testify, I will instruct the jury, as I've

8    already indicated to the jury panel, but I will instruct the

9    jury in more detail that they are not to consider that fact at

10   all because the Government has the burden of proof in this

11   case, and you don't have to prove your innocence.  So I will

12   instruct the jury that they are not to consider the fact that

13   you did not testify in reaching a verdict in this case.

14           Now, you ought to consider the advice of your

15   counsel in deciding whether or not to testify, but that is

16   entirely up to you.  I mean, that is a decision that you must

17   make.  In other words, your attorney cannot prevent you or

18   require you to testify.  That's -- even though he may give you

19   advice, and I expect he has or will so advise you what his

20   opinion is.  And, certainly, if you ask him, he will.  But --

21   and you ought to consider that advice, but whether or not you

22   decide to testify is your decision.  Of course, you understand

23   that if you do testify, you will be subject to

24   cross-examination by the Government attorney with respect to

25   your testimony.

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(540) 623-6151*

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 16 of 296   Pageid#: 11150

         So you don't have to tell me right now.  As I
understand it, there is another witness who is going to
testify.  But, before you testify, you obviously need to make
that decision whether or not you wish to testify.

         So do you understand what I've told you, Mr. --
Dr. Smithers?

         THE DEFENDANT:  Yes, Your Honor.

         THE COURT:  All right.  Is there anything else you
want to say to me about that?

         THE DEFENDANT:  Your Honor, I have discussed with my
counsel in regards to my testimony, and because of the change
of schedule, I don't really feel that that decision -- I'm
adequately prepared today to testify.  I would like to testify
at this point, but I don't feel that I'm prepared to testify
today.

         THE COURT:  Well, in what way are you not prepared?

         THE DEFENDANT:  I believe the organization of the
initial direct examination with my counsel, we've yet to go
all the way through that.  And this decision was up in the air
even into the early hours of this morning in my mind.  And
until late Friday evening, you know, our understanding I was
going to at least have the benefit of seeing the other
witnesses.  And at this point we would be calling, I believe,
at least two other witnesses after I testify.  And I -- you
know, I was hoping to testify last, if I did.

```
 1              But it is currently my intention to testify.
 2              THE COURT:  You do wish to testify?
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  All right.  Well, I don't understand
 5    about two other -- you were hoping to testify last.  I mean,
 6    as I understand, there's one witness that's going to testify
 7    and then you're up.  So do you understand that?
 8              THE DEFENDANT:  Yes, Your Honor.
 9              Due to the scheduling situation, the other two
10    witnesses would have testified before me, and they can't be
11    here until tomorrow.  And that was the reason.  That changed
12    the order of -- and the timeline of my preparation.
13              THE COURT:  All right.
14              Well, Mr. Williams, tell me about that.  What
15    witnesses can't be here?
16              Yes, sir.  You may be seated, Dr. Smithers.
17              THE DEFENDANT:  Thank you.
18              MR. WILLIAMS:  Your Honor, I think one of the
19    witnesses was Ms. Moore, who we brought up yesterday.  We were
20    not able to get ahold of her as of yet.  This was the lady who
21    was the elder lady who had fallen that was on her way up from
22    Florida, was supposed to have a flight last night and land in
23    West Virginia.  I think that's one of the witnesses that he's
24    talking about.
25              THE COURT:  And she, apparently -- you don't know
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5734

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 18 of 296   Pageid#:
11152

1  where she is or anything like that?

2          MR. WILLIAMS:  I do not at this point.

3          THE COURT:  And she was not subpoenaed?

4          MR. WILLIAMS:  She was not subpoenaed.

5          THE COURT:  Okay.

6          MR. WILLIAMS:  And then I think that Dr. Smithers

7  gave me -- he had given me a list of about 40 to 50 names of

8  people that he wanted me to talk to that was about probably

9  three or four days before trial.  I was in the middle of trial

10  prep, couldn't take the time out to call 40 to 50 people.  But

11  I think he was in contact with one other person about possibly

12  testifying.  I'm not even sure that I know the name of that

13  gentleman, but --

14          THE COURT:  Well, he said that there were two other

15  people who were going to testify tomorrow.

16          MR. WILLIAMS:  I think one is the gentleman he

17  talked about, and the other one was Deborah Moore, to be

18  hopeful that Deborah Moore would be able to be here tomorrow.

19  That was the two that he mentioned.

20          THE COURT:  But we don't know of that?

21          MR. WILLIAMS:  We don't know anything about Deborah

22  Moore at this point.

23          THE COURT:  Yeah.  And the other person -- you

24  mentioned yesterday something about pharmacists.  Is this a

25  pharmacist?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5171

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 19 of 296   Pageid#: 11153

```
 1            MR. WILLIAMS:  The pharmacist is here today.  That's

 2   going to be the one that testifies here in just a moment.  The

 3   pharmacist is here.

 4            THE COURT:  What about this other witness?

 5            MR. WILLIAMS:  The other witness is simply a patient

 6   of Dr. Smithers, is my understanding, that he treated during

 7   the course of his practice.

 8            THE COURT:  And that person has not been subpoenaed?

 9            MR. WILLIAMS:  They have not.

10            THE COURT:  But -- and have you talked to that

11   person?

12            MR. WILLIAMS:  I have not, Your Honor.

13            THE COURT:  All right.

14            So, you don't know -- I mean, has your -- I'm not

15   asking you to tell me what your client said, obviously, but

16   have you discussed what the testimony might be?

17            MR. WILLIAMS:  My understanding, Judge, is that the

18   testimony would simply be that regarding his care and

19   treatment of the patient and kind of the visits, how it went,

20   his practice.  I think it would probably go toward the --

21            THE COURT:  Similar to the other patients that have

22   testified?

23            MR. WILLIAMS:  Similar to Mr. Hartshorn and to

24   Brenda Fisher would be my understanding, Judge.

25            THE COURT:  All right.  Well, I think we ought to go
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5173

Case 1:17-cr-00027-JPJ-PMS   Document 245   Filed 07/17/19   Page 20 of 296   Pageid#: 11154

```
1    ahead and proceed in the fashion that you've outlined.  And
2    you're going to call a witness and then Dr. Smithers.  We'll
3    take a short recess after your witness, and Dr. Smithers can,
4    at that time, make a final decision as to whether he wishes to
5    testify based on what advice you've given him and my advice to
6    him.
7             He's indicated to me, as you've heard, that he does
8    intend to testify.  But I want to give him any opportunity to
9    make that decision.  Again, if you have any further advice to
10   him, obviously, I assume you would give it to him.
11             MR. WILLIAMS:  Yes, Your Honor.
12             THE COURT:  All right.  So we're going to hear your
13   witness, so we'll have the jury in.
14        (Proceedings held in the presence of the jury.)
15             THE COURT:  All right.  Good morning, ladies and
16   gentlemen.  We're ready to go again.
17             And, Mr. Williams, you may call your next witness.
18             MR. WILLIAMS:  Defense calls Tom Hayes.
19             THE COURT:  Yes, sir.  If you'd come up here and
20   stand before the clerk and be sworn, please.
21             THE WITNESS:  Up here?
22             THE COURT:  Yes, sir.
23             THE CLERK:  Please raise your right hand.
24             Do you solemnly swear that the testimony you're
25   about to give in this case shall be the truth, the whole
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 21 of 296   Pageid#:
11155

1    truth, and nothing but the truth, so help you God?

2              THE WITNESS:  I do.

3              THE CLERK:  You may be seated.

4              THE WITNESS:  Over here?

5              THE CLERK:  Yes.

6                        **TOM HAYES,**

7    Called as a witness herein by the Defense, having been first

8    duly sworn, was examined and testified as follows:

9                      **DIRECT EXAMINATION**

10   BY MR. WILLIAMS:

11   Q.   Good morning.

12   A.   Morning.

13   Q.   Would you state your full name for the record.

14   A.   I'm Tom Hayes.

15   Q.   Okay.  And spell your last name, if you would.

16   A.   H-a-y-e-s.  I'm the pharmacist and owner of Hayes Drug.

17   Q.   And where do you live, Tom?

18   A.   In ███████████████████ in Tazewell, Virginia.

19             THE COURT:  Sir, just your community, we don't need

20   your exact address.

21             THE WITNESS:  Thompson Valley, Tazewell Virginia.

22   BY MR. WILLIAMS:

23   Q.   And I think you said you're the owner of Hayes Drug; is

24   that correct?

25   A.   Yes, sir.

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5111*

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 22 of 296   Pageid#:
11156

1   Q.   And you own that?

2   A.   Yes, sir.

3   Q.   And how long have you owned Hayes Drug?

4   A.   I opened it in 2008.

5   Q.   Okay.

6   A.   About 11 years.

7   Q.   All right.  Now, you said you're a pharmacist?

8   A.   Yes, sir.

9   Q.   Okay.  Where did you get your training?

10  A.   Medical College of Virginia.  I graduated in '93.

11  Q.   Okay.  And so you got what -- what kind of a degree would

12  that be?

13  A.   It was -- at that point in time the pharmacy degree

14  was -- it was like a BS.  It was before they changed it to

15  doctorate.

16  Q.   Okay.  And so -- but you are a licensed pharmacist in the

17  commonwealth of Virginia; is that correct?

18  A.   Yes, sir.

19  Q.   Okay.  And prior to opening -- did you work anywhere

20  prior to opening your own drugstore?

21  A.   Yes, sir.  I worked full time for Kmart for about four

22  years and averaged about 21 hours overtime, worked in probably

23  65 stores in the first three years I was there doing overtime.

24  I worked overtime the next, like, ten years.  I think I

25  counted up in the first 6 years I had worked in over 65

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(423) 623-6291

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 23 of 296   Pageid#:
11157

1  different pharmacies and full-time at one of my pharmacies

2  trying to pay the bills.

3  Q.   Now, when you say you're working that many pharmacies, I

4  assume you're floating?

5  A.   I would float, but I kept a full-time position at my

6  pharmacy where I worked.  Kmart had 12-hour shifts.  I could

7  work 77 hours in a week.

8  Q.   All right.  Now, have you had any further training or

9  anything since you got your degree?  Do you have to have

10  continuing education, anything like that?

11  A.   We do have to have continuing education.  What I tend to

12  do and what I've done is I was blessed that initially with

13  Kmart, you do it in books.  But I worked for Counts Drug for

14  about eight years.  They had three pharmacies, and part of the

15  benefits would be that they would pay for continuing education

16  for you to go to a professional organization like the National

17  Association of Retail Drugstore, Virginia Pharmacist

18  Association, and attend the live CE, which I've tried to

19  continue to do with the VPHA, because the Virginia Board of

20  Pharmacy has an actual presentation with the updates on the

21  laws, which is very educational and beneficial, and so I've

22  tried to do that most years.

23  Q.   Okay.  Now -- and you may have already said this, I think

24  I missed it, but how long have you been a pharmacist?

25  A.   Since 1993.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5171
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 24 of 296   Pageid#:
11158

1    Q.    Twenty-five years, roughly?

2    A.    A little over.

3    Q.    Is that pretty close?

4    A.    Yes, sir.

5    Q.    Okay.  Now, do you know Dr. Smithers?

6    A.    I'm familiar with him.  I've spoke with him on the phone.

7    I don't know for sure if I'd recognize him if I saw him, but

8    I've communicated with him.  He always made himself available.

9    Because initially when I got his patients, I had questions, so

10    I called him.

11    Q.    Okay.  And how many of his patients were regulars at your

12    pharmacy?  Do you know?  I'm not asking an exact number, just

13    approximately.

14    A.    I would guesstimate between 6 and 12, something of that

15    nature.  I know -- you know, it probably fluctuated.  He was

16    in one office closer and then he moved further away.  When he

17    did, I called and discussed it with him.  Some patients

18    followed him when he went to Roanoke.  It was less than he had

19    initially what I had seen but still probably 6 or 12 at that

20    point, may have been a few more when he was closer.

21    Q.    Okay.  Now, I think you stated you had talked to him and

22    had some questions.  What kind of questions did you have?

23    A.    Well, if I have a new patient that has, you know, not a

24    starting dose but looks like someone that's being treated for

25    chronic pain and I'm not familiar with the physician or the

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(423) 623-7311

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 25 of 296   Pageid#: 11159

1    patient, first, I obtain information, establish a valid

2    pharmacist-patient relationship, look them up on the PMP, the

3    Prescription Monitoring Program, see where they've been

4    getting their prescriptions, what they've been getting.  And

5    then if I'm not familiar with the physician and it's a pain

6    medication and they're not within the area, I call usually.  I

7    also look up the physician on the MPI site and the DEA site to

8    see that he's got a valid license and where his address is and

9    what have you.

10   Q.   Now, what's the standard for a pharmacist to be able to

11   fill a prescription?  What is it you have to determine?

12   A.   Well, I think they're -- the board would say at meetings

13   there is several things that would throw up red flags.  If you

14   look at any of those things and see things that look like red

15   flags -- if I had a patient come here from, say, Richmond,

16   Virginia, just that's a long ways away for their address to be

17   there to be here.  But you have to keep an open mind as a

18   pharmacist because I've been surprised over the years at how

19   many reasonable explanations there are for things that fall

20   directly under the red flag.

21          So some patients are -- I'm lacking for the

22   terminology -- they have two addresses.  You know, they live

23   in wintertime in Richmond and then in the summertime come back

24   to Tazewell and stay for a couple months.  My parents live in

25   Brownsville and come to Tazewell for a few months.

1   Explanation of why the distance is or what's going on and fill

2   that out.

3           You know, if the dosage was reasonable or if it's

4   higher than usual seeing on morphine equivalents where it

5   might be questionable and it's a new patient, like I said, I

6   can look at the PMP, see what they're on, see if they

7   developed tolerance, see if the dose is reasonable.  If I had

8   a question, then like I said, I would call Smithers.  When I

9   had questions if he had patients changing from one thing to

10  another or whatever, if the insurance would flag some things

11  because they like to establish a prolonged, extended-release

12  maintenance medication and then have breakthrough pain

13  medication, sometimes they would say things are duplicate

14  therapy and what have you.  So we get diagnosis and previous

15  history and information.  When I'd call, if the answers don't

16  give me the warm fuzzies, I --

17          MR. LEE:  Your Honor, I'm going to object at this

18  point to any conversations the witness had with the defendant.

19  Those would be hearsay statements and inadmissible.

20          THE COURT:  I believe you were just discussing

21  generally why you called --

22          THE WITNESS:  In general.

23          THE COURT:  -- physicians.

24          But I think you answered the question, so wait for

25  the next question.

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 27 of 296   Pageid#:
11161

```
1    BY MR. WILLIAMS:

2    Q.   Now, isn't it true that a pharmacist has to find that

3    there's a legitimate medical purpose behind -- before you can

4    fill the prescription?

5    A.   Well, that makes sense, yes, sir.

6    Q.   Okay.

7    A.   You know, if there's any question that there wasn't,

8    then, you know...

9    Q.   And did you fill all Dr. Smithers's prescriptions?

10   A.   Well, I'm not going to assure you that I filled all of

11   them because some patients may come, look at it, and may be a

12   little bit too early or they may have been from a little bit

13   too far of a distance.  If a patient's residence was above

14   Princeton toward Beckley, I would tell them I think they

15   passed up too many pharmacies on the route to get to me for me

16   to find that reasonable.  So I kind of don't just fill any

17   prescriptions just because they're a particular doctor.

18   Q.   Okay.  All right.

19          MR. WILLIAMS:  If I may have just a moment,

20   Your Honor.

21          THE COURT:  You may.

22          MR. WILLIAMS:  I think that's all, Your Honor.

23          THE COURT:  All right.  Cross-examination?

24   ///

25   ///
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5171
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 28 of 296   Pageid#: 11162

**CROSS-EXAMINATION**

BY MR. LEE:

Q.    Morning.

A.    Good morning.

Q.    Mr. Hayes, you said you owned Hayes Pharmacy; is that correct?

A.    Yes, sir.  Well, the bank owns it, but I'm making the payments.

Q.    I understand.  Are you the only pharmacist that works there?

A.    I occasionally have someone fill in for me, like today. I've been trying to work six days a week.  But every now and then I take about a half a day off now.  When I had custody of my children, I used to take two days off a week.

Q.    Okay.  And who are the other pharmacists that fill in for you?

A.    I've had several.  Right now, Pete Vladimir, he's filling in for me.  He used to be the pharmacist at Kmart.  And I have another pharmacist that's just recently started helping, Jessica.  But over the years I've had multiple pharmacists in the area.  You can usually talk to them.  If they're not a direct competitor close by, they're willing to pick up a day here and there, say, if you're going on vacation.

Q.    Back in 2015 timeframe -- I'm sorry, 2017, who are the other pharmacists that might have been helping you out?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 29 of 296   Pageid#:
11163

1  A.    That's close to the time Gazelle Bowman used to fill in

2  for me a lot.  I don't know if she still was at that point.

3  And I had a couple other different ones, one of my friends Ray

4  Lassiter that appeared and filled in for me a few times.  And

5  Megan Smith was a student that did rotations at my pharmacy.

6  And, after Gazelle, she worked for me for a couple years

7  covering two days a week while I had child custody.

8  Q.    Okay.  And this is something that shows my ignorance as

9  to how pharmacists can dispense drugs, or Schedule IIs anyway.

10  Can anybody fill a prescription or does it have to be the

11  person whose name is on the prescription?

12  A.    Oh, someone else can come on behalf of the patient.  The

13  laws have to allow for, say, if you were in an accident and

14  you were bedridden, you can't make it to the pharmacy.  So

15  there are rules and steps and ways to do that.

16          Generally, we can work past if you just come from

17  the ER or the hospital, released from the ICU or a dental

18  procedure or something, critical care or urgent care from an

19  accident or something.  But we still get an ID of the person

20  obtaining the prescription and their relationship to the

21  patient and as much information as possible.  And I always

22  request that at their earliest convenience, when the patient

23  is able, even if they could come through the drive-through, to

24  have an ID so I can meet the patient to solidify our

25  pharmacist-patient relationship.  We do, but we don't leave

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(4.3) 623-5171

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 30 of 296   Pageid#:
11164

```
 1    those patients not treated just because they're bedridden.
 2    Q.   Okay.  All right.  You're familiar with the what's been
 3    called the "opioid epidemic"?
 4    A.   Very.
 5    Q.   And would you agree that's been having very destructive
 6    consequences on Southwest Virginia?
 7    A.   Unbelievably.  It was very enlightening, the Board of
 8    Pharmacy, last year and the year before that, their continuing
 9    education directed right on that and big changes.
10    Q.   And, but fair to say, you're a pharmacist in this part of
11    the country.  You've known about the opioid problems that
12    people have been having, communities have been having for more
13    than just a couple years but for decades or longer; right?
14    A.   Oh, yes, sir.
15    Q.   Okay.  So it's no surprise to you that opioids are being
16    abused and distributed and causing great harm on our
17    communities.
18    A.   Correct.
19    Q.   Okay.  And, for that reason, you would agree that there
20    needs to be extra care when physicians are prescribing those
21    medications?
22    A.   When they're prescribing or dispensing and what have you.
23    You know, it would be nice if you could see into a person's
24    soul and they're actually truthful, honest, and their pain
25    level.  But you can't do that, so do the best you can, give
```

```
1    the benefit of the doubt.  And, if anything comes up
2    questionable, I ask the patient to call the doctor, do
3    everything that we can.  And I -- if a patient becomes
4    forceful or threatening in any way to obtain a narcotic, I
5    send them to jail.  I don't play with that.
6    Q.   And you would agree with me that these controlled
7    substances that Dr. Smithers was prescribing, they were
8    powerful Schedule II narcotics, weren't they?
9    A.   Yes, sir.
10   Q.   Oxycodone, powerful drug?
11   A.   Yes, sir.
12   Q.   Oxymorphone, powerful drug?
13   A.   Yes, sir.
14   Q.   Are you familiar with what Opana ER is?
15   A.   Opana is oxymorphone, yes, sir.
16   Q.   Is that still available?
17   A.   Yes, sir.
18   Q.   Hydromorphone, it's a powerful drug?
19   A.   Yes, sir.  Dilaudid.
20   Q.   Morphine sulfate, MS Contin, powerful drugs?
21   A.   Yes, sir.
22   Q.   You said you thought you had 6 to 12 patients of
23   Dr. Smithers.  Would the number 25 be more accurate?
24   A.   It wouldn't surprise me.  I've got a lot of patients.  I
25   do know and I do recall calling Dr. Smithers several times and
```

```
1     it stuck in my mind because he was courteous and professional
2     and said, "If you have any questions ever, here's my cell
3     phone.  I have a lot of patients that have a great deal of
4     pain," and explained that and told me the diagnosis, so...
5     Q.   I wasn't asking what the conversation was.
6     A.   Got it.
7     Q.   My question was:  You said you had 12 patients of his,
8     would 25 patients be more accurate?
9     A.   Like I said, it was a guesstimation.  There was probably
10    a larger amount before he moved further away to Roanoke and
11    Salem.  Then a lot -- a majority followed him, but not all.
12    So the numbers did fluctuate from one time to another.
13    Q.   Okay.  Now, you keep mentioning that Dr. Smithers was in
14    Roanoke or Salem.  Is that what he told you?
15    A.   I think I had an address in that area.  I could go back
16    and look at my records.  It's just I'm going off the top of my
17    head.  I did not take time to research any of this on
18    Smithers.  Come straight in here without looking at any
19    information.  Didn't have time.  Got notified yesterday
20    evening.  Changed my schedule.  Came straight here.  So this
21    has been several years ago.  I'm telling you the best I can to
22    the best of my ability without looking at my records as to the
23    exact address.  But I know it was out that distance.  I
24    thought it was more than a couple hours' drive.  But typically
25    I see a lot of patients treated from Roanoke and Bristol for
```

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 33 of 296   Pageid#:
11167

```
 1   chronic pain because they don't generally do that with a
 2   primary care physician.
 3   Q.   All right.  Martinsville, Virginia, is where
 4   Dr. Smithers's practice was located.
 5   A.   Is that not close to Salem and Roanoke?
 6   Q.   It's not, no.  It's --
 7           Would it be fair to say it's at least a
 8   two-and-a-half-hour drive from Tazewell?
 9   A.   To Martinsville?
10   Q.   Yeah.
11   A.   I'm not sure.
12   Q.   Have you ever been to Martinsville?
13   A.   No.  But if I saw Martinsville, I would have looked it up
14   in the distance before I called to try to find out why a
15   patient was going that distance.  It's just what I do every
16   day.
17   Q.   So it never red flagged to you that these 25 patients of
18   yours -- or Dr. Smithers, were filling at your pharmacy from
19   the Tazewell, Virginia, area were traveling over two and a
20   half hours to --
21   A.   Oh, it definitely did.  That's why I called him to talk
22   to him about we've got patients traveling this far a distance
23   and coming to our pharmacies, still.  What's going on?
24           And he said, "Tom, I was treating these patients.  I
25   established a relationship with them.  They have confidence in
```

```
 1    me, and I told them they could, but I was surprised at how
 2    many people did and would take the time to drive the distance
 3    to maintain a relationship with the physician.
 4    Q.   Your brother was a patient of his, wasn't he?
 5    A.   Yes, sir.
 6    Q.   And he was receiving oxycodone, oxymorphone, oxycodone,
 7    oxymorphone.
 8    A.   Oh, yes, sir.
 9    Q.   Okay.  And he had a drug problem, didn't he?
10    A.   Yes.  He had chronic pain and a drug problem.  He's with
11    hospice now, doesn't weigh 90 pounds.  He's had pancreatic
12    cancer.  He's had horrific disease states where he's suffered
13    his whole life.  But like a lot of patients, once they get
14    started and have a legitimate need for pain medication, they
15    still develop an addiction and do not use good judgment and
16    overuse.  Tim now has to have hospice watch him and fill up
17    all his medication on a timed-locked box, and he can barely
18    get up and walk.
19    Q.   He was actually convicted of drug distribution, wasn't
20    he?
21    A.   I have never took time and effort to find out what my
22    brother's charges were or what he had legal problems with.  I
23    have not had association with my brother with business since
24    1995.  We had a farm together.  And we're still brothers, but
25    I don't get involved in his business with what his legal
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(43) 628-5541

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 35 of 296   Pageid#: 11169

```
 1    matters were.
 2    Q.   Well, you were filling his prescriptions, weren't you?
 3    A.   No.  I did stop filling his prescriptions when --
 4    whenever he got indicted.  But then when they released him to
 5    Charlottesville, Virginia, and he had pancreatic cancer and
 6    contacted his physicians and talked to them and hospice,
 7    Kristen Thompson-Whit, a nurse practicer, I've been trying to
 8    help them supply his medications in the locked boxes again.
 9    But for a brief period, I didn't fill his prescriptions at
10    all.
11    Q.   Okay.  But you were filling his prescriptions when he was
12    going to Dr. Smithers in 2015.
13    A.   I did.
14    Q.   And it was right after that that he got indicted, wasn't
15    it?
16    A.   That Tim got indicted?
17    Q.   Correct.
18    A.   I think it was around 2015.
19    Q.   Mm-hmm.  And you never questioned that your brother was
20    traveling two and a half plus hours to see a doctor?
21    A.   Oh, I did.  I called on him specifically.
22    Q.   And got -- and you knew at that time that he was a drug
23    user or drug addict; right?
24    A.   I knew Tim was a drug addict?  No, sir.  I knew that he
25    had chronic pain.  I mean, Tim never went more than three or
```

1  four months without getting dehydrated to the point that he'd

2  be in the hospital on IVs for a prolonged amount of time.  The

3  family had always told me that with his pancreatis, that if he

4  was to continue to drink alcohol -- because he's been an

5  alcoholic his entire life and ended up dehydrated in the

6  hospital.  So I didn't realize that he had a drug problem.

7  Most all of his medications looked reasonably justifiable for

8  his disease state.

9  Q.   And Heather Hartshorn --

10  A.   They will tell you that, too, at the hospice.  As long as

11  Tim is drunk, he can sit and answer a question to you.  He's

12  an attorney and he's very knowledgeable.  You could come back

13  an hour later and ask the same question, he would not recall

14  the answer and give you a different answer.  He's drank for so

15  long, he does not have a clear mind.

16  Q.   You were filling Heather Hartshorn's prescriptions also?

17  A.   Heather who?

18  Q.   Heather Hartshorn.

19  A.   I remember the name.

20  Q.   Do you remember what happened to her?

21  A.   Did -- did she overdose?

22  Q.   Is that what you recall?

23  A.   Vaguely.  I think that is what happened.

24  Q.   She overdosed on prescriptions filled at your pharmacy?

25  A.   Yes, sir.

1    Q.    You're aware of that?

2    A.    Yes, sir.

3    Q.    Two days after you filled them --

4    A.    Yes, sir.

5    Q.    -- or two days after --

6    A.    I think I do remember the incident.

7    Q.    -- or the day after?

8    A.    Yes, sir.

9    Q.    Now, you don't actually know what happened between

10   Dr. Smithers and his patients.

11   A.    No, sir.

12   Q.    You don't know what sort of exams, if any, were given,

13   what sort of diagnosis, if any, was made, what sort of --

14   A.    On the majority of the patients, I would not.  Like I

15   said, with my brother, red flag, and I would call him and

16   asked about traveling the distance and the medications.  A

17   very logical, medical explanation was given.  I mean, I felt

18   comfortable with when I talked to him at the end of the

19   conversation.  But I wouldn't have called him if I wasn't

20   uncomfortable with him to begin with.

21          And I think you'll find on any of Tim's

22   prescriptions and Heather's prescriptions that there will be

23   extensive notes about me questioning them and the reasonable

24   medicinal justification for the use of the dosages and the

25   medication.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 623-5311

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 38 of 296   Pageid#:
11172

1    Q.   All right.  Again, you don't know what happened between

2    the doctor and the patients, do you?

3    A.   I was never there.  No, sir.

4    Q.   You don't now what medical conditions any of these

5    patients had?

6    A.   I do not diagnose.

7    Q.   Okay.  And you've talked about red flags that you

8    yourself would find to be troubling; correct?

9    A.   I would find them to be a red flag.  But, like I said, on

10   a daily basis we have patients that have chronic pain that

11   travel to Bristol.  I'm from Tazewell.  The day my wife had a

12   car accident, she's going to Dr. Brasfield neurological in

13   Bristol.  To travel two hours in Tazewell is not unreasonable.

14   There's not anybody in Tazewell that's doing a reasonable job

15   of being a neurosurgeon that I know of.

16   Q.   First of all, you have to admit that somebody who has

17   been trained in neurosurgery is very different than

18   Dr. Smithers's qualifications; correct?

19   A.   Correct.

20   Q.   I mean, do you know even what sort of training or

21   specialized training he's had?

22   A.   I'm not familiar with what specialized training he would

23   have.

24   Q.   Okay.  So your comparison really is very different.

25   A.   It's different.  But -- and he gave me an explanation of

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 39 of 296   Pageid#:
11173

why he treats and that he did treat pain patients.

Q.   Right.  So you're basing everything, all the decisions you're making, solely based on what Mr. Smithers was telling you; right?

A.   What he said and when I researched the DEA site, I find his DEA, the MPI, and I look up the PMP for patients and history.  That's all I have to go by.

Q.   Well, Mr. Hayes, did Dr. Smithers ever tell you that he left pre-signed prescription pads in his office and let his urine collector/staff member fill out which prescriptions should be given to patients?

A.   No, he would never tell me nothing like that.

Q.   Would that be a red flag?

A.   I would think that would be not the normal practice, and it would be a hard thing to judge.

Q.   Would you fill that prescription?

A.   I mean, because I --

        MR. WILLIAMS:  I'm going to object to what his qualifications would be to know this kind of information.

        THE COURT:  I'll overrule the objection.

BY MR. LEE:

Q.   Let me ask it this way:  Would you fill that prescription knowing that's what happened?

A.   I would probably call and get an explanation.  To tell you for sure I thought this was very unusual when I first got

```
 1   to Tazewell and started practicing.  There was a dentist,

 2   Dr. Stanton.  Every prescription he had come in, all day long,

 3   the patients he specialized in had extractions, would have

 4   gauze and blood all in their mouth, and they'd have a stamped

 5   signature and then it would have a different handwriting for

 6   the prescription, and then they'd have a different writing for

 7   the patient's name.  And that's a big red flag.  And I called

 8   him.

 9         And, I mean, I'm right there in town.  I've known

10   him all my life.  He was at every football game when I was in

11   little league.  And he said, "Tom, when I get there in the

12   morning, I sign the prescriptions.  Nobody can read my

13   writing, so I have the nurse write the prescription out.  And

14   then I have the patient print their name on it.  So we have

15   three different handwritings on there."

16         And I said, "As long as you do, I'm going to call on

17   every one of them and verify them."  And I did on every time

18   we saw one.

19         So that happened sometimes and sometimes there is an

20   explanation.  But, yes, it's a red flag and a call.  If there

21   wasn't a justifiable reason and I didn't have the warm

22   fuzzies, I would say, "I'm sorry.  I can't fill this."  If I

23   couldn't reach Dr. Smithers on the phone to find out if the

24   prescription had any questions, then I would tell them I'd

25   have to wait until I can answer the questions that have a red
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5174

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 41 of 296   Pageid#: 11175

```
 1    flag.  That's what we do.
 2           Red flag doesn't mean we just say, oh -- some
 3    pharmacists do that.  I ain't talked to -- we don't got it.
 4    That's what they'll tell them.  We don't got the medicine.
 5    Well, I don't like to bear false witness, so I don't do that
 6    either.
 7    Q.   Okay.  So you'd fill a prescription filled out by an
 8    untrained staff member at Dr. Smithers's office without
 9    question --
10    A.   The law is the doctor has the ability to deem anybody --
11    he could pick anyone in this room, able to call in a
12    prescription for him.  Just all he has to do is tell you, and
13    you could call in a prescription for him.
14    Q.   For Schedule II controlled substances?
15    A.   Schedule II controlled substances have to be written out.
16    It doesn't say that the doctor has to write it.  He just has
17    to sign it.  Like a checkbook, my wife can fill out my
18    checkbook.  She's not on there for signing.  I have to sign
19    it.  So that's the way the legal document is.
20    Q.   What if you knew that Dr. Smithers's practice in
21    Martinsville had patients traveling from Columbus, Ohio, to
22    get controlled substances?
23    A.   That doesn't make a lot of sense.  When you're getting to
24    that kind of distance, we're getting into something that's
25    more like when we had patients traveling from Florida all the
```

1    way up the east coast on the OxyContin express.  When that

2    initially happened 18, 19 years ago, it blew all of our minds

3    and there were big changes made.  And -- but I don't -- you

4    know, until we got in a position to learn how to handle that,

5    it was a learning experience.  I mean, nothing like that had

6    ever happened.

7    Q.    Mr. --

8              THE COURT:  Let's try to just answer the question

9    and if --

10             THE WITNESS:  That -- it's not reasonable to travel

11   from Ohio to West Virginia, to Virginia, in between your

12   pharmacists and your doctor, I don't think.

13   BY MR. LEE:

14   Q.    Okay.  So that's a red flag if someone is traveling from

15   Columbus, Ohio, to Martinsville?

16   A.    It would be a red flag.  Definitely.

17   Q.    You would question that prescription, wouldn't you?

18   A.    You would what, now?

19   Q.    You would question that prescription?

20   A.    Definitely.

21   Q.    What if Dr. Smithers's patients from West Virginia would

22   drive to Martinsville to get their prescription, then drive

23   all the way to Jeffersonville, Indiana, to fill their

24   prescription?

25   A.    That sounds --

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 43 of 296   Pageid#: 11177

```
 1   Q.   Sounds crazy, doesn't it?
 2   A.   Very questionable, yes, sir.
 3   Q.   That's not questionable.  That's crazy, isn't it?
 4   A.   Well, you know, I like to think that you can look at
 5   something and define it that way.  But over the years I found
 6   out there would be things like a special surgeon in one place
 7   that they had to have something done.  If it's justifiable, it
 8   is.  But it doesn't sound reasonable.  The only way you'd know
 9   is start digging.  When you get a red flag, you dig until you
10   find a legitimate answer.  If you do not, you don't fill it.
11              MR. LEE:  No further questions, Your Honor.
12              THE COURT:  All right.  Anything further?
13              MR. WILLIAMS:  Just a couple questions.
14                        RECROSS-EXAMINATION
15   BY MR. WILLIAMS:
16   Q.   Mr. Hayes, did you fill a prescription around that same
17   time of Ms. Hartshorn's death for benzodiazepines for her?  Do
18   you recall?
19   A.   I think I did.
20   Q.   Okay.
21   A.   It's been a long time.  I haven't looked at the records,
22   but it sounds like I did.
23   Q.   And, with respect to your regular customers, customers in
24   that area, did you fill all of Dr. Smithers's prescriptions
25   for them?
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 44 of 296   Pageid#: 11178

1   A.   Not -- I don't think all of them.  You know, if there was

2   not -- if there were red flags that were not answered, then I

3   may not have filled a couple numerous prescriptions.  And

4   people will tell you, too, if the patient gets loud or

5   forceful and doesn't have patience with me to answer these red

6   flags, they either go out the door or I call the police for

7   them trying to pursue -- obtain a narcotic through threatening

8   a pharmacist.

9               MR. WILLIAMS:  No further questions.

10              THE COURT:  Anything further?

11              MR. LEE:  No, Your Honor.

12              THE COURT:  All right.  Thank you, sir.

13              You may step down.  Sir, you may leave.  Thank you,

14   sir.

15              All right.  We're going to -- ladies and gentlemen,

16   we're going to take a short recess at this time.  If you'll

17   follow the bailiff out.

18        (Proceedings held in the absence of the jury.)

19              THE COURT:  All right.  Counsel, we're going to take

20   a short recess and when we come back, we'll see if the

21   defendant has any further evidence.

22              We'll be in recess.

23        (Proceedings suspended at 10:06 a.m. and resumed at 10:20

24   a.m.)

25              THE COURT:  All right.  Mr. Williams, do you have

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 45 of 296   Pageid#: 11179

```
 1    any further witnesses?

 2              MR. WILLIAMS:  Yes.  I think -- against counsel's

 3    advice, but I think Dr. Smithers has indicated he wishes to

 4    testify at this point.

 5              THE COURT:  All right.  Dr. Smithers, is that

 6    correct?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  All right.  Again, you understand the

 9    advice that I gave you?

10              THE DEFENDANT:  Yes, Your Honor.

11              THE COURT:  All right.  We'll have the jury in.

12        (Proceedings held in the presence of the jury.)

13              THE COURT:  All right.  Ladies and gentlemen, we're

14    ready to go again.  You may call your next witness.

15              MR. WILLIAMS:  The defense calls Dr. Joel Smithers.

16              THE CLERK:  Please raise your right hand.

17              Do you solemnly swear that the testimony you're

18    about to give in this case shall be the truth, the whole

19    truth, and nothing but the truth, so help you God?

20              THE DEFENDANT:  Yes, ma'am.

21                        JOEL ADAM SMITHERS,

22    Called as a witness herein by the Defense, having been first

23    duly sworn, was examined and testified as follows:

24    ///

25    ///
```

**DIRECT EXAMINATION**

BY MR. WILLIAMS:

Q.    State your name for the members of the jury.

A.    Joel Adam Smithers.

Q.    Okay.  And, Joel, where do you live?

A.    I live in Greensboro, North Carolina.

Q.    And who do you live with down there?

A.    My wife, Angel, and four kids; E., 14; S., 11; A., 4; and

B., 2; and a third daughter due in July.

Q.    Okay.  Now let's talk a little bit about your educational

upbringing.  Okay.  Where did you graduate high school from?

A.    I was homeschooled.  But Trinity Christian High School --

or Texas Christian High School in Texas.

Q.    What did you do in high school?  Anything particular?

A.    I was president of 4-H and we did forestry competition

and worked for my dad.  He's a veterinarian.

Q.    Okay.  And did you go off to college beyond that?

A.    No.  At the age of 17, I joined a non-profit Christian

organization that did disaster relief, The Air, Land, and

Emergency Resource Team, and we responded to disasters.  I was

there from the age of 17 to 21.  And we did disaster relief

and recovery for tornados, hurricanes, floods.  And we did

underwater search and recovery and different activities such

as that.

Q.    Okay.  Now, with respect to this, what -- did you

```
 1    eventually go off to college?
 2    A.    I did.  At the age of 21, after I'd been on the staff
 3    there, I went to -- I began my business education, business
 4    college in an accelerated program to complete that in two and
 5    a half years.  And then while I was finishing that program, I
 6    also started taking the prerequisite science courses to be
 7    able to go to medical school.
 8    Q.    Okay.  And when did you change your mind to go away from
 9    business into medical school?
10    A.    Well, I -- I mean, my whole life I had, from a young age,
11    really going to back to when I was 12 and went on a mission
12    trip to Mexico, reroof and pour a roof for a person in Jikad
13    (phonetic), I discovered how much I enjoyed helping other
14    people.
15              While I was doing my business education, I
16    volunteered at a local cancer center and that really
17    solidified the idea in my mind that I wanted to help people
18    through medicine.
19    Q.    Okay.  And I don't know.  Did you ever say which college
20    you graduated from?
21    A.    My undergraduate in business is from the Thomas Edison
22    State University out of Trenton, New Jersey.
23    Q.    Okay.  Now, you grew up in Texas; right?
24    A.    Yes, sir.  I grew up on a cattle farm in northeast Texas,
25    about 30 minutes south of Texarkana.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5171
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 48 of 296   Pageid#: 11182

1  Q.    How did you get to college in New Jersey?  Was this an

2  online type college or --

3  A.    Yes.  It was correspondence, an accelerated program where

4  I could test out of a lot of subjects.  It was originally

5  created for military people to be able to do correspondence

6  undergraduate degrees.  Then they opened it up to anybody who

7  wanted to try and move through their coursework faster.

8  Q.    Okay.  You graduated that when?

9  A.    I started that in September of 2001 and graduated in June

10  of 2004.

11  Q.    2004?

12  A.    Yes, sir.

13  Q.    Okay.  And beyond going from there, once you graduated

14  from college, you mentioned something about military.  Were

15  you involved with the military in college or anything?

16  A.    Not in that -- no, sir.  Not at that time.

17  Q.    Okay.  What did you do after you graduated?

18  A.    After I graduated, I worked for a period of time as a

19  nursing assistant in a county hospital in Arkansas.  I lived

20  with my 88-year-old grandfather at the time, helped take care

21  of him, and then decided to take additional coursework to be

22  able to apply to medical school.

23  Q.    Okay.  And so was the next step in your life to go to

24  medical school at that point, or --

25  A.    It was.  I went and did additional training in Emergency

```
 1    Medicine Techniques school, EMT, in Fort Worth, Texas.  Then I
 2    worked in Trueport, and at that time had been accepted into
 3    medical school and was -- and that was in 2007.
 4    Q.    Okay.  And where did you go to medical school at?
 5    A.    Lincoln Memorial University, DeBusk College of Medicine
 6    in Harrogate, Tennessee.
 7    Q.    And that would have been starting in when?
 8    A.    I believe July of 2007.
 9    Q.    Okay.  And describe what is a -- what is a doctor of
10    osteopathic medicine?
11    A.    The simplest way I could say it, I guess, it's a
12    different approach to practicing medicine than allopathic
13    medicine, which is what you traditionally think of as a
14    medical doctor, an M.D.  The last initials after my name are
15    D.O.  And one of the chief ways that we differ is that in our
16    education we are taught how -- we spend a little bit more time
17    doing manipulative training.  Some people -- if you saw me do
18    that on a patient you would say it looks like chiropractic but
19    it's not.  It's very similar.  But we're educated in that
20    arena and have a lot more hands-on training in that regard.
21    Q.    Okay.  Now, D.O., obviously, is able to prescribe
22    narcotics; correct?
23    A.    Yes, sir.  I believe -- yes, sir, that's correct.
24    Q.    Now, with respect to this, was there some point in time
25    that you became involved not only in your schooling but also
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) schmidt@3.9.9.9.
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 50 of 296   Pageid#: 11184

 1    with the Air Force?

 2    A.    Yes, sir, that's correct.  I believe in the first or

 3    second year of medical school I was accepted into the Air

 4    Force's Health Profession Scholarship program and that summer

 5    began officer training school in Montgomery, Alabama.

 6    Q.    And describe why were you involved in that program?  What

 7    was that benefit of that program?  Or why did you do it?

 8    A.    Well, most my life I had wanted to be in the military.  I

 9    didn't know what capacity I would serve, but I'd wanted to.

10    Both my grandfathers fought in World War II and I had an uncle

11    that died in Vietnam.  I wanted to serve, so that was an

12    opportunity to do that.  They accepted me into the program.

13    It was an application process, and they accepted me.

14    Q.    Okay.  Did they help pay for school or anything through

15    that program?

16    A.    They did, yes, sir.

17    Q.    Okay.  Did you have a commitment for anything afterwards?

18    A.    I did a four-year commitment.

19    Q.    Okay.  And that would have been after what?

20    A.    Post graduation.  Well, the four-year commitment wouldn't

21    start until after internship period had been completed.

22    Q.    Okay.  So you would graduate school, go through

23    internship, then you would have started your four-year

24    commitment to military; is that correct?

25    A.    Yes, sir, that's correct.

1    Q.   Now, with respect to -- with respect to this, where did

2    you do an internship at?

3    A.   So I graduated medical school in 2012 and was accepted

4    into an internship training program in Morganton,

5    North Carolina, at Blue Ridge Health Care.

6    Q.   Okay.  And did you counter -- what were you training in,

7    specifically?  What was your role in that?

8    A.   Yes, sir.  That was rotating transitional internship,

9    which that just means that you rotate through a variety of

10   different services.  You rotate through -- I think my first

11   service I was on was obstetrics and gynecology, delivering

12   babies, then internal medicine in the hospital, pediatrics,

13   and you got some electives, and one of my electives was pain

14   management.

15   Q.   Okay.  So that kind of got you -- you had some training

16   in that.  When you say "training," what kind of training?

17   A.   Well, so when you rotate through each of those

18   specialties, you would be with -- in my training program, you

19   would be with another physician.  They would be your attending

20   physician.  They would give you jobs, tasks.  You'd probably

21   spend the first few days more or less watching what they do.

22   And then they would basically expect you to be able to

23   replicate on most of the general patients and continue to

24   teach you and give you more jobs and responsibilities as you

25   showed the aptitude throughout the month of training.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 52 of 296   Pageid#:
11186

1   Q.   Now, you ran into some problems in the training in

2   North Carolina, didn't you?

3   A.   I did.  I was six weeks from completing that program in

4   May, the end of May of 2013, and I made possibly one of the

5   worst decisions of my life.  I had worked at the hospital 14

6   or 16 hours that day and some senior residents asked me to

7   come get a bite to eat and have some beer with them.  Against

8   my better judgment, I did that.  And driving home, somewhere

9   between midnight and 1:00 a.m., I sped through a stoplight,

10  and Officer Lloyd -- there in Morganton, North Carolina,

11  Officer Lloyd pulled me over, said he smelled alcohol on my

12  breath.  At the time I was six weeks away from starting my Air

13  Force training to be a doctor in the Air Force.  So I -- I did

14  panic, and I made a bad decision and told Officer Lloyd that I

15  was headed to the hospital to see a patient when I was not.

16  Q.   Okay.  And as a result of that, what happened with the

17  internship?

18  A.   As a result of that, I was called into the office the

19  next day through a series of events and was given the choice

20  to continue in the -- I was given the choice in a matter of

21  three days to either resign from the internship or be fired.

22  Q.   Okay.  And you chose to resign; correct?

23  A.   I chose to resign, yes, sir.

24  Q.   Okay.  Now, did something else, again, happen to you at

25  that point?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 623-5171

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 53 of 296   Pageid#:
11187

1   A.   The same day that I resigned from my internship, my wife

2   at the time, her attorney, who I didn't know she had an

3   attorney, she called me as I was driving down the interstate

4   and asked me where to send divorce papers to.   And that was a

5   pretty bad day.

6   Q.   Okay.   Now, after all this happened in North Carolina,

7   where did you go after that?

8   A.   Within about three months, I had found a new residency

9   program, a new internship program in Bluefield, West Virginia.

10  Q.   Okay.   And why West Virginia?   Anything particular about

11  West Virginia?

12  A.   No, sir.   At that point, with that type of problem on my

13  record, I was grateful to be able to go anywhere to continue

14  my training at that time.

15  Q.   Okay.   Who did you go to work with there?

16  A.   My director of medical education was Jonathan --

17  Dr. Jonathan Yates.

18  Q.   Okay.   And how long were you in that training program?

19  A.   I successfully completed my internship there.   I did

20  another nine months of internship and was planning to begin my

21  internal medicine residency program there.   I found out the --

22  again, the end of May of 2014, that the hospital board had

23  voted to de-fund the internal medicine residency program.   And

24  so at the end of May that year they informed me that I no

25  longer was going to be able to have a position in internal

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 54 of 296   Pageid#:
11188

1    medicine.

2    Q.    Okay.  This was all in Bluefield?

3    A.    Correct.  This was in Bluefield, West Virginia.

4    Q.    This was in what time period?

5    A.    May, June, 2014.

6    Q.    So roughly around this time, with that program gone,

7    where did you go?  Or what was the next step in your process?

8    A.    At that point I tried to find another residency program.

9    The way the residency -- the way doctors get patched into the

10   residency program, it typically happens in February, March is

11   when you're trying to find those positions.  So by the time

12   this happened, there were really no positions for me to go to

13   in the area.

14           And I was remarried at that point, and my family was

15   in Greensboro, North Carolina.  So I had conflicting issues to

16   deal with in regards to family responsibility.  And so I --

17   not being able to find a residency to start in, I applied for

18   full medical licensure from the Medical Board of Osteopathic

19   Medicine.

20   Q.    Were you granted that licensure?

21   A.    I was, I believe by September of 2014.  It took a few

22   months.

23   Q.    Did you have to go through any training or anything like

24   that to get that?

25   A.    I believe they required some CME -- in West Virginia they

1    have your general medical license, and then they also require

2    you to get a license for prescribing controlled substances.

3    So I think there was some training I had to do to be able to

4    get both of those licenses.

5    Q.   Okay.  And so once you were granted that license, where

6    did you go?

7    A.   I drove around the state.  I'd applied to several

8    different federally-qualified health centers, which are rural

9    health centers in every -- I think every state has one.  But

10    they're grant-funded rural health centers to provide health

11    care to the rural population.  West Virginia has quite a few.

12    And not having completed a residency program, I wasn't board

13    certified, so it's -- it makes it much more difficult when

14    you're not board certified to be able to find a job as a

15    physician.

16         So I had contacted someone in Charleston, I think,

17    who helped -- that worked the federally-qualified health

18    centers in West Virginia, and they got me interviews.  And I

19    drove around the state and was given a job offer at a couple

20    of -- I think three different locations.  And I chose the one

21    closest to Greensboro.  It's outside of Princeton, West

22    Virginia.

23    Q.   That would be the one in Bluestone; is that correct?

24    A.   That's Bluestone Health Care.

25    Q.   Bluestone Health Care?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 56 of 296   Pageid#: 11190

```
1   A.   Yes, sir.

2   Q.   Now, how long did you work for Bluestone Health Care?

3   A.   I began working there in October of 2014, I believe.  And

4   worked there until April or May of 2015.

5   Q.   Okay.  And so April or May of 2015 you're still in

6   Bluestone.  Why leave Bluestone?

7   A.   There were a few reasons.  One of them was I was not

8   seeing enough patients per day.  The administrator there

9   wanted me to see more people per day, and I didn't think I

10  could provide adequate care if I saw more people per day.  So

11  that was kind of a major issue for me --

12  Q.   Okay.

13  A.   -- to try and find other places to go.

14  Q.   So in 2014 you decide to leave Bluestone; is that

15  correct?

16  A.   Yes, sir, in the spring of 2014.

17  Q.   And what did you do at that point?

18  A.   So at that point I had looked at a few different options.

19  One of the things I was very interested in, and I had done at

20  Bluestone, they had kind of a combination service.  We did

21  urgent care.  We also did primary care medicine, and we had

22  our own pharmacy inside of the facility as well.  And so I was

23  interested in probably starting my own urgent care at that

24  point in time and had been looking at different ways to do

25  that.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-6152

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 57 of 296   Pageid#:
11191

1    Q.    Okay.  And what did you do at that point?  What's the

2    next step?

3    A.    So I was put in touch with a physician by the name of

4    Dr. Bloom through another physician who had previously worked

5    at Bluestone, I believe Dr. Clarkson, who I'd never met but I

6    talked to him on the phone.  And through Dr. Bloom, I guess,

7    he was the medical director for the top pain clinic in

8    Bethany, West Virginia, or Weaver, West Virginia, which is

9    right next to Beckley, and they expressed an interest in an

10    urgent care, primary care facility being inside their

11    facility.  They saw a lot of patients a day, between 100 and

12    150 patients a day, and a lot of them needed primary care

13    and/or urgent care type services.

14    Q.    Okay.  Now, did you set up an urgent care?

15    A.    So that was, I believe, in May, end of June of 2014.  I

16    did start -- I moved into an office space there.  They have a

17    really large office building.  And so I had -- I was given an

18    office space to set up an office in there.  And after about

19    two weeks it became clear that they were not going to get

20    renewed for their pain clinic licensure, which is something

21    that West Virginia had just started at that time.  And their

22    license, I believe like most of the clinics in the state at

23    that time, was revoked and they were not allowed to continue

24    to see patients.

25    Q.    And was this in a -- was this a separate building?  Was

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 58 of 296   Pageid#:
11192

1    it a medical arts building?  Was it a hospital?

2    A.  It was a large -- it almost looked like a house, but it

3    was a large office building, well over 12,000 square feet.  It

4    was big.  I believe it used to be the accounting department

5    for Jim Justice, the governor of West Virginia.  So it's a

6    large building.

7    Q.  So you've opened the urgent care.  All the sudden now you

8    found out that the center is about to close?

9    A.  Correct.

10    Q.  Okay.  What happened at that point?

11    A.  At that point I immediately -- I had laid the groundwork

12    and I believe had gotten a business license or was about to

13    get a business license for my urgent care, Priority Urgent

14    Care, so I began looking for a medical office space to open

15    that service in.

16    Q.  Okay.  How did the business go?  In other words, what --

17    patients -- did you --

18    A.  So I found an office space in the Beckley Medical Arts

19    Building just down the hall from LabCorp and a radiology

20    office where they did X-rays and ultrasound.  I was next door

21    to a dentist, and there's a pulmonologist across the hall,

22    sort of catty corner.  It was 4,000 square feet of office

23    space, wasn't very big.  But that's where I opened the urgent

24    care.

25    Q.  Did you have a lot of patients?

A.   First day I had no patients.  That was a Monday.  This
would have been in June, I believe.  And then Tuesday I -- it
was like someone opened a water spigot.  I mean, it was more
people -- and I was -- I hadn't hired any staff yet.  I was
just -- it was just me that first day -- or that second day.

Q.   Okay.  What were these patients coming in complaining
with?

A.   They were complaining that they had lost access to their
chronic pain physician and that they were in severe pain.
They had run out of medication.  Some of them were so sick
that I sent them to the emergency room.  It was -- I had never
experienced anything like that in the United States of
America.

Q.   Okay.  Now, as far as these patients, how long did you
continue to operate the urgent care?

A.   So I think I operated the urgent care in West Virginia
for another maybe two months.  I don't have a calendar in
front of me, but it was the rest of June, maybe, then July and
August.

Q.   Okay.  Now, was there a reason that you left West
Virginia?

A.   There were a few reasons, one of which was the tons of
patients that were continuing to come into my office that I
was refusing to see; and the other was that the laws in West
Virginia were such that if anyone treated more than 50 percent

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 60 of 296   Pageid#:
11194

```
 1    of their patients for chronic pain with anything more than
 2    Tramadol, they were labeled a pain clinic and were subject to
 3    being shut down or fined.  So I didn't see any way to be able
 4    to take care of these people adequately and stay in a state
 5    that was -- you know, had that type of law in place.
 6    Q.   Now, where was your family at this time?
 7    A.   My family was in Greensboro the entire time.
 8    Q.   Okay.
 9    A.   I would go home on the weekends.
10    Q.   All right.  And so were you looking for something closer
11    to home?
12    A.   Yes, sir, I was.
13    Q.   Okay.  And did that opportunity present itself?
14    A.   It did.  My wife Angel, she found a medical office that
15    had recently become available in Martinsville, Virginia.  And
16    it was about a half mile down from the hospital, right across
17    the street from the minor league baseball stadium, had two
18    doctor offices below it.  It seemed like a good place to open
19    a medical practice.
20    Q.   Okay.  Now, with this -- you had to get licensed in
21    Virginia; correct?
22    A.   Yes, sir.
23    Q.   Okay.  And did you get the license?
24    A.   I did, yes, sir.
25    Q.   Okay.  And when did you move to Martinsville?
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(436) 823-5311

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 61 of 296   Pageid#:
11195

1    A.    I believe the license was granted in August of 2015, and

2    I moved shortly thereafter.   I believe it was the last week of

3    August of 2015 is when I moved my office by myself from West

4    Virginia to Martinsville.

5    Q.    Okay.   What was your intent when you moved to Virginia,

6    as far as what type of office and everything you wanted to

7    have?

8    A.    Well, I mean, initially, the patients that continued to

9    come to my office and see me, you know, I was going to try and

10   take care of them.   I made it clear to them that my goal was

11   that they would find doctors close to home to treat them.

12   Because I didn't -- I didn't think it would be a long-term

13   situation because I thought it was so catastrophic what I had

14   seen in West Virginia with all -- I mean, thousands of

15   patients not having treatment -- that I thought that situation

16   would get corrected quickly and that doctors' offices would be

17   able to take patients again.   I mean, everybody was telling me

18   they had a six-month wait list or one-year wait list to see a

19   chronic pain doctor or even a primary care doctor that would

20   treat chronic pain.   So I was hopeful that they would go back

21   to that, to their home states and be treated there.

22   Q.    Okay.   Now, once you're in Martinsville, you began to see

23   patients.

24   A.    Yes, sir.

25   Q.    Did you have patients that followed you from West

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5171
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 62 of 296   Pageid#:
11196

1   Virginia?

2   A.   I did, yes, sir.

3   Q.   Okay.  You began to have other patients; correct?

4   A.   Yes, sir.

5   Q.   And where were all these patients from?

6   A.   Well, a few patients from Virginia, but most of them,

7   through word of mouth, would come from Kentucky and West

8   Virginia.  Those were the main two places.  I think there were

9   a few patients from Tennessee because Tennessee had shut down

10   some clinics, as well.  And, I mean, it was just kind of word

11   of mouth.  I never really advertised.  I had a sign out in

12   front of my office.

13   Q.   Why deal with this type of practice?  Did anything change

14   in your mind as you began this practice?

15   A.   I mean, initially, no.  I thought I had needed more

16   training, and I sought that out.

17   Q.   What kind of training did you get?

18   A.   I went to the American Society of Interventional Pain

19   Physicians controlled substance course in Chicago to go

20   through their certification program.

21   Q.   Was that in July of 2015?

22   A.   Yes, sir, that was.

23           MR. WILLIAMS:  May I approach the witness,

24   Your Honor?

25           THE COURT:  You may.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 63 of 296   Pageid#: 11197

1   BY MR. WILLIAMS:

2   Q.    Dr. Smithers, I'm going to ask you, what is that a copy

3   of?

4   A.    This is a copy of my completion certificate with the

5   American Board of Interventional Pain Physicians.

6   Q.    And you state you attended that course in July of 2015?

7   A.    Yes, sir.

8   Q.    And how many hours was that, do you know?

9   A.    I want to say it was at least around 15, maybe more.

10  Maybe 20 or 25 hours, I'm not -- it doesn't say here on the

11  certificate.  But it was intensive.

12  Q.    You were awarded that certificate; is that correct?

13  A.    Yes, sir.

14          MR. WILLIAMS:  Your Honor, at this time we'd ask to

15  move that as Defense Exhibit 2 -- or 3 I think it is now.

16          THE COURT:  It will be admitted.

17      (Defense Exhibit 3 received.)

18  BY MR. WILLIAMS:

19  Q.    Now, Dr. Smithers, have you received any other training

20  in pain management or controlled substance prescribing?

21  A.    Prior to that I had completed CME in West Virginia, the

22  required -- I believe it's three or three and a half hours of

23  medical education in regards to controlled substances and, you

24  know, basically the pharmacology of controlled substances,

25  some of the science that we have to know, and then that was

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 623-5211

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 64 of 296   Pageid#:
11198

1    the other activity I completed.

2    Q.    Okay.  Now, once you sort of completed this course,

3    where -- what did you begin to do as far as seeing these

4    patients?  Did you have a change in philosophy or anything

5    that --

6            MR. RAMSEYER:  Your Honor, the course that he's

7    talking to, he went to -- according to.

8            MR. WILLIAMS:  That's a different one.  I was just

9    giving you a heads up on that.

10           MR. RAMSEYER:  That's all right.  Go ahead.

11   BY MR. WILLIAMS:

12   Q.    Let me back up, see where I was.

13           Did you have any kind of change of philosophy after

14   you began to treat these patients?

15   A.    I did.  These patients were on medicine that, you know --

16   I guess what I had seen with these patients, I think what in

17   my mind made them different -- or similar to other patients

18   I'd seen, honestly in my practice at Bluestone, was that, you

19   know, other physicians followed a model where they prescribed

20   patients really high doses of immediate release narcotics,

21   like oxycodone 30 milligrams.  And they'd give them 120, 150,

22   over 200, 300 pills in cases.  And the pattern that I saw as I

23   interviewed these patients and talked to them about their

24   chronic pain is that they would have these -- they would have

25   spikes in severe pain, and they would take their medicine.  It

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 65 of 296   Pageid#:
11199

1    would last, you know, two to four hours, and then their severe

2    pain would return.

3            And so I began to take information I learned in

4    these courses and compare that with my experience reading

5    these patients and find that extended-release medicine gave

6    them a better control of their pain and also gave them better

7    quality of life.  And so my goal began to be to try to get

8    them off the immediate-release narcotics as much as possible.

9    The other problem with the immediate-release narcotics, as has

10   been pointed out, is their abuse potential.  They're easily

11   abused.

12   Q.   Okay.  Now let's fast forward the record just a little

13   bit.  Take me to the date that the search warrant was issued

14   on your office.  Tell me a little bit what happened at that

15   time.

16   A.   Yes, sir, that would be March 7 of 2017.

17   Q.   Okay.  And what happened on that day?

18   A.   I was at the office.  I was in seeing, I believe, my

19   first patient of the day, around 8:00 or 9:00 a.m.  And

20   Mr. Wilson, the compliance manager at my office, came and

21   informed me that there were two DEA agents that he had seated

22   in the kitchen that needed -- that had requested to speak with

23   me.

24   Q.   Okay.  And did you comply with everything they asked that

25   day?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 623-5111

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 66 of 296   Pageid#: 11200

```
1    A.    Absolutely, yes, sir.

2    Q.    Okay.  Now, there was a search that was done of your

3    vehicle; correct?

4    A.    Yes, sir, there was.

5    Q.    Okay.  And what was found in that -- in your vehicle?

6    A.    They found what we've all seen on the pictures.  They

7    found a backpack with 70 pill bottles with medications that

8    patients had returned, I believe most of which weren't

9    controlled substances, some of which were controlled

10   substances, Ms. Fisher's returned medication, and then in the

11   glove box there was a large amount of cash.

12   Q.    Okay.  Let's talk a little bit about what the cash was.

13   Okay.  Why were you carrying around a large amount of cash?

14   A.    That was money that had been saved to go into a credit

15   union account my wife and I had just opened a couple weeks

16   prior to begin -- we had signed up with the IRS for the

17   electronic payment transfer service, I believe it's called.

18   And that money was going to be deposited into the credit union

19   account so that the taxes could be paid on a quarterly basis.

20   And that was going to be the initial deposit into that

21   account.

22   Q.    Now, so you had set up -- you were going to set up a tax

23   thing to pay it; is that correct?

24   A.    Right.  We already set up -- I believe the week before

25   the search warrant was executed, we already set up and had
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5171
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 67 of 296   Pageid#: 11201

1  gotten a confirmation letter from the IRS that their

2  electronic payment system was linked with our newly-opened

3  credit union account.

4  Q.   So you had this money that you were getting ready to put

5  into that account; is that correct?

6  A.   Yes, sir, that's correct.

7  Q.   And what about the pills?

8  A.   The medications had been in that backpack since I moved

9  to Martinsville.  And the week prior to the search warrant

10 being executed is when Mr. Wilson's father had passed away in

11 Tennessee and he had to leave suddenly.  And after I walked

12 Ms. Fisher out because I think it was after -- it was dark

13 outside.  It was after 7:00 or 8:00 when I walked her out to

14 her car that night.  She was the last patient.  When I came

15 back to turn off the light, her medicine was still on the

16 counter in the baggies that she had brought it in.  Because

17 normally Mr. Wilson took care of the distribution with the

18 patient in the bathroom and I then I just saw the form in the

19 chart.

20         So at that time, I put -- I remember that I had that

21 backpack.  And it was in a locked office in the back.  My

22 office was about 4,000 square feet.  And there were rooms in

23 the back that we just -- we didn't use.  One of them was a

24 storage room that was locked.  And that's where this backpack

25 had been.  And so I put that medicine with that, and my

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 68 of 296   Pageid#: 11202

1   intention was to take it to the Henry County Sheriff's

2   Department and have them take control of all those medicines.

3   I was just going to give all of them to them.

4   Q.   Okay.  When were you planning on doing that?

5   A.   That week.

6   Q.   Okay.  Now, have you ever sold any pills?

7   A.   No, sir.

8   Q.   Have you ever taken anything that's not prescribed to

9   you?

10  A.   No, sir.

11  Q.   Did you ever take any of those pills?

12  A.   No, sir.

13  Q.   Did you ever give any of those pills out to another

14  patient?

15  A.   No, sir.

16  Q.   Now, what I'd like to do is let's go through -- as you

17  set up your practice, okay, were there certain safety

18  precautions you tried to implement throughout the time of your

19  practice?

20  A.   Yes, sir.

21  Q.   When I say "safety precautions," I'm talking about --

22  we're talking about high-level narcotics and stuff.  Were

23  there things that you tried to implement in your practice to

24  be able to make sure these things weren't being abused and

25  stuff?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 69 of 296   Pageid#: 11203

```
1    A.    Yes.

2    Q.    Describe some of the things you set up.

3    A.    So I would go back to when I had the urgent care in West

4    Virginia.  I -- even before that when I was at Bluestone, and

5    the reason I had taken back patients' medications, which I

6    later found out you're not supposed to do, I had a patient

7    that had really severe gout.  And he had been taking, I

8    believe, ibuprofen just around the clock to try to make his

9    toe feel better where he had the gout.  And then when he came

10   to see me, we did lab tests, and I had done a physical exam

11   and prescribed him another type of medicine similar to

12   ibuprofen called diclofenac.  And I'd seen it work better on

13   other patients.  And I told him to stop taking ibuprofen.

14         So they were the same type of medicine.  It would be

15   like taking ibuprofen and Aleve at the same time.  He came

16   back two weeks later for his followup and he was still taking

17   the ibuprofen and the diclofenac.  Those medicines really can

18   hurt your stomach, cause you to bleed.  I've actually seen a

19   young man in the ICU with a stomach bleed because of taking

20   too much of those medicine.

21         So it really made me aware -- I was -- I wouldn't

22   say paranoid, but it really made me aware that patients do not

23   always listen and follow your directions.  So when -- from

24   that point forward, even at the urgent care, we would

25   repossess medicine.  I think the nurses put them in a
```

1    biohazard container.

2          But then going forward with patients that are on

3    long-term products, I discovered through the training programs

4    there's different ways of maintaining surveillance, and that

5    became more of an integrated part of my practice once I moved

6    to Martinsville.

7    Q.   Okay.  We've talked a lot about it.  I don't think we've

8    gone into detail much.  But tell the jury, what are opioids?

9    A.   So --

10          THE WITNESS:  Is it possible to draw on this,

11   Ms. Felicia?

12          THE CLERK:  Is there something up on the screen?

13          THE COURT:  It is possible to draw on it.

14          THE WITNESS:  Opioids.  Dr. Hail kind of covered the

15   breakdown between opioids and opiates.  But opioids, in

16   general, are what we classify as narcotic medication.  And

17   there are both legal and illegal forms of opioids or opiates

18   in the United States.  And we use those terms almost

19   interchangeably.  They do have specific meanings, but for our

20   purposes I think they mean basically the same thing.

21          They're medicine that have been used for, I believe,

22   around 3,000 years or more for the treatment of pain and other

23   types of illnesses.  They were discovered long ago to alleve

24   [phonetic] pain in people with -- among other issues.  In the

25   United States we have certain opioids or opiates that we're

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 71 of 296   Pageid#: 11205

allowed to prescribe to help treat certain medical conditions

for patients.

         But what an opiate does, it acts on the part of the

body called the CNS, or the central nervous system.  That's

the main area that it affects.  And the CNS stands for central

nervous system.  That is your brain and your spinal cord.  So

just head and spine, that's the main areas.  They affect other

parts of your body, but those are the main two areas that they

affect.

         And the way that happens, it happens at what we

understand to be the cellular level, so at a very small level

that you can only see under a really good microscope something

like this is occurring.  And, I apologize, I'm not an artist.

         You have what are called synapses.  You have a

pre-synapses and post-synapses, and you also have different

inputs.  And so what will happen, the reason opiates or

opioids actually work in our body is because we have receptors

for those in our body.  And we actually make our own opiates

in our body, or opioids.  They're called endorphins.  And

endorphins are released when you work out really hard.  Maybe

you've heard of "runner's high".  Our body under stress

releases those endorphins.  And those endorphins come in from

whatever source.  They're released in the brain or the spinal

cord or other parts of the body.  There's receptors in the

synapses that these endorphins attach to.  Those receptors

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 72 of 296   Pageid#: 11206

```
1    also respond to the opiate or opioid medications.  So when
2    someone takes an opiate or opioid -- remember, they mainly
3    affect the brain and spinal cord -- those receptors are what's
4    responsible for the effects of pain relief and any type of
5    sensation associated with that.  And some people, they
6    experience a great deal of what they call "euphoria" or
7    "high".  That's rare, but that does happen, and it can depend
8    on what type of opiate they've taken whether they experience
9    that or not.  But these receptors in our body are there, and
10   they allow us to have these medications used to help treat
11   various illnesses, including severe chronic pain.
12   BY MR. WILLIAMS:
13   Q.   Okay.  Now, with respect to -- how does this impact with
14   tolerance and dependance and stuff like that?
15           MR. RAMSEYER:  Your Honor, I didn't hear the
16   question.  Can you repeat the question?
17   BY MR. WILLIAMS:
18   Q.   So how does this affect with respect to tolerance and
19   dependance?
20           MR. RAMSEYER:  Your Honor, I think he is allowed to
21   testify about his practice, but I don't know how much he can
22   just go into theory.  We would object.
23           THE COURT:  Well, being he -- are you going to have
24   him offer expert opinions?
25           MR. WILLIAMS:  Your Honor, I can move on.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 783-9771

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 73 of 296   Pageid#:
11207

```
 1              THE COURT:  All right.  If you would, please.
 2    BY MR. WILLIAMS:
 3    Q.   Dr. Smithers, what was your treatment philosophy?
 4    A.   So, in that period of time when I moved to Martinsville
 5    and had additional education my treatment philosophy became
 6    that as I would treat the patients that came to me to reduce
 7    or completely remove their immediate-release narcotic as
 8    quickly and as safely as I thought I could while trying to
 9    find an extended-release medication that could better control
10    their severe chronic pain.
11              And in conjunction with that, I was not just using
12    narcotics.  I was using nortriptyline and medicine in that
13    class, which specifically can help with nerve pain.  They're
14    not a narcotic medicine.  Nortriptyline is in a class similar
15    to amitriptyline or Elavil.  And some people, they do make
16    people sleepy.  In other people, I found that they got better
17    relief from that than from taking a narcotic.  And so that was
18    one medicine.
19              The other part of what I would do in my diagnostic
20    workup was a lot of patients suffered from chronic muscle
21    spasms.  So I would work through a variety of different muscle
22    relaxants with that person to try to find one that gave them
23    the most benefit and allowed them to improve their function
24    and improve their quality of life.  And at the end of the day,
25    that was the goal of medication therapy with my patients was
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 74 of 296   Pageid#: 11208

1   for them to have a higher quality of life, be able to sleep at

2   night, then be able to get up, like Mr. Hartshorn was being

3   able to testify yesterday, be able to get up and do things and

4   with life.  You know, for all of the bad things that we could

5   say about the abuse of opiates and opioids, there's a reason

6   that they're still legal and they're approved by the FDA as

7   safe and effective for the treatment of severe chronic pain.

8   It's because they work and they give these patients the

9   ability to live their lives.

10  Q.   Now, Dr. Smithers, if we can, you got over 50 counts

11  against you regarding over 50 different patients that you're

12  charged with.  What I'd like to do is start going through some

13  of those patients, if we can here, regarding your treatment,

14  if we can.

15          MR. WILLIAMS:  Ms. Felicia, can we put this up?

16          This is RB-2, 13.

17          THE CLERK:  You want these displayed to the jury?

18          THE COURT:  Are these documents admitted?

19          MR. WILLIAMS:  They're admitted.

20          I apologize.  I'm not very technologically savvy.

21  BY MR. WILLIAMS:

22  Q.   All right.  Dr. Smithers, what I'm going to show you

23  here, let's look at Robert Battaglia.  That's the first person

24  on the indictment.  All right.  What I'd like to do is tell

25  the members of the jury, what is this form?

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 75 of 296   Pageid#:
11209

 1   A.   So this is a modified new patient intake form for pain

 2   management that I adjusted to -- it's -- I believe this is

 3   page 1 of maybe 28 pages.  It's an extensive form that I would

 4   use to have the patients fill out and provide information to

 5   help me better understand the nature of their illness and then

 6   guide our discussion about the medical issues that they had so

 7   that I would be able to understand, you know, what their

 8   complaint was and what type of problems they were suffering

 9   from, as well as hopefully get as much information up front.

10   So after I reviewed this document and talked to the patient it

11   hopefully speeds up that process.

12   Q.   All right.  Now, with respect to Mr. Battaglia, what's

13   the date that he came into your office?

14   A.   I believe it says here September 3rd, of 2015.

15   Q.   Okay.  Now, what would you have done here with respect to

16   this as far as the intake with Mr. Battaglia?  Walk us through

17   your first visit with Mr. Battaglia.

18   A.   So --

19            THE COURT:  Wait.  If I can interrupt.  What would

20   you have done?  What did you do?

21   BY MR. WILLIAMS:

22   Q.   What did you do?

23            THE COURT:  Okay.  You said, "What would you have

24   done?"  But you mean what he did in fact.

25            MR. WILLIAMS:  Correct.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 293-0714

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 76 of 296   Pageid#: 11210

```
 1              THE COURT:  All right.  Thank you.

 2   BY MR. WILLIAMS:

 3   Q.    What did you do with Mr. Battaglia?

 4   A.    So he -- at that time I believe my office procedure was

 5   that he would have been handed a clipboard with this document

 6   blank, and he would have filled this document out and then

 7   handed the document in to -- I believe my wife was working at

 8   the front desk at that time, and she would have checked the

 9   form for errors, then I would have had a chance to review it.

10   Q.    Okay.  And what does it say Mr. Battaglia was complaining

11   of?

12   A.    Looks like he wrote down neck and back.

13   Q.    Okay.  And when you would see this, what would be your

14   next -- what's the next thing you did?

15   A.    So, I mean, this is the first page that I would review.

16   It tells you the general complaint that the person has.  It

17   tells you -- and the reason that there's a drawing there, so

18   that they can mark, you know, and use arrows.  And some of the

19   patients are more descriptive than others in letting you know

20   where their problem is and where the problem goes to.  But it

21   gives you a guide on what to talk about with the patients.

22   Q.    So what would it be -- when Mr. Battaglia came in, what

23   would be the first thing that would happen when he came in

24   your office?

25              MR. RAMSEYER:  Objection, Your Honor.  I think he
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 77 of 296   Pageid#:
11211

```
 1    can ask what happened.
 2              THE COURT:  Yeah, I'm still not sure I understand.
 3    Is it that --
 4              MR. WILLIAMS:  I just --
 5              THE COURT:  Wait a minute.  You said that you don't
 6    remember what happened.  Are you guessing --
 7              What I understood you to ask is what he did.  And he
 8    can obviously refer to these records.  But he -- and you keep
 9    saying, "I would have done this.  I would have done that."
10    And I don't understand that.
11              MR. WILLIAMS:  My apologies.
12              THE COURT:  I'm just trying to bring this out for
13    the jury's knowledge.
14              MR. WILLIAMS:  Right.
15              THE COURT:  Could you elaborate on your question,
16    or --
17    BY MR. WILLIAMS:
18    Q.   When Mr. Battaglia came in, what was the first thing that
19    you did in that office?
20    A.   So you're referring to when he came back and we had the
21    examination?
22    Q.   Would he have any kind of vitals taken?
23    A.   Correct, yes, sir.
24              THE COURT:  In other words, Doctor, what I'm
25    suggesting is you keep saying, "I would have," which sounds
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 78 of 296   Pageid#:
11212

```
 1    like you don't know what you did or you didn't do it but you
 2    should have done it, and I don't think that's what you mean.
 3              THE WITNESS:  No, sir.
 4              THE COURT:  So let's don't use "I would have."
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  Let's just refer to what you did --
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  -- based on your recollection and the
 9    records you have in front of you.  Okay?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  All right.
12              THE WITNESS:  So I brought the patient back, did
13    vital signs and immediately -- and one of the reasons I did my
14    own vital signs typically was so I could start the interview
15    process with the patient as I did their vital signs.  I
16    could -- also, there's certain things you could learn.  I
17    learned as a nurse aid and EMT there's certain things you
18    could observe, involuntary movements and things when you do
19    vital signs yourself for your patient.  And I also trusted
20    myself to do vital signs more than anyone else, so that was
21    the other reason I did it that way.
22              After I did the vital signs, I would immediately sit
23    down with the document and begin questioning the patient.  Or
24    I did sit down and go through the forms that he completed and
25    spoke with him in regards to his chief complaint and would
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 522-5171
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 79 of 296   Pageid#: 11213

1   attempt to get more information specifically to the cause.

2   And typically I would write that on this page.  It doesn't

3   appear that that happened in this case, but that was what this

4   first page would be used for.

5   BY MR. WILLIAMS:

6   Q.   All right.  Now, what did -- what did Mr. Battaglia state

7   was wrong with him and how he was hurt?

8   A.   So I believe the first time I saw Mr. Battaglia was

9   actually in West Virginia at my other office.  And this looks

10  like what he complained of often, specifically from a car

11  accident that he had suffered ten years prior.  He complained

12  of severe chronic pain in his neck and low back.  And he often

13  complained of the pain radiating from his neck to his low

14  back, or from his low back up into his neck.  And this can be

15  common with different types of nerve compression injuries that

16  people suffer in car accidents frequently.

17  Q.   Okay.  And did Mr. Battaglia relate to you that he had

18  been in a motor vehicle accident?

19  A.   He did, yes, sir.

20  Q.   And what physical things did you do with Mr. Battaglia?

21  A.   So I would have done -- or I did do range of motion

22  testing.  Specifically, where the patient -- it's called a

23  focused physical exam.  So you focus on the areas where the

24  patient is saying they're having the most difficulty or they

25  have the most pain.  And the idea from my training and

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 80 of 296   Pageid#:
11214

1    experience was that you -- if they did have what we call

2    radiculopathy, if they have nerve pain or shooting nerve pain,

3    you could get to that issue much quicker by doing a focused

4    physical examination where you measure or have them do range

5    of motion against resistance.  If it's someone's head and

6    they're complaining of neck pain, you can have a hand on

7    either side of their face and turn against resistance.  If

8    that produces the response of normal reaction, sometimes they

9    have the normal response of muscle reaction.  They also have

10   or complain of a shooting pain into their arm, or they can

11   complain of shooting pain into their opposite arm.  So

12   that's -- those are the types of physical manipulation

13   maneuvers I did on Mr. Battaglia.

14   Q.   Okay.  What objective determinations did you make

15   regarding Mr. Battaglia?

16   A.   Based on my past medical history, past medication

17   history, and physical examination, I determined that he was

18   in -- he lived in daily chronic pain.

19   Q.   Okay.  And that was based on what all decisions that you

20   made?

21   A.   My determination was --

22   Q.   Yeah.  What all factors did you use to come to that

23   conclusion?

24   A.   That he -- well, I trusted the patient.  I believed that

25   he was telling me the truth.  And then his physical

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 81 of 296   Pageid#: 11215

1  examination at the time corresponded with the complaints that

2  he had indicated on his chart.  And I used my training and

3  experience and knowledge of treating these types of conditions

4  hundreds of times up to this point in my career that he

5  definitely suffered from these medical ailments.

6  Q.   Okay.  And did you consult any outside information such

7  as MRIs?  X-rays?

8  A.   In Mr. Battaglia's case, I would have to be refreshed on

9  his chart to see what other records existed.  Typically that

10  is what I preferred to do is rely on other medical records.

11  That's very helpful.

12         MR. WILLIAMS:  Okay.  Let's stop right here just a

13  second.  If we could push this back up.

14         THE CLERK:  Turn it back on?

15         MR. WILLIAMS:  Yes, please.

16  BY MR. WILLIAMS:

17  Q.   Okay.  Now, what I'm asking you is what is this form

18  right here that you were using?

19  A.   So this would typically be -- or this was the last page

20  in the chart where I would spend most of my time taking the

21  findings on physical examination, using the drawings, which in

22  my training and experience was common that this is how this

23  was notated on paper.  And I would also -- so I did not just

24  accept what she, the patient, wrote down.  Oftentimes, the

25  patients were confused, even on the zero-to-ten pain scale.

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 82 of 296   Pageid#: 11216

1  So I would go over that scale in my own way with the patients.

2  And the way I would explain the zero-to-ten pain scale, which

3  everybody is familiar with, I think, I would say zero is no

4  pain at all and 10 is the pain of death or ten is, you know,

5  the most severe pain you've ever experienced in your life,

6  just to try to give the patient a reference point as to what

7  that actually was.  And then I would go through the questions

8  on this form with the patient.

9        It looks in this case that my wife went through

10  those questions and did the vital signs herself, actually.

11  But, typically, I was the one performing all the work on this

12  page specifically.

13  Q.   And what I want to do is circle this right here.  Right

14  below his name, what are those codes?

15  A.   So those are -- as Dr. Bassam testified to yesterday,

16  those are ICD codes.  It's from the international coding

17  diagnosis manual.  I believe those are the ICD-9 codes.  And

18  by October of 2015, just a month after this, I think we

19  changed to ICD-10.  But these codes, these numbers, they

20  correspond with actual diagnoses.

21        So the first code that he has there, 338.21, that

22  corresponds with severe chronic pain due to trauma.  The way

23  we think about trauma in medicine is if your chronic pain was

24  caused by a motor vehicle accident, or was caused by a coal

25  mine collapse, or was caused by domestic abuse, then that is

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(423) 623-5171

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 83 of 296   Pageid#: 11217

1  trauma.  You suffered trauma.  So that would be the cause --

2  or the primary cause of your severe chronic pain.

3          There can be additional causes.  I think in

4  Mr. Battaglia's case, it wasn't helped by the fact that he sat

5  in cars and drove as a salesman from California to everywhere

6  and was sitting for long periods of time.  I think that

7  contributed greatly.  His primary cause of chronic pain was

8  trauma.

9          MR. WILLIAMS:  Ms. Felicia, you might turn that off.

10  Is there a way I can do that?

11          THE CLERK:  You might have a box.  I don't think so.

12          MR. WILLIAMS:  Your Honor, if I can have her place

13  that back up again, please.

14  BY MR. WILLIAMS:

15  Q.   This is in Mr. Battaglia's file, but what is this right

16  here?

17  A.   So this would be the -- excuse me.  This would be the

18  Brief Pain Inventory (Short Form).  This was another form that

19  I used on every follow-up visit after the initial visit to,

20  again, monitor the status of the patient as far as their

21  control with the motions we were using and other interventions

22  I'd recommended to the patient.  This was a way to keep track

23  of if there was improvement or if things were staying the

24  same, or if, you know, they had a better month.  And if we

25  changed a medicine the previous month, this was a way to see

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 84 of 296   Pageid#: 11218

1    and have documentation by the patient that they experienced

2    improvement from the medication change we made the prior

3    month.  So that was the significance of this document.

4            Excuse me, the other significant element to this

5    document is the ability for the patient to document any side

6    effect they were having to the medicine.  Then that would

7    allow me to discuss side effects they had to the medicine and

8    to potentially make changes, like in Ms. Fisher's case where

9    we decided to make a change to her medicine because of the

10   side effects.

11   Q.   Okay.  Now, this would state for the patient to point out

12   where the injuries were; is that right?

13   A.   If you could scroll down just a little bit.

14           Yes.

15   Q.   I mean on the body.  I'm talking about on the body.

16   A.   Oh, yes.  On the mannequin there, that is just an

17   opportunity, again, for the patient to indicate if they had

18   any new injuries, if they had any, you know, current issues

19   that were worsening or improving and where those would be

20   located on the body.

21   Q.   Okay.  As we scroll down it talks about your worst pain

22   and least pain in the past 24 hours; is that correct?

23   A.   Yes, sir.

24   Q.   And this would be a document that the -- that they would

25   fill out or that you would fill out?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 623-5171

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 85 of 296   Pageid#: 11219

          1     A.    No, this would be a document the patient was supposed to

          2     fill out.

          3     Q.    Okay.  And then I think it says, "Describe your average

          4     pain," Number 5.  Is that right?

          5     A.    Yes, sir, that's correct.

          6     Q.    And the pain right now in Number 6?

          7     A.    Correct.

          8     Q.    And then what treatments you're receiving for your pain?

          9     A.    Correct.

         10     Q.    Why would all these things be necessary to make a

         11     determination?

         12     A.    Well, because each visit we are -- we want to know how

         13     they're doing in response to the treatment.  I mean, this

         14     is -- I found it to be an effective way to -- with honest

         15     patients, I found it to be an effective way to monitor their

         16     response to therapy.

         17     Q.    "With honest patients," what are you talking about?

         18     A.    I am referencing the fact that within the first six

         19     months of -- to a year of practice I learned several lessons

         20     the hard way about trusting people that I should not have

         21     trusted.

         22     Q.    Okay.  Did you implement anything at your practice during

         23     this time period to try to stop this?

         24     A.    I did.  I was approached by a gentleman named Mark

         25     Radcliff who operated the company, I believe PPPFD,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(436) 293-0129

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 86 of 296   Pageid#: 11220

 1    Physicians, Patients, and Pharmacists Fighting Diversion, and

 2    he offered one of his compliance managers, as I understood it

 3    at the time, Mr. Wendell Wilson, who had prior law enforcement

 4    experience on a narcotics task force.  And we -- he and I

 5    discussed what type of services he provided as far as

 6    accountability and monitoring the patients.  That was

 7    something I definitely thought I needed more in my practice.

 8    That, you know -- so as soon as -- I think as early as

 9    September or October of 2015 he began to work in my office.

10    Q.    Okay.  And that would be Wendell Wilson; correct?

11    A.    That would be Wendell Wilson, yes, sir.

12    Q.    What did Wendell do?  What was his role?

13    A.    So Wendell, he wore many hats.  But his primary -- his

14    primary role was that of a compliance manager.  And so -- and

15    the reason that it made sense to me to employ someone like

16    this was I had trained with physicians who at times were

17    really rude to patients and yelled at them and berated them,

18    you know, even in some cases cursed at them.  And I -- my

19    approach to patient care was that I wanted to develop a

20    relationship with the patient to be able to see them on each

21    visit and honestly be able to assess their status.  For me it

22    was difficult to have kind of a policeman function compliance

23    with them and be their physician and trust them and try to

24    treat them at the same time.

25            And so Mr. Wilson, he being former law enforcement,

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
(276) 523-5171

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 87 of 296   Pageid#:
11221

```
 1    he had a much more direct approach about him.  And so he --
 2    you know, he would help.  He would do the urine drug screens
 3    and he would monitor the patients for, you know, pill count
 4    and different things like that, needle marks, track marks.  He
 5    would go through -- he had a couple different forms that he
 6    went through.  I think he had an initial form that was pretty
 7    extensive where he went through patients' depression, suicidal
 8    risk, and any drug abuse history, any forms of drug abuse.
 9    And that was also a helpful screening tool.  He also ran
10    criminal background checks.  And this was all provided under
11    that company, the Physicians, Patients, Pharmacists Fighting
12    Diversion he was employed through.  And it -- to me, it
13    provided a service hopefully I was only going to be treating
14    patients I could trust.
15    Q.    Okay.  Now, did he also conduct the pill count and stuff
16    in your office, too, or was that someone else in your office?
17    A.    No, he would have done that as well.
18    Q.    So a person comes into your office.  They would check in
19    at the front desk; is that right?
20    A.    Yes.
21    Q.    And then after you hired Wendell, the next person they
22    would see would be Wendell?
23    A.    Yes, sir, that's correct.
24    Q.    And that's when Wendell would take them back through the
25    pill count, through the drug testing and all like that.  And
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 238-9371

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 88 of 296   Pageid#: 11222

```
 1   then would the patient go back out and wait, or would the
 2   patient then immediately come to you?
 3   A.   So we tried a few different approaches to try and
 4   streamline the process.  I mean, we really had more exam
 5   rooms.  I think we had ten exam rooms in that office.  I think
 6   the way we tried that worked the best was Wendell, when he
 7   finished with the patient, he would put them in an exam room,
 8   put their chart next -- in the holder next to the door, and
 9   then he would let me know that the patient was ready to be
10   seen.
11   Q.   Okay.
12           THE COURT:  Excuse me, Mr. Williams.  I think it
13   would be appropriate to stop for lunch at this time.
14           I have another matter that I need to take up in a
15   different case.  And so what I'd like to do is just end your
16   examination right now and allow the parties and the jury to go
17   to lunch and come back at 1:00.  All right?
18           MR. WILLIAMS:  Okay.  Thank you.
19           THE COURT:  So, ladies and gentlemen, I'm going to
20   let you go to lunch a little early now.  If you'll be back at
21   1:00, that way you won't have to wait while I take up another
22   matter.  So if you'll follow the bailiff out, please.
23       (Proceedings held in the absence of the jury.)
24           THE COURT:  All right.  Ladies and gentlemen, we're
25   going to take a short recess.  And in this case we'll
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(43) 228-5311*

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 89 of 296   Pageid#:
11223

```
 1    reconvene at 1:00.
 2              All right.  We'll be in recess.
 3        (Proceedings suspended at 11:34 a.m. and resumed at 1:00
 4    p.m.)
 5              THE COURT:  Are we ready for the jury, Mr. Williams?
 6              MR. WILLIAMS:  Yes, Your Honor.
 7              THE COURT:  All right.  Dr. Smithers, if you'd
 8    retake the stand, please.
 9              We'll have the jury in.
10        (Proceedings held in the presence of the jury.)
11              THE COURT:  All right.  We're ready to go again.
12              Mr. Williams, you may proceed.
13    BY MR. WILLIAMS:
14    Q.   Okay.  Dr. Smithers, if I can, let's go -- if we can show
15    up what I've got on my screen here.  We'll start with Robert
16    Battaglia.  What I'd like to do is sort of scroll through this
17    here a little bit.  I'll try to go real slow.  What I'd like
18    for you to do is just sort of tell us what you see here with
19    respect -- what you did with Mr. Battaglia, what he presented,
20    and what you diagnosed him with.
21              MR. RAMSEYER:  Your Honor, I'm going to object.  Of
22    course --
23              THE COURT:  Didn't you already go through Dr. --
24    this patient?
25              MR. WILLIAMS:  I don't think we got completely
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 90 of 296   Pageid#:
11224

```
 1    through it.  I was going to scroll on through a little bit

 2    more, but if I can have just a little bit of leeway,

 3    Your Honor.

 4              THE COURT:  Okay.

 5              THE WITNESS:  Yes.  What we discussed about

 6    Mr. Battaglia on the first page here is correct and supported

 7    the objective findings I found on physical examination and

 8    further discussion with the patient in the patient interview.

 9    BY MR. WILLIAMS:

10    Q.   What did Mr. Battaglia present with?  What was his

11    injuries?

12    A.   He, he was favoring his -- I believe he was favoring his

13    right side.  He had significant pain, even to palpation, I

14    believe, in his neck.  And on range of motion in his lower

15    back, he had some shooting pains into I believe his right side

16    as well, into his right leg.

17    Q.   Okay.  Now, as we scroll through here just a little bit,

18    did he indicate he had been involved in a motor vehicle

19    accident?

20    A.   Yes.

21    Q.   Okay.  What else did he indicate he had been involved

22    with?

23    A.   Most of the significant injury he had suffered was as a

24    result of a motor vehicle accident.  He indicated to me that

25    that pain had -- this is common with some types of chronic
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 91 of 296   Pageid#:
11225

pain that it had -- and I've been in a car accident.  I've

been in a couple car accidents myself.  Sometimes you have an

initial phase that you go through where you feel better and

then things kind of settle down in your body and get worse.

And I believe that he was in that phase of dealing with this

issue where his pain was worsening and his symptoms were

getting worse.

Q.    Okay.  What symptoms and stuff was he suffering from?

A.    He was suffering from severe chronic pain.  He had, you

know, limited range of motion in his neck due to pain.  On a

physical examination, he suffered from limited range of motion

in his low back due to, again, pain with certain extremes of

movement.  When you have -- and this is common if you have any

type of impingement of nerves or if your back's ever gone out

on you, if you move a certain way or feel a sharp pinch, that

can -- sometimes we can elicit that or we can draw that

symptom out on physical examination when we put you through a

certain range of motion in your low back or in your neck.  We

can get that -- we can reproduce that objective finding of

shooting pain in some cases.

Q.    Okay.  Based upon your -- based upon your examination,

based upon what he told you, did you feel like he had a

legitimate pain?

A.    Yes.  Based on my objective findings through physical

examination, verbal examination of his past medical history

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 263-0931
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 92 of 296   Pageid#:
11226

1    and documentation I had at the time, yes, he was diagnosed

2    with severe chronic pain due to trauma, among other diagnoses

3    that indicated he had legitimate medical need to be treated.

4    Q.    Okay.  What I'm showing on the screen here should be

5    RB-269.  What is this a copy of?

6    A.    This appears to be a copy of the discharge letter that I

7    drafted and mailed to Mr. Robert Battaglia.

8    Q.    Okay.  And why did you discharge Mr. Battaglia?

9    A.    I received information, as sometimes happened at my

10   office.  I think pretty much every doctor's office I've ever

11   worked in, patients tell you things.  But I received

12   confidential information that he had been treated at a

13   methadone facility previously.  And in reviewing the records

14   that we had in the office, he had never indicated that he had

15   received such treatment.  And that's something that we

16   routinely screen patients for and ask them if they had had

17   those types of therapies.

18          There were several other statements he had made that

19   did not add up and that were not consistent with other

20   documentation I was able to find.

21   Q.    Okay.  I'm going to show you, if I can back up here,

22   to -- should be RB, page 64.  What is this of?

23   A.    This is another Brief Pain Inventory (Short Form) of

24   Mr. Battaglia's visit on September 10th -- I'm sorry.  That's

25   his date of birth -- on April 11th, 2016.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 825-0311
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 93 of 296   Pageid#:
11227

 1   Q.   Okay.  And what would this short form be -- I know we

 2   described generally what it is, but this is sort of an interim

 3   type thing where he would repeat.  Is that what it is?

 4   A.   Correct.  Usually the goal was to see a patient every

 5   month, every 30 days, roughly, to -- and that was not what was

 6   required.  It wasn't my understanding of what was required in

 7   regards to the types of treatment that these patients were

 8   receiving with controlled substances.  You know, they could

 9   have been seen on a 90-day --

10             MR. RAMSEYER:  Objection, Your Honor.  I think he's

11   going to -- if he's saying what's required, I don't think he

12   necessarily is an expert on that.

13             THE COURT:  I'm not sure I understand the objection,

14   Mr. Ramseyer.

15             MR. RAMSEYER:  He said -- he's saying his

16   understanding of what is required.

17             THE COURT:  Yes, sir.

18             And the basis of your objection?

19             MR. RAMSEYER:  I mean, if he wants to limit it to

20   that's what he -- if he wants to say that's what he thought,

21   that's fine, but I don't think he can say what's a fact in

22   terms of what's required.

23             THE COURT:  Well, where did you get this information

24   that this was required?

25             THE WITNESS:  This was through my training and

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 94 of 296   Pageid#: 11228

```
 1    practice in hospital residency training, internship training,
 2    and working with other physicians.
 3            THE COURT:  I mean, when you say "required," you
 4    mean by law or just you felt that that was a good practice?
 5    Or --
 6            THE WITNESS:  Well, no, Your Honor.  I mean, I --
 7    we -- I don't know any physician that's actually trained on
 8    the Controlled Substances Act.  We kind of learn by osmosis.
 9    We learn by training with other physicians.  And that's how I
10    came to understand the 90-day rule.
11            THE COURT:  All right.  Well, I'm going to overrule
12    the objection.  Go ahead.
13    BY MR. WILLIAMS:
14    Q.   Now, Dr. Smithers, if you will, this is a note at the
15    bottom of that.  What does this note say?
16    A.   So this would first be starting with the subjective
17    information from -- information from the patient.  This is
18    what the patient reported to me, Mr. Battaglia being the
19    patient.  "Patient takes and tolerates medication RX,"
20    prescription medication, "well with," S with a line over it,
21    "without issues.  Patient reports increased driving due
22    to," D/T "due to work.  Now," C with a line over it, "with
23    1,000 to 1500 miles per week.  He anticipates at least two
24    more months of driving this much due to work.  He reports
25    increased right leg pain," with up arrow, "that begins in his
```

```
1   low back and radiates to his toes.  Patient states the
2   radiating, aching, burning pain with numbness is worse with
3   sitting."
4   Q.   Okay.  And what does the next section say?  It's got a
5   bunch of letters and numbers.  What are those?
6   A.   Correct.  So the next section, "A/P," is assessment/plan.
7   And then those numbers are the ICD codes for the diagnoses
8   that I have diagnosed Mr. Battaglia with.
9   Q.   Okay.  Do you recognize those codes?
10  A.   Yes, sir.
11  Q.   What are they?
12  A.   So G89.4 would be chronic pain syndrome.  G892.1 would be
13  severe chronic pain due to trauma.  N54.5, I believe that is
14  low back pain.  M54.16 would relate to that.  M62.838 and
15  appears 54.16 is listed twice.  M.79.2, that may be a
16  radiculopathy.  I would have to look and see.
17  Q.   Okay.  And what else does the remainder of the note say?
18  A.   It describes the plan.  "Patient was given extensive
19  guidance regarding posture and postural support while driving.
20  He will be acquiring health insurance within the next few
21  months, hopefully, and better able to afford a new MRI of his
22  low back.  Blood work, including testosterone levels,
23  T-levels.  And we increased his extended-release long-acting
24  medication.  We decreased his immediate-release pain
25  medication.  Patient reports not taking his Neurontin the past
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5171
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 96 of 296   Pageid#: 11230

1    four to five months and has supply at home.  He will resume

2    now taking it at nighttime."  QHS is at bedtime.  "And three

3    times daily once adjusted to prescription.  Continue on

4    current prescriptions as written," is what that last line

5    stands for.

6    Q.    Okay.  We'll skip down to page 80.  I'm going to show you

7    what is RB-2-80.  What do you see here?  What is this right

8    here?  If you can, if you would tell the jury.

9    A.    So this would be a copy.  The types of prescriptions I

10   used I believe were the most secure at the time, and they

11   transferred -- without a piece of carbon paper in there, they

12   transferred the handwriting onto the initial page onto a

13   second page behind that.  And so this is a carbon -- what we'd

14   call a carbon copy of that prescription.

15   Q.    Okay.  And does it have anything on there regarding codes

16   of any type?

17   A.    Yes.  It was my habit to put the diagnosis code.

18   Typically, I would put three of their diagnosis codes, but in

19   this case it was just one.  I believe that's the G89.1, severe

20   pain due to trauma diagnosis code.

21   Q.    Okay.  So that was actually on your prescription?

22   A.    Correct, yes, sir.

23   Q.    Were you required to do that?

24   A.    I was not.

25   Q.    Okay.  If we can, we're going to move to Frank Blair.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 97 of 296   Pageid#: 11231

1   This would be F. Blair 1-21.

2          Okay.  What are we seeing here?

3   A.   This is what's called a super bill.  Pretty much every

4   medical office or even hospital you go to, but especially a

5   clinic, has some type of what's called a super bill.  And it

6   just allows whoever is treating the person, whether it's a

7   nurse, nurse practitioner, physician's assistant, doctor, at

8   the end of the visit it allows them to circle or mark what --

9   basically using these codes, mark what they did and then

10  indicate, you know, what types of diagnosis they were treating

11  in that visit.

12  Q.   Okay.  And so this would have, actually, diagnosis codes

13  on it; correct?

14  A.   Yes, sir.  These are a menu of diagnosis codes here.

15  Q.   Okay.  What does it state that these -- or having

16  complaints with?

17  A.   In the case of Mr. Blair, he appears to suffer from

18  diagnosis of headache, which I believe was recurrent.  He also

19  suffered from osteoarthritis in 19.9.  And M62.838 would be

20  muscle spasms.  And G89.21 would be severe chronic pain due to

21  trauma.  G89.4 would be chronic pain syndrome.  And M54.10 and

22  M54.5, those would be related to radiculopathy.  And it may be

23  unspecified, but that would be radiating pain or shooting

24  nerve pain.

25  Q.   Okay.  Now, with respect to Mr. Blair, what is this

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(434) 293-3177

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 98 of 296   Pageid#:
11232

1  again?

2  A.    So this is Mr. Blair's Initial Pain Assessment Tool that

3  was completed on his first visit.

4  Q.    Okay.  And if I'm circling right here, what would that

5  be?

6  A.    It appears his vital signs.

7  Q.    Okay.  That would be what?  Blood pressure?

8  A.    Blood pressure, yes, sir; 122 over 82, pulse rate or

9  heart rate of 85; oxygen saturation 97 percent; and a weight

10  of 175.8 pounds.

11  Q.    Okay.  And what would these right here be again?

12  A.    Those would be the diagnoses that I've diagnosed

13  Mr. Blair with on that office visit.

14  Q.    Okay.  And do you recall what those are?

15  A.    Those are the earlier diagnosis code systems.  So this --

16  these are ICD-9 codes.  The codes we were just looking at are

17  ICD-10.  Which this is, in September of 2015, it's right

18  before the transition to ICD-10.

19        These diagnosis codes would reflect similar

20  diagnoses to what we just looked at on the super bill for this

21  patient.  338.21 is severe chronic pain due to trauma.  I

22  believe 724.4 and 724.2 have to do with radiculopathy or

23  radiculitis, neuritis, nerve pain.

24  Q.    When Mr. Blair came in, what kind of examination did you

25  do on him?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(436) 623-5112

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 99 of 296   Pageid#:
11233

1    A.    So Frank Blair, he suffered a number of different

2    injuries, the most significant of which involved some head and

3    neck trauma due to an ATV accident when he was younger.  He

4    was out driving, and he lived in a -- kind of lived in a

5    holler up in West Virginia.  So he was out driving his ATV and

6    he came around the corner, and another vehicle in a truck, a

7    neighbor in a truck, came and I think basically hit him head

8    on.

9                MR. RAMSEYER:  Your Honor, the only objection I'd

10   make is just I think he can testify to what Mr. Blair told

11   him, I don't think he can testify that that's what happened.

12               THE COURT:  Yes, sir.  You're testifying to what he

13   told you.  You don't -- you didn't witness the accident or

14   anything like that?

15               THE WITNESS:  No, Your Honor.

16               THE COURT:  Well, you need to make clear what you're

17   being told and what you know of your own knowledge.

18               THE WITNESS:  Yes, sir.

19               THE COURT:  All right.  Thank you.

20               THE WITNESS:  So this is based on what the patient

21   told me.  He was thrown from the ATV and had multiple

22   fractures in his head and neck as a result of this accident.

23   And as a result of this, he ended up on permanent disability

24   at a very young age.

25   ///

1    BY MR. WILLIAMS:

2    Q.    Did you do any objective tests on him?

3    A.    Yes, sir.

4    Q.    What did you do?

5    A.    Again, with the reported history of neck and upper back

6    and lower back issues, there was range of motion testing.

7    There was palpation, which is -- palpation is just where we

8    are trained to feel.  You know, when we touch the human body

9    in certain areas, we're trained to be able to assess what

10   we're feeling and, you know, determine based on that.

11          So, typically, I would be doing palpation while I

12   was doing range of motion so that if there was pain in a

13   certain area of motion -- so if I'm holding at the top of his

14   head and I'm moving his head in certain planes, side to side,

15   forward, backward, and I'm feeling his neck at the same time,

16   I am trying to understand if his muscles are responding the

17   way they're supposed to respond to that movement.  And then

18   whenever I have him try to move his head in resistance to my

19   hand, I'm also doing the same thing to try to assess if he has

20   full range of motion, or if he has certain types of pain, or

21   if he has those types of pain if they're legitimate or if

22   they're not legitimate.

23          It's a very effective way at assessing not only the

24   underlying cause, potentially, of a structural problem or a

25   nerve damage or if a person is experiencing a disk that's

1   compressing a nerve, it's also helpful, I believe, to see, you

2   know, if the patient has the full range of motion capacity and

3   then be able to evaluate their functional capacity based on

4   that exam.

5   Q.   Okay.  I don't want you to go through all of this because

6   we're going to try to speed it up.  I know everyone is kind of

7   wanting to move along.  As we go through this initial

8   assessment, describe some of these things that they fill out

9   and why it's important for you to know.

10  A.   So when I'm evaluating a patient and wanting to better

11  understand how their problems affect their daily quality of

12  life, I adjusted this form and used it because it gave me a

13  lot of information.  As I would go through this form with the

14  patient on their first visit, it would give me a lot of

15  information in regards to therapies they had tried before,

16  therapies they hadn't tried before.  In this page

17  specifically, you know, "Check all of the following that

18  describe your pain."  It gave me something to conversate

19  (sic), to talk with them about, as far as what types of

20  symptoms they had as a result of the chronic pain they lived

21  with.

22  Q.   Okay.  I think this would -- this section here just

23  basically says, "Mark what increases your pain or decreases

24  your pain."  Is that correct?

25  A.   That is correct.

1  Q.   Okay.  And that would be doing things such as bending,

2  lifting, standing, those type things; correct?

3  A.   Yes, sir.

4  Q.   Okay.  And then I think, "Associated symptoms, numbness,

5  tingling."  Why is that important?

6  A.   So with different types of nerve compression and nerve

7  injury, especially if you think about someone who's thrown off

8  of a four wheeler in a head-on collision with a vehicle, some

9  things heal over time and get better.  Some things may not.

10 And numbness, tingling, and as you move down there, weakness

11 and balance, it's going -- it's assessing what type of

12 external deficits that person may continue to be living with,

13 and it's giving me a clue on what to talk to them about and

14 ask further questions to better understand their functional

15 capacity as well as, actually, their -- the level of pain that

16 they live with on a day-to-day basis.

17 Q.   Certainly treatments that have worked and not worked,

18 that's a part of this section, isn't it?

19 A.   Yes, it is.

20 Q.   Okay.  And then certainly whether or not they've had MRIs

21 and X-rays and those type things; correct?

22 A.   That is correct, yes.

23 Q.   Now, as we go through, this section here would be telling

24 you what?

25 A.   So this is a really important part of this document of

```
1    the whole chart.  You'll frequently see my handwriting here
2    because when I would go over this part of the document, I
3    filled out medical charts in doctors' offices before.  I'm
4    sure all of us have.  There are things you forget or things
5    you don't think of.  This was a really important thing for me
6    to know what medicines and, right above this, what other
7    therapies have been tried.  I believe it's the page before
8    this -- and what's worked and what hasn't because that was a
9    way for me to understand what type of benefit they had
10   received from previous therapies, what other doctors have done
11   that have helped, and what other doctors have done that
12   haven't helped.
13   Q.   Okay.  So you have social histories, things such as
14   family history.  That's just to be able to make a better
15   assessment; is that correct?
16   A.   Yes.  Again, understand their social situation.  And it
17   was really important to me to try to understand as much about
18   their situation outside of my office as possible.
19   Q.   Okay.  Now, on page 109, I'm going to ask you to go over
20   this real quick.  I promise, ladies and gentlemen, we're not
21   going to go through it on every one.  I just want to go over
22   it once so we understand.  What is this document right here?
23   A.   So this is a screening tool that we use.  And the --
24   there's a variety of different screening tools that have been
25   developed over, I would say, the past 30 to 40 years for pain
```

1   management and to assess different aspects of that patient,

2   you know, whether they're going to abuse their medicine,

3   whether they're going to be compliant and take medicine the

4   way it's prescribed.

5            This is one of the -- as it was presented to me,

6   this was one of the best research tools.  From a screening

7   standpoint, it had been verified as being one of the best

8   tools to accurately indicate the patient's likelihood of not

9   using their medicine appropriately.

10  Q.   It was a two-page document; is that correct?

11  A.   Yes, sir, 24 questions.

12  Q.   So what is this right here?

13  A.   So this is the standard agreement that patients were

14  required to understand and sign at the beginning of any type

15  of opioid maintenance therapy.  Whether they had cancer or did

16  not have cancer, this was the document -- I typically read

17  through this document with the patient so that they -- so that

18  there was no confusion.  And many of the practices I had in my

19  office were designed to minimize confusion that the patient

20  could have about what we expected in terms of compliance.

21  Q.   Okay.  And I won't go over it -- get you to go over it.

22  I think the jury has certainly heard and could read anything

23  with that.  One of the things that's been brought up is a lot

24  of times the pharmacy stuff was not filled out.  What would be

25  the reasons pharmacy stuff would not be filled out?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 105 of 296   Pageid#:
11239

1   A.   In certain cases, you know, these severe chronic pain

2   refugee patients that came from other states, they -- and I

3   believe especially Kentucky had this problem from the

4   standpoint of the patient -- they have lost their provider,

5   and in many cases the pharmacy, because of the way the state

6   of Kentucky chose to approach this issue.  There were a lot of

7   pharmacies in Kentucky that were shut down.  So patients, a

8   lot of times, didn't have a pharmacy at that time.  So we

9   would go back -- and the fact -- I think that document there

10  showed it.  We went back and changed the pharmacy because the

11  patient changed pharmacies.  But there were times where a

12  patient just didn't have a pharmacy and we would, you know,

13  enter that information.  And later, sometimes that information

14  did not get entered in.

15  Q.   Okay.  Now, let's move on, if we can, to Steven Blevins.

16  Okay?

17  A.   Okay.

18  Q.   And we're going to try to go a lot faster with these, not

19  go through all these documents.

20          What do you see here with Steven Blevins?

21  A.   So he had a few different issues going on.  And it would

22  appear, based on how I numbered those issues in the document

23  here from a -- after my physical examination, he mainly

24  suffered from lower left leg problems and chronic pain from

25  that issue, in addition to low back and mid back between the

```
 1  shoulder blades, chronic pain issues with that as well and
 2  more so on the right side as opposed to the left.
 3  Q.   Okay.  And these would be what the diagnosis codes would
 4  be with respect to that?
 5  A.   Yes, sir.  Those would be the ICD-9 diagnosis codes.
 6  Q.   Okay.  Did you have occasion to -- did you do a thorough
 7  exam on Mr. Blevins?
 8  A.   Yes, sir.  And my objective findings indicated that those
 9  diagnoses were appropriate and that he was -- he had
10  legitimate medical need to be treated for his chronic pain
11  issues.
12  Q.   Okay.  And I'm going to show you what is page 2, SB-2.
13  A.   Correct.
14  Q.   And that is the first page of the pain assessment.
15  A.   Yes, sir.
16  Q.   And that indicates he was involved in a motorcycle
17  accident.
18  A.   Correct, yes, sir.
19  Q.   Okay.  And based upon your examination and everything,
20  did you believe he had a legitimate need?
21  A.   Absolutely, yes, sir.
22  Q.   Okay.  If we can, let's move to Geneva Bowman.
23         Okay.  Page 41 of Geneva Bowman.  What do you see
24  with respect to Geneva Bowman?
25  A.   So Ms. Bowman, she suffered from a variety of issues.
```

1    Her most significant issue was in her low back and left hip.

2    Q.    What did you do with -- what are those diagnosis codes?

3    Do you recall?

4    A.    The -- those are the ICD-9 diagnosis codes.  I have not

5    used those diagnosis codes since the fall of 2015, so those --

6    I mean, if memory serves me, those are related to chronic pain

7    and, you know, nerve radiculopathy, shooting pains, things of

8    that nature which do correspond to the physical exam document

9    there.

10   Q.    Okay.  Did you conduct a physical exam on Ms. Bowman?

11   A.    Yes, sir.

12   Q.    Did you always conduct a physical exam on --

13   A.    Yes, sir.

14   Q.    Now, looking here at the initial pain thing, what is it

15   that Ms. Bowman was complaining of?  What did her injury --

16   what did she tell you her injury resulted from?

17   A.    Well, she indicates here that she had a severe fall.  And

18   I believe she was trying to indicate a stress fracture.  This

19   caused two fractures in her neck, FX, apostrophe S, fractures,

20   and it was due to a work-related accident, traumatic fall

21   while working in a factory.  In the process of that she also

22   injured her left hip.  And she reported at that time that she

23   had been on permanent disability.

24   Q.    Okay.  Anything else about Ms. Bowman that you recall?

25   A.    She had multiple issues.  And this is kind of a common

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 108 of 296   Pageid#:
11242

```
 1   situation, as the previous form indicated.  So you know, when
 2   her initial injury occurred, when the fall occurred, the
 3   fractures in her neck were the biggest problem she was facing
 4   at that time, but then she also hurt her left hip.  Then over
 5   time the left hip became more of an issue for her than the
 6   neck.  That's a pretty common situation where when someone has
 7   multiple injuries in an accident, one injury can linger and
 8   get worse over time.
 9   Q.   All right.  Did you believe she had a legitimate need,
10   medical need?
11   A.   Based on my objective findings, she definitely had a
12   legitimate need to be treated.
13   Q.   Do you feel like that continued throughout your
14   treatment?
15   A.   Yes, absolutely.
16   Q.   Go to Jason Bowman.
17   A.   Can I clarify on Geneva Bowman?
18   Q.   Yes.
19   A.   So when I say, "legitimate medical need existed," in some
20   of the -- in most of these patients I believe that we're
21   looking at, they were discharged, ultimately.  And as Mr. Tom
22   the pharmacist mentioned earlier, legitimate medical need can
23   exist even when a person has a problem with taking opiate pain
24   medication.  They can still have chronic pain.  They can still
25   have cancer.  They can still suffer tremendously.  So that was
```

```
 1    why I worked very hard to have as organized of a discharge

 2    process as possible over time.  I didn't start out with that,

 3    but I would say we could determine at what point they were no

 4    longer candidates to receive opiate therapy.

 5            THE COURT:  Well, when you say "discharged," you

 6    mean when you terminated them?

 7            THE WITNESS:  Right.  When the doctor-patient

 8    relationship was terminated due to noncompliance.

 9            THE COURT:  All right.

10    BY MR. WILLIAMS:

11    Q.   Now, if I can, let's move to Jason Bowman.

12    A.   Yes, sir.

13    Q.   This is his Initial Intake Form; is that correct?

14    A.   Yes, sir, does appear to be.

15    Q.   This would be what he filled out and provided to you?

16    A.   Correct.

17    Q.   Okay.  What does it say that his injuries are a result

18    of?

19    A.   It appears, my handwriting toward the bottom of the page,

20    that he -- so he filled out the form and then I -- as I was

21    saying earlier, on the direct patient interview that I did

22    with him, this is commonly what I would do is try to get more

23    information to understand the initial cause of their severe

24    chronic pain.  And, in his case, he had a motor vehicle

25    accident in 2012, suffered -- reported suffering two neck
```

fractures, upper back strain/sprain.  And that was believed to
be a source of nerve damage in his lower back.

He had also suffered -- this was common for several
of the patients I'd saw.  He suffered two mining accidents
working in underground coal mines.  One of those was a --

MR. RAMSEYER:  Again, I just want to note my
objection.  He's saying that he did suffer a mining accident.
I think the correct answer is the patient told me that.

THE COURT:  Is that correct?

THE WITNESS:  Yes, sir, the patient reported that.

THE COURT:  Well, you understand the importance of
making the distinction?

THE WITNESS:  Yes, Your Honor.  I'm sorry.

THE COURT:  All right.

THE WITNESS:  He reported the two mining accidents
and apparently suffered further injuries as he reported those
to me.

BY MR. WILLIAMS:

Q.   Okay.  Did you conduct independent investigations and do
an examination on Mr. Bowman?

A.   I did do an examination on Mr. Bowman.  It's not common
practice in medicine to conduct independent investigations.

Q.   I guess what I'm saying with that is would you try to
review any and all charts and the past medical records, MRIs,
X-rays?

1    A.    Yes, sir.

2    Q.    Okay.  All right.  Now, with Mr. Bowman, let's back up

3    here just a little bit with his pain assessment tool.

4          Where the diagnosis codes are filled in, do you know

5    what those diagnosis codes are?

6    A.    It would appear -- I mean, I recognize the 338.21.  That

7    is severe chronic pain due to trauma.  And then the different

8    other codes primarily relate to, again, radiculitis, neuritis,

9    radiculopathy, nerve pain, shooting pains.  I believe these

10   are the ICD-9 codes from 2015.

11   Q.    All right.  Based upon your treatment, do you believe

12   that he had a legitimate medical need for what you prescribed

13   him?

14   A.    Absolutely.  Yes, sir.  My objective findings certainly

15   indicated that.

16   Q.    We can go to Deborah Brown.

17          Okay.  And what about Ms. Brown?

18   A.    So I don't believe Ms. Brown was a patient for very long.

19   It doesn't indicate here that I found her most significant

20   problems on physical exam to be in her lower back.  And

21   that -- the "LS" is lumbar spine -- and that those -- that

22   pain and those symptoms related to that pain were greater on

23   the right side as opposed to the left.  That's why, "R greater

24   than L," right side is greater than the left side.

25   Q.    And the numbers that would be up here in the corner --

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 112 of 296   Pageid#:
11246

```
1   A.    Those would be her vital signs; weight of 221 pounds,

2   blood pressure 180 over 99, heart rate of 81, oxygen

3   saturation of 97 percent.

4   Q.    Now, as we go forward, this would be the Initial Intake

5   Form; is that correct?

6   A.    Correct.

7   Q.    Okay.  And Ms. Brown reported to you what?

8   A.    So it appears Ms. Brown reported that quite some time

9   ago, I believe that said 74 years.  Is that -- or maybe its

10  seven years ago.  Sorry.  Seven years ago she suffered an

11  accident in regards to lifting a basket of wet sand.

12  Q.    Okay.  And you conducted an examination of her; is that

13  correct?

14  A.    Correct, yes, sir.

15  Q.    Okay.  And you consulted MRIs, whatever would be

16  available?

17  A.    I consulted all available medical records at the time.

18  Q.    Okay.  And based upon that, you felt like there was a

19  legitimate medical need.

20  A.    Based on my objective findings from my examination of

21  her, yes, that she had a legitimate medical need to be treated

22  for her diagnosis.

23  Q.    Okay.  If we can move to Clayton Colegrove.

24        You believe Ms. Brown had a continuing medical need,

25  too, throughout the treatment?
```

```
 1   A.   Yes, sir.

 2   Q.   Now, on Mr. Colegrove, starting on page -- let's see.

 3   Start with page 47 here.  Once again, what are those?

 4   A.   Those are the diagnoses for Mr. Clayton Colegrove.

 5   Q.   Okay.  And those would be what?

 6   A.   Severe chronic pain due to trauma, chronic pain syndrome.

 7   Q.   Okay.  And vital signs were taken; is that correct?

 8   A.   That is correct.

 9   Q.   With respect to the Initial Intake Form, what was it

10   Mr. Colegrove presented to you that his injuries were from?

11   A.   So Mr. Colegrove reported experiencing a severe accident

12   with his coal truck and in the course of that severely injured

13   his low back.  And as a result of that injury to his low back,

14   he reported significant radiating pains into his legs.

15   Q.   Okay.  What did you do with respect to trying to check

16   that to confirm those injuries?

17   A.   I would have reviewed all available medical records that

18   I was provided, and he would have undergone a physical

19   examination.

20        MR. RAMSEYER:  Your Honor, again, I'd object to what

21   he would be doing.  I think he can testify to what he did.

22        THE WITNESS:  My apologies.

23   BY MR. WILLIAMS:

24   Q.   What did you do?

25   A.   He underwent a physical examination, as well as a past
```

1  medical history and a complete review of his records that were

2  provided.  And based on my objective findings, he had a

3  legitimate medical need to be treated, and I treated him.

4  Q.   Okay.  Did he have a continuing need?

5  A.   Yes, sir.

6        THE COURT:  Doctor, when you say "provided," you

7  mean brought to you by the patient?  Is that what you're

8  saying?

9        THE WITNESS:  In some cases they were brought by the

10  patient.  In many cases they were faxed.  We would send

11  medical records requests to their primary care specialist and

12  those records would be directly faxed to us from their health

13  care entity.  And that's how we preferred to receive those

14  documents.

15        THE COURT:  All right.  Thank you.

16  BY MR. WILLIAMS:

17  Q.   Now, in the essence of time, all of these forms that

18  we're showing have further information that you used to assess

19  this; correct?

20  A.   That is correct, yes, sir.

21  Q.   Okay.  In essence of time, we're trying to go forward

22  with just showing the main things.  Okay.

23        Now, with respect to Ms. Craycraft, what did

24  Ms. Craycraft represent to you was wrong with her?

25  A.   She reported to being ejected from a vehicle when she was

```
 1   traveling and as a result of that suffered a fracture in her
 2   low back that she reported.
 3   Q.   Okay.  What did you notice of Ms. Craycraft?  Was there
 4   anything you observed about her?
 5   A.   She walked with a limp and she had noted restricted range
 6   of motion on physical examination --
 7   Q.   Okay.
 8   A.   -- due to -- I mean, she was pinned under a truck when
 9   she was ejected in that car accident -- reported.
10           THE COURT:  Again --
11           THE WITNESS:  In that reported car accident, she was
12   reported to have been pinned under a truck and suffered a low
13   back fracture.
14   BY MR. WILLIAMS:
15   Q.   All right.  And Ms. Craycraft, this would be her
16   diagnosis codes?
17   A.   Yes, those would be the initial diagnosis codes.
18   Q.   And they would be involving what?
19   A.   Again, those are the ICD-9 codes.  I have not used those
20   codes in quite some time.
21   Q.   She complains, though, with lower back pain; is that
22   correct?
23   A.   Yes.  And her objective findings on physical examination
24   and direct medical history confirmed severe chronic pain due
25   to trauma.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 116 of 296   Pageid#: 11250

```
 1   Q.   Okay.  Do you believe she had a legitimate medical need?

 2   A.   She had a legitimate ongoing need for treatment.

 3   Q.   Okay.  If we can go to Mr. Damron.  What do you we see

 4   initially with Mr. Damron here?

 5   A.   So in this case I did not use diagnosis codes.  I simply

 6   wrote out his diagnosis of chronic cervical pain with spasms

 7   and chronic low back pain with radiculopathy.  And again,

 8   radiculopathy, whatever part of the body that occurs in,

 9   whether it's cervical radiculopathy or low back, it's

10   indicating that there is most likely a pinched nerve root in

11   that part of the body somewhere and it's -- depending on the

12   patient and how compressed that nerve root is, it's -- you're

13   getting the shooting pains from that injury and from that

14   chronic pain issue.

15   Q.   Okay.  And looking at the initial assessment form, what

16   does Mr. Damron claim to be injured by?

17   A.   Again, he was -- he reported -- he reported he was in a

18   coal mining accident where he was in a coal mine collapse is

19   what he reported.

20   Q.   Okay.  And did you do any objective testing?

21   A.   Yes.  He received a physical examination, focused

22   physical examination on his specific issues.  And those

23   confirmed the diagnosis, which was for a legitimate medical

24   need.

25   Q.   All right.  If we can, let's go to -- let's see.  We just
```

1    finished with Mr. Damron.

2         Go to Hassel Daniels.

3         All right.  With respect to Mr. Daniels, what did

4    you see with Mr. Daniels here with his Initial Pain Assessment

5    Tool?

6    A.   He was diagnosed with severe chronic pain due to trauma.

7    It would appear due to his physical examination his most

8    significant area of ongoing chronic pain was focused in his

9    lower back with radiation into -- into his right leg, upper

10   leg and buttock area.  He also had some radiation into his

11   left buttock area.  But the more prominent radiculopathy or

12   radiation was into his right side.

13   Q.   Okay.  And with respect to his initial assessment, what

14   did Mr. Daniels report to you was the cause of his accident?

15   A.   So, again, he was a former coal miner.  He reported a

16   severe mine collapse and that this occurred -- that he was

17   involved in -- he reported he was involved in at least four

18   mine collapses as a coal miner, and his last one was the

19   primary cause of his most significant injuries.

20   Q.   Okay.  And did you conduct objective testing on

21   Mr. Daniels?

22   A.   I did.

23   Q.   Okay.  And what else did you do with respect to

24   Mr. Daniels?

25   A.   I believe with Mr. Daniels, whatever medical records

1  would have been available would have also been used.  I

2  believe in this case we had additional medical records that

3  were reviewed and additional medical records may have been

4  ordered in his case due to the age of his medical records that

5  he provided.

6  Q.   When you mentioned that, what would be some examples of

7  why you wouldn't automatically do new MRIs or something when a

8  patient comes in?

9  A.   Well, you know, doctors have been diagnosing chronic pain

10 before the MRI was invented, even before the X-ray was

11 invented.  MRIs have been around --

12         MR. RAMSEYER:  Your Honor, I object to what's been

13 going on for years.

14         THE COURT:  Well, yes.  Why don't you just explain

15 why you didn't use MRIs.

16         THE WITNESS:  Well, that was very rare.  Normally we

17 did have an MRI on file for the patient, but as respect --

18 were you asking about how long?

19 BY MR. WILLIAMS:

20 Q.   Why would you not do a new one all the time?

21 A.   Right.  As Dr. Bassam mentioned, they're very expensive

22 tests.  Many of my patients have no insurance.  Many of them

23 had Medicaid, which was just a state program that wouldn't pay

24 for tests if doctors -- in Kentucky and West Virginia

25 specifically, they won't pay.  So if you order a test, even a

1    lab test, they won't pay for that patient's lab test unless --

2              MR. RAMSEYER:  Your Honor, I object.  I think he's

3    just saying stuff.

4              THE COURT:  Well, I mean, he -- you're explaining --

5    I'll overrule the objection, but -- and the jury can consider

6    that.

7              You're just saying that they're expensive tests.

8              THE WITNESS:  Correct.

9              THE COURT:  Okay.  So that's the bottom line.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  So any other reason?

12             THE WITNESS:  The other reason you wouldn't order a

13   new MRI right away is if, based on the current MRI, there

14   hadn't been substantial change in the patient's condition

15   since their most recent MRI.

16   BY MR. WILLIAMS:

17   Q.   And do you believe based on your examination and

18   everything that you did on Mr. Hassel Daniels that he had a

19   legitimate medical need?

20   A.   Yes, sir.

21   Q.   And it continued throughout your treatment?

22   A.   It did, yes, sir.

23   Q.   And with respect to Mr. Robert Daniels, what did

24   Mr. Robert Daniels report to you was his injury?

25   A.   So, again, this was another long-time coal miner that he

1    reported a couple of severe accidents in the mine.  One he

2    reported from 1999 resulted in a right wrist fracture that

3    also severely injured his back and neck.  In 2010, while

4    working as a roof bolter in a high coal ridge, my

5    understanding of that is it's a higher roof or ceiling in the

6    coal mine, he was compressed in a wall collapse and this

7    severely injured his lower back.  And he reported --

8              THE COURT:  That's all what he told you; is that

9    right?

10             THE WITNESS:  Yes, sir.  That's all reported.

11   BY MR. WILLIAMS:

12   Q.   Okay.  Now, you conducted other testing on him as well?

13   A.   Yes.  We -- he underwent a physical -- a focused physical

14   examination and a medical record review in determining his

15   final diagnosis.

16             MR. RAMSEYER:  Your Honor, I object.  I don't think

17   the answer was responsive.  The question was:  You conducted

18   testing of him?

19   BY MR. WILLIAMS:

20   Q.   Okay.  Did --

21             THE COURT:  Well, I'll overrule the objection.  But

22   you say -- did you conduct other testing on him?

23             THE WITNESS:  From a medical standpoint, Your Honor,

24   physical examination is a form of testing, as I understand it.

25             THE COURT:  And you also said medical record review.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 121 of 296   Pageid#:
11255

```
 1    That's not testing.
 2            THE WITNESS:  That is not a test, no, Your Honor.
 3            THE COURT:  Okay.  Well, try to answer the questions
 4    directly, please.
 5            THE WITNESS:  Yes, sir.
 6    BY MR. WILLIAMS:
 7    Q.   And you did a physical exam on that; correct?
 8    A.   Yes, sir.
 9    Q.   On Mr. Robert Daniels?
10    A.   Yes, sir.
11    Q.   Now, looking at the initial pain assessment, do you
12    recognize any of those codes that you've had?
13    A.   Yes.  The first one, 338.21, is severe chronic pain due
14    to trauma.  That was his primary diagnosis.
15    Q.   Okay.  And, based upon your examination and everything
16    you did, you believe he had a legitimate medical need for the
17    medications you prescribed?
18    A.   Based on my objective findings he had a medical need to
19    be treated and that was an ongoing need.
20    Q.   Donna Dotson.  What do you know about Ms. Dotson?
21    A.   She was a patient of mine.
22    Q.   Okay.  Without looking at anything, do you recall
23    anything much about her while I'm pulling this up?
24    A.   She -- I believe -- well, Ms. Dotson was a patient from
25    Kentucky.  She is the mother of Shannon Kovaleski.
```

1    Q.    What did Ms. Dotson -- based upon the document here in

2    front of you, what did Ms. Dotson report to you was her

3    injury, the cause of her injury?

4    A.    She reported -- she reported a diagnosis of rheumatoid

5    arthritis from the year 2000 and that in 2010 she suffered

6    from osteomyelitis in her left tibia.  Osteomyelitis is an

7    infection of the bone that can be very painful and sometimes

8    does not completely heal correctly depending on how it's

9    treated.

10          In 2010 she reported a major fall in her bathtub and

11    in 2007 a motor vehicle accident that resulted in severe neck

12    and head trauma -- neck and back -- severe neck and back

13    sprain.  She also indicated that her pain was gradual but it

14    had worsened.

15    Q.    Okay.  Now, is this the Initial Pain Assessment Tool that

16    you did on Ms. Dotson?

17    A.    This would be, yes, sir.

18    Q.    Okay.  And do you recognize any of the diagnosis codes?

19    A.    Yes, sir, I do.  She had diagnosis for chronic pain

20    syndrome.  She had an incorporated diagnosis regarding her

21    rheumatoid arthritis.  She also had a diagnosis that I

22    provided based on physical examination of neuralgia and

23    radiculopathy.

24    Q.    Okay.  And based upon your examination of her -- did you

25    examine her?

```
 1    A.    Yes, sir.
 2    Q.    Okay.  Based upon your examination, did you find that she
 3    had a legitimate medical need?
 4    A.    Yes, sir.
 5    Q.    And a continuing medical need?
 6    A.    Yes, sir.
 7    Q.    Let's go to Stephen Fearin.
 8          Okay.  Mr. Fearin's Initial Assessment Tool.  Do you
 9    recall what that number would be?
10    A.    I do not recall off the top of my head.  I believe it's
11    due to low back pain --
12    Q.    Okay.
13    A.    -- which appears to be his number one most significant
14    issue on his physical exam that I noted.
15    Q.    Okay.  On his Physician Intake Form, this would be SF-20,
16    what did Mr. Fearin report was the cause of his injury?
17    A.    Mr. Fearin was a sawyer, and he climbed trees for a
18    living, and at one point in doing that he reported that he had
19    a significant fall and that, in one case, a tree actually fell
20    on him while he was logging.
21    Q.    You believed he had a legitimate medical need at the time
22    that you prescribed it?
23    A.    I did.
24    Q.    And you believe that he continued throughout the
25    treatment?
```

```
1    A.    Yes, I did.

2    Q.    Okay.  Brenda Fisher, page 29.

3          All right.  What do you see with respect to

4    Ms. Fisher's Initial Intake Form?  What did Ms. Fisher report

5    to you?

6    A.    She reported quite a few things.  One of the significant

7    things we discussed here is her diagnosis of cancer with

8    metastasis that she reported to her ovaries and fallopian

9    tubes.  She had undergone treatment with radiation.  That is

10   what she reported, as well as excisional biopsy.

11   Q.    Okay.

12   A.    She also suffered from other significant pain issues.

13   Q.    Ms. Fisher was in here earlier just two or three

14   witnesses ago; correct?

15   A.    Yes, sir.

16   Q.    Now, get to page 37.  Here we go.  On page 29, is this

17   Ms. Brenda Fisher's Initial Assessment Tool?

18   A.    Yes, it is.

19   Q.    And what were the diagnoses on that?

20   A.    Severe chronic pain due to trauma.

21   Q.    Okay.  And did you conduct an independent examination of

22   Ms. Fisher?

23   A.    I did.

24   Q.    Okay.  And -- did I just ask you if they -- what the

25   codes were?
```

 1    A.    Yes, sir.  Severe chronic pain due to trauma.

 2    Q.    Okay.  And based upon Ms. Fisher's -- your examination --

 3    did you examine Ms. Fisher?

 4    A.    I did.

 5    Q.    Okay.  Based upon that examination and any outside

 6    information that you would have acquired, did you believe she

 7    had a legitimate medical need?

 8    A.    She did.

 9    Q.    This is Candy George.  What did Ms. George report to you?

10    It's page 3.

11    A.    She indicated a number of -- reported a number of causes

12    for her ongoing pain from cheerleading and car accidents.

13    Also to -- she was, at that time as well, a horse caretaker, I

14    believe.

15          MR. RAMSEYER:  Your Honor, again, not clear that's

16    what she told him.

17          THE WITNESS:  That's what the patient indicated.

18    The patient also indicated she had been thrown from horses

19    five different times.

20    BY MR. WILLIAMS:

21    Q.    Okay.  This is the Initial Pain Assessment Tool.  Do you

22    recognize any of those codes up at the top?

23    A.    Yes, sir.  Again, 338.21 is the ICD-9 code for severe

24    chronic pain due to trauma, diagnostic code --

25    Q.    Okay.

1    A.    -- which is a diagnosis I gave her.

2    Q.    Okay.  And did you conduct an examination on her?

3    A.    I did.

4    Q.    Okay.  And did you try to review any and all records that

5    were available to you?

6    A.    I did.

7    Q.    Okay.  And based upon that, did you feel like she had a

8    legitimate medical need at that time?

9    A.    Yes, sir.

10   Q.    And the medication you prescribed?

11   A.    Yes, sir.

12   Q.    And did you also feel like it was a continuing need?

13   A.    Yes, sir.

14   Q.    Okay.  Bryan Harlow, page 54.  And what did Mr. Harlow

15   report to you?

16   A.    So Mr. Harlow reported significant injury in the coal

17   mines.

18   Q.    And what pain was he suffering from at that time did he

19   indicate?

20   A.    He indicated that as a result of the coal mine injury

21   that he had severe injury to his right shoulder and his low

22   back with radiation into his left leg.

23   Q.    Okay.  And did you conduct an examination of him?

24   A.    Yes, sir.

25   Q.    And is this the Initial Pain Assessment Tool that you had

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 328-0244*

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 127 of 296   Pageid#:
11261

```
 1    with respect to Mr. Harlow?

 2    A.    Yes, sir, it appears so.

 3    Q.    Okay.  Any diagnosis that you see there?

 4    A.    He had quite a bit of nerve damage and shooting nerve

 5    pain that was further assessed on further exam.  ICD-7 --

 6    ICD-9 code 724.4.  That would be lower back pain.  He

 7    definitely also suffered from severe chronic pain due to

 8    trauma.

 9    Q.    Okay.  Now, I think you did say you did an examination on

10    him?

11    A.    Yes, sir.

12    Q.    Okay.  And based upon it and the assessments that you

13    made, did you feel like he had a legitimate medical need?

14    A.    Yes, sir.

15    Q.    Go to John Harlow.  Okay.  Mr. Harlow, what did

16    Mr. Harlow report to you?

17    A.    He reported being in an altercation in 2002 in which he

18    was hit in the head and neck with a slate bar.

19    Q.    Okay.  And what was he complaining of?  His injuries?

20    A.    He was complaining of significant ongoing chronic neck

21    pain and low back pain --

22    Q.    Okay.

23    A.    -- that it occurred suddenly and were worsening.

24    Q.    And did you conduct an examination of him?

25    A.    Yes, sir.
```

1  Q.   And did you also do an initial pain assessment?

2  A.   Yes, sir.

3  Q.   And what was your diagnosis?

4  A.   He received multiple diagnoses that most significant of

5  which would be severe chronic pain due to trauma.

6  Q.   Okay.  And he was complaining with, what did you say?

7  His neck and back and left shoulder?

8  A.   Correct.  It would also indicate here that on my physical

9  examination his most prominent issue actually was his left

10  knee and a secondary issue was what he initially complained

11  of.  And this was not uncommon that on physical exam other

12  issues would come up that the patient was suffering from.

13  Q.   And based upon your examination and everything available

14  to you, did you feel like he had a legitimate medical need for

15  the medicine prescribed?

16  A.   Yes, sir.

17  Q.   And did you feel like it was a continuing need?

18  A.   Yes, sir.

19  Q.   Pam Harlow.  Okay.  Ms. Harlow, this is her Initial Pain

20  Assessment Tool; is that correct?

21  A.   Yes, sir.

22  Q.   Okay.  And what does it indicate as far as the diagnosis?

23  A.   Based on my physical exam findings, her most prominent

24  significant chronic issue is her lower back, which is showing

25  radiating pain greater into her left leg and a diminished

1  amount of radiating pain into her right.

2  Q.   Okay.  Now, the Initial Pain Assessment Tool, is that

3  something you did?

4  A.   Yes, this is something I documented as I was going

5  through the exam with the patient.  I would perform the

6  physical examination, then I would immediately sit down and

7  document it and discuss my findings with the patient as I move

8  through the visit with them.

9  Q.   Okay.  Now, on page 75, the New Patient Intake Form, now,

10  this, differing from the other, is something that the patient

11  would fill out; correct?

12  A.   Correct.  This is a document that they would be handed on

13  a clipboard and they would fill out several pages.  Like I

14  said, I think it was 28 pages that they filled out on their

15  initial visit to my office.

16  Q.   Okay.  And this -- Ms. Pam Harlow, what did Ms. Pam

17  Harlow complain was the cause of her accident?

18  A.   She indicated to me that she had an accident with a

19  wheelbarrow that resulted in four back surgeries and a spinal

20  cord stimulator that had been placed in 2001, and the

21  batteries were -- at the time of this report, had run out.

22  Q.   According to her; correct?

23  A.   According to her, yes.

24  Q.   Okay.  And based upon your examination and evidence that

25  you gathered, did you feel like she had a legitimate medical

1   need?

2   A.   Yes, sir.

3   Q.   Heather Hartshorn.  This would be the Initial Intake

4   Form.  This would have been what Heather Hartshorn filled out

5   again; correct?

6   A.   Yes, sir.

7   Q.   And what did Ms. Heather Hartshorn fill out was the cause

8   of her injuries?

9   A.   She indicated, or reported, multiple chronic ongoing

10  issues in her lower back, her legs, her knee, her hips, and

11  her neck.  And the causes for these different pain issues

12  varied between two prominent accidents she had suffered:  One

13  was a slip, and fall and another was a severe car accident

14  that she had suffered.

15  Q.   Okay.  And is this the Initial Pain Assessment Tool that

16  you prepared?

17  A.   Yes, sir.

18  Q.   Okay.  And what were the diagnoses on those?

19  A.   Severe chronic pain due to trauma, chronic pain syndrome,

20  and I believe a lower back radiculopathy.

21  Q.   Okay.  And did you do a physical exam on her?

22  A.   Yes, sir.

23  Q.   Okay.  And based upon your physical exam and anything you

24  observed and looked at, reports, X-rays, things like that, did

25  you feel like she had a legitimate medical need?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 131 of 296   Pageid#: 11265

```
1    A.   She had a legitimate ongoing medical need for treatment.

2    Q.   And you felt like that continued throughout the

3    treatment?

4    A.   Yes, sir.

5    Q.   Bobby Hopkins.  This, again, is the Initial Intake Form

6    regarding Mr. Hopkins.  This would be what Mr. Hopkins

7    reported to you; correct?

8    A.   This would be, yes, sir.

9    Q.   And what did Mr. Hopkins report was the cause of his

10   injury?

11   A.   Just based on this form, he reported that he had disk

12   disease of four years' duration, and it would be in his neck.

13   Q.   All right.  And is this the Initial Pain Assessment Tool

14   that you would have prepared?

15   A.   Yes, sir, this is.

16   Q.   Okay.  And what were the diagnoses that you came up with

17   at that time?

18   A.   This would be -- within those diagnosis codes listed

19   would be chronic neck pain or cervical pain, as well as

20   cervical radiculopathy from likely compression of spinal nerve

21   roots, as well as low back pain and radiculopathy in the lower

22   back.

23   Q.   All right.  And did you conduct a physical exam on

24   Mr. Bobby Hopkins?

25   A.   Yes, sir.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 132 of 296   Pageid#:
11266

1    Q.    And based upon the exam and the -- any MRIs, X-rays or

2    anything, documents, reports in your physical observations,

3    did you feel like he had a legitimate medical need?

4    A.    Yes, sir.

5    Q.    Donald Hopkins.   This is the Initial Pain Assessment

6    Tool?

7    A.    Yes, sir.

8    Q.    What is the diagnosis that you have there for Mr. Donald

9    Hopkins?

10   A.    Those would be diagnosis codes related to chronic low

11   back pain and chronic low back radiculopathy or radiating

12   nerve pain.

13   Q.    All right.   Now, this is the Initial Intake Form filled

14   out by Mr. Hopkins, Donald Hopkins.   And what does Mr. Hopkins

15   report as the cause of his injury?

16   A.    He reported that he had suffered a car accident in 2008

17   and that his chronic pain as a result of that motor vehicle

18   accident was worsening.

19   Q.    Okay.   And based upon your physical examination and

20   reviewing the MRIs, X-rays, or whatever would have been

21   available to you in your physical observation, did you feel

22   like he had a legitimate medical need?

23   A.    He did.   He had an ongoing legitimate medical need for

24   treatment.

25   Q.    Go to Samuel Hubbard.

```
 1              THE COURT:  All right.  Mr. Williams, we've been

 2    going for a while here.  We're going to take a break at this

 3    time.  Ladies and gentlemen, if you'll follow the bailiff out,

 4    please.

 5         (Proceedings held in the absence of the jury.)

 6              THE COURT:  All right.  Anything that we need to

 7    take up?

 8              MR. RAMSEYER:  Your Honor, one matter.  With it

 9    being the defendant, is he allowed to talk to his attorney now

10    that he's in the middle of his testimony?

11              THE COURT:  Yes, sir.

12              MR. RAMSEYER:  Okay.  Thank you.

13              THE COURT:  All right.  If there's nothing further,

14    we will be in recess.

15         (Proceedings suspended at 2:20 p.m. and resumed at 2:36

16    p.m.)

17              THE COURT:  Are we ready to bring the jury in?

18              MR. WILLIAMS:  We are.

19              THE COURT:  All right.  We'll have the jury in.

20         (Proceedings held in the presence of the jury.)

21              THE COURT:  All right.  You may proceed.

22              MR. WILLIAMS:  Thank you, Your Honor.

23    BY MR. WILLIAMS:

24    Q.   Dr. Smithers, if you will, let's start with Samuel

25    Hubbard.  Okay.
```

          Showing what is his Initial Pain Assessment Tool.

1    Once again, that is the tool that you provided; correct?  Or

2    that you did your findings on?

3    A.   Yes, sir, that is correct.  Everything on there is filled

4    out by me.

5    Q.   All right.  What is the diagnosis on that?

6    A.   He had a number of diagnoses.  Mr. Bo Hubbard, Sr., he

7    suffered from severe chronic pain due to trauma, but he had a

8    number of different chronic pain and chronic pain-related

9    diagnoses that required treatment.

10   Q.   Okay.  And what is he primarily complaining with?

11   A.   So his -- from my physical examination there, his most

12   prominent complaint would be in his lower back.  And he had

13   associated radiculopathy with that chronic lower back pain

14   with shooting pains into his lower extremities.  In this case

15   it would be worse on the left lower extremity than on the

16   right lower extremity.

17   Q.   Okay.  And you had a diagnosis of severe chronic pain; is

18   that correct?

19   A.   Yes, sir.

20   Q.   Okay.  And based upon the -- Mr. Hubbard's -- what was

21   his report of what was wrong with him?

22   A.   Mr. Hubbard, he indicated that he had suffered a

23   traumatic fall -- and this is while he was a water utility

24   worker -- from about 60 to 70 feet.  And his report to me was

1    that most of his ongoing chronic pain issues were a result of

2    that.  He had also, at one point, had his left leg he reported

3    given out.  He fell down 13 to 14 concrete steps and that

4    pretty much finished off his neck is what he reported.  That

5    caused severe injury to his neck.

6    Q.   Okay.  We'll go to Blakely Hurley (sic) this is Initial

7    Pain Assessment Tool on Blakely Hurley; is that correct?

8    A.   Yes, sir.

9    Q.   Okay.  What is your findings on Mr. Blakely Hurley?

10   A.   Mr. Hurley, he also had a diagnosis of severe chronic

11   pain due to trauma.  In addition to that, he had a

12   diagnosis -- the M54.10, that would be radiculopathy, the

13   nerve pain, spinal root nerve disease.

14   Q.   Okay.  And with Mr. Hurley, this is his Initial Pain

15   Assessment; is that correct?

16   A.   Yes, sir.

17   Q.   Okay.  What did Mr. Hurley report was his injuries?

18   A.   He reported a couple of significant injuries:  One, while

19   working in the coal mines he suffered a severe lower back

20   injury that he reported from 2001.  And that also in 2001 is

21   when he first injured his neck, according to him, and this was

22   a severe injury as a result of running into a roof bolt --

23   Q.   All right.  Did you conduct a physical exam on him?

24   A.   -- which cracked his safety helmet and caused severe neck

25   injury.

1          Yes, sir.

2    Q.   Now, Ms. Deanna Jessie.  Okay.  This is her Initial

3    Intake Form?

4    A.   Yes, sir.

5    Q.   What is Ms. Jessie reporting is her injury?

6    A.   She indicated a history of having slipped and fallen in

7    Walmart and also a motor vehicle accident that left her with

8    ongoing chronic lower back pain.

9    Q.   Okay.  And your findings, these would be your findings on

10   that day; is that correct?

11   A.   Yes.  I listed severe chronic pain due to trauma.  She

12   also suffered from chronic back pain, low back pain, as well

13   an associated radiculopathy, among other diagnoses that I've

14   determined.

15   Q.   Okay.  If we go to Rebecca Jessie.  Okay.  What is

16   Ms. Rebecca Jessie's -- what's your initial diagnosis?

17   A.   So my initial diagnosis I wrote -- CLBP is chronic low

18   back pain with lumbar radiculopathy which is --

19   Q.   What's radiculopathy?

20   A.   That's where -- radiculopathy can be caused by a

21   structural damage to the spinal nerve root.

22         THE COURT:  The question was what is it, not where

23   does it come from.  What is it?

24         THE WITNESS:  That is it, Your Honor.

25         THE COURT:  I mean, is it like skin disease?  Is

1    it -- what is it?

2          THE WITNESS:  It's a compression or disease of the

3    spinal nerve root causing shooting pains into the extremities

4    from the spine.

5          THE COURT:  Go ahead.

6    BY MR. WILLIAMS:

7    Q.   And so that would have been your finding based upon your

8    examination?

9    A.   Yes, that is correct.

10    Q.   Okay.  And what was Ms. Jessie reporting?

11    A.   She had reported some type of accident.  I believe --

12    well, I believe she reported that that was in a motor vehicle

13    accident.

14    Q.   Okay.  And she was complaining of what?

15    A.   Significant pain in her lower back.  Ms. Jessie, when she

16    walked -- the entire time she was my patient, I never saw her

17    standing upright.  She typically walked with her body -- with

18    her entire upper body at an angle at the waist.  In some cases

19    she was almost parallel to the ground.  This is due,

20    typically, to when people have back injuries where if they

21    straighten up all the way, the back has been injured in such a

22    way if the bones in the back come together, they actually

23    compress the nerves.  So that's why you see some people just

24    walk with a forward lean or hunch.  Because if they straighten

25    up, it actually hurts more.  It looks really uncomfortable.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 138 of 296   Pageid#:
11272

1    That's actually a more comfortable position for them.

2    Q.   With respect to Rick Jessie, this is his intake form.

3    What was Mr. Rick Jessie reporting?

4    A.   He reported multiple car accidents.  One of those

5    involved a semi truck and a rollover that resulted in a severe

6    sprain of his neck and back is what he reported, also with a

7    concussion.  And typically when a concussion is reported along

8    with a car accident, that involves injuries to the neck and

9    back.  That -- just like in a football game, that added detail

10   typically indicates that there was significant trauma to the

11   areas around the head such as the neck and upper back.

12   Q.   Okay.  And you did a physical exam on Mr. Jessie?

13   A.   Yes, sir.

14   Q.   Is this the Initial Pain Assessment Tool?

15   A.   Yes, it is.

16   Q.   Okay.  What was your diagnosis?

17   A.   He received several diagnoses chief of which would be

18   severe chronic pain.  He also had different -- different types

19   of radiculopathy and chronic low back pain.  Again, these are

20   the ICD-9 codes that I'm not as familiar with from years that

21   have passed since then.

22   Q.   Okay.  We'll go to Neil Jewell.

23            Okay.  Mr. Jewell's intake form.  What was

24   Mr. Jewell reporting was wrong with him?

25   A.   He reported that five years prior to our meeting in my

1 office that he had fallen off an explosive -- possibly an

2 explosive platform. I'm not really sure I can read his

3 handwriting clearly there.

4 Q. Okay. And what does it say he was complaining with?

5 A. He indicated that as a result of that accident he had

6 significant ongoing chronic pain to his entire spine from his

7 neck to his lower back.

8 Q. Okay. This is your Initial Pain Assessment Tool; is that

9 correct?

10 A. Yes, sir.

11 Q. What was the diagnosis that you had for Jewell?

12 A. He suffered from severe chronic pain due to trauma and

13 most significant of which was to his lower back, which also

14 had significant radiculopathy into the lower extremities.

15 Q. You conducted a physical exam on him; is that correct?

16 A. Yes, sir.

17 Q. All right. Let's go to Lora Kicklighter.

18 Okay. What was Ms. Kicklighter reporting?

19 A. She reported a significant motor vehicle accident and

20 also an ATV accident as the initial cause for her significant

21 chronic pain.

22 Q. Okay. And she checked that it had worsened over time; is

23 that correct?

24 A. That is correct.

25 Q. And this is your Initial Pain Assessment Tool on

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 140 of 296   Pageid#:
11274

     1    Ms. Kicklighter?

     2    A.    This is.

     3    Q.    Okay.  And what does it say?

     4    A.    She was diagnosed with severe chronic pain due to trauma,

     5    and most of that was as a result of the chronic pain found on

     6    physical examination in her lower back that -- with radiation

     7    of that pain into her left and right lower extremities.

     8    Q.    Okay.  Now, was Ms. Kicklighter removed from your

     9    practice?

    10    A.    She was discharged, yes, sir.

    11    Q.    Okay.  And what was that for?  Do you recall?

    12    A.    I do not recall the specific reason.  I would not want to

    13    speculate.  It should be in the record.

    14    Q.    Would it be possible that she tested positive for

    15    cocaine?

    16    A.    That is possible.

    17    Q.    Okay.  And Shannon Kovaleski, is this her Initial Pain

    18    Assessment Tool?

    19    A.    Yes, sir.

    20    Q.    What did you find on Ms. Kovaleski?

    21    A.    On her physical examination she actually had some really

    22    significant what I believed to be post-surgical muscle

    23    imbalance in her midback due to the surgery she had had for

    24    breast reduction and the -- her body habits.  The way she

    25    carried her posture, she developed significant muscle spasms

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 141 of 296   Pageid#: 11275

1  that were relatively equal in the middle of her back and this

2  resulted in severe chronic pain.

3  Q.   Okay.  And what did Ms. Kovaleski report on her initial

4  report?

5  A.   She indicated that she had had a significant weight gain

6  in 2008 and that that's when her pain began.  She also

7  indicated a history of being a gymnast from the fifth grade to

8  her freshman year of college at Marshall State.  And she was

9  also diagnosed with macromastia, which is enlarged breasts, in

10  2009 by Dr. Haaser and she had bilateral reduction or

11  mammoplasty.

12  Q.   Okay.  Did you do a physical exam on Ms. Kovaleski?

13  A.   Yes, sir.

14  Q.   Were you aware of any relationship between her and

15  Mr. Bodai in your office?

16  A.   At no time.

17  Q.   Okay.  Billie Lindsay.  This is Ms. Lindsey's intake

18  report.  What does Ms. Lindsay report?

19  A.   She indicated -- she indicated she had degenerative disk

20  disease.  When I further interviewed her --

21        It may help if you scroll up a little bit.

22  Q.   Oh, sorry.

23  A.   She -- I don't see that she's indicating a cause in this

24  case, but she is indicating the areas where she had -- has

25  significant debility and pain.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 142 of 296   Pageid#: 11276

```
 1   Q.    Okay.  This is your initial pain assessment?

 2   A.    Correct.

 3   Q.    Okay.  And what was your finding on this?

 4   A.    Based on the physical exam notes that I put here, there

 5   was significant pain in the upper back and neck, as well as in

 6   the lower back with bilateral radiculopathy into the upper

 7   buttocks.

 8   Q.    Okay.  Let's go to James Long.

 9         Did you conduct a physical exam on her?

10   A.    On Ms. Lindsay?

11   Q.    Yes.

12   A.    Yes, sir.

13   Q.    James Long.  This is his Initial Pain Assessment Tool?

14   A.    Yes, sir.

15   Q.    Okay.  And what is your diagnosis on Mr. Long?

16   A.    Based on documentation available, his chief diagnosis was

17   pancreatitis --

18   Q.    Okay.

19   A.    -- which was his primary chronic pain issue that he

20   suffered from.  He also had a secondary chronic pain issue

21   with lower back pain.

22   Q.    Okay.  And what did Mr. Long report?

23   A.    He reported that in 2007 his pain began due to a fall,

24   and it began suddenly and it was worsening or had worsened.

25   Q.    Okay.  Joshua Marian.  Okay.  This is the Patient Intake
```

1   Form.  What was Mr. Marian reporting that his injuries were?

2   A.   I'm not sure that I can read all of his handwriting.  He

3   is indicating that he suffered from low back pain as well as

4   pain in his legs and feet.

5   Q.   Also in his hip; is that correct?

6   A.   Correct.  Also in his hip and looks like also in his neck

7   as well.

8   Q.   Okay.  His initial pain assessment, what did you find?

9   A.   It appears on this physical examination his most

10  prominent cause for chronic pain is his low back pain, which

11  is the diagnosis code listed there, I believe.  He also --

12  apparently, I document there that he suffered from

13  Calve-Perthes disease, which is a degenerative condition that

14  can result in severe chronic pain.

15  Q.   Jerry Maynard.  Mr. Maynard, was this your Initial

16  Assessment Tool?

17  A.   Yes, sir.  This is for Mr. Jerry Maynard.

18  Q.   Okay.  And what was his diagnosis?

19  A.   His diagnosis was chronic low back pain, and he had

20  greater radiculopathy on the left side as compared to the

21  right.

22  Q.   Okay.  In his Initial Assessment Tool, what was he

23  reporting as his injury?

24  A.   He reported multiple ATV accidents and falling off of a

25  horse.

1    Q.    Resulting in back, leg, neck, and arm pain?

2    A.    Correct, resulting in multiple different chronic pain

3    complaints.

4    Q.    Amanda Miles.  What's Ms. Miles initially reporting as

5    her cause of pain?

6    A.    She had multiple car wrecks.

7    Q.    Okay.  And what's she -- her chief complaint?

8    A.    Upper middle back pain, joint pain across her back, down

9    her back into the legs, through the arms and neck, joint pain,

10   hips and elbow, numbing and tingling pain.

11   Q.    Okay.  Did you do a physical exam on her?

12   A.    Yes, sir.

13   Q.    And based upon your physical exam and anything you took

14   into account, what was your assessment with respect to pain?

15   A.    Based on my objective finding, she was diagnosed as --

16   accordingly, and treated for the general medical need.

17   Q.    Okay.  Charlene Miller.  Your Initial Pain Assessment

18   Tool was what with Ms. Miller?

19   A.    Her most significant problem -- this was at the time she

20   was still undergoing post-cancer treatment surveillance, and

21   her most significant problem was her low back pain, which

22   corresponded with some of the cancer treatment she had

23   received.  And she had multiple complaints due to multiple

24   issues in relationship to the chronic pain issues she dealt

25   with.

Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 145 of 296   Pageid#:
11279

1    Q.   Oh, I'm sorry.  And her Initial Intake Form, what does

2    she complain with, or what does she indicate to you was her

3    pain?

4    A.   She mentions her lower back with her right leg being the

5    most prominent.  And this is after two back surgeries to her

6    lower back after working in a factory.

7    Q.   Okay.  You did a physical exam on her; is that correct?

8    A.   Yes, sir.

9    Q.   Connie Miller.  Ms. Connie Miller, this is her Initial

10   Pain Assessment Form.  What is she complaining with?

11   A.   She indicates that her chronic pain is due to a reported

12   history of lifting too much and a couple of car accidents in

13   '99 and 2001.  And she indicates chronic pain due to domestic

14   abuse from a past boyfriend.

15   Q.   Okay.  And your initial pain assessment form?

16   A.   So for Ms. Miller, her most prominent chronic pain

17   diagnosis was in her middle back, and this had radiating pains

18   that associated with her second most prominent diagnosis,

19   which was chronic lower back pain, which also had radiating

20   pain into her right lower extremity.

21   Q.   Okay.  Jennifer Moore.  Her initial pain assessment.

22   A.   So she indicated prior to this visit that she had had a

23   car accident in 2005.  It was significant with a rollover in a

24   collision with a tractor trailer, 18 wheeler.  In the process

25   of the rollover, she indicates that the shift lever collided

```
 1    with her lower back causing a large hematoma from her midback
 2    to her hip on the left side.
 3    Q.    And your initial pain assessment?
 4    A.    Yes.  And her lower back is where she suffered most of
 5    her chronic pain from, and it was positive on testing with
 6    physical examination.
 7    Q.    Sharon Mullins.  Her Initial Intake Form, she reported
 8    what to you?
 9    A.    She indicated that she'd been treated for chronic pain
10    resulting from a car accident, that the pain had gradually
11    worsened and she'd been receiving treatment off and on since
12    2001.
13    Q.    Okay.  And your Initial Pain Assessment Tool?
14    A.    On initial examination her lower back was where she
15    experienced the most prominent ongoing pain with radiculopathy
16    into the right lower extremity that was more significant than
17    the left lower extremity, and she also suffered from chronic
18    neck pain that radiated into her right shoulder.
19    Q.    All right.  Billy Jack Parsley.  Mr. Parsley reported
20    what to you?
21    A.    He indicated that he had had a severe motor vehicle
22    accident in 2008.  And if we can scroll up just a little bit.
23    He had numerous different injuries that he had sustained and
24    that he reported.  One of his most significant injuries was to
25    his left knee that he had sustained in high school football
```

```
 1   and that had caused some recurring chronic pain that he
 2   reported regularly and that we tried to get an orthopedist to
 3   evaluate to see if there was a repair option possible.
 4   Q.   Now, this is your Initial Pain Assessment Tool; is that
 5   correct?
 6   A.   Yes, sir.
 7   Q.   Okay.  What was your diagnosis of pain?
 8   A.   His chief diagnosis was chronic low back pain.  And, in
 9   addition to that, he was experiencing more shooting nerve
10   pain; radiculopathy into the left lower extremity as opposed
11   to the right.  He was also experiencing the left ankle or
12   joint pain, as well as left knee pain that was significant.
13   Q.   Jessica Parsley, her initial pain assessment?
14   A.   Her initial pain assessment, she was diagnosed with
15   chronic pain due to trauma with most of her pain in her lower
16   back, more to her left side as opposed to her right.  She did
17   have some significant pain at the time in her left knee.  And
18   she kind of had multiple compartment on physical examination
19   with the front of the knee being marked 1A and the back of the
20   knee being marked 1B.  I was able to elicit pain.  That would
21   indicate that I was able to elicit pain in both compartments
22   of her knee --
23   Q.   Okay.
24   A.   -- on physical exam.
25   Q.   And Ms. Parsley reported what to you?
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 148 of 296   Pageid#: 11282

1    A.    She reported a significant motor vehicle accident that

2    caused severe injury to her left knee, her lower back, and her

3    neck, and these gradually became worse.

4    Q.    Michelle Smith.  Michelle Smith reported what?  Or what

5    was your initial pain assessment for Michelle Smith?

6    A.    My initial diagnosis of Ms. Smith was, again, chronic

7    pain due to trauma along with a constellation of other

8    diagnoses due to my objective findings and physical

9    examination.  She had significant lower back pain that she

10   suffered from, and it radiated into her left lower extremity

11   and also up into her thoracic or midback area.

12   Q.    Okay.  And Ms. Smith reported what to you?

13   A.    She had a significant car accident that she reported in

14   April of 2015.  It caused a fracture to her left forearm, and

15   this also severely -- she reported this also severely sprained

16   her mid to low back and left hip with pain radiating into the

17   left thigh.

18   Q.    All right.  Nancy Turner, initial pain assessment.

19   A.    Ms. Turner also -- she had a diagnosis as chronic pain

20   due to trauma as well as the lower back -- or I'm sorry --

21   neck and radiculopathy associated with that.  She had

22   significant -- on physical examination, significant tenderness

23   and limited range of motion in regards to her upper neck there

24   and the nerve pain she suffered from.

25   Q.    Okay.

```
1   A.    And those diagnosis codes correspond with that.
2   Q.    And what did Ms. Turner report to you on her Initial
3   Intake Report?
4   A.    She reported a significant history of a variety of
5   ailments, all of which have chronic pain as a component.
6   Typically, fibromyalgia, rheumatoid arthritis, as well as
7   traumatic causes for her chronic pain such as a motor vehicle
8   accident that occurred in 1992.  And she reported a severely
9   sprained neck and right leg and low back that were severely
10  injured as well.  She reported a traumatic fall down an HVAC
11  or ventilation duct chute that severely injured her lower back
12  in the early 2000s.  And she was diagnosed with fibromyalgia
13  between 2010 and 2012.
14  Q.    And we've already done the diagnosis codes, have we not?
15  Ms. Turner -- we've already done the diagnosis codes on
16  Ms. Turner; is that correct?
17  A.    I believe so, yes, sir.
18  Q.    Okay.
19  A.    We had --
20  Q.    Thomas Wiley.  Wait a minute.  I skipped one here.
21        Andre White.  Initial Pain Assessment Tool?
22  A.    Yes.  This -- on his physical examination here he
23  suffered from severe lower back pain with radiating pain into
24  his left lower extremity, and his chief diagnosis, 338.21,
25  would be severe chronic pain due to trauma.  He also had
```

```
1    chronic lower back pain and neck pain, which I believe the
2    other page will show he reported significant head and neck
3    injury due to trauma.
4    Q.   There's Mr. White's initial pain assessment.  What did he
5    report to you?
6    A.   Broken back with scoliosis from 1994.
7    Q.   All right.  And now Mr. Thomas Wiley.
8              Mr. Wiley's Initial Pain Assessment Tool?
9    A.   Yes, sir.  He was -- he was also diagnosed with severe
10   chronic pain due to trauma, in addition to chronic low back
11   pain.  His radiculopathy path was significant in the left
12   lower extremity more so than the right.
13   Q.   Okay.  And Mr. Wiley reported what?
14   A.   So his report indicated while he was working that he was
15   lifting and throwing metal rails and that that is how he
16   initially injured his lower back.
17   Q.   Okay.  Darryl Williams.  What's your initial pain
18   assessment with respect to Mr. Williams?
19   A.   His physical exam indicated that his most severe chronic
20   pain was in his lower back with radiculopathy greater on the
21   left side going down into his foot, on the right side stopping
22   at the back of the knee.  Also suffered from knee pain.
23   Q.   And what was Mr. Williams reporting?
24   A.   Mr. Williams was a very -- he's a very tall man, and he
25   indicated that he had slipped on ice and fallen down and that
```

1  he had also, while working in the coal mines, had a coal mine

2  collapse with rock landing on him.  The slip and fall incident

3  he indicated, along with falling down 14 steps here,

4  significantly increased his chronic pain.

5  Q.  Okay.  Now, Frank Williams.  What was your initial pain

6  assessment with respect to Frank?

7  A.  So with Franklin Williams -- he went by Scotty Williams.

8  He also had significant chronic pain due to trauma, among

9  other significant diagnoses, due to musculoskeletal pain that

10 he had suffered from his lower back to his left knee to his

11 neck.

12 Q.  Okay.

13 A.  And he experienced a significant radiculopathy in his

14 neck into his left shoulder and upper arm.

15 Q.  Okay.  And what did Mr. Frank -- or Scotty Williams

16 report?

17 A.  He indicated that he had been crushed in the coal mines

18 and that a car had fallen on him as the two most significant

19 accidents he had suffered to cause his significant chronic

20 pain.

21 Q.  Okay.  And Wesley Williams.

22 A.  So Mr. -- this is Wesley.  It says Evans.

23 Q.  Let me go -- I'll have to check that one.

24         Let's go to David Wood.

25 A.  Okay.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 152 of 296   Pageid#:
11286

1    Q.    Okay.  What's Mr. Wood's Initial Pain Assessment Tool?

2    A.    So, Mr. Wood, on physical examination, he had significant

3    pain in his right forearm followed by significant pain in his

4    neck with radiation of that pain greater into the right

5    extremity versus the left.  And he also suffered --

6    Q.    Okay.  And your diagnosis was what now?  What was your

7    pain assessment?

8    A.    That was the physical examination, which is done after

9    the medical history, past medical history.  So that would have

10   been formed with physical examination and resulted in those

11   findings.

12   Q.    Okay.  And Mr. Wood reported what to you?

13   A.    So he indicated about seven years prior to having a motor

14   vehicle accident and a torn rotator cuff.

15   Q.    Okay.  And Larry Workman, in his Initial Pain Assessment

16   Tool, what was the diagnosis?

17   A.    Severe chronic pain due to trauma, chronic pain syndrome,

18   and a lower back radiculopathy.

19   Q.    Okay.

20   A.    Which, apparently, was completely unilateral.  It was

21   one-sided to the right.

22   Q.    Okay.  And what was -- did Mr. Workman report to you?

23   A.    Mr. Workman indicated he had suffered from a fall.  And,

24   as a result of that fall, he had suffered significant injury

25   to his lower back.  This was a fall off of his porch outside

1    of his trailer.  And when he fell down, he injured his lower

2    back and his right knee.

3    Q.   Okay.  And you believed all of these prescriptions and

4    all of your examinations and everything were written with --

5    for a legitimate medical need?

6    A.   Yes, sir.

7    Q.   Okay.  And you believe that their ongoing treatment was

8    prudent for a legitimate medical purpose?

9    A.   Yes, sir.  Until that was established otherwise, that was

10   my -- as long as I treated them as a patient, that was my

11   understanding.  I was prescribing medication for a legitimate

12   medical need.

13   Q.   Okay.  And were -- during the time that you were -- all

14   of these people that you saw, did you conduct physical exams

15   on all of them?

16   A.   Yes, sir.

17   Q.   Okay.  And what would you do -- how would you do the

18   physical exam?  I mean, what would you do in physical exam?

19   Explain to the jury.

20   A.   Right.  So, as I was saying, I would sit down with them

21   and go over this form first.  So that would inform what I

22   would do on physical exam.  If a patient was not -- I mean, if

23   they weren't complaining of a problem, that was not further

24   investigated on physical examination unless there was a clear

25   medical reason in my mind to do so.

```
 1              The goal in spending a lot of time talking to the
 2   patient was to find out what their actual underlying problems
 3   were so that when I did the physical examination I could focus
 4   on those areas that were most likely the root cause of the
 5   problem that they were having.
 6   Q.   Okay.  Now, were there significant numbers of patients
 7   you discharged?
 8   A.   Yes.
 9   Q.   How many patients did you discharge?
10   A.   I don't know the exact number.  Most of the charts we've
11   reviewed so far, I believe, are patients that were discharged.
12   Q.   Is Darryl Williams one that was discharged?
13   A.   Yes, sir.
14   Q.   Is Billy Jack Parsley one that was discharged?
15   A.   No.  He overdosed.
16   Q.   Okay.  Was Connie Miller discharged?
17   A.   Yes, sir, I believe so.
18   Q.   Was Charlene Miller?
19   A.   I believe so, yes, sir.
20   Q.   Okay.  Lora Kicklighter?
21   A.   Yes, sir.
22   Q.   Samuel Hubbard?
23   A.   Yes, sir.
24   Q.   Pam Harlow?
25   A.   I believe so, yes, sir.
```

```
1    Q.    Bryan Harlow?

2    A.    I believe so, yes, sir.

3    Q.    Clayton Colegrove?

4    A.    I believe so.

5    Q.    Jason Bowman?

6    A.    Yes, sir.

7    Q.    Frank Blair?

8    A.    Yes, sir.

9    Q.    Mr. Battaglia?

10   A.    Yes, sir.

11   Q.    And others?

12   A.    Yes, several others.

13   Q.    Okay.  Now, let's talk about -- the Government's talked

14   about several different things with respect to your practice.

15   With respect to -- did you take insurance?

16   A.    I did not take insurance.  I investigated it, and I

17   started my medical practice without a loan or without any

18   financial assistance from anyone.  And it was going to be very

19   expensive to take insurance, and I didn't have the funds at

20   the time to invest in that system.  And when you take

21   insurance, you don't get paid right away from the insurance

22   company.  You typically don't get paid for an office visit for

23   three, four, six months, sometimes longer.  So it was an issue

24   of being able to pay the bills.

25              The rent for the building I was in alone in
```

1    Martinsville was $3,700 a month, I believe.

2    Q.   Okay.  So were there processes for the patients to be

3    able to get reimbursed through insurance?

4    A.   There were.  That was the nature and purpose of the super

5    bill was so that in many patients who did have insurance --

6    one patient who had Blue Cross Blue Shield and worked at

7    General Dynamics here in Virginia, he was reimbursed, I

8    believe, $280 a month by Blue Cross Blue Shield.  So most of

9    his office visit was reimbursed because of that super bill.

10           MR. RAMSEYER:  Your Honor, I object, unless he has

11   personal knowledge of that.

12           THE COURT:  Yes.  How did you know that?

13           THE WITNESS:  The patient reported it to me

14   repeatedly.  I can give -- the patient's name is Larry Wayne

15   Carter.

16           THE COURT:  All right.  Go ahead.

17           MR. RAMSEYER:  Your Honor, I object.  I don't think

18   that's admissible what a patient told him.

19           THE COURT:  Yeah.  I believe that's not admissible

20   hearsay.  And I'm going to direct the jury not to consider the

21   statement of the witness as to reimbursement by Blue Cross

22   Blue Shield of Larry Wayne Carter's charges from the doctor.

23   BY MR. WILLIAMS:

24   Q.   Okay.  Dr. Smithers, regarding your policies for

25   discharge, when someone would have a dirty drug screen or

something or another, describe -- did you have a policy on that?

A.   So I had a policy that -- it was -- I think the easiest way to describe it was a three-strikes policy.  And we had a three-tiered risk stratification.  So we had, at the initial visit, based on Mr. Wilson's visit with the patient, my visit with the patient, and their initial urine drug screen in the office, we -- and the documentation that we had based on those patient interviews, we would put them into a risk category. So they would either be a low-risk patient, a moderate-risk patient, or a high-risk patient.  And then, based on that designation in their file, that informed our policy as far as how often they were drug screened.

        So if they were low risk, they were drug screened once every four to six months.  If they were moderate risk, they were drug tested at least every three months, if not more often.  And then if they were high risk, they were drug tested every month.

Q.   Is there a standard policy anywhere that tells you what you're supposed to discharge a person for?

A.   There is not, to my knowledge, no, sir.

Q.   Okay.  So it would be an individual doctor's choice?

        MR. RAMSEYER:  Your Honor, I object to that question.  It's leading, for one thing.

        THE COURT:  Well, I'll sustain it.  And there's no

1   foundation for the witness's answer.  So please disregard that

2   question, ladies and gentlemen.

3   BY MR. WILLIAMS:

4   Q.   Now, describe your relationship with Darryl Williams.

5   A.   Darryl Williams was someone that I trusted.  I -- he was

6   one of my initial patients when I was in West Virginia.  And

7   based on my initial evaluation and examination of him, I had,

8   at that time -- I trusted him.  And he -- he was someone that

9   I -- I felt was trying to help other people.  It was -- in

10  addition to, at that time, just being my only staff.

11  Occasionally my wife was able to come up and help, but he was

12  someone that seemed like he cared about other people, and he

13  seemed like he was concerned about the welfare of other people

14  that were also in his community that were suffering as a

15  result of people losing access to their physicians who were

16  treating their medical issues.  And I believed his intentions

17  were that, that they were good intentions to try and help

18  people in his community have better access to chronic pain

19  management and healthcare.

20  Q.   Now, you've seen the text messages?

21  A.   I have.

22  Q.   Okay.  Describe to the jury what -- what you thought.

23  What was your impression of what was going on?

24  A.   When they were read here in the courtroom or when it

25  happened?

    1    Q.    When it happened.

    2    A.    Well, at the time it happened, I -- again, this was

    3    someone that I trusted, had the best of intentions at their

    4    heart for these people in their community.  And at the time I

    5    made some very unwise decisions to trust someone who was also

    6    a patient at the time to help in a way that is, you know,

    7    certainly -- you know, was not standard practice.  But it was

    8    something that I -- you know, I trusted this person.  I didn't

    9    have a lot of staff at the time, and I extended trust to this

   10    person to help with certain things.  I'm embarrassed and

   11    ashamed, in hindsight, that I did.

   12    Q.    Were you aware of anything that was going on with him and

   13    the others?

   14    A.    I was not.

   15    Q.    Okay.  What was your understanding of what Mr. Williams's

   16    role was?

   17    A.    My understanding was what I just stated, that he was a

   18    concerned member of his community where he lived in Kentucky.

   19    And I knew, based on other patients I treated from that part

   20    of the country, that the access to chronic pain management was

   21    fairly dire.  It was very difficult with six months to one

   22    year wait lists being reported.

   23            And, you know, I -- he really came across as

   24    somebody who had the other person's best interests at heart.

   25    And I -- I'm a pretty trusting person, and I like to see the

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 160 of 296   Pageid#:
11294

1  best in people, and that's what I saw initially.

2  Q.   Okay.  Now, with respect to Deborah Reynolds, tell the

3  members of the jury what happened with Deborah Reynolds.

4  A.   So in the context of my relationship at that time with

5  Mr. Williams, he was not discharged as a patient at that time.

6  The system that his urine drug screen was on was not available

7  to me, so I was not aware that he'd already tested positive

8  for cocaine at that time.  When I became aware of that, he was

9  immediately discharged.  But at the time I was not aware he

10 had tested -- had a positive test.

11          And he presented Ms. Reynolds to me as someone who

12 was in significant need of a doctor, that she was in an

13 emergent situation, that she had been in a severe car accident

14 a few years prior and had multiple pieces of hardware in her

15 back and had had back surgery and that she ran the largest RV

16 dealership in Kentucky.  He presented her as an upstanding

17 person in the community.

18          That was, again, in a situation where they had just

19 suddenly lost their access to a provider, and I had just

20 recently dealt with a lot of patients in West Virginia and now

21 at this office that, you know, had lost access to care.  And

22 it's devastating to see these patients that haven't had their

23 medication or --

24          MR. RAMSEYER:  Your Honor, I object.  I think the

25 question was how he got involved with Deborah Reynolds.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 161 of 296   Pageid#:
11295

```
1          THE COURT:  Yes, sir.  What -- you need to answer
2     the question about Deborah Reynolds.
3          THE WITNESS:  Yes, sir.
4          So believing those things, I -- Mr. Williams was --
5     he was at the office that day, and he had relayed this
6     information to me previously and was continuing -- I think it
7     was at the end of the day and I had finished seeing all the
8     patients that day, and he was continuing to tell me about her
9     situation.  And I asked for her phone number, and I made a
10    phone call.
11         My recollection of that experience is that I was on
12    the phone with her between 30 and 40 minutes and that I went
13    through her complete medical history, as well as her
14    medication history at the time.  It was a phone call, so I
15    really had no visual way to identify her in that situation.
16    But that phone number that I had is the same phone number that
17    she still has today.
18         So my understanding was that I was talking to that
19    person and that was the situation and that they were in an
20    emergent situation of needing access to care and that they
21    would be coming into my office either later that week or the
22    following week.  And that -- and I -- it's the only time in my
23    entire medical career that I have ever prescribed C-II
24    narcotics for someone without seeing them face-to-face for an
25    initial visit, and I regret the decision to this day.
```

                    And it was -- it was a very bad decision, very poor

judgment on my part to prescribe her medication without seeing

her in the office.

BY MR. WILLIAMS:

Q.   Now, with respect to -- also with Mr. Williams, what was

your understanding of the payment relationship -- arrangements

with people that he was bringing to the office?

A.   So, again, this was a period of time when I didn't have

consistent help managing payments.  I mean, I would get

people -- I operated mainly on a paper basis in the office.

We had the three copy receipt books from Walmart.  And that's

basically the system I used to keep track of who paid what.

And I was often seeing patients at the beginning of my

practice and not charging the full amount.

                    And, I believe in Mr. Williams's case, there were

many circumstances where I would see several patients, three,

four, five patients, and, you know, nobody had the ability to

pay then, or one person would be able to pay and then the

other people couldn't.  And some of these people were on

either fixed income or they weren't -- you know, their

paycheck didn't fall in such a time they could pay the day

they came to the office.  So I would treat them and see them

in the office and then whenever we could settle up -- I mean,

sometimes the patient would settle with me directly.

                    Mr. Williams, I think he just kind of became for

1  that -- for a certain group of people, he became the person

2  that was paying.  I mean, again, you know, to look back on

3  this now, it's -- it was a very naive, very dumb decision to

4  make.  Again, I thought this person had those people's best

5  interests at heart.

6  Q.   Okay?  Now, we've heard stuff about FedExing

7  prescriptions and stuff.

8  A.   Yes, sir.

9  Q.   Tell the jury about FedExing prescriptions.  Did you do

10  that?

11  A.   I did.  That was something that I'd only seen done a few

12  times before.  And it was in regards to, you know, people who

13  are on these medicines long term.  As we discussed with the

14  opiates earlier, once your body --

15         MR. RAMSEYER:  Your Honor, object, again.  The

16  question was about the FedExing.

17         THE COURT:  Well, I think the witness is explaining

18  his ground -- his reason.  But maybe if you could get into it

19  a little quicker here.

20         THE WITNESS:  Yes, sir.  Yes, sir.

21         And as the FDA has recently indicated, these

22  medicines.  It's not safe --

23         MR. RAMSEYER:  Your Honor, I'd object to what the

24  FDA's recently indicated.  The events in question are a

25  certain time period.

 1          THE COURT:  Yeah.  Just explain why you FedExed

 2    prescriptions to people.

 3          THE WITNESS:  It's not safe for people to suddenly

 4    stop these medicines.  And if they were not able to come to

 5    the office, we would do a telemedicine visit over the phone.

 6    It would be documented.  And in those situations, their

 7    medicine would be FedExed, many times without payment.  In

 8    some cases they did pay later.  In some cases they paid over

 9    the phone with a credit or debit card.  But, again, this was

10    inside the context of they were being seen monthly.  And then

11    on occasion this circumstance would arise where they couldn't

12    be there or the office might be closed and those prescriptions

13    were FedExed to them.

14    BY MR. WILLIAMS:

15    Q.   Okay.  Was there a -- what was your thought process as

16    far as the prescriptions getting to the parties?

17    A.   Again, for a brief period of time when I first started my

18    practice in the fall of 2015 and the first part of 2016, I

19    trusted people I should not have trusted.  And I know that

20    now, and I was believing the best in people that they were

21    doing what they told me they would do and from conversations

22    that -- you know, most of which are not reflected in those

23    text messages.  And I -- I trusted people to do these things,

24    and I shouldn't have trusted them.

25    Q.   Okay.  It's your understanding that if someone took a

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 165 of 296   Pageid#: 11299

```
 1    prescription to a pharmacy they would have to be the one to
 2    take it?
 3    A.   That is -- I mean, in light of what Mr. Tom Hayes
 4    testified to earlier today, I mean, that's -- those are --
 5    there are certain exceptions where hospice patients and people
 6    that are bedridden or recently discharged from the hospital
 7    don't have to go.  But my understanding is typically the
 8    pharmacy practice is that medications are dispensed to the
 9    person that they're prescribed to.
10    Q.   Okay.  Now, there's been evidence of pre-signed scripts
11    and stuff.  Tell the jury about that.
12    A.   Well, there was a prescription pad with signatures that I
13    had pre-signed in my office.  This was a practice I learned
14    when I worked at Bluestone.  The medical director there,
15    Dr. Bird, he would be -- he had two different clinics.
16              MR. RAMSEYER:  Your Honor, I'm going to object to
17    what somebody else did.
18              THE COURT:  Well, I'm going to overrule the
19    objection.  Go ahead.
20              THE WITNESS:  Okay.  Dr. Bird worked at -- the rural
21    health clinic I was working at had more than one site in the
22    Princeton area in West Virginia.  So he would leave some
23    pre-signed prescriptions, and it was typically for either
24    emergencies or situations where we -- you know, for his
25    patients if you needed to order tests or studies.  And if I
```

```
 1    was out of the office and a patient needed blood work done at
 2    the ER or other tests or studies ordered, that was -- a signed
 3    prescription, if you take that into a hospital, to a hospital
 4    lab, that's the fastest way to get that test done and most
 5    likely approved by insurance where they'll pay for it.
 6              THE COURT:  So I'm not sure -- why did you pre-sign
 7    prescriptions?  What's the reason?
 8              THE WITNESS:  That was the reason.  That was the
 9    primary reason, Your Honor.
10              THE COURT:  No.  I didn't follow the reason.  If you
11    could repeat the reason you did it.
12              THE WITNESS:  Right.  So if I was not in the office
13    and I needed -- if I was not in office and there were
14    patients coming to the office that day and I wasn't there and
15    there was a medical need for a test to be done, that was the
16    fastest way for that test to be ordered.
17              THE COURT:  So you mean the prescriptions that you
18    signed were only for tests, not for narcotic drugs?
19              THE WITNESS:  Those -- those empty -- the empty
20    prescription pad was primarily there for tests.  There were
21    circumstances and emergencies, as I was saying with Dr. Bird
22    and then also in my case, where a change in patient medication
23    would occur where they didn't tolerate a medicine, they had to
24    be changed to a different medication, and that allowed for
25    that process to occur quickly while the patient was still in
```

1       the office.

2                THE COURT:  And you weren't there and didn't --

3                THE WITNESS:  Correct.  This is --

4                THE COURT:  -- patient --

5                THE WITNESS:  -- this is for patients that are

6       ongoing chronic patients that are in the office regularly.

7       This was on a rare occasion if I wasn't in the office and this

8       change needed to happen immediately.

9                THE COURT:  So a patient would come in and tell

10      whoever was behind the counter, I want you to change my

11      prescription, or, I need another prescription, and that person

12      would fill it in and give it to them?

13               THE WITNESS:  That is completely not correct.  What

14      would --

15               THE COURT:  Okay.  So I -- again, I'm just trying to

16      explain this for the -- for you to explain it to the jury.

17               THE WITNESS:  Yes, sir.

18               THE COURT:  Because I don't understand it.  Maybe

19      they do.

20               THE WITNESS:  Right.

21               THE COURT:  Why did you fill out signed blank

22      prescriptions for narcotic -- that were to be used for the

23      prescription of narcotic medication?

24               THE WITNESS:  So, again, these are for emergency

25      situations where --

```
 1              THE COURT:  But, like, what would be an emergency
 2    situation?
 3              THE WITNESS:  So if I wasn't at the office and I was
 4    able to have a telemedicine visit with an established
 5    patient -- this is an established patient that's already in
 6    ongoing treatment in my facility.  They're not a new patient.
 7    This isn't someone just randomly walking in.  We didn't see
 8    walk-ins.  This is an established patient that's already on
 9    treatment.  If they were intolerant to their medicine -- in
10    most cases the prescriptions they received were post dated, or
11    they had a may-fill date on them already in their chart.
12              THE COURT:  So you're saying that in all of these
13    cases where you had your -- somebody on your staff fill in the
14    prescription, a blank prescription that you had signed, you
15    had -- you had a teleconference with them?  In other words, a
16    FaceTime conference over the phone with the patient --
17              THE WITNESS:  There was --
18              THE COURT:  -- and then you told the count person to
19    go ahead and do it?
20              THE WITNESS:  There was a telemedicine conference
21    with the patient and then there was also a phone conversation
22    with Mr. Wilson.  This was never -- nothing like this ever was
23    handled at the front desk in any way, shape, or form.  This
24    was all done in the back with exam rooms and within a standard
25    process that we followed.  And this was rare.  This -- but
```

1    this was -- it was in place so that if a patient's medication

2    needed to be changed -- like Ms. Fisher with her gastric

3    bypass, her medicine had to be changed.  If I hadn't been

4    there that day, you know, her medicine needed to be changed at

5    that point, and that was the --

6              THE COURT:  All right.  Thank you.  Go ahead.

7              THE WITNESS:  -- solution I came up with.

8    BY MR. WILLIAMS:

9    Q.   Would you talk with the patients each and every time?

10   A.   I -- as far as I can remember, there was never a visit --

11   there was never a prescription issued for any medical purpose

12   from my office without me first talking to a patient, either

13   through a telemedicine visit or through a face-to-face visit.

14   Q.   Now, did you counsel the patients about other alternative

15   options other than medication?

16   A.   Absolutely.

17   Q.   Like what?  Explain to the jury what those would be.

18   A.   Well, we have that handout that I don't know if we found

19   yet, but my goal was not to remain a chronic pain -- in the

20   sense that my office started out as where I was treating these

21   chronic pain refugees from West Virginia and Kentucky.  My

22   goal was to transform my practice into an integrative holistic

23   office.

24              And I did provide some manipulative therapy, which

25   is the osteopathic manipulative therapy that I mentioned

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 170 of 296   Pageid#:
11304

1    earlier, to some of these patients, the ones I felt it was

2    safe on.  But, you know, I would routinely counsel patients in

3    regards to different research-proven methods, such as yoga,

4    Pilates, acupuncture.  And I had handouts that I would go over

5    with the patients in regards to this, including stretching.

6    And part of the initial pain intake where they would fill in

7    previous treatments tried such as physical therapy and other

8    modalities, TENS unit.  I personally use a TENS unit for my

9    back.

10           So there were other modalities that would come up in

11   those initial visits and later on that we would discuss.  I

12   was very much an advocate for because if someone could have

13   proper control of their pain without being on a controlled

14   substance, that was absolutely a goal of mine.

15   Q.   But would you do that with every patient?

16   A.   I would.  I would say with the initial patients in 2015

17   and part of 2016, I hadn't developed that process completely.

18   So I don't want to say every patient that I ever saw in that

19   office received that type of counseling, but that was a

20   substantial part of visits I would have with patients on

21   followup as well as initial visits.

22   Q.   Did you counsel patients on addiction?

23   A.   Well, I did.  That was typically in a discharge scenario.

24   In the initial visit where opiate pain management -- in most

25   of these patients' cases they came to me on very strong

1  narcotic opiate pain medications.  So in that initial

2  conversation they would be counseled in conjunction with the

3  Opiate Provider Agreement, the contract between myself and the

4  patient.  I would counsel them in regards to the risks of

5  substance abuse addiction, tolerance.  Tolerance is not the

6  same as addiction.  Physiologic dependence, which is where

7  your body develops a dependence on the opiate, but that

8  doesn't necessarily mean that they're -- that you're addicted

9  to the opiate.  It just means that if you suddenly stop it

10  you're going to go into withdrawal.  And these things were

11  discussed in the initial visit and then periodically as

12  needed.

13  Q.  When you did the telemedicine visits, what was your

14  purpose for doing that?

15  A.  I wanted to maintain contact with the patient, and I

16  wanted to be able to assess how they were tolerating their

17  medicine.  That was one of the chief reasons for monthly

18  visits was to, as rapidly as possible, decrease the amount of

19  narcotic they were taking, if possible.  It wasn't always

20  possible.  But, if possible, decrease the amount of narcotic

21  quickly, get them converted over from immediate release

22  narcotic medicine, like oxycodone 30 milligrams, and get them

23  off those, which is why I was reducing doses on those, and get

24  them to a stable extended-release medication that would give

25  them better quality of life and better functionality and

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 172 of 296   Pageid#:
11306

```
 1  hopefully less opiate narcotic in their system over a period
 2  of time.
 3  Q.    Was it a concern for the patients, their health?
 4  A.    Oh, I mean, certainly.  Long term -- your long-term
 5  health and survival rate is improved the less drugs you have
 6  to take, period, whether it's narcotics or non-controlled
 7  drugs.
 8  Q.    When you were FedExing the prescriptions to people, what
 9  was your intent from that?
10            MR. RAMSEYER:  Your Honor, it's been asked and
11  answered.
12            THE COURT:  Haven't we asked that question already?
13            MR. WILLIAMS:  I was just asking whether it was his
14  intent to help people or -- well, I'll withdraw the question.
15            THE COURT:  Yes, sir.
16  BY MR. WILLIAMS:
17  Q.    Now, how did you feel about your patients?
18  A.    I did what I did because I really cared about them.
19  Q.    Do you believe you were helping them?
20  A.    Yes, sir.
21  Q.    What did you base that on?
22  A.    I mean, I based it on why I went into medicine to begin
23  with, to -- to try to help other people have a better life and
24  have a more productive life, better function.  I lived for the
25  stories from my patients where they were able to play with
```

```
 1    their grandkids more and able to spend more time outside and
 2    able for them, you know -- the people still worked, be able to
 3    go to work and come home and take care of their family.
 4    Q.   You made a lot of mistakes in your practice.
 5    A.   I did.
 6    Q.   Okay.  Were you deceived a lot?
 7    A.   Yes, sir, I believe so.
 8    Q.   From who all?
 9    A.   Several of the patients that we've discussed during this
10    trial.
11    Q.   That would be the Jessies?
12    A.   Yes, sir.
13    Q.   Darryl Williams?
14    A.   Yes.
15    Q.   Lora Kicklighter?
16    A.   Yes, sir.
17    Q.   Kovaleski?
18    A.   Yes, sir.
19    Q.   Was it your intention to hurt anybody?
20    A.   Never.
21    Q.   Did you believe when you wrote these prescriptions, all
22    of these prescriptions were written for a legitimate medical
23    purpose and need?
24    A.   Yes, sir.
25              MR. WILLIAMS:  Thank you.  That's all the questions
```

1    I have.

2              THE COURT:  All right.  Cross-examination?

3              MR. RAMSEYER:  Yes, Your Honor.

4                      **CROSS-EXAMINATION**

5    BY MR. RAMSEYER:

6    Q.   You testified at length on direct that the most important

7    thing is that physical exam where you get to touch that person

8    and hold onto them; right?  That's the most important thing;

9    correct?  That's what you said?

10   A.   I'm not sure if I said it's the most important.  It's

11   certainly one of the more important aspects.

12   Q.   Okay.  And Deborah Reynolds, you never touched her, never

13   saw her, did you?

14   A.   In her situation, I did not.

15   Q.   Okay.  And you say it was an emergent situation.  It was

16   an emergency that you sent these prescriptions; correct?

17   A.   That -- at the time that's what I was led to believe,

18   yes, sir.

19   Q.   So it was an emergency in October, November, January,

20   February?  It's a five-month emergency?

21   A.   I made a very, very poor decision.

22   Q.   Well, let me just ask you, is it within the scope of

23   professional practice to mail Schedule II narcotics to a

24   patient you never see and send them to somebody else?  Is that

25   within the scope of professional practice?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 175 of 296   Pageid#:
11309

1    A.   I haven't read the specific laws as it relates to that.

2    Q.   You think that's legitimate?

3    A.   I believe that the patient had a legitimate medical need,

4    yes, sir.

5    Q.   No.  I asked you what you did.  You believe what you did

6    was legitimate, to send some patient you never saw and -- I

7    mean, it could have been Tom Jones on the phone.  It could

8    have been -- it could have been anybody that you talked to on

9    the phone, supposedly; right?

10   A.   It was a female.

11   Q.   Okay.  It could have been any female on the phone, and

12   you think that's a legitimate medical practice?

13   A.   I would just simply say I believe a legitimate medical

14   need was established.

15   Q.   Okay.  So 20 different people call up.  They say, "Doc, I

16   got this friend.  They need pills.  Can you send them to them

17   for me?  They're in really bad shape.  They're hurting.  Just

18   mail them to me.  I'll make sure they get them."  That would

19   be legitimate -- legitimate medical practice?

20   A.   I don't believe I ever did anything like that.

21   Q.   You did exactly that, didn't you?  With Deborah Reynolds

22   that's exactly what you did.

23   A.   The scenario you described didn't sound like it was an

24   emergency.

25   Q.   Okay.  If a patient -- so if a patient calls up and says,

1  "I've got a friend.  It's an emergency situation."  You've

2  never seen the patient, but they need their Schedule II

3  narcotics mailed to me.  And they call you next month and say

4  the same thing.  And they call you the next month and say the

5  same thing.  You say that's legitimate?

6  A.   I don't think it would be appropriate.

7  Q.   It's not legitimate -- it's not for a legitimate medical

8  need and it's not within the scope of professional practice,

9  is it?

10  A.   I believed it was for a legitimate medical purpose.  I

11  agree it was not an appropriate decision.

12  Q.   Do we agree it's not within the scope of professional

13  practice?

14  A.   I agree it's not an appropriate decision.

15  Q.   You're not going to agree with me.  Just answer the

16  question.  Yes or no, was that within the scope of

17  professional practice?

18  A.   I don't think it was an appropriate decision.

19  Q.   Can you give me a yes or no answer.  Was it within the

20  scope of professional practice to mail Schedule II narcotics

21  to a patient you never saw on multiple months?

22  A.   I believe they had a legitimate medical need.

23  Q.   So you say yes, that would be legitimate?

24  A.   I believe the patient that I was writing those medicines

25  to, based on their medical records and based on the extensive

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 177 of 296   Pageid#:
11311

conversation I had with them, and ongoing conversations I had

with them, that they had a legitimate medical need.  I

certainly disagree with my decision to do that.

Q.   All right.

         MR. RAMSEYER:  Your Honor --

BY MR. RAMSEYER:

Q.   I've noticed you've been looking at notes.  Do you mind

if I look at your notes?

A.   I have no problem.

Q.   All right.  Sir, let me ask you a few questions.  You

first appeared in federal court on August 15th of 2017; is

that right?

A.   August 15th?

Q.   Yes, Monday.

A.   Yes, sir, I believe so.

Q.   And you first started practice in Martinsville about

August 20th, 2017, something like that?  Excuse me -- 2015,

August 20th of 2015?

A.   It was the last days of August.  I'm not sure of the

date.

Q.   In any event, August of 2015?

A.   At the end, yes, sir.

Q.   So you were in business in Martinsville for about two

years; is that right?

A.   I maintained an office there, yes, sir.

```
1    Q.   And during that two-year time period you wrote over 9,000
2    prescriptions for Schedule II drugs; correct?
3    A.   I have not added up the numbers on that.
4    Q.   Well, if you look at the PMP, which doesn't include all
5    of them, it shows 9,000 prescriptions for controlled
6    substances.
7    A.   If that's what the numbers indicate.  I'm sure that's --
8    Q.   And over half a million pills, units of controlled
9    substances; does that sound right?
10   A.   If that's what the numbers indicate, I'm --
11   Q.   Okay.  Now, did you take the Hippocratic Oath when you
12   graduated from your med school?
13   A.   I did not.  We actually recite the Osteopathic Oath, but
14   it's very similar to the Hippocratic Oath.
15   Q.   And the first thing is do no harm; right?
16   A.   That -- I'm not sure if that specific phrase is in our
17   oath.  I'm sure the spirit of that is contained in there.
18   Q.   Things like, if you don't know what you're doing, don't
19   do anything; right?
20   A.   I don't know if that's my understanding of that.
21   Q.   That's what it means, doesn't it?  The first thing is
22   don't do any harm.  Sometimes when you do things to people,
23   it's worse than doing nothing.  That's what it means, doesn't
24   it?
25   A.   I mean, in my understanding of it, it can be true in both
```

```
 1    senses of withholding action and also whether or not to
 2    proceed.
 3    Q.   Okay.  Well, let me ask you this:  All the prescriptions
 4    that have been entered into evidence in this case, you signed
 5    them; right?
 6    A.   Correct.
 7    Q.   You authorized them; right?
 8    A.   As -- I mean, I don't know that I've reviewed every
 9    prescription in evidence.  But, I mean, if I was prescribing
10    someone controlled substances from my office, it was for a
11    legitimate medical need.
12    Q.   That wasn't my question.  Did you sign all -- did you
13    authorize all the prescriptions that are in evidence, all the
14    ones -- all the counts that you're charged with?
15    A.   I mean, as far as I know.  Like I said, I haven't
16    reviewed every prescription that you have in evidence.  In
17    fact, I don't think I've actually reviewed the hard copies of
18    that.
19    Q.   All right.  So -- all right.  So, Dr. Smithers, let's go
20    back to this pre-signed script pad.  All right?  That's
21    against the law; right?
22    A.   I -- I don't know.
23              MR. RAMSEYER:  May I approach the witness,
24    Your Honor?
25              THE COURT:  Yes, sir.
```

BY MR. RAMSEYER:

Q.   I'm going to show you Title 21, Code of Federal

Regulations.  It's manner and issuance of prescriptions.  It

says a prescription's supposed to be signed and dated the day

it issues; correct?

A.   Yes, I believe that's what it's indicating.

Q.   All right.

A.   Do you want me to read it?

Q.   You didn't do that, did you, because you signed it ahead

of time and just left it there at the office; correct?

A.   In certain circumstances, yes.

Q.   And you had no idea that somebody else had just written

prescriptions out and given them to people?

A.   I was religiously checking the prescription monitoring

database.  I would have realized that fairly quickly.  I ran

self-checks quite often.

Q.   You said the reason you kept them there was so if

somebody came with gastric bypass medication needs that

Wendell could give them a prescription.

A.   I'm sorry.  I don't understand.

Q.   On your previous testimony -- you just testified a few

minutes ago.  You said the reason you left a pre-signed

prescription pad in your office was so if a person came by and

they needed new gastric bypass medication or they had run out,

Wendell could write it in and give it to the patient.  That's

```
 1   what you said.
 2   A.    No.  Respectfully, Ms. Fisher had a gastric bypass.  And
 3   what I was indicating was that for people that had an
 4   immediate need to have a change in medical therapy, that would
 5   allow for that to happen quickly so that they could hopefully
 6   fill their medication on their way home.
 7   Q.    So what kind of medication are you talking about?
 8   A.    In this case, it would be typically their controlled
 9   substance medication.
10   Q.    Well, it would be the only thing; right?  Schedule II
11   narcotics?
12   A.    They were also written for other medications such as
13   SSRIs, medicines for nerve pain such as Neurontin, muscle
14   relaxants.
15   Q.    Exactly.  All those pills you don't need a prescription,
16   do you?  Everything else, except a Schedule II, you can call
17   the pharmacy.  You could have called the pharmacy and sent the
18   prescription in that way; correct?
19   A.    With C-II narcotics I'm not sure if that would have --
20   Q.    That was my point.  Everything except Schedule II
21   narcotics you can call in to the pharmacy.
22   A.    Okay.
23   Q.    All the other drugs, you could have just called them in?
24   A.    Well, there was an emergency procedure for faxing C-II
25   prescriptions in.  Then you have to mail the original in.  So
```

1    you have to bring the prescription.  This happened on a few

2    occasions.  I had to write the prescription and then fax it to

3    the pharmacy so that it would be filled by the time the

4    patient drove through the pharmacy there.  But they couldn't

5    start filling that medication or process it until they had the

6    actual -- or at least a photocopy of the prescription through

7    a fax, and then that allowed them to proceed.

8    Q.   So, Dr. Smithers, again, my original question was,

9    everything except a Schedule II could be called in to the

10   pharmacy; correct?

11   A.   I believe that -- I mean, yeah.  There had to be some

12   type of paper document.  I mean, I think there's also an

13   electronic way to transmit them now.

14          THE COURT:  Doctor, you can explain, but first, why

15   don't you answer the question.

16   BY MR. RAMSEYER:

17   Q.   Isn't it true that everything except the Schedule II

18   controlled substance could be called into the pharmacy by a

19   doctor?

20   A.   Yeah.  I think that's probably accurate.

21   Q.   Okay.  And so the only thing these prescriptions were for

22   were for Schedule -- these pre-signed prescriptions, they were

23   for Schedule II narcotics; correct?  That's why you had them

24   there?

25   A.   They were for emergency tests that might need to be

```
 1   ordered for patients that came in that were sick or that had

 2   other conditions.  And if I wasn't there to write that

 3   prescription, then those tests couldn't be ordered that

 4   quickly.  And then in certain emergency situations where

 5   patients' medicines were changed at my direction, or I had

 6   talked with the patient and made a medical decision on

 7   changing their therapy, that would allow for immediate -- an

 8   immediate change in their medical therapy.

 9   Q.   But you agree it's against the law to do that; correct?

10   A.   I'm not sure.  I mean, that's --

11   Q.   I just showed it to you.  You just read it and said it

12   was.

13   A.   Is that statute or is it an instruction, or...

14   Q.   It's the Code of Federal Regulations, Title 21.

15   A.   Okay.

16   Q.   Code of Federal Regulations --

17   A.   If that's --

18   Q.   -- 36.05.

19   A.   If that's what it says, I mean --

20   Q.   It's kind of a basic tenant for physicians.  Because

21   physicians know you don't pre-sign prescription pads and leave

22   them in your office.  You knew that; correct?

23   A.   As I testified, I worked with Dr. Bird.  He was a medical

24   director at the clinic that I worked at.  That's where I

25   observed that practice.  And most of what we learn about the
```

controlled substances that we deal with and prescribe we learn

from other doctors that we work with.  We don't ever get a

class on the Controlled Substances Act or get a class in the

law.

Q.    Okay.  So, Dr. Smithers, let me ask you this:  Did you

ever see Deborah Reynolds as a patient?

A.    I saw her as a patient through a telemedicine visit.

Q.    You saw her on the telemedicine visit.  You saw her face

on a telemedicine visit, Deborah Reynolds?

A.    It was telemedicine in the sense that it was a phone

conversation.

Q.    So you didn't see her, did you?  You never saw her?

A.    I did not.

Q.    You never had a face-to-face -- I mean, you never had an

in-person encounter with her?

A.    I did not.

Q.    Is that correct?

A.    Yes, sir.

Q.    And Darryl Williams paid you for the prescriptions you

issued for Deborah Reynolds -- in Deborah Reynolds's name;

correct?

A.    I'm not sure.  She may have paid over the phone.  I'm not

sure exactly how her office visit fee was paid for --

Q.    Well, you know that --

A.    -- at any given time.

```
 1   Q.    -- the text messages we've been showing in court --
 2   A.    Yes, sir.
 3   Q.    -- there was the one that you had the 18 different
 4   initials that you sent to Darryl Williams and you say, "18 x 3
 5   = 54."  That means those 18 people you wrote prescriptions
 6   for, "18 x 3" is the $300 per visit, and "54" is $5400.
 7   That's what you told me; correct?
 8   A.    That was a one-time issue that did occur.
 9   Q.    Okay.  And Deborah Reynolds was one of those 18 people;
10   correct?  She's DR?
11   A.    I don't have that information in front of me.  It's
12   possible.
13   Q.    Okay.  So does that refresh your memory that when Darryl
14   Williams wired money to you and your wife, some of that money
15   was for Deborah Reynolds's prescriptions?
16   A.    It's possible.  I don't know.
17   Q.    Okay.  And you charged 450 for an initial office visit;
18   right?
19   A.    So it -- it's somewhat misleading to say it that way
20   because Mr. Wilson worked for PPPFD.  So it was actually a
21   split payment.  That would be the total, but I believe $75 was
22   the fee to pay for those services that went directly to the
23   Physicians, Patients, and Pharmacists Fighting Diversion, that
24   company that he worked for, and then the remainder of that was
25   the office fee.
```

1  Q.   The fee was 450, 375 to you, 75 to Wendell Wilson; is

2  that right?

3  A.   To PPPFD.

4  Q.   Well, Wendell Wilson was PPPFD; right?

5  A.   Well, Mark Radcliff owned the company.  My understanding

6  was Mr. Wilson was an employee of the company.

7  Q.   Okay.  At your office, physically the way it worked, when

8  450 came in, you took 375.  Wendell Wilson took 75; correct?

9  A.   That was -- that's how the receptionist, I think,

10 separated the money, yes.

11 Q.   That's what you told the receptionist to do; correct?

12 A.   That's what they were supposed to do as part of managing

13 and keeping the funds separated.  Yes, sir.

14 Q.   All right.  Did Peter Bodai come up with the idea of you

15 getting 375 and Wendell Wilson getting 75?  Was that his idea?

16 A.   I don't believe so.

17 Q.   That was your idea, and you told him to do that; correct?

18 A.   The idea was -- kind of came about through negotiations

19 with PPPFD as to what their fee would be.  And then we -- I

20 mean, it was over a period I think of a few weeks to figure

21 out what would be the best way to keep those funds separate so

22 that it would make it easier for Mr. Wilson to make deposits

23 and for me to make deposits.

24 Q.   Okay.  So you and Wendell Wilson worked it out, and you

25 told Peter Bodai what to do; correct?

1    A.    I believe so.  But, I mean, the negotiation wasn't just

2    with Wendell.  It was also with the rest -- mainly with

3    Mr. Radcliff as well.

4    Q.    But, in any event, on the "3 x 18 = 54" those patients

5    never came in for that -- for those prescriptions; correct?

6    A.    I don't believe that's accurate.  I believe a number of

7    those patients came into the office.  I would have to -- I

8    mean, I don't know.  There were several circumstances where

9    there were text messages indicating payment and I had already

10   seen those patients in the office.

11   Q.    This is one of them because you got the FedEx where you

12   FedEx the prescriptions, you FedExed 18 people's prescriptions

13   to Darryl Williams; correct?

14   A.    I don't know that that's true.  I'd have to see those.

15   Q.    Well, you've seen them repeatedly.  We've gone over them

16   several times.

17   A.    I've seen quite a few different pages of evidence in this

18   trial.

19   Q.    All right.  So assume the evidence is that you FedExed

20   those 18 people's prescriptions to Darryl Williams, and he

21   wired the money to you, $5400.  Did Wendell Wilson get a cut

22   of that?

23   A.    I don't know.  I believe our contractual agreement was

24   only for patients that screening services were provided for in

25   the office.  So in the event that patients didn't come, that

```
 1    was -- we had forms to keep track of that.  So if there was a
 2    circumstance where we received payment in that way and the
 3    patient had actually come in the office, then there would
 4    be -- that fee would be divided.  $75 would go to PPPFD.
 5    Q.   I'm talking about the 18 scripts you mailed to Wendell
 6    Wilson at one time to the -- in the text messages.  You sent
 7    those e-mails -- or you sent those prescriptions to him.  He
 8    wired you $5400.  Did Wendell get a cut of it?  That's all I'm
 9    asking.
10    A.   Right.  I don't know.  Because I don't know if any of
11    those patients were seen in the office.  And if patients came
12    into the office and they didn't -- and they weren't seen -- or
13    if they were seen, then -- and they didn't pay, which occurred
14    quite a bit, then I would actually cover their fee for PPPFD,
15    and then whatever they paid after the fact, that would be
16    covered -- or I would basically be refunded that money.
17    Q.   I'm going to actually try one more time.  Just answer my
18    question.  Did Wendell Wilson get a cut of the $5400 that
19    Darryl Williams wired to you and your wife?
20    A.   I'm not sure.  I'm not sure.
21    Q.   Well, who would decide that?
22    A.   It would be based on whether any of those patients had
23    been seen in the office.
24    Q.   Well, we know they weren't.  So assume they weren't.
25    Would he get the cut?
```

```
 1    A.   I don't feel comfortable making an assumption to answer a
 2    question.
 3    Q.   Okay.  Well, did you see those patients?
 4    A.   Again, I'm being asked to make an assumption about
 5    something that I'm --
 6    Q.   I'm not asking --
 7            THE COURT:  The question to you, Doctor, is did you
 8    see the patients?  And you need to answer that question.
 9            THE WITNESS:  If -- I'm not sure as to the question.
10    I mean, because I'm not sure if I did see those patients on
11    that circumstance or not.
12            THE COURT:  So, you know, the alternative would be
13    yes, no, or I don't know.
14            THE WITNESS:  I don't know.
15    BY MR. RAMSEYER:
16    Q.   All right.  Thank you.
17            So Deborah Reynolds, you never saw her.  But you
18    charged Darryl Williams a $450 first-time patient visit;
19    didn't you?
20    A.   If there's a record that shows that -- I mean, I'm not
21    sure exactly.  Like I said, Ms. Reynolds could have paid over
22    the phone.
23    Q.   The point is, you charged $450.  You never even saw the
24    patient.
25    A.   I spent significant time with her in reviewing her
```

```
 1   medical records that came later.
 2   Q.   When -- you say you talked to her on the phone?
 3   A.   Yes, sir.
 4   Q.   And you say you talked to her a significant amount of
 5   time.  You didn't have any medical records at that time, did
 6   you?
 7   A.   I did not.  I had someone who I trusted at the time
 8   vouching for this person, and it was -- I was led to believe
 9   that this person would be coming into my office later that
10   week or the following week at that time.
11   Q.   Okay.  And then it went on another month, another month,
12   another month.
13   A.   I made a significant error in judgment.
14   Q.   And the reason -- one of the reasons you were sending
15   prescriptions to Deborah Reynolds's name is you thought
16   Deborah Reynolds was going to be an investor in a pharmacy you
17   were trying to set up; isn't that the truth?
18   A.   That is not in any way, shape, or form the truth.
19   Q.   Did you think that --
20   A.   I only treated patients that had legitimate medical need,
21   and I only treated Ms. Reynolds because I believed she did
22   have a legitimate medical need after I did investigation into
23   her medical condition by talking to her.
24   Q.   Okay.  So Deborah Reynolds is in your phone as "Deborah
25   Reynolds investor."  So why did you have her in there as
```

1   "Deborah Reynolds investor"?

2   A.   She may have indicated she wanted to invest in a project

3   that never happened.  There were never any investors, to

4   my knowledge, that I --

5   Q.   What was the project she wanted to invest in, according

6   to you?

7   A.   There had been some discussion, I think maybe that week,

8   that, you know, people would either want to invest in the -- a

9   lab or the monitoring system that we were using there in my

10   office through PPPFD.  And there also was a discussion at that

11   time of possibly a pharmacy, and the people might want to

12   invest in that as another --

13   Q.   And you were thinking about investing in it as a pharmacy

14   also; correct?

15   A.   Well, this is true.  I had thought about putting a

16   pharmacy in my office at this time and had gone through some

17   of the process of investigating that and ultimately didn't do

18   it.

19   Q.   Because, I mean, if you set up a pharmacy, you make a

20   $300 office visit, plus you make whatever they pay for the

21   pills; right?  That's what you were looking at?

22   A.   No.  I was trying to assist patients that were driving

23   long distances and struggling.  And I wanted them to have a

24   consistent place where if their insurance was accepted that

25   they would be able to fill their medication.  There were many

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 192 of 296   Pageid#:
11326

```
1    situations where I would get reports where pharmacies were
2    charging unbelievable amounts of money for a patient's
3    medication.  And in some cases, I -- I mean, I changed
4    patients' medical treatment so that they would not have to pay
5    as much for their medication because it was outrageous.
6    Q.   Okay.  So during the whole time we're talking about in
7    this trial, August of '15, August of '17, did you maintain
8    your clinic at the Center For Integrative Health at Smithers
9    Community Healthcare Clinic doing business as Smithers
10   Community Healthcare Clinic at 445 Commonwealth Boulevard
11   East, Suite A, in Martinsville, Virginia?
12   A.   Yes, sir.
13   Q.   And the pictures we've seen of the clinic that have been
14   introduced into evidence, that's your clinic; correct?
15   A.   Yes, sir.
16   Q.   And "SCH" in the text, that's you; correct?
17   A.   That's Smithers Community Healthcare, yes, sir.
18   Q.   But that's you.  It was your phone; correct?
19   A.   That was my old iPhone with the Tennessee area code, the
20   865 area code, and I think that's how I still have it listed
21   in my other iPhone.
22   Q.   So it's your phone; correct?
23   A.   Yes, sir.
24   Q.   Also in those texts is Angela Smithers, your -- or Angel
25   Smithers, your wife; correct?
```

1   A.   That depends on which text message you're referring to.

2   Q.   Where it said "AS".

3   A.   I would say typically that's probably the case.

4   Q.   And jasmithers@gmail.com, that's you in the text;

5   correct?

6   A.   That is my e-mail address, yes, sir.

7   Q.   The texts that say "Joel Smithers," those are you too;

8   correct?

9   A.   I believe so, as long as the number matches my name.

10   Q.   And the names in the text are, in fact, the names that

11   you gave those people in your contact book; correct?

12   A.   The names?

13   Q.   Yeah.  Like on the text where it shows "Darryl Williams,"

14   that's because you have Darryl Williams in your phone with

15   that phone number; correct?

16   A.   Yes, sir.

17   Q.   And that's true for all of those names; correct?

18   A.   I mean, I would suppose that's the case.

19   Q.   Now, let me show you Government's Exhibit 90, if we

20   could.  This has already been introduced into evidence.

21         MR. RAMSEYER:  Please, can we have her computer?

22         THE CLERK:  Yes.

23   BY MR. RAMSEYER:

24   Q.   Is that your car?

25   A.   Yes, sir.

1    Q.    Is that the car you had at Smithers Healthcare?

2    A.    Yes, sir.  I still drive that car.

3    Q.    Okay.  And you -- at some point you bought an Escalade,

4    didn't you, Cadillac Escalade?

5    A.    For my wife, yes.

6              MR. RAMSEYER:  And go to Exhibit 92.

7    BY MR. RAMSEYER:

8    Q.    Those your credit cards that were found in the car?

9    A.    Yes, sir.

10             MR. RAMSEYER:  If we can go to 96.

11   BY MR. RAMSEYER:

12   Q.    Those your drugs?

13   A.    That is my backpack.  Those are old, expired or returned

14   patient medications.

15   Q.    That you possessed; correct?

16   A.    They were in my possession en route to the Henry County

17   Sheriff's Office for disposal.

18   Q.    Okay.  And that was March 7th of 2017; right?

19   A.    Yes, sir.

20   Q.    And you hadn't practiced in West Virginia since July --

21   or August of 2015; is that right?

22   A.    Yes, sir.

23   Q.    And you say that these were pills that you'd had for that

24   period of time except for the ones -- the ones in baggies from

25   Brenda Fisher.

```
1    A.    Correct.

2    Q.    You'd had them for about two years in your backpack;

3    correct?

4    A.    Correct.

5    Q.    And that week you were going to take it to the

6    Martinsville PD to get it destroyed; right?

7    A.    I believe my research that the Henry County Sheriff's

8    Department was where they --

9    Q.    My question was -- you testified you had them for two

10   years.  But when the search came, coincidentally, that was the

11   same week you were going to go get them destroyed.  Is that

12   what you testified to?  It was going to be that week?

13   A.    It did -- it happened at that time.  Yes, sir.

14   Q.    And were any of these pills going to go to a patient?

15   A.    No, sir.

16   Q.    Okay.  Because you couldn't; right?  They're all mixed

17   together.  People have touched them.  You can't give those to

18   a person, can you, legitimately?

19   A.    I wouldn't -- I wouldn't want anyone to be given those.

20   Q.    Right.  And would you agree that the Schedule II drugs

21   that were in that backpack were hydrocodone, hydromorphone,

22   oxycodone, oxymorphone, methadone, and morphine?

23   A.    That's entirely possible.

24   Q.    Well, it's true, isn't it?  You knew what was in there

25   because you say you got them from people.
```

```
 1    A.    They were all mixed together.  I didn't know exactly
 2   which drugs were in what bottle.  They were just -- whenever I
 3   was practicing basically by myself in West Virginia, I didn't
 4   think about the flushing system that Mr. Wilson instituted in
 5   my office.  And so I was just -- I didn't want to take
 6   patients' bottles because of potential HIPAA issues.  So
 7   that -- I just had empty vitamin bottles.  I take a lot of
 8   different vitamins.
 9    Q.    All right.  So when you talk about Mr. Wilson's flushing
10   system, it's not very complicated.  It's pour it in the toilet
11   and flush; correct?  That's his flushing system?
12    A.    He has a form that he edits that indicates the name and
13   the dose of the medicine, as well as the quantity.  And then
14   on that form he -- it has a place for the witness, the patient
15   to witness the destruction and then he witnesses it as well.
16    Q.    Understood.  But you didn't follow any of that; correct?
17   You just took them from the patient?
18    A.    I -- like I said, I was not aware of that system.  That
19   wasn't something that I was familiar with.
20    Q.    But you could have just flushed them down the toilet on
21   your own at any time; right?
22    A.    I could have.  I didn't.
23    Q.    And you know from being in the medical profession and
24   being familiar with the kind of patients you have, those are
25   very valuable pills, aren't they, on the street?
```

```
 1   A.   Over the time that I practiced, I became aware when I
 2   discharged certain patients, people did indicate certain
 3   things about street value of certain medicines.
 4           THE COURT:  The question to you was did you know
 5   that these were valuable pills?
 6           THE WITNESS:  I knew in a subconscious sense.  I
 7   mean, I wasn't -- I don't know what the value would be.  I
 8   know that they're -- that people sell pills on the street.  I
 9   don't know what the -- how to evaluate that.
10   BY MR. RAMSEYER:
11   Q.   All right.  Did you know hydrocodone, hydromorphone,
12   oxycodone, oxymorphone, methadone, and morphine are all sold
13   on the street?  Did you know that?
14   A.   I -- I am aware of that.
15   Q.   You knew that in March when you had these pills in your
16   car; correct?
17   A.   Yes, sir, I probably was.
18   Q.   Did you pay Peter Bodai in cash?
19   A.   For -- yes, sir.  Yes.
20   Q.   All right.  Always; right?  He was always paid in cash by
21   you?
22   A.   As far as I know, yes, sir.
23   Q.   And Juan Angel, was he paid in cash?
24   A.   He was.
25   Q.   And Wendell Wilson, was he paid in cash?
```

1   A.   I was not his employer, so I'm not familiar with how he

2   was paid.  PPPFD, I mean, we had an accounting process for --

3   I mean, because when patients' credit cards or debit cards

4   would be charged, I -- we had a system where I would debit

5   money, and that deposit went towards PPPFD to keep the

6   finances separate.

7   Q.   Actually, Wendell Wilson would take a bag of cash to

8   deposit at the bank.

9   A.   Yeah.  He had a night deposit bag, I believe.

10   Q.   Right.  He -- so the 75 bucks he got, he got a cash bag;

11   right?

12   A.   As far as I know, he -- he did a total and accounting at

13   the end of the day just like I did and had an accounting

14   worksheet that he went through just like I went through an

15   accounting worksheet.

16   Q.   Let me try it a different way.  Did you ever pay Wendell

17   Wilson by check?

18   A.   I wasn't paying him.  This was a division of --

19   Q.   It was an easy question.  Did you ever pay Wendell Wilson

20   by check?

21   A.   No, sir.

22   Q.   Did you ever pay him by direct deposit?

23   A.   I don't believe I ever paid him.

24   Q.   Okay.  The same thing for Juan Angel and Peter Bodai.

25   Did you ever pay them by check or direct deposit?

```
 1    A.    I don't believe so, no, sir.

 2    Q.    Did you have any trained medical personnel that worked at

 3    Smithers Community Healthcare in Martinsville?

 4    A.    When my wife worked there she was not a licensed nurse.

 5    I believe her license was a Certified Nurse Assistant.

 6            THE COURT:  Well, what's the answer to the question?

 7            THE WITNESS:  She was licensed as a certified nurse

 8    assistant.

 9            THE COURT:  The answer to the question, did you have

10    any trained medical personnel?

11            THE WITNESS:  I was trained medical personnel.

12    BY MR. RAMSEYER:

13    Q.    Other than yourself, were there other trained medical

14    personnel there?

15    A.    I'm not sure what training Mr. Wilson had.  I know he at

16    least had CPR training, and he worked in a medical setting for

17    years at that point.

18    Q.    He worked at the Hope Clinic before; right?

19    A.    He -- my understanding he worked in other clinics as

20    well.

21    Q.    Well, the only places Wendell Wilson worked in a medical

22    setting was Hope Clinic pain clinic, before he went to you;

23    correct?

24    A.    I'm not sure.  My understanding was he worked at a

25    variety of medical clinics before he worked for me.
```

1   Q.   And do you know why he left law enforcement?

2   A.   I only know what I can remember that he told me.

3   Q.   And you knew he was living in a car; right?

4   A.   I did not.

5   Q.   I mean, where did he live?  Where was his actual house

6   during the time period he was working at your clinic?

7   A.   My understanding he was living with his wife and three or

8   four kids in Tennessee.

9   Q.   Murfreesboro, Tennessee; right?

10  A.   That sounds correct.

11  Q.   Which is near Nashville.  It's about a six-hour drive, at

12  least -- more than that, probably six or seven hours from

13  Martinsville.

14  A.   I don't know.

15  Q.   Seem odd to you?

16  A.   I -- I mean, it didn't -- I mean, I was trying to figure

17  out why he did drive that far to work.  But I wasn't -- I

18  mean, he did a good job as far as I could tell and --

19  Q.   Okay.  Now, do you agree that over $650,000 was deposited

20  into your bank account in cash, wire transfers -- not wire

21  transfers -- cash and credit transactions between the time

22  period on that chart?

23  A.   If that's what Bank of America says, I don't have any

24  reason to dispute that.

25  Q.   Okay.  How much cash did you not deposit?

1    A.    The contents of the glove box, which were earmarked to go

2    to the IRS.

3    Q.    That's about 20,000?

4    A.    I think it was between 20 and $30,000.

5    Q.    Okay.  What about the cash that was in your safe deposit

6    box at your house?

7    A.    That was life savings that had been saved over several

8    years.

9    Q.    Okay.  So all the cash you got from Smithers Healthcare

10   you put into your bank deposits?

11   A.    With the exception of the money that had been saved to

12   put into the IRS account that was -- that was --

13   Q.    The 20,000-something in your glove compartment?

14   A.    That was going and earmarked for the IRS.  Yes, sir.

15   Q.    So with exception of that.  What about the money you paid

16   Peter Bodai and Juan Angel, would those -- that didn't go

17   through --

18   A.    They were 1099 employees, independent contractors, and

19   they accepted the responsibility of paying taxes on that

20   income.

21   Q.    Okay.  But, in fact, you were their employer; correct?

22   A.    They were hired temporarily.  And, you know, it had been

23   my experience that people that worked in that job were not --

24   Q.    I'm just going to interrupt you a minute.  Could you

25   answer my question first and then if you want to explain it?

```
 1            You were their employer; correct?
 2   A.    Yes, sir.
 3   Q.    You told them when to come to work, what to do, when to
 4   leave; correct?
 5   A.    Yes, sir.
 6   Q.    Okay.  But you paid them in cash because that way you
 7   wouldn't have to pay any taxes on them; correct?
 8   A.    That was an arrangement that they -- they accepted.  I
 9   believe in Peter's case requested.  And Juan, I believe,
10   requested as well.
11   Q.    Can you answer my question first and then explain it?
12   Isn't the reason you paid them cash, one of the reasons, was
13   so you wouldn't have to pay tax on it?
14   A.    I don't believe that's the reason at all, no, sir.
15   Q.    Okay.  But anyway, the way you paid them, that was money
16   you made at Smithers Community Healthcare Clinic that never
17   went into your deposits; correct?
18   A.    That would be correct, yes, sir.  It was still an expense
19   that I believe was noted on our taxes, because it was an
20   employment expense for the business.
21   Q.    Let's talk about how you ended up in Martinsville,
22   Virginia.  You graduated from medical school in 2012; correct?
23   A.    Yes, sir.
24   Q.    Then you did a residency internship at Blue Ridge
25   Healthcare in Morganton?  Was it a residency or internship?
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 203 of 296   Pageid#:
11337

```
 1   A.   A rotating internship, yes, sir.

 2   Q.   How much were you paid there?

 3   A.   Between 50 and $60,000, I believe.

 4   Q.   50 and 60,000 per year?

 5   A.   Yes, sir, I believe so, in that, I think.

 6   Q.   Did they pay you in cash?

 7   A.   I could be wrong about that.  I was a W-2 employee there,

 8   so, no, sir.

 9   Q.   Did they pay you in cash?

10   A.   No, sir.

11   Q.   And you left there in what? June of -- June of 2014; is

12   that right?

13   A.   Yes, sir, I believe -- no, June of 2013, I believe.

14   Q.   Actually, May of 2013.

15   A.   May of 2013.

16   Q.   And you left there -- you talked a little bit about what

17   happened.  But really what happened was you used your position

18   as a doctor to try to get out of legal trouble; isn't that the

19   truth?

20   A.   I did.  I made a horrible decision, and I lied to a

21   police officer.  It's the only time I've ever done that, and I

22   paid a very high price for it.

23   Q.   And what you actually did was, you got -- you were

24   almost to the -- you were near the hospital and you got pulled

25   over and the doctor smelled -- or the officer smelled alcohol
```

1   on your breath; correct?

2   A.    Correct.

3   Q.    And you blew a .082; correct?

4   A.    I don't know.  Officer Lloyd didn't -- he field sobriety

5   tested me.  He didn't show me what the test was.

6   Q.    You got pulled over originally for speeding; correct?

7   A.    That is correct, yes, sir.

8   Q.    And you told the officer, "I'm a doctor.  I'm on call.

9   There's a stroke victim at the hospital that I'm trying to get

10  to," didn't you?

11  A.    I think -- it was either a stroke patient or a patient

12  with pancreatitis.  I'm not sure which.  But I did make those

13  types of statements.

14  Q.    And it was a total lie; correct?

15  A.    It was, yes, sir.

16  Q.    You weren't on call.

17  A.    I was not.

18  Q.    There was no patient you were going to see.

19  A.    No, I was not.

20  Q.    It was just a way to get out of trouble; correct?

21  A.    I was -- I was panicked.  And I did not know what would

22  happen with the Air Force having a DUI.  I never had been

23  pulled over with alcohol in my system, and I made a really bad

24  decision.

25  Q.    All right.  So you had to leave there, as you testified,

1    in May of 2013; correct?

2    A.    Yes, sir.

3    Q.    And you ended up at an internship in Bluefield, West

4    Virginia, Bluefield Regional Medical Center; is that correct?

5    A.    Yes, sir.

6    Q.    And how much were you paid there?

7    A.    I believe it was about the same.  Resident intern

8    salaries are governed mainly by the Center for Medicaid and

9    Medicare Services, I believe, and they don't change a whole

10   lot, I don't believe.

11   Q.    So it was 50 to $60,000 per year?

12   A.    I would believe that's probably correct.

13   Q.    All right.  Do they pay you in cash?

14   A.    No, sir.  I was a W-2 employee.

15   Q.    Okay.  And you left there in June of 2014; is that

16   correct?

17   A.    Yes, sir, that is correct.

18   Q.    Why'd you leave there?

19   A.    The -- I was informed at the end of May, around the first

20   of June that the hospital board had voted to de-fund the

21   internal medicine residency program.  It's very rare, but it

22   does happen.  And the internal medicine residency position I

23   was supposed to go into was -- no longer had any funding, and

24   so I didn't have a residency to go into.

25   Q.    So from June to -- through September 14, did you have a

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 206 of 296   Pageid#: 11340

1    medical job?

2    A.    I don't believe so.  I mainly did odd jobs.

3    Q.    Okay.  Then October of 2014.  You started seeing patients

4    at Bluestone Health Center in Princeton, West Virginia; is

5    that correct?

6    A.    October of 2014?

7    Q.    Yes.

8    A.    Yes, sir.  Yeah, that's correct.

9    Q.    And you left in April or May of 2015; correct?

10   A.    Yes, sir, that's correct.  Yeah, 2015.

11   Q.    And when you left, you didn't have another job lined up,

12   did you?

13   A.    I did.  I was going to open an urgent care, primary care

14   practice in Dr. Bloom's clinic in Beaver, West Virginia.

15   Q.    Well, that didn't open until June of 2015; right?  You

16   left in April.

17   A.    It was going to open in May, but May is when they lost

18   their appeal, I believe, for a chronic referred pain clinic

19   license in Virginia.  When they lost that appeal, it suddenly

20   became not an option to have a practice there.

21   Q.    Okay.  Let me ask you this:  At Bluestone, how much did

22   you get paid?

23   A.    I think I was paid -- I believe I was paid as a 1099

24   employee twice monthly, 4 or $6,000 twice a month.

25   Q.    So 8 to $12,000 a month?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 207 of 296   Pageid#: 11341

```
 1   A.    I believe so, yes, sir.  I'm sorry.  I don't remember
 2   exactly which number --
 3   Q.    Around $100,000 a year, approximately?
 4   A.    I think that -- I wasn't there for a full year, but I
 5   think it would have -- the annualized gross number would have
 6   been around 120.
 7   Q.    Okay.  120,000.  But you left there.  You said one of the
 8   reasons you left was people said you weren't basically seeing
 9   enough patients.  You weren't working hard enough.  Is that
10   it?
11   A.    That was not my testimony.  I had a difference with the
12   administrator of that clinic who wanted me to see more
13   patients in a day, and I didn't feel I could safely see that
14   many patients in a day.  And we had -- I mean, we had talked
15   along the way about, she -- you know, just kind of a regular,
16   you know --
17   Q.    There were some other issues, too, weren't there, between
18   you and that administrator?
19   A.    We got along well other than that.
20   Q.    So the only issue was she wanted you to see more patients
21   than you wanted to see?
22   A.    I think we had a disagreement about maybe the time of the
23   urgent care opening.  We had an urgent care time that we had
24   set up, and I wasn't always showing up for that right at 7:00
25   or something, and we may have had a disagreement about that.
```

1   Q.   So you're showing up late for work?

2   A.   We had a disagreement about it.

3   Q.   Well, were you showing up late for work?

4   A.   I did at times, yes.

5   Q.   And that was the reason why you left; correct?

6   A.   I don't believe that was the reason why I left.

7   Q.   Okay.  So at that time, you're out of work.  You're

8   negotiating with the Hope Clinic.  And just let the grand

9   jury -- or the jury know.  Mark Radcliff is one of the key

10  figures in Hope Clinic; right?

11  A.   My understanding is he -- Dr. Bloom was the medical

12  director and Mr. Radcliff was the CEO, I believe, or the

13  operations manager.

14  Q.   Okay.  So again, Mark Radcliff was CEO of Hope Clinic;

15  correct?

16  A.   Correct.

17  Q.   And Mark Radcliff was a former district sales manager for

18  Purdue Pharma; correct?  The company that makes OxyContin?

19  A.   I'm not familiar with Mr. Radcliff's employment history

20  that well.

21  Q.   Well, you've talked to Mr. Radcliff on several occasions,

22  haven't you?

23  A.   I have.  I don't recall ever talking to him about where

24  he's worked.  I know he worked in finance in the Air Force.

25  Q.   You knew he was a sales rep for a drug company at one

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 209 of 296   Pageid#: 11343

1    point, didn't you?

2    A.    I don't believe so, no, sir.

3    Q.    Okay.  So he talks to you about opening a clinic in

4    Beaver because -- or Beckley because the Hope Clinic is about

5    ready to shut down; right?

6    A.    He talked to me about opening an urgent care practice in

7    his practice because his practice was about to be shut down.

8    Q.    I asked you, isn't it true Mr. Radcliff was trying to

9    find another doctor to send his Hope Clinic patients to, so he

10   approached you about opening a clinic?

11   A.    No, sir.  I was opening my own practice so that I could

12   continue to feed my family.

13   Q.    Okay.  So you opened that clinic called Priority Urgent

14   Care on your own?

15   A.    Yes, sir.

16   Q.    No help from anyone else?

17   A.    I think on my way out the door at Hope -- I mean, they

18   may have provided me some lab sample bags, some paperwork.  I

19   think I may have gotten some office supplies.  I mean, they

20   didn't need the office supplies anymore, and --

21   Q.    And explain that to the jury, too.  On your way out the

22   door from Hope, what does that mean?

23   A.    Well, they were closing the clinic down.  So, I mean --

24   Q.    Had you worked at Hope?

25   A.    No.  I had set up an office there.  I never saw a patient

1   there.

2   Q.   So you set up an office at the Hope Clinic.  And when it

3   gets closed down, you take supplies with you; is that correct?

4   A.   I was given certain items.  I mean, they didn't need them

5   anymore.  They weren't open.  That was my understanding.

6   Q.   Did you get anything else to help open Priority Urgent

7   Care?  Any kind of financial backing?

8   A.   Not that I recall.

9   Q.   So you just had enough money saved up you could open this

10   clinic on your own?

11   A.   It wasn't that expensive.  It was a 400-square foot

12   office.

13   Q.   You need to answer my question.  You had enough money to

14   open it on your own?

15   A.   I must have.

16   Q.   Nobody gave you any money; correct?

17   A.   I do not recall anyone giving me any money at the time.

18   Q.   You'd remember that, wouldn't you?  That's a pretty big

19   thing, somebody giving you money to open a business?

20   A.   I would think I would.  I mean, I -- yeah.  I should

21   remember that if it happened.

22   Q.   So did anybody give you any money to help you open

23   Priority Urgent Care?

24   A.   Not that I recall.

25   Q.   Now, at Priority Urgent Care, you opened it on June 15th;

```
 1  correct?
 2  A.   That sounds -- is that a Monday?  It was a Monday.
 3  Q.   Okay.  And let me back up.  You talked about -- well,
 4  we'll get to that later.
 5           Your Priority Urgent Care that you opened in
 6  Beckley, West Virginia, you were the owner; right?
 7  A.   Yes.  Yes, sir.
 8  Q.   Okay.  It was all cash; right?
 9  A.   I had not had a chance to set up --
10  Q.   Again, just answer my question, please.  It's all cash;
11  correct?
12  A.   Yes.  It was -- it was -- I did have a Bank of America
13  business account at that time, so we accepted all forms of
14  payment, other than insurance.
15  Q.   Well, you did not take insurance?
16  A.   Correct, we did not take insurance.
17  Q.   Cash, credit card was fine; right?
18  A.   Yes, sir.
19  Q.   So you open on June 16.  You see 22 patients that day;
20  correct?
21  A.   That number sounds correct.
22  Q.   And 22 of those patients all came from the Hope Clinic;
23  correct?
24  A.   I -- I don't know.  I haven't reviewed those records in a
25  long time.
```

1    Q.    Well, you remember telling people that, that they were

2    from the Hope Clinic?

3    A.    Telling people?

4    Q.    Yeah.    There was a proceeding about this that you were

5    involved in; correct?

6    A.    I don't believe I was present for that proceeding.    I --

7    My -- I had an attorney that was present for that.

8    Q.    Okay.    Well, would you agree that you saw a lot of Hope

9    Clinic patients on June 16th?

10   A.    From my understanding, the patients -- I mean, I didn't

11   ask patients where they -- the specific name of which pain

12   clinic they came from in every instance.    There were patients

13   from a variety of pain clinics.    My understanding there was at

14   least three, maybe four pain clinics that had been shut down

15   in Beckley all about the same time.

16   Q.    Dr. Smithers, let me ask you about that.    You made it

17   sound like a pain clinic can't operate in West Virginia.

18   That's not the truth, is it?    All that -- all that West

19   Virginia requires is that you be licensed as a pain clinic and

20   that you be subject to inspection and that you follow the law;

21   correct?

22   A.    I think that's an oversimplification.    That's part of

23   licensure.    As was witnessed with all the clinics that were

24   shut down, it was made to be a very rigorous process, which is

25   probably a good thing.    At the same time, though, by

```
 1   implementing that law resulted in thousands of patients losing

 2   access to care overnight.

 3   Q.   My question though is isn't it accurate that you could

 4   operate a pain management clinic in West Virginia so long as

 5   you registered and complied with the law and were subject to

 6   inspection; correct?

 7   A.   Those were the -- those were -- I mean, as far as I know,

 8   those are still the requirements.

 9           THE COURT:  Sir, is that -- it seems to me you could

10   answer that yes or no or I don't know.

11           THE WITNESS:  As far as I know --

12           THE COURT:  Here's the three options:  Yes, no, I

13   don't know.

14           THE WITNESS:  As far as I know, yes, that's --

15   that's correct.

16   BY MR. RAMSEYER:

17   Q.   So the only clinics that can't operate are the ones that

18   aren't licensed, don't follow the law, or don't subject

19   themselves to inspection; correct?

20   A.   I don't know if it's been clarified, but at the time the

21   law was passed, there was a great deal of ambiguity because

22   the law said any -- any physician's office that saw more than

23   50 percent in the 30-day calendar period that received

24   anything so much as Tramadol -- or beyond Tramadol as a

25   controlled substance and if they were over 50 percent in any
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 214 of 296   Pageid#:
11348

1    given 30-day period, they were considered a pain clinic.  And

2    if they hadn't applied for licensure, then they were

3    considered an unlicensed pain clinic.

4    Q.   Right.  So all it was, they had to apply for a license,

5    had to get it, had to be subject to inspection, and they had

6    to follow the law; correct?

7    A.   That -- that is -- yes.

8    Q.   Okay.  So you saw 22 Hope patients on June 16th at

9    Priority Urgent Care.  These are controlled substance

10   patients; correct?

11   A.   I believe they were treated with controlled substances,

12   yes, sir.

13   Q.   By you; correct?

14   A.   After establishing a legitimate medical need, yes.

15   Q.   And when you say "treated," you gave them a prescription

16   for controlled substances; correct?

17   A.   If that's what the record shows, yes.

18   Q.   Okay.  On June 17th and 18th, you actually -- you hired

19   two registered medical assistants; correct?

20   A.   I attempted to hire different people.  I'm not sure.

21   Q.   Well, you hired Kristin Medor and Ashley Harris; correct?

22   A.   They did come and work for a couple days.  I don't think

23   they were there for more than a few days.

24   Q.   They quit after being there for a day.  Those were people

25   with medical licenses, and they quit; correct?

```
 1   A.    I don't recall them quitting.  I believe someone -- one
 2   of them got a job somewhere else.  And I don't really remember
 3   the circumstances of why they -- they left.
 4   Q.    Well, getting a job somewhere else would involve quitting
 5   at your place; correct?
 6   A.    That is true, yes, sir.
 7   Q.    So isn't it true they both quit after a day, or at most,
 8   two days?
 9   A.    If that's what the record shows.  I'm -- I don't
10   remember.
11   Q.    Okay.  On June 17th, you saw 33 Hope patients, controlled
12   substances patients; correct?
13   A.    Again, it's been a long time since I've reviewed those
14   records.  If that's what --
15   Q.    Does that sound right?
16   A.    If that's what the record shows, that's correct.
17   Q.    And then on Monday, June 22nd, you saw 26 Hope patients,
18   controlled substances; correct?
19   A.    Again, if the record reflects that.
20   Q.    Well, I mean, does it sound right?  I mean --
21   A.    It does.  It does.  It does.
22   Q.    -- you lived the experience.  The Hope place was there.
23   Were you giving controlled substances?
24   A.    I was pretty overwhelmed.  I mean, it does sound -- those
25   numbers, there was really -- that's a lot of patients for me
```

```
 1   to see in a day.

 2   Q.   Did you want the Hope patients?  Did you want to see

 3   them?

 4   A.   I wanted to help people.  I was not wanting to -- I mean,

 5   I was wanting to operate an urgent care.  And these were very

 6   difficult patients in many cases to deal with.

 7   Q.   My question again is did you want the Hope patients?

 8   A.   I didn't -- I mean, I wanted to help people.  I don't

 9   know what that means.  I mean, I didn't have a desire for any

10   specific patient other than to help people.

11   Q.   Well, you said you didn't have any interest in running a

12   pain care business, didn't you?

13   A.   That was not the purpose of that office.  The purpose of

14   that office was hopefully to be an urgent care.

15   Q.   Right.  And you told the people that came that you didn't

16   want to run a pain care business; correct?

17   A.   That was -- that is correct, yes, sir.

18   Q.   So on June 23rd, you'd been open for just about a week.

19   The West Virginia authorities come.  These licensing people

20   that deal with pain clinics, they come to your office and they

21   talk to you; correct?

22   A.   Yes, sir, the people in this field and the people from

23   OFLAC.

24   Q.   From OFLAC; correct? in West Virginia?

25   A.   Yes, sir.
```

```
1    Q.    And they tell you, we want to -- we want to look at your
2    records to determine whether you are operating a pain care
3    business or not, pain management clinic; correct?
4    A.    I believe they did make that request, yes, sir.
5    Q.    And working at your window is Mark Radcliff's son;
6    correct?
7    A.    He was auditioning as an office manager, yes, sir.
8    Q.    From Hope Clinic; correct?  That's where he'd been?
9    A.    I believe, yes.  He had been there previously.
10   Q.    And he gave the inspectors a fake last name; correct?
11   A.    Later on I had found that out.  I was not aware of that
12   at the time.
13   Q.    And so the OFLAC people talked to you, said, we'd like to
14   look at your records, see if your operating a pain clinic.
15   You tell them to come back with a subpoena; correct?
16   A.    I don't believe that's how that conversation went.
17   That's certainly the inference they took.  You know, I was
18   trying to operate an urgent care.  I was not trying to
19   maintain a doctor/patient relationship with these patients.
20   And, you know, I felt it was unwarranted, you know, because I
21   was trying to operate an urgent care.
22   Q.    Do you understand my question?  My question was:  They
23   asked to look at your records, and you said come back with a
24   subpoena; correct?
25   A.    I don't know that I said that.  I told them if they
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 218 of 296   Pageid#:
11352

```
 1   wanted to see medical records, my understanding of HIPAA and
 2   patient privacy is that they would need a court -- some type
 3   of court document to --
 4   Q.    Dr. Smithers --
 5   A.    -- assess those records.
 6   Q.    Did you let them see the records when they asked to see
 7   them on that day?
 8   A.    I did not, no, sir.
 9   Q.    And the reason you didn't was you didn't really have your
10   records even ready for somebody to look at, did you?
11   A.    I don't believe that was the reasoning at all.  It was
12   concern for patient privacy.  And I was not familiar with the
13   laws in regards to this state committee that was there in my
14   office.  And my understanding, as far as patient privacy,
15   that, you know, there would need to be some type of a court
16   order for them to have access to those records.
17   Q.    So the OFLAC people come -- and earlier on direct
18   examination you said you operated that clinic for two months.
19   That's not really accurate.  You operated that clinic for
20   about a week; right?  Because the day after the inspectors
21   came, you -- that place was closed when they came back the
22   next day to serve the warrant.
23   A.    Well, one, I didn't know they had a warrant.  Two, I --
24   based on that interaction, they were very aggressive, and I
25   took from the interaction that I needed some type of
```

1    representation.  So I basically closed my practice on

2    Wednesday to go find an attorney to represent me and hopefully

3    come to some type of resolution with this state agency.

4    Q.   And when they came back the next day, they found 72

5    untested urine samples in the garbage from your clinic;

6    correct?

7    A.   I believe Mr. Radcliff, Josh, against what he had told me

8    and what I had instructed him to do, which was to mail

9    those -- because the last time I saw them they were in sealed

10   packaging for UPS to go to the lab.  I didn't find out about

11   that until months later that they had found those in the

12   dumpster.

13   Q.   That's what happened; right?

14   A.   But that is what happened.

15   Q.   The inspectors were there one day.  Come back the next

16   day, you're gone.  The urine is in the dumpster.  That's what

17   happened; correct?

18   A.   Those are the facts, yes, sir.

19   Q.   And then you opened a clinic over in Beaver, where Hope

20   Clinic is in Beaver.  You open a little clinic there out on

21   Industrial Park Boulevard; correct?

22   A.   I -- so because of the influx of patients at this

23   facility --

24   Q.   Okay.  Can you just answer my question first?

25   A.   Yes, sir.  Yeah.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 220 of 296   Pageid#:
11354

So I did -- I had a falling out with the landlord
because of the patients that were coming in there.  And so I
did --

Q.   This is the place you already fled?

A.   This is the office that I agreed to leave I think in July
at some point.  We came to an agreement on that.

Q.   Wait a minute.  Let's back up.  So June 24th is when the
inspectors came back and the office was abandoned.  Where did
you move your clinic to at that point?  Did you move to
Beaver?

A.   I thought that we saw patients out of that location in
the medical arts building until July 4th weekend or the end of
June.

Q.   Okay.  So you're saying you went back there after you'd
abandoned it?

A.   Well, I didn't abandon it.  I just went to find an
attorney.  I didn't have enough staff and I didn't have
another provider to see patients, so I had to close my office
to go find an attorney.

Q.   But when you left on the 23rd -- when the inspectors come
back on the 24th, there were no patient files there.  They
were gone; correct?

A.   Because I was trying to find an attorney, and I assumed
that attorney would want to review my medical records in
preparation for any type of dealings with this -- these

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 221 of 296   Pageid#:
11355

1    people.

2    Q.   So you were so concerned about these patient files, where

3    did you keep them?

4    A.   I believe they stayed locked in the trunk of my car.

5    Q.   Okay.  So at some point you say you opened that back up

6    then in Beckley?

7    A.   As memory serves me, I believe that -- I believe my wife

8    and I worked there out of that office up until July 4th

9    weekend.  I mean, that's what I remember.  I could be wrong.

10   Q.   And then you moved to Beaver; correct?

11   A.   Yes, sir.  About ten minutes down the road there I found

12   another office space.

13   Q.   Okay.  And you opened that clinic when?

14   A.   That probably would have been the first week of July.

15   Q.   Okay.  The first week of July?

16   A.   Or it could have been at the end of June.  I don't --

17   yeah.  I don't know the exact time.

18   Q.   Okay.  You heard Lora Kicklighter talk about where she

19   saw you.  That's where she saw you; right? that place in

20   Beaver?

21   A.   That office, yes, sir.

22   Q.   Darryl Williams saw you there in Beaver?

23   A.   Yes, sir.

24   Q.   A bunch of people we've been talking about came to see

25   you in Beaver; correct?

```
 1   A.   Yes, sir.

 2   Q.   And you gave them controlled substances; correct?

 3   A.   They were --

 4   Q.   Again, if you would just answer yes or no, please.

 5   A.   After the determination of legitimate medical need on my

 6   objective findings, they were prescribed some controlled

 7   substances, yes, sir.

 8   Q.   And then what made you -- you were only there, what, a

 9   month; correct?

10   A.   Most of -- I mean, I was there most of August, so a

11   month, month and a half, yes, sir.

12   Q.   And you say you left there because if you'd stayed in

13   West Virginia you would have to comply with the licensing laws

14   on pain clinics; is that right?

15   A.   I don't believe I said that.  But if I wanted to see

16   people -- so the premise of my urgent care was that I was

17   seeing people and they were actually signing documents at

18   their initial visit, which was their only visit with my urgent

19   care was that it's a one-time visit.  And I wasn't going to be

20   able to, because of the law in West Virginia, see people on

21   follow-up visits.  And many of these patients, based on my

22   medical assessment, needed ongoing care.

23   Q.   Again, you could have stayed right there in Beaver,

24   applied for a license as a pain clinic, comply with the law,

25   and be subject to inspection; right?  You could have done
```

1   that?

2   A.   And I would have still been four, five hours from my

3   family, so --

4   Q.   Was it true you could have done that?  You could have

5   stayed there and done that?

6   A.   I could have, yes, sir.

7   Q.   Instead, you closed; right?

8   A.   I did.

9   Q.   And you moved your practice to Martinsville, Virginia;

10  correct?

11  A.   Yes, sir.

12  Q.   And that was in August of 2015?

13  A.   Yes, sir, the end of -- end of August of 2015.

14  Q.   And at this urgent care where you're prescribing

15  controlled substances, you didn't give people, like, a

16  seven-day supply or a ten-day supply in urgent care.  You gave

17  them a 30-day supply, didn't you?

18  A.   It was -- I did.  And it was based on my medical judgment

19  that, you know, these people were going to have an extended --

20  you know, I mean, it's going to probably take them an entire

21  month to find a new chronic pain facility clinic to treat

22  them.  And, you know, I didn't think it would be me in any

23  circumstance because, you know, recurrent patients visits

24  would not -- you know, I wasn't -- I didn't want to be out of

25  compliance.  And that -- the way West Virginia was doing

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 224 of 296   Pageid#:
11358

```
1    things at that time, to my knowledge, they still do things, is
2    really, you know, there's really no leeway to try and help
3    people that are in between certain types of management for
4    their medical conditions.
5    Q.   All right.  So in West Virginia you were found to have
6    knowingly operated an unlicensed pain clinic; correct?
7    A.   That was the ruling.  It's been appealed.
8    Q.   Okay.  Is that the reason you left West Virginia?
9    A.   No, sir.  I left West Virginia because I wanted to be
10   closer to my wife and kids.
11   Q.   Okay.  And you knew that all the patients would come with
12   you, wherever you went, didn't you?
13   A.   I had no assurance of what patients would do, and I was
14   hopeful that I could have a much quieter, calmer practice
15   being away -- further away from that place.
16   Q.   All right.  So you talked a little bit about your Air
17   Force background.  How long did you stay in the Air Force?
18   A.   I -- I believe I entered the Air Force in April of 2008
19   or 2009.  And as a result of leaving the -- or the internship
20   program in Morganton, I did not realize at the time, but that
21   actually resulted in an administrative discharge because they
22   didn't want to wait until I finished the next internship, so
23   they decided to end my scholarship with them.
24   Q.   Did you have a Less Than Honorable Discharge?
25   A.   It was an administrative discharge.  I'm not sure -- I
```

```
 1    haven't seen my DD-214.  I'm not sure what it says.
 2    Q.   In any event, you didn't retire from the Air Force, did
 3    you?
 4    A.   It is a general discharge, if I remember correctly.
 5    Q.   You didn't retire from the Air Force, did you?
 6    A.   I was forced to retire from them, yeah.  They -- at that
 7    point --
 8    Q.   You didn't retire.  You were discharged.
 9    A.   Well, everyone that leaves or separates from the service
10    is discharged.
11    Q.   But some are honorable?
12    A.   When you're separated from the military, you're
13    discharged.
14    Q.   So you consider yourself retired from the Air Force,
15    that's why you put it on your letterhead that you're retired?
16    A.   I don't know that it's on my letterhead anywhere.  It's
17    on my e-mail signature maybe.
18    Q.   You sign your name as "U.S. Air Force, retired"?
19    A.   It might be in an e-mail signature somewhere.  It's not
20    still in my e-mail signature, to my knowledge.
21          MR. RAMSEYER:  May I approach the witness,
22    Your Honor?
23          THE COURT:  You may.
24    BY MR. RAMSEYER:
25    Q.   This is a letter dated November 25th, 2015.  It's from
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 226 of 296   Pageid#:
11360

1    you.  Can you read to the jury how you signed your letter?

2    A.    In this case -- in this case it was signed, "Joel A.

3    Smithers, D.O., Captain, USAF Medical Corps, Retired."

4    Q.    Thank you.

5            I'm going to show you what we've previously marked

6    as Government's Exhibit 87.  Whose handwriting is that?

7    A.    It looks like my handwriting, sir.

8    Q.    It's your handwriting.  So you wrote a note saying, "Is

9    Darryl Williams wearing a wire;" correct?

10   A.    Yes, sir.

11   Q.    All right.  I'm going to show you Government's Exhibit

12   49.  Who wrote that?

13   A.    I did.

14   Q.    And it says, "For suspected wires:  Without verification

15   of your issues, I cannot help you."  Correct?

16   A.    Yes, sir.

17   Q.    I'll show you what we've previously marked --

18           MR. RAMSEYER:  And this will be just for the

19   witness, please.

20           Exhibit 89, please.

21   BY MR. RAMSEYER:

22   Q.    Dr. Smithers, did your clinic have a list of recommended

23   pharmacies that you handed out to patients?

24   A.    Eventually, yes, we did.

25   Q.    Okay.  Do you recognize this as one of those lists?

```
 1   A.   Yes, sir, I do.

 2            MR. RAMSEYER:  Your Honor, I'd move for admission of

 3   Government's Exhibit 89 at this time.

 4            THE COURT:  It will be admitted.

 5            MR. RAMSEYER:  Ask that it be published to the jury.

 6       (Government's Exhibit 89 received.)

 7   BY MR. RAMSEYER:

 8   Q.   Now, one of those pharmacies, you put Jeffersonville,

 9   Idaho, but it's actually Indiana; correct?

10   A.   It's not Idaho.  That is Indiana, yes, sir.

11   Q.   Have you ever driven there?  Have you ever been there?

12   A.   I don't know that I have.  I've driven through Indiana.

13   I'm not sure.

14   Q.   Have you been to Kentuckiana Pharmacy?

15   A.   No, I've not been to that pharmacy.  No, sir.

16   Q.   Did you talk to the owner?

17   A.   Yes, sir, I did.

18   Q.   Is that Dr. Assad.

19   A.   Yes, sir.

20   Q.   Did you talk to him about having a supply of oxymorphone

21   and other drugs for your patients?

22   A.   I communicated with him as a professional.

23   Q.   It's a simple question.  Did you talk to him about having

24   a supply of oxymorphone for your patients?

25   A.   I talked to him in certain terms.  I'm not sure if those
```

```
 1    are specific words that I used.
 2    Q.   Did you and Darryl Williams send text messages back and
 3    forth about Kentuckiana and the supply and what they had?
 4    A.   If the record reflects that, then that's what happened.
 5    Q.   You've seen the record.  It's your text messages, and
 6    you've seen them.  Isn't that what happened?
 7    A.   Again, if that's what they show, then that's what it --
 8    that's what it represents.  I'm not trying to be difficult.  I
 9    just -- I've seen a lot of records over the past couple of
10    months.
11    Q.   Okay.  So you had -- you say you had these drug screens
12    at your clinic to try to guide your practice.  Who supervised
13    the urine screens for females?
14    A.   Well, Mr. Wilson had his own system that, you know,
15    obviously no one was female was on staff at the practice, so
16    he had a system of listening and, as Mr. Angel testified, you
17    know, looking at cloudiness and temperature.  But nobody was
18    able to be directly in the restrooms.
19    Q.   Okay.  And you didn't hire a woman to do that job, did
20    you?
21    A.   We didn't have -- I mean, as I recall --
22    Q.   Let me ask you a question.  Did you hire a woman to do
23    that job?
24    A.   We did not.
25    Q.   Okay.  Were there days you came in late to the office in
```

1   Martinsville?

2   A.   Yes, sir.

3   Q.   Were there days you didn't come in at all when patients

4   were there?

5   A.   That's possible, yes, sir.

6   Q.   Well, it did happen; correct?  Not just possible, there

7   were days patients came to your clinic and you weren't there;

8   correct?

9   A.   Yes, sir, that is true.

10  Q.   And there were days you didn't come in until the

11  afternoon; correct?

12  A.   Yes, sir, there were.

13  Q.   And patients would be there at 7:00 or 8:00 in the

14  morning, but you weren't there until late in the afternoon;

15  correct?

16  A.   There were situations where that occurred.

17  Q.   And sometimes you would stay at the office 'til after

18  midnight; correct?

19  A.   Yes, sir.

20  Q.   And sometimes you'd call the pharmacy and say, hey, I

21  just sent some patients your way.  They just got out the door.

22  Can you keep the pharmacy open a little bit later until they

23  get there?

24  A.   I've heard testimony I think last week about that.  That

25  may have happened one time.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 230 of 296   Pageid#:
11364

1   Q.   Which pharmacies did you call and do that to?

2   A.   If it happened, it would have not been very often.

3   Q.   Which pharmacies did you call and ask them to stay open

4   for your patients?

5   A.   I don't recall.  I don't -- I don't know who that would

6   have been.

7   Q.   So when those occasions when you weren't at the clinic

8   and the patients were there, did they get their prescriptions

9   filled?

10  A.   In many cases, yes.

11  Q.   In every case; correct?

12  A.   It's possible.  I don't know that it's true in every

13  case.

14  Q.   Dr. Smithers, every patient you saw got a controlled

15  substance; correct?

16  A.   I did some free sports physicals in my office, but, I

17  mean, ongoing patients that were in my office, I believe most,

18  if not all received a controlled substance at some point.

19  Q.   Every patient you saw got a controlled substance other

20  than those free physicals; correct?

21  A.   I believe so, yes, sir.

22  Q.   And when they came there and you weren't there, they

23  still got their controlled substance prescriptions; correct?

24  A.   After a rigorous process that included the screening with

25  Mr. Wilson, a telemedicine visit.

```
1    Q.   It's a simple yes or no.

2    A.   Well, I believe the context is important for the jury.

3    Q.   Okay.  Can you answer my question first?

4    A.   They -- they -- they did receive prescriptions for the

5    medications they were on, and in many cases -- or in some

6    cases, there was adjustments made to their therapy, both

7    controlled and non-controlled substances, because most

8    patients -- I believe almost all patients received a

9    combination of different medicines.

10   Q.   All right.  And they paid the $300 whether they saw you

11   or not; correct?

12   A.   That is true, yes, sir.

13   Q.   And when you mailed the prescriptions, they still had to

14   pay the $300; correct?

15   A.   In some circumstances -- there were several

16   circumstances, like with the Jessies where -- I mean, they

17   both had medical office bills with my office in excess of

18   $1,200 of monies owed.  So there were several circumstances

19   where I would do things to take care of those patients and

20   they --

21   Q.   Well, other than the Jessies, everybody else had to pay

22   $300?

23   A.   There was other patients that didn't pay or they only

24   paid shipping costs.

25   Q.   Let's try it this way:  For most of the patients and most
```

```
 1    the prescriptions that you mailed to them, they had to pay the

 2    $300; correct?

 3    A.    I believe so, yes, sir.

 4    Q.    The Jessies brought you a lot of patients; right?

 5    A.    I don't remember that that was the case, no, sir.

 6    Q.    You've seen the text messages where they're sending you

 7    patients and you're having to ask them, hey, this a first-time

 8    patient, or second-time patient, or having them tell you, no,

 9    these are patients you've seen before, Doctor.  Do you

10    remember all those?

11    A.    I remember those specific messages, but I don't -- I

12    mean, even from the documents in the past week, it seems like

13    that was one or two patients.  I'm not really --

14    Q.    So you think the Jessies only sent you one or two

15    patients?

16    A.    I -- that's only -- that's all that I can recall from the

17    past week.  It's not --

18    Q.    I'm not asking about last week.

19    A.    I don't -- I don't recall --

20    Q.    I'm talking about real life.

21    A.    Yeah.  I don't recall any specific number.  I don't

22    recall them sending maybe more than one or two that they

23    referred, but --

24    Q.    How many different crews did you have?  We've been

25    talking about crews.  You had the Williams crew.  You had the
```

```
1    Jessie crew.  What other crews did you have?
2    A.   I'm not sure I understand.  I mean, I didn't know these
3    people that engaged in this type of activity, so I'm not sure
4    I understand what you're asking.
5    Q.   Well, people that arranged for other people to come and
6    see you.
7    A.   There were a variety of patients that did that, and it
8    didn't always -- it wasn't the same from month to month.  I
9    mean, I know people carpooled.  And at the time I -- you know,
10   in many cases I gave people the benefit of the doubt that that
11   was due to the long trip and, you know, lack of funding and
12   wanting to save on gas money.
13   Q.   What about the Johnson-Rose crew?  Do you remember them?
14   A.   I -- I recognize the Johnson name, but I don't know of
15   anybody that --
16               MR. RAMSEYER:  May I approach the witness,
17   Your Honor?
18               THE COURT:  You may.
19   BY MR. RAMSEYER:
20   Q.   Show you a text message.  Ask you to read that.  Can you
21   read that out loud to the jury, please?
22   A.   "Hope you slept well last night, sir.  The Parsleys and
23   Ralph Marcum, Jr., texted a bit ago and were stuck behind a
24   wreck in Wytheville" --
25               THE COURT:  Wait.  Not so fast.
```

```
 1              THE WITNESS:  Oh -- oh, sorry.

 2              I can't tell who this is from.

 3              "Hope you slept well last night, sir.  The Parsleys

 4    and Ralph Marcum, Jr., texted a bit ago and were stuck behind

 5    a wreck in Wytheville, so we will see the Johnson-Rose crew

 6    first."

 7    BY MR. RAMSEYER:

 8    Q.   And that's from you first; right? that text message?

 9    A.   I -- I'm not sure.

10    Q.   Well, it says that; right?  Doesn't it say, "From Joel

11    Smithers"?

12    A.   I can't see where it says "from."

13    Q.   "Sent."  See, "Joel Smithers, sent"?

14    A.   Okay.

15    Q.   So who are you talking about?  Who's the -- when you

16    refer about the Williams crew and the Jessie crew -- who is

17    the Johnson-Rose crew?  Who are they?

18    A.   I'm not -- I have a couple different patients that have

19    the last name of Johnson.  I know I had at least one patient

20    with the last name of Rose.  I don't -- I mean, I -- you know,

21    I was very flippant in some of these text messages.  I

22    don't -- I don't really know who exactly I was referring to

23    there.

24    Q.   Sharon Mullins testified that she met you at Starbucks

25    and you gave her a prescription for fentanyl.  She was telling
```

1    the truth, wasn't she?

2    A.    That -- that did occur.

3    Q.    And that was in North Carolina; right?

4    A.    That did occur, yes, sir.

5    Q.    And that was in -- she paid you $300 in cash; correct?

6    A.    I don't recall.  But if she testified that that is what

7    happened, then I would say that that's probably what happened.

8    Q.    She gave you 300 -- she handed you $300, and you handed

9    her a prescription; correct?

10   A.    I believe I handed her the Brief Pain Inventory that she

11   filled out, and then we discussed her medical situation.

12   Q.    You're saying that you -- in the Starbucks parking lot,

13   you had her fill out the Brief Pain Inventory?

14   A.    I believe so, yes, sir.

15   Q.    Okay.

16   A.    I don't recall specifically, but, I mean, that form was

17   filled out.

18   Q.    Well, sometimes you filled out the Brief Pain Inventory

19   after the fact, didn't you?

20   A.    If it was a telemedicine visit, that would, in some

21   cases, be done as I was talking to the patient and getting

22   that information from them over the phone and going through

23   that with them.

24   Q.    Now --

25              THE COURT:  Mr. Ramseyer, let me interrupt you.

```
 1          Ladies and gentlemen, I'd like -- this is our last
 2   witness, and I'd like to finish today.  I know this may be
 3   inconvenient for you to stay a little later, but I think it
 4   would save time.  But you may need a little break right now.
 5   We've been going for a while.  So we're going to take a short
 6   recess.
 7          And let's push on, if we can, so that we can finish
 8   up and get you back into real life as soon as we can.
 9          All right.  We'll be in short recess.
10      (Proceedings suspended at 5:12 p.m. and resumed at 5:26
11   p.m.)
12      (Proceedings held in the absence of the jury.)
13          THE COURT:  All right.  Are we ready for the jury?
14          MR. RAMSEYER:  We are, Your Honor.
15          THE COURT:  All right.  We'll have the jury in.
16      (Proceedings held in the presence of the jury.)
17          THE COURT:  All right.  You may proceed.
18          MR. RAMSEYER:  Thank you, Your Honor.
19   BY MR. RAMSEYER:
20   Q.   Dr. Smithers, first, I took a look at the notes you were
21   having before you.  Isn't it true that when you talked to the
22   jury about prescription opioids having a similar structure to
23   endorphins, you had actually written out what you were going
24   to say about that, the script?
25   A.   These were just notes to refresh my memory last night
```

```
 1    when I was preparing to possibly testify today.
 2    Q.   And the little diagram you drew, you actually got that on
 3    your notes; is that right?
 4    A.   I'm not an artist.  I wanted to practice to be ready.
 5    Q.   You have sort of like stock answers, "Counselor, I'm
 6    confused."  You had to write those down to know what to say?
 7    A.   I think a lot of these were notes from phone
 8    conversations with my dad and things that he mentioned to me,
 9    and I just wrote them down when I was the phone with him for
10    about two hours last night.
11    Q.   If we could look at VHU-338, please.  It's on your
12    screen.
13    A.   Yes, sir.
14    Q.   Okay.  Whose handwriting is that?
15    A.   For the -- it's my signature.  The handwriting -- the
16    handwriting is -- I believe it's Mr. Wilson's.
17    Q.   Wendell Wilson's; correct?
18    A.   I believe so, yes, sir.
19    Q.   So this is one of those where you left a pre-signed
20    script, and he filled out the information; correct?
21    A.   That would -- there was probably a change in medication
22    therapy that warranted --
23    Q.   Can you answer my question, please?
24    A.   Yes, sir.
25              THE COURT:  Mr. Smithers, you can always explain,
```

```
 1   but you need to answer the question first.
 2           THE WITNESS:  Yes, sir.  Yes, that would be correct,
 3   and it was done probably when the, you know, urgent change to
 4   the patient's medication.
 5   BY MR. RAMSEYER:
 6   Q.   Okay.  And if there's, like, no Brief Pain Inventory done
 7   on that date, that would be an indication that really nothing
 8   happened other than the patient came in and got their
 9   prescription; right?
10   A.   That's not necessarily true.  I mean, days that I wasn't
11   at the office there were procedures in place for those
12   documents to be filled out.  If there isn't one filled out,
13   I'm not sure why that would be the case.  That would be very
14   rare.  And there would have been a telemedicine visit for this
15   medication, especially if we were changing the medication.
16   I'm the only person that would make a change to a patient's
17   medicine, so...
18   Q.   So the only time a prescription is changed, is you
19   made -- it's all in your handwriting; correct?
20   A.   I'm saying it's a change -- no.  I'm saying it's a change
21   that occurred as a result of talking to the patient and
22   determining a new course of treatment based on information
23   from the patient in regards to the medicine they'd been on the
24   previous month and that necessitating a change to continue
25   treatment.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 239 of 296   Pageid#:
11373

```
1    Q.   Okay.  I'm confused.  Is this a -- Wendell Wilson writes
2    it out if there's going to be a change or if there's not a
3    change?
4    A.   So if -- if there's a change -- so if there's not a
5    change, there's typically a may-fill date or a postdated
6    prescription in the chart that I have written and that would
7    be what the patient would receive if they -- if everything
8    goes -- they go through the screening process, they go through
9    the urine drug screen, they go through their pill counts and
10   there's no issues, checking for needle marks.  Then at the end
11   of that, then that postdated, or predated, or may-fill date
12   prescription would be issued.  And that's if there's no
13   changes to their therapy.
14         If there's a change that needs to be made after I
15   speak with the patient or in the course of all the compliance
16   screening, there is an issue with their compliance, they don't
17   pass their pill count, their previous month's urine drug
18   screen wasn't what it was supposed to be, if there was a
19   compliance issue, then that's also going to necessitate a
20   change in therapy.
21   Q.   And so then Wendell will make the change?
22   A.   No, I will make the change.  I would speak with the
23   patient after speaking with Mr. Wilson and gathering all the
24   relevant information that I can, and then I will speak with
25   the patient.  In some cases, this did happen by phone.
```

1    Q.   In some cases, it didn't happen at all.  There were

2    patients that didn't see you, didn't talk to you on the phone,

3    and they got a prescription?

4    A.   I don't know that that's true.  It could have happened,

5    but I don't know that that's true.  If there was no change in

6    therapy and for some reason I was completely out of pocket,

7    couldn't be reached, that may have happened, but it would have

8    been exceedingly rare.

9    Q.   Okay.  So all the prescriptions with Wendell Wilson's

10   handwriting up there at the top, those are ones where you were

11   not at the clinic; correct?

12   A.   Again, I don't necessarily know.  In some cases there may

13   have been a situation where I directed him to fill out the

14   information and then I signed it after he filled the

15   information out.

16   Q.   Well, that didn't happen, did it?

17   A.   In some situations I believe it did.

18   Q.   Okay.  Would you agree that in 90-some percent of the

19   prescriptions where it's Wendell's name -- I mean, Wendell's

20   handwriting, you weren't there?

21   A.   I don't have any data to agree or disagree with that

22   statement.

23   Q.   Okay.  You don't have any idea how many times Wendell

24   filled out prescriptions and you weren't there?

25   A.   It was very rare.  It was not a common occurrence.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 241 of 296   Pageid#:
11375

```
 1    Q.    It happened all the time towards the end, didn't it?

 2    A.    Towards what end?

 3    Q.    There were weeks where you were there one or two days.

 4    A.    Well, we were only open three days a week, so...

 5    Q.    Okay.  And there were weeks you were only there one or

 6    two days.

 7    A.    That was rare, but that did happen.

 8    Q.    There were prescriptions going out and you weren't

 9    talking to them on the phone; correct?

10    A.    That is not correct.

11    Q.    You talked to them all on the phone?

12    A.    To my knowledge, most patients were -- did have some type

13    of contact with me directly to confirm --

14    Q.    If you could answer my question.  Did you talk to all the

15    patients on the phone before Wendell Williams -- Wilson filled

16    out a prescription?

17    A.    If there was a change in therapy and Mr. Wilson did

18    this --

19    Q.    I didn't ask that.

20    A.    Well, you stipulated that he did.  So if he did, in that

21    case, I would have talked to the patient.

22    Q.    No.  The question, again, is, were there times Wendell

23    Wilson filled out the prescription, you had already pre-signed

24    the script a day or two before, and you didn't see the

25    patient?  You didn't talk to the patient?
```

1  A.   I don't believe that any -- that would have ever

2  occurred, no, sir.

3  Q.   Okay.  Now, you testified on direct that you -- you put a

4  special notation on the prescriptions.  Well, the reason you

5  put that notation on there was to try to get the pharmacy to

6  fill it; correct?

7  A.   No, sir.  It was there to provide the pharmacist with

8  additional information that, after speaking with pharmacists,

9  I found the more information that they had the faster they

10  could do their job and determine legitimate medical need.  And

11  that that helped them do their job better and so that just

12  became a standard practice of mine.

13  Q.   Now, your medical files that you kept, did you write down

14  what happened to that -- at your visits in your encounters?

15  A.   In some cases I did and in other cases I did not.

16  Q.   You're supposed to; right?  A good doctor would do that;

17  correct?

18  A.   I should have done a much better job of maintaining my

19  medical records.

20  Q.   You agree a good doctor, a doctor doing what doctors do

21  would keep track of what happened; correct?

22  A.   I don't agree with the generalization.  I do agree that I

23  should have done a better job.

24  Q.   And looking through your charts, you were -- you didn't

25  really have any experience in pain medicine; correct?

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 243 of 296   Pageid#: 11377

```
 1    A.    I -- I did.  I had education.  I had worked with a few
 2    different pain specialists.  I mean, I did not have the level
 3    of experience of a board certified specialist, no.
 4    Q.    And you really, really, really cared about your patients;
 5    correct?  You really wanted them to get the best treatment
 6    possible; correct?
 7    A.    I -- I did.
 8    Q.    And so in the charts, will we find a lot of times where
 9    you've referred the patients to, like, a legitimate pain
10    management clinic to help deal with the problem?
11    A.    There were not many clinics back home where they could
12    go.  And the way that process would work, especially for those
13    that --
14    Q.    You need to answer my question.  If we look through those
15    charts --
16    A.    That's -- that's not going to be found in the charts
17    because with a lot of these patients, the types of insurance
18    they had, those referrals needed to come from their primary
19    care physician so that they could get coverage for those new
20    referrals through their insurance.
21    Q.    All right.  Now, if a patient had, like, a real medical
22    problem where they actually needed you to do something, would
23    you deal with it?
24    A.    I don't understand.
25    Q.    If they had a real medical issue, like, not just that
```

```
1    they wanted pain pills but they had a real medical issue, just

2    something normal people want to go to the doctor for, would

3    you deal with it?

4    A.   Every patient I treated at my office had a real medical

5    problem, sir.

6    Q.   Okay.  So the answer is yes?

7    A.   As far as I'm aware, yes, sir.

8    Q.   And you felt like pain medicine with these high-powered

9    narcotics was something you could do over the phone, not see

10   the patient; right?

11   A.   These were patients that are being seen month to month

12   and this was on occasion within the 90-day period where they

13   had been seen on a month-to-month basis where they would --

14           MR. RAMSEYER:  I just want to show it to him.

15           THE WITNESS:  -- where they would -- if they were

16   not -- if we had no non-compliance issues and no changes in

17   therapy, there were circumstances where -- where we would do

18   what we could to try and help the patient.

19   BY MR. RAMSEYER:

20   Q.   So, Dr. Smithers, if you'd look at this.  This is the

21   text message exchange between you and a patient; correct?

22   A.   This does appear to be a text message.  It's between me

23   and a patient, yes, sir.

24           MR. RAMSEYER:  Your Honor, I move that this be

25   admitted at Government's Exhibit 108.
```

```
 1              THE COURT:  It will be admitted.
 2         (Government's Exhibit 108 received.)
 3              MR. RAMSEYER:  If we can publish this to the jury.
 4    BY MR. RAMSEYER:
 5    Q.   And that's an exchange between you and a patient;
 6    correct?
 7    A.   Yes, sir.
 8    Q.   It's yes or no.
 9    A.   Yes, sir, I believe so.
10    Q.   I'll leave it up so everybody gets a chance to read it,
11    actually.
12              Dr. Smithers, if any person comes into your clinic
13    and has got an MRI, says they're in pain, said Advil doesn't
14    work for them, you're giving them controlled substance; right?
15    A.   No, sir.  I disagree with the premise of your question.
16    That is not what occurred.  There were -- there was a time at
17    my practice where I allowed people with medical records to
18    come in.  That practice quickly changed after I opened my
19    practice in Martinsville and I began requiring patients to fax
20    their medical records to me first so I could review those
21    medical records and then make a determination whether I wanted
22    to see them as a patient.
23    Q.   All right.  Now, again, it's really important that
24    healthcare professionals work together; right?
25    A.   Yes, sir.
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 246 of 296   Pageid#:
11380

```
 1   Q.   I mean, would you want -- as a doctor, you would want to
 2   know the whole story about your patient; correct?
 3   A.   Yes, sir.  I tried to --
 4   Q.   You want to know what doctors they're going to.  You want
 5   to know what prescriptions they're getting; correct?
 6   A.   Yes, sir.
 7   Q.   It's important so that one doctor doesn't do something
 8   that might affect the other doctor; correct?
 9   A.   Yes, sir.
10   Q.   Pretty harmful to patient to withhold information from a
11   healthcare provider; correct?
12   A.   It could be.
13        MR. RAMSEYER:  Can I have just a moment, Your Honor?
14   BY MR. RAMSEYER:
15   Q.   Dr. Smithers, if we can go back to the Blakey Hurley
16   exhibit.
17        While they're doing that, what does "PRN" mean?
18   A.   As needed.
19   Q.   So that means somebody's got that prescription, they can
20   take it as needed; correct?  When the prescription says "as
21   needed" --
22   A.   As needed in the context of the rest of the directions on
23   the prescription, yes, sir.
24   Q.   So if they have a prescription taken as needed, that
25   means they take them when they think it's appropriate to take
```

it; correct?

A.   In the context of the prescription's other directions.
It's never just PRN and no other directions.  It's PRN and
other directions are given.  As this example, every 8 to
12 hours as needed for severe breakthrough pain.

Q.   Okay.  And this prescription is dated January 3rd, 2017;
correct?

A.   Yes, sir.

Q.   And I'm just trying to understand again, does Wendell
sign it if there is a change or if there -- I mean, does he
write it out if there is a change or if there's not a change?

A.   Typically, that would only occur if there was a change
and the postdated or may-fill date prescription in the chart
that was previously written by me could not be used because
there was a change in therapy.  So if there was a change in
therapy, that prescription gets shredded and a new
prescription has to -- has to be created to account for the
change in therapy.

Q.   All right.  So you're saying every prescription that we
see with Wendell Wilson's handwriting is going to be a change;
correct?

A.   I don't believe I've testified to that today.

Q.   Well, is that true or not?

A.   I can't say with absolute certainty that that is the
case, no, sir.  And this prescription I'm looking at now is in

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 248 of 296   Pageid#:
11382

```
1    my handwriting.
2    Q.   Now, your practice the entire time you were there, as
3    you've testified, every person got a controlled substance;
4    correct?
5    A.   At some point, I believe so, yes, sir.
6    Q.   And you wrote a letter to somebody one time describing
7    your clinic.  Do you remember that?
8    A.   Yes, sir, I do.
9              MR. RAMSEYER:  And I'd like to approach.
10             THE COURT:  Yes, sir.
11   BY MR. RAMSEYER:
12   Q.   And I'd like you to read that, that first paragraph,
13   please, of your letter that describes your practice at
14   Smithers Healthcare.
15   A.   All right.  I wrote, "The Center For Integrative Health
16   at Smithers Community Healthcare PC is to become the
17   community's primary resource for integrative medical care in
18   Martinsville, Virginia, as we serve adult patients with a
19   holistic healthcare model and treatment options focused on
20   improved function and health of the individual.  This will be
21   accomplished through a variety of modalities, including the
22   application of osteopathic and internal medicine principles
23   using medication and OMM, Osteopathic Manipulative Medicine,
24   as well as alternative therapies where appropriate on a
25   customized basis for each patient.
```

1      "I have regularly practiced OMM since medical school

2   and continue to help patients regularly with this proven

3   medical modality.  A cornerstone of the practice will be

4   strong advocacy for physical activity on a daily basis as the

5   patient is able, including basic but vital activities such as

6   walking, as well as other highly researched and recommended

7   physical activity options such as yoga and/or Pilates.  Our

8   goals will be to educate patients regarding their health to

9   facilitate improved outcomes manifested as improved daily

10  functioning, which hopefully translates to improved quality of

11  life."

12  Q.   Okay.  Why didn't you say, "I'm running a pain clinic"?

13  A.   My intention in writing this was what I wanted my office

14  to become.

15  Q.   And it wasn't -- that's not what your clinic was, is it?

16  A.   There are many things in this letter that I was doing at

17  my office, as described in this letter, and was pushing it

18  towards more of at the time it was drafted and written.

19  Q.   Okay.  Now, your patients paid $300, and they got a

20  prescription; correct?

21  A.   No.  They paid $300 and went through a rigorous

22  compliance program and had a medical office visit with a

23  physician and had someone that was on 24/7 hour call.

24  Q.   Okay.  Let me ask you about this.  So the payment was

25  actually 225 to you; correct?

```
 1   A.    At one point, yes, sir.

 2   Q.    Seventy-five to Wendell; correct?

 3   A.    To PPPFD.

 4   Q.    PPPFD.  And the $75 was for that compliance stuff.

 5   Correct?

 6   A.    Yes, sir.

 7   Q.    Now, going back to my other question, it's important that

 8   you share information with -- between physicians.  I want you

 9   to read a text message that you sent to Wendell, and let me

10   show you -- and if you could read the part that's highlighted

11   there to the jury as to what you sent to him about a patient.

12   If you could read it out loud, please.

13   A.    So "Wherever he -- wherever he is having increased or

14   worsening pain, he needs to see his primary care provider and

15   have at least X-rays done, as well as potentially a referral

16   to orthopedics."

17   Q.    And then what's your text message you say after that?

18   A.    "At no point during any discussion with his primary care

19   provider should he mention us."

20   Q.    Yeah.  Don't tell the primary care provider about us;

21   correct?

22   A.    That is not the correct context of that conversation.

23   You're misconstruing it.

24   Q.    "At no point during any discussion with his primary care

25   provider should he mention us."  That's what you said;
```

1    correct?

2    A.    You're misconstruing the context of that conversation,

3    sir.

4    Q.    Well, I mean, the context is you didn't want him to talk

5    to his primary care provider about you; correct?

6    A.    This is in the context of trying to get our patient a

7    medical procedure and referral approved through his insurance.

8    And for that process to typically work the way it's supposed

9    to, as I understand the text messages you're not having me

10   read to the jury, that that context -- I haven't had a chance

11   to review this whole page but that context is important for

12   this conversation.

13   Q.    Well, it was a simple question.  Did you tell Wendell to

14   tell the patient under no circumstances -- "At no point during

15   any discussion with his primary care provider should he

16   mention us"?

17   A.    That's what's in that text message.

18   Q.    Would that ever be appropriate for a patient to not tell

19   another provider that he's going to you and getting pain

20   pills?

21   A.    That's not what is in that context or in that

22   conversation.  It's in regards to a test and referral that a

23   patient needs for medical care.

24   Q.    Well, it's a simple question.  Did you tell Wendell to

25   tell the patient, "At no point during any discussion with his

     1    primary care prior should he mention us."  Did you say that?

     2    A.    In the context -- as it is on paper right there, but it's

     3    in a specific context.

     4    Q.    Well, the context is you say it's so it wouldn't mess up

     5    his insurance?

     6    A.    It would allow him to get the appropriate medial care he

     7    needed and have his insurance cover that care.

     8    Q.    But don't -- you agreed earlier it was important that

     9    healthcare providers work together and you know what everybody

    10    is doing.  So why wouldn't you want him to tell his provider

    11    that he was getting controlled substances from you?

    12    A.    That's not the context of that conversation.  That's a

    13    context of X-rays and the orthopedic referral, which is

    14    specifically so his insurance would be able to be billed and

    15    paid for.  Because if I order that X-ray and I refer him to an

    16    orthopedist, his insurance won't cover it because he's an

    17    out-of-state patient and his insurance won't cover --

    18    Q.    So why don't you tell him to tell his primary care

    19    provider about us but tell him to order it himself?

    20    A.    I'm not sure why I made that specific distinction, but

    21    the conversation, as far as I can tell, had nothing to do with

    22    controlled substances.

    23              MR. RAMSEYER:  Thank you.

    24              THE COURT:  All right.  Any further questions?

    25              Exhibit 108, is that admitted?

```
 1              MR. RAMSEYER:  Was -- 108 was the -- I picked it up.
 2    I'll get it.
 3              THE COURT:  All right.  Mr. Williams, let's not
 4    repeat.  All right?
 5              MR. WILLIAMS:  Okay.
 6                        REDIRECT EXAMINATION
 7    BY MR. WILLIAMS:
 8    Q.   Dr. Smithers, let's talk about Heather Hartshorn for just
 9    a minute.  You treated Heather on February the 20th, I
10    believe, of -- just prior to her death; is that correct?
11    A.   That's correct.
12    Q.   Okay.  And did you have any discussions with Heather
13    about her medications that day?
14    A.   I did, yes, sir.
15    Q.   What were those discussions about?
16              MR. RAMSEYER:  Your Honor, I think it exceeds the
17    direct -- or the cross.
18              THE COURT:  Yes, sir.  I mean, we've been through
19    his direct examination, Mr. Williams.
20    BY MR. WILLIAMS:
21    Q.   Did -- Dr. Smithers, did you have any -- Mr. Ramseyer
22    talked to you about flushing pills and stuff, that Mr. Wilson
23    flushed pills.  Did you have any concerns over flushing pills?
24    A.   I did.  I eventually actually did some research, and the
25    EPA, I believe, was recommending -- some study was
```

```
 1    recommending that that practice be ceased.  When I did the
 2    research on it, there were conflicting opinions at the time,
 3    but that -- that was the most prominent thing in my mind at
 4    the time and that's why I didn't flush all the pills.
 5    Q.   Okay.  Now, with respect to Sharon Mullins, when you met
 6    her at the Starbucks parking lot, why did you meet Sharon
 7    Mullins that day?
 8    A.   I had a sick child at home, and I myself was actually
 9    quite ill that day and I felt terrible that she had spent the
10    night in a hotel and that my office wasn't going to be open,
11    and I didn't know -- I mean, it was kind of an emergency.  I
12    didn't know any other way to proceed.  And it was probably an
13    error in judgment on my part to -- to -- to proceed that way.
14    Q.   Now, with -- going back to Heather Hartshorn, on -- did
15    you mail her any prescriptions?
16    A.   If I did, it may have been one time.  I don't recall
17    any --
18    Q.   You didn't mail her a prescription the day -- on the --
19    A.   Oh, no.  No.  I saw her in the office.  Yes, sir.
20    Q.   And you actually physically saw her?
21    A.   Yes, sir.
22    Q.   Did an examination?
23    A.   Yes, sir.
24    Q.   How many telemed visits did you have with people,
25    approximately?
```

```
1    A.    It varied.  It typically only would occur if I was on
2    vacation or if I was sick.  I mean, it -- there was -- I mean,
3    most weeks it didn't happen.  Then there were weeks where, I
4    mean, there may have been -- you know, we probably typically
5    saw 7 to 10 patients a day, you know, maybe 30 patients a
6    week.  So you know, if I wasn't there for the whole week --
7               THE COURT:  So do you know how many?
8               THE WITNESS:  I don't.  I don't.  Your Honor, I'm
9    sorry.  I'm rambling.  Yeah.  I don't know a specific number.
10   BY MR. WILLIAMS:
11   Q.    Okay.  Now, is it a fair statement to say that for the
12   majority of the time you actually --
13               MR. RAMSEYER:  Objection to leading, Your Honor.  I
14   mean, I know we're trying to move things along, but --
15               THE COURT:  Yes, sir, I'll sustain the objection.
16   BY MR. WILLIAMS:
17   Q.    Percentage-wise, how many times did you actually see the
18   patient in your office as compared to not?
19   A.    Over the amount of time I practiced, I would say maybe
20   five to ten percent.
21   Q.    Five to ten percent that you would do it through
22   telemedicine --
23   A.    Correct.
24   Q.    -- or that you wouldn't actually see the patient?
25   A.    Correct, yes, sir.
```

```
 1              MR. WILLIAMS:  No further questions, Your Honor.
 2              THE COURT:  All right.  Anything further?
 3              MR. RAMSEYER:  No, Your Honor.
 4              THE COURT:  All right.  Thank you, sir.  You may
 5      step down.
 6              All right.  Mr. Williams, do you have any further
 7      evidence?
 8              MR. WILLIAMS:  Your Honor, I think my client has one
 9      other witness that's supposed to be here tomorrow that he had
10      indicated.
11              THE COURT:  All right.  And that's the last witness?
12              MR. WILLIAMS:  It's -- we actually had two, but I
13      have not had a chance to contact the second one.  That was the
14      lady from Florida that I've advised the Court about, but I
15      have not been able to get ahold of her as of yet.
16              THE COURT:  All right.  Very well.
17              Now, we've ended with the doctor, Mr. Williams.  You
18      understand?
19              MR. WILLIAMS:  Yes, Your Honor.
20              THE COURT:  All right.  Ladies and gentlemen, I'm
21      sorry I kept you so late, but I think it had benefits.  So if
22      you could return tomorrow so we could begin at 9:00.  And
23      drive carefully, and we'll see you in the morning.  If you'll
24      follow the bailiff out.
25              (Proceedings held in the absence of the jury.)
```

          THE COURT:  All right.  Counsel, is there anything
we need to take up?  If not, we'll adjourn court until 9:00 in
the morning.

     (Proceedings concluded at 5:57 p.m.)

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5141*

1 **REPORTER'S CERTIFICATE**

2

3        I, DONNA J. PRATHER, do hereby certify that the

4 above and foregoing, consisting of the preceding 259 pages,

5 constitutes a true and accurate transcript of my stenographic

6 notes and is a full, true and complete transcript of the

7 proceedings to the best of my ability.

8        Dated this 7th day of June, 2019.

9

10

11        DONNA J. PRATHER, RPR, CRR, CBC, CCP
         Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

260



Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia



Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 249   Filed 07/17/19   Page 261 of 296   Pageid#: 11395

**$**

**$1,200** [1] - 232:18
**$100,000** [1] - 208:3
**$12,000** [1] - 207:25
**$280** [1] - 157:8
**$3,700** [1] - 157:1
**$30,000** [1] - 202:4
**$300** [10] - 186:6,
192:20, 232:10,
232:14, 232:22,
233:2, 236:5, 236:8,
250:19, 250:21
**$450** [2] - 190:18,
190:23
**$5400** [4] - 186:6,
188:21, 189:8, 189:18
**$6,000** [1] - 207:24
**$60,000** [2] - 204:3,
206:11
**$650,000** [1] - 201:19
**$75** [3] - 186:21,
189:4, 251:4

**-**

**'15** [1] - 193:7
**'17** [1] - 193:7
**'93** [1] - 23:10
**'99** [1] - 146:13

**0**

**082** [1] - 205:3

**1**

**1** [13] - 5:2, 5:7, 5:8,
5:9, 5:10, 6:6, 6:7,
11:8, 11:18, 12:9,
12:18, 13:1, 76:3
**1,000** [1] - 95:23
**1-21** [1] - 98:1
**1-A** [2] - 5:7, 5:21
**10** [2] - 83:4, 256:5
**100** [1] - 58:11
**108** [5] - 2:10,
245:25, 246:2,
253:25, 254:1
**109** [1] - 104:19
**1099** [2] - 202:18,
207:23
**10:06** [1] - 45:23
**10:20** [1] - 45:23
**10th** [1] - 93:24
**11** [3] - 6:23, 23:6,
47:8
**11:34** [1] - 90:3
**11th** [2] - 6:19, 93:25
**12** [6] - 25:14, 25:19,
32:22, 33:7, 48:11,

248:5
**12,000** [1] - 59:3
**12-hour** [1] - 24:6
**120** [2] - 65:21, 208:6
**120,000** [1] - 208:7
**122** [1] - 99:8
**13** [2] - 75:16, 136:3
**14** [5] - 47:8, 53:5,
136:3, 152:3, 206:25
**15** [1] - 64:9
**150** [2] - 58:12, 65:21
**1500** [1] - 95:23
**15th** [1] - 178:11,
178:13, 211:25
**16** [1] - 53:6, 212:19
**16th** [2] - 213:9,
215:8
**17** [2] - 47:18, 47:21
**175** [1] - 2:6
**175.8** [1] - 99:10
**17th** [2] - 215:18,
216:11
**18** [11] - 43:2,
146:24, 186:3, 186:4,
186:5, 186:6, 186:9,
188:4, 188:12,
188:20, 189:5
**180** [2] - 1:20, 113:2
**18th** [1] - 215:18
**19** [1] - 43:2
**19.9** [1] - 98:19
**1992** [1] - 150:8
**1993** [1] - 24:25
**1994** [1] - 151:6
**1995** [1] - 35:24
**1999** [1] - 121:2
**1:00** [5] - 53:9, 89:17,
89:21, 90:1, 90:3
**1:17-cr-00027-JPJ-
PMS-1** [1] - 1:6
**1A** [1] - 148:19
**1B** [1] - 148:20

**2**

**2** [4] - 12:21, 47:9,
64:15, 107:12
**20** [1] - 64:10,
176:15, 202:4
**20,000** [1] - 202:3
**20,000-something**
[1] - 202:13
**200** [1] - 65:22
**2000** [1] - 123:5
**2000s** [1] - 150:12
**2001** [6] - 49:9,
130:20, 136:20,
146:13, 147:12
**2002** [1] - 128:17
**2004** [2] - 49:10,

49:11
**2005** [1] - 146:23
**2007** [4] - 50:3, 50:8,
123:11, 143:23
**2008** [5] - 23:4,
133:16, 142:6,
147:22, 225:18
**2009** [2] - 142:10,
225:19
**2010** [4] - 121:3,
123:5, 123:10, 150:13
**2012** [4] - 52:3,
110:25, 150:13,
203:22
**2013** [5] - 53:4,
204:13, 204:14,
204:15, 206:1
**2014** [4] - 54:9,
206:12, 214:3, 214:6
**2015** [5] - 54:11,
54:16, 58:12, 60:10,
214:14
**2016** [3] - 60:12, 60:16,
57:4, 57:5, 62:1, 62:3,
63:21, 64:6, 76:14,
83:18, 87:9, 99:17,
108:5, 112:10,
149:14, 165:18,
171:16, 178:17,
178:18, 178:21,
195:21, 207:9,
207:10, 207:15,
224:12, 224:13,
226:25
**2016** [3] - 93:25,
165:18, 171:17
**2017** [6] - 29:24,
66:16, 178:11,
178:17, 195:18, 248:6
**2019** [1] - 1:12
**20th** [3] - 178:17,
178:18, 254:9
**21** [5] - 23:22, 47:21,
48:2, 181:2, 184:14
**22** [4] - 2:3, 212:19,
212:22, 215:8
**221** [1] - 113:1
**225** [1] - 250:25
**228** [1] - 2:10
**22nd** [1] - 216:17
**23rd** [2] - 217:18,
221:20
**24** [2] - 85:22, 105:11
**24/7** [1] - 250:23
**24210** [1] - 1:21
**24277** [1] - 1:24
**246** [1] - 2:10
**24th** [2] - 221:7,
221:21

**25** [4] - 32:23, 33:8,
34:17, 64:10
**254** [1] - 2:6
**25th** [1] - 226:25
**26** [1] - 216:17
**28** [2] - 76:3, 130:14
**29** [3] - 2:4, 125:2,
125:16
**2:20** [1] - 134:15
**2:36** [1] - 134:15

**3**

**3** [7] - 2:13, 64:15,
64:17, 126:10, 186:4,
186:6, 188:4
**3,000** [1] - 71:22
**30** [7] - 48:25, 65:21,
62:7, 66:12, 66:10,
338.21 [6] - 83:21,
99:21, 112:6, 122:13,
126:23, 150:24
**36.05** [1] - 184:18
**37** [1] - 125:16
**375** [3] - 187:1,
187:8, 187:15
**3rd** [2] - 76:14, 248:6

**4**

**4** [2] - 47:8, 207:24
**4,000** [2] - 59:22,
68:22
**4-H** [1] - 47:15
**40** [4] - 19:7, 19:10,
104:25, 162:12
**400-square** [1] -
211:11
**403** [3] - 4:13, 8:14,
13:6
**41** [1] - 107:23
**44** [1] - 2:4
**445** [1] - 193:10
**450** [3] - 186:17,
187:1, 187:8
**47** [2] - 2:5, 114:3
**49** [1] - 227:12
**4th** [2] - 221:12,
222:8

**5**

**5** [1] - 86:4
**50** [10] - 19:7, 19:10,
60:25, 75:10, 75:11,
204:3, 204:4, 206:11,

214:23, 214:25
**54** [4] - 127:14,
186:5, 186:6, 188:4
**54.16** [1] - 98:12
**5:12** [1] - 237:10
**5:26** [1] - 237:10
**5:57** [1] - 258:4

**6**

**6** [6] - 23:25, 25:14,
25:19, 32:22, 86:6
**60** [1] - 135:25
**60,000** [1] - 204:4
**601** [1] - 1:23
**64** [2] - 2:13, 93:22
**65** [2] - 23:23, 23:25

**7**

**7** [4] - 1:11, 1:12,
66:16, 256:5
**70** [2] - 67:7, 135:25
**72** [1] - 220:4
**724.2** [1] - 99:22
**724.4** [2] - 99:22,
128:6
**74** [1] - 113:9
**75** [5] - 130:9, 187:1,
187:8, 187:15, 199:10
**77** [1] - 24:7
**7:00** [3] - 68:13,
208:24, 230:13
**7th** [1] - 195:18

**8**

**8** [2] - 207:25, 248:4
**80** [1] - 97:6
**81** [1] - 113:2
**82** [1] - 99:8
**85** [1] - 99:9
**865** [1] - 193:20
**87** [1] - 227:6
**88-year-old** [1] -
49:20
**89** [4] - 2:10, 227:20,
228:3, 228:6
**8:00** [3] - 66:19,
68:13, 230:13

**9**

**9,000** [2] - 179:1,
179:5
**90** [2] - 35:11, 194:19
**90-day** [3] - 94:9,
95:10, 245:12
**90-some** [1] - 241:18
**92** [1] - 195:6
**96** [1] - 195:10
**97** [2] - 99:9, 113:3

**99** [1] - 113:2
**9:00** [4] - 3:1, 66:19, 257:22, 258:2

## A

**a.m** [6] - 3:1, 45:23, 45:24, 53:9, 66:19, 90:3
**A/P** [1] - 96:6
**abandon** [1] - 221:16
**abandoned** [2] - 221:8, 221:15
**ability** [6] - 7:14, 33:22, 42:10, 75:9, 85:5, 163:17
**ABINGDON** [1] - 1:4
**Abingdon** [1] - 1:21
**able** [50] - 4:10, 18:20, 19:18, 26:10, 30:23, 42:11, 48:7, 49:5, 49:22, 50:21, 52:22, 54:13, 54:25, 55:17, 56:3, 56:14, 61:3, 62:17, 69:24, 75:1, 75:2, 75:3, 76:7, 87:20, 87:21, 93:20, 96:21, 101:9, 102:3, 104:14, 148:20, 148:21, 156:24, 157:3, 159:11, 163:18, 165:4, 169:4, 172:16, 173:25, 174:1, 174:2, 192:25, 223:20, 229:18, 250:5, 253:14, 257:15
**absence** [5] - 45:18, 89:23, 134:5, 237:12, 257:25
**absolute** [1] - 248:24
**absolutely** [6] - 67:1, 107:21, 109:15, 112:14, 170:16, 171:14
**abuse** [9] - 11:3, 66:10, 75:5, 83:25, 88:8, 105:2, 146:14, 172:5
**abused** [3] - 31:16, 66:11, 69:24
**abusing** [1] - 7:19
**abusive** [1] - 10:24
**abusive-type** [1] - 10:24
**accelerated** [2] - 48:4, 49:3
**accept** [1] - 82:24
**accepted** [9] - 50:2, 51:3, 51:12, 51:13, 52:3, 192:24, 202:19, 203:8, 212:13

**access** [9] - 60:8, 159:15, 159:18, 160:20, 161:19, 161:21, 162:20, 214:2, 219:16
**accident** [44] - 30:13, 30:19, 39:12, 80:11, 80:18, 83:24, 91:19, 91:24, 92:1, 100:3, 100:13, 100:22, 107:17, 108:20, 109:7, 110:25, 111:7, 113:11, 114:11, 116:9, 116:11, 117:18, 118:14, 123:11, 130:17, 130:18, 131:13, 133:16, 133:18, 137:7, 138:11, 138:13, 139:8, 140:5, 140:19, 140:20, 146:23, 147:10, 147:22, 149:1, 149:13, 150:8, 153:14, 161:13
**accidents** [11] - 80:16, 92:2, 111:4, 111:15, 121:1, 126:12, 131:12, 139:4, 144:24, 146:12, 152:19
**accomplished** [1] - 249:21
**according** [5] - 65:7, 130:22, 130:23, 136:21, 192:5
**accordingly** [1] - 145:16
**account** [10] - 67:15, 67:19, 67:21, 68:3, 68:5, 145:14, 201:20, 202:12, 212:13, 248:17
**accountability** [1] - 87:6
**accounting** [5] - 59:4, 199:2, 199:12, 199:13, 199:15
**accurate** [6] - 32:23, 33:8, 183:20, 188:6, 214:3, 219:19
**accurately** [1] - 105:8
**aching** [1] - 96:2
**acquired** [1] - 126:6
**acquiring** [1] - 96:20
**Act** [2] - 95:8, 185:3
**acting** [1] - 96:23
**action** [1] - 180:1
**activities** [2] - 47:23,

250:5
**activity** [4] - 65:1, 234:3, 250:4, 250:7
**acts** [1] - 72:3
**actual** [5] - 24:20, 83:20, 155:2, 183:6, 201:5
**acupuncture** [1] - 171:4
**Adam** [1] - 47:4
**ADAM** [2] - 2:5, 46:21
**add** [1] - 93:19
**added** [2] - 139:9, 179:3
**addict** [2] - 36:23, 36:24
**adds** [1] - 172:2
**additional** [8] - 12:10, 49:21, 49:25, 74:5, 84:3, 119:2, 119:3, 243:8
**address** [8] - 3:10, 15:25, 22:20, 26:8, 26:16, 33:15, 33:23, 194:6
**addresses** [1] - 26:22
**adequate** [1] - 57:10
**adequately** [2] - 17:13, 61:4
**adjourn** [1] - 258:2
**adjusted** [3] - 76:2, 97:3, 102:12
**adjustments** [1] - 232:6
**administrative** [2] - 225:21, 225:25
**administrator** [3] - 57:8, 208:12, 208:18
**admissible** [2] - 157:18, 157:19
**admission** [2] - 5:8, 228:2
**admit** [1] - 39:16
**admitted** [12] - 5:2, 11:7, 11:12, 13:2, 64:16, 75:18, 75:19, 228:4, 245:25, 246:1, 253:25
**adult** [1] - 249:18
**advertised** [1] - 63:11
**advice** [8] - 16:14,

16:19, 16:21, 21:5, 21:9, 46:3, 46:9
**Advil** [1] - 246:13
**advise** [2] - 16:3, 16:19
**advised** [1] - 257:14
**advocacy** [1] - 250:4
**advocate** [1] - 171:12
**affect** [6] - 72:7, 72:9, 73:3, 73:18, 102:11, 247:8
**affects** [1] - 72:5
**afford** [1] - 96:21
**afternoon** [2] - 230:11, 230:14
**afterwards** [1] - [illegible]
[illegible]
**aggressive** [1] - 219:24
**ago** [10] - 33:21, 43:2, 71:23, 113:9, 113:10, 125:14, 181:22, 234:23, 235:4
**agree** [16] - 31:5, 31:19, 32:6, 177:11, 177:12, 177:14, 177:15, 184:9, 196:20, 201:19, 213:8, 241:18, 241:21, 243:20, 243:22
**agreed** [4] - 4:3, 6:20, 221:5, 253:8
**agreement** [4] - 10:3, 105:13, 188:23, 221:6
**Agreement** [1] - 172:3
**ahead** [9] - 21:1, 65:10, 95:12, 138:5, 157:16, 166:19, 169:19, 170:6, 181:9
**ahold** [2] - 18:20, 257:15
**aid** [1] - 79:17
**Aided** [1] - 1:25
**ailments** [2] - 82:5, 150:5
**ain't** [1] - 42:3
**Air** [14] - 47:19, 51:1, 51:3, 53:13, 53:13, 205:22, 209:24, 225:16, 225:17, 225:18, 226:2, 226:5, 226:14, 226:18

**air** [1] - 17:19
**Alabama** [1] - 51:5
**alcohol** [6] - 8:19, 8:23, 37:4, 53:11, 204:25, 205:23
**alcoholic** [1] - 37:5
**alcoholism** [1] - 7:12
**Aleve** [1] - 70:15
**allegation** [3] - 4:1, 10:25, 12:6
**allegations** [1] - 3:20
**alleged** [1] - 13:9
**allegedly** [1] - 8:17
**alleve** [1] - 71:23
**allopathic** [1] - 50:12
**allow** [8] - 13:25, 30:13, 73:10, 85:7, 89:16, 182:5, 184:7, 253:6
**allowed** [10] - 3:12, 4:16, 58:23, 72:1, 73:20, 74:23, 134:9, 167:24, 183:7, 246:17
**allows** [2] - 98:6, 98:8
**almost** [5] - 59:2, 71:18, 138:19, 204:24, 232:8
**alone** [1] - 156:25
**altercation** [1] - 128:17
**alternative** [3] - 170:14, 190:12, 249:24
**Amanda** [1] - 145:4
**ambiguity** [1] - 214:21
**AMERICA** [1] - 1:5
**America** [3] - 60:13, 201:23, 212:12
**American** [3] - 2:13, 63:18, 64:5
**amitriptyline** [1] - 74:15
**amount** [10] - 33:10, 37:2, 67:11, 67:13, 130:1, 163:14, 172:18, 172:20, 191:4, 256:19
**amounts** [1] - 193:2
**Andre** [1] - 150:21
**angel** [1] - 229:16
**Angel** [4] - 47:8, 61:14, 193:24, 198:23, 199:24, 202:16
**Angela** [1] - 193:24
**angle** [1] - 138:18
**ankle** [1] - 148:11
**annualized** [1] -

208:5

**answer** [34] - 12:14, 37:11, 37:14, 41:25, 43:8, 44:10, 45:5, 111:8, 121:17, 122:3, 159:1, 162:1, 177:15, 177:19, 183:15, 189:17, 190:1, 190:8, 200:6, 200:9, 202:25, 203:11, 211:13, 212:10, 214:10, 220:24, 223:4, 232:3, 238:23, 239:1, 242:14, 244:14, 245:6

**answered** [3] - 27:24, 45:2, 173:11

**answers** [2] - 27:15, 238:5

**anticipates** [1] - 95:23

**anxiety** [1] - 10:11

**anyway** [3] - 6:1, 30:9, 203:15

**apologies** [2] - 78:11, 114:22

**apologize** [3] - 4:25, 72:13, 75:20

**apostrophe** [1] - 108:19

**appeal** [2] - 207:18, 207:19

**appealed** [1] - 225:7

**appear** [6] - 80:3, 106:22, 110:14, 112:6, 118:7, 245:22

**appeared** [2] - 30:4, 178:11

**application** [2] - 51:13, 249:22

**applied** [6] - 6:13, 6:14, 55:17, 56:7, 215:2, 223:24

**apply** [2] - 49:22, 215:4

**approach** [9] - 50:12, 63:23, 87:19, 88:1, 106:6, 180:23, 226:21, 234:16, 249:9

**approached** [2] - 86:24, 210:10

**approaches** [1] - 89:3

**appropriate** [11] - 9:23, 89:13, 107:9, 177:6, 177:11, 177:14, 177:18, 247:25, 249:24, 252:18, 253:6

**appropriately** [1] - 105:9

**approval** [3] - 6:24, 9:8

**approved** [4] - 6:22, 75:6, 167:5, 252:7

**April** [7] - 57:4, 57:5, 93:25, 149:14, 207:9, 207:16, 225:18

**aptitude** [1] - 52:25

**area** [15] - 26:6, 29:21, 33:15, 34:19, 44:24, 55:13, 72:5, 101:13, 118:8, 118:10, 118:11, 149:11, 166:22, 193:19, 193:20

**areas** [7] - 72:7, 72:8, 80:23, 101:9, 139:11, 142:24, 155:4

**arena** [1] - 50:20

**argument** [4] - 11:21, 11:22, 12:6, 14:25

**arise** [1] - 165:11

**Arkansas** [1] - 49:19

**arm** [4] - 81:10, 81:11, 145:1, 152:14

**arms** [1] - 145:9

**arranged** [1] - 234:5

**arrangement** [1] - 203:8

**arrangements** [1] - 163:6

**arrow** [1] - 95:25

**arrows** [1] - 77:18

**arthritis** [3] - 123:5, 123:21, 150:6

**article** [3] - 5:2, 5:3, 5:5

**artist** [2] - 72:13, 238:4

**arts** [2] - 59:1, 221:12

**Arts** [1] - 59:18

**AS"** [1] - 194:2

**ashamed** [1] - 160:11

**Ashley** [1] - 215:21

**aspect** [1] - 4:20

**aspects** [2] - 105:1, 175:11

**Assad** [1] - 228:18

**assess** [7] - 87:21, 101:9, 101:19, 105:1, 115:18, 172:16, 219:5

**assessed** [1] - 128:5

**assessing** [2] - 101:23, 103:11

**Assessment** [30] - 99:2, 118:4, 123:15, 124:8, 125:17,

126:21, 127:25, 129:20, 130:2, 131:15, 132:13, 133:5, 135:1, 136:7, 136:15, 139:14, 140:8, 140:25, 141:18, 143:13, 144:16, 144:22, 145:17, 146:10, 147:13, 148:4, 150:21, 151:8, 153:1, 153:15

**assessment** [23] - 102:8, 104:15, 107:14, 112:3, 117:15, 118:13, 122:11, 129:1, 143:1, 144:8, 145:14,

**assessment/plan** [1] - 96:6

**assessments** [1] - 128:12

**assist** [1] - 192:22

**assistance** [1] - 156:18

**Assistant** [1] - 200:5

**assistant** [3] - 49:19, 98:7, 200:8

**assistants** [1] - 215:19

**associated** [5] - 73:5, 135:14, 137:13, 146:18, 149:21

**Associated** [1] - 103:4

**Association** [2] - 24:17, 24:18

**association** [1] - 35:23

**assume** [4] - 21:10, 24:4, 188:19, 189:24

**assumed** [1] - 221:23

**assuming** [1] - 9:22

**assumption** [2] - 190:1, 190:4

**assurance** [1] - 225:13

**assure** [1] - 28:10

**attach** [1] - 72:25

**attachment** [2] - 11:5, 11:6

**attempt** [1] - 80:1

**attempted** [1] -

215:20

**attend** [1] - 24:18

**attended** [1] - 64:6

**attending** [1] - 52:19

**attention** [1] - 13:20

**attorney** [12] - 16:17, 16:24, 37:12, 54:2, 54:3, 134:9, 213:7, 220:2, 221:17, 221:19, 221:23, 221:24

**Attorneys** [1] - 1:20

**ATV** [5] - 100:3, 100:5, 100:21, 140:20, 144:24

**auditioning** [1] - 218:7

224:13

**authenticated** [1] - 15:12

**authorities** [1] - 217:19

**authority** [2] - 4:10, 10:15

**authorize** [1] - 180:13

**authorized** [1] - 180:7

**automatically** [1] - 119:7

**autopsy** [1] - 12:2

**available** [12] - 25:8, 32:16, 61:15, 113:16, 113:17, 114:17, 119:1, 127:5, 129:13, 133:21, 143:16, 161:6

**average** [1] - 86:3

**averaged** [1] - 23:22

**awarded** [1] - 64:12

**aware** [13] - 38:1, 70:21, 70:22, 142:14, 160:12, 161:7, 161:8, 161:9, 197:18, 198:1, 198:14, 218:11, 245:7

**B**

**B19** [1] - 1:20

**babies** [1] - 52:12

**back's** [1] - 92:14

**background** [3] - 6:10, 88:10, 225:17

**backing** [1] - 211:7

**backpack** [8] - 11:1, 67:7, 68:6, 68:21, 68:24, 195:13, 196:2, 196:21

**backward** [1] - 101:15

**bad** [6] - 53:14, 54:5, 75:4, 163:1, 176:17, 205:23

**bag** [3] - 199:7, 199:9, 199:10

**baggies** [2] - 68:16, 195:24

**bags** [1] - 210:18

**bailiff** [4] - 45:17, 89:22, 134:3, 257:24

**balance** [1] - 103:11

**bank** [4] - 29:7, 199:8, 201:20, 202:10

**Bank** [2] - 201:23, 212:12

**bar** [1] - 128:18

**barely** [1] - 35:17

**base** [1] - 173:21

**baseball** [1] - 61:17

**based** [58] - 12:1, 21:5, 40:3, 79:8, 81:16, 81:19, 92:21, 92:22, 92:24, 100:20, 101:10, 102:3, 106:22, 107:19, 109:11, 112:11, 113:18, 113:20, 115:2, 120:13, 120:17, 122:15, 122:18, 123:1, 123:22, 123:24, 124:2, 126:2, 126:5, 127:7, 128:12, 129:13, 129:23, 130:24, 131:23, 132:11, 133:1, 133:19, 135:21, 138:7, 143:4, 143:16, 145:13, 145:15, 158:6, 158:8, 158:11, 159:7, 160:19, 173:22, 177:25, 189:22, 219:24, 223:21, 224:18, 239:22

**basic** [2] - 184:20, 250:5

**basing** [1] - 40:2

**basis** [9] - 12:14, 39:10, 67:19, 94:18, 103:16, 163:10, 245:13, 249:25, 250:4

**basket** [1] - 113:11

**Bassam** [1] - 83:15,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

119:21
**bathroom** [1] - 68:18
**bathtub** [1] - 123:10
**Battaglia** [23] -
75:23, 76:12, 76:16,
76:17, 77:3, 77:10,
77:22, 78:18, 80:6,
80:8, 80:17, 80:20,
81:13, 81:15, 90:16,
90:19, 91:6, 91:10,
93:7, 93:8, 95:18,
96:8, 156:9
**Battaglia's** [4] - 82:8,
84:4, 84:15, 93:24
**batteries** [1] - 130:21
**bear** [1] - 42:5
**Beaver** [10] - 207:14,
210:4, 220:19,
220:20, 221:10,
222:10, 222:20,
222:22, 222:25,
223:23
**became** [13] - 6:11,
50:25, 58:19, 71:5,
74:5, 109:5, 149:3,
161:8, 163:25, 164:1,
198:1, 207:20, 243:12
**Beckley** [7] - 28:14,
58:9, 59:18, 210:4,
212:6, 213:15, 222:6
**become** [3] - 61:15,
249:16, 250:14
**becomes** [1] - 32:3
**bedridden** [3] -
30:14, 31:1, 166:6
**bedtime** [1] - 97:2
**beer** [1] - 53:7
**began** [17] - 4:6, 4:7,
48:3, 51:5, 57:3,
59:14, 62:22, 63:3,
63:14, 65:14, 66:3,
66:7, 87:9, 142:6,
143:23, 143:24,
246:19
**begin** [8] - 10:23,
38:20, 54:20, 65:3,
67:16, 79:23, 173:22,
257:22
**beginning** [2] -
105:14, 163:13
**begins** [1] - 95:25
**BEHALF** [2] - 2:9,
2:12
**behalf** [4] - 1:18,
1:22, 16:4, 30:12
**behind** [5] - 28:3,
97:13, 168:10,
234:23, 235:4
**below** [2] - 61:18,
83:14

**bending** [1] - 103:1
**beneficial** [1] - 24:21
**benefit** [6] - 17:22,
32:1, 51:7, 74:23,
104:9, 234:10
**benefits** [2] - 24:15,
257:21
**Benzodiazepines** [1]
- 12:4
**benzodiazepines** [3]
- 6:3, 11:19, 44:17
**berated** [1] - 87:17
**best** [13] - 31:25,
33:21, 33:22, 89:6,
105:6, 105:7, 160:3,
160:24, 161:1, 164:4,
165:20, 187:21, 244:5
**Bethany** [1] - 58:8
**better** [23] - 53:8,
66:6, 70:9, 70:12,
74:9, 74:16, 76:5,
84:24, 92:3, 96:21,
102:10, 103:9,
103:14, 104:14,
159:18, 172:25,
173:23, 173:24,
243:11, 243:18,
243:23
**between** [23] - 2:10,
25:14, 38:9, 39:1,
43:19, 53:8, 58:11,
71:15, 106:25,
131:12, 142:14,
150:13, 162:12,
172:3, 201:21, 202:4,
204:3, 208:17, 225:3,
245:21, 245:22,
246:5, 251:8
**beyond** [3] - 47:17,
49:13, 214:24
**big** [6] - 31:9, 41:7,
43:3, 59:4, 59:23,
211:18
**biggest** [1] - 109:3
**bilateral** [2] - 142:10,
143:6
**bill** [5] - 98:3, 98:5,
99:20, 157:5, 157:9
**billed** [1] - 253:14
**Billie** [1] - 142:17
**bills** [3] - 24:2,
156:24, 232:17
**Billy** [2] - 147:19,
155:14
**biohazard** [1] - 71:1
**biopsy** [1] - 125:10
**bird** [4] - 166:15,
166:20, 167:21,
184:23
**birth** [1] - 93:25

**bit** [22] - 28:12,
47:10, 50:16, 66:13,
66:14, 67:12, 85:13,
90:17, 91:1, 91:2,
91:17, 112:3, 128:4,
142:21, 147:22,
189:14, 204:16,
225:16, 230:22,
234:23, 235:4
**bite** [1] - 53:7
**blades** [1] - 107:1
**Blair** [9] - 97:25,
98:1, 98:17, 98:25,
99:13, 99:24, 100:1,
100:10, 156:7
**Blair's** [1] - 99:2
**Blakely** [3] - 136:6,
136:7, 138:8
**blessed** [1] - 24:12
**Blevins** [3] - 106:15,
106:20, 107:7
**blew** [1] - 43:2, 205:3
**blood** [6] - 41:4,
96:22, 99:7, 99:8,
113:2, 167:1
**bloom** [1] - 58:4,
56:8, 209:11
**Bloom's** [1] - 207:14
**Blue** [8] - 52:5,
157:6, 157:8, 157:21,
157:22, 203:24
**Bluefield** [5] - 54:9,
55:2, 55:3, 206:3,
206:4
**Bluestone** [13] -
56:23, 56:24, 57:3,
57:6, 57:14, 57:20,
57:58, 65:18, 70:4,
166:14, 207:4, 207:21
**bluestone** [1] - 56:25
**Bo** [1] - 135:7
**board** [6] - 26:12,
54:22, 56:12, 56:14,
206:20, 244:3
**Board** [8] - 2:13, 8:2,
8:8, 9:14, 24:19, 31:7,
55:18, 64:5
**Bobby** [2] - 132:5,
132:24
**Bodai** [6] - 142:15,
187:14, 187:25,
198:18, 199:24,
202:16
**body** [20] - 72:4,
72:8, 72:17, 72:18,

72:19, 72:21, 72:24,
73:9, 85:15, 85:20,
92:4, 101:8, 117:8,
117:11, 138:17,
138:18, 141:24,
164:14, 172:7
**bolt** [1] - 136:22
**bolter** [1] - 121:4
**bone** [1] - 123:7
**bones** [1] - 138:22
**book** [2] - 11:10,
194:11
**books** [2] - 24:13,
163:11
**bottle** [1] - 197:2
**bottles** [3] - 67:7,
197:6, 197:7
**bottom** [1] - 35:17,
107:22, 107:23,
107:24, 107:25,
108:10, 108:15,
108:24, 109:16,
109:17, 110:11,
111:20, 111:21,
112:2, 156:5
**box** [5] - 35:17,
67:11, 84:11, 202:1,
202:6
**Box** [1] - 1:23
**boxes** [1] - 36:8
**boyfriend** [1] -
146:14
**brain** [3] - 72:6,
72:23, 73:3
**Brasfield** [1] - 39:12
**break** [2] - 134:2,
237:4
**breakdown** [1] -
71:15
**breakthrough** [2] -
27:12, 248:5
**breast** [1] - 141:24
**breasts** [1] - 142:9
**breath** [2] - 53:12,
205:1
**Brenda** [4] - 20:24,
125:2, 125:17, 195:25
**Brief** [6] - 84:18,
93:23, 236:10,
236:13, 236:18, 239:6
**brief** [2] - 36:9,
165:17
**bring** [5] - 13:13,
13:19, 78:12, 134:17,
183:1

**bringing** [1] - 163:7
**Bristol** [3] - 33:25,
39:11, 39:13
**broken** [1] - 151:6
**brother** [4] - 35:4,
35:23, 36:19, 38:15
**brother's** [1] - 35:22
**brothers** [1] - 35:24
**brought** [7] - 18:19,
68:16, 79:12, 105:23,
115:7, 115:9, 233:4
**Brown** [1] - 112:16
**brown** [5] - 112:17,
112:18, 113:7, 113:8,
113:24
**Brownsville** [1] -
26:25
**Bryan** [2] - 127:14,
156:1
**BS** [1] - 23:14
**bucks** [1] - 199:10
**building** [7] - 58:17,
58:25, 59:1, 59:3,
59:6, 156:25, 221:12
**Building** [1] - 59:19
**bunch** [2] - 96:5,
222:24
**burden** [1] - 16:10
**burning** [1] - 96:2
**business** [18] -
35:23, 35:25, 48:3,
48:9, 48:15, 48:21,
59:12, 59:13, 59:16,
178:23, 193:9,
212:13, 217:12,
217:16, 218:3
**buttock** [2] - 118:10,
118:11
**buttocks** [1] - 143:7
**BY** [76] - 2:3, 2:4,
2:4, 2:5, 2:6, 2:6,
22:10, 22:22, 28:1,
29:2, 40:21, 43:13,
44:15, 47:2, 64:1,
64:18, 65:11, 73:12,
73:17, 74:2, 75:21,
76:21, 77:2, 78:17,
80:5, 82:16, 84:14,
90:13, 91:9, 95:13,
101:1, 110:10,
111:18, 114:23,
115:16, 116:14,
119:19, 120:16,
121:11, 121:19,
122:6, 126:20,
134:23, 138:6,
157:23, 159:3, 163:4,
165:14, 170:8,
173:16, 175:5, 178:6,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

181:1, 183:16,
190:15, 194:23,
195:7, 195:11,
198:10, 200:12,
214:16, 226:24,
227:21, 228:7,
234:19, 235:7,
237:19, 239:5,
245:19, 246:4,
247:14, 249:11,
254:7, 254:20,
256:10, 256:16
  **bypass** [4] - 170:3,
181:18, 181:24, 182:2

## C

**C-II** [3] - 162:23,
182:19, 182:24
  **Cadillac** [1] - 195:4
  **Cagle** [1] - 1:19
  **calendar** [2] - 60:17,
214:23
  **California** [1] - 84:5
  **calmer** [1] - 225:14
  **Calve** [1] - 144:13
  **Calve-Perthes** [1] -
144:13
  **cancer** [9] - 35:12,
36:5, 48:16, 105:15,
105:16, 109:25,
125:7, 145:20, 145:22
  **candidates** [1] -
110:4
  **Candy** [1] - 126:9
  **cannot** [2] - 16:17,
227:15
  **capacity** [4] - 51:9,
102:2, 102:3, 103:15
  **Captain** [1] - 227:3
  **car** [27] - 39:12,
68:14, 80:10, 80:16,
92:1, 92:2, 116:9,
116:11, 126:12,
131:13, 133:16,
139:4, 139:8, 145:6,
146:12, 146:23,
147:10, 149:13,
152:18, 161:13,
194:24, 195:1, 195:2,
195:8, 198:16, 201:3,
222:4
  **carbon** [3] - 97:11,
97:13, 97:14
  **card** [2] - 165:9,
212:17
  **cards** [3] - 195:8,
199:3
  **care** [66] - 3:21,
20:18, 30:18, 31:20,
34:2, 49:20, 56:11,

57:10, 57:21, 57:23,
58:10, 58:12, 58:13,
58:14, 59:7, 59:13,
59:24, 60:15, 60:16,
61:4, 62:10, 62:19,
68:17, 70:3, 70:24,
87:19, 115:11,
115:13, 161:21,
162:20, 174:3,
207:13, 208:23,
210:6, 214:2, 217:5,
217:12, 217:14,
217:16, 218:2,
218:18, 218:21,
223:16, 223:19,
223:22, 224:14,
224:16, 232:19,
244:19, 249:17,
251:14, 251:18,
251:20, 251:24,
252:5, 252:15,
252:23, 253:1, 253:6,
253:7, 253:18
  **Care** [12] - 3:21,
52:5, 56:24, 56:25,
57:2, 59:14, 210:14,
211:7, 211:23,
211:25, 212:5, 215:9
  **cared** [3] - 159:12,
173:18, 244:4
  **career** [2] - 82:4,
162:23
  **carefully** [1] - 257:23
  **caretaker** [1] -
126:13
  **Carolina** [10] - 6:10,
7:16, 10:12, 47:6,
52:5, 53:2, 53:10,
54:6, 55:15, 236:3
  **Carolina's** [1] - 6:12
  **carpooled** [1] - 234:9
  **carried** [1] - 141:25
  **carrying** [1] - 67:13
  **cars** [1] - 84:5
  **Carter** [1] - 157:15
  **Carter's** [1] - 157:22
  **case** [39] - 6:1, 8:17,
14:19, 15:17, 16:11,
16:13, 21:25, 46:18,
80:3, 82:8, 83:9, 84:4,
85:8, 89:15, 89:25,
97:19, 98:17, 110:24,
117:5, 119:2, 119:4,
124:19, 135:15,
142:24, 163:15,
167:22, 180:4, 182:8,
194:3, 194:18, 203:9,
227:2, 231:11,
231:13, 233:5,
239:13, 242:21,

248:25
  **Case** [1] - 1:6
  **cases** [25] - 65:22,
87:18, 92:20, 106:1,
106:5, 115:9, 115:10,
138:18, 165:8,
169:10, 169:13,
171:25, 193:3, 217:6,
231:10, 232:5, 232:6,
234:10, 236:21,
240:25, 241:1,
241:12, 243:15
  **cash** [23] - 67:11,
67:12, 67:13, 198:18,
198:20, 198:23,
198:25, 199:7,
199:10, 201:20,
201:21, 201:25,

**category** [1] - 158:9
  **cattle** [1] - 48:24
  **catty** [1] - 59:22
  **caused** [10] - 83:24,
83:25, 108:19, 136:5,
136:24, 137:20,
148:1, 149:2, 149:14
  **causes** [7] - 10:22,
11:2, 14:10, 84:3,
126:11, 131:11, 150:7
  **causing** [3] - 31:16,
138:3, 147:1
  **CE** [1] - 24:18
  **ceased** [1] - 255:1
  **ceiling** [1] - 121:5
  **cell** [1] - 33:2
  **cellular** [1] - 72:11
  **center** [2] - 48:16,
59:8
  **Center** [5] - 193:8,
206:4, 206:8, 207:4,
249:15
  **centers** [4] - 56:8,
56:9, 56:10, 56:18
  **central** [2] - 72:4,
72:5
  **CEO** [2] - 209:12,
209:14
  **certain** [29] - 3:12,
5:4, 9:5, 9:19, 69:17,
71:25, 72:1, 79:16,
79:17, 92:12, 92:15,
92:18, 101:9, 101:13,
101:14, 101:20,
106:1, 160:10, 164:1,
164:25, 166:5,

181:11, 184:4, 198:2,
198:3, 211:4, 225:3,
228:25
  **certainly** [23] - 3:17,
4:15, 4:23, 8:7, 10:9,
10:14, 10:21, 11:2,
12:7, 12:9, 12:13,
14:10, 14:22, 16:20,
103:17, 103:20,
105:22, 112:14,
160:7, 173:4, 175:11,
178:3, 218:17
  **certainty** [1] - 248:24
  **certificate** [3] - 64:4,
64:11, 64:12
  **Certification** [1] -
2:13

  **chance** [5] - 77:9,
117:9, 132:19, 132:20
  **chance** [5] - 77:9,
212:9, 246:10,
252:10, 257:13
  **change** [38] - 17:11,
48:8, 63:13, 65:4,
65:13, 85:2, 85:9,
120:14, 167:22,
168:8, 168:10, 182:4,
184:8, 206:9, 238:21,
239:3, 239:16,
239:20, 239:24,
240:2, 240:3, 240:4,
240:5, 240:14,
240:20, 240:21,
240:22, 241:5,
242:17, 248:10,
248:11, 248:12,
248:15, 248:18,
248:20
  **changed** [15] -
18:11, 23:14, 33:20,
83:19, 84:25, 106:10,
106:11, 167:24,
170:2, 170:3, 170:4,
184:5, 193:3, 239:18,
246:18
  **changes** [5] - 31:9,
43:3, 85:8, 240:13,
245:16
  **changing** [3] - 27:9,
184:7, 239:15
  **charge** [1] - 10:25
  **charged** [6] - 75:12,
180:14, 186:17,
190:18, 190:23, 199:4

  **charges** [2] - 35:22,
157:22
  **charging** [2] -
163:14, 193:2
  **Charlene** [2] -
145:17, 155:18
  **Charleston** [1] -
56:16
  **Charlottesville** [1] -
36:5
  **chart** [10] - 68:19,
82:2, 82:9, 82:20,
89:8, 104:1, 169:11,
201:22, 240:6, 248:13
  **charts** [7] - 104:3,
111:24, 155:10,
243:24, 244:8,
244:15, 244:16
  **check** [6] - 88:18,
114:15, 152:23,
199:17, 199:20,
199:25
  **Check** [1] - 102:17
  **checkbook** [2] -
42:17, 42:18
  **checked** [2] - 77:8,
140:22
  **checking** [2] -
181:14, 240:10
  **checks** [2] - 88:10,
181:16
  **cheerleading** [1] -
126:12
  **chemical** [2] - 7:13,
7:18
  **Chicago** [1] - 63:19
  **chief** [8] - 50:15,
79:25, 139:17,
143:16, 145:7, 148:8,
150:24, 172:17
  **child** [2] - 30:7,
255:8
  **children** [1] - 29:14
  **chiropractic** [1] -
50:18
  **choice** [3] - 53:19,
53:20, 158:22
  **chose** [4] - 53:22,
53:23, 56:20, 106:6
  **Christian** [3] - 47:12,
47:13, 47:18
  **chronic** [119] - 25:25,
34:1, 35:10, 36:25,
39:10, 60:9, 61:1,
62:19, 62:20, 65:24,
73:11, 74:10, 74:20,
75:7, 80:12, 81:18,
83:22, 83:23, 84:2,
84:7, 91:25, 92:9,
93:2, 96:12, 96:13,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

98:20, 98:21, 99:21, 102:20, 106:1, 106:24, 107:1, 107:10, 108:6, 109:24, 110:24, 112:7, 114:6, 116:24, 117:6, 117:7, 117:14, 118:6, 118:8, 119:9, 122:13, 123:19, 125:20, 126:1, 126:24, 128:7, 128:20, 129:5, 129:24, 131:9, 131:19, 132:19, 133:10, 133:11, 133:17, 135:8, 135:9, 135:14, 135:18, 136:1, 136:10, 137:8, 137:11, 137:12, 137:17, 139:18, 139:19, 140:6, 140:12, 140:21, 141:4, 141:5, 142:2, 143:19, 143:20, 144:10, 144:14, 144:19, 145:2, 145:24, 146:11, 146:13, 146:16, 146:19, 147:5, 147:9, 147:17, 148:1, 148:8, 148:15, 149:6, 149:19, 150:5, 150:7, 150:25, 151:1, 151:10, 151:19, 152:4, 152:8, 152:19, 153:17, 159:18, 160:20, 168:6, 170:19, 170:21, 207:18, 224:21

**chute** [1] - 150:11
**circle** [2] - 83:13, 98:8
**circling** [1] - 99:4
**circumstance** [4] - 165:11, 189:2, 190:11, 224:23
**circumstances** [10] - 163:16, 167:21, 181:11, 188:8, 216:3, 232:15, 232:16, 232:18, 245:17, 252:14
**claim** [1] - 117:16
**clarified** [1] - 214:20
**clarify** [1] - 109:17
**Clarkson** [1] - 58:5
**class** [4] - 74:13, 74:14, 185:3
**classify** [1] - 71:16
**Clayton** [3] - 113:23,

---

114:4, 156:3
**CLBP** [1] - 137:17
**clean** [1] - 9:20
**clear** [7] - 10:12, 37:15, 58:19, 62:10, 100:16, 126:15, 154:24
**cleared** [1] - 4:4
**clearly** [1] - 140:3
**CLERK** [9] - 21:23, 22:3, 22:5, 46:16, 71:12, 75:17, 82:14, 84:11, 194:22
**clerk** [2] - 6:5, 21:20
**Clerk** [3] - 6:7, 12:24, 15:19
**click** [1] - 5:4
**client** [6] - 3:18, 10:10, 11:15, 12:11, 20:15, 257:8
**client's** [1] - 3:6
**climbed** [1] - 124:17
**Clinic** [16] - 193:9, 193:10, 200:18, 200:22, 203:16, 209:8, 209:10, 209:14, 210:4, 210:9, 211:2, 212:22, 213:2, 213:9, 218:8, 220:20
**clinic** [47] - 58:7, 58:20, 61:2, 98:5, 166:21, 184:24, 193:8, 193:13, 193:14, 200:22, 201:6, 207:14, 207:18, 208:12, 210:3, 210:10, 210:13, 210:23, 211:10, 213:12, 213:17, 213:19, 214:4, 215:1, 215:3, 218:3, 218:14, 219:19, 220:5, 220:19, 220:20, 221:9, 222:13, 223:24, 224:21, 225:6, 227:22, 229:12, 230:7, 231:7, 241:11, 244:10, 246:12, 249:7, 250:12, 250:15
**clinics** [12] - 58:22, 63:10, 166:15, 200:19, 200:25, 213:13, 213:14, 213:23, 214:17, 217:20, 223:14, 244:11
**clipboard** [2] - 77:5, 130:13

---

**clock** [1] - 70:8
**close** [7] - 25:3, 29:22, 30:1, 34:5, 59:8, 62:11, 221:18
**closed** [5] - 165:12, 211:3, 219:21, 220:1, 224:7
**closer** [2] - 25:16, 25:20, 61:10, 225:10
**closest** [1] - 56:21
**closing** [1] - 210:23
**cloudiness** [1] - 229:17
**clue** [1] - 103:13
**CME** [2] - 55:25, 64:21
**CNS** [2] - 72:4, 72:5

[signature: Donna J. Prather]

192:1, 192:17
**coast** [1] - 43:1
**cocaine** [2] - 141:15, 161:8
**Code** [3] - 181:2, 184:14, 184:16
**code** [10] - 83:21, 97:17, 97:20, 99:15, 126:23, 126:24, 128:6, 144:11, 193:19, 193:20
**codes** [38] - 83:14, 83:16, 83:17, 83:19, 96:7, 96:9, 97:15, 97:18, 98:9, 98:12, 98:14, 99:16, 99:19, 107:3, 107:5, 108:2, 108:4, 108:5, 112:4, 112:5, 112:8, 112:10, 116:16, 116:17, 116:19, 116:20, 117:5, 122:12, 123:18, 125:25, 126:22, 132:18, 133:19, 150:1, 150:14, 150:15
**coding** [1] - 83:16
**coincidentally** [1] - 196:10
**Colegrove** [6] - 113:23, 114:2, 114:4, 114:10, 114:11, 156:3
**collapse** [5] - 83:25, 117:18, 118:16, 121:6, 152:2
**collapses** [1] - 118:18

---

**collector/staff** [1] - 40:10
**college** [9] - 47:17, 48:1, 48:4, 48:19, 49:1, 49:2, 49:14, 49:15, 142:8
**College** [2] - 23:10, 50:5
**collided** [1] - 146:25
**collision** [2] - 103:8, 146:24
**Columbus** [2] - 42:21, 43:15
**combination** [1] - 57:20, 232:9
**combining** [2] - 6:2, 11:18

**commitment** [4] - 51:17, 51:18, 51:20, 51:24
**committee** [1] - 219:13
**common** [9] - 80:15, 82:22, 91:25, 92:13, 108:25, 109:6, 111:3, 111:21, 241:25
**commonly** [1] - 110:22
**Commonwealth** [1] - 193:10
**commonwealth** [1] - 23:17
**communicated** [2] - 25:8, 228:22
**communities** [2] - 31:12, 31:17
**community** [6] - 22:19, 159:14, 159:18, 160:4, 160:18, 161:17
**Community** [6] - 193:9, 193:10, 193:17, 200:3, 203:16, 249:16
**community's** [1] - 249:17
**company** [6] - 86:25, 88:11, 156:22, 186:24, 187:5, 187:6, 209:18, 209:25
**compare** [1] - 66:4
**compared** [2] - 144:20, 256:18
**comparison** [1] -

---

39:24
**compartment** [2] - 148:18, 202:13
**compartments** [1] - 148:21
**competition** [1] - 47:15
**competitor** [1] - 29:22
**complain** [4] - 81:10, 81:11, 130:17, 146:2
**complained** [4] - 80:10, 80:11, 80:13, 129:10
**complaining** [13] - 60:6, 60:8, 77:10, 81:6, 108:15, 128:19, 128:20, 129:6, 135:11, 138:14, 140:4, 146:10, 154:23
**complains** [1] - 16:21
**complaint** [5] - 76:8, 77:16, 79:25, 135:13, 145:7
**complaints** [4] - 82:1, 98:16, 145:3, 145:23
**complete** [3] - 48:4, 115:1, 162:13
**completed** [8] - 51:21, 54:19, 56:12, 64:21, 65:1, 65:2, 79:24, 99:3
**completely** [8] - 14:5, 74:7, 90:25, 123:8, 153:20, 168:13, 171:17, 241:6
**completing** [1] - 53:3
**completion** [1] - 64:4
**compliance** [12] - 66:20, 87:2, 87:14, 87:22, 105:20, 224:25, 240:15, 240:16, 240:19, 245:16, 250:22, 251:4
**compliant** [1] - 105:3
**complicated** [1] - 197:10
**complied** [1] - 214:5
**comply** [5] - 7:2, 8:9, 66:24, 223:13, 223:24
**component** [1] - 150:5
**compress** [1] - 138:23
**compressed** [2] - 117:12, 121:6
**compressing** [1] - 102:1

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
637/243

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 267 of 296   Pageid#: 11401

**compression** [4] - 80:15, 103:6, 132:20, 138:2

**Computer** [1] - 1:25

**computer** [1] - 194:21

**Computer-Aided** [1] - 1:25

**concern** [3] - 11:2, 173:3, 219:12

**concerned** [3] - 159:13, 160:18, 222:2

**concerns** [1] - 254:23

**concluded** [1] - 258:4

**conclusion** [1] - 81:23

**conclusions** [1] - 12:15

**concrete** [1] - 136:3

**concussion** [2] - 139:7

**condition** [4] - 9:4, 120:14, 144:13, 191:23

**conditions** [7] - 9:5, 9:7, 39:4, 72:1, 82:3, 184:2, 225:4

**conduct** [16] - 13:15, 88:15, 108:10, 108:12, 111:19, 111:22, 118:20, 121:22, 125:21, 127:2, 127:23, 128:24, 132:23, 136:23, 143:9, 154:14

**conducted** [4] - 113:12, 121:12, 121:17, 140:15

**conference** [2] - 169:16, 169:20

**confidence** [1] - 34:25

**confidential** [1] - 93:12

**confirm** [2] - 114:16, 242:13

**confirmation** [1] - 68:1

**confirmed** [2] - 116:24, 117:23

**conflicting** [2] - 55:15, 255:2

**confused** [3] - 82:25, 238:6, 240:1

**confusion** [3] - 10:22, 105:18, 105:19

**conjunction** [2] - 74:11, 172:2

**connection** [2] - 8:22, 13:11

**Connie** [3] - 146:9, 155:16

**consequences** [1] - 31:6

**consider** [8] - 13:24, 16:9, 16:12, 16:14, 16:21, 120:5, 157:20, 226:14

**considered** [2] - 215:1, 215:3

**consistent** [3] - 93:19, 163:9, 192:24

**constellation** [1] - 149:7

**constitution** [1] - 16:6

**consult** [1] - 82:6

**consulted** [2] - 113:15, 113:17

**contact** [5] - 19:11, 142:15, 194:11, 242:13, 257:13

**contacted** [2] - 36:6, 56:16

**contained** [1] - 179:17

**container** [1] - 71:1

**contents** [1] - 202:1

**contested** [1] - 12:19

**context** [17] - 161:4, 165:10, 232:2, 247:22, 248:2, 251:22, 252:2, 252:4, 252:6, 252:10, 252:11, 252:21, 253:2, 253:3, 253:4, 253:12, 253:13

**Contin** [1] - 32:20

**continue** [12] - 24:19, 37:4, 52:23, 53:20, 54:13, 58:23, 60:15, 97:3, 103:12, 210:12, 239:24, 250:2

**continued** [5] - 62:8, 109:13, 120:21, 124:24, 132:2

**continuing** [12] - 24:10, 24:11, 24:15, 31:8, 60:23, 113:24, 115:4, 124:5, 127:12, 129:17, 162:6, 162:8

**contract** [8] - 6:19, 6:20, 7:11, 8:5, 9:5, 12:9, 13:10, 172:3

**contractors** [1] - 202:18

**contractual** [1] - 188:23

**contributed** [1] - 84:7

**control** [5] - 66:6, 69:2, 74:9, 84:21, 171:13

**Controlled** [2] - 95:8, 185:3

**controlled** [41] - 13:23, 32:6, 42:14, 42:15, 42:22, 56:2, 63:19, 64:20, 64:23, 64:24, 67:9, 94:8, 171:13, 173:6, 179:5, 179:8, 180:10, 182:8, 183:18, 185:1, 214:25, 215:9, 215:11, 215:16, 216:11, 216:18

**convenience** [1] - 30:22

**conversate** [1] - 102:18

**conversation** [13] - 33:5, 38:19, 169:21, 172:2, 178:1, 185:11, 218:16, 251:22, 252:2, 252:12, 252:22, 253:12, 253:21

**conversations** [4] - 27:18, 165:21, 178:1, 238:8

**converted** [1] - 172:21

**convicted** [1] - 35:19

**copies** [1] - 180:17

**copy** [9] - 5:13, 15:3, 64:2, 64:4, 93:5, 93:6, 97:9, 97:14, 163:11

**cord** [4] - 72:6, 72:24, 73:3, 130:20

**corner** [3] - 59:22, 100:6, 112:25

**cornerstone** [1] - 250:3

**Corps** [1] - 227:3

**Correct** [18] - 39:19, 59:9, 78:23, 86:7, 97:22, 107:18, 110:16, 113:6, 113:14, 120:8, 130:12, 143:2, 144:6, 180:6, 196:4, 205:2, 209:16, 256:23

**correct** [239] - 14:21, 22:24, 23:17, 29:6, 31:18, 36:17, 39:8, 39:18, 46:6, 50:22, 50:23, 51:2, 51:24, 51:25, 53:22, 55:3, 56:23, 57:15, 61:21, 63:3, 64:12, 67:3, 67:23, 68:5, 68:6, 86:9, 87:10, 88:23, 91:6, 94:4, 96:6, 98:13, 102:24, 102:25, 103:2, 103:21, 103:22, 104:15, 105:10, 107:13, 110:13, 111:8, 111:9, 113:5, 135:2, 135:4, 135:19, 136:7, 136:15, 137:10, 138:9, 140:9, 140:15, 140:23, 140:24, 144:5, 145:2, 146:7, 148:5, 150:16, 168:3, 168:13, 175:9, 175:16, 179:2, 181:5, 181:10, 182:18, 183:10, 183:23, 184:9, 184:22, 185:17, 185:21, 186:7, 186:10, 187:8, 187:11, 187:17, 187:25, 188:5, 188:13, 192:14, 193:14, 193:16, 193:18, 193:22, 193:25, 194:5, 194:8, 194:11, 194:15, 194:17, 195:15, 196:1, 196:3, 197:11, 197:16, 198:16, 200:23, 201:10, 202:21, 203:1, 203:4, 203:7, 203:17, 203:18, 203:22, 205:1, 205:3, 205:6, 205:7, 205:14, 205:20, 206:1, 206:4, 206:12, 206:16, 206:17, 207:5, 207:8, 207:9, 207:10, 209:5, 209:15, 209:18, 211:3, 211:16, 212:1, 212:11, 212:16, 212:20, 212:21,

212:23, 213:5, 213:21, 214:6, 214:15, 214:19, 215:6, 215:10, 215:13, 215:16, 215:19, 215:21, 215:25, 216:5, 216:12, 216:16, 216:18, 217:16, 217:17, 217:21, 217:24, 218:3, 218:6, 218:8, 218:10, 218:15, 218:24, 220:6, 220:17, 220:21, 221:22, 222:10, 222:25, 223:2, 223:9, 224:10, 225:6, 227:9, 227:15, 228:9, 230:6, 230:8, 230:11, 230:15, 230:18, 231:11, 231:15, 231:20, 231:23, 232:11, 232:14, 232:11, 232:14, 233:2, 236:5, 236:9, 238:17, 238:20, 239:2, 239:19, 241:11, 242:9, 242:10, 243:6, 243:17, 243:21, 243:25, 244:5, 244:6, 245:21, 246:6, 247:2, 247:5, 247:8, 247:11, 247:20, 248:1, 248:7, 248:21, 249:4, 250:20, 250:25, 251:2, 251:5, 251:21, 251:22, 252:1, 252:5, 254:10, 254:11, 256:25

**corrected** [1] - 62:16

**correctly** [2] - 123:8, 226:4

**correspond** [3] - 83:20, 108:8, 150:1

**corresponded** [2] - 82:1, 145:22

**correspondence** [2] - 49:3, 49:5

**corresponds** [1] - 83:22

**costs** [1] - 232:24

**cough** [2] - 6:2, 11:19

**counsel** [9] - 16:15, 17:11, 17:18, 45:19, 170:14, 171:2, 171:22, 172:4, 258:1

**counsel's** [1] - 46:2

**counseled** [1] - 172:2

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

counseling [1] - 171:19
Counselor [1] - 238:5
count [7] - 11:25, 88:3, 88:15, 88:25, 169:18, 240:17
counted [1] - 23:25
counter [3] - 52:6, 68:16, 168:10
country [2] - 31:11, 160:20
counts [3] - 75:10, 180:14, 240:9
Counts [1] - 24:13
county [1] - 49:19
County [3] - 69:1, 195:16, 196:7
couple [18] - 3:5, 26:24, 30:3, 30:6, 31:13, 33:24, 44:13, 45:3, 56:19, 67:15, 88:5, 92:2, 121:1, 136:18, 146:12, 215:22, 229:9, 235:18
course [11] - 12:24, 16:22, 20:7, 63:19, 64:6, 65:2, 65:6, 90:22, 114:12, 239:22, 240:15
courses [2] - 48:6, 66:4
coursework [2] - 49:7, 49:21
court [6] - 178:11, 186:1, 219:2, 219:3, 219:15, 258:2
Court [1] - 1:25, 4:21, 5:1, 6:4, 13:23, 13:25, 15:25, 257:14
COURT [183] - 1:2, 3:2, 3:7, 4:19, 5:11, 5:15, 5:18, 6:6, 7:3, 7:7, 7:17, 7:22, 8:11, 8:13, 9:24, 10:1, 10:8, 11:5, 11:16, 12:8, 12:16, 12:23, 13:5, 14:3, 14:7, 14:12, 15:2, 15:7, 15:11, 15:19, 16:2, 17:8, 17:16, 18:2, 18:4, 18:13, 18:25, 19:3, 19:5, 19:14, 19:20, 19:23, 20:4, 20:8, 20:10, 20:13, 20:24, 20:25, 21:12, 21:15, 21:19, 21:22, 22:19, 27:20, 27:23, 28:21, 28:23, 40:20, 43:8, 44:12, 45:10, 45:12,

45:19, 45:25, 46:5, 46:8, 46:11, 46:13, 63:25, 64:16, 71:13, 73:23, 74:1, 75:18, 76:19, 76:23, 77:1, 78:2, 78:5, 78:12, 78:15, 78:24, 79:4, 79:6, 79:8, 79:11, 89:12, 89:19, 89:24, 90:5, 90:7, 90:11, 90:23, 91:4, 94:13, 94:17, 94:23, 95:3, 95:11, 100:12, 100:16, 100:19, 110:5, 110:9, 111:9, 111:11, 111:14, 115:6, 115:15, 116:10, 119:14, 120:4, 120:9, 120:11, 121:8, 121:21, 121:25, 122:3, 134:1, 134:6, 134:11, 134:13, 134:17, 134:19, 134:21, 137:22, 137:25, 138:5, 157:12, 157:16, 157:19, 158:25, 162:1, 164:17, 165:1, 166:18, 167:6, 167:10, 167:17, 168:2, 168:4, 168:9, 168:15, 168:18, 168:21, 169:1, 169:12, 169:18, 170:6, 173:12, 173:15, 175:2, 180:25, 183:14, 190:7, 190:12, 198:4, 200:6, 200:9, 214:9, 214:12, 226:23, 228:4, 234:18, 234:25, 236:25, 237:13, 237:15, 237:17, 238:25, 246:1, 249:10, 253:24, 254:3, 254:18, 256:7, 256:15, 257:2, 257:4, 257:11, 257:16, 257:20, 258:1
Court's [1] - 13:19
courteous [1] - 33:1
courtroom [1] - 159:24
cover [4] - 189:14, 253:7, 253:16, 253:17
coverage [1] - 244:19
covered [2] - 71:14,

189:16
covering [1] - 30:7
CPR [1] - 200:16
cracked [1] - 136:24
Craycraft [4] - 115:23, 115:24, 116:3, 116:15
crazy [2] - 44:1, 44:3
created [2] - 49:5, 248:17
credibility [1] - 8:1
credit [8] - 67:14, 67:18, 68:3, 165:9, 195:8, 199:3, 201:21, 212:17
crew [2] - 233:25, 234:1, 234:13, 235:5,
cross [7] - 4:16, 11:9, 13:25, 16:24, 28:23, 175:2, 254:17
Cross [3] - 157:6, 157:8, 157:21
CROSS [4] - 2:4, 2:6, 29:1, 175:4
cross-examination [4] - 11:9, 16:24, 28:23, 175:2
CROSS-EXAMINATION [4] - 2:4, 2:6, 29:1, 175:4
cross-examine [2] - 4:16, 13:25
crushed [1] - 152:17
cuff [1] - 153:14
current [3] - 85:18, 97:4, 120:13
cursed [1] - 87:18
custody [2] - 29:13, 30:7
customers [2] - 44:23
customized [1] - 249:25
cut [4] - 188:21, 189:8, 189:18, 189:25

## D

D.O [3] - 50:15, 50:21, 227:3
D/T [1] - 95:22
dad [2] - 47:16, 238:8
daily [6] - 39:10,

81:18, 97:3, 102:11, 250:4, 250:9
damage [4] - 101:25, 111:2, 128:4, 137:21
Damron [3] - 117:3, 117:4, 117:16
damron [1] - 118:1
Daniels [2] - 118:2, 118:3, 118:4, 118:14, 118:21, 118:24, 118:25, 120:18, 120:23, 120:24, 122:9
dark [1] - 68:12
Darryl [17] - 151:17, 155:12, 159:4, 159:5, 174:13, 185:19, 186:4, 186:13, 189:13, 190:14,
date [10] - 15:9, 66:13, 76:13, 93:25, 169:11, 178:20, 239:7, 240:5, 240:11, 248:13
dated [4] - 169:10, 181:4, 226:25, 248:6
daughter [1] - 47:9
David [1] - 152:24
DAY [1] - 1:11
day-to-day [1] - 103:16
days [21] - 19:9, 29:12, 29:14, 30:7, 38:3, 38:5, 52:21, 53:21, 94:5, 178:19, 215:22, 215:23, 216:8, 229:25, 230:3, 230:7, 230:10, 239:10, 242:3, 242:4, 242:6
DD-214 [1] - 226:1
de [2] - 54:23, 206:20
de-fund [2] - 54:23, 206:20
DEA [4] - 26:7, 40:5, 40:6, 66:21
deal [11] - 33:3, 55:16, 63:13, 73:6, 185:1, 214:21, 217:6, 217:20, 244:10, 244:23, 245:3
dealership [1] - 161:16
dealing [1] - 92:5
dealings [1] - 221:25

dealt [2] - 145:24, 161:20
Deanna [1] - 137:2
death [6] - 6:2, 11:23, 11:25, 44:17, 83:4, 254:10
debility [1] - 142:25
debit [2] - 165:9, 199:3, 199:4
Deborah [22] - 19:17, 19:18, 19:21, 112:16, 161:2, 161:3, 161:25, 162:2, 175:12, 176:21, 185:6, 185:9, 185:20, 186:9, 186:15, 190:17, 191:15, 191:16, 191:24, 192:1
DeBusk [1] - 50:5
decades [1] - 31:13
deceived [1] - 174:6
decide [3] - 16:22, 57:14, 189:21
decided [3] - 49:21, 85:9, 225:23
deciding [1] - 16:15
decision [21] - 3:6, 11:13, 16:16, 16:22, 17:4, 17:12, 17:19, 21:4, 21:9, 53:14, 162:25, 163:1, 164:3, 175:21, 177:11, 177:14, 177:18, 178:3, 184:6, 204:20, 205:24
decisions [4] - 40:2, 53:5, 81:19, 160:5
decrease [2] - 172:18, 172:20
decreased [1] - 96:24
decreases [1] - 102:23
deem [1] - 42:10
Defendant [2] - 1:9, 1:22
DEFENDANT [9] - 17:7, 17:10, 17:17, 18:3, 18:8, 18:17, 46:7, 46:10, 46:20
defendant [2] - 3:16, 9:17, 13:9, 15:12, 27:18, 45:21, 134:9
Defendant's [7] - 5:2, 5:20, 6:6, 11:8, 12:9, 12:21, 13:1
defendant's [2] - 13:6, 13:17
DEFENSE [2] - 2:2, 2:12

**Defense** [4] - 22:7, 46:22, 64:15, 64:17
**defense** [3] - 14:18, 21:18, 46:15
**deficits** [1] - 103:12
**define** [1] - 44:5
**definitely** [7] - 34:21, 43:16, 43:20, 82:5, 87:7, 109:11, 128:7
**degenerative** [2] - 142:19, 144:13
**degree** [3] - 23:11, 23:13, 24:9
**degrees** [1] - 49:6
**dehydrated** [2] - 37:1, 37:5
**delivering** [1] - 52:11
**denies** [2] - 15:12, 15:13
**dental** [1] - 30:17
**dentist** [2] - 41:1, 59:21
**Department** [4] - 10:17, 10:18, 69:2, 196:8
**department** [1] - 59:4
**dependance** [2] - 73:14, 73:19
**dependence** [2] - 172:6, 172:7
**dependency** [2] - 7:13, 7:18
**deposit** [8] - 67:20, 199:5, 199:8, 199:9, 199:22, 199:25, 201:25, 202:5
**deposited** [2] - 67:18, 201:19
**deposits** [4] - 187:22, 187:23, 202:10, 203:17
**depression** [2] - 10:11, 88:7
**describe** [10] - 14:16, 50:9, 51:6, 70:2, 102:8, 102:18, 158:1, 158:4, 159:4, 159:22
**Describe** [1] - 86:3
**described** [3] - 94:2, 176:23, 250:17
**describes** [3] - 13:21, 96:18, 249:13
**describing** [2] - 14:2, 249:6
**description** [1] - 13:21
**descriptive** [1] - 77:19
**designation** [1] -

158:12
**designed** [1] - 105:19
**desire** [1] - 217:9
**desk** [3] - 77:8, 88:19, 169:23
**destroyed** [2] - 196:6, 196:11
**destruction** [1] - 197:15
**destructive** [1] - 31:5
**detail** [4] - 12:14, 16:9, 71:8, 139:9
**details** [1] - 13:8
**determination** [4] - 81:21, 86:11, 223:5, 246:21
**determinations** [1] - 81:14
**determine** [5] - 26:11, 101:10, 110:3, 218:2, 243:10
**determined** [2] - 81:17, 137:14
**determining** [2] - 121:14, 239:22
**devastating** [1] - 161:22
**develop** [2] - 35:15, 87:19
**developed** [4] - 27:7, 104:25, 141:25, 171:17
**develops** [1] - 172:7
**diagnose** [1] - 39:6
**diagnosed** [11] - 90:20, 93:1, 96:8, 99:12, 118:6, 141:4, 142:9, 145:15, 148:14, 150:12, 151:9
**diagnoses** [17] - 83:20, 93:2, 96:7, 99:12, 99:20, 107:9, 114:4, 125:19, 129:4, 131:18, 132:16, 135:7, 135:10, 137:13, 139:17, 149:8, 152:9
**diagnosing** [1] - 119:9
**diagnosis** [67] - 10:11, 27:14, 33:4, 38:13, 83:17, 97:17, 97:18, 97:20, 98:10, 98:12, 98:14, 98:18, 99:15, 99:19, 107:3, 107:5, 108:2, 108:4, 108:5, 112:4, 112:5, 113:22, 116:16, 116:17, 117:5, 117:6,

117:23, 121:15, 122:14, 123:4, 123:18, 123:19, 123:20, 123:21, 125:7, 127:1, 128:3, 129:3, 129:22, 132:18, 133:8, 133:10, 135:6, 135:18, 136:10, 136:12, 137:16, 137:17, 139:16, 140:11, 143:15, 143:16, 144:11, 144:18, 144:19, 146:17, 146:18, 148:7, 148:8, 149:6, 149:19, 150:1, 150:14, 150:15,
____
**died** [1] - 51:11
**differ** [1] - 50:15
**difference** [1] - 208:11
**different** [54] - 24:1, 30:3, 37:14, 39:17, 39:24, 39:25, 41:5, 41:6, 41:15, 47:23, 50:12, 52:10, 56:8, 56:20, 57:18, 57:24, 65:8, 65:17, 71:4, 72:15, 74:21, 75:11, 80:15, 88:4, 88:5, 89:3, 89:15, 100:1, 103:6, 104:24, 105:1, 106:21, 112:7, 126:19, 131:11, 135:9, 139:18, 145:2, 147:23, 156:14, 166:15, 167:24, 171:3, 176:15, 186:3, 188:17, 197:8, 199:16, 215:20, 232:9, 233:24, 235:18, 244:2
**differing** [1] - 130:10
**difficult** [5] - 56:13, 87:22, 160:21, 217:6, 229:8
**difficulty** [1] - 80:24
**dig** [1] - 44:9
**digging** [1] - 44:9
**Dilaudid** [1] - 32:19
**diminished** [1] - 129:25
**dire** [1] - 160:21

**direct** [14] - 9:19, 17:18, 29:22, 88:1, 110:21, 116:24, 157:20, 175:6, 199:22, 199:25, 219:17, 243:3, 254:17, 254:19
**DIRECT** [4] - 2:3, 2:5, 22:9, 47:1
**directed** [2] - 31:9, 241:13
**direction** [1] - 184:5
**directions** [5] - 70:23, 247:22, 248:2, 248:3, 248:4
**directly** [7] - 26:20, 115:12, 122:4, ...
____
... [4] - 1:6, 7:18, 100:23, 108:23
**disagree** [3] - 178:3, 241:21, 246:15
**disagreement** [3] - 208:22, 208:25, 209:2
**disaster** [2] - 47:19, 47:21
**disasters** [1] - 47:20
**discharge** [10] - 93:6, 93:8, 110:1, 155:9, 157:25, 158:20, 171:23, 225:21, 225:25, 226:4
**Discharge** [1] - 225:24
**discharged** [15] - 109:21, 110:5, 141:10, 155:7, 155:11, 155:12, 155:14, 155:16, 161:5, 161:9, 166:6, 198:2, 226:8, 226:10, 226:13
**disciplined** [2] - 4:12, 8:17
**discovered** [3] - 48:13, 71:3, 71:23
**discuss** [3] - 85:7, 130:7, 171:11
**discussed** [10] - 17:10, 20:16, 25:17, 87:5, 91:5, 125:7, 164:13, 172:11, 174:9, 236:11
**discussing** [1] - 27:20

**discussion** [8] - 76:6, 91:8, 192:7, 192:10, 251:18, 251:24, 252:15, 252:25
**discussions** [2] - 254:12, 254:15
**disease** [9] - 7:12, 35:12, 37:8, 132:12, 136:13, 137:25, 138:2, 142:20, 144:13
**disk** [3] - 101:25, 132:11, 142:19
**dispense** [1] - 30:9
**dispensed** [1] - 166:8
**dispensing** [1] - 31:22
**displayed** [1] - 75:17
**disposal** [1] - 195:17
**dispute** [1] - 201:24
**disregard** [1] - 159:1
**distance** [9] - 27:1, 28:13, 33:23, 34:14, 34:15, 34:22, 35:2, 38:16, 42:24
**distances** [1] - 192:23
**distinction** [2] - 111:12, 253:20
**distribute** [1] - 11:1
**distributed** [1] - 31:16
**distribution** [3] - 13:16, 35:19, 68:17
**district** [1] - 209:17
**DISTRICT** [2] - 1:2, 1:3
**Diversion** [3] - 87:1, 88:12, 186:23
**divided** [1] - 189:4
**division** [1] - 199:18
**DIVISION** [1] - 1:4
**divorce** [1] - 54:4
**Doc** [1] - 176:15
**Doctor** [3] - 78:24, 190:7, 233:9
**doctor** [32] - 28:17, 32:2, 36:20, 39:2, 42:10, 42:16, 43:12, 50:9, 50:14, 53:13, 61:18, 62:19, 98:7, 110:7, 115:6, 157:22, 161:12, 183:14, 183:19, 204:18, 204:25, 205:8, 210:9, 243:16, 243:20, 245:2, 247:1, 247:7, 247:8, 257:17
**doctor's** [2] - 93:10,

158:22
**doctor-patient** [1] - 110:7
**doctor/patient** [1] - 218:19
**doctorate** [1] - 23:15
**doctors** [9] - 55:9, 62:11, 104:10, 104:11, 119:9, 119:24, 185:2, 243:20, 247:4
**doctors'** [2] - 62:16, 104:3
**document** [27] - 4:2, 42:19, 76:10, 77:5, 77:6, 77:7, 79:23, 85:3, 85:5, 85:24, 86:1, 103:25, 104:2, 104:22, 105:10, 105:16, 105:17, 106:9, 106:22, 108:8, 123:1, 130:7, 130:12, 144:12, 183:12, 219:3
**documentation** [5] - 85:1, 93:1, 93:20, 143:16, 158:8
**documented** [2] - 130:4, 165:6
**documents** [7] - 75:18, 106:19, 115:14, 133:2, 223:17, 233:12, 239:12
**domestic** [2] - 83:25, 146:13
**Donald** [4] - 1:22, 133:5, 133:8, 133:14
**done** [33] - 24:12, 44:7, 57:19, 67:2, 70:10, 76:15, 76:20, 76:24, 78:9, 79:2, 80:21, 88:17, 104:10, 104:11, 150:14, 150:15, 153:8, 164:11, 167:1, 167:4, 167:15, 169:24, 204:21, 223:25, 224:4, 224:5, 236:21, 239:3, 239:6, 243:18, 243:23, 251:15
**Donna** [1] - 122:20
**door** [7] - 9:18, 45:6, 59:20, 89:8, 210:17, 210:22, 230:21
**dosage** [1] - 27:3
**dosages** [1] - 38:24
**dose** [3] - 25:24, 27:7, 197:13
**doses** [2] - 65:20, 172:23

**Dotson** [6] - 122:20, 122:24, 123:1, 123:2, 123:16
**doubt** [2] - 32:1, 234:10
**down** [38] - 45:13, 47:7, 54:3, 59:19, 61:3, 61:16, 63:9, 77:12, 79:23, 79:24, 82:24, 85:13, 85:21, 92:4, 97:6, 103:10, 106:7, 130:6, 136:3, 145:8, 150:10, 151:21, 151:25, 152:3, 154:1, 154:20, 197:20, 210:5, 210:7, 210:23, 211:3, 213:14, 213:24, 222:11, 238:6, 238:9, 243:13, 257:5
**Dr** [78] - 3:13, 3:24, 4:1, 5:23, 6:10, 9:2, 12:1, 12:5, 13:20, 15:24, 17:6, 18:16, 19:6, 20:6, 21:2, 21:3, 25:5, 28:9, 32:7, 32:23, 32:25, 33:13, 34:4, 34:18, 36:12, 38:10, 39:12, 39:18, 40:8, 41:2, 41:23, 42:8, 42:20, 43:21, 44:24, 46:3, 46:5, 46:15, 54:17, 58:4, 58:5, 58:6, 64:2, 64:19, 71:14, 74:3, 75:10, 75:22, 83:15, 90:7, 90:14, 90:23, 95:14, 119:21, 134:24, 142:10, 157:24, 166:15, 166:20, 167:21, 180:19, 183:8, 184:23, 185:5, 207:14, 209:11, 213:16, 219:4, 227:22, 228:18, 231:14, 237:20, 245:20, 246:12, 247:15, 254:8, 254:21
**DR** [1] - 186:10
**drafted** [2] - 93:7, 250:18
**drank** [1] - 37:14
**draw** [3] - 71:10, 71:13, 92:16
**drawing** [1] - 77:17
**drawings** [1] - 82:21
**drew** [1] - 238:2
**drink** [1] - 37:4
**drive** [10] - 30:23,

33:24, 34:8, 35:2, 43:22, 195:2, 201:11, 201:17, 257:23
**drive-through** [1] - 30:23
**driven** [2] - 228:11, 228:12
**driving** [8] - 53:8, 54:3, 95:21, 95:24, 96:19, 100:4, 100:5, 192:22
**drove** [4] - 56:7, 56:19, 84:5, 183:4
**drug** [26] - 8:19, 32:10, 32:12, 32:18, 35:9, 35:10, 35:19, 36:22, 36:23, 36:24, 37:3, 38:2, 38:3, ...
22:23, 23:3, 24:13
**drugs** [15] - 7:19, 8:23, 10:24, 14:20, 30:9, 32:20, 167:18, 173:5, 173:7, 179:2, 182:23, 195:12, 196:20, 197:2, 228:21
**Drugstore** [1] - 24:17
**drugstore** [1] - 23:20
**drunk** [1] - 37:11
**duct** [1] - 37:7
**due** [53] - 18:9, 47:9, 83:22, 92:10, 92:12, 93:2, 95:21, 95:22, 95:24, 96:13, 97:20, 98:20, 99:21, 100:3, 108:20, 110:8, 112:7, 114:6, 116:8, 116:24, 118:6, 118:7, 119:4, 122:13, 124:11, 125:20, 126:1, 126:24, 128:7, 129:5, 131:19, 135:8, 136:11, 137:11, 138:19, 140:12, 143:4, 141:23, 143:23, 145:23, 146:11, 146:13, 148:19, 149:7, 149:8, 149:20, 150:25, 151:3, 151:10, 152:8, 152:9, 153:17, 234:11
**DUI** [1] - 205:22
**duly** [2] - 22:8, 46:23
**dumb** [1] - 164:3
**dumpster** [2] -

220:12, 220:16
**duplicate** [1] - 27:13
**duration** [1] - 132:12
**during** [12] - 4:4, 20:6, 86:22, 154:13, 174:9, 179:1, 193:6, 201:6, 251:18, 251:24, 252:14, 252:25
**Dynamics** [1] - 157:7

## E

**e-mail** [5] - 3:23, 194:6, 226:17, 226:19, 226:20
**e-mails** [1] - 189:7
**earliest** [1] - 30:22
...
**easiest** [1] - 158:3
**easily** [1] - 66:10
**east** [1] - 43:1
**East** [1] - 193:11
**easy** [1] - 199:19
**eat** [1] - 53:7
**Edison** [1] - 48:21
**edits** [1] - 197:12
**educate** [1] - 250:8
**educated** [1] - 50:19
**education** [11] - 24:10, 24:11, 24:15, 31:9, 48:3, 48:15, 50:16, 54:16, 64:23, 74:5, 244:1
**educational** [2] - 24:21, 47:10
**effect** [1] - 85:6
**effective** [4] - 75:7, 86:14, 86:15, 101:23
**effects** [3] - 73:4, 85:7, 85:10
**effort** [1] - 35:21
**eight** [1] - 24:14
**either** [12] - 13:8, 42:6, 45:6, 53:21, 81:7, 158:10, 162:21, 163:20, 166:23, 170:12, 192:8, 205:11
**ejected** [2] - 115:25, 116:9
**elaborate** [2] - 11:17, 78:15
**Elavil** [1] - 74:15
**elbow** [1] - 145:10
**elder** [1] - 18:21

**electives** [2] - 52:13
**electronic** [3] - 67:17, 68:2, 183:13
**element** [1] - 85:4
**elicit** [3] - 92:16, 148:20, 148:21
**embarrassed** [1] - 160:10
**emergencies** [2] - 166:24, 167:21
**emergency** [12] - 60:11, 168:24, 169:1, 175:16, 175:19, 175:20, 176:24, 177:1, 182:24, 183:25, 184:4, 255:11
**Emergency** [2] - 47:20, 49:25
**emergent** [3] - 161:13, 162:20, 175:15
**employ** [1] - 87:15
**employed** [1] - 88:12
**employee** [4] - 187:6, 204:7, 206:14, 207:24
**employees** [1] - 202:18
**employer** [3] - 199:1, 202:21, 203:1
**employment** [2] - 203:20, 209:19
**empty** [1] - 167:19, 197:7
**EMT** [2] - 50:1, 79:17
**en** [1] - 195:16
**encounter** [1] - 185:15
**encounters** [1] - 243:14
**end** [20] - 38:18, 53:4, 54:22, 54:24, 58:15, 74:24, 89:15, 98:8, 162:7, 178:22, 199:13, 206:19, 221:12, 222:16, 224:13, 225:23, 240:10, 242:1, 242:2
**ended** [5] - 37:5, 100:23, 203:21, 206:3, 257:17
**endorphins** [6] - 72:19, 72:20, 72:22, 72:25, 237:23
**enforcement** [3] - 87:3, 87:25, 201:1
**engaged** [2] - 14:19, 234:3
**enjoyed** [1] - 48:13
**enlarged** [1] - 142:9

enlightening [1] - 31:7
enrollment [1] - 3:13
enter [1] - 106:13
entered [3] - 106:14, 180:4, 225:18
entire [8] - 37:5, 61:7, 138:16, 138:18, 140:6, 162:23, 224:20, 249:2
entirely [2] - 16:16, 196:23
entity [2] - 10:16, 115:13
EPA [1] - 254:25
epidemic [1] - 31:3
equal [1] - 142:1
equivalents [1] - 27:4
ER [3] - 30:17, 32:14, 167:2
error [2] - 191:13, 255:13
errors [1] - 77:9
Escalade [2] - 195:3, 195:4
especially [5] - 98:4, 103:7, 106:3, 239:15, 244:12
essence [2] - 115:17, 115:21
establish [2] - 26:1, 27:11
established [7] - 4:8, 34:25, 154:9, 169:4, 169:5, 169:8, 176:14
establishing [1] - 215:14
euphoria [1] - 73:6
evaluate [3] - 102:3, 148:3, 198:9
evaluating [1] - 102:10
evaluation [1] - 159:7
Evans [1] - 152:22
evening [2] - 17:21, 33:20
event [4] - 178:21, 188:4, 188:25, 226:2
events [2] - 53:19, 164:24
eventually [3] - 48:1, 227:24, 254:24
everywhere [1] - 84:5
evidence [18] - 4:14, 4:15, 5:23, 8:21, 8:23, 11:11, 45:21, 130:24, 166:10, 180:4, 180:9,

180:13, 180:16, 188:17, 188:19, 193:14, 194:20, 257:7
Evidence [1] - 13:6
evidenced [1] - 7:15
exact [5] - 22:20, 25:12, 33:23, 155:10, 222:17
exactly [9] - 11:24, 176:21, 176:22, 182:15, 185:23, 190:21, 197:1, 208:2, 235:22
exam [37] - 70:10, 80:23, 89:4, 89:5, 89:7, 102:4, 107:7, 108:8, 108:10, 108:12, 112:20, 122:7, 124:14, 128:5, 129:11, 129:23, 130:5, 131:21, 131:23, 132:23, 133:1, 136:23, 139:12, 140:15, 142:12, 143:4, 143:9, 145:11, 145:13, 146:7, 148:24, 151:19, 154:18, 154:22, 169:24, 175:7
examination [70] - 11:9, 16:24, 17:18, 28:23, 78:21, 81:4, 81:17, 82:1, 82:21, 89:16, 91:7, 92:11, 92:17, 92:21, 92:25, 99:24, 106:23, 107:19, 111:20, 111:21, 113:12, 113:20, 114:19, 114:25, 116:6, 116:23, 117:21, 117:22, 118:7, 120:17, 121:14, 121:24, 122:15, 123:22, 123:24, 124:2, 125:21, 126:2, 126:5, 127:2, 127:23, 128:9, 128:24, 129:9, 129:13, 130:6, 130:24, 133:19, 135:12, 138:8, 141:6, 141:21, 144:9, 147:6, 147:14, 148:18, 149:9, 149:22, 150:22, 152:2, 153:8, 153:10, 154:24, 155:3, 159:7, 175:2, 219:18, 254:19, 255:22
EXAMINATION [12] -

2:3, 2:4, 2:4, 2:5, 2:6, 2:6, 22:9, 29:1, 44:14, 47:1, 175:4, 254:6
examinations [1] - 154:4
examine [4] - 4:16, 13:25, 123:25, 126:3
examined [2] - 22:8, 46:23
example [1] - 248:4
examples [1] - 119:6
exams [2] - 38:12, 154:14
exceedingly [1] - 241:8
exceeds [1] - 254:16
except [5] - 182:16,
excess [1] - 232:17
exchange [3] - 8:3, 245:21, 246:5
excisional [1] - 125:10
excuse [5] - 14:17, 84:17, 85:4, 89:12, 178:17
executed [2] - 67:25, 68:10
exhibit [4] - 11:8, 12:9, 12:10, 247:16
Exhibit [25] - 5:2, 5:7, 5:8, 5:9, 5:10, 5:21, 6:6, 6:7, 11:8, 11:18, 12:9, 12:18, 12:21, 13:1, 64:15, 64:17, 194:19, 195:6, 227:6, 227:11, 227:20, 228:3, 228:6, 245:25, 246:2, 253:25
EXHIBITS [1] - 2:8
exhibits [1] - 12:17
exist [1] - 109:23
existed [2] - 82:9, 109:19
expect [2] - 16:19, 52:22
expected [1] - 105:20
expense [2] - 203:18, 203:20
expensive [4] - 119:21, 120:7, 156:19, 211:11
experience [13] - 43:5, 66:4, 73:6, 73:8,

81:1, 82:3, 82:22, 87:4, 162:11, 202:23, 216:22, 243:25, 244:3
experienced [5] - 60:12, 83:5, 85:1, 147:15, 152:13
experiencing [4] - 101:25, 114:11, 148:9, 148:11
expert [4] - 5:3, 12:19, 73:24, 94:12
expired [1] - 195:13
explain [13] - 12:14, 83:2, 119:14, 154:19, 165:1, 168:16, 170:17, 183:14, 202:25, 203:11,
explanation [5] - 27:1, 38:17, 39:25, 40:24, 41:20
explanations [1] - 26:19
explosive [2] - 140:1, 140:2
express [1] - 43:1
expressed [1] - 58:9
extended [7] - 27:11, 66:5, 74:9, 96:23, 160:9, 172:24, 224:19
extended-release [5] - 27:11, 66:5, 74:9, 96:23, 172:24
extensive [5] - 38:23, 76:3, 88:7, 96:18, 177:25
external [1] - 103:12
extra [1] - 31:20
extractions [1] - 41:3
extremes [1] - 92:12
extremities [4] - 135:15, 138:3, 140:14, 141:7
extremity [10] - 135:16, 135:17, 146:20, 147:16, 147:17, 148:10, 149:10, 150:24, 151:12, 153:5

**F**

face [8] - 81:7, 162:24, 170:13, 185:8, 185:14

face-to-face [3] - 162:24, 170:13, 185:14
FaceTime [1] - 169:16
facilitate [1] - 250:9
facility [7] - 57:22, 58:10, 58:11, 93:13, 169:6, 220:23, 224:21
facing [1] - 109:3
fact [16] - 7:17, 9:11, 9:14, 10:5, 16:9, 16:12, 76:24, 84:4, 86:18, 94:21, 106:9, 180:17, 189:15, 194:10, 202:21, 236:19
factors [1] - 81:22
factory [2] - 108:21, 146:6
facts [1] - 220:18
fair [3] - 31:10, 34:7, 256:11
fairly [2] - 160:21, 181:15
fake [1] - 218:10
fall [17] - 26:19, 108:5, 108:17, 108:20, 109:2, 123:10, 124:19, 131:13, 135:24, 143:23, 150:10, 152:2, 153:23, 153:24, 153:25, 163:21, 165:18
fallen [5] - 18:21, 137:6, 140:1, 151:25, 152:18
falling [3] - 144:24, 152:3, 221:1
fallopian [1] - 125:8
false [1] - 42:5
familiar [3] - 25:6, 25:25, 26:5, 31:2, 32:14, 39:22, 83:3, 139:20, 197:19, 197:24, 199:1, 209:19, 219:12
family [9] - 37:3, 55:14, 55:16, 61:6, 61:7, 104:14, 174:3, 210:12, 224:3
far [26] - 4:14, 28:13, 34:22, 60:14, 62:6, 65:3, 76:16, 84:20, 87:5, 102:19, 129:22, 155:11, 158:12, 165:16, 170:10, 180:15, 198:22, 199:12, 201:17,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

201:18, 214:7, 214:11, 214:14, 219:14, 245:7, 253:21
**farm** [2] - 35:24, 48:24
**fashion** [1] - 21:1
**fast** [2] - 66:12, 234:25
**faster** [3] - 49:7, 106:18, 243:9
**fastest** [2] - 167:4, 167:16
**father** [1] - 68:10
**favoring** [2] - 91:12
**fax** [3] - 183:2, 183:7, 246:19
**faxed** [2] - 115:10, 115:12
**faxing** [1] - 182:24
**FDA** [2] - 75:6, 164:21
**FDA's** [1] - 164:24
**Fearin** [3] - 124:7, 124:16, 124:17
**Fearin's** [1] - 124:8
**February** [3] - 55:10, 175:20, 254:9
**Federal** [3] - 181:2, 184:14, 184:16
**federal** [1] - 178:11
**federally** [2] - 56:8, 56:17
**federally-qualified** [2] - 56:8, 56:17
**FedEx** [2] - 188:11, 188:12
**FedExed** [5] - 165:1, 165:7, 165:13, 188:12, 188:19
**FedExing** [4] - 164:6, 164:9, 164:16, 173:8
**fee** [7] - 185:23, 186:22, 186:25, 187:1, 187:19, 189:4, 189:14
**feed** [1] - 210:12
**feet** [5] - 59:3, 59:22, 68:22, 135:25, 144:4
**Felicia** [3] - 71:11, 75:15, 84:9
**fell** [3] - 124:19, 136:3, 154:1
**felt** [9] - 38:17, 95:4, 113:18, 132:2, 159:9, 171:1, 218:20, 245:8, 255:9
**female** [3] - 176:10, 176:11, 229:15
**females** [1] - 229:13
**fentanyl** [1] - 235:25

**few** [24] - 25:20, 26:25, 30:4, 52:21, 55:21, 56:11, 57:7, 57:18, 60:22, 63:6, 63:9, 89:3, 96:20, 106:21, 125:6, 161:14, 164:11, 178:10, 181:21, 183:1, 187:20, 188:17, 215:23, 244:1
**fibromyalgia** [2] - 150:6, 150:12
**field** [1] - 205:4, 217:22
**fifth** [1] - 142:7
**Fighting** [3] - 87:1, 88:11, 186:23
**figure** [2] - 187:20, 201:16
**figures** [1] - 209:10
**file** [1] - 44:15, 119:17, 158:12
**filed** [1] - 3:11
**files** [3] - 221:21, 222:2, 243:13
**fill** [42] - 26:11, 27:1, 28:4, 28:9, 28:16, 29:11, 29:15, 30:1, 30:10, 35:16, 36:9, 40:10, 40:16, 40:22, 41:22, 42:7, 42:17, 43:23, 44:10, 44:16, 44:24, 76:4, 85:25, 86:2, 102:8, 130:11, 130:13, 131:7, 168:12, 168:21, 169:11, 169:13, 171:6, 182:6, 192:25, 236:13, 240:5, 240:11, 241:13, 243:6, 248:13
**filled** [29] - 28:10, 30:4, 37:24, 38:3, 42:7, 45:3, 77:6, 104:3, 105:24, 105:25, 110:15, 110:20, 112:4, 130:14, 131:4, 133:13, 135:4, 183:3, 231:9, 236:11, 236:17, 236:18, 238:20, 239:12, 241:14, 241:24, 242:15, 242:23
**final** [2] - 21:4, 121:15
**finance** [1] - 209:24

**finances** [1] - 199:6
**financial** [2] - 156:18, 211:7
**findings** [1] - 82:21, 91:7, 92:24, 107:8, 109:11, 112:14, 113:20, 115:2, 116:23, 122:18, 129:23, 130:7, 135:3, 136:9, 137:9, 149:8, 153:11, 223:6
**fine** [2] - 94:21, 212:17
**fined** [1] - 61:3
**finish** [2] - 237:2, 237:7
**finished** [1] - 89:7,
40:25, 46:22, 51:2, 52:10, 52:21, 60:1, 60:5, 66:19, 75:23, 76:17, 77:15, 77:23, 78:18, 80:4, 80:8, 83:21, 86:18, 91:6, 95:16, 99:3, 102:14, 107:14, 122:13, 136:21, 154:21, 165:17, 165:18, 170:12, 178:11, 178:16, 179:15, 179:21, 183:14, 190:18, 202:25, 203:11, 206:19, 220:24, 222:14, 222:15, 232:3, 233:7, 235:6, 235:8, 237:20, 239:1, 246:20, 249:12
**first-time** [2] - 190:18, 233:7
**fisher** [7] - 68:12, 125:4, 125:13, 125:22, 126:3, 170:2, 182:2
**Fisher** [3] - 20:24, 125:2, 195:25
**Fisher's** [1] - 125:17
**fisher's** [4] - 67:10, 85:8, 125:4, 126:2
**five** [10] - 25:1, 97:1, 126:19, 139:25, 163:17, 175:20, 224:2, 251:2, 256:20, 256:21
**five-month** [1] -

175:20
**fixed** [1] - 163:20
**flag** [2] - 26:20, 27:10, 38:15, 39:9, 40:13, 41:7, 41:20, 42:1, 42:2, 43:14, 43:16, 44:9
**flagged** [1] - 34:17
**flags** [5] - 26:13, 26:15, 39:7, 45:2, 45:6
**fled** [1] - 221:4
**flight** [1] - 18:22
**flippant** [1] - 235:21
**float** [1] - 24:5
**floating** [1] - 24:4
**floods** [1] - 47:22
**flushed** [2] - 197:20, 254:23
**flushing** [5] - 197:4, 197:9, 197:11, 254:22, 254:23
**focus** [2] - 80:23, 155:3
**focused** [6] - 80:23, 81:3, 117:21, 118:8, 121:13, 249:19
**follow** [12] - 45:17, 70:23, 84:19, 89:22, 134:3, 167:10, 197:16, 213:20, 214:18, 215:6, 223:21, 257:24
**follow-up** [2] - 84:19, 223:21
**followed** [6] - 25:18, 33:11, 62:25, 65:19, 153:3, 169:25
**following** [3] - 102:17, 162:22, 191:10
**follows** [2] - 22:8, 46:23
**followup** [2] - 70:16, 171:21
**foot** [2] - 151:21, 211:11
**football** [3] - 41:10, 139:9, 147:25
**FOR** [1] - 1:3
**for-profit** [1] - 10:16
**Force** [12] - 51:1, 53:13, 205:22, 209:24, 225:17,

225:18, 226:2, 226:5, 226:14, 226:18
**force** [1] - 87:4
**Force's** [1] - 51:4
**forced** [1] - 226:6
**forceful** [2] - 32:4, 45:5
**forearm** [2] - 149:14, 153:3
**forestry** [1] - 47:15
**forget** [1] - 104:4
**Form** [15] - 93:23, 110:13, 113:5, 114:9, 124:15, 125:4, 130:9, 131:4, 132:5, 133:13, 137:3, 144:1, 146:1, 146:10, 147:7
**form** [26] - 68:18, 75:25, 76:1, 76:3, 77:9, 82:17, 83:8, 84:18, 88:6, 94:1, 102:12, 102:13, 109:1, 110:20, 117:15, 121:24, 132:11, 139:2, 139:23, 146:15, 154:21, 169:23, 191:18, 197:12, 197:14, 236:16
**Form)** [1] - 84:18
**formed** [1] - 153:10
**former** [3] - 87:25, 118:15, 209:17
**forms** [7] - 71:17, 79:24, 88:5, 88:8, 115:17, 189:1, 212:13
**Fort** [1] - 50:1
**forth** [1] - 229:3
**forward** [7] - 66:12, 70:24, 71:2, 101:15, 113:4, 115:21, 138:24
**fought** [1] - 51:10
**foundation** [2] - 159:1
**four** [19] - 19:9, 23:21, 37:1, 47:8, 51:18, 51:20, 51:23, 66:1, 97:1, 103:8, 118:17, 130:19, 132:12, 156:23, 158:15, 163:17, 201:8, 213:14, 224:2
**four-year** [2] - 51:18, 51:20, 51:23
**fracture** [2] - 108:18, 116:1, 116:13, 121:2, 149:14
**fractures** [5] - 100:22, 108:19, 109:3, 111:1

frank [1] - 152:15
**Frank** [5] - 97:25,
100:1, 152:5, 152:6,
156:7
**Franklin** [1] - 152:7
frankly [1] - 11:7
fraud [1] - 8:8
free [2] - 231:16,
231:20
frequently [2] -
80:16, 104:1
freshman [1] - 142:8
**Friday** [1] - 17:21
friend [2] - 176:16,
177:1
friends [1] - 30:3
front [10] - 60:18,
63:12, 76:9, 77:8,
79:9, 88:19, 123:2,
148:19, 169:23,
186:11
full [9] - 22:13,
23:21, 24:1, 24:5,
55:18, 101:20, 102:2,
163:14, 208:4
**full-time** [2] - 24:1,
24:5
fully [1] - 5:9
function [4] - 74:23,
87:22, 173:24, 249:20
functional [2] -
102:3, 103:14
functionality [1] -
172:25
functioning [1] -
250:10
fund [2] - 54:23,
206:20
funded [1] - 56:10
funding [2] - 206:23,
234:11
funds [3] - 156:19,
187:13, 187:21
fuzzies [2] - 27:16,
41:22
**FX** [1] - 108:19

## G

**G89.1** [1] - 97:19
**G89.21** [1] - 98:20
**G89.4** [2] - 96:12,
98:21
**G892.1** [1] - 96:12
gain [1] - 142:5
game [2] - 41:10,
139:9
**Gap** [1] - 1:24
garbage [1] - 220:5
gas [1] - 234:12

gastric [4] - 170:2,
181:18, 181:24, 182:2
gathered [1] - 130:25
gathering [1] -
240:23
gauze [1] - 41:4
**Gazelle** [2] - 30:1,
30:6
**General** [1] - 157:7
general [7] - 27:22,
52:23, 56:1, 71:16,
77:16, 145:16, 226:4
generalization [1] -
243:22
generally [4] - 27:21,
30:16, 34:1, 94:2
**Geneva** [1] - 107:22,
107:23, 107:24,
109:17
gentleman [3] -
19:13, 19:16, 86:24
gentlemen [1] - 3:2,
21:16, 45:15, 46:13,
89:19, 89:24, 104:20,
134:3, 159:2, 237:1,
257:20
**George** [2] - 126:9
given [19] - 19:7,
21:5, 38:12, 38:17,
40:11, 53:19, 53:20,
56:19, 58:17, 96:18,
136:3, 181:13,
185:25, 196:19,
211:4, 215:1, 248:4
glove [3] - 67:11,
202:1, 202:13
goal [8] - 62:10,
66:7, 74:25, 94:4,
155:1, 170:19,
170:22, 171:14
goals [1] - 250:8
**God** [2] - 22:1, 46:19
gout [2] - 70:7, 70:9
governed [1] - 206:8
**Government** [15] -
3:12, 3:15, 3:23, 4:16,
4:24, 5:1, 5:12, 5:19,
8:8, 9:1, 9:3, 13:7,
15:2, 16:10, 16:24
**Government's** [8] -
156:13, 194:19,
227:6, 227:11, 228:3,
228:6, 245:25, 246:2
governor [1] - 59:5
grade [1] - 142:7
gradual [1] - 123:13
gradually [1] -
147:10, 149:3
graduate [1] - 47:11,
51:22

graduated [10] -
23:10, 48:20, 49:8,
49:9, 49:13, 49:17,
49:18, 52:3, 179:12,
203:22
graduation [1] -
51:20
grand [1] - 209:8
grandfather [1] -
49:20
grandfathers [1] -
51:10
grandkids [1] - 174:1
grant [3] - 13:5,
13:16, 56:10
**grant-funded** [1] -
56:10

112:23, 112:24,
129:25, 144:20,
151:20, 153:4
greatly [1] - 84:7
**Greensboro** [4] -
47:6, 55:15, 56:21,
61:7
grew [2] - 48:23,
48:24
gross [1] - 208:5
ground [2] - 138:19,
164:18
grounds [1] - 14:23
groundwork [1] -
59:11
group [1] - 164:1
guess [6] - 6:11,
8:13, 50:11, 58:6,
65:16, 111:23
guessing [1] - 78:6
guesstimate [1] -
25:14
guesstimation [1] -
33:9
guidance [1] - 96:19
guide [3] - 76:6,
77:21, 229:12
guided [1] - 5:23
guy [1] - 9:20
gymnast [1] - 142:7
gynecology [1] -
52:11

## H

**H-a-y-e-s** [1] - 22:16
**Haaser** [1] - 142:10

habit [1] - 97:17
habits [1] - 141:24
**Hail** [2] - 12:1, 71:14
half [9] - 29:13, 34:8,
34:20, 36:20, 48:5,
61:16, 64:22, 179:8,
223:11
hall [2] - 59:19, 59:21
hand [4] - 21:23,
46:16, 81:6, 101:19
handed [8] - 12:12,
77:5, 77:7, 130:12,
227:23, 236:8, 236:10
handle [1] - 43:4
handled [1] - 169:23
handout [1] - 170:18
handouts [1] - 171:4

238:14, 238:15,
238:16, 239:19,
241:10, 241:20,
248:20, 249:1
handwritings [1] -
41:15
hard [6] - 40:15,
72:20, 86:20, 110:1,
180:17, 208:9
hardware [1] -
161:14
**Harlow** [13] - 127:14,
127:16, 128:1,
128:15, 128:16,
129:19, 130:16,
130:17, 155:24, 156:1
harm [3] - 31:16,
179:15, 179:22
harmful [1] - 247:10
**Harp** [1] - 3:24
**Harris** [1] - 215:21
**Harrogate** [1] - 50:6
**Hartshorn** [11] -
11:24, 12:3, 20:23,
37:9, 37:18, 75:2,
131:3, 131:4, 131:7,
254:8, 255:14
**Hartshorn's** [2] -
37:16, 44:17
**Hassel** [2] - 118:2,
120:18
hats [1] - 87:13
**HAYES** [2] - 2:3, 22:6
**Hayes** [10] - 21:18,
22:14, 22:16, 22:23,
23:3, 29:5, 40:8,
44:16, 166:3

head [15] - 33:17,
72:7, 81:5, 100:2,
100:7, 100:22,
101:14, 101:18,
103:8, 123:12,
124:10, 128:18,
139:11, 151:2
**head-on** [1] - 103:8
headache [1] - 98:18
headed [1] - 53:15
heads [1] - 65:9
heal [2] - 103:9,
123:8
**Health** [12] - 3:13,
3:21, 7:5, 7:16, 51:4,
52:5, 56:24, 56:25,
57:2, 193:8, 207:4,
249:15
health [17] - 3:21,
7:14, 10:17, 10:18,
13:14, 56:8, 56:9,
56:10, 56:17, 96:20,
115:12, 166:21,
173:3, 173:5, 249:20,
250:8
healthcare [6] - 6:21,
159:19, 246:24,
247:11, 249:19, 253:9
**Healthcare** [10] -
193:9, 193:10,
193:17, 195:1, 200:3,
202:9, 203:16,
203:25, 249:14,
249:16
hear [3] - 5:18,
21:12, 73:15
heard [7] - 8:21,
21:7, 72:25, 105:22,
164:6, 222:18, 230:24
hearing [1] - 11:3
hearsay [2] - 27:19,
157:20
heart [5] - 99:9,
113:2, 160:4, 160:24,
164:5
**Heather** [12] - 11:24,
37:9, 37:16, 37:17,
37:18, 131:3, 131:4,
131:7, 254:8, 254:9,
254:12, 255:14
**Heather's** [1] - 38:22
held [10] - 21:14,
45:18, 46:12, 89:23,
90:10, 134:5, 134:20,
237:12, 237:16,
257:25
helmet [1] - 136:24
help [11] - 11:16,
13:13, 22:1, 36:8,
46:19, 48:17, 51:14,

72:1, 73:10, 74:13, 76:5, 88:2, 142:11, 159:9, 159:11, 159:17, 160:6, 160:10, 163:9, 173:14, 173:23, 210:16, 211:6, 211:22, 217:4, 217:8, 217:10, 225:2, 227:15, 244:10, 245:18, 250:2

**helped** [6] - 49:20, 56:17, 84:4, 104:11, 104:12, 243:11

**helpful** [3] - 82:11, 88:9, 102:1

**helping** [4] - 29:19, 29:25, 48:13, 173:19

**helps** [1] - 12:13

**hematoma** [1] - 147:1

**Henry** [3] - 69:1, 195:16, 196:7

**herein** [2] - 22:7, 46:22

**herself** [1] - 83:10

**high** [10] - 47:11, 47:14, 65:20, 69:22, 121:4, 147:25, 158:11, 158:17, 204:22, 245:8

**High** [2] - 47:12, 47:13

**high"** [2] - 72:21, 73:7

**high-level** [1] - 69:22

**high-powered** [1] - 245:8

**high-risk** [1] - 158:11

**higher** [3] - 27:4, 75:1, 121:5

**highlighted** [1] - 251:10

**highly** [2] - 4:13, 250:6

**himself** [3] - 14:16, 25:8, 253:19

**hindsight** [1] - 160:11

**hip** [8] - 108:1, 108:22, 109:4, 109:5, 144:5, 144:6, 147:2, 149:16

**HIPAA** [2] - 197:6, 219:1

**Hippocratic** [2] - 179:11, 179:14

**hips** [2] - 131:10, 145:10

**hire** [3] - 215:20,

229:19, 229:22

**hired** [5] - 60:4, 88:21, 202:22, 215:18, 215:21

**histories** [1] - 104:13

**history** [20] - 7:15, 27:15, 40:7, 81:16, 81:17, 88:8, 92:25, 101:5, 104:14, 115:1, 116:24, 137:6, 142:7, 146:12, 150:4, 153:9, 162:13, 162:14, 209:19

**hit** [2] - 100:7, 128:18

**hmm** [1] - 36:19

**hold** [1] - 175:8

**holder** [1] - 89:8

**holding** [1] - 101:13

**holistic** [3] - 13:22, 170:22, 249:19

**holler** [1] - 100:5

**home** [10] - 53:8, 61:9, 61:11, 62:11, 62:21, 97:1, 174:3, 182:6, 244:11, 255:8

**homeschooled** [1] - 47:12

**honest** [3] - 31:24, 86:14, 86:17

**honestly** [2] - 65:18, 87:21

**Honor** [83] - 3:4, 3:9, 4:23, 4:25, 5:14, 5:20, 6:9, 7:20, 8:12, 9:1, 9:25, 10:9, 11:15, 12:11, 13:18, 15:4, 15:5, 15:8, 17:7, 17:10, 18:8, 18:18, 20:12, 21:11, 27:17, 28:20, 28:22, 44:11, 45:11, 46:7, 46:10, 63:24, 64:14, 65:6, 73:15, 73:20, 73:25, 77:25, 84:12, 90:6, 90:21, 91:3, 94:10, 95:6, 100:9, 100:15, 111:13, 114:20, 119:12, 120:2, 121:16, 121:23, 122:2, 126:15, 134:8, 134:22, 137:24, 157:10, 157:17, 158:23, 161:24, 164:15, 164:23, 166:16, 167:9, 173:10, 175:3, 178:5, 180:24, 226:22, 228:2, 234:17, 237:14, 237:18,

245:24, 247:13, 254:16, 256:8, 256:13, 257:1, 257:3, 257:8, 257:19

**HONORABLE** [1] - 1:11

**Honorable** [1] - 225:24

**honorable** [1] - 226:11

**Hope** [24] - 200:18, 200:22, 209:8, 209:10, 209:14, 210:4, 210:9, 210:17, 210:22, 210:24, 211:2, 212:22, 213:2, 213:8, 215:8, 216:11,

**hoping** [2] - 17:25, 18:5

**Hopkins** [10] - 132:5, 132:6, 132:9, 132:24, 133:5, 133:9, 133:14

**horrible** [1] - 204:20

**horrific** [1] - 35:12

**horse** [2] - 126:13, 144:25

**horses** [1] - 126:18

**hospice** [3] - 35:11, 35:16, 36:6, 37:10, 166:5

**hospital** [18] - 30:17, 37:2, 37:6, 49:19, 52:12, 53:5, 53:15, 54:22, 59:1, 61:16, 95:1, 98:4, 166:6, 167:3, 204:24, 205:9, 206:20

**hotel** [1] - 255:10

**hour** [4] - 34:8, 37:13, 201:11, 250:23

**hours** [15] - 7:10, 23:22, 24:7, 34:20, 36:20, 39:13, 53:6, 64:8, 64:10, 64:22, 66:1, 85:22, 201:12, 224:2, 238:10, 248:5

**hours'** [1] - 33:24

**house** [3] - 59:2, 201:5, 202:6

**HPMP** [20] - 3:22, 4:5, 4:9, 6:9, 6:17,

6:18, 6:19, 6:22, 6:24, 7:3, 8:3, 8:5, 10:14, 13:9, 13:21, 14:6, 14:9, 14:11, 14:22, 14:24

**Hubbard** [5] - 133:25, 134:25, 135:7, 135:23, 155:22

**Hubbard's** [1] - 135:21

**human** [1] - 101:8

**hunch** [1] - 138:24

**hundreds** [1] - 82:4

**Hurley** [7] - 136:6, 136:7, 136:9, 136:10, 136:14, 136:17, 247:15

*Donna J. Prather* (signature)

173:1, 182:5, 217:14, 220:2, 250:10

**HVAC** [1] - 136:10

**hydrocodone** [2] - 196:21, 198:11

**Hydromorphone** [1] - 32:18

**hydromorphone** [2] - 196:21, 198:11

## I

**ibuprofen** [5] - 70:8, 70:12, 70:13, 70:15, 70:17

**ICD** [2] - 83:16, 96:7

**ICD-10** [3] - 83:19, 99:17, 99:18

**ICD-7** [1] - 128:5

**ICD-9** [9] - 83:17, 99:16, 107:5, 108:4, 112:10, 116:19, 126:23, 128:6, 139:20

**ice** [1] - 151:25

**ICU** [2] - 30:17, 70:19

**ID** [2] - 30:19, 30:24

**Idaho** [2] - 228:9, 228:10

**idea** [8] - 48:17, 80:25, 181:12, 187:14, 187:15, 187:17, 187:18, 241:23

**identify** [1] - 162:15

**ignorance** [1] - 30:8

**II** [18] - 32:8, 42:14, 42:15, 51:10, 162:23, 175:23, 177:2, 177:20, 179:2,

182:10, 182:16, 182:19, 182:20, 182:24, 183:9, 183:17, 183:23, 196:20

**lls** [1] - 30:9

**ill** [1] - 255:9

**illegal** [2] - 13:15, 71:17

**illness** [3] - 7:13, 7:14, 76:5

**illnesses** [2] - 71:23, 73:11

**imbalance** [1] - 141:23

**immediate** [9] - 65:20, 66:8, 66:9, 74:7, 96:24, 172:21, 182:4, 184:7, 184:8

**immediate-release** [4] - 66:8, 66:9, 74:7, 96:24

**immediately** [10] - 6:23, 8:4, 9:11, 59:11, 79:13, 79:22, 89:2, 130:6, 161:9, 168:8

**impact** [2] - 3:6, 73:13

**impairment** [1] - 6:13

**impairs** [1] - 7:14

**impeach** [1] - 4:16

**impingement** [1] - 92:14

**implement** [3] - 69:18, 69:23, 86:22

**implementing** [1] - 214:1

**importance** [1] - 111:11

**important** [15] - 102:9, 103:5, 103:25, 104:5, 104:17, 175:6, 175:8, 175:10, 175:11, 232:2, 246:23, 247:7, 251:7, 252:11, 253:8

**impression** [1] - 159:23

**improve** [2] - 74:23, 74:24

**improved** [5] - 173:5, 249:20, 250:9, 250:10

**improvement** [2] - 84:23, 85:2

**improving** [1] - 85:19

**IN** [1] - 1:2

**in-person** [1] - 185:15

**inadmissible** [1] - 27:19

**incident** [2] - 38:6, 152:2

**include** [1] - 179:4

**included** [1] - 231:24

**including** [5] - 73:11, 96:22, 171:5, 249:21, 250:5

**income** [2] - 163:20, 202:20

**inconvenient** [1] - 237:3

**incorporated** [1] - 123:20

**increased** [5] - 95:21, 95:25, 96:23, 152:4, 251:13

**increases** [1] - 102:23

**independent** [4] - 111:19, 111:22, 125:21, 202:18

**INDEX** [1] - 2:1

**Indiana** [4] - 43:23, 228:9, 228:10, 228:12

**indicate** [15] - 85:17, 91:18, 91:21, 98:10, 105:8, 108:18, 112:19, 127:19, 129:8, 129:22, 146:2, 148:21, 179:7, 179:10, 198:2

**indicated** [40] - 3:15, 15:24, 16:8, 21:7, 46:3, 82:2, 91:24, 93:3, 93:14, 107:8, 109:1, 112:15, 123:13, 126:11, 126:17, 126:18, 127:20, 130:18, 131:9, 135:23, 137:6, 140:5, 142:5, 142:7, 142:19, 146:22, 147:9, 147:21, 151:14, 151:19, 151:25, 152:3, 152:17, 153:13, 153:23, 164:21, 164:24, 192:2, 257:10

**indicates** [7] - 107:16, 108:17, 139:10, 146:11, 146:13, 146:25, 197:12

**indicating** [7] - 117:10, 142:23, 142:24, 144:3, 181:6, 182:3, 188:9

**indication** [1] - 239:7

**indicted** [3] - 36:4, 36:14, 36:16

**indictment** [1] - 75:24

**individual** [2] - 158:22, 249:20

**Industrial** [1] - 220:21

**infection** [1] - 123:7

**inference** [1] - 218:17

**influx** [1] - 220:22

**inform** [1] - 154:21

**information** [38] - 3:13, 5:5, 11:11, 12:2, 26:1, 27:15, 30:21, 33:19, 40:19, 66:3, 76:4, 76:9, 80:1, 82:6, 93:9, 93:12, 94:23, 95:17, 102:13, 102:15, 106:13, 110:23, 115:18, 126:6, 162:6, 186:11, 236:22, 238:20, 239:22, 240:24, 241:14, 241:15, 243:8, 243:9, 247:10, 251:8

**informed** [4] - 54:24, 66:21, 158:12, 206:19

**Initial** [41] - 99:2, 110:13, 113:4, 114:9, 118:4, 123:15, 124:8, 125:4, 125:17, 126:21, 127:25, 129:19, 130:2, 131:3, 131:15, 132:5, 132:13, 133:5, 133:13, 135:1, 136:6, 136:14, 137:2, 139:14, 140:8, 140:25, 141:17, 143:13, 144:15, 144:22, 145:17, 146:1, 146:9, 147:7, 147:13, 148:4, 150:2, 150:21, 151:8, 153:1, 153:15

**initial** [49] - 3:14, 17:18, 67:20, 84:19, 88:6, 92:3, 97:12, 102:7, 108:14, 109:2, 110:23, 116:17, 117:15, 118:13, 122:11, 129:1, 130:15, 137:16, 137:17, 140:20, 142:3, 143:1, 144:8, 146:15, 146:21, 147:3, 147:14,

148:13, 148:14, 149:5, 149:6, 149:18, 151:4, 151:17, 152:5, 158:5, 158:7, 159:6, 159:7, 162:25, 171:6, 171:11, 171:16, 171:21, 171:24, 172:1, 172:11, 186:17, 223:18

**initials** [2] - 50:14, 186:4

**injured** [11] - 108:22, 114:12, 117:16, 121:3, 121:7, 136:21, 138:21, 150:10, 150:11, 151:16, 154:1

**injuries** [20] - 80:15,

147:23, 147:24

**injury** [26] - 91:23, 103:7, 108:15, 108:16, 109:2, 109:7, 114:13, 117:13, 120:24, 123:3, 124:16, 127:16, 127:20, 127:21, 132:10, 133:15, 136:5, 136:20, 136:22, 136:25, 137:5, 144:23, 149:2, 151:3, 153:24

**innocence** [1] - 16:11

**inputs** [1] - 72:16

**inside** [3] - 57:22, 58:10, 165:10

**inspection** [5] - 213:20, 214:6, 214:19, 215:5, 223:25

**inspectors** [5] - 218:10, 219:20, 220:15, 221:8, 221:20

**instance** [1] - 213:12

**instead** [1] - 224:7

**instituted** [1] - 197:4

**instruct** [3] - 16:7, 16:8, 16:12

**instructed** [1] - 220:8

**instruction** [1] - 184:13

**insurance** [23] - 27:10, 96:20, 119:22, 156:15, 156:16,

156:19, 156:21, 157:3, 157:5, 167:5, 192:24, 212:14, 212:15, 212:16, 244:17, 244:20, 252:7, 253:5, 253:7, 253:14, 253:16, 253:17

**Intake** [14] - 110:13, 113:4, 114:9, 124:15, 125:4, 130:9, 131:3, 132:5, 133:13, 137:3, 143:25, 146:1, 147:7, 150:3

**intake** [6] - 76:1, 76:16, 139:2, 139:23, 142:17, 171:6

**intended** [2] - 3:16, 3:23

**intensive** [1] - 64:11

**intent** [5] - 8:9, 11:1, 62:5, 173:9, 173:14

**intention** [4] - 18:1, 69:1, 174:19, 250:13

**intentions** [3] - 159:16, 159:17, 160:3

**interaction** [2] - 219:24, 219:25

**interchangeably** [1] - 71:19

**interest** [2] - 58:9, 217:11

**interested** [2] - 57:19, 57:23

**interests** [2] - 160:24, 164:5

**interim** [1] - 94:2

**intern** [1] - 206:7

**internal** [7] - 52:12, 54:21, 54:23, 54:25, 206:21, 206:22, 249:22

**International** [1] - 2:13

**international** [1] - 83:16

**internet** [1] - 5:22

**internship** [19] - 6:11, 51:21, 51:23, 52:2, 52:4, 52:8, 53:17, 53:21, 54:1, 54:9, 54:19, 54:20, 95:1, 203:24, 203:25,

204:1, 206:3, 225:19, 225:22

**interrupt** [1] - 76:19, 202:24, 236:25

**interstate** [1] - 54:3

**Interventional** [2] - 63:18, 64:5

**interventions** [1] - 84:21

**interview** [3] - 79:14, 91:8, 110:21

**interviewed** [2] - 65:23, 142:20

**interviews** [2] - 56:18, 158:9

**intolerant** [1] - 169:9

**introduce** [2] - 3:23, 4:13, 7:25

**introduced** [5] - 4:24, 5:7, 13:15, 193:14, 194:20

**invented** [2] - 119:10, 119:11

**Inventory** [6] - 84:18, 93:23, 236:10, 236:13, 236:18, 239:6

**invest** [5] - 156:20, 192:2, 192:5, 192:8, 192:12

**investigated** [2] - 154:24, 156:16

**investigating** [1] - 192:17

**investigation** [1] - 191:22

**investigations** [2] - 111:19, 111:22

**investing** [1] - 192:13

**investor** [3] - 191:16, 191:25, 192:1

**investors** [1] - 192:3

**involuntary** [1] - 79:18

**involve** [1] - 216:4

**involved** [16] - 12:5, 14:6, 14:9, 35:25, 49:15, 50:25, 51:6, 91:18, 91:21, 100:2, 107:16, 118:17, 139:5, 161:25, 213:5

**involves** [2] - 14:22, 139:8

**involving** [2] - 11:25, 116:18

**iPhone** [2] - 193:19, 193:21

**IRS** [5] - 67:16, 68:1, 202:2, 202:12, 202:14

**issuance** [1] - 181:3

**issue** [21] - 57:11, 81:3, 92:6, 106:6, 106:25, 108:1, 109:5, 117:14, 124:14, 129:9, 129:10, 129:24, 143:19, 143:20, 156:23, 186:8, 208:20, 240:16, 240:19, 244:25, 245:1

**issued** [4] - 66:13, 170:11, 185:20, 240:12

**issues** [30] - 6:13, 13:13, 15:17, 55:15, 71:24, 76:6, 85:18, 95:21, 101:6, 106:21, 106:22, 107:1, 107:11, 107:25, 108:25, 117:22, 125:12, 129:12, 131:10, 131:11, 136:1, 145:24, 159:16, 181:5, 197:6, 208:17, 227:15, 240:10, 245:16

**items** [1] - 211:4

**itself** [1] - 61:13

**IVs** [1] - 37:2

---

## J

**Jack** [2] - 147:19, 155:14

**jail** [1] - 32:5

**JAMES** [1] - 1:11

**James** [2] - 143:8, 143:13

**January** [2] - 175:19, 248:6

**jasmithers@gmail. com** [1] - 194:4

**Jason** [3] - 109:16, 110:11, 156:5

**Jeffersonville** [2] - 43:23, 228:8

**Jennifer** [1] - 146:21

**Jerry** [2] - 144:15, 144:17

**Jersey** [2] - 48:22, 49:1

**Jessica** [2] - 29:20, 148:13

**Jessie** [10] - 137:2, 137:5, 137:15, 138:10, 138:15, 139:2, 139:3, 139:12, 234:1, 235:16

**Jessie's** [1] - 137:16

**Jessies** [5] - 174:11, 232:16, 232:21,

---

233:4, 233:14

**Jewell** [3] - 139:22, 139:24, 140:11

**Jewell's** [1] - 139:23

**Jikad** [1] - 48:12

**Jim** [1] - 59:5

**job** [15] - 39:14, 56:14, 56:19, 201:18, 202:23, 207:1, 207:11, 216:2, 216:4, 229:19, 229:23, 243:10, 243:11, 243:18, 243:23

**jobs** [3] - 52:20, 52:24, 207:2

**Joel** [9] - 2:10, 7:11, 46:15, 47:4, 47:5, 194:7, 227:2, 235:10, 235:13

**JOEL** [3] - 1:8, 2:5, 46:21

**John** [1] - 128:15

**Johnson** [5] - 234:13, 234:14, 235:5, 235:17, 235:19

**Johnson-Rose** [3] - 234:13, 235:5, 235:17

**joined** [1] - 47:18

**joint** [3] - 145:8, 145:9, 148:12

**Jonathan** [2] - 54:16, 54:17

**Jones** [1] - 176:7

**JONES** [1] - 1:11

**Josh** [1] - 220:7

**Joshua** [1] - 143:25

**Jr** [3] - 1:22, 234:23, 235:4

**Juan** [4] - 198:23, 199:24, 202:16, 203:9

**Judge** [5] - 11:22, 14:10, 14:21, 20:17, 20:24

**JUDGE** [1] - 1:11

**judge** [1] - 40:15

**judgment** [6] - 35:15, 53:8, 163:2, 191:13, 224:18, 255:13

**Juhan** [1] - 1:19

**July** [11] - 47:9, 50:8, 60:18, 63:21, 64:6, 195:20, 221:5, 221:12, 222:8, 222:14, 222:15

**June** [23] - 49:9, 55:5, 58:15, 60:2, 60:18, 204:11, 204:13, 206:15, 206:20, 206:25, 207:15, 211:25,

---

212:19, 213:9, 215:8, 215:18, 216:11, 216:17, 217:18, 221:7, 221:13, 222:16

**JURY** [1] - 1:11

**jury** [54] - 8:16, 10:22, 11:3, 11:16, 14:24, 16:7, 16:8, 16:9, 16:12, 21:13, 21:14, 45:18, 46:11, 46:12, 47:3, 71:8, 75:17, 75:25, 89:16, 89:23, 90:5, 90:9, 90:10, 97:8, 105:22, 120:5, 134:5, 134:17, 134:19, 134:20, 154:19, 157:20, 159:22, 161:3, 164:9, [illegible], 237:22, 246:3, 251:11, 252:10, 257:25

**jury's** [2] - 14:11, 78:13

**Justice** [1] - 59:5

**justifiable** [1] - 37:7, 41:21, 44:7

**justification** [1] - 38:24

---

## K

**keep** [12] - 26:17, 33:13, 78:8, 78:25, 84:22, 163:12, 187:21, 189:1, 199:5, 222:3, 230:22, 243:21

**keeping** [1] - 187:13

**Kentuckiana** [2] - 228:14, 229:3

**Kentucky** [9] - 63:7, 106:3, 106:6, 106:7, 119:24, 122:25, 160:18, 161:16, 170:21

**kept** [4] - 24:5, 181:17, 243:13, 257:21

**key** [1] - 209:9

**Kicklighter** [7] - 140:17, 140:18, 141:1, 141:8, 155:20, 174:15, 222:18

**kids** [5] - 47:8, 201:8, 225:10

**kind** [32] - 3:15,

---

20:19, 23:11, 25:22, 28:16, 40:19, 42:24, 52:15, 52:16, 57:11, 57:20, 63:10, 63:17, 65:13, 71:14, 78:22, 87:22, 92:4, 95:8, 99:24, 100:4, 102:6, 108:25, 148:18, 163:25, 182:7, 184:20, 187:18, 197:24, 208:15, 211:7, 255:11

**kitchen** [1] - 66:22

**Kmart** [1] - 23:21, 24:6, 24:13, 29:18

**knee** [13] - 129:10, 131:10, 147:25, 149:12, 149:47, [illegible], 225:6

**knowledge** [9] - 78:13, 82:3, 100:17, 157:11, 158:21, 192:4, 225:1, 226:20, 242:12

**knowledgeable** [1] - 37:12

**known** [2] - 31:11, 41:9

**Kovaleski** [6] - 122:25, 141:17, 141:20, 142:3, 142:12, 174:17

**Kristen** [1] - 36:7

**Kristin** [1] - 215:21

---

## L

**lab** [7] - 70:10, 120:1, 167:4, 192:9, 210:18, 220:10

**LabCorp** [1] - 59:19

**labeled** [1] - 61:2

**lack** [1] - 234:11

**lacking** [1] - 26:21

**ladies** [11] - 3:2, 21:15, 45:15, 46:13, 89:19, 89:24, 104:20, 134:3, 159:2, 237:1, 257:20

**lady** [3] - 18:20, 18:21, 257:14

**laid** [1] - 59:11

**land** [1] - 18:22

**Land** [1] - 47:19

---

**landing** [1] - 152:2

**landlord** [1] - 221:1

**large** [7] - 58:17, 59:2, 59:3, 59:6, 67:11, 67:13, 147:1

**larger** [1] - 33:10

**largest** [1] - 161:15

**Larry** [3] - 153:15, 157:14, 157:22

**Lassiter** [1] - 30:4

**last** [25] - 17:25, 18:5, 18:22, 22:15, 31:8, 50:14, 62:2, 66:1, 68:14, 82:19, 97:4, 118:18, 178:19, 218:10, 220:9, 230:24, 233:18, 234:22, 235:3, 235:19, 235:20, 237:1, 237:25, 238:10, 257:11

**ate** [6] - 17:21, 209:1, 209:3, 229:25, 230:14, 257:21

**Law** [1] - 1:23

**law** [18] - 42:10, 61:5, 87:3, 87:25, 95:4, 180:21, 184:9, 185:4, 201:1, 213:20, 214:1, 214:5, 214:18, 214:21, 214:22, 215:6, 223:20, 223:24

**laws** [6] - 24:21, 30:13, 60:24, 176:1, 219:13, 223:13

**leading** [2] - 158:24, 256:13

**league** [2] - 41:11, 61:17

**lean** [1] - 138:24

**learn** [6] - 43:4, 79:16, 95:8, 95:9, 184:25, 185:1

**learned** [4] - 66:3, 79:17, 86:19, 166:13

**learning** [1] - 43:5

**least** [15] - 14:8, 17:22, 17:24, 34:7, 64:9, 85:22, 95:23, 118:17, 158:16, 183:6, 200:16, 201:12, 213:14, 235:19, 251:15

**leave** [12] - 30:25, 45:13, 57:6, 57:14, 68:11, 166:22, 184:21, 203:4, 205:25, 206:18, 221:5, 246:10

**leaves** [1] - 226:9

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276)243-2516

Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 277 of 296   PageId#: 11411

leaving [1] - 225:19
lectern [1] - 3:8
led [2] - 175:17, 191:8
Lee [1] - 1:19
LEE [7] - 2:4, 27:17, 29:2, 40:21, 43:13, 44:11, 45:11
leeway [2] - 91:2, 225:2
left [59] - 40:9, 60:20, 106:24, 107:2, 108:1, 108:22, 109:4, 109:5, 112:23, 112:24, 118:11, 123:6, 127:22, 129:7, 129:9, 129:25, 135:16, 136:2, 137:7, 141:7, 144:20, 147:2, 147:17, 147:25, 148:10, 148:11, 148:12, 148:16, 148:17, 149:2, 149:10, 149:14, 149:16, 149:17, 150:24, 151:11, 151:21, 152:10, 152:14, 153:5, 181:10, 181:22, 201:1, 204:11, 204:16, 206:15, 207:9, 207:11, 207:16, 208:7, 208:8, 209:5, 209:6, 216:3, 221:20, 223:12, 225:8, 225:9, 238:19
leg [11] - 91:16, 95:25, 106:24, 118:9, 118:10, 127:22, 129:25, 136:2, 145:1, 146:4, 150:9
legal [6] - 35:22, 35:25, 42:19, 71:17, 75:6, 204:18
legitimate [59] - 28:3, 35:14, 44:10, 92:23, 93:3, 101:21, 101:22, 107:10, 107:20, 109:9, 109:12, 109:19, 109:22, 112:12, 113:19, 113:21, 115:3, 117:1, 117:2, 117:23, 120:19, 122:16, 124:3, 124:21, 126:7, 127:8, 128:13, 129:14, 130:25, 131:25, 132:1, 133:3, 133:22, 133:23, 154:5, 154:8,

154:11, 174:22, 176:2, 176:3, 176:6, 176:12, 176:13, 176:19, 177:5, 177:7, 177:10, 177:22, 177:23, 178:2, 180:11, 191:20, 191:22, 215:14, 223:5, 243:10, 244:9
legitimately [1] - 196:18
legs [4] - 114:14, 131:10, 144:4, 145:9
length [1] - 175:6
less [4] - 25:18, 52:21, 173:1, 173:5
Less [1] - 225:24
lessons [1] - 86:19
letter [10] - 14:1, 68:1, 93:6, 226:25, 227:1, 249:6, 249:13, 250:16, 250:17
letterhead [2] - 226:15, 226:16
letters [1] - 96:5
letting [1] - 77:19
level [6] - 31:25, 69:22, 72:11, 103:15, 244:2
levels [2] - 96:22, 96:23
lever [1] - 146:25
license [26] - 3:20, 4:8, 4:9, 4:10, 4:11, 6:15, 6:16, 8:4, 8:9, 9:4, 10:15, 10:19, 26:8, 56:1, 56:2, 56:5, 58:22, 59:12, 59:13, 61:23, 62:1, 200:5, 207:19, 215:4, 223:24
licensed [6] - 23:16, 61:20, 200:4, 200:7, 213:19, 214:18
licenses [2] - 56:4, 215:25
licensing [2] - 217:19, 223:13
licensure [5] - 55:18, 55:20, 58:20, 213:23, 215:2
lie [2] - 9:14, 205:14
lied [1] - 204:20
lies [1] - 9:17
life [20] - 35:13, 37:5, 41:10, 48:10, 49:23, 51:8, 53:5, 66:7, 74:24, 75:1, 75:4, 83:5, 102:12, 172:25, 173:23, 173:24, 202:7, 233:20, 237:8,

250:11
lifting [4] - 103:2, 113:11, 146:12, 151:15
light [2] - 68:15, 166:3
likelihood [1] - 105:8
likely [4] - 117:10, 132:20, 155:4, 167:5
limit [1] - 94:19
limited [3] - 92:10, 92:11, 149:23
limp [1] - 116:5
Lincoln [1] - 50:5
Lindsay [3] - 142:17, 142:18, 143:10
Lindsey's [1] - 
List [1] - 2:10
list [4] - 19:7, 62:18, 227:22
listed [5] - 96:15, 132:18, 137:11, 144:11, 193:20
listen [1] - 70:23
listening [1] - 229:16
lists [2] - 160:22, 227:25
live [10] - 22:17, 24:18, 26:22, 26:24, 47:5, 47:6, 47:7, 75:9, 103:16, 201:5
lived [8] - 49:19, 81:18, 100:4, 102:20, 160:18, 173:24, 216:22
lives [1] - 75:9
living [4] - 103:12, 124:18, 201:3, 201:7
Lloyd [4] - 53:10, 53:11, 53:14, 205:4
loan [1] - 156:17
local [1] - 48:16
located [2] - 34:4, 85:20
location [1] - 221:11
locations [1] - 56:20
locked [5] - 35:17, 36:8, 68:21, 68:24, 222:4
logging [1] - 124:20
logical [1] - 38:17
long-acting [1] - 96:23
long-term [3] - 

62:12, 71:3, 173:4
long-time [1] - 120:25
look [24] - 6:5, 14:7, 26:2, 26:7, 26:14, 27:6, 28:11, 33:16, 40:6, 44:4, 75:23, 96:16, 164:2, 178:8, 179:4, 218:1, 218:14, 218:23, 219:10, 237:20, 238:11, 244:14, 245:20
looked [2] - 12:16, 34:13, 37:7, 44:21, 57:18, 59:2, 99:20, 131:24
looking [16] - 33:18, 33:22, 57:24, 59:14, 
looks [8] - 25:24, 50:18, 77:12, 80:9, 83:9, 138:25, 144:6, 227:7
Lora [4] - 140:17, 155:20, 174:15, 222:18
losing [2] - 159:15, 214:1
lost [6] - 60:8, 106:4, 161:19, 161:21, 207:17, 207:19
loud [3] - 45:4, 234:21, 251:12
low [35] - 80:12, 80:13, 80:14, 92:12, 92:18, 96:1, 96:14, 96:22, 106:25, 108:1, 114:13, 116:2, 116:12, 117:7, 117:9, 124:11, 127:21, 128:21, 132:21, 133:10, 133:11, 137:12, 137:17, 139:19, 144:3, 144:10, 144:19, 145:21, 148:8, 149:16, 150:9, 151:10, 158:10, 158:14
low-risk [1] - 158:10
lower [54] - 91:14, 101:6, 106:24, 111:2, 112:20, 116:21, 118:9, 121:7, 128:6, 129:24, 131:10,

131:20, 132:21, 135:13, 135:14, 135:15, 135:16, 135:17, 136:19, 137:8, 138:15, 140:7, 140:13, 140:14, 141:6, 141:7, 143:6, 143:21, 146:4, 146:6, 146:19, 146:20, 147:1, 147:4, 147:14, 147:16, 147:17, 148:10, 148:15, 149:2, 149:9, 149:10, 149:20, 150:11, 150:23, 150:24, 151:1, 151:12, 151:16, 151:20, 152:10, 153:18, 153:25, 154:1
LS [1] - 112:21
lumbar [2] - 112:21, 127:18
lunch [3] - 89:13, 89:17, 89:20

## M

M.79.2 [1] - 96:15
M.D [1] - 50:14
M54.10 [2] - 98:21, 136:12
M54.16 [1] - 96:14
M54.5 [1] - 98:22
M62.838 [2] - 96:14, 98:19
ma'am [1] - 46:20
macromastia [1] - 142:9
Madam [3] - 6:7, 12:24, 15:19
mail [12] - 3:23, 175:23, 176:18, 177:20, 182:25, 194:6, 220:8, 226:17, 226:19, 226:20, 255:15, 255:18
mailed [5] - 93:7, 177:3, 189:5, 232:13, 233:1
mails [1] - 189:7
main [7] - 4:22, 5:16, 63:8, 72:5, 72:7, 72:8, 115:22
Main [1] - 1:20
maintain [4] - 35:3, 172:15, 193:7, 218:19
maintained [1] - 178:25
maintaining [2] - 71:4, 243:18
maintenance [2] - 

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

27:12, 105:15
**major** [2] - 57:11, 123:10
**majority** [3] - 33:11, 38:14, 256:12
**mammoplasty** [1] - 142:11
**man** [2] - 70:19, 151:24
**management** [13] - 14:17, 14:19, 52:14, 64:20, 76:2, 105:1, 159:19, 160:20, 171:24, 214:4, 218:3, 225:3, 244:10
**manager** [5] - 66:20, 87:14, 209:13, 209:17, 218:7
**managers** [1] - 87:2
**managing** [2] - 163:9, 187:12
**maneuvers** [1] - 81:13
**manifested** [1] - 250:9
**manipulation** [1] - 81:12
**manipulative** [3] - 50:17, 170:24, 170:25
**Manipulative** [1] - 249:23
**mannequin** [1] - 85:16
**manner** [1] - 181:3
**manual** [1] - 83:17
**March** [4] - 55:10, 66:16, 195:18, 198:15
**Marcum** [2] - 234:23, 235:4
**Marian** [2] - 143:25, 144:1
**mark** [4] - 12:20, 77:18, 98:8, 98:9
**Mark** [7] - 86:24, 102:23, 187:5, 209:9, 209:14, 209:17, 218:5
**MARKED** [1] - 2:8
**marked** [4] - 148:19, 148:20, 227:5, 227:17
**marks** [3] - 88:4, 240:10
**Marshall** [1] - 142:8
**Martinsville** [26] - 34:3, 34:9, 34:12, 34:13, 42:21, 43:15, 43:22, 61:15, 61:25, 62:4, 62:22, 68:9, 71:6, 74:4, 157:1, 178:16, 178:23, 193:11, 196:6, 200:3,

201:13, 203:21, 224:9, 230:1, 246:19, 249:18
**matches** [1] - 194:9
**material** [1] - 6:9
**matter** [6] - 3:10, 13:19, 53:20, 89:14, 89:22, 134:8
**matters** [2] - 3:5, 36:1
**MAY** [1] - 1:12
**may-fill** [4] - 169:11, 240:5, 240:11, 248:13
**Maynard** [3] - 144:15, 144:17
**mean** [125] - 7:8, 7:18, 7:19, 7:24, 8:6, 8:7, 8:14, 8:21, 8:22, 11:7, 11:17, 12:8, 14:17, 15:11, 15:12, 16:16, 18:5, 20:14, 36:25, 38:17, 39:20, 40:17, 41:9, 42:2, 43:5, 48:10, 60:3, 62:8, 62:14, 62:17, 63:10, 63:15, 71:20, 76:24, 77:15, 79:2, 85:15, 86:13, 89:4, 94:19, 95:3, 95:4, 95:6, 108:6, 110:6, 112:6, 115:7, 116:8, 120:4, 137:25, 154:18, 154:22, 163:9, 163:23, 164:2, 166:3, 166:4, 167:17, 172:8, 173:4, 173:22, 176:7, 179:25, 180:8, 180:9, 180:15, 183:11, 183:12, 184:10, 184:19, 185:14, 187:20, 188:1, 188:8, 190:10, 190:20, 192:19, 193:3, 194:18, 198:7, 199:2, 199:3, 201:5, 201:16, 201:18, 208:14, 210:17, 210:19, 210:22, 210:23, 211:4, 211:20, 213:10, 214:7, 216:20, 216:24, 217:4, 217:8, 217:9, 222:9, 223:10, 224:20, 229:21, 231:17, 232:16, 233:12, 234:2, 234:9, 235:20, 236:16, 239:10, 241:19, 244:2, 247:1, 247:17, 248:10, 252:4,

254:18, 255:11, 256:2, 256:4, 256:14
**meanings** [1] - 71:19
**means** [9] - 16:6, 52:9, 172:9, 179:21, 179:23, 186:5, 217:9, 247:19, 247:25
**measure** [1] - 81:4
**med** [1] - 179:12
**medial** [1] - 253:6
**Medicaid** [2] - 119:23, 206:8
**medical** [144] - 28:3, 38:17, 39:4, 48:7, 48:9, 49:22, 49:24, 50:3, 50:4, 50:14, 51:3, 52:3, 54:16, [...], 109:22, 111:24, 112:12, 113:17, 113:19, 113:21, 113:24, 114:17, 115:1, 115:3, 115:11, 116:24, 117:1, 117:23, 118:25, 119:2, 119:3, 119:4, 120:19, 121:14, 121:23, 121:25, 122:16, 122:18, 124:3, 124:5, 124:21, 126:7, 127:8, 128:13, 129:14, 130:25, 131:25, 132:1, 133:3, 133:22, 133:23, 145:16, 153:9, 154:5, 154:8, 154:12, 154:25, 156:17, 159:16, 162:13, 162:23, 166:14, 167:15, 170:11, 174:22, 176:3, 176:12, 176:13, 176:19, 177:7, 177:10, 177:22, 177:25, 178:2, 180:11, 182:4, 184:6, 184:8, 184:23, 191:1, 191:5, 191:20, 191:22, 191:23, 193:4, 197:23, 200:2, 200:10, 200:11, 200:13, 200:16, 200:21, 200:25, 203:22, 207:1,

209:11, 215:14, 215:19, 215:25, 219:1, 221:12, 221:24, 223:5, 223:22, 224:18, 225:4, 232:17, 236:11, 243:10, 243:13, 243:19, 244:21, 244:25, 245:1, 245:4, 246:17, 246:20, 246:21, 249:17, 250:1, 250:3, 250:22, 252:7, 252:23
**Medical** [5] - 23:10, 55:18, 59:18, 206:4, 227:3
**Medicare** [1] - 206:9
medication [...], 96:25, 109:24, 127:10, 154:11, 161:23, 162:14, 163:2, 167:22, 167:24, 168:23, 170:1, 170:15, 172:24, 181:18, 181:24, 182:6, 182:7, 182:9, 183:5, 192:25, 193:3, 193:5, 238:21, 239:4, 239:15, 249:23
**medications** [16] - 31:21, 36:8, 37:7, 38:16, 67:7, 68:8, 70:5, 73:1, 73:10, 122:17, 166:8, 172:1, 182:12, 195:14, 232:5, 254:13
**medicinal** [1] - 38:24
**medicine** [53] - 6:3, 9:8, 9:12, 42:4, 48:18, 50:5, 50:10, 50:12, 50:13, 52:12, 54:21, 54:23, 55:1, 57:21, 65:15, 65:25, 66:5, 68:15, 68:25, 70:11, 70:14, 70:20, 70:25, 71:21, 74:12, 74:14, 74:18, 83:23, 84:25, 85:6, 85:7, 85:9, 105:2, 105:3, 105:9, 111:22, 129:15, 165:7, 167:23, 169:9, 170:3, 170:4, 172:17, 172:22, 173:22, 197:13, 206:21,

206:22, 239:17, 239:23, 243:25, 245:8, 249:22
**Medicine** [6] - 8:2, 8:9, 9:14, 50:1, 55:19, 249:23
**medicines** [12] - 11:19, 69:2, 70:17, 104:6, 164:13, 164:22, 165:4, 177:24, 182:13, 184:5, 198:3, 232:9
**Medor** [1] - 215:21
**meet** [2] - 30:24, 255:6
**meeting** [1] - 139:25
**meetings** [1] - 26:12
**Megan** [1] - 30:5
**member** [3] - 40:10, 42:8, 160:18
**members** [3] - 47:3, 85:25, 161:3
**Memorial** [1] - 50:5
**memory** [4] - 108:6, 186:13, 222:7, 237:25
**mental** [2] - 7:13, 13:14
**mention** [5] - 13:22, 251:19, 251:25, 252:16, 253:1
**mentioned** [8] - 19:19, 19:24, 49:14, 109:22, 119:6, 119:21, 170:25, 238:8
**mentioning** [1] - 33:13
**mentions** [1] - 146:4
**menu** [1] - 98:14
**mess** [1] - 253:4
**message** [8] - 194:1, 234:20, 235:8, 245:21, 245:22, 251:9, 251:17, 252:17
**messages** [12] - 2:10, 159:20, 165:23, 186:1, 188:9, 189:6, 229:2, 229:5, 233:6, 233:11, 235:21, 252:9
**met** [3] - 58:5, 235:24, 255:5
**metal** [1] - 151:15
**metastasis** [1] - 125:8
**methadone** [3] - 93:13, 196:22, 198:12
**methods** [1] - 171:3
**Mexico** [1] - 48:12
**Michelle** [3] - 149:4, 149:5
**microscope** [1] -

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

missed [1] - 24:24
mission [1] - 48:11
mistakes [1] - 174:4
mixed [2] - 196:16,
197:1
modalities [3] -
171:8, 171:10, 249:21
modality [1] - 250:3
model [2] - 65:19,
249:19
moderate [2] -
158:10, 158:15
moderate-risk [1] -
158:10
modified [1] - 76:1
moment [4] - 20:2,
28:19, 247:13
Monday [5] - 60:1,
178:14, 212:2, 216:17
money [20] - 67:14,
67:18, 68:4, 186:14,
187:10, 188:21,
189:16, 193:2, 199:5,
202:11, 202:15,
203:15, 211:9,
211:13, 211:16,
211:17, 211:19,
211:22, 234:12
monies [1] - 232:18
monitor [3] - 84:20,
86:15, 88:3
monitoring [5] - 7:8,
7:15, 87:6, 181:14,
192:9
Monitoring [6] -
3:14, 3:22, 6:12, 7:6,
7:16, 26:3
Montgomery [1] -
51:5
month [29] - 52:25,
62:18, 83:18, 84:24,
84:25, 85:3, 94:5,
157:1, 157:8, 158:18,
175:20, 177:3, 177:4,
191:11, 191:12,
207:24, 207:25,
223:9, 223:11,
224:21, 234:8,
239:24, 245:11,
245:13
month's [1] - 240:17
month-to-month [1]
- 245:13
monthly [3] - 165:10,
172:17, 207:24
months [21] - 6:25,
8:7, 26:24, 26:25,
37:1, 54:8, 54:20,
55:22, 60:17, 86:19,
95:24, 96:21, 97:1,

156:23, 158:15,
158:16, 160:21,
177:21, 219:18,
220:11, 229:10
**Moore** [5] - 18:19,
19:17, 19:18, 19:22,
146:21
**Morganton** [4] -
52:4, 53:10, 203:25,
225:20
morning [12] - 3:2,
12:12, 17:20, 21:15,
22:11, 22:12, 29:3,
29:4, 41:12, 230:14,
257:23, 258:3

117:10, 118:7,
118:19, 120:15,
124:13, 129:4, 129:9,
129:23, 135:12,
136:1, 140:13, 141:5,
144:9, 145:19,
145:21, 146:5,
146:16, 146:18,
147:4, 147:15,
147:24, 148:15,
151:19, 152:18,
155:4, 155:10, 157:8,
165:22, 167:4,
169:10, 171:24,
175:6, 175:8, 175:10,
184:25, 216:7,
223:10, 231:17,
232:7, 232:25,
242:12, 255:3, 256:3
**mother** [1] - 122:25
**motion** [17] - 3:11,
4:18, 13:6, 13:17,
80:21, 81:5, 91:14,
92:10, 92:11, 92:18,
101:6, 101:12,
101:13, 101:20,
102:2, 116:6, 149:23
**Motion** [1] - 3:11
**motions** [1] - 84:21
**motor** [14] - 80:18,
83:24, 91:18, 91:24,
110:24, 123:11,
133:17, 137:2,
138:12, 140:19,
147:21, 149:1, 150:7,
153:13

motorcycle [1] -
107:16
**mouth** [3] - 41:4,
63:7, 63:11
**move** [19] - 49:7,
61:25, 64:15, 73:25,
92:15, 97:25, 101:18,
102:7, 103:10,
106:15, 107:22,
110:11, 113:23,
130:7, 221:9, 228:2,
245:24, 256:14
**moved** [11] - 25:16,
33:10, 58:16, 62:2,
62:3, 62:5, 68:8, 71:5,
74:4, 222:10, 224:9
**movement** [4] -
3:9, 4:22, 5:13, 5:16,
5:20, 6:9, 7:5, 7:10,
7:20, 7:23, 8:12, 9:1,
9:25, 10:7, 10:9,
11:15, 11:22, 12:11,
12:22, 13:4, 13:18,
14:5, 14:9, 14:21,
15:4, 15:8, 15:18,
15:23, 18:18, 19:2,
19:4, 19:6, 19:16,
19:21, 20:1, 20:5,
20:9, 20:12, 20:17,
20:23, 21:11, 21:18,
22:10, 22:22, 27:17,
28:1, 28:19, 28:22,
29:2, 40:18, 40:21,
43:13, 44:11, 44:13,
44:15, 45:9, 45:11,
46:2, 46:15, 47:2,
63:23, 64:1, 64:14,
64:18, 65:6, 65:8,
65:10, 65:11, 73:12,
73:15, 73:17, 73:20,
73:25, 74:2, 75:15,
75:19, 75:21, 76:21,
76:25, 77:2, 77:25,
78:4, 78:11, 78:14,
78:17, 80:5, 82:12,
82:15, 82:16, 84:9,
84:12, 84:14, 89:18,
90:6, 90:13, 90:21,
90:25, 91:9, 94:10,
94:15, 94:19, 95:13,
100:9, 101:1, 110:10,
111:6, 111:18,
114:20, 114:23,

115:16, 116:14,
119:12, 119:19,
120:2, 120:16,
121:11, 121:16,
121:19, 122:6,
126:15, 126:20,
134:8, 134:12,
134:18, 134:22,
134:23, 138:6,
157:10, 157:17,
157:23, 158:23,
159:3, 161:24, 163:4,
164:15, 164:23,
165:14, 166:16,
170:8, 173:10,
173:13, 173:16,
174:25, 175:3, 175:5,
178:5, 178:6, 180:23,
181:1, 183:16,
190:15, 194:21,
194:23, 195:6, 195:7,
195:10, 195:11,
198:10, 200:12,
214:16, 226:21,
226:24, 227:18,
227:21, 228:2, 228:5,
228:7, 234:16,
234:19, 235:7,
237:14, 237:18,
237:19, 239:5,
245:14, 245:19,
245:24, 246:3, 246:4,
247:13, 247:14,
249:9, 249:11,
253:23, 254:1, 254:5,
254:7, 254:16,
254:20, 256:10,
256:13, 256:16,
257:1, 257:3, 257:8,
257:12, 257:19
**MRI** [7] - 96:21,
119:10, 119:17,
120:13, 120:15,
246:13
**MRIs** [9] - 82:7,
103:20, 111:24,
113:15, 119:7,
119:11, 119:15,
133:1, 133:20
**MS** [1] - 32:20
**Mullins** [4] - 147:7,
235:24, 255:5, 255:7
**multiple** [15] - 29:20,
100:21, 108:25,
109:7, 129:4, 131:9,
139:4, 144:24, 145:2,
145:6, 145:23,
148:18, 161:14,
177:21
**Murfreesboro** [1] -

72:12
mid [2] - 106:25,
149:16
**midback** [3] -
141:23, 147:1, 149:11
**middle** [5] - 19:9,
134:10, 142:1, 145:8,
146:17
**midnight** [1] - 53:9,
230:18
might [11] - 3:4,
20:16, 27:5, 29:25,
84:9, 84:11, 165:12,
183:25, 192:11,
226:19, 247:8
mile [1] - 61:16
**Miles** [1] - 145:4
miles [2] - 95:23,
145:4
military [6] - 49:5,
49:14, 49:15, 51:8,
51:24, 226:12
**Miller** [7] - 145:17,
145:18, 146:9,
146:16, 155:16,
155:18
milligrams [2] -
65:21, 172:22
million [1] - 179:8
mind [13] - 14:11,
16:3, 17:20, 26:17,
33:1, 37:15, 48:8,
48:17, 63:14, 65:17,
154:25, 178:7, 255:3
minds [1] - 43:2
mine [11] - 83:25,
117:18, 118:16,
118:18, 121:1, 121:6,
122:21, 127:20,
152:1, 171:14, 243:12
miner [3] - 118:15,
118:18, 120:25
mines [5] - 111:5,
127:17, 136:19,
152:1, 152:17
minimize [1] -
105:19
mining [4] - 111:4,
111:7, 111:15, 117:18
minor [1] - 61:17
minute [5] - 78:5,
150:20, 202:24,
221:7, 254:9
minutes [4] - 48:25,
162:12, 181:22,
222:11
misconstruing [2] -
251:23, 252:2
misleading [1] -
186:19

201:9
  **muscle** [7] - 74:20, 74:21, 81:9, 98:20, 141:22, 141:25, 182:13
  **muscles** [1] - 101:16
  **musculoskeletal** [1] - 152:9
  **must** [2] - 16:16, 211:15

## N

**N54.5** [1] - 96:13
**naive** [1] - 164:3
**name** [23] - 19:12, 22:13, 22:15, 30:11, 37:19, 41:7, 41:14, 47:3, 50:14, 58:3, 83:14, 157:14, 185:20, 191:15, 194:9, 197:12, 213:11, 218:10, 226:18, 234:14, 235:19, 235:20, 241:19
**named** [1] - 86:24
**names** [5] - 19:7, 194:10, 194:12, 194:17
  **Nancy** [1] - 149:18
  **narcotic** [15] - 14:20, 32:4, 45:7, 71:16, 74:7, 74:14, 74:17, 167:18, 168:22, 168:23, 172:1, 172:19, 172:20, 172:22, 173:1
  **narcotics** [20] - 8:18, 13:16, 32:8, 50:22, 65:20, 66:8, 66:9, 69:22, 74:12, 87:4, 162:24, 173:6, 175:23, 177:3, 177:20, 182:11, 182:19, 182:21, 183:23, 245:9
  **Nashville** [1] - 201:11
  **National** [1] - 24:16
  **nature** [7] - 4:17, 7:18, 10:21, 25:15, 76:5, 108:8, 157:4
  **near** [2] - 201:11, 204:24
  **necessarily** [5] - 14:25, 94:12, 172:8, 239:10, 241:12
  **necessary** [1] - 86:10
  **necessitate** [1] -

240:19
  **necessitating** [1] - 239:24
  **neck** [48] - 77:12, 80:12, 80:13, 80:14, 81:6, 91:14, 92:10, 92:18, 100:3, 100:22, 101:5, 101:15, 108:19, 109:3, 109:6, 110:25, 121:3, 123:11, 123:12, 128:18, 128:20, 129:7, 131:11, 132:12, 132:19, 136:4, 136:5, 136:21, 136:24, 139:6, 139:8, 139:11, 140:7, 143:5, 144:6, 145:1, 145:9, 147:18, 149:3, 149:21, 149:23, 150:9, 151:1, 151:2, 152:11, 152:14, 153:4
  **need** [76] - 17:3, 22:19, 35:14, 89:14, 93:3, 100:16, 107:10, 107:20, 109:9, 109:10, 109:12, 109:19, 109:22, 112:12, 113:19, 113:21, 113:24, 115:3, 115:4, 117:1, 117:2, 117:24, 120:19, 122:16, 122:18, 122:19, 124:3, 124:5, 124:21, 126:7, 127:8, 127:12, 128:13, 129:14, 129:17, 131:1, 131:25, 132:1, 133:3, 133:22, 133:23, 134:6, 145:16, 154:5, 154:12, 161:12, 162:1, 167:15, 168:11, 174:23, 176:3, 176:14, 176:16, 177:2, 177:8, 177:22, 178:2, 180:11, 182:4, 182:15, 183:25, 190:8, 191:20, 191:22, 210:20, 211:4, 211:13, 215:14, 219:2, 219:15, 223:5, 237:4, 239:1, 243:10, 244:14, 258:2
  **needed** [3] - 58:12, 63:15, 66:22, 87:7, 166:25, 167:1, 167:13, 168:8, 170:2, 170:4, 172:12,

181:24, 219:25, 223:22, 244:18, 244:22, 247:18, 247:20, 247:21, 247:22, 247:24, 248:5, 253:7
  **needing** [1] - 162:20
  **needle** [2] - 88:4, 240:10
  **needs** [5] - 31:20, 181:18, 240:14, 251:14, 252:23
  **negotiating** [1] - 209:8
  **negotiation** [1] - 188:1
  **negotiations** [2] - 107:10,
  112:9, 117:10, 117:12, 128:4, 132:20, 133:12, 136:13, 137:21, 138:3, 148:9, 149:24, 182:13
  **nerves** [2] - 92:14, 138:23
  **nervous** [2] - 72:4, 72:6
  **neuralgia** [1] - 123:22
  **neuritis** [2] - 99:23, 112:8
  **neurological** [1] - 39:12
  **Neurontin** [2] - 96:25, 182:13
  **neurosurgeon** [1] - 39:15
  **neurosurgery** [1] - 39:17
  **never** [38] - 4:9, 4:11, 9:20, 15:14, 34:17, 35:21, 36:19, 36:25, 39:3, 40:12, 58:5, 60:11, 63:11, 93:14, 138:16, 169:22, 170:10, 170:11, 174:20, 175:12, 175:24, 176:6, 177:2, 177:21, 185:12, 185:14, 188:5, 190:17, 190:23, 192:3, 203:16, 205:22, 210:25, 248:3

**New** [3] - 48:22, 49:1, 130:9
  **new** [16] - 25:23, 27:5, 54:8, 54:9, 76:1, 85:18, 96:21, 119:7, 119:20, 120:13, 169:6, 181:24, 224:21, 239:22, 244:19, 248:16
  **newly** [1] - 68:2
  **newly-opened** [1] - 68:2
  **next** [24] - 21:17, 23:24, 27:25, 46:14, 49:23, 53:19, 55:7, 58:2, 58:9, 59:20, 77:14, 88:21, 89:8,
  237:25, 238:10, 255:10
  **nighttime** [1] - 97:2
  **nine** [1] - 54:20
  **nobody** [4] - 41:12, 163:17, 211:16, 229:17
  **non** [4] - 47:18, 173:6, 232:7, 245:16
  **non-compliance** [1] - 245:16
  **non-controlled** [2] - 173:6, 232:7
  **non-profit** [1] - 47:18
  **noncompliance** [1] - 110:8
  **normal** [4] - 40:14, 81:8, 81:9, 245:2
  **normally** [2] - 68:17, 119:16
  **North** [11] - 6:10, 6:12, 7:16, 10:12, 47:6, 52:5, 53:2, 53:10, 54:6, 55:15, 236:3
  **northeast** [1] - 48:24
  **nortriptyline** [2] - 74:12, 74:14
  **notated** [1] - 82:23
  **notation** [2] - 243:4, 243:5
  **note** [5] - 95:14, 95:15, 96:17, 111:6, 227:8
  **noted** [3] - 116:5, 124:14, 203:19

  **notes** [8] - 38:23, 143:4, 178:7, 178:8, 237:20, 237:25, 238:3, 238:7
  **nothing** [9] - 22:1, 40:12, 43:5, 46:19, 134:13, 169:22, 179:23, 239:7, 253:21
  **notice** [1] - 116:3
  **noticed** [1] - 178:7
  **notified** [1] - 33:19
  **November** [3] - 7:1, 175:19, 226:25
  **Number** [2] - 86:4, 86:6
  **number** [22] - 11:25, 25:12, 32:23, 100:1, 124:9, 124:13, 126:11, 135:7, 135:9, 155:10, 162:9, 162:16, 188:6, 194:9, 194:15, 208:2, 208:5, 212:21, 233:21, 256:9
  **numbered** [1] - 106:22
  **numbers** [10] - 33:12, 83:19, 96:5, 96:7, 112:25, 155:6, 179:3, 179:7, 179:10, 216:25
  **numbing** [1] - 145:10
  **numbness** [3] - 96:2, 103:4, 103:10
  **numerous** [2] - 45:3, 147:23
  **nurse** [7] - 36:7, 41:13, 79:17, 98:7, 200:4, 200:7
  **Nurse** [1] - 200:5
  **nurses** [1] - 70:25
  **nursing** [1] - 49:19

## O

  **Oath** [3] - 179:11, 179:13, 179:14
  **oath** [1] - 179:17
  **object** [15] - 27:17, 40:18, 73:22, 90:21, 114:20, 119:12, 120:2, 121:16, 157:10, 157:17, 158:23, 161:24, 164:15, 164:23, 166:16
  **objecting** [1] - 14:23
  **objection** [14] - 14:4, 40:20, 77:25, 94:10, 94:13, 94:18, 95:12, 100:9, 111:7, 120:5, 121:21, 166:19,

objective [17] -
81:14, 91:7, 92:19,
92:24, 101:2, 107:8,
109:11, 112:14,
113:20, 115:2,
116:23, 117:20,
118:20, 122:18,
145:15, 149:8, 223:6
  observation [1] -
133:21
  observations [1] -
133:2
  observe [1] - 79:18
  observed [3] - 116:4,
131:24, 184:25
  obstetrics [1] - 52:11
  obtain [3] - 26:1,
32:4, 45:7
  obtaining [1] - 30:20
  obviously [7] - 9:19,
17:3, 20:15, 21:10,
50:21, 78:8, 229:15
  occasion [4] - 107:6,
165:11, 168:7, 245:12
  occasionally [2] -
29:11, 159:11
  occasions [3] -
183:2, 209:21, 231:7
  occur [7] - 167:23,
167:25, 186:8, 236:2,
236:4, 248:12, 256:1
  occurred [10] -
109:2, 118:16,
128:23, 150:8,
189:13, 230:16,
239:21, 243:2, 246:16
  occurrence [1] -
241:25
  occurring [1] - 72:13
  occurs [1] - 117:8
  October [6] - 57:3,
83:18, 87:9, 175:19,
207:3, 207:6
  odd [2] - 201:15,
207:2
  OF [5] - 1:3, 1:5,
1:11, 2:9, 2:12
  offer [2] - 56:19,
73:24
  offered [1] - 87:2
  office [122] - 25:16,
40:9, 42:8, 53:18,
58:16, 58:17, 58:18,
59:3, 59:14, 59:18,
59:20, 59:22, 60:23,
61:14, 62:3, 62:6,
62:9, 63:12, 66:14,
66:18, 66:20, 68:21,
68:22, 76:13, 77:4,

77:24, 78:19, 80:9,
87:9, 88:16, 88:18,
89:5, 93:10, 93:14,
98:4, 99:13, 104:18,
105:19, 130:15,
140:1, 142:15,
156:22, 157:9, 158:8,
161:21, 162:5,
162:21, 163:3, 163:7,
163:10, 163:22,
163:23, 165:5,
165:12, 166:13,
167:1, 167:12,
167:13, 167:14,
168:1, 168:6, 168:7,
169:3, 170:12,
170:20, 170:23,
171:19, 178:25,
180:10, 181:10,
181:23, 184:22,
185:23, 186:17,
186:25, 187:7, 188:7,
188:10, 188:25,
189:3, 189:11,
189:12, 189:23,
191:9, 192:10,
192:16, 192:20,
197:5, 210:19,
210:20, 210:25,
211:2, 211:12,
214:22, 217:13,
217:14, 217:20,
218:7, 219:14, 221:5,
221:8, 221:18, 222:8,
222:12, 222:21,
229:25, 230:17,
231:16, 231:17,
232:17, 239:11,
245:4, 250:13,
250:17, 250:22,
255:10, 255:19,
256:18
  Office [3] - 1:20,
1:23, 195:17
  officer [5] - 51:5,
204:21, 204:25,
205:4, 205:8
  Officer [3] - 53:10,
53:11, 53:14
  offices [3] - 61:18,
62:16, 104:3
  OFLAC [4] - 217:23,
217:24, 218:13,
219:17
  often [7] - 80:10,
80:12, 158:13,
158:17, 163:13,
181:16, 231:2
  oftentimes [1] -
82:24

Ohio [3] - 42:21,
43:11, 43:15
  old [2] - 193:19,
195:13
  OMM [2] - 249:23,
250:1
  ON [2] - 2:9, 2:12
  once [12] - 35:13,
49:13, 56:5, 62:22,
65:2, 71:5, 97:3,
104:22, 114:3, 135:2,
158:15, 164:14
  one [108] - 3:20,
4:22, 9:7, 10:7, 11:25,
13:18, 15:15, 15:23,
18:6, 18:18, 18:23,
19:11, 19:16, 19:17,
20:17, 21:1, 25:19,
54:15, 63:2, 68:15,
74:18, 74:22, 79:13,
83:11, 87:2, 97:19,
104:21, 105:5, 105:6,
105:7, 105:23, 109:7,
118:18, 119:20,
121:1, 122:13,
124:13, 124:18,
124:19, 125:6,
131:12, 134:8, 136:2,
136:18, 139:4,
147:24, 150:20,
152:23, 153:21,
155:12, 155:14,
157:6, 158:24, 159:6,
160:21, 163:18,
166:1, 166:21,
172:17, 175:11,
186:3, 186:8, 186:9,
188:11, 189:6,
189:17, 191:14,
203:12, 208:7, 209:9,
209:25, 216:1,
219:23, 220:15,
223:19, 227:25,
228:8, 229:15,
230:25, 233:13,
233:14, 233:22,
235:19, 238:19,
239:12, 242:3, 242:5,
247:7, 249:6, 251:1,
255:16, 257:8, 257:13
  One [1] - 111:5
  one-sided [1] -
153:21
  one-time [2] - 186:8,
223:19

one-year [1] - 62:18
  ones [7] - 30:3,
171:1, 180:14,
195:24, 214:17,
241:10
  ongoing [18] - 117:2,
118:8, 122:19,
126:12, 128:20,
131:9, 132:1, 133:23,
136:1, 137:8, 140:6,
147:15, 154:7, 168:6,
169:6, 178:1, 223:22,
231:17
  online [1] - 49:2
  Opana [2] - 32:14,
32:15
  open [20] - 9:17,
[illegible]
231:3, 242:4, 255:10
  opened [14] - 23:4,
49:6, 59:7, 59:23,
60:3, 67:15, 68:2,
210:13, 211:25,
212:5, 220:19, 222:5,
222:13, 246:18
  opening [7] - 23:19,
23:20, 208:23, 210:3,
210:6, 210:10, 210:11
  operate [7] - 60:15,
213:17, 214:4,
214:17, 217:5,
218:18, 218:21
  operated [6] - 60:16,
86:25, 163:10,
219:18, 219:19, 225:6
  operating [2] -
218:2, 218:14
  operations [1] -
209:13
  Opiate [1] - 172:3
  opiate [12] - 12:4,
72:3, 73:1, 73:2, 73:8,
109:23, 110:4,
171:24, 172:1, 172:7,
172:9, 173:1
  opiates [7] - 71:15,
71:17, 71:25, 72:16,
72:18, 75:5, 164:14
  opinion [1] - 16:20
  opinions [2] - 73:24,
255:2
  opioid [7] - 6:2,
11:18, 31:3, 31:11,
73:1, 73:2, 105:15

opioids [11] - 31:15,
71:8, 71:14, 71:15,
71:17, 71:25, 72:17,
72:19, 75:5, 237:22
  opportunity [4] -
21:8, 51:12, 61:13,
85:17
  opposed [4] - 107:2,
112:23, 148:10,
148:16
  opposite [1] - 81:11
  option [2] - 148:3,
207:20
  options [5] - 57:18,
170:15, 214:12,
249:19, 250:7
  or.. [2] - 7:19, 184:13
  order [7] - 18:12,
119:25, 120:12,
166:25, 219:16,
253:15, 253:19
  ordered [5] - 119:4,
167:2, 167:16, 184:1,
184:3
  organization [3] -
17:17, 24:16, 47:19
  organized [1] - 110:1
  original [2] - 12:18,
182:25, 183:8
  originally [2] - 49:4,
205:6
  orthopedic [1] -
253:13
  orthopedics [1] -
251:16
  orthopedist [2] -
148:2, 253:16
  osmosis [1] - 95:8
  osteoarthritis [1] -
98:19
  osteomyelitis [1] -
123:6
  osteopathic [3] -
50:10, 170:25, 249:22
  Osteopathic [3] -
55:18, 179:13, 249:23
  otherwise [2] -
15:16, 154:9
  ought [3] - 16:14,
16:21, 20:25
  out-of-state [1] -
253:17
  outcomes [1] - 250:9
  outlined [1] - 21:1
  outrageous [1] -
193:5
  outset [1] - 3:15
  outside [7] - 56:21,
68:13, 82:6, 104:18,
126:5, 153:25, 174:1

outweighs [1] - 10:21
ovaries [1] - 125:8
overdose [1] - 37:21
overdosed [2] - 37:24, 155:15
overnight [1] - 214:2
overrule [5] - 40:20, 95:11, 120:5, 121:21, 166:18
oversimplification [1] - 213:22
overtime [3] - 23:22, 23:23, 23:24
overuse [1] - 35:16
overwhelmed [1] - 216:24
owed [1] - 232:18
own [15] - 16:4, 23:1, 23:20, 57:22, 57:23, 72:18, 79:14, 83:1, 100:17, 197:21, 210:11, 210:14, 211:10, 211:14, 229:14
owned [3] - 23:3, 29:5, 187:5
owner [4] - 22:16, 22:23, 212:6, 228:16
owns [1] - 29:7
oxycodone [7] - 32:10, 35:6, 65:21, 172:22, 196:22, 198:12
OxyContin [2] - 43:1, 209:18
oxygen [2] - 99:9, 113:2
oxymorphone [8] - 32:12, 32:15, 35:6, 35:7, 196:22, 198:12, 228:20, 228:24

**P**

p.m [6] - 90:4, 134:15, 134:16, 237:10, 237:11, 258:4
P.O [1] - 1:23
packaging [1] - 220:10
pad [4] - 166:12, 167:20, 180:20, 181:23
pads [2] - 40:9, 184:21
page [29] - 76:3, 77:15, 80:2, 80:4, 82:19, 83:12, 91:6, 93:22, 97:6, 97:12,

97:13, 102:16, 104:7, 104:19, 105:10, 107:12, 107:14, 107:23, 110:19, 114:2, 114:3, 125:2, 125:16, 126:10, 127:14, 130:9, 151:2, 252:11
PAGE [1] - 2:2
pages [4] - 76:3, 130:13, 130:14, 188:17
paid [34] - 67:19, 156:21, 156:22, 163:12, 165:8, 185:19, 185:22, 185:23, 189:15, 190:21, 198:20, 198:23, 198:25, 199:2, 199:23, 202:15, 203:6, 203:12, 203:15, 204:2, 204:22, 206:6, 207:22, 207:23, 232:10, 232:24, 236:5, 250:19, 250:21, 253:15
pain [293] - 6:2, 11:18, 14:16, 14:17, 14:19, 25:25, 26:5, 27:12, 31:24, 33:4, 34:1, 35:10, 35:14, 36:25, 39:10, 40:1, 52:13, 58:7, 58:20, 60:9, 61:1, 61:2, 62:19, 62:20, 64:20, 65:24, 65:25, 66:2, 66:6, 71:22, 71:24, 73:4, 73:11, 74:10, 74:13, 75:7, 76:1, 80:12, 80:13, 80:25, 81:2, 81:6, 81:10, 81:11, 81:18, 82:25, 83:2, 83:4, 83:5, 83:22, 83:23, 84:2, 84:7, 85:21, 85:22, 84:6, 86:6, 86:8, 91:13, 91:25, 92:1, 92:6, 92:9, 92:10, 92:12, 92:20, 92:23, 93:2, 95:25, 96:2, 96:12, 96:13, 96:14, 96:24, 97:20, 98:20, 98:21, 98:23, 98:24, 99:21, 99:23, 101:12, 101:20, 101:21, 102:18, 102:20, 102:23, 102:24, 103:15, 104:25, 106:1, 106:24, 107:1, 107:10, 107:14,

108:6, 108:14, 109:23, 109:24, 110:24, 112:3, 112:7, 112:9, 112:22, 114:6, 116:21, 116:24, 117:6, 117:7, 117:14, 118:6, 118:8, 119:9, 122:11, 122:13, 123:13, 123:19, 124:11, 125:12, 125:20, 126:1, 126:12, 126:24, 127:18, 128:5, 128:6, 128:7, 128:21, 129:1, 129:5, 129:25, 130:1, 131:11, 131:19, 132:19, 132:21, 133:11, 133:12,

[signature: Donna J. Prather]

139:18, 139:19, 140:6, 140:12, 140:21, 141:4, 141:5, 141:7, 142:2, 142:6, 142:25, 143:1, 143:5, 143:19, 143:20, 143:21, 143:23, 144:3, 144:4, 144:8, 144:10, 144:14, 144:19, 145:1, 145:2, 145:5, 145:8, 145:9, 145:10, 145:14, 145:21, 145:24, 146:3, 146:11, 146:13, 146:15, 146:16, 146:19, 146:20, 146:21, 147:3, 147:5, 147:9, 147:10, 147:15, 147:18, 148:1, 148:7, 148:8, 148:10, 148:12, 148:13, 148:14, 148:15, 148:17, 148:20, 148:21, 149:5, 149:7, 149:9, 149:16, 149:18, 149:19, 149:24, 150:5, 150:7, 150:23, 150:25, 151:1, 151:4, 151:10, 151:11, 151:17, 151:20, 151:22, 152:4, 152:5, 152:8, 152:9, 152:20, 153:3, 153:4, 153:7, 153:17, 159:18, 160:20, 170:19, 170:21,

139:14, 140:8, 140:25, 141:17, 143:13, 145:17, 146:10, 147:13, 148:4, 150:21, 151:8, 153:1, 153:15, 236:10, 236:13, 236:18, 239:6
pain-related [1] - 135:9
painful [1] - 123:7
pains [8] - 91:15, 108:7, 112:9, 114:14, 117:13, 135:15, 138:3, 146:17
palpation [4] - 91:13, 101:7, 101:11
Pam [4] - 129:19, 130:16, 155:24
pamphlet [1] - 11:10
pancreatic [2] - 35:11, 36:5
pancreatis [1] - 37:3
pancreatitis [2] - 143:17, 205:12
panel [1] - 16:8
panic [1] - 53:14
panicked [1] - 205:21
paper [5] - 82:23, 97:11, 163:10, 183:12, 253:2
papers [1] - 54:4
paperwork [1] - 210:18
paragraph [2] - 15:6,

249:12
parallel [1] - 138:19
paranoid [1] - 70:22
parents [1] - 26:24
Park [1] - 220:21
parking [2] - 236:12, 255:6
Parsley [5] - 147:19, 148:13, 148:25, 155:14
Parsleys [2] - 234:22, 235:3
part [24] - 4:7, 5:7, 10:6, 13:20, 24:14, 31:10, 71:5, 72:3, 74:19, 103:18, 103:25, 104:2, 117:8, 117:11, 160:19, 163:2, 165:18, 171:6, 171:17, 171:20, 187:12, 213:22, 251:10, 255:13
participate [3] - 6:16, 8:5, 9:15
participation [1] - 7:11
particular [3] - 28:17, 47:14, 54:10
parties [2] - 89:16, 165:16
parts [2] - 72:8, 72:24
pass [1] - 240:17
passed [4] - 28:15, 68:10, 139:21, 214:21
past [14] - 30:16, 81:16, 85:22, 92:25, 96:25, 104:25, 111:24, 114:25, 146:14, 153:9, 229:9, 233:12, 233:17
patched [1] - 55:9
path [1] - 151:11
patience [1] - 45:5
patient [191] - 2:11, 20:5, 20:19, 25:23, 26:1, 26:2, 26:15, 27:5, 30:12, 30:21, 30:22, 30:24, 30:25, 32:2, 32:3, 34:15, 35:4, 41:14, 45:4, 50:18, 53:15, 66:19, 68:14, 68:18, 69:14, 70:6, 76:1, 76:10, 79:12, 79:15, 79:19, 79:23, 80:22, 80:24, 81:24, 82:24, 83:6, 83:8, 84:20, 84:22, 85:1, 85:5, 85:11, 85:17, 86:1, 87:19,

87:20, 89:1, 89:2, 89:7, 89:9, 90:24, 91:8, 94:4, 95:17, 95:18, 95:19, 95:21, 96:1, 96:18, 96:25, 99:21, 100:20, 102:2, 102:10, 102:14, 105:1, 105:17, 105:19, 106:4, 106:11, 106:12, 110:7, 110:21, 111:8, 111:10, 112:18, 115:7, 115:10, 117:12, 119:8, 119:17, 122:21, 122:24, 126:17, 126:18, 129:12, 130:5, 130:7, 130:10, 138:16, 154:10, 154:22, 155:2, 157:6, 157:13, 157:18, 158:6, 158:7, 158:9, 158:10, 158:11, 160:6, 161:5, 163:24, 167:1, 167:22, 167:25, 168:4, 168:9, 169:5, 169:6, 169:8, 169:16, 169:21, 170:12, 171:15, 171:18, 172:4, 172:15, 175:24, 176:3, 176:6, 176:25, 177:2, 177:21, 177:24, 181:25, 183:4, 184:6, 185:6, 185:7, 189:3, 190:18, 190:24, 195:14, 196:14, 197:14, 197:17, 205:11, 205:18, 210:25, 217:10, 219:2, 219:12, 219:14, 221:21, 222:2, 231:14, 231:19, 233:8, 235:19, 236:21, 239:8, 239:21, 239:23, 240:7, 240:15, 240:23, 240:25, 242:21, 242:25, 244:21, 245:4, 245:10, 245:18, 245:21, 245:23, 246:5, 246:22, 247:2, 247:10, 249:25, 250:5, 251:11, 252:6, 252:14, 252:18, 252:23, 252:25, 253:17, 256:18, 256:24

**Patient** [2] - 130:9,

143:25

**patient's** [10] - 28:13, 41:7, 105:8, 120:1, 120:14, 157:14, 170:1, 193:2, 239:4, 239:16

**Patients** [3] - 87:1, 88:11, 186:23

**patients** [206] - 4:4, 4:8, 8:6, 20:21, 25:9, 25:11, 25:17, 26:21, 27:9, 28:11, 31:1, 32:22, 32:24, 33:3, 33:7, 33:8, 33:25, 34:17, 34:22, 34:24, 35:13, 38:10, 38:14, 39:2, 39:5, 39:10, 40:1, 40:6, 40:11, 41:3, 42:21, 42:25, 43:21, 52:23, 57:8, 58:11, 58:12, 58:24, 59:17, 59:25, 60:1, 60:6, 60:14, 60:23, 61:1, 62:8, 62:15, 62:17, 62:23, 62:25, 63:3, 63:5, 63:6, 63:9, 65:4, 65:14, 65:15, 65:16, 65:17, 65:20, 65:23, 66:5, 67:8, 70:13, 70:22, 71:2, 72:2, 74:6, 74:20, 74:25, 75:8, 75:11, 75:13, 76:4, 77:19, 77:21, 82:25, 83:1, 86:15, 86:17, 87:6, 87:17, 88:3, 88:14, 93:11, 93:16, 94:7, 105:13, 106:2, 106:7, 109:20, 111:4, 119:22, 155:6, 155:9, 155:11, 157:2, 157:5, 159:6, 160:19, 161:20, 161:22, 162:8, 163:13, 163:16, 163:17, 166:5, 166:25, 167:14, 168:5, 168:6, 170:9, 170:14, 171:1, 171:2, 171:5, 171:16, 171:20, 171:22, 173:3, 173:17, 173:25, 174:9, 184:1, 188:4, 188:7, 188:10, 188:24, 188:25, 189:11, 189:22, 190:3, 190:8, 190:10, 191:20, 192:22, 197:24, 198:2, 207:3, 208:9, 208:13, 208:14, 208:20, 210:9, 212:19,

212:22, 213:9, 213:10, 213:11, 213:12, 214:1, 215:8, 215:10, 216:11, 216:12, 216:17, 216:25, 217:2, 217:6, 217:7, 218:19, 220:22, 221:2, 221:11, 221:18, 223:21, 224:23, 225:11, 225:13, 227:23, 228:21, 228:24, 230:3, 230:7, 230:13, 230:21, 231:4, 231:8, 231:17, 232:8, 232:19, 232:23, 232:25, 233:4, 233:7, 233:9

250:19, 256:5

**patients'** [7] - 70:5, 88:7, 171:25, 184:5, 193:4, 197:6, 199:3

**pattern** [1] - 65:22

**pay** [31] - 24:2, 24:15, 51:14, 67:23, 119:23, 119:25, 120:1, 156:24, 163:18, 163:21, 165:8, 167:5, 186:22, 189:13, 192:20, 193:4, 198:18, 199:16, 199:19, 199:22, 199:25, 203:7, 203:13, 204:6, 204:9, 206:13, 232:14, 232:21, 232:23, 233:1

**paycheck** [1] - 163:21

**paying** [3] - 164:2, 199:18, 202:19

**payment** [9] - 67:17, 68:2, 163:6, 165:7, 186:21, 188:9, 189:2, 212:14, 250:24

**payments** [2] - 29:8, 163:9

**PC** [1] - 249:16

**PD** [1] - 196:6

**pediatrics** [1] - 52:12

**Pennington** [1] - 1:24

**people** [92] - 6:24, 19:8, 19:10, 19:15,

31:12, 35:2, 45:4, 48:14, 48:17, 49:5, 50:17, 57:9, 57:10, 60:4, 61:4, 71:24, 73:5, 74:15, 74:16, 80:16, 86:20, 138:20, 138:23, 154:14, 159:9, 159:12, 159:13, 159:15, 159:18, 160:4, 161:1, 163:7, 163:10, 163:19, 164:1, 164:12, 165:2, 165:3, 165:19, 165:20, 165:23, 166:5, 173:8, 173:14, 173:23, 174:2, 176:15, 179:22, 181:13,

215:24, 217:4, 217:8, 217:10, 217:15, 217:19, 217:22, 218:13, 219:17, 222:1, 222:24, 223:16, 223:17, 223:20, 224:15, 224:19, 225:3, 234:3, 234:5, 234:9, 234:10, 245:2, 246:17, 255:24

**people's** [3] - 164:4, 188:12, 188:20

**per** [7] - 57:8, 57:9, 57:10, 95:23, 186:6, 204:4, 206:11

**percent** [8] - 60:25, 99:9, 113:3, 214:23, 214:25, 241:18, 256:20, 256:21

**percentage** [1] - 256:17

**percentage-wise** [1] - 256:17

**perform** [1] - 130:5

**performing** [1] - 83:11

**period** [19] - 36:9, 49:18, 51:21, 55:4, 74:4, 86:23, 163:8, 164:25, 165:17, 173:1, 173:6, 179:1, 187:20, 195:24, 201:6, 201:22, 214:23, 215:1, 245:12

**periodically** [1] - 172:11

**periods** [1] - 84:6
**permanent** [2] - 100:23, 108:23
**permission** [1] - 10:4
**perpetrated** [1] - 8:8
**person** [38] - 8:1, 19:11, 19:23, 20:8, 20:11, 30:11, 30:19, 48:12, 74:22, 75:23, 77:16, 88:18, 88:21, 98:6, 101:25, 103:12, 109:23, 158:20, 160:8, 160:10, 160:25, 161:17, 162:19, 163:18, 164:1, 164:4, 166:9, 168:11, 169:18, 175:7, 181:23, 185:15, 191:8, 191:9, 196:18, 239:16, 246:12, 249:3
**person's** [2] - 31:23, 160:24
**personal** [1] - 157:11
**personally** [1] - 171:8
**personnel** [4] - 200:2, 200:10, 200:11, 200:14
**Perthes** [1] - 144:13
**Pete** [1] - 29:17
**Peter** [5] - 187:14, 187:25, 198:18, 199:24, 202:16
**Peter's** [1] - 203:9
**Pharma** [1] - 209:18
**Pharmacies** [1] - 2:10
**pharmacies** [13] - 24:1, 24:3, 24:14, 28:15, 34:23, 106:7, 106:11, 193:1, 227:23, 228:8, 231:1, 231:3
**pharmacist** [19] - 19:25, 20:1, 20:3, 22:16, 23:7, 23:16, 24:24, 26:2, 26:10, 26:18, 28:2, 29:9, 29:18, 29:19, 30:25, 31:10, 45:8, 109:22, 243:7
**Pharmacist** [1] - 24:17
**pharmacist-patient** [2] - 26:2, 30:25
**pharmacists** [8] - 19:24, 29:15, 29:20, 29:25, 30:9, 42:3, 43:12, 243:8

**Pharmacists** [3] -
87:1, 88:11, 186:23
**pharmacology** [1] -
64:24
**Pharmacy** [4] -
24:20, 29:5, 31:8,
228:14
**pharmacy** [32] -
23:13, 24:6, 25:12,
30:5, 30:14, 34:18,
37:24, 57:22, 105:24,
105:25, 106:5, 106:8,
106:10, 106:12,
166:1, 166:8, 182:17,
182:21, 183:3, 183:4,
183:10, 183:18,
191:16, 192:11,
192:13, 192:16,
192:19, 228:15,
230:20, 230:22, 243:5
**phase** [2] - 92:3,
92:5
**philosophy** [4] -
65:4, 65:13, 74:3,
74:5
**phone** [35] - 25:6,
33:3, 41:23, 58:6,
162:9, 162:10,
162:12, 162:14,
162:16, 165:5, 165:9,
169:16, 169:21,
176:7, 176:9, 176:11,
185:10, 185:22,
190:22, 191:2,
191:24, 193:18,
193:22, 194:14,
194:15, 236:22,
238:7, 238:9, 240:25,
241:2, 242:9, 242:11,
242:15, 245:9
**phonetic** [2] - 48:13,
71:24
**photocopy** [1] -
183:6
**phrase** [1] - 179:16
**physical** [74] - 7:14,
70:10, 80:20, 80:23,
81:4, 81:12, 81:17,
81:25, 82:21, 91:7,
92:11, 92:17, 92:24,
106:23, 108:8,
108:10, 108:12,
112:20, 114:18,
114:25, 116:6,
116:23, 117:21,
117:22, 118:7,
121:13, 121:24,
122:7, 123:22,
124:14, 129:8,
129:11, 129:23,

130:6, 131:21,
131:23, 132:23,
133:2, 133:19,
133:21, 135:12,
136:23, 139:12,
140:15, 141:6,
141:21, 142:12,
143:4, 143:9, 144:9,
145:11, 145:13,
146:7, 147:6, 148:18,
148:24, 149:8,
149:22, 150:22,
151:19, 153:2, 153:8,
153:10, 154:14,
154:18, 154:22,
154:24, 155:3, 171:7,
175:7, 250:4, 250:7
**physically** [2] -
187:7, 255:20
**physicals** [2] -
231:16, 231:20
**physician** [15] -
25:25, 26:5, 26:7,
34:2, 35:3, 52:19,
52:20, 56:15, 58:3,
58:4, 60:9, 87:23,
95:7, 244:19, 250:23
**Physician** [2] - 7:16,
124:15
**physician's** [2] -
98:7, 214:22
**physicians** [12] -
6:12, 27:23, 31:20,
36:6, 65:19, 87:16,
95:2, 95:9, 159:15,
184:20, 184:21, 251:8
**Physicians** [6] -
2:14, 63:19, 64:5,
87:1, 88:11, 186:23
**physiologic** [1] -
172:6
**pick** [2] - 29:22,
42:11
**picked** [1] - 254:1
**pictures** [1] - 67:6,
193:13
**piece** [1] - 97:11
**pieces** [1] - 161:14
**Pilates** [2] - 171:4,
250:7
**pill** [6] - 67:7, 88:3,
88:15, 88:25, 240:9,
240:17
**pills** [21] - 65:22,
68:7, 69:6, 69:11,
69:13, 176:16, 179:8,
182:15, 192:21,
195:23, 196:14,
197:25, 198:5, 198:8,
198:15, 245:1,

252:20, 254:22,
254:23, 255:4
**pinch** [1] - 92:15
**pinched** [1] - 117:10
**pinned** [2] - 116:8,
116:12
**place** [14] - 44:6,
61:5, 61:18, 84:12,
170:1, 192:24,
197:14, 216:5,
216:22, 219:21,
221:4, 222:19,
225:15, 239:11
**placed** [1] - 130:20
**places** [3] - 57:13,
63:8, 200:21
**Plaintiff** [1] - 1:6
**PLAINTIFF** [ ] - 2:2
play [2] - 52:5,
173:25
**PLC** [1] - 1:23
**plus** [2] - 36:20,
192:20
**PMP** [4] - 26:2, 27:6,
40:6, 179:4
**pocket** [1] - 241:6
**point** [49] - 6:25,
12:18, 13:20, 17:14,
17:23, 19:2, 19:22,
23:13, 25:20, 27:18,
30:2, 37:1, 46:4,
49:24, 50:24, 53:25,
54:12, 55:8, 55:14,
57:17, 57:18, 57:24,
58:1, 59:10, 59:11,
70:24, 82:4, 83:6,
85:11, 110:3, 124:18,
136:2, 170:5, 182:20,
190:23, 195:3,
200:17, 210:1, 221:6,
221:9, 222:5, 226:7,
231:18, 249:5, 251:1,
251:18, 251:24,
252:14, 252:25
**pointed** [1] - 66:10
**police** [2] - 45:6,
204:21
**policeman** [1] -
87:22
**policies** [1] - 157:24
**policy** [5] - 158:1,
158:3, 158:4, 158:12,
158:19
**poor** [2] - 163:1,
175:21

**population** [1] -
56:11
**porch** [1] - 153:25
**position** [11] - 3:19,
4:9, 6:21, 10:14,
12:13, 24:5, 43:4,
54:25, 139:1, 204:17,
206:22
**positions** [2] - 55:11,
55:12
**positive** [4] - 141:14,
147:5, 161:7, 161:10
**possess** [1] - 10:25
**possessed** [1] -
195:15
**possession** [1] -
195:16
**possible** [ ] - 9:22,
106:12, 106:16,
196:23, 230:5, 230:6,
231:12, 244:6
**possibly** [5] - 19:11,
53:4, 140:1, 192:11,
238:1
**post** [5] - 51:20,
72:15, 141:22,
145:20, 169:10
**post-cancer** [1] -
145:20
**post-surgical** [1] -
141:22
**post-synapses** [1] -
72:15
**postdated** [3] -
240:5, 240:11, 248:13
**postural** [1] - 96:19
**posture** [2] - 96:19,
141:25
**potential** [2] - 66:10,
197:6
**potentially** [6] -
10:23, 13:25, 15:24,
85:8, 101:24, 251:15
**pounds** [3] - 35:11,
99:10, 113:1
**pour** [2] - 48:12,
197:10
**powered** [1] - 245:8
**powerful** [5] - 32:8,
32:10, 32:12, 32:18,
32:20
**PPPFD** [12] - 86:25,
186:20, 187:3, 187:4,
187:19, 189:4,
189:14, 192:10,

199:2, 199:5, 251:3,
251:4
**practice** [70] - 5:24,
7:14, 9:7, 10:4, 13:21,
13:22, 14:2, 14:14,
14:17, 14:18, 20:7,
20:20, 34:4, 40:14,
42:20, 61:19, 63:13,
63:14, 65:18, 69:17,
69:19, 69:23, 71:5,
73:21, 86:19, 86:22,
87:7, 95:1, 95:4,
111:22, 141:9,
156:14, 156:17,
160:7, 163:14,
165:18, 166:8,
166:13, 170:22,
174:4, 175:23,
175:25, 176:12,
176:19, 177:8,
177:13, 177:17,
177:20, 178:16,
184:25, 207:14,
207:20, 210:6, 210:7,
210:11, 220:1, 224:9,
225:14, 229:12,
229:15, 238:4,
243:12, 246:17,
246:18, 246:19,
249:2, 249:13, 250:3,
255:1
**practiced** [5] - 6:14,
195:20, 198:1, 250:1,
256:19
**practicer** [1] - 36:7
**practices** [1] -
105:18
**practicing** [6] - 6:20,
6:23, 9:12, 41:1,
50:12, 197:3
**practitioner** [1] -
98:7
**Practitioners'** [1] -
7:5
**pre** [12] - 40:9, 72:15,
166:10, 166:13,
166:23, 167:6,
180:20, 181:22,
183:22, 184:21,
238:19, 242:23
**pre-sign** [2] - 167:6,
184:21
**pre-signed** [9] -
40:9, 166:10, 166:13,
166:23, 180:20,
181:22, 183:22,
238:19, 242:23
**pre-synapses** [1] -
72:15
**precautions** [1] -

69:18, 69:21
  predated [1] - 240:11
  preferred [2] - 82:10,
115:13
  prejudice [1] - 9:16
  prejudicial [9] - 4:13,
4:14, 8:24, 10:20,
13:8, 13:13, 14:15,
15:16
  premise [2] - 223:16,
246:15
  prep [1] - 19:10
  preparation [2] -
18:12, 221:25
  prepared [5] - 17:13,
17:14, 17:16, 131:16,
132:14
  preparing [1] - 238:1
  prerequisite [1] -
48:6
  prescribe [4] - 50:21,
72:1, 163:2, 185:1
  prescribed [14] -
12:6, 14:20, 65:19,
69:8, 70:11, 105:4,
112:12, 122:17,
124:22, 127:10,
129:15, 162:23,
166:9, 223:6
  prescribing [8] -
31:20, 31:22, 32:7,
56:2, 64:20, 154:11,
180:9, 224:14
  Prescription [1] -
26:3
  prescription [70] -
8:18, 26:11, 28:4,
30:10, 30:11, 30:20,
40:9, 40:16, 40:22,
41:2, 41:6, 41:13,
41:24, 42:7, 42:12,
42:13, 43:17, 43:19,
43:22, 43:24, 44:16,
95:20, 97:3, 97:14,
97:21, 166:1, 166:12,
167:3, 167:20,
168:11, 168:23,
169:14, 170:11,
180:9, 180:16,
181:14, 181:19,
181:23, 182:15,
182:18, 183:1, 183:2,
183:6, 184:3, 184:21,
215:15, 235:25,
236:9, 237:22, 239:9,
239:18, 240:6,
240:12, 241:3,
242:16, 242:23,
247:19, 247:20,
247:23, 247:24,

248:6, 248:13,
248:16, 248:17,
248:19, 248:25,
250:20, 255:18
  prescription's [2] -
181:4, 248:2
  prescriptions [62] -
26:4, 28:9, 28:17,
36:2, 36:3, 36:9,
36:11, 37:16, 37:24,
38:22, 40:10, 41:12,
44:24, 45:3, 97:4,
97:9, 154:3, 164:7,
164:9, 165:2, 165:12,
165:16, 166:23,
167:7, 167:17,
168:22, 169:10,
173:8, 174:21,
174:22, 175:16,
179:2, 179:5, 180:3,
181:3, 181:13,
181:13, 182:25,
183:21, 183:22,
185:19, 186:5,
186:15, 188:5,
188:12, 188:20,
189:7, 191:15, 231:8,
231:23, 232:4,
232:13, 233:1, 241:9,
241:19, 241:24,
242:8, 243:4, 247:5,
255:15
  presence [5] - 21:14,
46:12, 90:10, 134:20,
237:16
  present [4] - 61:13,
91:10, 213:6, 213:7
  presentation [1] -
24:20
  presented [5] -
90:19, 105:5, 114:10,
161:11, 161:16
  president [1] - 47:15
  PRESIDING [1] -
1:11
  pressure [3] - 99:7,
99:8, 113:2
  presumably [1] - 9:6
  pretty [11] - 25:3,
54:5, 88:6, 93:10,
98:3, 109:6, 136:4,
160:25, 211:18,
216:24, 247:10
  prevent [1] - 16:17
  previous [8] - 27:14,
84:25, 104:10, 109:1,
171:7, 181:21,
239:24, 240:17
  previously [7] - 58:4,
93:13, 162:6, 218:9,

227:5, 227:17, 248:14
  price [1] - 204:22
  primarily [3] - 112:8,
135:11, 167:20
  primary [25] - 34:2,
57:21, 58:10, 58:12,
62:19, 84:2, 84:7,
87:13, 87:14, 115:11,
118:19, 122:14,
143:19, 167:9,
207:13, 244:18,
249:17, 251:14,
251:18, 251:20,
251:24, 252:5,
252:15, 253:1, 253:18
  Princeton [4] -
28:14, 56:21, 166:22,
207:4

[signature: Donna J. Prather]

212:5, 215:9
  privacy [2] - 219:2,
219:12, 219:14
  PRN [3] - 247:17,
248:3
  probative [2] - 4:14,
10:21
  problem [20] - 8:13,
35:9, 35:10, 37:6,
54:12, 66:9, 77:20,
101:24, 106:3, 109:3,
109:23, 145:19,
145:21, 154:23,
155:5, 178:9, 244:10,
244:22, 245:5
  problems [10] - 8:20,
9:21, 31:11, 35:22,
53:1, 76:8, 102:11,
106:24, 112:20, 155:2
  procedure [4] -
30:18, 77:4, 182:24,
252:7
  procedures [1] -
239:11
  proceed [9] - 3:3,
21:1, 90:12, 134:21,
180:2, 183:7, 237:17,
255:12, 255:13
  proceeding [2] -
213:4, 213:6
  Proceedings [17] -
1:25, 3:1, 21:14,
45:18, 45:23, 46:12,
89:23, 90:3, 90:10,
134:5, 134:15,
134:20, 237:10,

237:12, 237:16,
257:25, 258:4
  process [20] - 51:13,
55:7, 76:11, 79:15,
89:4, 108:21, 110:2,
146:24, 165:15,
167:25, 169:25,
171:17, 183:5,
192:17, 199:2,
213:24, 231:24,
240:8, 244:12, 252:8
  processes [1] -
157:2
  produces [1] - 81:8
  productive [1] -
173:24
  products [1] - 71:3
  Professional [1] - 54:1
  [...]
175:25, 177:8,
177:12, 177:17,
177:20, 228:22
  professionals [1] -
246:24
  Professions [3] -
3:22, 10:17, 10:18
  proffer [1] - 9:2
  profit [2] - 10:16,
47:18
  Program [6] - 3:14,
3:22, 6:12, 7:6, 7:16,
26:3
  program [7] - 3:25,
4:2, 6:17, 6:18, 6:19,
7:1, 7:8, 8:3, 8:10,
9:8, 9:15, 10:10, 48:4,
48:5, 49:3, 51:4, 51:6,
51:7, 51:12, 51:15,
52:4, 52:18, 53:3,
54:9, 54:18, 54:21,
54:23, 55:6, 55:8,
55:10, 56:12, 63:20,
119:23, 206:21,
225:20, 250:22
  programs [1] - 71:3
  project [2] - 192:2,
192:5
  prolonged [2] -
27:11, 37:2
  prominent [11] -
118:11, 129:9,
129:23, 131:12,
135:13, 144:10,
146:5, 146:16,
146:18, 147:15, 255:3

  promise [1] - 104:20
  proof [1] - 16:10
  proper [1] - 171:13
  prove [1] - 16:11
  proven [2] - 171:3,
250:2
  provide [5] - 56:10,
57:10, 76:4, 170:24,
243:7
  provided [14] - 5:1,
5:13, 87:5, 88:10,
88:13, 110:15,
114:18, 115:2, 115:6,
119:5, 123:22, 135:2,
188:24, 210:18
  Provider [1] - 172:3
  provider [13] - 106:4,
161:19, 231:18,
247:11, 251:14,
251:19, 251:20,
251:25, 252:5,
252:15, 252:19,
253:10, 253:19
  providers [1] - 253:9
  prudent [1] - 154:8
  publish [1] - 246:3
  published [4] - 53:11,
204:24, 205:6, 205:23
  pulled [1] - 122:23
  pulmonologist [1] -
59:21
  pulse [1] - 99:8
  Purdue [1] - 209:18
  purpose [10] - 11:6,
28:3, 154:8, 157:4,
170:11, 172:14,
174:23, 177:10,
217:13
  purposes [1] - 71:20
  pursue [2] - 3:17,
45:7
  push [2] - 82:13,
237:7
  pushing [1] - 250:17
  put [20] - 14:11, 58:3,
68:4, 68:20, 68:25,
70:25, 75:15, 89:7,
89:8, 92:17, 97:17,
97:18, 143:4, 158:9,
202:10, 202:12,
226:15, 228:8, 243:3,
243:5
  putting [1] - 192:15

## Q

QHS [1] - 97:2
  qualifications [2] -
39:18, 40:19

qualified [2] - 56:8, 56:17
quality [6] - 66:7, 74:24, 75:1, 102:11, 172:25, 250:10
quantity [1] - 197:13
quarterly [1] - 67:19
questionable [4] - 27:5, 32:2, 44:2, 44:3
questioned [1] - 36:19
questioning [2] - 38:23, 79:23
questions [21] - 6:8, 9:22, 25:9, 25:22, 27:9, 33:2, 41:24, 41:25, 44:11, 44:13, 45:9, 83:7, 83:10, 103:14, 105:11, 122:3, 174:25, 178:10, 253:24, 257:1
quick [1] - 104:20
quicker [2] - 81:3, 164:19
quickly [8] - 62:16, 74:8, 167:25, 172:21, 181:15, 182:5, 184:4, 246:18
quieter [1] - 225:14
quit [3] - 215:24, 215:25, 216:7
quite [9] - 56:11, 113:8, 116:20, 125:6, 128:4, 181:16, 188:17, 189:14, 255:9
quitting [2] - 216:1, 216:4

## R

Radcliff [10] - 86:25, 187:5, 188:3, 209:9, 209:12, 209:14, 209:17, 209:21, 210:8, 220:7
Radcliff's [2] - 209:19, 218:5
radiated [2] - 147:18, 149:10
radiates [1] - 96:1
radiating [11] - 80:13, 96:2, 98:23, 114:14, 129:25, 130:1, 133:11, 146:17, 146:19, 149:16, 150:23
radiation [7] - 118:9, 118:10, 118:12, 125:9, 127:22, 141:6, 153:4
radiculitis [1] -

99:23, 112:8
radiculopathy [32] - 81:2, 96:16, 98:22, 99:22, 108:7, 112:9, 117:7, 117:8, 117:9, 118:11, 123:23, 131:20, 132:20, 132:21, 133:11, 135:14, 136:12, 137:13, 137:18, 137:19, 137:20, 139:19, 140:14, 144:6, 144:20, 147:15, 148:10, 149:21, 151:11, 151:20, 152:13, 153:18
radiology [1] - 59:19
rails [1] - 151:15
raise [2] - 21:23, 46:16
Ralph [2] - 234:23, 235:4
rambling [1] - 256:9
Ramseyer [6] - 1:18, 14:13, 15:20, 94:14, 236:25, 254:21
RAMSEYER [83] - 2:6, 5:20, 6:9, 7:5, 7:10, 7:20, 7:23, 8:12, 9:1, 9:25, 13:18, 15:4, 65:6, 65:10, 73:15, 73:20, 77:25, 90:21, 94:10, 94:15, 94:19, 100:9, 111:6, 114:20, 119:12, 120:2, 121:16, 126:15, 134:8, 134:12, 157:10, 157:17, 158:23, 161:24, 164:15, 164:23, 166:16, 173:10, 175:3, 175:5, 178:5, 178:6, 180:23, 181:1, 183:16, 190:15, 194:21, 194:23, 195:6, 195:7, 195:10, 195:11, 198:10, 200:12, 214:16, 226:21, 226:24, 227:18, 227:21, 228:2, 228:5, 228:7, 234:16, 234:19, 235:7, 237:14, 237:18, 237:19, 239:5, 245:14, 245:19, 245:24, 246:3, 246:4, 247:13, 247:14, 249:9, 249:11, 253:23,

254:1, 254:16, 256:13, 257:3
ran [4] - 53:1, 88:9, 161:15, 181:15
Randall [1] - 1:18
randomly [1] - 169:7
range [12] - 80:21, 81:4, 91:14, 92:10, 92:11, 92:18, 101:6, 101:12, 101:20, 102:2, 116:5, 149:23
rapidly [1] - 172:18
rare [3] - 73:7, 119:16, 168:7, 169:25, 206:21, 239:14, 241:8, 241:25, 242:7

131:24, 133:1, 133:20, 251:5, 253:13
RB [1] - 93:22
RB-2 [1] - 75:16
RB-2-80 [1] - 97:7
RB-269 [1] - 93:5
reach [1] - 41:23
reached [1] - 241:7
reaching [1] - 16:13
reaction [2] - 81:8, 81:9
read [19] - 10:6, 41:12, 105:16, 105:22, 140:2, 144:2, 159:24, 176:1, 181:8, 184:11, 227:1, 234:20, 234:21, 246:10, 249:12, 251:9, 251:10, 251:12, 252:10
reading [1] - 66:4
ready [12] - 3:3, 21:16, 46:14, 68:4, 89:9, 90:5, 90:11, 134:17, 210:5, 219:10, 237:13, 238:4
real [8] - 90:17, 104:20, 233:20, 237:8, 244:21, 244:25, 245:1, 245:4
realize [2] - 37:6, 225:20
realized [1] - 181:15
really [52] - 5:24, 5:25, 8:20, 9:17, 11:6,

11:8, 13:22, 14:18, 17:12, 39:24, 48:11, 48:16, 55:12, 58:17, 63:11, 65:20, 70:7, 70:17, 70:21, 70:22, 72:12, 72:20, 87:17, 89:4, 103:25, 104:5, 104:17, 138:25, 140:2, 141:21, 160:23, 162:15, 173:18, 176:17, 204:17, 205:23, 216:2, 216:25, 219:9, 219:19, 225:2, 233:13, 235:22, 239:7, 243:25, 244:4, 244:5, 246:23
reason [22] - 10:10,

167:7, 167:8, 167:9, 167:10, 167:11, 181:17, 181:22, 191:14, 201:24, 203:12, 203:14, 209:5, 209:6, 219:9, 225:8, 241:6, 243:4
reasonable [8] - 26:19, 27:3, 27:7, 28:16, 38:23, 39:14, 43:10, 44:8
reasonably [1] - 37:7
reasoning [1] - 219:11
reasons [8] - 57:7, 60:22, 79:13, 105:25, 172:17, 191:14, 203:12, 208:8
Rebecca [2] - 137:15, 137:16
receipt [1] - 163:11
receive [5] - 6:24, 110:4, 115:13, 232:4, 240:7
RECEIVED [1] - 2:8
received [19] - 9:8, 64:17, 64:19, 93:9, 93:11, 93:15, 104:10, 117:21, 129:4, 139:17, 145:23, 169:10, 171:19, 189:2, 214:23, 228:6, 231:18, 232:8, 246:2
receiving [4] - 35:6, 86:8, 94:8, 147:11
recent [1] - 120:15

recently [6] - 29:19, 61:15, 161:20, 164:21, 164:24, 166:6
receptionist [2] - 187:9, 187:11
receptors [5] - 72:17, 72:24, 72:25, 73:3, 73:9
recess [9] - 21:3, 45:16, 45:20, 45:22, 89:25, 90:2, 134:14, 237:6, 237:9
recite [1] - 179:13
recognize [9] - 13:7, 25:7, 96:9, 112:6, 122:12, 123:18, 126:22, 227:25, 234:14
recognizing [1] - 7:12
recollection [2] - 78:8, 162:11
recommended [3] - 84:22, 227:22, 250:6
Recommended [1] - 2:10
recommending [2] - 254:25, 255:1
reconvene [1] - 90:1
record [13] - 22:13, 54:13, 66:12, 121:14, 121:25, 141:13, 190:20, 215:17, 216:9, 216:16, 216:19, 229:4, 229:5
records [39] - 7:21, 33:16, 33:22, 44:21, 78:8, 79:9, 82:9, 82:10, 93:13, 111:24, 113:17, 114:17, 115:1, 115:11, 115:12, 118:25, 119:2, 119:3, 119:4, 127:4, 177:25, 191:1, 191:5, 212:24, 216:14, 218:2, 218:14, 218:23, 219:1, 219:5, 219:6, 219:10, 219:16, 221:24, 229:9, 243:19, 246:17, 246:20, 246:21
recovery [2] - 47:22, 47:23
RECROSS [2] - 2:4, 44:14
RECROSS-EXAMINATION [2] - 2:4, 44:14
recurrent [2] - 98:18,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 287 of 296   PageID#: 11421

224:23
**recurring** [1] - 148:1
**red** [17] - 26:13, 26:14, 26:20, 34:17, 38:15, 39:7, 39:9, 40:13, 41:7, 41:20, 41:25, 42:2, 43:14, 43:16, 44:9, 45:2, 45:5
**REDIRECT** [2] - 2:6, 254:6
**reduce** [1] - 74:6
**reducing** [1] - 72:23
**reduction** [2] - 141:24, 142:10
**refer** [4] - 78:8, 79:6, 235:16, 253:15
**reference** [1] - 83:6
**referencing** [1] - 86:18
**referral** [4] - 251:15, 252:7, 252:22, 253:13
**referrals** [2] - 244:18, 244:20
**referred** [3] - 207:18, 233:23, 244:9
**referring** [3] - 78:20, 194:1, 235:22
**reflect** [1] - 99:19
**reflected** [1] - 165:22
**reflects** [2] - 216:19, 229:4
**refrain** [1] - 6:20
**refresh** [2] - 186:13, 237:25
**refreshed** [1] - 82:8
**refugee** [1] - 106:2
**refugees** [1] - 170:21
**refunded** [1] - 189:16
**refuse** [1] - 12:20
**refused** [1] - 12:23
**refusing** [1] - 60:24
**regard** [4] - 12:10, 13:15, 16:3, 50:20
**regarding** [13] - 3:11, 3:13, 5:5, 20:18, 75:11, 75:13, 81:15, 96:19, 97:15, 123:20, 132:6, 157:24, 250:8
**regards** [15] - 17:11, 55:16, 64:23, 79:25, 94:7, 102:15, 113:11, 149:23, 164:12, 171:3, 171:5, 172:4, 219:13, 239:23, 252:22
**Regional** [1] - 206:4
**registered** [1] - 214:5, 215:19

**regret** [1] - 162:25
**regular** [2] - 44:23, 208:15
**regularly** [4] - 148:2, 168:6, 250:1, 250:2
**regulars** [1] - 25:11
**Regulations** [3] - 181:3, 184:14, 184:16
**reimbursed** [3] - 157:3, 157:7, 157:9
**reimbursement** [1] - 157:21
**relate** [1] - 80:17, 96:14, 112:8
**related** [7] - 13:19, 98:22, 108:6, 108:20, 112:22, 133:10, 135:9
**relates** [1] - 176:1
**relationship** [13] - 26:2, 30:20, 30:25, 34:25, 35:3, 87:20, 110:8, 142:14, 145:24, 159:4, 161:4, 163:6, 218:19
**relatively** [1] - 142:1
**relaxants** [1] - 74:22, 182:14
**relayed** [1] - 162:5
**release** [11] - 27:11, 65:20, 66:5, 66:8, 66:9, 74:7, 74:9, 96:23, 96:24, 172:21, 172:24
**released** [4] - 30:17, 36:4, 72:20, 72:23
**releases** [1] - 72:22
**relevance** [2] - 5:25, 6:1
**relevancy** [1] - 7:22
**relevant** [6] - 8:1, 8:20, 9:21, 14:15, 15:17, 240:24
**relief** [4] - 47:19, 47:21, 73:4, 74:17
**relies** [1] - 8:14
**religiously** [1] - 181:14
**rely** [1] - 82:10
**remain** [2] - 16:5, 170:19
**remainder** [2] - 96:17, 186:24
**remarried** [1] - 55:14
**remember** [22] - 11:24, 37:19, 37:20, 38:6, 68:20, 73:2, 78:6, 170:10, 201:2, 208:1, 211:18, 211:21, 213:1, 216:2, 216:10, 222:9, 226:4,

233:5, 233:10, 233:11, 234:13, 249:7
**remove** [1] - 74:7
**removed** [1] - 141:8
**renewed** [1] - 58:20
**rent** [1] - 156:25
**rep** [1] - 209:25
**repair** [1] - 148:3
**repeat** [4] - 73:16, 94:3, 167:11, 254:4
**repeatedly** [2] - 157:14, 188:15
**replicate** [1] - 52:23
**report** [25] - 52:2, 118:14, 120:24, 123:2, 124:16, 125:4, 126:9, 127:15,
**Report** [1] - 150:3
**reported** [71] - 95:18, 101:5, 108:22, 110:25, 111:10, 111:15, 111:16, 113:7, 113:8, 114:11, 114:14, 115:25, 116:2, 116:9, 116:11, 116:12, 117:17, 117:19, 118:15, 118:17, 121:1, 121:2, 121:7, 121:10, 123:4, 123:10, 124:18, 125:6, 125:8, 125:10, 126:11, 127:16, 128:17, 131:9, 132:7, 132:11, 133:16, 136:2, 136:4, 136:18, 136:20, 138:11, 138:12, 139:4, 139:6, 139:7, 139:25, 140:19, 143:23, 144:24, 146:11, 147:7, 147:19, 147:24, 148:2, 148:25, 149:1, 149:4, 149:12, 149:13, 149:15, 150:4, 150:8, 150:10, 151:2, 151:13, 153:12, 157:13, 160:22
**Reporter** [1] - 1:25
**reporting** [9] - 137:5, 138:10, 139:3, 139:24, 140:18, 144:1, 144:23, 145:4,

151:23
**reports** [7] - 10:17, 95:21, 95:24, 96:25, 131:24, 133:2, 193:1
**repossess** [1] - 70:25
**represent** [2] - 115:24, 220:2
**representation** [1] - 220:1
**represented** [2] - 5:22, 14:13
**represents** [1] - 229:8
**reproduce** [1] - 92:19
**request** [3] - 3:18,

**required** [2] - 55:25, 64:22, 94:6, 94:11, 94:16, 94:22, 94:24, 95:3, 97:23, 105:14, 135:10
**requirements** [1] - 214:8
**requires** [1] - 213:19
**requiring** [1] - 246:19
**reroof** [1] - 48:12
**research** [6] - 33:17, 105:6, 171:3, 196:7, 254:24, 255:2
**research-proven** [1] - 171:3
**researched** [2] - 40:5, 250:6
**residence** [1] - 28:13
**residency** [15] - 6:11, 54:8, 54:21, 54:23, 55:8, 55:9, 55:10, 55:17, 56:12, 95:1, 203:24, 203:25, 206:21, 206:22, 206:24
**resident** [1] - 206:7
**residents** [1] - 53:6
**resign** [3] - 53:21, 53:22, 53:23
**resigned** [1] - 54:1
**resistance** [3] - 81:5, 81:7, 101:18
**resolution** [1] - 220:3
**resource** [1] - 249:17
**Resource** [1] - 47:20

**respect** [38] - 4:17, 10:13, 11:2, 11:23, 15:1, 16:24, 44:23, 47:25, 50:24, 52:1, 73:13, 73:18, 76:12, 76:15, 90:19, 98:25, 107:4, 107:24, 114:9, 114:15, 115:23, 118:3, 118:13, 118:23, 119:17, 120:23, 125:3, 128:1, 139:2, 145:14, 151:18, 152:6, 156:14, 156:15, 161:2, 163:5, 255:5
**respectfully** [1] - 182:2
**respond** [2] - 73:1, 101:17
**responded** [1] - 47:20
**responding** [1] - 101:16
**response** [4] - 81:8, 81:9, 86:13, 86:16
**responsibilities** [1] - 52:24
**responsibility** [2] - 55:16, 202:19
**responsible** [1] - 73:4
**responsive** [1] - 121:17
**rest** [3] - 60:18, 188:2, 247:22
**restricted** [1] - 116:5
**restrooms** [1] - 229:18
**result** [20] - 53:16, 53:18, 91:24, 100:22, 100:23, 102:20, 110:17, 114:13, 116:1, 127:20, 133:17, 136:1, 136:22, 140:5, 141:5, 144:14, 153:24, 159:15, 225:19, 239:21
**resulted** [9] - 108:16, 121:2, 123:11, 130:19, 139:5, 142:2, 153:10, 214:1, 225:21
**resulting** [3] - 145:1, 145:2, 147:10
**resume** [2] - 14:13, 97:1
**resumed** [4] - 45:23, 90:3, 134:15, 237:10
**Retail** [1] - 24:17
**retake** [1] - 90:8

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

**retire** [4] - 226:2, 226:5, 226:6, 226:8
**Retired** [1] - 227:3
**retired** [3] - 226:14, 226:15, 226:18
**return** [2] - 66:2, 257:22
**returned** [3] - 67:8, 67:10, 195:13
**reverse** [1] - 11:13
**review** [10] - 77:9, 77:15, 111:24, 115:1, 121:14, 121:25, 127:4, 221:24, 246:20, 252:11
**reviewed** [9] - 76:10, 114:17, 119:3, 155:11, 180:8, 180:16, 180:17, 212:24, 216:13
**reviewing** [1] - 93:13, 133:20, 190:25
**revoked** [3] - 4:9, 4:11, 58:23
**Reynolds** [18] - 161:2, 161:3, 161:11, 161:25, 162:2, 175:12, 176:21, 185:6, 185:9, 185:20, 186:9, 190:17, 190:21, 191:16, 191:21, 191:24, 191:25, 192:1
**Reynolds's** [3] - 185:20, 186:15, 191:15
**rheumatoid** [3] - 123:4, 123:21, 150:6
**Richmond** [2] - 26:15, 26:23
**Rick** [2] - 139:2, 139:3
**Ridge** [2] - 52:5, 203:24
**ridge** [1] - 121:4
**rigorous** [3] - 213:24, 231:24, 250:21
**risk** [10] - 11:18, 88:8, 158:5, 158:9, 158:10, 158:11, 158:14, 158:15, 158:17
**risks** [2] - 6:2, 172:4
**road** [1] - 222:11
**Roanoke** [5] - 25:18, 33:10, 33:14, 33:25, 34:5
**Robert** [6] - 75:23, 90:15, 93:7, 120:23,

120:24, 122:9
**rock** [1] - 152:2
**role** [4] - 52:7, 87:12, 87:14, 160:16
**rollover** [3] - 139:5, 146:23, 146:25
**roof** [4] - 48:12, 121:4, 121:5, 136:22
**room** [4] - 42:11, 60:11, 68:24, 89:7
**rooms** [4] - 68:22, 89:5, 169:24
**root** [6] - 117:10, 117:12, 136:13, 137:21, 138:3, 155:4
**roots** [1] - 132:21
**Rose** [4] - 234:13, 235:5, 235:17, 235:20
**rotate** [3] - 52:9, 52:10, 52:17
**rotating** [2] - 52:8, 204:1
**rotations** [1] - 30:5
**rotator** [1] - 153:14
**roughly** [3] - 25:1, 55:6, 94:5
**route** [2] - 28:15, 195:16
**routinely** [1] - 93:16, 171:2
**rude** [1] - 87:17
**Rule** [3] - 4:13, 8:14, 13:6
**rule** [2] - 4:21, 95:10
**rules** [2] - 11:10, 30:15
**ruling** [2] - 3:18, 225:7
**run** [4] - 60:10, 130:21, 181:24, 217:16
**runner's** [1] - 72:21
**running** [3] - 136:22, 217:11, 250:12
**rural** [4] - 56:8, 56:10, 56:11, 166:20
**RV** [1] - 161:15
**RX** [1] - 95:19

## S

**safe** [5] - 75:7, 164:22, 165:3, 171:2, 202:5
**safely** [3] - 7:15, 74:8, 208:13
**safety** [3] - 69:17, 69:21, 136:24
**salaries** [1] - 206:8
**Salem** [3] - 33:11,

33:14, 34:5
**sales** [2] - 209:17, 209:25
**salesman** [1] - 84:5
**sample** [1] - 210:18
**samples** [1] - 220:5
**Samuel** [4] - 1:19, 133:25, 134:24, 155:22
**sand** [1] - 113:11
**sat** [1] - 84:4
**saturation** [2] - 99:9, 113:3
**save** [2] - 234:12, 237:4
**saved** [4] - 67:14, 202:7, 202:11, 211:9

158:16, 194:14,
161:1, 171:18,
175:13, 176:6,
177:21, 185:7, 185:8,
185:12, 190:17,
190:23, 210:25,
213:8, 214:22, 215:8,
216:11, 216:17,
220:9, 221:11,
222:19, 222:22,
231:14, 231:19,
232:10, 255:19,
255:20, 256:5
**sawyer** [1] - 124:17
**SB-2** [1] - 107:12
**scale** [3] - 82:25, 83:1, 83:2
**scenario** [2] - 171:23, 176:23
**SCH** [1] - 193:16
**schedule** [2] - 17:12, 33:20
**Schedule** [16] - 30:9, 32:8, 42:14, 42:15, 175:23, 177:2, 177:20, 179:2, 182:10, 182:16, 182:20, 183:9, 183:17, 183:22, 183:23, 196:20
**scheduling** [1] - 18:9
**Scholarship** [1] - 51:4
**scholarship** [1] - 225:23
**school** [18] - 47:11, 47:14, 48:7, 48:9,

49:22, 49:24, 50:1, 50:3, 50:4, 51:3, 51:5, 51:14, 51:22, 52:3, 147:25, 179:12, 203:22, 250:1
**School** [2] - 47:12, 47:13
**schooling** [1] - 50:25
**science** [2] - 48:6, 64:25
**scoliosis** [1] - 151:6
**scope** [6] - 175:22, 175:25, 177:8, 177:12, 177:16, 177:20
**Scotty** [2] - 152:7, 152:15

104:23, 104:24,
105:6, 188:24,
231:24, 240:8, 240:16
**screens** [3] - 88:2, 229:11, 229:13
**script** [4] - 180:20, 237:24, 238:20, 242:24
**scripts** [2] - 166:10, 189:5
**scroll** [7] - 85:13, 85:21, 90:16, 91:1, 91:17, 142:21, 147:22
**sealed** [1] - 220:9
**search** [6] - 47:23, 66:13, 67:2, 67:25, 68:9, 196:10
**seated** [3] - 18:16, 22:3, 66:21
**second** [8] - 10:7, 51:3, 60:5, 82:13, 97:13, 146:18, 233:8, 257:13
**second-time** [1] - 233:8
**secondary** [2] - 129:10, 143:20
**section** [5] - 96:4, 96:6, 102:22, 103:18, 103:23
**secure** [1] - 97:10
**see** [92] - 4:3, 4:8, 6:6, 8:6, 8:22, 13:12, 15:2, 15:16, 26:3, 26:8, 26:14, 27:6, 27:7, 31:23, 33:25,

36:20, 45:20, 53:15, 57:9, 58:24, 60:24, 61:3, 62:9, 62:18, 62:22, 65:12, 70:10, 72:12, 77:13, 82:9, 84:25, 87:20, 88:22, 90:18, 94:4, 96:16, 97:7, 102:1, 104:1, 106:20, 107:23, 114:2, 117:3, 117:25, 118:4, 125:3, 128:3, 138:23, 142:23, 148:3, 160:25, 161:22, 163:16, 163:22, 169:7, 175:24, 185:6, 185:12, 188:14, 190:3, 190:8, 190:10, 205:18, 208:12, 208:13, 208:20, 208:21, 212:19, 217:1, 217:2, 218:14, 219:1, 219:6, 221:18, 222:24, 223:15, 223:20, 234:6, 235:5, 235:12, 235:13, 241:2, 242:24, 245:9, 246:22, 248:20, 251:14, 256:17, 256:24, 257:23
**seeing** [13] - 17:22, 27:4, 57:8, 65:3, 66:18, 98:2, 162:7, 162:24, 163:2, 163:13, 207:3, 208:8, 223:17
**seem** [1] - 201:15
**self** [1] - 181:16
**self-checks** [1] - 181:16
**sell** [1] - 198:8
**semi** [1] - 139:5
**send** [8] - 32:5, 54:4, 115:10, 175:24, 176:6, 176:16, 210:9, 229:2
**sending** [3] - 191:14, 233:6, 233:22
**senior** [1] - 53:6
**sensation** [1] - 73:5
**sense** [6] - 28:5, 42:23, 87:15, 170:20, 185:10, 198:6
**senses** [1] - 180:1
**sent** [14] - 13:20, 14:1, 60:11, 175:16, 182:17, 186:4, 189:6, 189:7, 230:21, 233:14, 235:13, 251:9, 251:11

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 243   Filed 07/17/19   Page 289 of 296   Pageid#: 11423

**separate** [4] - 12:25, 58:25, 187:21, 199:6
**separated** [3] - 187:10, 187:13, 226:12
**separates** [1] - 226:9
**September** [7] - 49:9, 55:21, 76:14, 87:9, 93:24, 99:17, 206:25
**series** [1] - 53:19
**serious** [1] - 6:2
**serve** [4] - 51:9, 51:11, 219:22, 249:18
**serves** [2] - 108:6, 222:7
**service** [6] - 52:11, 57:20, 59:15, 67:17, 88:13, 226:9
**Services** [1] - 206:9
**services** [5] - 52:10, 58:13, 87:5, 186:22, 188:24
**set** [14] - 58:14, 58:18, 67:22, 67:24, 67:25, 69:17, 70:2, 191:17, 192:19, 208:24, 210:25, 211:2, 212:9
**setting** [3] - 6:21, 200:16, 200:22
**settle** [3] - 92:4, 163:23, 163:24
**seven** [5] - 113:10, 153:13, 201:12, 224:16
**seven-day** [1] - 224:16
**seventy** [1] - 251:2
**seventy-five** [1] - 251:2
**several** [21] - 6:25, 26:13, 29:17, 32:25, 33:21, 56:7, 86:19, 93:18, 111:3, 130:13, 139:17, 156:12, 156:14, 163:16, 174:9, 188:8, 188:16, 202:7, 209:21, 232:15, 232:18
**severe** [61] - 60:9, 65:25, 66:1, 70:7, 73:11, 74:10, 75:7, 80:12, 83:5, 83:22, 84:2, 92:9, 93:2, 96:13, 97:19, 98:20, 99:21, 106:1, 108:17, 110:23, 112:7, 114:6, 114:11, 116:24, 118:6, 118:16, 121:1,

122:13, 123:11, 123:12, 125:20, 126:1, 126:23, 127:21, 128:7, 129:5, 131:13, 131:19, 135:8, 135:18, 136:5, 136:10, 136:19, 136:22, 136:24, 137:11, 139:5, 139:18, 140:12, 141:4, 142:2, 144:14, 147:21, 149:2, 150:23, 150:25, 151:9, 151:19, 153:17, 161:13, 248:5
**severely** [8] - 114:12, 121:3, 121:7, 149:15, 150:8, 150:9, 150:11
**SF-20** [1] - 124:15
**shall** [2] - 21:25, 46:18
**Shannon** [2] - 122:25, 141:17
**shape** [3] - 169:23, 176:17, 191:18
**share** [1] - 251:8
**Sharon** [4] - 147:7, 235:24, 255:5, 255:6
**sharp** [1] - 92:15
**Sheriff's** [1] - 69:1, 195:17, 196:7
**Shield** [3] - 157:6, 157:8, 157:22
**shift** [1] - 146:25
**shifts** [1] - 24:6
**shipping** [1] - 232:24
**shooting** [13] - 81:2, 81:10, 81:11, 91:15, 92:20, 98:23, 108:7, 112:9, 117:13, 128:4, 135:15, 138:3, 148:9
**Short** [2] - 84:18, 93:23
**short** [7] - 21:3, 45:16, 45:20, 89:25, 94:1, 237:5, 237:9
**shortly** [1] - 62:2
**shoulder** [5] - 107:1, 127:21, 129:7, 147:18, 152:14
**show** [16] - 75:22, 90:14, 93:21, 97:6, 107:12, 151:2, 181:2, 194:19, 205:5, 227:5, 227:11, 227:17, 229:7, 234:20, 245:14, 251:10
**showed** [3] - 52:25, 66:10, 184:11
**showing** [9] - 93:4,

115:18, 115:22, 129:24, 135:1, 186:1, 208:24, 209:1, 209:3
**shown** [1] - 5:11
**shows** [9] - 8:11, 9:17, 30:8, 179:5, 190:20, 194:13, 215:17, 216:9, 216:16
**shredded** [1] - 248:16
**shut** [7] - 61:3, 63:9, 106:7, 210:5, 210:7, 213:14, 213:24
**sic** [2] - 102:19, 136:6
**sick** [4] - 60:10, 184:1, 255:8, 256:2

**sign** [15] - 3:21, 3:24, 4:1, 8:2, 9:5, 41:12, 42:17, 42:18, 63:11, 105:14, 167:6, 180:12, 184:21, 226:18, 248:10
**signature** [5] - 41:5, 226:17, 226:19, 226:20, 238:15
**signatures** [1] - 166:12
**signed** [2] - 4:2, 6:18, 6:22, 10:3, 40:9, 67:16, 166:10, 166:13, 166:23, 167:2, 167:18, 168:21, 169:14, 180:4, 180:20, 181:4, 181:9, 181:22, 183:22, 227:1, 227:2, 238:19, 241:14, 242:23
**significance** [1] - 85:3
**significant** [58] - 85:4, 91:13, 91:23, 100:2, 108:1, 112:19, 114:14, 118:8, 118:19, 124:13, 124:19, 125:6, 125:12, 127:16, 128:20, 129:4, 129:24, 136:18, 138:15, 139:10, 140:6, 140:13, 140:14, 140:19,

140:20, 141:22, 141:25, 142:5, 142:25, 143:5, 145:19, 145:21, 146:23, 147:16, 147:24, 148:12, 148:17, 149:1, 149:9, 149:13, 149:22, 150:4, 151:2, 151:11, 152:8, 152:9, 152:13, 152:18, 152:19, 153:2, 153:3, 153:24, 155:6, 161:12, 190:25, 191:4, 191:13
**significantly** [1] - 152:4
**signing** [2] - 42:18, 223:17

20:21, 20:23, 50:19, 65:17, 70:11, 74:14, 99:19, 179:14, 237:22
**simple** [4] - 228:23, 232:1, 252:13, 252:24
**simplest** [1] - 50:11
**simply** [10] - 5:8, 10:2, 10:15, 10:20, 11:23, 12:12, 20:5, 20:18, 117:5, 176:13
**sit** [5] - 37:11, 79:22, 79:24, 130:6, 154:20
**site** [5] - 5:22, 26:7, 40:5, 166:21
**sitting** [2] - 84:6, 96:3
**situation** [19] - 18:9, 62:13, 62:15, 104:16, 104:18, 109:1, 109:6, 161:13, 161:18, 162:9, 162:15, 162:19, 162:20, 169:2, 175:14, 175:15, 177:1, 236:11, 241:13
**situations** [8] - 11:4, 165:6, 166:24, 168:25, 184:4, 193:1, 230:16, 241:17
**six** [10] - 29:12, 53:3, 53:12, 62:18, 86:18, 156:23, 158:15, 160:21, 201:11, 201:12
**six-hour** [1] - 201:11
**six-month** [1] - 62:18

**skin** [1] - 137:25
**skip** [1] - 97:6
**skipped** [1] - 150:20
**slate** [1] - 128:18
**sleep** [1] - 75:1
**sleepy** [1] - 74:16
**slept** [2] - 234:22, 235:3
**slip** [2] - 131:13, 152:2
**slipped** [2] - 137:6, 151:25
**slow** [1] - 90:17
**small** [1] - 72:11
**smelled** [3] - 53:11, 204:25
**Smith** [3] - 30:5, 149:4, 149:5, 149:6, 149:12
**Smithers** [73] - 2:11, 3:24, 4:1, 5:23, 6:10, 7:11, 9:2, 12:5, 13:20, 15:24, 16:2, 17:6, 18:16, 19:6, 20:6, 21:2, 21:3, 25:5, 27:8, 32:7, 32:23, 32:25, 33:13, 33:18, 34:18, 36:12, 38:10, 40:3, 40:8, 41:23, 46:3, 46:5, 46:15, 47:4, 64:2, 64:19, 74:3, 75:10, 75:22, 90:7, 90:14, 95:14, 134:24, 157:24, 180:19, 183:8, 185:5, 193:8, 193:9, 193:17, 193:24, 193:25, 194:7, 195:1, 200:3, 202:9, 203:16, 213:16, 219:4, 227:3, 227:22, 231:14, 235:11, 235:13, 237:20, 238:25, 245:20, 246:12, 247:15, 249:14, 249:16, 254:8, 254:21
**SMITHERS** [3] - 1:8, 2:5, 46:21
**Smithers's** [8] - 3:13, 28:9, 34:4, 39:18, 42:8, 42:20, 43:21, 44:24
**so.** [4] - 11:4, 33:4, 239:17, 242:4
**sobriety** [1] - 205:4
**social** [2] - 104:13, 104:16
**Society** [1] - 63:18
**sold** [2] - 69:6, 198:12

**solely** [1] - 40:3
**solemnly** [2] - 21:24, 46:17
**solidified** [1] - 48:17
**solidify** [1] - 30:24
**solution** [1] - 170:7
**someone** [27] - 14:2, 25:24, 29:11, 30:12, 43:14, 56:16, 60:3, 73:2, 87:15, 88:16, 103:7, 109:6, 157:25, 159:5, 159:8, 159:12, 160:3, 160:5, 161:11, 162:24, 165:25, 169:7, 171:12, 180:10, 191:7, 216:1, 250:23
**sometimes** [15] - 27:13, 41:19, 81:8, 92:2, 92:16, 93:9, 106:13, 123:7, 156:23, 163:24, 179:22, 230:17, 230:20, 236:18
**somewhat** [1] - 186:19
**somewhere** [5] - 53:8, 117:11, 216:2, 216:4, 226:19
**son** [1] - 218:5
**soon** [2] - 87:8, 237:8
**sorry** [13] - 29:24, 41:22, 93:24, 111:13, 113:10, 142:22, 146:1, 149:20, 181:20, 208:1, 235:1, 256:9, 257:21
**sort** [11] - 14:13, 38:12, 38:13, 39:20, 59:22, 65:2, 90:16, 90:18, 94:2, 238:5
**sought** [1] - 63:16
**soul** [1] - 31:24
**sound** [8] - 14:14, 44:8, 176:23, 179:9, 213:17, 216:15, 216:20, 216:24
**sounds** [7] - 43:25, 44:1, 44:22, 78:25, 201:10, 212:2, 212:21
**source** [2] - 72:23, 111:2
**south** [1] - 48:25
**Southwest** [1] - 31:6
**space** [6] - 58:16, 58:18, 59:14, 59:18, 59:23, 222:12
**spasms** [4] - 74:21, 98:20, 117:6, 141:25

**speaking** [2] - 240:23, 243:8
**special** [2] - 44:6, 243:4
**specialist** [2] - 115:11, 244:3
**specialists** [1] - 244:2
**specialized** [3] - 39:21, 39:22, 41:3
**specialties** [1] - 52:18
**specific** [13] - 71:19, 117:22, 141:12, 176:1, 179:16, 213:11, 217:10, 229:1, 233:11, 233:21, 253:3, 253:20, 256:9
**specifically** [11] - 36:21, 52:7, 74:13, 80:1, 80:10, 80:22, 83:12, 102:17, 119:25, 236:16, 253:14
**speculate** [1] - 141:13
**speculation** [1] - 13:14
**sped** [1] - 53:9
**speed** [1] - 102:6
**speeding** [1] - 205:6
**speeds** [1] - 76:11
**spell** [1] - 22:15
**spend** [4] - 50:16, 52:21, 82:20, 174:1
**spending** [1] - 155:1
**spent** [2] - 190:25, 255:9
**spigot** [1] - 60:3
**spikes** [1] - 65:25
**spinal** [8] - 72:6, 72:23, 73:3, 130:19, 132:20, 136:13, 137:21, 138:3
**spine** [4] - 72:7, 112:21, 138:4, 140:6
**spirit** [1] - 179:17
**split** [1] - 186:21
**sports** [1] - 231:16
**sprain** [2] - 123:13, 139:6
**sprained** [2] - 149:15, 150:9
**spring** [1] - 57:16
**square** [3] - 59:3, 59:22, 68:22
**Sr** [1] - 135:7
**SSRIs** [1] - 182:13
**stable** [1] - 172:24

**stadium** [1] - 61:17
**staff** [9] - 6:22, 42:8, 48:2, 60:4, 159:10, 160:9, 169:13, 221:17, 229:15
**stamp** [1] - 15:9
**stamped** [1] - 41:4
**stand** [3] - 7:4, 21:20, 90:8
**standard** [6] - 26:10, 105:13, 158:19, 160:7, 169:24, 243:12
**standing** [3] - 16:3, 103:2, 138:17
**standpoint** [3] - 105:7, 106:4, 121:23
**stands** [2] - 72:5, ...
75:12, 79:14, 90:15, 110:2, 114:3, 134:24, 183:5
**started** [12] - 29:19, 35:14, 41:1, 48:6, 49:9, 51:23, 58:21, 156:17, 165:17, 170:20, 178:16, 207:3
**starting** [6] - 25:24, 50:7, 53:12, 57:23, 95:16, 114:2
**State** [2] - 48:22, 142:8
**state** [18] - 9:4, 22:13, 37:8, 47:3, 56:7, 56:9, 56:19, 58:22, 61:4, 64:6, 80:6, 85:11, 98:15, 106:5, 119:23, 219:13, 220:3, 253:17
**statement** [4] - 11:17, 157:21, 241:22, 256:11
**statements** [3] - 27:19, 93:18, 205:13
**states** [4] - 35:12, 62:21, 96:1, 106:2
**STATES** [1] - 1:2, 1:5
**States** [5] - 1:18, 1:20, 60:12, 71:18, 71:25
**stating** [2] - 3:24, 4:2
**status** [2] - 84:20, 87:21
**statute** [1] - 184:13
**stay** [6] - 26:24, 61:4, 225:17, 230:17, ...

231:3, 237:3
**stayed** [4] - 222:4, 223:12, 223:23, 224:5
**staying** [1] - 84:23
**step** [5] - 45:13, 49:23, 55:7, 58:2, 257:5
**Stephen** [1] - 124:7
**steps** [3] - 30:15, 136:3, 152:3
**Steven** [3] - 1:18, 106:15, 106:20
**still** [30] - 14:10, 16:1, 25:19, 30:2, 30:19, 32:16, 34:23, 35:15, 35:24, 57:5, 68:15, 70:16, 75:6, ...
**stimulator** [1] - 130:20
**stipulated** [1] - 242:20
**stock** [1] - 238:5
**stomach** [2] - 70:18, 70:19
**stop** [7] - 36:3, 70:13, 82:12, 86:23, 89:13, 165:4, 172:9
**stoplight** [1] - 53:9
**stopping** [1] - 151:21
**storage** [1] - 68:24
**stores** [1] - 23:23
**stories** [1] - 173:25
**story** [1] - 247:2
**straight** [2] - 33:18, 33:20
**straighten** [2] - 138:21, 138:24
**strain/sprain** [1] - 111:1
**stratification** [1] - 158:5
**streamline** [1] - 89:4
**street** [5] - 61:17, 197:25, 198:3, 198:8, 198:13
**Street** [1] - 1:20
**stress** [2] - 72:21, 108:18
**stretching** [1] - 171:5
**strikes** [1] - 158:4
**stroke** [2] - 205:9, 205:11

**strong** [2] - 171:25, 250:4
**structural** [2] - 101:24, 137:21
**structure** [1] - 237:22
**struggling** [1] - 192:23
**stuck** [3] - 33:1, 234:23, 235:4
**student** [1] - 30:5
**studies** [2] - 166:25, 167:2
**study** [1] - 254:25
**stuff** [13] - 69:22, 69:25, 73:14, 88:15, 92:8, 105:24, 105:25, 120:3, 164:6, 164:7, 166:11, 251:4, 254:22
**subconscious** [1] - 198:6
**subject** [8] - 6:11, 16:23, 61:2, 213:20, 214:5, 214:18, 215:5, 223:25
**subjective** [1] - 95:16
**subjects** [1] - 49:4
**subpoena** [2] - 218:15, 218:24
**subpoenaed** [3] - 19:3, 19:4, 20:8
**substance** [14] - 63:19, 64:20, 171:14, 172:5, 182:9, 183:18, 214:25, 215:9, 231:15, 231:18, 231:19, 231:23, 246:14, 249:3
**Substances** [2] - 95:8, 185:3
**substances** [26] - 13:23, 32:7, 42:14, 42:15, 42:22, 56:2, 64:23, 64:24, 67:9, 67:10, 94:8, 67:9, 179:9, 180:10, 185:1, 215:11, 215:16, 216:12, 216:18, 216:23, 223:2, 223:7, 224:15, 232:7, 253:11, 253:22
**substantial** [2] - 120:14, 171:20
**successfully** [1] - 54:19
**sudden** [1] - 59:7
**suddenly** [7] - 68:11, 128:23, 143:24, 161:19, 165:3, 172:9, ...

207:19
suffer [5] - 7:12, 80:16, 98:17, 109:25, 111:7
suffered [43] - 35:12, 74:20, 80:11, 82:5, 84:1, 91:23, 92:11, 98:19, 100:1, 106:24, 107:25, 110:25, 111:3, 111:4, 111:16, 113:10, 116:1, 116:12, 123:5, 125:12, 128:7, 131:12, 131:14, 133:16, 135:8, 135:23, 136:19, 137:12, 140:12, 143:20, 144:3, 144:12, 147:4, 147:17, 149:10, 149:24, 150:23, 151:22, 152:10, 152:19, 153:5, 153:23, 153:24
suffering [7] - 76:8, 92:8, 92:9, 110:25, 127:18, 129:12, 159:14
suggesting [1] - 78:25
suicidal [1] - 88:7
Suite [2] - 1:20, 193:11
sulfate [1] - 32:20
summer [1] - 51:4
summertime [1] - 26:23
super [5] - 98:3, 98:5, 99:20, 157:4, 157:9
supervised [1] - 229:12
supplies [3] - 210:19, 210:20, 211:3
supply [8] - 36:8, 97:1, 224:16, 224:17, 228:20, 228:24, 229:3
support [1] - 96:19
supported [1] - 91:6
suppose [1] - 194:18
supposed [12] - 18:22, 70:6, 86:1, 101:17, 158:20, 181:4, 187:12, 206:23, 240:18, 243:16, 252:8, 257:9
supposedly [1] - 176:9
Suppress [1] - 3:11
suppressed [1] -

4:15
surgeon [1] - 44:6
surgeries [2] - 130:19, 146:5
surgery [2] - 141:23, 161:15
surgical [1] - 141:22
surprise [2] - 31:15, 32:24
surprised [2] - 26:18, 35:1
surveillance [2] - 71:4, 145:20
survival [1] - 173:5
suspected [1] - 227:14
suspend [3] - 4:10, 10:15, 10:19
suspended [4] - 45:23, 90:3, 134:15, 237:10
sustain [1] - 158:25, 256:15
sustained [2] - 147:23, 147:25
swear [2] - 21:24, 46:17
sworn [3] - 21:20, 22:8, 46:23
symptom [1] - 92:17
symptoms [5] - 92:6, 92:8, 102:20, 103:4, 112:22
synapses [4] - 72:14, 72:15, 72:25
syndrome [6] - 96:12, 98:21, 114:6, 123:20, 131:19, 153:17
system [17] - 12:4, 68:2, 72:4, 72:6, 156:20, 161:6, 163:12, 173:1, 192:9, 197:4, 197:10, 197:11, 197:18, 199:4, 205:23, 229:14, 229:16
systems [1] - 99:15

T

T-levels [1] - 96:23
tab [1] - 5:9
tabs [4] - 5:4, 5:21, 5:22, 12:13
talks [2] - 85:21, 210:3
tall [1] - 151:24
task [1] - 87:4
tasks [1] - 52:20

taught [1] - 50:16
tax [2] - 67:22, 203:13
taxes [4] - 67:19, 202:19, 203:7, 203:19
Tazewell [10] - 22:18, 22:21, 26:24, 26:25, 34:8, 34:19, 39:11, 39:13, 39:14, 41:1
teach [1] - 52:24
Team [1] - 47:20
Techniques [1] - 50:1
technologically [1] - 75:20
teleconference [1] - 169:15

256:20, 255:14, 256:22
temperature [1] - 229:17
temporarily [1] - 202:22
ten [10] - 23:24, 80:11, 82:25, 83:2, 83:4, 89:5, 222:11, 224:16, 256:20, 256:21
ten-day [1] - 224:16
tenant [1] - 184:20
tend [1] - 24:11
tenderness [1] - 149:22
Tennessee [7] - 50:6, 63:9, 68:11, 193:19, 201:8, 201:9
TENS [2] - 171:8
term [5] - 62:12, 71:3, 164:13, 173:4
terminated [3] - 7:1, 110:6, 110:8
terminology [1] - 26:22
terms [4] - 71:18, 94:22, 105:20, 228:25
terrible [1] - 255:9
test [11] - 49:4, 119:25, 120:1, 122:2, 161:10, 167:4, 167:15, 167:16, 205:5, 252:22
tested [6] - 141:14, 158:16, 158:17, 161:7, 161:10, 205:5

testified [19] - 12:1, 18:10, 20:22, 22:8, 46:23, 83:15, 166:4, 175:6, 181:21, 184:23, 196:9, 196:12, 205:25, 229:16, 235:24, 236:6, 243:3, 248:22, 249:3
testifies [7] - 7:24, 9:19, 13:12, 13:24, 15:13, 20:2
testify [33] - 3:6, 3:16, 9:3, 16:4, 16:6, 16:7, 16:13, 16:15, 16:18, 16:22, 16:23, 17:3, 17:4, 17:13, 17:14, 17:24, 17:25,

100:12
testimony [11] - 4:6, 16:25, 17:11, 20:16, 20:18, 21:24, 46:17, 134:10, 181:21, 208:11, 230:24
testing [11] - 80:22, 88:25, 101:6, 117:20, 118:20, 121:12, 121:18, 121:22, 121:24, 122:1, 147:5
testosterone [1] - 96:22
tests [11] - 70:10, 101:2, 119:22, 119:24, 120:7, 166:25, 167:2, 167:18, 167:20, 183:25, 184:3
Texarkana [1] - 48:25
Texas [5] - 47:13, 48:23, 48:24, 50:1
text [22] - 159:20, 165:23, 186:1, 188:9, 189:6, 193:16, 194:1, 194:4, 194:10, 194:13, 229:2, 229:5, 233:6, 234:20, 235:8, 235:21, 245:21, 245:22, 251:9, 251:17, 252:9, 252:17
Text [1] - 2:10
texted [2] - 234:23, 235:4
texts [2] - 193:24,

194:7
THE [269] - 1:2, 1:3, 2:9, 2:12, 3:2, 3:7, 4:19, 5:11, 5:15, 5:18, 6:6, 7:3, 7:7, 7:17, 7:22, 8:11, 8:13, 9:24, 10:1, 10:8, 11:5, 11:16, 12:8, 12:16, 12:23, 13:5, 14:3, 14:7, 14:12, 15:2, 15:7, 15:11, 15:19, 16:2, 17:7, 17:8, 17:10, 17:16, 17:17, 18:2, 18:3, 18:4, 18:8, 18:13, 18:17, 18:25, 19:3, 19:5, 19:14, 19:20, 19:23, 20:4, 20:8, 20:10, 20:13, 20:21, 20:25, 21:12, 21:15, 21:19, 21:21, 21:22, 21:23, 22:2, 22:19, 22:21, 27:20, 27:22, 27:23, 28:21, 28:23, 40:20, 43:8, 43:10, 44:12, 45:10, 45:12, 45:19, 45:25, 46:5, 46:7, 46:8, 46:10, 46:11, 46:13, 46:16, 46:20, 63:25, 64:16, 71:10, 71:12, 71:13, 71:14, 73:23, 74:1, 75:17, 75:18, 76:19, 76:23, 77:1, 78:2, 78:5, 78:12, 78:15, 78:24, 79:3, 79:4, 79:5, 79:6, 79:7, 79:8, 79:10, 79:11, 79:12, 82:14, 84:11, 89:12, 89:19, 89:24, 90:5, 90:7, 90:11, 90:23, 91:4, 91:5, 94:13, 94:17, 94:23, 94:25, 95:3, 95:6, 95:11, 100:12, 100:15, 100:16, 100:18, 100:19, 100:20, 110:5, 110:9, 111:9, 111:10, 111:11, 111:13, 111:14, 111:15, 114:22, 115:6, 115:9, 115:15, 116:10, 116:11, 119:14, 119:16, 120:4, 120:8, 120:9, 120:10, 120:11, 120:12, 121:8, 121:10, 121:21, 121:23, 121:25, 122:2, 122:3, 122:5, 126:17, 134:1,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
Case 1:17-cr-00027-JPJ-PMS   Document 248   Filed 07/17/19   Page 292 of 296   Pageid#: 11426

134:6, 134:11, 134:13, 134:17, 134:19, 134:21, 137:22, 137:24, 137:25, 138:2, 138:5, 157:12, 157:13, 157:16, 157:19, 158:25, 162:1, 162:3, 164:17, 164:20, 165:1, 165:3, 166:18, 166:20, 167:6, 167:8, 167:10, 167:12, 167:17, 167:19, 168:2, 168:3, 168:4, 168:5, 168:9, 168:13, 168:15, 168:17, 168:18, 168:20, 168:21, 168:24, 169:1, 169:3, 169:12, 169:17, 169:18, 169:20, 170:6, 170:7, 173:12, 173:15, 175:2, 180:25, 183:14, 190:7, 190:9, 190:12, 190:14, 194:22, 198:4, 198:6, 200:6, 200:7, 200:9, 200:11, 214:9, 214:11, 214:12, 214:14, 226:23, 228:4, 234:18, 234:25, 235:1, 236:25, 237:13, 237:15, 237:17, 238:25, 239:2, 245:15, 246:1, 249:10, 253:24, 254:3, 254:18, 256:7, 256:8, 256:15, 257:2, 257:4, 257:11, 257:16, 257:20, 258:1

**themselves** [1] - 214:19

**theory** [1] - 73:22

**therapies** [6] - 93:17, 102:15, 102:16, 104:7, 104:10, 249:24

**therapy** [21] - 27:14, 74:25, 86:16, 105:15, 110:4, 170:24, 170:25, 171:7, 182:4, 184:7, 184:8, 232:6, 238:22, 240:13, 240:20, 241:6, 242:17, 245:17, 248:15, 248:16, 248:18

**thereafter** [1] - 62:2

**they've** [4] - 26:3, 26:4, 73:8, 103:20

**thigh** [1] - 149:17

**thinking** [1] - 192:13

**third** [1] - 47:9

**Thomas** [3] - 48:21, 150:20, 151:7

**Thompson** [2] - 22:21, 36:7

**Thompson-Whit** [1] - 36:7

**thoracic** [1] - 149:11

**thorough** [1] - 107:6

**thousands** [2] - 62:14, 214:1

**threatening** [1] - 32:4, 45:7

**three** [23] - 19:9, 23:23, 24:14, 36:25, 41:15, 53:21, 54:8, 56:20, 64:22, 97:2, 97:18, 125:13, 156:23, 158:4, 158:5, 158:16, 163:11, 163:16, 201:7, 213:14, 214:12, 242:4

**three-strikes** [1] - 158:4

**three-tiered** [1] - 158:5

**throughout** [7] - 52:25, 69:18, 109:13, 113:25, 120:21, 124:24, 132:2

**throw** [1] - 26:13

**throwing** [1] - 151:15

**thrown** [3] - 100:21, 103:7, 126:18

**tibia** [1] - 123:6

**tiered** [1] - 158:5

**tim** [1] - 35:16

**Tim** [4] - 36:16, 36:24, 36:25, 37:11

**Tim's** [1] - 38:21

**timed** [1] - 33:17

**timed-locked** [1] - 35:17

**timeframe** [1] - 29:24

**timeline** [1] - 18:12

**tingling** [1] - 103:5, 103:10, 145:10

**Title** [2] - 181:2, 184:14

**today** [9] - 17:13, 17:15, 20:1, 29:11, 162:17, 166:4, 237:2, 238:1, 248:22

**toe** [1] - 70:9

**toes** [1] - 96:1

**together** [6] - 35:24, 138:22, 196:17, 197:1, 246:24, 253:9

**toilet** [2] - 197:10, 197:20

**tolerance** [5] - 27:7, 73:14, 73:18, 172:5

**tolerate** [1] - 167:23

**tolerates** [1] - 95:19

**tolerating** [1] - 172:16

**Tom** [8] - 21:18, 22:14, 22:17, 34:24, 41:11, 109:21, 166:3, 176:7

**TOM** [2] - 2:3, 22:6

**tomorrow** [2] - 18:11, 19:15, 19:18, 257:9, 257:22

**tons** [1] - 60:22

**Tool** [28] - 99:2, 118:5, 123:15, 124:8, 125:17, 126:21, 127:25, 129:20, 130:2, 131:15, 132:13, 133:6, 135:1, 136:7, 139:14, 140:8, 140:25, 141:18, 143:13, 144:16, 144:22, 145:18, 147:13, 148:4, 150:21, 151:8, 153:1, 153:16

**tools** [3] - 104:24, 105:6, 105:8

**top** [6] - 33:16, 58:7, 101:13, 124:10, 126:22, 241:10

**torn** [1] - 153:14

**tornados** [1] - 47:22

**total** [3] - 186:21, 199:12, 205:14

**touch** [1] - 58:3, 101:8, 175:7

**touched** [2] - 175:12, 196:17

**toward** [3] - 20:20, 28:14, 110:19

**towards** [4] - 199:5, 242:1, 242:2, 250:18

**town** [1] - 41:9

**track** [5] - 84:22, 88:4, 163:12, 189:1, 243:21

**tractor** [1] - 146:24

**traditionally** [1] -

50:13

**trailer** [2] - 146:24, 154:1

**trained** [9] - 39:17, 87:16, 95:7, 101:8, 101:9, 200:2, 200:10, 200:11, 200:13

**training** [15] - 23:9, 24:8, 39:20, 39:21, 39:22, 49:25, 50:17, 50:20, 51:5, 52:4, 52:6, 52:15, 52:16, 52:18, 52:25, 53:1, 53:13, 54:14, 54:18, 55:23, 56:3, 63:16, 63:17, 64:19, 71:3, 80:25, 82:2, 82:22, 84:25, 85:1, 85:9,

1:25

**TRANSCRIPT** [1] - 1:11

**Transcription** [1] - 1:25

**transfer** [1] - 67:17

**transferred** [2] - 97:11, 97:12

**transfers** [2] - 201:20, 201:21

**transform** [1] - 170:22

**transition** [1] - 99:18

**transitional** [1] - 52:8

**translates** [1] - 250:10

**transmit** [1] - 183:13

**trauma** [37] - 83:22, 83:23, 84:1, 84:8, 93:2, 96:13, 97:20, 98:21, 99:21, 100:3, 112:7, 114:6, 116:25, 118:6, 122:14, 123:12, 125:20, 126:1, 126:24, 128:8, 129:5, 131:19, 135:8, 136:11, 137:11, 139:10, 140:12, 141:4, 148:15, 149:7, 149:20, 150:25, 151:3, 151:10, 152:8, 153:17

**traumatic** [4] - 108:20, 135:24, 150:7, 150:10

**travel** [3] - 39:11, 39:13, 43:10

**traveling** [8] - 34:19, 34:22, 36:20, 38:16, 42:21, 42:25, 43:14, 116:1

**treat** [10] - 40:1, 62:11, 62:20, 65:14, 72:1, 73:10, 74:6, 87:24, 163:22, 224:21

**treated** [26] - 10:13, 20:6, 25:24, 31:1, 33:25, 60:25, 62:21, 93:3, 93:12, 107:10, 109:12, 113:21, 115:3, 122:19, 123:9, 145:16, 147:9, 154:10, 160:19, 191:20, 191:21, 215:11, 215:15, 245:4, 254:9

**treating** [7] - 34:24, 82:3, 88:13, 98:6, 98:10, 159:16, 170:20

**treatment** [32] - 20:19, 62:15, 71:22, 74:3, 74:5, 75:7, 75:13, 86:13, 93:15, 94:7, 109:14, 112:11, 113:25, 117:2, 120:21, 124:25, 125:9, 132:1, 132:3, 133:24, 135:10, 145:20, 145:22, 147:11, 154:7, 169:6, 169:9, 193:4, 239:22, 239:25, 244:5, 249:19

**treatments** [3] - 86:8, 103:17, 171:7

**treats** [1] - 40:1

**tree** [1] - 124:19

**trees** [1] - 124:17

**tremendously** [1] - 109:25

**Trenton** [1] - 48:22

**TRIAL** [1] - 1:11

**trial** [5] - 19:9, 174:10, 188:18, 193:7

**tried** [13] - 24:18, 24:22, 55:8, 69:18, 69:23, 89:3, 89:6, 102:15, 102:16, 104:7, 148:2, 171:7, 247:3

**Trinity** [1] - 47:12

**trip** [2] - 48:12, 234:11

**trouble** [2] - 204:18, 205:20

**troubling** [1] - 39:8

**truck** [6] - 100:6, 100:7, 114:12, 116:8, 116:12, 139:5

**true** [21] - 8:18, 9:3, 28:2, 179:25, 183:17, 188:14, 192:15, 194:17, 196:24, 210:8, 216:6, 216:7, 224:4, 230:9, 231:12, 232:12, 237:21, 239:10, 241:4, 241:5, 248:23

**Trueport** [1] - 50:2

**trunk** [1] - 222:4

**trust** [4] - 87:23, 88:14, 160:5, 160:9

**trusted** [12] - 79:19, 81:24, 86:21, 159:5, 159:8, 160:3, 160:8, 165:19, 165:23, 165:24, 191:7

**trusting** [2] - 86:20, 160:25

**truth** [12] - 21:25, 22:1, 46:18, 46:19, 81:25, 191:17, 191:18, 204:19, 213:18, 236:1

**truthful** [1] - 31:24

**truthfulness** [2] - 7:24, 13:12

**try** [32] - 34:14, 43:8, 49:7, 57:13, 62:9, 66:7, 70:8, 74:22, 83:6, 86:23, 87:23, 89:3, 90:17, 101:18, 101:19, 102:6, 104:17, 106:18, 110:22, 111:23, 122:3, 127:4, 159:17, 173:23, 189:17, 199:16, 204:18, 225:2, 229:12, 232:25, 243:5, 245:18

**trying** [27] - 3:19, 24:2, 29:12, 36:7, 45:7, 55:11, 74:8, 78:12, 101:16, 108:18, 114:15, 115:21, 159:9, 168:15, 191:17, 192:22, 201:16, 205:9, 210:8, 218:18, 218:21, 221:23, 229:8, 248:9, 252:6, 256:14

**tubes** [1] - 125:9

**TUESDAY** [1] - 1:12

**Tuesday** [1] - 60:2

**turn** [4] - 68:15, 81:7,

82:14, 84:9

**Turner** [5] - 149:18, 149:19, 150:2, 150:15, 150:16

**twenty** [1] - 25:1

**twenty-five** [1] - 25:1

**twice** [3] - 96:15, 207:24

**two** [52] - 5:16, 8:7, 17:24, 18:5, 18:9, 19:14, 19:19, 26:22, 29:14, 30:7, 34:8, 34:19, 36:20, 38:3, 38:5, 39:13, 48:4, 58:19, 60:17, 61:17, 63:8, 66:1, 66:21, 70:16, 72:8, 95:23, 105:10, 111:4, 110:25, 111:4, 111:15, 125:13, 132:12, 146:5, 152:18, 166:15, 178:23, 179:1, 196:2, 196:9, 215:19, 216:8, 219:18, 219:23, 233:13, 233:14, 233:22, 238:10, 242:3, 242:6, 242:24, 257:12

**two-and-a-half-hour** [1] - 34:8

**two-page** [1] - 105:10

**two-year** [1] - 179:1

**type** [33] - 10:24, 11:4, 49:2, 54:12, 58:13, 61:5, 62:6, 63:13, 70:11, 70:14, 73:4, 73:8, 76:8, 87:5, 92:14, 94:3, 97:16, 98:5, 103:2, 103:11, 103:21, 104:9, 105:14, 138:11, 171:19, 183:12, 219:2, 219:15, 219:25, 220:3, 221:25, 234:3, 242:12

**types** [17] - 71:23, 80:15, 81:12, 82:3, 91:25, 93:17, 94:7, 97:9, 98:10, 101:20, 101:21, 102:19, 103:6, 139:18, 205:13, 225:3, 244:17

**typically** [26] - 33:24, 55:10, 79:14, 80:2, 82:9, 82:19, 83:11, 97:18, 101:11, 105:16, 138:17, 138:20, 139:7,

139:10, 150:6, 156:22, 166:7, 166:23, 171:23, 182:8, 194:3, 240:5, 248:12, 252:8, 256:1, 256:4

## U

**U.S** [1] - 226:18

**ultimately** [2] - 109:21, 192:17

**ultrasound** [1] - 59:20

**unbelievable** [1] - 193:2

**unbelievably** [1] - 31:7

**under** [15] - 4:2, 4:12, 5:9, 7:10, 11:9, 13:6, 16:5, 26:20, 72:12, 72:21, 88:10, 116:8, 116:12, 252:14

**undergoing** [1] - 145:20

**undergone** [2] - 114:18, 125:9

**undergraduate** [2] - 48:21, 49:6

**underground** [1] - 111:5

**underlying** [2] - 101:24, 155:2

**underneath** [2] - 4:12, 5:3

**understood** [3] - 78:7, 87:2, 197:16

**underwater** [1] - 47:23

**underwent** [2] - 114:25, 121:13

**unduly** [4] - 13:8, 13:13, 14:15, 15:16

**unfairly** [2] - 8:24, 9:16

**unilateral** [1] - 153:20

**union** [3] - 67:15, 67:18, 68:3

**unit** [2] - 171:8

**UNITED** [2] - 1:2, 1:5

**United** [5] - 1:18, 1:20, 60:12, 71:18, 71:25

**units** [1] - 179:8

**University** [2] - 48:22, 50:5

**unless** [4] - 3:16, 120:1, 154:24, 157:10

**unlicensed** [2] - 215:3, 225:6

**unreasonable** [1] - 39:13

**unspecified** [1] - 98:23

**untested** [1] - 220:5

**untrained** [1] - 42:8

**untruthfulness** [1] - 8:11

**unusual** [1] - 40:25

**unwarranted** [1] -

18:21, 21:19, 21:21, 23:25, 26:2, 26:7, 26:13, 28:15, 29:22, 32:1, 34:13, 35:16, 35:18, 37:5, 40:6, 43:1, 48:23, 48:24, 49:6, 58:14, 58:18, 65:9, 65:12, 67:16, 67:22, 67:24, 67:25, 69:17, 70:2, 71:12, 75:2, 75:3, 75:15, 76:9, 76:11, 80:14, 82:4, 82:13, 84:13, 84:19, 89:14, 89:21, 90:15, 93:19, 93:21, 95:25, 100:5, 100:23, 102:6, 105:23, 112:2, 112:25, 122:23, 126:22, 129:12, 132:16, 134:7, 138:21, 138:25, 142:21, 147:22, 149:11, 159:11, 163:23, 170:7, 171:10, 176:15, 176:25, 179:3, 187:14, 191:17, 192:19, 203:21, 206:3, 207:11, 208:24, 209:1, 209:3, 210:25, 211:2, 211:9, 212:3, 212:9, 221:7, 222:5, 222:8, 223:21, 237:8, 241:10, 246:10, 253:4, 254:1, 258:2

**upbringing** [1] -

47:11

**updates** [1] - 24:20

**upper** [10] - 101:5, 111:1, 118:9, 138:18, 139:11, 143:5, 143:6, 145:8, 149:23, 152:14

**upright** [1] - 138:17

**UPS** [1] - 220:10

**upstanding** [1] - 161:16

**urgent** [26] - 30:18, 57:21, 57:23, 58:10, 58:13, 58:14, 59:7, 59:13, 59:23, 60:15, 60:16, 70:3, 70:24, 207:13, 208:23, 210:6, 217:5, 217:14, 218:18, 218:21, 223:16, 223:18, 224:14, 224:16, 239:3

**Urgent** [7] - 59:13, 210:13, 211:6, 211:23, 211:25, 212:5, 215:9

**urine** [9] - 40:10, 88:2, 158:7, 161:6, 220:5, 220:16, 229:13, 240:9, 240:17

**USAF** [1] - 227:3

**user** [1] - 36:23

**usual** [1] - 27:4

**utility** [1] - 135:24

## V

**VA** [2] - 1:21, 1:24

**vacation** [2] - 29:23, 256:2

**vaguely** [1] - 37:23

**valid** [3] - 4:11, 26:1, 26:8

**Valley** [1] - 22:21

**valuable** [2] - 197:25, 198:5

**value** [3] - 10:21, 198:3, 198:7

**varied** [2] - 131:12, 256:1

**variety** [9] - 52:9, 74:21, 104:24, 107:25, 150:4, 200:25, 213:13, 234:7, 249:21

**various** [1] - 73:11

**vehicle** [10] - 67:3, 67:5, 80:18, 83:24, 91:18, 91:24, 100:6, 103:8, 110:24, 115:25, 123:11, 133:17, 137:7,

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia

138:12, 140:19, 147:21, 149:1, 150:7, 153:14
**ventilation** [1] - 150:11
**verbal** [1] - 92:25
**verdict** [1] - 16:13
**verification** [1] - 227:14
**verified** [1] - 105:7
**verify** [1] - 41:17
**versus** [1] - 153:5
**veterinarian** [1] - 47:16
**VHU-338** [1] - 238:11
**victim** [1] - 205:9
**Vietnam** [1] - 51:11
**violation** [2] - 8:4, 13:10
**Virginia** [80] - 3:20, 6:14, 6:15, 6:21, 8:3, 8:8, 9:4, 9:9, 10:4, 18:23, 22:18, 22:21, 23:10, 23:17, 24:17, 24:19, 26:16, 31:6, 34:3, 34:19, 36:5, 43:11, 43:21, 54:9, 54:10, 54:11, 55:3, 55:25, 56:11, 56:18, 56:22, 58:8, 58:21, 59:5, 60:16, 60:21, 60:25, 61:15, 61:21, 62:4, 62:5, 62:14, 63:1, 63:6, 63:8, 64:21, 70:4, 80:9, 100:5, 119:24, 157:7, 159:6, 161:20, 166:22, 170:21, 193:11, 195:20, 197:3, 203:22, 206:4, 207:4, 207:14, 207:19, 212:6, 213:17, 213:19, 214:4, 217:19, 217:24, 223:13, 223:20, 224:9, 224:25, 225:5, 225:8, 225:9, 249:18
**VIRGINIA** [1] - 1:3
**Virginia's** [1] - 6:16
**visit** [42] - 76:17, 84:19, 86:12, 87:21, 93:24, 98:8, 98:11, 99:3, 99:13, 102:14, 130:8, 130:15, 146:22, 156:22, 157:9, 158:6, 162:25, 165:5, 169:4, 170:10, 170:13, 171:24, 172:11, 185:7, 185:8,

185:9, 185:23, 186:6, 186:17, 190:18, 192:20, 223:18, 223:19, 231:25, 236:20, 239:14, 250:22
**visits** [10] - 20:19, 171:11, 171:20, 171:21, 172:13, 172:18, 223:21, 224:23, 243:14, 255:24
**visual** [1] - 162:15
**vital** [11] - 79:13, 79:14, 79:15, 79:19, 79:20, 79:22, 83:10, 99:6, 113:1, 114:7, 250:5
**vitals** [1] - 78:22
**vitamin** [1] - 197:7
**vitamins** [1] - 197:8
**Vladimir** [1] - 29:17
**volunteered** [1] - 48:16
**voted** [1] - 54:23, 206:20
**vouching** [1] - 191:8
**VPHA** [1] - 24:19
**vs** [1] - 1:7

## W

**W-2** [2] - 204:7, 206:14
**waist** [1] - 138:18
**wait** [13] - 27:24, 41:25, 62:18, 76:19, 78:5, 89:1, 89:21, 150:20, 160:22, 221:7, 225:22, 234:25
**walk** [4] - 35:18, 76:16, 138:24, 169:8
**walk-ins** [1] - 169:8
**walked** [5] - 68:11, 68:13, 116:5, 138:16, 138:17
**walking** [2] - 169:7, 250:6
**wall** [1] - 121:6
**Walmart** [2] - 137:7, 163:11
**wants** [2] - 94:19, 94:20
**War** [1] - 51:10
**warm** [2] - 27:16, 41:21
**Warns** [1] - 6:1
**warns** [1] - 11:18
**warrant** [5] - 66:13, 67:25, 68:9, 219:22,

219:23
**warranted** [1] - 238:22
**watch** [1] - 35:16
**watching** [1] - 52:21
**water** [2] - 60:3, 135:24
**Wayne** [2] - 157:14, 157:22
**ways** [5] - 26:16, 30:15, 50:15, 57:24, 71:4
**weakness** [1] - 103:10
**wearing** [1] - 227:9
**Weaver** [1] - 58:8
**Wednesday** [1] -
196:12, 217:18, 219:20, 222:14, 222:15, 230:24, 233:12, 233:17, 233:18, 242:4, 256:6
**weekend** [2] - 221:12, 222:9
**weekends** [1] - 61:9
**weeks** [10] - 53:3, 53:12, 58:19, 67:15, 70:16, 187:20, 242:3, 242:5, 256:3
**weigh** [1] - 35:11
**weight** [3] - 99:9, 113:1, 142:5
**welfare** [1] - 159:13
**Wendell** [39] - 87:3, 87:10, 87:11, 87:12, 88:21, 88:22, 88:24, 89:6, 181:19, 181:25, 187:1, 187:4, 187:8, 187:15, 187:24, 188:2, 188:21, 189:5, 189:8, 189:18, 198:25, 199:7, 199:16, 199:19, 200:21, 238:17, 240:1, 240:21, 241:23, 242:15, 242:22, 248:9, 248:20, 251:2, 251:9, 252:13, 252:24
**Wendell's** [2] - 241:19
**Wesley** [2] - 152:21,

152:22
**West** [50] - 1:20, 6:14, 18:23, 43:11, 43:21, 54:9, 54:10, 54:11, 55:3, 55:25, 56:11, 56:18, 56:21, 58:8, 58:21, 59:5, 60:16, 60:20, 60:24, 62:3, 62:14, 62:25, 63:7, 64:21, 70:3, 80:9, 100:5, 119:24, 159:6, 161:20, 166:22, 170:21, 195:20, 197:3, 206:3, 207:4, 207:14, 212:6, 213:17, 213:18, 214:4, 217:19, 217:24, 223:13,
**wheeler** [2] - 103:8, 146:24
**Whit** [1] - 36:7
**White** [1] - 150:21
**white's** [1] - 154:4
**whole** [10] - 21:25, 35:13, 46:18, 48:10, 104:1, 193:6, 206:9, 247:2, 252:11, 256:6
**why'd** [1] - 206:18
**wife** [17] - 39:11, 42:17, 47:8, 54:1, 61:14, 67:15, 77:7, 83:9, 159:11, 186:14, 189:19, 193:25, 195:5, 200:4, 201:7, 222:7, 225:10
**Wiley** [2] - 150:20, 151:7
**wiley** [1] - 151:13
**Wiley's** [1] - 151:8
**WILLIAMS** [114] - 2:3, 2:4, 2:5, 2:6, 3:4, 3:9, 4:22, 5:13, 5:16, 10:7, 10:9, 11:15, 11:22, 12:11, 12:22, 13:4, 14:5, 14:9, 14:21, 15:8, 15:18, 15:23, 18:18, 19:2, 19:4, 19:6, 19:16, 19:21, 20:1, 20:5, 20:9, 20:12, 20:17, 20:23, 21:11, 21:18, 22:10, 22:22, 28:1, 28:19, 28:22, 40:18, 44:13, 44:15, 45:9,

46:2, 46:15, 47:2, 63:23, 64:1, 64:14, 64:18, 65:8, 65:11, 73:12, 73:17, 73:25, 74:2, 75:15, 75:19, 75:21, 76:21, 76:25, 77:2, 78:4, 78:11, 78:14, 78:17, 80:5, 82:12, 82:15, 82:16, 84:9, 84:12, 84:14, 89:18, 90:6, 90:13, 90:25, 91:9, 95:13, 101:1, 110:10, 111:18, 114:23, 115:16, 116:14, 119:19, 120:16, 121:11, 121:19, 122:6, 126:20, 134:18, 134:22, 134:23, 138:6, 157:23, 159:3, 163:4, 165:14, 170:8, 173:13, 173:16, 174:25, 254:5, 254:7, 254:20, 256:10, 256:16, 257:1, 257:8, 257:12, 257:19
**Williams** [49] - 1:22, 1:23, 3:3, 8:14, 10:1, 14:4, 18:14, 21:17, 45:25, 89:12, 90:5, 90:12, 134:1, 151:17, 151:18, 151:23, 151:24, 152:5, 152:7, 152:15, 152:21, 155:12, 159:4, 159:5, 161:5, 162:4, 163:5, 163:25, 174:13, 185:19, 186:4, 186:14, 188:20, 189:19, 190:18, 194:14, 222:22, 227:9, 229:2, 233:25, 235:16, 242:15, 254:3, 254:19, 257:6, 257:17
**Williams's** [2] - 160:15, 163:15
**willing** [1] - 29:22
**wilson** [3] - 200:15, 229:14, 231:25
**Wilson** [30] - 66:20, 68:17, 87:3, 87:10, 87:11, 87:25, 169:22, 186:20, 187:1, 187:4, 187:6, 187:8, 187:15, 187:22, 187:24, 188:21, 189:6, 189:18, 197:4,

198:25, 199:7, 199:17, 199:19, 200:21, 240:1, 240:23, 242:15, 242:17, 242:23, 254:22

**wilson's** [1] - 238:16
**Wilson's** [6] - 68:10, 158:6, 197:9, 238:17, 241:9, 248:20
**window** [1] - 218:5
**wintertime** [1] - 26:23
**wire** [3] - 201:20, 227:9
**wired** [4] - 186:14, 188:21, 189:8, 189:19
**wires** [1] - 227:14
**wise** [1] - 256:17
**wish** [2] - 17:4, 18:2
**wishes** [2] - 21:4, 46:3
**withdraw** [1] - 173:14
**withdrawal** [1] - 172:10
**withhold** [1] - 247:10
**withholding** [1] - 180:1
**witness** [29] - 7:25, 11:9, 15:23, 17:2, 18:6, 20:4, 20:5, 21:2, 21:3, 21:13, 21:17, 22:7, 27:18, 42:5, 46:14, 46:22, 63:23, 100:13, 157:21, 164:17, 180:23, 197:14, 197:15, 226:21, 227:19, 234:16, 237:2, 257:9, 257:11
**WITNESS** [66] - 21:21, 22:2, 22:4, 22:21, 27:22, 43:10, 71:10, 71:14, 79:3, 79:5, 79:7, 79:10, 79:12, 91:5, 94:25, 95:6, 100:15, 100:18, 100:20, 110:7, 111:10, 111:13, 111:15, 114:22, 115:9, 116:11, 119:16, 120:8, 120:10, 120:12, 121:10, 121:23, 122:2, 122:5, 126:17, 137:24, 138:2, 157:13, 162:3, 164:20, 165:3, 166:20, 167:8,

167:12, 167:19, 168:3, 168:5, 168:13, 168:17, 168:20, 168:24, 169:3, 169:17, 169:20, 170:7, 190:9, 190:14, 198:6, 200:7, 200:11, 214:11, 214:14, 235:1, 239:2, 245:15, 256:8
**witness's** [1] - 159:1
**witnessed** [1] - 213:23
**WITNESSES** [1] - 2:2
**witnesses** [10] - 15:22, 17:23, 17:24, 18:10, 18:15, 18:19, 18:23, 46:1, 125:14, 197:15
**woman** [2] - 229:19, 229:22
**wondering** [1] - 14:11
**Wood** [3] - 152:24, 153:2, 153:12
**wood's** [1] - 153:1
**word** [2] - 63:7, 63:10
**words** [5] - 16:17, 59:16, 78:24, 169:15, 229:1
**wore** [1] - 87:13
**work-related** [1] - 108:20
**worker** [1] - 135:25
**Workman** [1] - 153:15
**workman** [2] - 153:22, 153:23
**works** [1] - 29:9
**worksheet** [2] - 199:14, 199:15
**workup** [1] - 74:20
**World** [1] - 51:10
**worse** [7] - 92:4, 92:7, 96:2, 109:8, 135:16, 149:3, 179:23
**worsened** [4] - 123:14, 140:22, 143:24, 147:11
**worsening** [6] - 85:19, 92:6, 128:23, 133:18, 143:24, 251:14
**worst** [2] - 53:5, 85:21
**Worth** [1] - 50:1
**wreck** [2] - 234:24, 235:5
**wrecks** [1] - 145:6

**wrist** [1] - 121:2
**write** [9] - 41:13, 42:16, 80:2, 181:25, 183:2, 184:2, 238:6, 243:13, 248:11
**writes** [1] - 240:1
**writing** [4] - 41:6, 41:13, 177:24, 250:13
**written** [11] - 11:11, 42:15, 97:4, 154:4, 174:22, 181:12, 182:12, 237:23, 240:6, 248:14, 250:18
**wrote** [12] - 77:12, 82:24, 117:6, 137:17, 174:21, 179:1, 186:5, 227:8, 227:12, 238:9, 240:2, 240:15,

253:15
**X-rays** [9] - 59:20, 82:7, 103:21, 111:25, 131:24, 133:1, 133:20, 251:15, 253:13

## Y

**Yates** [1] - 54:17
**year** [17] - 31:8, 51:3, 51:18, 51:20, 51:23, 54:24, 62:18, 86:19, 123:5, 142:8, 160:22, 179:1, 204:4, 206:11, 208:3, 208:4
**years** [32] - 23:6, 23:22, 23:23, 23:24, 23:25, 24:14, 24:22, 25:1, 26:18, 29:20, 30:6, 31:13, 33:21, 43:2, 44:5, 48:5, 71:22, 80:11, 104:25, 113:9, 113:10, 119:13, 139:20, 139:25, 153:13, 161:14, 178:24, 196:2, 196:10, 200:17, 202:8
**years'** [1] - 132:12
**yelled** [1] - 87:17
**yesterday** [5] - 18:19, 19:24, 33:19, 75:3, 83:15
**yoga** [2] - 171:3, 250:7
**young** [3] - 48:10,

70:19, 100:24
**younger** [1] - 100:3
**yourself** [4] - 39:8, 79:19, 200:13, 226:14

## Z

**Zachary** [1] - 1:19
**zero** [3] - 82:25, 83:2, 83:3
**zero-to-ten** [2] - 82:25, 83:2

Donna J. Prather