```
1

2                    IN THE UNITED STATES DISTRICT COURT

3                   FOR THE WESTERN DISTRICT OF VIRGINIA

4                              ABINGDON DIVISION

5   UNITED STATES OF AMERICA,       )
                                    )
6                 Plaintiff,        )   Criminal Case No.
                                    )   1:17cr00027-JPJ-PMS-1
7   vs.                             )
                                    )
8   JOEL A. SMITHERS,               )   COA No. 19-4761
                                    )
9                 Defendant.        )
   _____

10

11                    TRANSCRIPT OF SENTENCING HEARING
                     HONORABLE JUDGE JAMES P. JONES PRESIDING
12                        WEDNESDAY, OCTOBER 2, 2019

13  _____

14

15

16

17

18                        A P P E A R A N C E S

    On behalf of the United States:
19           Steven Randall Ramseyer, Zachary T. Lee, and
             Samuel Cagle Juhan
20           U.S. Attorneys Office - Abingdon
             180 W. Main St., Suite B19
21           Abingdon, VA   24210-

22  On behalf of the Defendant:
             Donald M. Williams, Jr.
23           Williams Law Office, PLC
             P.O. Box 601
24           Pennington Gap, VA   24277

25  Proceedings taken by Certified Court Reporter and transcribed
    using Computer-Aided Transcription
```

```
 1   (Proceedings commenced at 10:30 a.m.)

 2           THE COURT:  Good morning, ladies and gentlemen.  The

 3   clerk will call the case.

 4           THE CLERK:  United States of America v. Joel Adam

 5   Smithers.  Criminal action 1:17cr27.

 6           THE COURT:  We're here today for the sentencing of

 7   the defendant Joel Adam Smithers.  Is the government ready?

 8           MR. RAMSEYER:  We are, Your Honor.

 9           THE COURT:  And, counsel, is your client ready?

10           MR. WILLIAMS:  We are, Your Honor.

11           THE COURT:  Dr. Smithers, if you'll stand, let me

12   ask you a question, sir.  Have you and your lawyer read and

13   discussed the presentence investigation report?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Thank you.  You may be seated.

16           I'll inquire of counsel if there are any remaining

17   objections to the presentence report or its calculation of the

18   advisory sentencing guidelines.  First, from the government.

19           MR. RAMSEYER:  No, Your Honor.

20           MR. WILLIAMS:  Your Honor, the only one that we had

21   was that the probation office I think had said there was not a

22   reason for a downward departure and we objected to that.

23           THE COURT:  Yes, sir.  Well, I will consider that

24   question and hear argument on it at the time for argument on

25   the appropriate sentence.
```

1          The probation officer has pointed out to me that

2    there are a couple of typographical errors in the presentence

3    report on page 2 at the top of the page in description of

4    certain of the counts.  It ought to read Counts 3 through 100,

5    102-297, and 300-862.

6          And on page 26 of the presentence investigation

7    report in paragraph 88, the specific offense characteristic

8    was omitted in error.  And it is under Section 2D1.12 of the

9    sentencing guidelines manual, maintaining a place for

10   distribution of controlled substances.  That's just an

11   inadvertent omission.

12         Accordingly, I will adopt the facts and calculation

13   of the advisory sentencing guidelines set forth in the

14   presentence investigation report.  I find that the defendant

15   has a total offense level under the advisory guidelines of 43

16   and a criminal history category of one.  The guideline,

17   advisory guideline provision for the defendant's convictions

18   is life in prison, supervised release of one to three years on

19   Count 2, and three years on the other counts, a fine range of

20   $50,000 to $1 million, and a special assessment of $100 as to

21   each count of conviction.

22         I have, of course, reviewed carefully the

23   presentence investigation report, as well as the sentencing

24   memorandum filed on behalf of the defendant by his counsel,

25   including its exhibits.  I've also considered the letters

1    written on behalf of the defendant which have been filed with

2    the court by his counsel.  But I'll be glad to hear from the

3    parties in regard to the appropriate sentence to be imposed in

4    this case.

5           And let me inquire as to whether the parties desire

6    to present evidence.  Mr. Ramseyer?

7           MR. RAMSEYER:  We do, Your Honor.

8           THE COURT:  All right.  The government may proceed

9    first then.

10          MR. RAMSEYER:  Your Honor, if I may first for the

11   record.  The Court indicated the guideline offense level is

12   43, and I believe that's because that's the highest available

13   on the table.  But the calculation actually came to a 46 in

14   the presentence report.

15          THE COURT:  Yes, sir.

16          MR. RAMSEYER:  Is that the Court's finding?

17          THE COURT:  Yes, sir, it is.

18          MR. RAMSEYER:  Thank you.

19          We'd call Patrick Long to the stand.

20          THE CLERK:  If you'll raise your right hand.

21          Do you solemnly swear that the testimony you're

22   about to give in this case shall be the truth, the whole

23   truth, and nothing but the truth, so help you God?

24          THE WITNESS:  Yes, ma'am.

25          THE CLERK:  Take the stand.

1                              **PATRICK LONG,**

2    called as a witness herein by the Plaintiff, having been first

3    duly sworn, was examined and testified as follows:

4                           **DIRECT EXAMINATION**

5    BY MR. RAMSEYER:

6    Q.   Please state your name and title.

7    A.   Patrick Long, Special Agent.

8    Q.   And you're employed with the DEA; is that correct?

9    A.   That's correct, yes.

10   Q.   You testified in the trial in this case; is that correct?

11   A.   I did, sir.

12   Q.   And you've been involved in the investigation of Dr. Joel

13   Smithers?

14   A.   That's correct, sir.

15   Q.   Now, let me ask you, at some point did you go through and

16   compile from various databases and sources of information the

17   total number of Schedule II prescription drugs that

18   Dr. Smithers prescribed during the brief time he was operating

19   in Martinsville?

20   A.   Yes, sir, I did.

21   Q.   What was the time period you used, do you recall?

22   A.   We started August 24th, 2015, through the date of his

23   arrest, which was August the 15th, 2017.

24   Q.   Okay.  And in that time period there was actually a

25   search warrant executed at his office at some point; is that

 1   correct?

 2   A.   That's correct.

 3   Q.   Do you remember when that was approximately?

 4   A.   March 7, 2017.

 5   Q.   Is it fair to say after March the prescriptions fell off

 6   quite a bit?

 7   A.   I'd have to review that, but some did, yes, I believe so.

 8   Q.   Anyway, but you took the whole two -- pretty much

 9   two-year time period, and during that time period were the

10   number of Schedule II controlled substances prescribed by

11   Dr. Smithers in excess of 500,000 pills?

12   A.   Yes, sir.

13   Q.   500,000 units?

14   A.   Yes, sir.

15   Q.   Some of them were liquid?

16   A.   That's correct.

17   Q.   All right.  And those drugs included oxycodone,

18   oxymorphone, hydromorphone, hydrocodone, fentanyl; is that

19   correct?

20   A.   That's correct, sir.

21   Q.   Also, during the course of the investigation, did you

22   recover a recording that Dr. Smithers had made of a

23   conversation he had had with a doctor during his residency?

24   A.   Yes, we did.

25   Q.   All right.  And can you tell the Court a little bit

```
 1    about kind of -- we're going to play some recordings, some of

 2    the portions of that recording.  Can you give the Court some

 3    background as to what led up to those recordings.

 4    A.   Dr. Smithers was enrolled in a residency program in

 5    North Carolina.  And the recording, which again I believe is a

 6    conversation he is having with the program director of that

 7    residency program following an incident that Dr. Smithers had

 8    had with a local police officer in which he had been stopped

 9    for speeding.  And the officer supposed that he had been under

10    the influence of alcohol.  Dr. Smithers received a speeding

11    ticket and after telling the officer that he was on his way to

12    the hospital to treat a patient with a serious ailment, the

13    officer let him continue, but then followed up with a phone

14    call to the hospital to advise them that a doctor was on route

15    that had possibly been consuming alcohol.

16    Q.   That was possibly impaired?

17    A.   Correct.  So the program director had essentially

18    provided an ultimatum to Dr. Smithers that he either resign or

19    be fired, terminated from the program.

20              MR. WILLIAMS:  I'm going to note an objection.

21    We're getting into quite a bit of hearsay.  We're also going

22    to object to the tape.  We weren't advised until yesterday.

23    It was provided to our office.  I believe it contains hearsay.

24    I don't see the relevance of what happened a couple years

25    prior to what happened in this case is relevant to this case.
```

```
 1              THE COURT:  I'll overrule the objection.  Hearsay is
 2    permissible in sentencing proceedings as long as it's
 3    reliable.  This is a, apparently, a recording.  And I believe
 4    it may possibly be relevant to the appropriate sentence in
 5    this case.
 6              MR. RAMSEYER:  Thank you, Your Honor.
 7              And I'd note for the record it was provided to
 8    defense counsel prior to trial.  The specific excerpts we've
 9    made, that was provided yesterday.  But the recording in its
10    entirety was provided prior to trial.
11              So at this time I'd like to play excerpt Number 1
12    from that.  And this was May 13th of 2013; is that correct?
13              THE WITNESS:  Yes, sir, I believe so.
14        (Audio played.)
15              MR. RAMSEYER:  All right.  And now I'm going to play
16    excerpt Number 2.
17        (Audio played.)
18              MR. RAMSEYER:  And now the third excerpt.
19        (Audio played.)
20              MR. RAMSEYER:  I'm going to pause briefly.
21    BY MR. RAMSEYER:
22    Q.   The person speaking there is Dr. Mazzola; correct?
23    A.   Yes, sir.
24    Q.   And he was the supervisor of Dr. Smithers during his
25    residency; is that right?  Or the head person, I guess?
```

1    A.    Right.   The program director of the residency.

2    Q.    And the other person we heard talking, that's Joel

3    Smithers; correct?

4    A.    Yes.

5         (Audio played.)

6              MR. RAMSEYER:   Next is excerpt 4.

7         (Audio played.)

8              MR. RAMSEYER:   Now excerpt 5.

9         (Audio played.)

10             MR. RAMSEYER:   Now clip Number 6.

11        (Audio played.)

12             MR. RAMSEYER:   This will be clip Number 7.

13        (Audio played.)

14             MR. RAMSEYER:   Now, clip Number 8.

15        (Audio played.)

16             MR. RAMSEYER:   Next I'm going to play clip Number 9.

17        (Audio played.)

18   BY MR. RAMSEYER:

19   Q.    I'm going to ask you, the other individual that's

20   talking, do you know what his name is?

21   A.    I don't know his name.   Dr. Veil or Dr. Bell, but he's a

22   colleague at the time of this recording.

23   Q.    Is it your understanding that Dr. Smithers asked him to

24   come to this meeting with him?

25   A.    Yes, sir.

```
 1          (Audio played.)

 2              MR. RAMSEYER:  The next several clips are all fairly

 3     brief.  So the next one is clip Number 10.

 4          (Audio played.)

 5     BY MR. RAMSEYER:

 6     Q.   Right there he said he didn't get pulled over often or

 7     ever.  In fact, you checked his record.  He's been pulled

 8     over.  He was pulled over several times and pulled over prior

 9     to this; is that correct?

10     A.   That's correct, sir.

11          (Audio played.)

12              MR. RAMSEYER:  And next is clip Number 11.

13          (Audio played.)

14              MR. RAMSEYER:  And next is excerpt Number 12.

15          (Audio played.)

16              MR. RAMSEYER:  Next is excerpt 13.

17          (Audio played.)

18              MR. RAMSEYER:  And the final excerpt is excerpt

19     Number 14.

20          (Audio played.)

21     BY MR. RAMSEYER:

22     Q.   So let me ask you, is it your understanding he blew

23     a .085 and that the officer was concerned about it, but

24     Dr. Smithers said that he was on his way to deal with a stroke

25     victim?
```

```
 1              MR. WILLIAMS:  Your Honor, I'd again object to

 2   hearsay.

 3              THE COURT:  Yes, sir, I'll overrule the objection.

 4              THE WITNESS:  The inference that was presented in

 5   the recording is yes, that was what the reading was.  I

 6   believe Dr. Mazzola read it as a .85, but it's -- the actual

 7   would be .085.

 8              And as far as the stroke victim, I don't recall

 9   specifically what the issue was.  It was a serious in nature

10   event.

11              MR. RAMSEYER:  Okay.  All right.  Your Honor, I'd

12   move at this time that the excerpts I played would be

13   introduced as Government's Exhibits 1 through 14.

14              THE COURT:  They will be admitted.

15        (Plaintiff's Exhibits 1-14 marked and admitted.)

16              MR. RAMSEYER:  May I approach the witness,

17   Your Honor?

18              THE COURT:  You may.

19   BY MR. RAMSEYER:

20   Q.   Again, I want to show what we've previously shown at

21   trial.  These are deposits by month for Smithers and Priority

22   Urgent Care; is that correct?

23   A.   Yes, sir.

24   Q.   These are deposits made into a bank account; is that

25   correct?
```

LONG - DIRECT                                                              12

```
 1   A.   Yes, sir.
 2   Q.   And it's from August of '15 through March of '17; is that
 3   right?
 4   A.   That's correct.
 5   Q.   And, in addition, you recovered significant amounts of
 6   cash; is that correct?
 7   A.   Yes, sir.
 8   Q.   And that was above what was involved in the deposits?
 9   A.   That is true, yes, sir.
10   Q.   What was the total amount, do you recall?
11   A.   Not off the top of my head, sir.
12   Q.   Was it over 700,000, do you recall?
13   A.   Together?
14   Q.   Yes.
15   A.   Yes, sir, that would have been over 700,000.
16   Q.   But the total amount, plus the cash?
17   A.   Plus the cash, yes, sir, well over 700,000.
18   Q.   Also based on your investigation, also the testimony at
19   trial, in 2015 Dr. Smithers set up a practice in, was it
20   Beckley, West Virginia?
21   A.   In 2015?
22   Q.   2015.
23   A.   Yes, sir.
24   Q.   And at some point the investigating agency in
25   West Virginia that investigates pain clinics came to that
```

1    clinic when it opened.

2    A.    Yes.

3    Q.    And they asked for records to determine if it was a pain

4    clinic; is that correct?

5    A.    That's correct.

6    Q.    And Dr. Smithers told them they couldn't get anything

7    without a subpoena.

8    A.    That's correct.  Subpoena or warrant, one of the two.

9    Q.    So they came back the next day with the paperwork and he

10   was gone.

11   A.    That's correct.

12   Q.    The office had been cleared out.

13   A.    Yes, sir.

14   Q.    And the dumpsters were full of urine samples that hadn't

15   been tested; is that right?

16   A.    They did find that, yes, sir.

17   Q.    And soon after that Dr. Smithers opened his clinic in

18   Martinsville that was the subject matter of this trial; is

19   that correct?

20   A.    Yes, sir.

21           MR. RAMSEYER:  Those are all my questions.  Thank

22   you.

23           THE COURT:  All right.  Any questions, Mr. Williams?

24           MR. WILLIAMS:  Yes, Your Honor.

25   ///

1                              **CROSS-EXAMINATION**

2     BY MR. WILLIAMS:

3     Q.   Special Agent Long, all the audios, those occurred

4     several years prior to him ever locating to Martinsville,

5     Virginia; correct?

6     A.   They occurred in 2013, yes, sir.

7     Q.   That was in North Carolina, completely different

8     jurisdiction; correct?  It was a different state?

9     A.   It's a different state, yes, sir.

10    Q.   And with respect to what happened there, again, he was

11    given a license to practice in Virginia; correct?

12    A.   Yes, sir.

13    Q.   Okay.

14    A.   Subsequently, yes.

15    Q.   Subsequently.

16              MR. WILLIAMS:   Thank you.   No further questions.

17              MR. RAMSEYER:   Briefly, Your Honor, I forgot to ask.

18                          **REDIRECT EXAMINATION**

19    BY MR. RAMSEYER:

20    Q.   When that happened in North Carolina, they did report him

21    to the Board of Medicine; is that correct?

22    A.   Yes, sir.

23    Q.   So the authorities did the right thing there to bring it

24    to the attention of the board.

25    A.   Yes, sir.

```
 1                 MR. RAMSEYER:  Thank you.

 2                 THE COURT:  All right.  Thank you, sir.  You may

 3      step down.

 4                 MR. RAMSEYER:  No other evidence, Your Honor, at

 5      this time.

 6                 THE COURT:  All right.  Mr. Williams.

 7                 MR. RAMSEYER:  I did want the Court to know, there

 8      is a victim here that would like to address the Court at some

 9      point.  I know now is not the time, but I wanted to make sure

10      the Court knew that.

11                 THE COURT:  Yes, sir.  I will allow the victim to

12      speak later in the proceedings.

13                 Mr. Williams.

14                 MR. WILLIAMS:  Your Honor, defense would call Brian

15      Andrew Farah.

16                 THE COURT:  Yes, sir.  If you'll come forward and

17      stand before the clerk and be sworn, please.

18                 THE CLERK:  Do you solemnly swear that the testimony

19      you're about to give in this case shall be the truth, the

20      whole truth, and nothing but the truth, so help you God?

21                        BRIAN ANDREW FARAH,

22      Called as a witness herein by the Defendant, having been first

23      duly sworn, was examined and testified as follows:

24                 THE COURT:  Yes, sir, you may proceed.

25                 MR. WILLIAMS:  Thank you.
```

1                        **DIRECT EXAMINATION**

2    BY MR. WILLIAMS:

3    Q.   Dr. Farah, please state your name for the record.

4    A.   Yes.  It's Brian Andrew Farah, F-a-r-a-h.

5    Q.   Okay.  And, Dr. Farah, what do you do?

6    A.   I'm currently the medical director for psychiatry at one

7    of the Wake Forest hospitals in High Point, North Carolina.

8    I've been there 19 years.

9              Am I too close?  Okay.

10             I'm employed there for one more day, and I will

11   transition to Cone Behavioral Health where I'll be associate

12   residency director.  So I'm just in transition now.

13   Q.   And what kind of education did you have?

14   A.   A bachelor of science followed by the Medical University

15   of South Carolina and then residency at Wake Forest

16   University.  I've been board-certified in psychiatry since

17   1995, recredentialed at each interval.

18   Q.   Have you ever testified in court before?

19   A.   Yes.  I've testified in numerous medical liability cases

20   as an expert since 1997.  I've testified in several civil

21   matters, criminal matters, even some federal court.

22   Q.   Okay.  And have you ever been denied certification as an

23   expert in any of those trials?

24   A.   No, sir.

25   Q.   And you've been practicing since -- how long did you say?

FARAH - DIRECT                                                                                      17

```
 1    A.    I got out of residency in '95, '94.

 2    Q.    How many cases, ballpark?  How many patients have you --

 3    A.    Thousands.  My unit this year, just my hospital unit,

 4    admitted 1800 people last year.  And I was the attending for

 5    all of them.  And I do about 15 consultations a day when I'm

 6    in the hospital.

 7    Q.    Okay.  Do you have any publications or anything that

 8    you've written?

 9    A.    Yes, I've got numerous publications.  I've done review

10    articles, clinical trials, edited a couple journals, published

11    a book on Ernest Hemingway in 2017 through USC Press.  It was

12    a specific biography about his mental illness and his suicide.

13    Q.    Okay.  And have you had occasion to meet with Dr. Joel

14    Smithers?

15    A.    I did.  I met with Dr. Smithers while he was

16    incarcerated.  This was on September 13th, a couple weeks ago.

17    Q.    Okay.  And as you have gone through -- or as you did,

18    have you consulted any other outside sources?

19    A.    I did interview his father by phone, interviewed his wife

20    by phone, looked at some trial transcripts just to get a grip

21    on some of his conduct.  That's -- I've had discussions with

22    you just about the case.

23    Q.    Okay.  And so have you used all this data in coming to

24    any conclusion that you might have regarding Dr. Smithers?

25    A.    Correct.  Tried to look at the whole picture.
```

1    Q.   Okay.  And is the information that you used considered

2    reliable in the field of psychiatry?

3    A.   Yes, sir.  In psychiatry, you know, we make diagnoses

4    based on specific criteria.  And that's usually referred to as

5    the DSM, or Diagnostic and Statistical Manual of Mental

6    Disorders, Volume V.  Basically it evolves over time.  But

7    it's a checklist-based way of categorizing illness.  When I

8    say someone has major depression, severe recurrent with or

9    without psychosis, some other physician knows exactly what

10   criteria I'm talking about rather than just using more archaic

11   terms like neuroses and so forth.

12   Q.   And have you recently applied these principles and

13   methods to the facts of this case in coming to your

14   conclusions?

15   A.   Correct.  I think just at the outset, just hearing about

16   the case, I think everyone involved felt that Dr. Smithers had

17   some type of psychiatric issues, but it was just hard to --

18   they were ill-defined for a lot of people.  And I think that

19   just applying those criteria it becomes clear what his --

20           THE COURT:  Let me ask you this, Doctor.  You said

21   just hearing about this case indicated to you or to some

22   people that he had mental issues.  What is it about this case

23   that would so indicate?

24           THE WITNESS:  Well, the discussions with his father,

25   that there was this pervasive pattern of impaired judgment.

```
 1              THE COURT:  I understood you said just hearing about
 2    this case.  And I wondered what hearing about the case would
 3    portray mental illness in the perpetrator.
 4              THE WITNESS:  Correct.  I wasn't referencing popular
 5    media or anything like that, just referencing the discussions
 6    as -- with his father and with his attorney as to whether I
 7    would examine him and take the case.  You know, could I help?
 8    Could I see -- could I examine him and see if something was
 9    going on?  So it was just those preliminary discussions I was
10    referencing.
11              THE COURT:  Well, hearing about the case, did it
12    indicate to you that he had -- I mean, hearing about the facts
13    of the case indicate to you that he had a mental illness?
14              THE WITNESS:  My initial impression was I assumed he
15    was much older and might be having some type of frontal lobe
16    dementia.  Because that's a form of dementia where your
17    judgment and insight go first.
18              THE COURT:  I'm not really communicating accurately
19    to you.
20              You indicated the facts of this case.  I'm talking
21    about the legal facts, the facts that were shown to the jury
22    and convinced the jury beyond a reasonable doubt the defendant
23    had practiced medicine beyond the bounds of medical
24    practice --
25              THE WITNESS:  Yes, sir.
```

FARAH - DIRECT

20

```
 1              THE COURT:  -- or for an unlawful purpose in this
 2    huge distribution of controlled substances to addicts.  So
 3    does that mean that a person who does that has a mental
 4    illness?  Is that what you're saying?
 5              THE WITNESS:  Not necessarily.  However, the --
 6              THE COURT:  I mean, you understand that numerous
 7    physicians, unfortunately, have been prosecuted across the
 8    country and in this court for overprescribing drugs.
 9              THE WITNESS:  That's correct.
10              THE COURT:  Do they have a mental illness?
11              THE WITNESS:  Perhaps not.  Right.  You're exactly
12    right that you can do these bad things without having a mental
13    illness.  But my understanding of his situation is this
14    pervasive and repeated lack of judgment.  And to actually
15    pursue this type of clinical practice in the midst of an
16    opiate crisis in the areas that are under the most scrutiny
17    and to do it with such a degree of recklessness and on a
18    consistent basis, coupled with the whole picture indicated to
19    me mental illness.
20              But your point is extremely well taken, Your Honor,
21    that there are many people just doing bad things for money or
22    for whatever motivation.
23              THE COURT:  I mean, the average street drug dealer
24    who is not addicted himself or herself but sells to get money
25    does not necessarily have a mental illness.
```

```
1                    THE WITNESS:  That's correct.

2                    THE COURT:  They may have other problems, but --

3                    THE WITNESS:  That's correct.  I think the

4       paradox --

5                    THE COURT:  People who rob banks --

6                    THE WITNESS:  Yes.

7                    THE COURT:  -- may not have a mental illness that

8       propels them to do that.

9                    THE WITNESS:  I agree.  I think that the paradox

10      here is that someone with such a high IQ would consistently

11      demonstrate such impaired judgment.  In fact, the tapes that

12      were played, the residency director used the phrase "impaired

13      judgment" or "poor judgment" at least five times.  And then --

14      so here you have a trained physician who monitors and trains

15      other physicians who has someone in front of him that is just

16      way out of bounds as far as their level of judgment for that

17      level of IQ and training and doesn't see it.

18                   You know, I think with Dr. Smithers he does have a

19      high IQ, he's very articulate and he's very obsessive.  Even I

20      got caught up in my mental status exams.  May be getting ahead

21      of myself.  But, I mean, he would take me down rabbit holes of

22      some legal technicality that would get him off.  And I was

23      like, no, this is not what we're here for.  We have to

24      redirect.  I can get to the specifics of what I think is going

25      on in his mind.
```

```
 1              But, again, I think that even other professionals

 2    probably didn't see these red flags of a longstanding pattern

 3    of impaired judgment, impaired insight, so forth.

 4              THE COURT:  You -- and for the record, I have

 5    carefully read your report which has been filed --

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  -- by Dr. Smithers's attorney.  So I

 8    take it your report is a summary at least of your opinion.

 9              THE WITNESS:  Correct.

10              THE COURT:  And your opinion is that he suffers from

11    untreated bipolar disorder.

12              THE WITNESS:  Yes, sir, that's correct.

13              THE COURT:  And as you point out, that is not a

14    psychosis.  That's not a -- he's not crazy.

15              THE WITNESS:  That's correct.  However, in the

16    context, he has at times had delusional beliefs.  There was a

17    period of time when he thought a patient was wearing a wire to

18    entrap him.  And there was a period of time he thought he was

19    being followed when he wasn't.

20              THE COURT:  Is that necessarily unreasonable?  I

21    mean, he was engaged in high-risk violations of the law.

22              THE WITNESS:  Yes.

23              THE COURT:  And I would think that that would be a

24    pretty reasonable concern of his that he was being recorded or

25    trailed.  And, in fact, he was being highly investigated, as
```

1    we know.

2            THE WITNESS:  Correct.  I think there were other

3    examples where he had -- as a resident, he was given an

4    antidepressant and became manic with that, and had some

5    hypererotic behavior that was referenced on one of the tapes

6    about misbehavior with a nurse and so forth.  That was a spree

7    of activity and a mania.  Then there was the -- his subduing

8    the manic symptoms with drinking.  And that, of course, led to

9    more problems and impaired judgment.  So his way of

10   compensating was alcohol.

11           Then his wife told me he was either working or

12   drinking.  So he was in this sort of propelled phase.  And

13   even as far as delusion, you're absolutely right that those

14   delusions are realistic given his situation.

15           But even as recently as a couple weeks ago, he

16   was -- had the delusion -- he had the fantasy that there would

17   be some expert that would swoop down and justify everything he

18   had done.  Some doctor would come from out of state and

19   explain that his practice was valid and he was doing

20   everything correctly.  The reality is he just wasn't.  There

21   was no way to bump him off that when I talked to him.  Or that

22   he would find a new attorney.  That he was, you know, two

23   weeks ago he wanted to fire this attorney.

24           THE COURT:  To make it clear, and please understand

25   I don't believe this, but to make it clear for the record, you

1    don't disagree that he was engaged in a -- the facts indicate

2    that he was engaged in a very large improper prescription of

3    narcotic drugs.

4            THE WITNESS:  That's correct, sir.  There's

5    really -- you know, everything that could go wrong in a

6    medical practice did.  The choice of practice, the way it was

7    practiced.  You can't dispute the facts in this case.

8            But what I want to make the Court aware of is that

9    his lack of judgment and his insistence on these continually

10   risky and problematic and dangerous behaviors, indeed

11   life-threatening behaviors were -- you know, he was in a state

12   of mind that was propelling him in a way that he did not -- I

13   don't want to say he wasn't in control, because what he did

14   took organization and brain power, but the judgment and

15   insight were completely erased.

16           THE COURT:  Well, he believed -- do you think he

17   believed and believes now that his practice was proper, that

18   he was, in fact, just helping these people and he was being a

19   good doctor?

20           THE WITNESS:  Yes, sir, he expressed that to me.

21   That he still believes he was helping with a humanitarian

22   crisis.  That there is a lot of people in pain and they only

23   need this type of treatment.  So, you know, that microcosm of

24   the tape shows this -- he's beat over the head with reality

25   repeatedly and just says, no, I just, you know, I got a

1   speeding ticket.  That's it.  And he just kind of gets this

2   version of his reality and doesn't bump off of it.  And he

3   still to this day believes that his practice was appropriate

4   and he was treating a very difficult population.  And he

5   himself, you know, almost in a grandiose way.

6           And in the -- his attorney describes periods that go

7   by when he was working with him where he would be despondent

8   and depressed in the morning, but by the afternoon had this

9   exuberance, this enthusiasm that he was going to fight this

10  and have all these grandiose ideas about how to beat it, you

11  know.

12          So I think the evidence is there for a bipolar-type

13  condition.  And I think your point is so well taken, he did

14  bad things.  You know, there's no way around disputing these

15  facts.  But there was a level of, you know, there was -- they

16  were just propelled from a different area.

17          And I think the sad thing in hearing those tapes is

18  that the standard thing to do when you have a resident who

19  gets drunk or gets in trouble or something, there is a PHP

20  program, a physicians health program, and you're supposed to

21  refer that person for a full evaluation and treatment.  Now he

22  might have gotten treatment.  Now, in fairness, at that time

23  the North Carolina PHP was under investigation by the State

24  Auditor for corruption and they have not recovered their

25  reputation.  They're still thought of as -- you just don't

1    want to go to them.  So it may be that that residency director

2    knew this was not the place for him to get help.  But I think

3    he asked for help, you know, three times.  Can't I have a

4    treatment program?  I came to you for help.  You know, so he

5    had some awareness.

6           Interestingly, he self-described himself to me as a

7    cyclothymic.  Which is, you know, the first time I met him, he

8    first started talking about his past abuse.  And he said, "I'm

9    cyclothymic."  That is a form of bipolar where patients tend

10   to be, you know, depressed a lot of time and then will be

11   hypomanic, but not full-blown manic.  And I think that's again

12   why he's under the radar was any time he did have the more

13   obvious manifestation, he would drink.

14          THE COURT:  Well, getting back to his request for

15   help to the program director of the residency program, he

16   contended that he had just had two beers.  But we know now

17   that he had a serious drinking problem; correct?

18          THE WITNESS:  Correct.

19          THE COURT:  And has had for some time.

20          THE WITNESS:  Correct.

21          THE COURT:  It even escalated after he was removed

22   from the residency program.

23          THE WITNESS:  Correct.  I think, as his wife

24   described it --

25          THE COURT:  But he did not -- that was not what he

```
 1    was conveying --

 2              THE WITNESS:  Correct.

 3              THE COURT:  -- to the director of the program.  I

 4    don't know that anyone knew at the hospital that he had this

 5    serious alcohol problem.

 6              THE WITNESS:  Yes.  I don't know all those details,

 7    but I think his wife elaborated very well that that's how he

 8    suppressed these -- this disorganization was by drinking.  And

 9    of course, it created its own monster; the alcoholism.

10              THE COURT:  All right.  Mr. Williams, again, I have

11    read the report and so we need to move along.

12              MR. WILLIAMS:  Okay.  We would ask he be declared an

13    expert.

14              THE COURT:  Yes, sir.

15    BY MR. WILLIAMS:

16    Q.   Now, Dr. Farah, you stated here that -- you described him

17    as being bipolar.

18    A.   Yes, sir.

19    Q.   Describe what that would be to the Court.

20    A.   It's a mood disorder where it usually presents in your

21    early adulthood and patients spend most their time depressed,

22    but they have -- they're prone to episodes of mania or

23    hyperactivity.  And in those periods they can become

24    delusional, psychotic, so forth.

25              I think he would fit the criteria.  About five
```

1   percent of bipolar patients spend their time mostly in a

2   hypomanic phase sort of.  They're not obviously manic, but

3   they have some manifestations.  And then prone to depression.

4   I think the evidence was that many bipolar patients who take

5   an antidepressant break manic, they get hyper.  And for him

6   that was described.

7   Q.    He was taking those while in North Carolina?

8   A.    Correct.  In the residency.

9   Q.    In the residency.

10         So you also described some delusional beliefs as

11  well in your report.

12  A.    Yes, that's correct.

13         THE COURT:  Again, Mr. Williams, I know, I've talked

14  to the doctor about this.

15         MR. WILLIAMS:  I understand.

16         THE COURT:  And I've read the report.

17         MR. WILLIAMS:  Okay.

18  BY MR. WILLIAMS:

19  Q.    Now, what do you believe regarding the treatment of

20  Dr. Smithers?

21  A.    You mean going forward?

22  Q.    Yeah.  Going forward.

23  A.    Yeah, you know, the standard is a mood stabilizer.  We've

24  all heard of Lithium.  Sometimes Carbamazepine or Depakote.

25  That would sort of prevent these sort of escalations.  And I

1    think basic cognitive therapy.  Because when he -- I think the

2    members of this court have seen him in that phase where he's

3    impenetrable.  You can't -- you know, he has his ideas about

4    things.  And it goes beyond stubbornness.  It does get to his

5    own version -- he creates a version of reality that's

6    impenetrable.

7             I apologize to Dr. Smithers.  It's very hard to hear

8    yourself talked about in psychiatric terms like you're a case

9    study or something.  But don't do any favors by pretending

10   there's nothing wrong here.

11   Q.   Is therapy part of the treatment?

12   A.   It would be part, correct.  Yeah, both therapy and

13   medication, correct.

14   Q.   And, again, combined with alcohol use and everything, it

15   would just enhance; correct?

16   A.   That was sort of gas on the fire.  Because then you're

17   dealing with the disinhibition of alcohol and then possibly

18   alcohol withdrawal if you don't drink, then the impaired

19   judgment furthered by alcoholism and so forth.

20   Q.   How would a pressure-type situation affect?

21   A.   That's where you get your flare ups, and they don't do

22   well.  I mean, that's basically when the mood disorder

23   manifests, mainly under periods of high stress or, you know.

24   Q.   Okay.  So something as stressful as a medical practice,

25   for example, would --

1   A.   Yeah, I think -- I was thinking more like the DUI or the,

2   you know --

3   Q.   Criminal trial?

4   A.   Yeah, these sorts of things.  But I think the -- like I

5   said, he's got a very high IQ.  So he can navigate a lot of

6   things despite illness.  That's why it's very -- that's why

7   this seems elusive.  You know, that's why so many people have

8   a difficulty putting their finger on what is going on with

9   Joel, you know.

10          MR. WILLIAMS:  Your Honor, may I have just a moment?

11          THE COURT:  Yes, sir.

12          MR. WILLIAMS:  Answer any questions the government

13   may have.

14                          **CROSS-EXAMINATION**

15   BY MR. RAMSEYER:

16   Q.   Good morning, sir.

17   A.   Good morning.

18   Q.   You said you had some experience in the criminal system.

19   So you're probably familiar in the federal system there's an

20   incentive to exaggerate your substance abuse history.  Did you

21   know that?

22   A.   You're talking about the defendant themself?

23   Q.   Yes.

24   A.   I'm unaware of studies that cite that.  But you're saying

25   that the defendant would exaggerate substance abuse issues?

```
 1   Q.    Right.  Because if you can show you're an alcoholic, you

 2   can get in what's called the RDAP program, which is a program

 3   that has time reduced from your sentence.  Are you aware of

 4   that?

 5   A.    I've heard of it, but I wouldn't know the specifics.

 6   Q.    Are you aware that soon after his conviction he contacted

 7   RDAP Dan, who is a guy who helps work you through the system,

 8   to get into the RDAP program?  Did he tell you about that?

 9   A.    He did not.

10   Q.    Did he tell you that if he could say that he was an

11   alcoholic, he could have a year taken off his sentence?

12   A.    He did not.

13   Q.    Would that be something you'd want to know in determining

14   whether a guy is an alcoholic, since it's based on him telling

15   you he's an alcoholic?

16   A.    Well, his wife confirmed he was an alcoholic.

17   Q.    He and his wife?

18   A.    Yes.

19   Q.    Who both have a strong motivation to get as small a

20   sentence as possible for him, would you agree?

21   A.    Well, certainly he's motivated for a lesser sentence.  I

22   think he's asked for treatment in the past, so I'm not

23   surprised somebody with his IQ would ask for treatment when

24   he's cornered like that.

25   Q.    Well, he asked for treatment.  He's a very smart person
```

1    and he made $700,000 in a year.  So he could have just got

2    treatment, couldn't he?  He could afford it.

3    A.    Yes.  If he had the insight and judgment, he could have.

4    Q.    If his wife wanted him to; correct?

5    A.    Again, it would have to be voluntary, unless he was

6    petitioned for involuntary commitment.

7    Q.    Or if his father could have paid for it.  I mean,

8    taken -- all these people could have -- because you said he's

9    been this way for years; right?

10   A.    Well, his illness probably manifested early adulthood and

11   then into the residency it became full swing, and then the

12   drinking began heavy during residency.

13   Q.    That's what he says?

14   A.    His second wife confirmed that as well.

15   Q.    His second wife wasn't even married to him at the time,

16   was she?

17   A.    I don't know.  Of course not, not at the time, yes.  But

18   I don't know --

19   Q.    Did she even know him then?  Did she even know him during

20   his residency?

21   A.    I don't know that.  I can tell you I did have collateral

22   history from the father.

23   Q.    Okay.  But you said the reason you were convinced he was

24   an alcoholic was because his wife confirmed it about during

25   his residency.  But she didn't even -- did she even know him

```
 1    then?
 2    A.    Yes, you've answered the question.  I don't know if she
 3    knew him then or not.
 4    Q.    Really, doesn't it come down to what he told you about
 5    his alcoholism?
 6    A.    That's a piece of the puzzle.  There was -- certainly he
 7    was pulled over with alcohol in his system.
 8    Q.    There was what?
 9    A.    Yeah, there was alcohol in his system just below the
10    legal limit in the discussions that were had.
11    Q.    Did he admit to you that he was a .085 when he was pulled
12    over?
13    A.    He did.
14    Q.    He did?
15    A.    Yes.
16    Q.    Okay.  Now, did he also tell you that as a condition of
17    his pretrial release in this case he was not to excessively
18    use alcohol?
19    A.    He did not.
20    Q.    Did he tell you that, according to him, he violated that
21    every day?
22    A.    He did not.  Basically I met with him for a mental status
23    exam and to gather what history I could.  But those details
24    did not come up.
25    Q.    How long did you meet with him?
```

FARAH - CROSS                                                    34

```
 1   A.    Hour and a half.

 2   Q.    Did you meet with him in person?

 3   A.    Correct, yeah, but there was glass between us.

 4   Q.    And how much were you paid for your testimony today?

 5   A.    The total fee was 2,000 for a report and to come here

 6   today.

 7   Q.    How much were you paid for coming here today?

 8   A.    Oh, I did not get paid -- I did pro bono work for the

 9   first visit.  And today -- so the report was 500 and to appear

10   in court is 1500.

11   Q.    So the total amount you're going to get is $2,000 --

12   A.    Correct.

13   Q.    -- plus expenses?

14   A.    No expenses.

15   Q.    No expenses.  That's included.  All right.

16         So all your testimony today is based on an

17   hour-and-a-half interview with him, talking to his wife,

18   talking to his dad; is that right?

19   A.    Yes.  And you provided further information with these

20   tapes.  And then there were trial transcripts that he had, and

21   then there was -- then he sent, I think, a long text e-mail to

22   his attorney while I was working on the report.

23   Q.    Did you read the whole transcript of the trial?

24   A.    No, sir.

25   Q.    So you just read excerpts that he sent you?
```

FARAH - CROSS                                                          35

1   A.    No.  He had them in hand when we met.  He was, you know,

2   sharing them with his attorney and so forth.  Again, it spoke

3   to his obsessiveness about certain technical details; that he

4   was going to get off on this technicality and that

5   technicality.  And I just had to redirect him and say we're

6   not here for that, you know.

7   Q.    My question though is, are the only transcripts you read

8   of the trial the transcripts he provided?

9   A.    Correct.  I didn't read any other than those.

10  Q.    What were those transcripts that you read?

11  A.    I don't recall the details.

12  Q.    What was the general thought of it?

13  A.    You know, it was just legal technicalities and things he

14  had circled on the transcript to -- I can't repeat them now.

15  Q.    Okay.  So the transcripts that you saw, did those play at

16  all into your diagnosis?

17  A.    Yeah, just kind of -- his attorney, you know, expressed

18  to me that he did get -- again, talk about going down these

19  rabbit holes.  You know, these sort of --

20  Q.    Just understand, I was asking if the transcripts

21  themselves, what you read in the transcript, if that in itself

22  had any impact on your diagnosis?

23  A.    No, sir.  Just that he was obsessed with them.

24  Q.    Okay.  So you've dealt with -- you've dealt with criminal

25  defendants in the past; right?

FARAH - CROSS                                                                                36

```
 1  A.   Correct.

 2  Q.   And you know that, in general, criminal defendants expect

 3  that their attorney just gets them out of the trouble;

 4  correct?

 5  A.   I don't know that that's the expectation of the ones I've

 6  dealt with.  The last one was a schizophrenic who murdered

 7  somebody, so he didn't expect to get off.

 8  Q.   Okay.  So for that one it was a competency, insanity

 9  defense?

10  A.   Correct, yeah.

11  Q.   All right.  Now you said that he never received proper

12  therapy for his past abuse; correct?

13  A.   Correct.

14  Q.   Okay.  How was he abused?

15  A.   It's in the report.  Sexually from ages --

16  Q.   What was it?

17  A.   -- I think 9 to 14.

18  Q.   Did he say his father sexually abused him?

19  A.   No, sir, it was another individual.

20  Q.   Did he say his father tickled him inappropriately?

21  A.   He did report that.

22  Q.   Did you confirm whether that was true or not?

23  A.   I didn't discuss it with his father, if that's what you

24  mean.

25  Q.   Well, why not?  Why would you just rely on the word of
```

FARAH - CROSS                                                    37

```
 1    Dr. Joel Smithers?

 2    A.   Well, that's what we do.  We interview patients.  Now if

 3    you wanted to do some neuropsych testing for validity measures

 4    and check for malingering, that's a -- that's a -- that's a --

 5    like a longer neuropsychiatric battery.

 6    Q.   Okay.  They -- they didn't pay for you to check for

 7    malingering, did they?

 8    A.   Well, I don't do neuropsychological testing.  It wasn't a

 9    payment issue, just I did a psychiatric interview.

10    Q.   You didn't do anything to determine whether he was

11    malingering or not, did you?

12    A.   Well, that's the mental status exam.  And, of course, if,

13    you know, if -- it's a clinical judgment at this point without

14    neuropsychological testing.

15    Q.   All right.  Can you explain to everybody what malingering

16    is.

17    A.   Sure.  It's exaggeration or faking of symptoms.

18    Q.   Okay.  And would you agree that someone facing life in

19    prison would have the incentive to malinger?

20    A.   Would have the incentive?  In general, yes.  I think

21    there's enough pathology here without him making some up

22    though.

23    Q.   Okay.  So your basis of the bipolar was -- is it because

24    of the sexual abuse at the hands of his father, is that why

25    he's suffering from bipolar?
```

FARAH - CROSS                                                                    38

```
 1   A.    No, sir.  The importance of that, that was the first

 2   thing he said to me when we met, it's something that still

 3   torments him, the other abuse really.  But the -- often before

 4   there's a bipolar illness or schizophrenic illness, it's often

 5   precipitated by some childhood trauma or stress.  So those

 6   play a role in the manifestation.  So it was just important in

 7   a causative way to say look, there is a -- yes, there's

 8   genetic vulnerability.  But then the stressors also help

 9   precipitate that.  And this is a common one that helps

10   precipitate that pathology.

11   Q.    Did he tell you why he chose pain practice?

12   A.    He did not --

13   Q.    Okay.

14   A.    -- specifically.

15   Q.    Did he tell you that he had a job, like a regular job, he

16   was paid over $100,000 a year for, but he quit because he

17   didn't want to have to show up to work on time?

18   A.    He did not tell me that.

19   Q.    Then he decided to go into pain medicine.

20   A.    No, he didn't.  But, again, you're once again describing

21   just terrible judgment.

22   Q.    And you said that the tape we played in 2013, that he

23   should have been placed into the -- some sort of patient

24   assistance program, or physician assistance program?

25   A.    That's standard what's done when a physician gets into
```

FARAH - CROSS                                                                    39

```
 1    trouble with drinking or conduct issues.  Their first -- the
 2    medical board does have a physicians health program.  And
 3    they're -- they are in existence to treat people who have
 4    illnesses and discern them.  Again, that is -- at the time it
 5    was under investigation for corruption, so I can understand
 6    why he may not have been referred.  But --
 7    Q.   Or maybe he was.  Did he tell you whether he'd been
 8    referred to it?
 9    A.   He did not.
10    Q.   Did he tell you whether he participated in it?
11    A.   He did not.
12    Q.   Did he indicate to you that one of his conditions of
13    being licensed in the other states was that he continue his
14    treatment?
15    A.   I don't recall that from our interview.
16    Q.   Would that matter to you?
17    A.   Yeah.  I'd like to see the details of what they really --
18    what their evaluation was, sure.
19    Q.   Okay.  And as you heard on the tape, he wasn't fired for
20    drinking.  He wasn't fired for speeding.  He wasn't fired for
21    having a DUI.  He was fired for lying and using his position
22    as a physician to get out of trouble.  As Dr. Mazzola says, is
23    there a treatment program for that?  Is there a treatment
24    program for doctors who abuse their position of trust?
25    A.   I would see that as a symptom of the illness and that's
```

FARAH - CROSS                                                                40

1    what got his attention.  But there was drinking involved,

2    there was impaired judgment.  I mean, how many more red flags

3    do you need to say you need an evaluation?

4           I mean, you're asking is there a cure for a cough?

5    Well, no, but there's evaluation for pneumonia.  Where is the

6    cough coming from?  You pointed to a symptom of his pathology,

7    rather than his pathology.

8    Q.   So you think the lying was a result of his bipolar?

9    A.   I think it fits the pattern of just impaired judgment.

10   Q.   It's not impaired judgment.  There's bipolar people that

11   don't lie; right?

12   A.   Well, sure.

13   Q.   So it doesn't really -- they don't even go together.  I

14   mean, being bipolar doesn't make you a liar.

15   A.   No.  I think what I'm trying to impress upon the Court is

16   that his specific pathology, his bipolar pathology leads him

17   to this self-denial and this lack of judgment, and that

18   will -- yeah, he'll get in trouble.  I mean, he will say --

19   again, like Dr. Mazzola said, lack of judgment four or five

20   times.  So yeah, people with poor judgment lie to get out of

21   things.  They make mistakes, yes.

22   Q.   And people with poor judgment commit crimes; right?

23   A.   Correct.

24   Q.   Now, you put in your report that initially he was

25   exploited by supervisors taking advantage of his medical

FARAH - CROSS                                                    41

1  license.  So you didn't read the trial transcript.  So where

2  did you get that information, that supervisors exploited him?

3  A.   Let's see.  That was a statement he made that he felt

4  that his initial employment as a physician, you know, that he

5  could right, that he had not done a residency program, but

6  that he felt that people were -- one of his employers was

7  taking advantage of him.  May have been delusional, may not

8  have been accurate, I don't know.

9         I think the way to -- as again, he did not have a

10  residency program, he didn't have proper training, and he

11  jumped right into the absolute most difficult and most

12  libelous and dangerous form of medicine.  It's like being -- I

13  think I talked in the court about taking one flight lesson and

14  being put behind a jet airliner.  You know, you just don't --

15  he was not prepared for this type of pain management from a

16  clinical standpoint.  And yet still didn't have the insight to

17  pull back and say, I can't do this.

18  Q.   Right.  But is it fair to say when you have -- when you

19  put the summary of the history in your report --

20  A.   Mm-hmm.

21  Q.   -- that's all Joel Smithers just talking to you; right?

22  And you just take him at his word?

23  A.   Correct.  And what corroboration I mentioned, that's

24  correct.

25  Q.   You didn't contact the supervisor and find out if they

1   exploited him, did you?

2   A.   No, sir.

3   Q.   And you know his wife, she's not a psychiatrist, is she?

4   A.   No, sir.  She's actually -- she described herself as a

5   daughter of a minister.  And she interestingly said that as

6   her father would do therapy with numerous parishioners over

7   the years, she learned to identify bipolar and had told Joel,

8   I think you're bipolar, just based on her layman's

9   understanding of seeing these types of parishioners.

10  Q.   So part of your report is based on his wife learning from

11  her father who's a minister who is bipolar?

12  A.   No.  No.  Learning from her just observations of the

13  world that she had encountered bipolar patients before.

14  Q.   She had patients?

15  A.   She had encountered them before.

16  Q.   Bipolar patients?

17  A.   Correct.

18  Q.   So in what role does she deal with patients?

19  A.   No.  She'd just see them in the context of her father's

20  ministry in therapy, that they were in the church and in the

21  home and so forth.

22  Q.   All right.  Did Joel Smithers tell you about all the

23  money he made?

24  A.   He did not.

25  Q.   Did you ask about it?

FARAH - CROSS                                                                    43

```
 1    A.    I did not.

 2    Q.    Did he tell you about all the text messages that were

 3    introduced in the trial where he's talking about, I want my

 4    money?

 5    A.    No, he did not.

 6    Q.    Does that have any impact on your view of him that

 7    according to his text messages he was doing it for the money?

 8    It wasn't because of any kind of trying to help people, except

 9    himself.

10    A.    Mm-hmm.   Yeah, I've not seen the text messages.

11    Q.    Would it impact you, these text messages saying I want my

12    money?

13    A.    You know, I think there's so many facets to Joel Smithers

14    that would not -- it wouldn't change my opinion.   I'm sure

15    that -- everybody likes money.   It's nice to have money.   And

16    I think that he was very desperate and in debt on the tapes

17    you heard and suddenly money is coming in.   But, again, it

18    just speaks to the vagaries of his condition.   You know, one

19    minute he's exuberant and money seeking, the next minute he's

20    going to save the world from the opioid crisis, so forth.

21    He's just sort of a -- he's a scattered picture like that.

22                MR. RAMSEYER:   May I have a moment, Your Honor?

23                That's all my questions.   Thank you.

24                THE COURT:   Anything further, Mr. Williams?

25                MR. WILLIAMS:   No, Your Honor.   May he be excused?
```

USA v. Smithers                                    1:17-cr-00027-JPJ-1      44

```
1              THE COURT:  All right.  Thank you, Doctor.  You may

2    be excused.

3              THE WITNESS:  Thank you, sir.

4              THE COURT:  All right.  Mr. Williams, do you have

5    any other evidence you wish to present?

6              MR. WILLIAMS:  No.  Not at this time.

7              THE COURT:  All right.  I'll be glad to hear from

8    counsel.

9              MR. RAMSEYER:  Your Honor, we have a victim.  Would

10   the Court like to hear that at this time?

11             THE COURT:  Well, I usually wait until after

12   counsel, but we can do that now.

13             There is a victim?

14             MR. RAMSEYER:  Your Honor, this is the mother of the

15   woman who died as the result of the prescriptions from

16   Dr. Smithers, part of the case.

17             THE COURT:  Yes, ma'am.

18             And first, if you'll state your name, please.

19             MS. HARTSHORN:  My name is Ramona Hartshorn.

20             THE COURT:  All right.  And I'll be glad to hear

21   anything you wish to say to me in regard to the sentencing of

22   Dr. Smithers.

23             MS. HARTSHORN:  Thank you, Your Honor.

24             THE COURT:  And you need to speak up.  Make sure I

25   can hear you.
```

1:17-cr-00027-JPJ-1     45

```
 1              MS. HARTSHORN:  Okay.  My name is Ramona Hartshorn.

 2    I am the mother of Heather Hartshorn, who was one of

 3    Dr. Smithers's patients and passed away from an accidental

 4    overdose on February 22nd, 2017.

 5              When I first received my letter from the Department

 6    of Justice regarding my daughter and the court case against

 7    Dr. Smithers, I was unaware of any of the details and the

 8    extent of my daughter's involvement in the case.

 9    Unfortunately, my husband had filed for divorce 11 months

10    before my daughter passed and I had no communication with him

11    regarding any matters that I was once privy too.

12              After my daughter passed away on the morning of

13    February 22nd, 2017, I was still not kept informed of many of

14    the details surrounding her death.

15              Upon her death, I was thrown into a deep, dark

16    depression.  During that time I resigned from my position as a

17    full-time teacher and elected to apply for my retirement and

18    social security.  Days and months went by and I was like a

19    zombie.  I was unable to feel or see the beauty in anything.

20    My battle with severe depression lasted for well over a year.

21    I was in and out of psychiatric facilities at the request of

22    my family and friends because I had become very suicidal and

23    unable to cope with the way the disruption that had come upon

24    my family.

25              I lost 90 pounds and had to be force fed food.  I
```

1    was unable to care for the two precious children that my

2    daughter left behind because I couldn't even take care of

3    myself.

4         With the help of God, my family, and my friends, I

5    was able to return to work as a substitute teacher about

6    14 months after she passed.  I still battle with

7    post-traumatic stress due to the fact that I found my daughter

8    that morning.

9         I lived with Heather, her fiancée, and her two small

10   boys, ages five years and five months.  As part of my bedtime

11   and morning routine, I would check on my daughter and her

12   family every night before going to bed and every morning

13   before getting ready for work.

14        Heather retired to bed early the night before she

15   passed.  I checked on her and did not wake her because she was

16   always tired having two small boys to care for and trying to

17   take college classes.  The next morning around 6:00 a.m. I

18   entered her room to check on her.  I walked in.  I immediately

19   knew something was wrong because it appeared her body hadn't

20   changed position from the evening before.  As I moved closer

21   to her bed, an overwhelming feeling of despair came over me.

22   When I got to her bed and leaned over to touch her, this

23   horrible feeling became a reality as she was cold and hard to

24   the touch.  She also had brown foam emerging from her nose.

25        I immediately began screaming and with great

1    difficulty thinking, dialed the number.  I finally reached my

2    husband at the store.  It took several seconds for him to

3    understand what I was saying.  Shortly afterwards he made it

4    to our home, but I already knew there was nothing he could do

5    for her.

6           The next few hours were nothing short of hell on

7    earth as ambulance, police cars, the fire department, friends

8    and family began to fill our house.  From that moment on, I

9    knew our lives would never be the same.  My precious baby girl

10   was gone from this earth and my heart was forever broken.

11          After they placed her deceased body inside the body

12   bag and on to the gurney, they brought her into the living

13   room and stopped to let me say goodbye.  I left our home that

14   day and never returned to live there.  The reason was the

15   haunting memories of her passing.

16          After Heather was taken from her home that morning,

17   I would only see her one more time and that was at the funeral

18   home after they had returned her from the medical examiner's

19   office.  I never knew I could feel so broken and devastated.

20          I wish I could say that it has gotten easier, but

21   every morning since that fateful morning two and a half years

22   ago, I have awoken with the grim reality that someone I love

23   with all my heart is missing from my life.  It is by the grace

24   of God that I have survived this horrific ordeal.

25          Furthermore, it's with a heavy heart that I'm here

1    today.  A few days ago I read an article about the case where

2    my ex gave an interview with the local news station.  I later

3    learned that he has gained national attention.  It stated that

4    he testified in Dr. Joel's defense and he didn't blame him for

5    our daughter's death.  I do not agree with him.

6              How can Dr. Smithers not share the blame after being

7    convicted by the Court based on the indisputable finding from

8    the investigation authorities charging him with over 800

9    counts of illegally prescribing drugs such as oxycodone and

10   oxymorphone of which my daughter had received prescriptions

11   for from him.

12             Apparently his medical practice was primarily one of

13   drug trafficking and neglect where his actions have

14   contributed to the drug epidemic and contributed to the death

15   of our daughter.

16             There is no bringing my baby girl back, but I feel

17   her death has not been in vain and has been instrumental in

18   closing a pill mill.

19             In closing, I feel the need to tell Dr. Smithers

20   that I don't hate him, but I do feel his actions have caused

21   so much harm to so many people.  I want him to know that I

22   forgive him.  And I pray if he ever thinks about my daughter,

23   Heather, that he will pray for her two young sons who will

24   never know their mother, and he will also pray for me, her

25   mother, who will never ever stop grieving or suffering from

1   losing her oldest daughter.  I have cried a million tears and

2   there seems to be no end in sight.

3         Heather was one -- she was truly one of a kind.  Her

4   smile and laughter can light up a room.  She had a heart of

5   gold and a love for people and life.  She is so sadly missed

6   by so many.  But my faith in God assures me that I will see my

7   daughter some day, that it will be in heaven, because drugs

8   may have taken her life, but her faith in God, it didn't take

9   her soul.

10        Thank you, Your Honor.

11        THE COURT:  Thank you, ma'am.

12        MR. RAMSEYER:  Your Honor, we're all here today for

13  the sentencing of Joel Smithers.  And the Court will have to

14  consider all the 3553 factors and determine what's the

15  appropriate sentence.

16        As the Court stated, the guideline sentence is life

17  imprisonment.  And we're asking the Court for a sentence

18  within the guidelines.  We think it's appropriate in this

19  case.

20        This court, perhaps more than any other court in the

21  country, has seen prosecutions against physicians,

22  prosecutions against pharmaceutical companies, prosecutions

23  against street dealers, and has seen the consequences of the

24  actions of all of these parties.  And in all those

25  prosecutions of doctors that have gone before, they all pale

```
 1    in comparison to Dr. Smithers.  All those other doctors at

 2    least put on some sort of a pretense of being legitimate.

 3    Some of them actually treated real conditions and helped

 4    people.  Dr. Smithers isn't like that at all.  Dr. Smithers is

 5    a drug dealer, just a pure and simple drug dealer.

 6             And one of the things the Court has to take into

 7    account in this is to look at the nature and circumstances of

 8    the crime and the personal characteristics of the defendant.

 9    And the reason we wanted to play those excerpts from 2013 was

10    because we think it gives a great insight into who Dr. Joel

11    Smithers is.

12             He's someone who will blame everyone else for

13    everything.  He's someone who thinks he's above the law.  He's

14    someone that will do whatever it takes to advance his personal

15    agenda.  And in this case it was all about making money.  As

16    the Court heard at the trial, over $700,000 just in a brief

17    time period for doing nothing other than writing a

18    prescription.

19             The Court's sentenced many street dealers, and he's

20    worse than any of them because he didn't have to be here.  Not

21    that any of those people had to, they had choices to make.

22    But a lot of them had really serious obstacles to overcome in

23    their childhood and in their life.  You know, not -- bad

24    economic situations, no parents, things like that.

25             He didn't have any of that.  He had parents that
```

1    took care of him.  He had brothers and sisters -- or he had

2    siblings.  He had it all.  But for Dr. Smithers, that wasn't

3    enough.  He decided he wanted to make a lot of money.

4         And he had a job.  He had a job where he was making

5    over $100,000 a year, but he had to go to work on time.  And

6    Dr. Smithers wasn't going to be bothered with that.  He found

7    a way where he could make hundreds of thousands of dollars and

8    not even have to go to work.  As the Court heard from the

9    trial, he just wrote prescriptions from home or had his people

10   at the work write prescriptions for him.  He would FedEx the

11   prescriptions to people in Kentucky and West Virginia.  And he

12   did it all for the money.  Nothing else.

13        And, again, you know, now, a couple weeks before

14   sentencing, he gets a doctor to come in here and say that he's

15   bipolar and that's really what caused this.  He doesn't really

16   need to be punished, he really just needs treatment.  You

17   know, the Court can read in that report, it's an advocacy

18   piece.  Don't incarcerate him, just give him treatment.

19        But, again, we're all here because of Dr. Joel

20   Smithers.  Nobody else brought us here.  He blames his

21   attorney.  You know, it's his attorney's fault that he's here.

22   It's the prosecution's fault that he's here.  It's the Court's

23   fault that he's here.  Not his fault.  No acceptance of

24   anything because, in his mind, he was totally justified.

25   Because he's a doctor, he can do whatever he wants and can

```
1    make whatever money he wants.

2            The other thing is this isn't something that came

3    out of the blue for Dr. Smithers.  He knew what the

4    consequences were of what he did.  And he had all kinds of

5    warnings.  May of 2013, the tape we heard.  You know, his

6    friend there, Dr. Mazzola, they're both telling him, this

7    isn't going to define you, Joel.  What's going to define you

8    is what you do after this.  And so here we are.  That's what

9    defines him is what he's done after that.

10           In August of 2015, he opens up a clinic in Beckley,

11   West Virginia.  They ask to see his records.  He says, come

12   back with paper?  They come back with paper, he's shut down.

13   He's gone.  The urine samples from his patients are in the

14   dumpster untested.  Is that not a warning sign that you're

15   doing something wrong if he didn't know he was doing something

16   wrong?  Of course he knew what he was doing was wrong.

17           And so I think it's important we go back and look at

18   some of the text messages that were introduced at trial to

19   show why Dr. Joel Smithers committed this crime and why a

20   sentence within the guidelines is appropriate.

21           This is Joel Smithers and Darryl Williams.  Darryl

22   Williams telling him, "I got a lawyer that can help you so

23   much at one-third the cost and do a much better job than

24   anyone on earth."

25           This is September 2013.  Very sharp professional
```

1    guy.  He said, "If you do it right, you can make a million a

2    year.  Do it wrong, jail."

3            This is within a month of him opening a practice in

4    Martinsville.  He knows he faces jail.

5            Darryl Williams tells him, "You have a cow giving

6    cash now.  We need to learn how to protect it, grow it,

7    leverage it and retain most of it long term.  Learn how to

8    make steady injections of cash."

9            Dr. Smithers, "All very true."  "Also," and

10   Dr. Smithers says, "Also I have to know who I can trust and

11   who I can't."

12           Darryl Williams, "You can bring in 10K a day cash."

13           Dr. Smithers, "I just have to keep the DEA and State

14   Board of Medicine off of my back."

15           Darryl Williams, "You are operating a cash cow right

16   now.  Grow it.  Protect it."

17           Dr. Smithers, "Yep."

18           Dr. Smithers, "We need a serious strategy session by

19   phone or in person."  Tells Dr. Smithers how much commission

20   for this.

21           Dr. Smithers, "I really need to talk to him and come

22   up with a battle plan to fight these," his words, "fuckers."

23           Darryl Williams, "We can bulletproof you right now

24   before they come."

25           Dr. Smithers -- then he goes on, "He is cheap and he

1  has a cheap criminal lawyer friend that does major drug

2  cases."

3        Dr. Smithers, "Nice."

4        And then we get into what it's all about:  Money.

5        Darryl Williams, "Check your records and see what --

6  how much is due.  I think 900 paid.  1500 last payment."

7        Dr. Smithers, "Your peeps always have to have their

8  $75 counseling fee.  I can't owe the counseling service money.

9  Not to mention," again, his words, "it looks shady as fuck

10  when four or five people come through and say someone else is

11  paying for them."

12        And then here's -- here's the text messages where

13  Dr. Smithers FedExed prescriptions in 18 different people's

14  names.

15        Again, Dr. Smithers, here's what it's all about.

16  "18X3 equals 54.  $5,400 for me sitting here at my desk and

17  writing prescriptions and you FedExing and sending them."

18        That's not compassion, that's not caring.  That's

19  vile.

20        Dr. Smithers points out a counselor in his office is

21  suspicious.

22        "About what?"

23        "You paying for everything."

24        Then we go to the wire transfers.  "Can you get

25  anyone to pick up a wire for you?"

1              Smithers, Dr. Smithers, "We can do two more today,
2    big boy."
3              Williams is saying, "Got to watch how much you guys
4    do."
5              Darryl Williams in November of 2015, "Our bill will
6    be 2,850, but I'm sending three grand."
7              Dr. Smithers, "K.  Sweetness."
8              3,000 bucks.  You're an all right fellow,
9    Mr. Williams.
10             Darryl Williams, "If you want it Monday, I'll just
11   bring it and there won't be a paper trail."
12             "Sounds like a plan, man.  I will burn the
13   paperwork."
14             Darryl Williams talking about the people coming.
15   All these different people.
16             "Good for wallet."
17             "Indeed."
18             Another time, "Mailing out a whole bunch of scripts.
19   18 folks."
20             Dr. Smithers at the end, "18 is what we did last
21   month, because that's how we got the 5400."
22             Darryl Williams talking about Bryan Harlow, "He's
23   got several friends who'd like to come and they'll be seeing
24   what he got.  Hook him up good."
25             Here we talk about the wires.  Dr. Smithers knows

USA v. Smithers                                    1:17-cr-00027-JPJ-1    56

```
 1   that they have to be careful about how the wiring is done, so

 2   Smithers is saying, "So if we just did the 950 Walmart to

 3   Walmart six times, that would hit 5700 and we could call it

 4   even."  He wants his money.

 5          Darryl Williams, "K."

 6          Darryl Williams, "But we can't use the same name and

 7   senders that much."

 8          Dr. Smithers, "I agree.  Agreed."

 9          Then we got Dr. Smithers on December 22nd, 2015, "So

10   who is bringing my grand?"

11          The Court's sat through a lot of trials.  And

12   you've -- the Court's seen text messages from just regular old

13   street drug dealers, that's what this is.  This is just

14   regular old drug dealing.

15          There's more, talking about the text messages.

16   Dr. Smithers saying how it's beautiful.

17          Dr. Smithers letting Darryl Williams know he's just

18   counted the money.  "It was 3700."

19          Darryl Williams saying, "I just collected $4,200 for

20   you."

21          Dr. Smithers, "So we staying here, 7,482 minus 3,700

22   equals 3782."  Just a drug dealer just keeping track of what's

23   owed.

24          Then we have Scotty Williams who did something wrong

25   evidently and raised suspicions that people might check into
```

USA v. Smithers                                          1:17-cr-00027-JPJ-1      57

1   the doctor.  So he's willing to pay a $300 "F-up fee" to get

2   back in.  There's conversation about that and Darryl Williams

3   says, "Scotty can FedEx you a $300 money order and you can

4   FedEx his scripts back."

5          And we did that here where Darryl Williams says,

6   "Mike Bowe is driving down.  He is going to bring Scotty

7   Williams F-up fee."

8          Darryl Williams, asked him to FedEx Scotty Williams

9   scripts.  Dr. Smithers, "Yep.  So sorry about that."

10         After that, paid that F-up fee, Scotty Williams got

11  17 more prescriptions.

12         Here's more about the money.  December '15,

13  December 2015, talking about the scripts.  Dr. Smithers says,

14  "No one is being seen Monday, I'll be mailing everyone's

15  scripts."

16         Dr. Smithers, "Whoever wants to can make a

17  donation."  Oh, we can make donation.

18         Again, more money.

19         Down here.  Dr. Smithers says, "I have a second

20  Bluebird card we can set you up on and they can mail out a

21  real one to you in a few days."

22         More about FedExing prescriptions.

23         Darryl Williams telling the doctor, "This is what

24  the people get."

25         Mail more.  Here, Darryl Williams telling the doc,

1    "Don't call her at the hospital.  Or if you do, don't tell

2    them you're a doc because they frown on that."  Keep your drug

3    dealing hidden.

4            Dr. Smithers, "Not going to lose a penny."

5            So Darryl Williams says, "I'll have your tracking

6    number in an hour, please FedEx for Saturday delivery."

7            So the doc is going to go FedEx prescriptions to

8    him.  And tells him, "That's going to be another $70.50 if I

9    do that."

10           Here's the Jesses.  "Tell the doc I got pulled over

11   last night."  Again, letting your drug dealer know you run

12   into problems with the law.

13           But, you know, here's -- here's where this all leads

14   to.  This is where Dr. Smithers's conduct ends up.

15           It's a young person taken from this earth.  And

16   Dr. Smithers contributed to that.  And as the Court heard, she

17   wasn't the only person that died.  He had other patients that

18   overdosed.

19           Again, Dr. -- just another indicator of

20   Dr. Smithers.  You know, if you're out in the parking lot

21   using the restroom, we're not going to fire you.  Of course

22   not.  But we're going to get another 50 bucks from you.

23           And, again, the money.

24           Heather Hartshorn, she died on February 22nd, 2017.

25   Two days before that, Dr. Smithers saw her.  Saw that she was

 1    not doing what she's supposed to be doing in terms of drugs.

 2    She was taking marijuana.  She wasn't taking alprazolam that

 3    she had been prescribed.  So what did he do because he's so

 4    kind, caring, and compassionate?  He wrote prescriptions to

 5    her for oxycodone and oxymorphone, which directly led to her

 6    death.  That's on him.

 7              His guideline range is life.  And it's appropriate

 8    because there's not going to ever be another doctor that comes

 9    before the court in federal court that's worse than him.  This

10    is the most egregious that can be done.  This is just drug

11    dealing.  There's no pretense of anything else.

12              Now, for all doctors, the argument is always,

13    they're only dangerous if they've got the ability to write a

14    prescription.  And so, therefore, you know, we don't need to

15    keep them in jail, just take away their license and then

16    they're harmless.  And the Court should take that into account

17    when determining the sentence.

18              Is that right?  Is it appropriate that because

19    they're a professional, because they have a way of making a

20    legitimate large amount of income, they get some sort of a

21    benefit?  That somebody that lives in low economic status,

22    didn't have parents, didn't have the ability to get a medical

23    degree, they don't get that option.  They don't get to tell

24    the court, hey, you know, I don't have -- my degree is being

25    taken away, so you don't have to worry about me.

```
1          We don't think it's appropriate.  Again, we think
2     it's an aggravating factor.  He didn't have to do this.  He
3     could have made a lot of money legitimately, but it wasn't
4     enough for him.
5          So the Court's required to impose a sentence which
6     is sufficient to reflect the seriousness of the offense.  It
7     has to promote respect for the law, provide just punishment
8     for the offense, afford adequate deterrence to criminal
9     conduct, and protect the public from further crimes of the
10    defendant.  So what sentence accomplishes those objectives in
11    a case like this?
12         We're in a country that has an opioid crisis.  I
13    think everyone would agree to that.  And we have a doctor
14    that's committed the worst offense possible.  He's prescribed
15    medications to someone that led to their death, and he's been
16    just a drug dealer.  So what sentence reflects the seriousness
17    of the offense in that case?  What sentence promotes respect
18    for the law where people realize just because you're a doctor,
19    you don't get a break?  What provides just punishment for
20    writing a prescription that leads to someone's death?  What
21    adequately deters others from committing criminal conduct?
22         All of those factors we believe lead to a conclusion
23    that the appropriate sentence for Dr. Joel Smithers, who had
24    all these opportunities to stop what he was doing, had all
25    these warning signs that what he was doing was illegal, who
```

1    knew it was all illegal, who took on that risk, who said, I

2    don't care, I want to make a lot of money, we think the

3    appropriate sentence is within the guideline range; and, it's

4    life imprisonment.

5              Thank you, Your Honor.

6              THE COURT:  Thank you, Mr. Ramseyer.

7              Mr. Williams.

8              MR. WILLIAMS:  May it please the Court.

9              Standing before you today is Joel Smithers.  Not

10   going to go through a lot of details, the Court sat through a

11   lot of testimony, I'm not going to bore the Court with a lot

12   of the testimony.  What I will tell you is that Joel is a

13   father of four.  He also has two step-children that he's very,

14   very close to.  He has a wife who is here.  All of them are

15   here.  His dad, some friends and family are all here.

16             Joel has a troubled childhood, as is shown by the

17   presentence report.  He was sexually abused by a cousin as a

18   child.  He went through what he described as kind of a

19   troubled childhood with his mother and father dealing with a

20   lot of issues, some dependency issues by his mother.  And Joel

21   stands before you today as a person who is convicted of 860

22   counts.

23             What I'm going to ask the Court to do is to look at

24   the 3553(a) figures, or factors.  And as we go through just

25   talking a little bit about Joel's life, we see how Joel kind

Case 1:17-cr-00027-JPJ-PMS   Document 293   Filed 12/20/19   Page 62 of 82   Pageid#:
12561
USA v. Smithers                                          1:17-cr-00027-JPJ-1        62

 1    of progresses.  And Joel did, he had a lot of problems growing

 2    up along the way, many of which are self-inflicted by himself.

 3         The Court sat here and listened to the interview

 4    from the North Carolina incident.  And when he was coming out

 5    of medical school, he took this residency in North Carolina.

 6    He made some very poor decisions and he lost that residency.

 7    He joined the Air Force, wanted to represent his country.  As

 8    a result of losing the residency, he was discharged and not

 9    allowed to remain in the Air Force.

10         Also during that time period he lost his wife, and

11    he developed an addiction to alcohol.  We are asking the Court

12    to consider allowing him to be part of the RDAP program.  We

13    do believe that he would be a -- it would be a great benefit

14    to him.

15         What we have and what this Court sees in a lot of

16    cases, we see repeat offenders, we see people coming in who

17    have had multiple, multiple run-ins with the law.  We see how

18    that a lot of times their criminal history scores will be

19    three, four, five and six.  I don't know that I've ever had a

20    criminal history score of zero to come in.  But that's what

21    Joel's is.  He scores a zero.  He's at the lowest level that

22    he can be.

23         As he began to make these bad decisions, it kind of

24    spiraled out of control, I believe.  And as he lost that

25    residency, he lost the ability to be able to learn from other

1   doctors.  It forced him to kind of go out on his own.  Lead

2   him to make a lot of further bad decisions in his life.  And

3   it kind of ended with the idea that he began to trust

4   patients.  He trusted them greatly to a fault.

5        And what we heard in the courtroom, we heard a lot

6   of people who were seeking drugs.  We heard a lot of testimony

7   of people who admitted that they lied to Joel.  That they told

8   him incorrect things.  That they were just there trying to get

9   pills.  But they told him, they brought him medical records.

10  And for a person who doesn't have the kind of training that's

11  needed, it becomes easy to be deceived.  And certainly I think

12  that with that, Joel would simply tell you, and I think he did

13  when he testified, looking back in hindsight, there were a

14  whole lot of things he would do different.  There's a whole

15  lot of things he would like to change.  But, unfortunately, we

16  can't do that.

17        We heard the testimony of Dr. Farah.  Dr. Farah

18  diagnoses Joel, excuse me, as being bipolar.  He also

19  diagnoses him as having delusional beliefs.  Certainly the

20  Court could well attest to some bizarre behavior that

21  Dr. Smithers exhibited while in court.  Filing motions.  I

22  personally would watch him of a night as we would begin to try

23  to work on the next day's court cases and stuff, the bizarre

24  conduct in the way that he analyzed things.

25        And we do believe that Dr. Smithers is somebody who

1    needs treatment.  We do believe that it's something that he

2    does need potentially medication on.  He doesn't meet the

3    definition of insanity.  That's what Dr. Farah said.  He

4    doesn't -- he's not criminally insane by definition of the

5    court.  But I think it does go a long way to explaining some

6    of the decisions that Dr. Smithers made during his practice.

7         Mandatory minimum in this case is 20 years.  The

8    Court cannot go below that, and we acknowledge that.  Follow

9    the mandatory minimum, the Court sentence him to 20 years

10   would have him as a 56-year-old man coming out.  He'd be a

11   56-year-old man who is no longer in possession of a medical

12   license.  And what we saw was a situation -- and what the

13   Court has seen is that when Joel began to have problems was

14   when he had the medical license.  It led him to make the

15   decision in North Carolina.  Led him to make a lot of ill

16   decisions regarding this case.  And at 56 years old, if the

17   Court would go and follow the mandatory minimum, he will come

18   out at 56 with no social security, no real assets, extreme

19   debt, working just trying to earn minimal wage, trying to be

20   able to pay back.

21        And Joel's a hard worker.  While out on bond, while

22   out on release, he worked multiple jobs trying to help keep

23   his family afloat as they suffered through the loss of the

24   income.  And as he went through, he worked trimming trees, he

25   delivered food.  Things that from someone who was a doctor

USA v. Smithers                                          1:17-cr-00027-JPJ-1      65

1    would seem probably very demeaning.  But Joel was happy to do

2    it.  He often talked to me about wanting to become a plumber.

3    That's what his goal was, he wanted to become a plumber.  And

4    he felt like that would be a good profession for him once this

5    was over with.

6            But Joel Smithers without a medical license had a

7    criminal history score of zero.  Joel Smithers with a medical

8    license is facing 860 counts before this Court.  We certainly

9    believe that the forfeiture of the medical license, agreeing

10   not to practice certainly should be a major factor for the

11   Court to look at.

12           What was Joel like as an inmate?  He's began Bible

13   studies.  He's began talking and counseling with some other

14   inmates there.  And he says he wants to try to make a

15   difference.

16           While he was out on bond, there were no violations

17   of conditions that I know of that he ever failed to meet with

18   anyone.  I think he certainly showed up for court when he was

19   supposed to.  While facing as many charges as he did, he

20   always showed up for court.  He was here early.  He was here

21   ready to go.

22           I think that in facing the Court, we would expect

23   someone who is facing a life sentence to have some extensive

24   criminal history.  I've never seen one that had a score of

25   zero that had a recommendation of life.  There is no possible

```
 1      higher sentence that this Court could give him, whether this
 2      was involving bringing trainloads of methamphetamine across
 3      the border or whether it involved the murder of thousands of
 4      people, it could not be any higher than what Joel Smithers is
 5      facing.
 6              In looking at the 3553(a) factors, certainly we
 7      began to see that as the government has pointed out, the
 8      seriousness of the offense and to promote respect for the law,
 9      provide for just punishment, we certainly think a 20-year
10      sentence on a first-time offender clearly shows the
11      seriousness and the punishment offered by the Court.
12              What will Joel lose during those 20 years?  What
13      he's going to lose is he's going to lose being able to watch
14      his kids' birthday parties, go to graduations.  What he's
15      going to lose is the ability to see his kids potentially get
16      married and graduate from school.  And I certainly think that
17      dealing with all of that certainly sends a message by the
18      Court.
19              Factor number two is afford adequate deterrence to
20      the criminal conduct.  Joel really has no prior conduct.
21      Whether the Court imposes 20 years, or 30 years, or life, I
22      don't know that that serves as any more of a deterrent than
23      what the 20-year mandatory minimum would show.  I don't think
24      and don't know of any real data that shows that punishment of
25      one individual will cause other people not to offend.  And
```

```
 1    certainly to the public, I don't see that it does that.  I
 2    think it's important for the Court to balance the deterrent
 3    effect with one that has a low risk of recidivism.
 4           Third is protect the public.  Again, Joel Smithers
 5    before a medical license, criminal history score of zero.  We
 6    certainly believe that without a medical license, he poses no
 7    risk to the public.
 8           And then number four is needed medical care.
 9    Certainly think that Dr. Farah talks about the treatment that
10    could be.  And also the RDAP program to treat any alcoholism.
11           The Court's got to determine what punishment to set
12    for Joel Smithers.  But, again, he's already been separated
13    from his family.  He's lost the livelihood that he trained for
14    for many, many years, and he's lost his freedom for at least
15    the next 20 years.
16           What we're asking is the Court to consider placing
17    him at a local facility.  We're asking the Court to consider
18    that.  We requested in the thing Butner FCI, which allows --
19    allow his family to visit within a 50-mile drive.  And we're
20    asking once again for the RDAP.
21           The Court's already referenced letters that have
22    been filed on Joel's behalf.  And as I kind of conclude, I
23    want to talk about the real Joel Smithers.  And when I talk
24    about the real Joel Smithers, Joel's probably been as
25    difficult a client in court to deal with as I've probably had.
```

USA v. Smithers                                    1:17-cr-00027-JPJ-1        68

```
 1    But at the same point in time, when you see Joel Smithers and
 2    you get him outside of the pressure setting, and we would sit
 3    and eat dinner of a night and we'd discuss things, or we would
 4    sit around and talk at the end of the day kind of just going
 5    over things, you begin to see how he would talk about his
 6    family and he was proud of them.  You would see the
 7    vulnerability of him being scared for what his future held.
 8    You would certainly see the mood change drastically with him.
 9    And I certainly have seen the change with Joel since he's been
10    incarcerated.
11            To hear him talk about his volunteer work with the
12    International ALERT Academy as a volunteer where he served for
13    three years, working with RAM, working with Samaritans Purse
14    while in college, going on mission trips, and how that he had
15    renewed his relationship with his Lord and Savior.  Joel and I
16    would pray every day before we came to court.  And I think so
17    many times and as frustrated as I would get with him, I could
18    always look back and see sort of those times, too, when I saw
19    what I thought was a different side of Joel Smithers.  It's a
20    side that I don't think necessarily the Court got to see.
21            Joel is asking, I as his attorney am asking, and his
22    family is asking the Court to consider a varying or deviating
23    below the guidelines.  Give Dr. Joel Smithers an opportunity
24    to have a life.  Give him the opportunity to have some kind of
25    life afterwards, to be a part, reconnect with his kids.
```

 1    That's what we're asking for.

 2              Thank you, Your Honor.

 3              THE COURT:  Thank you, Mr. Williams.

 4              I'll ask Dr. Smithers to stand.

 5              Dr. Smithers, is there anything that you would like

 6    to say to me in mitigation of sentence before I impose your

 7    sentence?

 8              THE DEFENDANT:  Yes, Your Honor.

 9              THE COURT:  All right.  You may proceed.

10              THE DEFENDANT:  "The world and its desires are

11    passing away.  But he that does the will of God abides

12    forever."

13              I plead for mercy, Your Honor.  I plead for mercy

14    for the sake of my family, for the sake of my wife, Angel.

15    For the sake of Ethan Michael, for Seth David, for Aylianna

16    Marie, for Brielle Rose, for Paris Rebecca Nicole, for my wife

17    and kids.  For their sakes, I plead for mercy from the Court.

18              THE COURT:  Thank you, sir.

19              Ladies and gentlemen, we're going to take a brief

20    recess at this time while I consider this matter.  We'll be in

21    recess.

22         (Proceedings suspended at 12:44 p.m. and resumed at

23    1:00 p.m.)

24              THE COURT:  The following are the reasons for

25    imposition of the sentence in this case.  Under the law, in

USA v. Smithers                                    1:17-cr-00027-JPJ-1        70

1    order to impose an appropriate sentence I must consider the

2    nature and circumstances of the defendant's crimes, as well as

3    the history and characteristics of the defendant.  I must also

4    consider the purposes of sentencing that are laid down in the

5    law, including to reflect the seriousness of the crimes, to

6    promote respect for the law, and to provide just punishment,

7    to afford adequate deterrence to criminal conduct, to protect

8    the public from further crimes of the defendant, and to

9    provide the defendant with needed educational, medical care,

10   or other correctional treatment in the most effective manner.

11        These purposes in summary form are as follows:  In

12   other words, to punish the defendant, to seek to deter him and

13   others from future crimes, to incapacitate the defendant in

14   order to protect the public, and to rehabilitate the

15   defendant, if possible.

16        I'm required to impose a sentence that is sufficient

17   but not greater than necessary to comply with these purposes.

18        Finally, I am required to consider the advisory

19   sentencing range established in this case.  I've also, as

20   required, considered the arguments of the parties in regard to

21   the appropriate sentence.

22        The government argues that the serious nature of

23   Dr. Smithers's conduct justifies a sentence within the

24   guidelines; in other words, a life sentence.  I must add that

25   under the federal system there is no parole.  So a life

USA v. Smithers                                    1:17-cr-00027-JPJ-1       71

1    sentence means life in prison.

2             A number of arguments for leniencies are made on

3    behalf of the defendant.  It is contended that he simply made

4    mistakes, bad judgment, bad choices out of a failure to have

5    adequate medical training.  Of course, as we've heard,

6    Dr. Smithers was expelled from his medical residency for lying

7    to a police officer that he was on a medical emergency after

8    he had been pulled over and was suspected of drunk driving.

9             It is also argued, based on the defense expert's

10   opinions, that the defendant suffered and continues to suffer

11   from untreated bipolar disorder that contributed to his

12   criminal conduct.  And, thus, he should be released for mental

13   health treatment consisting of counseling and medication.

14            It's also argued that he poses no further danger to

15   others since he has lost his medical license.

16            And, finally, it is argued that his family needs his

17   presence and support.

18            As alluded to by government counsel, I've been a

19   judge of this court for over 20 years and, unfortunately, I've

20   presided over a number of cases with a physician charged with

21   overprescribing narcotics.  This is the worst case that I've

22   ever seen.

23            The defendant, as we've learned, began practicing

24   medicine around 2013.  And after a regional pain clinic in

25   West Virginia was closed leaving a number of patients without

1    a way to get pain pills, he opened an office called Priority

2    Urgent Care and which took many of these patients.

3            Complaints were received about this urgent care

4    clinic almost immediately.  And when authorities came to

5    investigate, as we've heard, Dr. Smithers refused to allow

6    them to enter the clinic.  They returned the next day with a

7    warrant only to find the clinic closed and deserted.

8    Investigators found patient records in a dumpster, and these

9    records showed that 50 percent of the patients in this

10   so-called urgent care clinic were being treated with pain

11   medication without the proper licensing.

12           Regretfully, Dr. Smithers did not learn from this

13   experience.  He moved to Martinsville, Virginia, and opened a

14   new office.  Within a few weeks, he again attracted the

15   attention of investigators, including by reason of the fact

16   that his parking lot was filled with patients' cars bearing

17   license plates from as far away as Ohio.

18           This was not a typical doctor's office.  There was

19   no trained medical staff and little or no medical equipment.

20   It was purely a pill mill in which virtually every patient got

21   a narcotic pain prescription on their first visit and which

22   virtually every later visit.

23           Interviews with patients by the investigators showed

24   that typically they would drive from two to eight hours from

25   their homes one way to Martinsville.  In order to get their

1   prescription, they often had to wait for hours for

2   Dr. Smithers who sometimes did not arrive until the afternoon.

3   They received little or no actual medical examinations and

4   then they got their prescription.

5          Their efforts to feed their addiction, however, was

6   not over because they found it hard to find legitimate

7   pharmacies to fill these highly suspicious prescriptions.

8   Dr. Smithers himself arranged with certain selected pharmacies

9   to fill these prescriptions.  One of them was as far away as

10  Jefferson, Indiana, 450 miles from Martinsville, a nearly

11  eight-hour drive.  So it would not be unusual for a patient to

12  drive many hours to Martinsville, wait for hours for their

13  prescription, then drive many more hours to get their

14  prescription filled, then drive in a different direction hours

15  back to their home.

16         Not only did the patient have to pay $300 in cash or

17  credit card for each prescription they received from

18  Dr. Smithers, but these selected pharmacies also required in

19  most cases cash payment.  Some as much as $1,000.

20         As much as anything, what the patients went through

21  shows the depth of their addictions.  They would go through

22  almost anything to get that prescription filled and obtained.

23         And Dr. Smithers, obviously, obliged.  No substance

24  abuse treatment or counseling, no real efforts to change their

25  drug-seeking behavior, no help from Dr. Smithers except to

1    drive them deeper into their terrible affliction for his own

2    profit.

3            Dr. Smithers even prescribed pills to people he did

4    not see.  Some of these, as we've heard, were sent to third

5    parties to distribute.  In one case he met a patient in a

6    Starbucks parking lot.  She gave him the required $300 and he

7    gave her his prescription.

8            At some point Dr. Smithers hooked up with an

9    accomplice named Williams.  And we've seen the text messages

10   between the two of them.  Mr. Williams would help find and

11   transport new patients to Dr. Smithers for a fee.  These text

12   messages which were introduced at trial, and which we've seen

13   today, show the true basis for Dr. Smithers's criminal

14   conduct; to make money.  They also show his consciousness of

15   guilt; that he knew that he was breaking the law.

16           As you will recall, Mr. Williams told him that if he

17   continued on this course, he could make a million bucks.  And

18   he almost reached that goal.  Again, as we've heard, over a

19   20-month period he deposited approximately $680,000 in a

20   single bank account.  Over $57,000 in cash was seized from his

21   home and office.  He even bought a Cadillac Escalade for his

22   wife.

23           In the two years, about, that he was engaged in this

24   conduct, he prescribed approximately a half a million pills or

25   dosage units.  A half a million.

```
 1              As we've heard in such a sad situation, on

 2    February 20, 2017, Dr. Smithers prescribed more pain pills to

 3    one of his pill-addicted patients.  She filled the

 4    prescriptions on the next day, February 21st.  And as we've

 5    heard from her mother, she passed away the next day,

 6    February 22nd, from an overdose.

 7              The government's expert at trial testified and the

 8    jury specifically found in its verdict that she would not have

 9    died had it not been for the pain pills prescribed by

10    Dr. Smithers.

11              Opioid addiction is a national crisis and has been

12    for some years.  The National Center For Disease Control and

13    Prevention reports that more than 300,000 people have died

14    from opioid overdoses in the last 20 years.  Dr. Smithers

15    certainly contributed to this death toll and to this crisis in

16    the two years or so that he distributed prescriptions.

17              It isn't really correct to label these people who

18    came to Dr. Smithers for drugs as patients.  They were really

19    victims, victims of his criminal conduct.

20              Now the defense medical expert has testified that

21    Dr. Smithers has a mental defect; namely, bipolar disorder

22    which impaired his judgment.  But he is and was clearly

23    competent.  Even accepting that he used poor judgment and made

24    poor choices, he knew what he was doing.  He knew that it was

25    unlawful and that he was profiting from the misery of these
```

1    victims who came to him for drugs.

2          I do not find that his mental issues mitigate his

3    punishment.

4          In addition, while it is correct that Dr. Smithers

5    was untrained in pain management, rather than being an excuse

6    for his conduct, that is an aggravation for it.  Dr. Smithers

7    has a high IQ.  We've heard that today, and I believe it.

8    He's a smart person.  He knew what he was doing.

9          Unfortunately, I don't believe that Dr. Smithers has

10   any real insight into his conduct or remorse for his crime.

11   He's certainly not expressed any today or any other time.  In

12   his testimony at trial he said, well, I would have done some

13   things differently.  But he's never owned up to this terrible,

14   terrible conduct which hurt so many people.

15         As his defense expert said, he continues to believe

16   that if he only gets the right lawyer or the right expert, he

17   will be vindicated.  That everything he did was all right.  He

18   was just helping these people.

19         Now, while it's true that Dr. Smithers likely will

20   not be able in the future to hurt patients since his medical

21   license has been taken away, I still see that lengthy

22   incarceration is important in this case.  This was a serious

23   crime.  And hopefully a lengthy sentence will deter others

24   inclined to make money by prescribing dangerous drugs.  In

25   other words, it will send a message.  Moreover, with his

1    existing mental disorder, prison will allow him to receive

2    long-term treatment.

3                I regret that Dr. Smithers will be separated from

4    his family.  They are innocent.  But they are just a few of

5    his victims.

6                I will vary below the advisory guideline range.  I

7    do not think that life in prison without the possibility of

8    parole is appropriate and is greater than necessary for the

9    factors that I'm required to consider.  However, I will

10   sentence him to a lengthy prison term.

11               For the reasons that I've stated, it is the judgment

12   of the Court that the defendant, Joel Adam Smithers, is hereby

13   committed to the custody of the Bureau of Prisons to be

14   imprisoned for a total term of 480 months; that is, 40 years.

15   This term consists of 240 months on each of Counts 2

16   through 100, Counts 102 through 297, and Counts 300

17   through 862, to run concurrently.  And a term of 480 months on

18   Counts 298 and 299, to run concurrently.

19               I will recommend to the Bureau of Prisons that the

20   defendant receive appropriate mental health treatment while

21   incarcerated and that he participate in a residential drug

22   treatment program.  I will recommend that he be designated to

23   a facility closest to his home in order to facilitate family

24   visits.

25               Upon release from imprisonment, the defendant shall

USA v. Smithers                                    1:17-cr-00027-JPJ-1      78

 1    be placed on supervised release for a term of three years.

 2    This term consists of three years on each count to run

 3    concurrently.

 4          While on supervision, he must comply with the

 5    following mandatory conditions:  He must not commit another

 6    federal, state or local crime.  He must not unlawfully possess

 7    a controlled substance.  He must refrain from any unlawful use

 8    of a controlled substance and must submit to one drug test

 9    within 15 days of release and at least two periodic drug tests

10    thereafter.  He must cooperate in the collection of DNA as

11    directed by the probation officer.  He must comply with the

12    standard conditions of supervision that have been adopted by

13    the court, as well as the following special conditions.

14          He must pay any monetary penalty imposed.  Following

15    his release, the Court will evaluate his status and determine

16    whether further drug rehabilitation is necessary and

17    appropriate.  If so, he must participate in a program that is

18    designated by the court, upon consultation with the probation

19    officer, until he has satisfied the requirements of the

20    program.

21          He must reside in a residence free of firearms,

22    ammunition, destructive devices, and dangerous weapons.

23          He must not purchase, possess, use or administer any

24    alcohol or frequent any businesses whose primary function it

25    is to serve alcoholic beverages.

USA v. Smithers                                    1:17-cr-00027-JPJ-1       79

1          He must submit to warrantless search and seizure of

2    person or property as directed by the probation officer or

3    other law enforcement officer whenever such officer has

4    reasonable suspicion that the defendant is engaged in criminal

5    activity.

6          He must pay to the United States a special

7    assessment, which is mandatory, of $86,000, which is due and

8    payable immediately.

9          It is ordered that he forfeit to the United States

10   his interest in the property listed in the preliminary order

11   of forfeiture filed in this case, which consists of a money

12   judgment and his medical license.

13         I find under these circumstances he does not have

14   the ability to pay a fine and will waive any fine in this

15   case.

16         I advise the defendant of his right to appeal.  A

17   notice of appeal must be filed within 14 days of the entry of

18   judgment or within 14 days of notice of appeal by the

19   government.  If requested, the clerk will prepare and file a

20   notice of appeal on behalf of the defendant.

21         And I also advise the defendant of a right of a

22   person who is unable to pay the cost to apply for leave to

23   appeal without prepayment of such cost.

24         And, Mr. Williams, I ask you and direct you to

25   consult with your client.  And if he directs you, file a

```
 1    notice of appeal on his behalf within the appropriate time.
 2           And as I have indicated, if you do not desire to
 3    represent him on that appeal, you should advise the Court of
 4    Appeals.
 5           Are there any further matters that the Court needs
 6    to resolve in this case?
 7           MR. WILLIAMS:  Your Honor, may -- we had requested
 8    the RDAP program.  Has the Court -- I don't know that I heard
 9    that.
10           THE COURT:  I did say that.
11           MR. WILLIAMS:  I'm sorry.
12           THE COURT:  The residential drug treatment program.
13           All right.  If there's nothing further, we will
14    adjourn court in a moment.
15           We have a trial, a jury waiting.  So counsel in that
16    case needs to be prepared to begin very shortly.
17           All right.  We'll be in recess.
18        (Proceedings concluded at 1:23 p.m.)
19
20
21
22
23
24
25
```

```
 1                             INDEX

 2    PLAINTIFF'S WITNESSES:                              PAGE

 3    PATRICK LONG
            DIRECT EXAMINATION BY MR. RAMSEYER              5
 4          CROSS-EXAMINATION BY MR. WILLIAMS              14
            REDIRECT EXAMINATION BY MR. RAMSEYER           14
 5

 6    DEFENSE WITNESSES:                                  PAGE

 7    BRIAN ANDREW FARAH
            DIRECT EXAMINATION BY MR. WILLIAMS            16
 8          CROSS-EXAMINATION BY MR. RAMSEYER             30

 9

10    EXHIBITS                            MARKED   RECEIVED

11    ON BEHALF OF THE PLAINTIFF:
      1-14 -   Thumb drive with audio clips     11       11
12

13

14                          -o0o-

15

16

17

18

19

20

21

22

23

24

25
```

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

1          **REPORTER'S CERTIFICATE**

2

3          I, DONNA J. PRATHER, do hereby certify that the

4    above and foregoing, consisting of the preceding 81 pages,

5    constitutes a true and accurate transcript of my stenographic

6    notes and is a full, true and complete transcript of the

7    proceedings to the best of my ability.

8          Dated this 20th day of December, 2019.

9

10          DONNA J. PRATHER, RPR, CRR, CBC, CCP

11          Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25