**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **Case No.: 1:17-CR-00027** |
| | ) | |
| **JOEL ADAMS SMITHERS** | ) | |

# GOVERNMENT'S SENTENCING MEMORANDUM REGARDING JOEL ADAMS SMITHERS

The United States of America, by counsel, having considered the facts and circumstances of this case, and the sentencing factors set forth in 18 U.S.C. § 3553(a), respectfully recommends the Court sentence Joel Adams Smithers to the same term of imprisonment previously imposed—40 years—followed by three years of supervised release.[1]

## PROCEDURAL HISTORY

On October 2, 2019, this Court sentenced Smithers to a total term of imprisonment of 40 years after he was convicted on 860 counts of the Second Superseding Indictment. Smithers appealed, and the Fourth Circuit ultimately vacated Smithers' convictions and remanded for a new trial based on the Supreme Court's newly issued decision in *Ruan v.*

---

[1] We note that the Court would be justified in imposing a sentence of imprisonment greater than 40 years. There is a rebuttable presumption of vindictiveness whenever a judge imposes a more severe sentence upon a defendant after a successful appeal. *See North Carolina v. Pearce*, 395 U.S. 711, 726 (1969), *distinguished by Alabama v. Smith*, 490 U.S. 794 (1989); *United States v. Singletary*, 75 F.4th 416, 424 (4th Cir. 2023). However, that presumption is "not particularly onerous to rebut: The district court's citation to objective, post-sentencing developments in support of its increased sentence will generally satisfy [an appellate court] that vindictiveness played no role." *Singletary*, 75 F.4th at 427. In the instant case, the Court could rely on Smithers' perjurious conduct at the retrial as an objective, post-sentencing development to support an increased sentence.

*United States*. *See United States v. Smithers*, 92 F.4th 237, 240 (4th Cir. 2024). A jury subsequently reconvicted Smithers on December 21, 2024, on 467 counts of the Second Superseding Indictment—which included Count Two, charging Smithers with maintaining a place for the purpose of unlawful distribution, and 466 unlawful distribution counts—following a three-week trial. Sentencing is presently scheduled for July 8, 2025.

## LEGAL STANDARD

In sentencing a defendant, district courts must follow a four-step process: (1) properly calculate the advisory sentencing guideline range; (2) determine whether a sentence within that range and within statutory limits serves the factors set forth in 18 U.S.C. § 3553(a) and, if it does not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate on the record the reasons for selecting a particular sentence and, if applicable, explain why a sentence outside of the advisory sentencing guideline range better serves the relevant sentencing purposes set forth in § 3553(a). *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006); *see also United States v. Booker*, 543 U.S. 220, 260–65 (2005); 18 U.S.C. § 3553(a).

## APPLICABLE GUIDELINE RANGE

Smithers' base offense level, for an offense involving between 3,000 and 10,000 kilograms of converted drug weight, is 32.[2] ECF No. 576 ¶ 99 (citing USSG § 2D1.1(a)(5), (c)(4)). A number of enhancements increase Smithers' adjusted offense level to 44: (1) a two-level increase because Smithers maintained a place for the purpose of unlawfully

[2] The drug weight calculation only includes the drugs in the counts of which Smithers was convicted. ECF No. 576 at 46. It does not include the drugs from acquitted counts or relevant conduct.

distributing controlled substances, *see id.* ¶ 100 (citing USSG § 2D1.1(b)(12)); (2) a four-level increase because Smithers was the leader or organizer of extensive criminal conduct involving at least five participants, *see id.* ¶ 104 (citing USSG § 3B1.1(a)); (3) a two-level increase because Smithers received an enhancement under § 3B1.1(a) and (i) knew that the individuals to whom he unlawfully distributed controlled substances were unusually vulnerable, and (ii) committed the offense as part of a pattern of criminal conduct engaged in as a livelihood, *see id.* ¶ 101 (citing USSG § 2D1.1(b)(16)(B), (b)(16)(E)); (4) a two-level increase because Smithers abused a position of trust and used a special skill that significantly facilitated the commission of the offense, *see id.* ¶ 103 (citing USSG § 3B1.3); and (5) a two-level increase for obstructing justice, *see id.* ¶ 105 (citing USSG § 3C1.1).

The Sentencing Guidelines Manual considers this to be a "rare case" as the adjusted offense level exceeds 43; as such, by application of the guidelines, Smithers' total offense level is considered to be a 43. *See id.* ¶ 109 (citing USSG Chapter 5, Part A, app. n. 2).

Smithers' total offense level, combined with his criminal history category of I, results in a recommended guideline sentence of life imprisonment.[3] *See id.* ¶ 142.

**STATUTORY LIMITATIONS**

Count Two and all 466 distribution counts for which Smithers was convicted each carry a maximum term of imprisonment of 20 years. 21 U.S.C. §§ 856, 841(b)(1)(C). The operative word is "each." The Court may impose consecutive sentences on each count of conviction, resulting in a total statutory maximum of 9,340 years of imprisonment, in order

[3] Technically, the guideline range of imprisonment is 9,340 years. *See* USSG § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.")

to achieve the total punishment appropriate here. *United States v. Chase*, 296 F.3d 247, 250 (4th Cir. 2002) (holding that grouping of offenses under the Sentencing Guidelines Manual does not prohibit the imposition of consecutive sentences under USSG § 5G1.2); *id.* at 253 ("A rule that favors more culpable criminals over their less culpable confederates does not promote justice."); USSG § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").

Smithers faces a fine of up to $500,000 on Count Two and $1,000,000 on each of the distribution convictions. ECF No. 576 ¶ 151. He further faces a period of supervised release of not more than three years on Count Two and at least three years on the distribution convictions. *Id.* ¶ 144. Finally, there is a mandatory special assessment of $100 for each count of conviction. *Id.* ¶ 152.

**APPLICATION OF § 3553(a) FACTORS**

Considering the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends that the Court sentence Smithers to a total term of imprisonment of 40 years, or 480 months.

The Court is thoroughly familiar with the nature of this offense, having presided over both of Smithers' trials. The Government does not recount all of the facts describing Smithers' vast, pervasive conduct, but notes some of the key facts supporting the

recommended sentence of 40 years and those supporting the guideline enhancements.[4]

From 2015 to 2017, in Martinsville, Virginia, Smithers engineered, organized, and managed a scheme to distribute Schedule II controlled substances to patients he knew were destitute. *See, e.g.*, ECF No. 540 at 125. Testimony of witnesses further described Smithers' patients as individuals who were obviously addicts. But that was Smithers' targeted demographic, and he utilized mules, recruiters, and distributors—such as Darryl Williams, Lora Kicklighter, Rick Jessie, and Rebecca Jessie—as well as an army of recommended pharmacists—including Assad Nasr at Kentuckiana Pharmacy and Mike Craddock of Mike's Best Practices—to reach his end-users. Smithers claims he was acting as a doctor exercising medical judgment, *see, e.g.*, ECF No. 541 at 70; in reality, Smithers was a drug dealer, controlling both supply and demand.

Rather than take responsibility for his actions, or show any sign of remorse, Smithers claimed at his retrial that everything he did was based on an exercise of his judgment and that nothing was unusual. This includes meeting patients at Subway or Starbucks and dealing them prescriptions in exchange for $300, *see* ECF No. 540 at 199; writing prescriptions in a "patient's" name who he never met or treated and delivering them to another patient, *see id.* at 92–97; accepting payment from patients who had been discharged for other patients' prescriptions, *see id.* at 135–36, 171–73; accepting payment from one

[4] As provided in its objections, the Government respectfully disagrees with the Probation Office's conclusion that a sentence below the guideline range may be appropriate due to Smithers' physical health condition. ECF No. 566. Smithers' apparent sole complaint with his care while incarcerated is that he is not being prescribed narcotics. ECF No. 576 ¶ 123. However, he has presented no evidence, and the PSR reflects none, that the BOP cannot appropriately manage Smithers' alleged back pain.

patient for a host of other patients, *see* Trial Ex. DWi-1000 at 271, 281; and repeatedly sending bulk prescriptions written out in numerous individuals' names to just one individual, *see, e.g.*, *id.* at 40. His testimony at retrial that he deployed due care based on experience, education, and training not only starkly contrasts with the evidence, but also his claims at his original trial and sentencing that he exercised bad judgment and made mistakes as a way to justify and mitigate his conduct. *Compare* ECF No. 540 at 27–29, *with* ECF No. 358-2 at 186, 198, 214, 483.

Smithers' obstructive conduct at retrial further establishes Smithers' lack of remorse and the danger he poses to the community if not otherwise deterred. The obstruction enhancement under USSG § 3C1.1 applies "when a defendant gives 'false [trial] testimony concerning a material matter with the willful intent to provide false [trial] testimony.'" *United States v. Becker*, No. 22-4693, 2024 WL 177703, at 1* (4th Cir. Jan. 17, 2024) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). The PSR reflects some of Smithers' false, material testimony. *See* ECF No. 576 ¶¶ 84, 89. But, his two-day testimony at trial is replete with willful falsehoods:

- Smithers testified "No," when asked the question "Did you think it was unusual that Darryl Williams might bring the balance of a patient's fee on some other day when the patient wasn't there?" ECF No. 540 at 105–06. Smithers testified "Correct," when asked "People paying for other people's office visits, not unusual, correct?" *Id.* at 206. Contrast his testimony with the texts he sent to Darryl Williams, "[I]t looks shady as fuck when 4 or 5 people come through and say someone else is paying for them," and "My counselor is ultra suspicious . . . [as to] [y]ou paying for everything." Trial Ex. DWi-1000 at 271, 281.
- Smithers testified that when he moved his practice to Virginia, he "wanted to eventually have, you know, a quieter practice and practice integrative medicine." ECF No. 540 at 19. He explained, "The focus of my practice was initially to treat the chronic pain patients that came to me. I was hopeful that once they were traveling great distances, that this was more of a bridge to help them find a referral

more local to them as things stabilized in their states with more people able to practice pain management there or to get the ability to practice pain management there." *Id.* at 40. In fact, the evidence at trial established that Smithers encouraged his patients to follow him, and many of them, like Lora Kicklighter, Darryl Williams, and the Jessies, did just that. *See, e.g.*, Trial Ex. RiJ1000 at 2–6; *see also* Trial Ex. 262 at 11, 15.

- As to mailing patients' prescriptions to them, a friend, or a family member, Smithers testified, "On the rare occasions that happened, it was for extenuating circumstances, and I was not aware of any issues with that." ECF No. 540 at 91. The trial evidence established that Smithers routinely mailed Darryl Williams multiple patients' prescriptions, mailed prescriptions to the Jessie's, and mailed prescriptions to patients outside of these crews. *See, e.g.*, Trial Ex. DWi-1000 at 40; Trial Ex. RiJ1000 at 32–42; Trial Ex. CC1000 at 1–4; Trial Ex. RB1000 at 1, 18. Darryl Williams confirmed he would "burn the paper work" for the wire payments he sent Smithers for these prescriptions. Trial Ex. DWi-1000 at 39.
- Smithers testified that he had repeated phone consultations with Deborah Reynolds before issuing prescriptions in her name. ECF No. 540 at 98, 257. However, Smithers testified at his first trial as to only one alleged phone conversation he had with Ms. Reynolds, which was first elicited on direct examination. ECF No. 358-2 at 185–06, 198, 208.
- With respect to his relationship with, and referrals from, Mark Radcliffe, Smithers testified, "I only felt comfortable seeing a certain number of patients a day and was not wanting to see the volume of patients." ECF No. 541 at 22. But the evidence established that Smithers was repeatedly taking referrals from Mark Radcliffe and doctors from closed clinics, and he was seeing, at times, approximately 50 patients per day. Trial Ex. 262 at 26, 32, 34–35, 41–42; Trial Ex. 263 at 1.
- Smithers testified during his first day of testimony on retrial that he was the only person working at his clinic from the end of 2015 through the spring of 2016, *i.e.*, the time frame he was dismissed from the Virginia Health Practitioners' Monitoring Program ("HPMP"). ECF No. 540 at 241–42; Trial Ex. 282 at 4. After the evening recess, he testified the next day that Wendell Wilson was at the clinic some days during that time period. ECF No. 541 at 24, 65, 84–85. But the evidence showed that Smithers deceived Mark Radcliffe into believing he was closed during the time frame that Smithers was dismissed from HPMP, and as an agent of Mark Radcliffe, Wendell Wilson was not working at Smithers' clinic from at least January 2016 through May 2016. *Id.* at 30–31, 65–66; Trial Ex. 269 at 6–10. Wilson's absence is evinced in the patient files themselves; for example, Wilson (and Smithers) did not review Darryl Williams's drug screen collected on December 21, 2015, until May 2016. Trial Ex. DWi at 42–43. Smithers claimed that this failed drug test—which was approximately five months old—was the basis for his dismissal of Williams from the practice in May 2016. ECF No. 540 at 135–36. There are no drug screens between December 2015 and May 2016 in

Williams's patient file—when Wilson, Smithers' compliance auditor, was absent from the practice.

- Smithers testified that he mailed prescriptions in January and February 2016 "due to travel issues for patients." ECF No. 540 at 245. The evidence at trial established, however, that Smithers had been dismissed from HPMP in November/December 2015, and he informed his patients that his office was closed during this time and that he would be mailing their prescriptions. *See, e.g.*, Trial Ex. DWi-1000 at 303–04.
- Smithers later claimed he was mailing prescriptions during the December 2015 to May 2016 time frame because his daughter had just been born. ECF No. 541 at 60. The Government then confronted Smithers with the truth—that his daughter had not been born in January 2016, as he testified, but instead was born in January 2017, several months after the conclusion of the time period at issue. *See id.* at 60–61; Trial Ex. 262 at 41.

Perhaps the most brazen perjury in the second trial was Smithers' repeated testimony that he was providing "concierge services" and "continuity of care." This was a new fabrication, likely fueled by Smithers' learning of Dr. Murphy's practice model. *See* ECF No. 424 at 28, 34, 42. Throughout his lengthy testimony at the first trial, Smithers never mentioned "concierge" or "continuity of care." In the 2024 trial, he mentioned "concierge" or "continuity of care" nearly 20 times. Contrast Smithers' testimony in 2024 to his testimony in 2019:

- 2024: "I had more of a concierge practice where the patients had direct access to me 24 hours a day, 7 days week. So even though it's referred to in some of the text messages as an office visit or a fee, it's really an ongoing continuity of care model that provides the patient with direct access to their physician, which is another reason why I controlled how many patients I had to the best of my ability." ECF No. 540 at 91–92.
- 2024: "It was continuity of care. Concierge medicine gave them 24 hours of a day seven days a week access to me through the phone, through telehealth visits. So that was a fee that was charged regardless of what else intervened in the process." ECF No. 540 at 197.
- 2024: *Question* – "But you went ahead and started practicing anyway?" *Answer* – "I maintained continuity of care for my patients. This seemed like an additional

bureaucratic step at the time." ECF No. 541 at 35.

- 2024: *Question* – "'Donated' means you pay me $3,850, right?" *Answer* – "Well, that's what the office visit fee was, the continuity of care fee was." ECF No. 541 at 50.

- 2024: *Question* – "What was the purpose of having a pad of presigned prescriptions?" *Answer* – "Well, that was to allow for changes in care or ordering tests that needed to be done if there was an urgent need for the patient. There were times where I was out of the office, and that allowed for continuity of care without having to mail a prescription and go through that process." ECF No. 540 at 199–200.

- 2019: "I'm not sure. She may have paid over the phone. I'm not sure exactly how her office visit fee was paid for . . . at any given time." ECF No. 358-2 at 208.

- 2019: *Question* – "Well, you know that . . . the text messages we've been showing in court . . . there was the one that you had the 18 different initials that you sent to Darryl Williams and you say, '18 x 3 = 54.' That means those 18 people you wrote prescriptions for, '18 x 3' is the $300 per visit, and '54' is $5400. That's what you told me; correct?" *Answer* – "That was a one-time issue that did occur." ECF No. 358-2 at 208–09.

The above are just some of the many deceits by Smithers at retrial, not a full recitation. But it does establish Smithers' obstructive conduct during his second trial, in which he sought to mislead the jury as to his unlawful distribution activity and the intent behind it.

Smithers charged $450 to new patients and $300 for each follow-up set of prescriptions. From just August 2015 to March 2017, Smithers deposited over $650,000 into one bank account. Trial Ex. 51. Law enforcement also seized over $50,000 in cash from Smithers' clinic, vehicle, and residence in March 2017. As the Court heard throughout the retrial, Smithers' patients—or his victims, as the Court appropriately characterized them at Smithers' original sentencing, ECF No. 358-2 at 487—were especially vulnerable. In addition, Smithers' conduct, which formed his primary occupation, occurred over a substantial period of time—approximately two years—and the income he derived from the

operation of his Martinsville practice more than exceeded 2,000 times the then-existing hourly, federal minimum wage.[5]

Smithers and the Government agree on at least one thing—Smithers possessed a special skill and utilized a position of trust when he became a licensed medical doctor and opened and operated a clinic in Southwest Virginia. Unfortunately, Smithers abused those skills and that trust when he turned his medical license into a blanket authorization to deal deadly drugs to impoverished patients. As this Court acknowledged at Smithers' first sentencing, "I've been a judge of this court for over 20 years and, unfortunately, I've presided over a number of cases with a physician charged with overprescribing narcotics. This is the worst case that I've ever seen." ECF No. 358-2 at 483.

The Government recognizes that Smithers was not convicted on retrial of the two counts alleging that his unlawful distribution resulted in death. However, Smithers was reconvicted on 467 counts, including charges involving unlawful distributions to Heather Hartshorn, and Smithers' illegitimate and criminal conduct from 2015 to 2017 remains unchanged. *See* ECF No. 520 at 8. The Government submits Smithers' case remains one of the worst of its kind to appear before the Court. In addition, before the Court at this resentencing is Smithers' perjurious retrial testimony.

From time to time, a convicted defendant appears before the Court many years later

---

5 The federal minimum wage in 2016 was $7.25/hour. *See* https://www.dol.gov/agencies/whd/state/minimum-wage/history; *see also United States v. Jones*, 56 F.4th 455, 504 (7th Cir. 2022) ("The government satisfies [this prong] if it can show that the defendant earned more than 2,000 times the then-current federal minimum hourly wage. In this case, the government needed to show only that [the defendant] earned more than $14,500 in a year from drug dealing.").

for a resentencing hearing based on a change in the law. Some of those defendants, at resentencing, evince a new self-awareness of the wrongfulness of their actions. They have used the intervening years to evaluate their conduct, stop blaming others, and take responsibility for their actions. Smithers has done none of these things since his original sentencing nearly six years ago. If anything, his testimony confirms that he is not and will not be reformed.

With many white-collar defendants, general deterrence is more important than specific deterrence. Smithers represents a different kind of white-collar defendant. His history and testimony make clear that when Smithers is released from custody, he will reoffend. Smithers has in fact shown that he will. When Smithers was first released on bond in August 2017, the Magistrate Judge prohibited Smithers from prescribing any controlled substances while on release. ECF No. 11 at 2. He next appeared before the Court just over two weeks later for a preliminary hearing, and he asked the Court to modify that condition. ECF No. 358 at 89–91; ECF No. 17. But-for the Court denying that request, ECF No. 18, Smithers would have continued his prescribing practices despite facing federal drug charges. Similarly, despite search warrants being executed at his practice and residence in March 2017, Smithers continued prescribing Schedule II controlled substances until he was arrested in August 2017.

While general deterrence will be served by Smithers receiving a lengthy sentence, the need for specific deterrence is very high in this case. The safety of the public demands a sentence that prevents Joel Smithers from reoffending and continuing to harm the community.

All of the § 3553(a) factors continue to support a total sentence of 40 years.

## SUPERVISED RELEASE

The government recommends that the Court impose a period of three years of supervised release, which would be consistent with the Sentencing Guidelines. ECF No. 576 ¶ 146.

## CONCLUSION

For these reasons, the United States respectfully recommends the Court impose a custody sentence of 40 years—which is below the guideline range of imprisonment—followed by three years of supervised release, which is sufficient but not greater than necessary to address the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney

/s/ Corey Hall
Assistant United States Attorney
Virginia Bar No. 94782
U.S. Attorney's Office
180 West Main Street, Suite B19
Abingdon, Virginia 24210
276-628-4161
276-628-7399 (fax)
E-Mail:USAVAW.ECFAbingdon@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a copy to the counsel of record.

/s/ Corey Hall
Assistant United States Attorney